1         IN THE UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF ARKANSAS

2

        Case No.   4:19-CR-00031-DPM-1

3

4  UNITED STATES OF AMERICA

5            GOVERNMENT,

6     vs.

7  GILBERT R. BAKER,
                    Little Rock, Arkansas

8           DEFENDANT.    July 26, 2021, 12:45 p.m.

9

        **VOLUME 2B - PAGES 104 - 239**
10      **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
     BEFORE THE HONORABLE D. PRICE MARSHALL, JR.,
11      UNITED STATES DISTRICT JUDGE and a jury

12

APPEARANCES:
13

On Behalf of the Government:
14

15    MS. JULIE E. PETERS, ESQ., AUSA
     MR. PATRICK C. HARRIS, ESQ, AUSA
16    United States Attorney's Office
      Eastern District of Arkansas
      425 West Capitol Avenue, Suite 500
17     Post Office Box 1229
     Little Rock, Arkansas  72203-1229
18

19  On Behalf of the Defendant:

20    MR. J. BLAKE HENDRIX, ESQ.,
     MS. MARGARET D. DEPPER, ESQ.
21     Fuqua Campbell, P.A.
      Riviera Tower
22     3700 Cantrell Road, Suite 205
     Little Rock, Arkansas  72202
23

24    Proceedings reported by machine stenography and displayed
  in realtime; transcript prepared utilizing computer-aided
25  transcription.

     Kathleen E. Maloney, RMR, FCRR, U.S. Court Reporter
    kathleen_maloney@ared.uscourts.gov - 501-604-5115

1    A F T E R N O O N   S E S S I O N

2         (Proceedings continued at 12:43 p.m.)

3         THE COURT:  Thank you.  Y'all can be seated or stand

4    as you choose.

5         Mr. Hendrix, I'm concerned about all the law in that brief.

6    And so I'm going to sustain Ms. Peters's objection.  On the

7    other hand, I think I understand at least part of the defense

8    theory, and I don't want to interfere with that.  I think you

9    have got enough in other papers and from the witnesses, but

10   sustained.  I might reconsider as we move along.  But, if so, I

11   think in fairness, we need dueling briefs, and then I know

12   that's too much so...

13        MR. HENDRIX:  I understand, Your Honor.

14        THE COURT:  Good.  The Defendant's Exhibit 2 will

15   become Court's Exhibit 1, a proffer, so that our record is

16   complete and the Court's exhibits don't go to the jury.  It's

17   where we put everything else so the Court of Appeals will know

18   what happened in the case down the line.

19        MR. HENDRIX:  Thank you, judge.

20        THE COURT:  Of course.  I think we are waiting on our

21   jury.  I don't have word that they are in the hall yet.  I

22   assume Officer Pike will come in when they are.

23        Is -- Mr. Hendrix, is there anything else you wanted to

24   cover?

25        MR. HENDRIX:  No, sir.  Thank you, Your Honor.

```
 1              THE COURT:  Ms. Peters?

 2              MS. PETERS:  No, Your Honor.  Wait.  Sorry.

 3              MR. HARRIS:  Our next witness is Linda Lee Flanagin.

 4    She's not here yet from lunch.  If she's not, we'll call

 5    somebody else.  I just wanted you to know if the other person we

 6    call is short and you are wondering why we didn't call them

 7    before, that's why.

 8              THE COURT:  Got it.  Thank you, Mr. Harris.  Officer

 9    Pike, do we have our jury?

10              COURT SECURITY OFFICER:  Yes, sir.

11              THE COURT:  Very good.  All rise, please.

12              COURT SECURITY OFFICER:  Ladies and gentlemen, the

13    jury.

14        (Jury present.)

15              THE COURT:  Everyone can be seated.  Mr. Harris?

16              MR. HARRIS:  Yes, Your Honor.  Can I just check the

17    witness?

18              THE COURT:  You may.

19              MS. PETERS:  The United States calls Connie May.

20              THE COURT:  Ms. May, will you come forward please?

21    And if you'll pause up here, I'll give you the oath.

22              CONNIE MAY, GOVERNMENT'S WITNESS, DULY SWORN

23              THE COURT:  Very good.  Be seated.  You can grab the

24    base of that microphone and pull it all the way down at the

25    base.  Pull it.  You are not going to hurt it.  Take your mask
```

1    down.  And use your outside voice please, ma'am.

2        Ms. Peters.

3            MS. PETERS:  Thank you, Your Honor.

4                        DIRECT EXAMINATION

5    BY MS. PETERS:

6    Q.   Would you please state your name?

7    A.   Connie May.

8    Q.   Miss May, I understand that you are retired?

9    A.   I am.

10   Q.   What are you retired from?

11   A.   I'm retired.  I was assistant in the president's office at

12   the University of Central Arkansas.

13   Q.   I'm going to ask you to speak up just a little bit.

14   A.   Okay.

15   Q.   So you were an assistant in the president's office at --

16   A.   Yes.

17   Q.   When was the last day that you worked at UCA?

18   A.   December 31, 2019.

19   Q.   When did you start working at UCA?

20   A.   In August of 2005.

21   Q.   And how long were you working in the president's office?

22   A.   Since 2011 or spring of 2011.

23   Q.   And do you know Gilbert Baker?

24   A.   Yes, I do.

25   Q.   How did you meet Gilbert Baker?

1    A.    I met him when he came -- I actually met him earlier at

2    a -- just briefly, just hello, at a function.  Probably in 2006

3    or '07.  But I actually met him and became his assistant when he

4    came to the president's office.

5    Q.    Okay.  And so he came to the president's office at UCA?

6    A.    Yes.

7    Q.    Okay.  What did he do at UCA?

8    A.    He assisted the president, and he also oversaw the

9    communications outreach, advancement, that type of thing.

10   Q.    Did he also teach?

11   A.    Not that I recall while he was in our office.

12   Q.    Okay.

13   A.    I don't think so.

14   Q.    At some point, had he taught in the music department at

15   UCA?

16   A.    I think he had.

17   Q.    Okay.  And what did you call Mr. Baker when you all were

18   working together?

19   A.    Gilbert.

20   Q.    Now, you were called to do jury duty in May of 2013 in

21   Faulkner County; is that right?

22   A.    That's correct.

23   Q.    And you were selected as a juror in Martha Bull versus the

24   Greenbrier Nursing Home --

25   A.    Yes.

1   Q.   Do you remember that the presiding judge was Judge Maggio?

2   A.   Yes, that's correct.

3   Q.   And did you know Judge Maggio?

4   A.   I did.

5   Q.   And how did you know Judge Maggio?

6   A.   My husband gave his daughter golf lessons.

7   Q.   Would you consider yourself friends?

8   A.   Well, friendly.  Yes.  We were -- we were --

9   Q.   Acquaintances?

10  A.   Acquaintances.  My husband knew him better than I did.

11  Q.   Did you take your jury service on the Martha Bull case

12  seriously?

13  A.   Yes, absolutely.

14  Q.   And did you listen to the testimony?

15  A.   Yes, I did.

16  Q.   While the case was going on, did you talk to anybody about

17  it?

18  A.   No.

19  Q.   And why not?

20  A.   Because they asked you not to, and so I didn't talk to

21  anybody about it.

22  Q.   Did people where you worked know which jury you were on?

23  A.   No.  They just knew I was -- had jury duty.

24  Q.   About how long did the case last?

25  A.   It was supposed to last two days but I think so it lasted

 1   four.

 2   Q.    And as a jury, you all deliberated?

 3   A.    Yes.

 4   Q.    Do you feel like you all had enough time to deliberate?

 5   A.    Yes.

 6   Q.    And the jury settled on $5.2 million?

 7   A.    Yes.

 8   Q.    Now, the day after the verdict on May 17, did you go back

 9   to work at UCA?

10   A.    Yes, I did go back to work because I had missed that week.

11   Q.    And when you first got back to work at UCA, did you have a

12   conversation with Gilbert Baker about the jury verdict?

13   A.    Yes.  When he came in, he stopped by my office.

14   Q.    And would you please tell the jury about that conversation?

15   A.    Yes.  He just came in, and since I had been on jury duty,

16   he said something like that was -- I guess you were on the jury

17   for the -- I don't remember if he said Greenbrier Nursing Home

18   or how he named it, but he assumed that that was the jury that I

19   was on since it had been in the newspaper or on the news.  I'm

20   not sure which one that he actually heard it on, and I said yes.

21   Q.    And did he make any comment about the jury award?

22   A.    Yes.  He said it was a shame that being $5.2 million that,

23   you know, they would have to close and the people would have to

24   lose their jobs and people would have to find another place to

25   go since that nursing home wouldn't be, you know, open anymore.

1  Q.   And what was your reaction to that comment?

2  A.   I thought it was peculiar.  I just didn't know how he would

3  know that.

4  Q.   In July of 2013, did you learn that the judge had reduced

5  the verdict?

6  A.   Yes.

7  Q.   Where were you when you heard that?

8  A.   I was on vacation in Florida, and I believe my husband read

9  it online and told me about it.

10  Q.   And what did you think when you heard that?

11  A.   I thought that was odd because we had already made the

12  decision and heard all of the evidence and then someone, you

13  know, came in and changed it, and I just didn't know that was

14  possible, for one thing.  It's not common that you hear that

15  happening.  So I just thought it was unusual, the case that I

16  was on, they came in and did that.

17          MS. PETERS:  May I have a moment, Your Honor?

18          THE COURT:  You may.

19          MS. PETERS:  That concludes direct examination.

20          THE COURT:  Thank you, Ms. Peters.

21                    CROSS-EXAMINATION

22  BY MR. HENDRIX:

23  Q.   Afternoon, Ms. May.  How are you?

24  A.   I'm fine.

25  Q.   Let's pick up where we ended on this remittitur.  Pardon

1    me.  You don't have a legal background?

2    A.    No.

3    Q.    Not a lawyer, that sort of thing?

4    A.    No.

5    Q.    Had you even heard of a remittitur before?

6    A.    I don't think I had.  I don't recall ever hearing that

7    term.

8    Q.    It's -- is it fair to say that among lay people, it's not

9    something that's commonly known?

10   A.    Right.

11   Q.    It's a pure legal thing?

12   A.    Sure.

13   Q.    Okay.  Let's turn to -- Judge Maggio, during the trial or

14   at the beginning and during the trial, instructed you and the

15   other juror members not to discuss the case with anybody else,

16   right?

17   A.    Correct.

18   Q.    To even talk about the name of the case you were sitting

19   on, correct?

20   A.    Correct.

21   Q.    Okay.  And did you stay true to that oath?

22   A.    I did stay true to that.

23   Q.    So no one knew what jury you were sitting on?

24   A.    Correct.  Not even my husband.

25   Q.    And certainly nobody at work?

1    A.    Yeah, nobody.

2    Q.    So there's no belief that -- you have no knowledge or any

3    belief or understanding that Gilbert Baker knew that you were

4    sitting on the Bull jury trial?

5    A.    Correct.

6    Q.    In fact, you never saw him in court, right?

7    A.    I'm sorry.  Could you say that again?

8    Q.    You never saw him come to court for the Bull trial,

9    correct?

10   A.    Who?

11   Q.    Gilbert?

12   A.    Oh, no.

13   Q.    Okay.  So then there's this conversation.  And how is it --

14   did it seem to you that Gilbert would not have known that you

15   were on the jury because you never told anybody, but was it a

16   day or two after the verdict you have this conversation with

17   Gilbert?

18   A.    Correct.

19   Q.    And the verdict had been in the newspaper, right?

20   A.    I believe it was in the newspaper.

21   Q.    I think it may --

22   A.    And online, yes, yes.

23   Q.    Right.  And online?

24   A.    Yes.

25   Q.    Right.

1    A.    Um-hum.

2    Q.    So very likely would you assume and in your opinion --

3    A.    That's what I assumed.

4    Q.    -- that Gilbert just put two and two together?

5    A.    Yes, yes.  And he may have actually told me where he heard

6    it or saw it, but he assumed that I was on that jury.

7    Q.    And so at the beginning of your conversation, it was

8    apparent to you that, until he put that two and two together

9    when the verdict was in the newspaper, he had no idea that you

10   were on that jury?

11   A.    As far as I know.

12   Q.    Right.  How long of a conversation was this?

13   A.    Oh, just a few minutes.

14   Q.    Few minutes?

15   A.    Um-hum.

16   Q.    Where were you?  Just at his office?

17   A.    In my office.

18   Q.    Okay.  And he said something about it's a shame that that

19   nursing home will have to go bankrupt?

20   A.    Yes, sir.

21   Q.    Okay.

22   A.    Out of business.  He may have said bankrupt but...

23   Q.    And it's called Greenbrier Nursing Home because it's in

24   Greenbrier, Arkansas?

25   A.    Correct.

1   Q.   And Greenbrier is a small town?

2   A.   Um-hum.

3   Q.   One would assume that that nursing home is something of

4   a -- I wouldn't say substantial employer but employed a lot of

5   folks there in Greenbrier?

6   A.   Yes.

7   Q.   Okay.

8   A.   I would think so.

9   Q.   All right.  Now, put this a little more in context.  So

10  let's talk about how long did you and Gilbert work together?

11  A.   He came into the president's office the -- in January 2013.

12  Q.   Um-hum.

13  A.   Um-hum.

14  Q.   And so where were y'all's offices?

15  A.   My office is shortly after you come in the door to the

16  president's office, the whole office space that held several

17  people, and his office is what's catty-corner across the hall

18  from mine.

19  Q.   Ms. May, that's what I was getting at.  I was trying to get

20  a visual image.  Paint a picture for us of what the space looks

21  like.

22  A.   Right.

23  Q.   How many people there are.  This is on some floor at the

24  University of Central Arkansas, correct?

25  A.   Right.

1    Q.    There's a presidential suite?

2    A.    Correct.

3    Q.    Tom Courtway was the president?

4    A.    Yes.

5    Q.    Does that take up the entire floor?

6    A.    No, the end of the floor.

7    Q.    And how many offices are there where everybody is working?

8    A.    Probably 10, 11.

9    Q.    So quite a few people?

10   A.    Yes.

11   Q.    Okay.  Did you see Gilbert every day?

12   A.    Almost every day.

13   Q.    And what was his schedule like then?  And I guess what I'm

14   talking about, when you first became aware he was employed there

15   until after this jury verdict and all that well and through the

16   summer, you would see him every day, but how often was he there?

17   A.    Well, he had meetings, you know, on campus, off campus; so

18   he would come in and check in or call or e-mail or text me and

19   let me know if he wasn't going to be in, if he was going to a

20   meeting first.  He would let me know that.  But I would see him

21   off and on throughout the day, but he was very busy.

22   Q.    That's kind of what I wanted to explore with you.  How

23   busy?  Was he the type of guy that would come to the office --

24   pardon me -- 9:00 -- come in at 9:00, leave at 5:00?

25   A.    Well, we were all there at 8 o'clock so he would come in

1    and he might be in and out through the day but if he was there

2    until the end of the day, we all left at 4:30.  He would be

3    there till 4:30.

4    Q.    And sometime --

5    A.    And sometime --

6    Q.    I'm sorry.

7    A.    Excuse me.

8    Q.    My fault.

9    A.    Go ahead.

10   Q.    The legislature was in session at this point, right?

11   A.    Yes.

12   Q.    And part of Gilbert's job was to be a liaison between Tom

13   Courtway, the president, and UCA and the state legislature,

14   right?

15   A.    Right.  Jeff Pitchford was also there, and he was our

16   government relations person at that time.  Gilbert and Jeff, you

17   know, sometimes both would go, but they both were liaisons.

18   Q.    And so was Gilbert in and out of the office between Conway

19   and Little Rock, the state capitol, and that sort of thing?

20   A.    Yes.

21   Q.    Is he busy?  That's what I'm driving at.

22   A.    Yes.

23   Q.    Is he in and out of the office quite a bit?

24   A.    Yes.

25   Q.    Okay.  And a lot going on in his life?

1    A.    Yes.   There was -- the university is a very busy place.

2    There's all types of meetings, and since he assisted the

3    president, if the president wanted him to attend the meeting,

4    have an event or whatever, he would do that.

5    Q.    Okay.  And that's the flavor that I was looking for.  Is he

6    constantly in and out of the office, or is he there all day

7    long?

8    A.    No, he's in and out.

9    Q.    Okay.  Busy guy?

10   A.    Um-hum.

11   Q.    Okay.  Now, let's talk about sitting on the jury.  You had

12   concerns about the verdict, correct?

13   A.    At what time?

14   Q.    Afterwards.  So the jury decided on $5.2 million on May

15   16th.

16   A.    Right.

17   Q.    Right?

18   A.    Um-hum, yes.

19   Q.    Did you immediately have reservations about that?

20   A.    Well, we had to come to a compromise.

21   Q.    How was that compromise reached?

22   A.    Well --

23         THE COURT:  Hold on just a moment.  Counsel, could I

24   talk with y'all?

25         (Sidebar conference as follows:)

1          THE COURT:  I'm concerned about the opening up the
2     jury room.  I got my rule 606, Ms. Peters, when you were
3     examining, and you very carefully maneuvered along.  Now
4     Mr. Hendrix is opening the door.  This concerns me.
5          MR. HENDRIX:  And jumping in.
6          THE COURT:  Yes.  Right.  You are right in the middle
7     of it.  Are we really going to open up the compromise on the
8     jury and talk about the reason for the verdict?  This seems --
9          MR. HENDRIX:  Right.
10         THE COURT:  This concerns me.
11         MR. HENDRIX:  Right.  And so let me work the thought
12    process.  The thought process being I think what we should say
13    is somebody voted for 100,000.  Somebody voted for 17 million.
14    We arrived at 5.2 million.  Does that advance my goal?  Probably
15    not.  So where I should go is what she will testify to, I
16    thought the verdict was too high, I thought that it would be two
17    to three million.
18         THE COURT:  She said it was a compromise.  I think you
19    can ask if she thought it was high or low, and then let's move
20    on, but thank you for avoiding the batch and all the details.
21         MS. PETERS:  Your Honor, so is he going to ask did she
22    think it was too high or low?  I think that that leaves a
23    misleading impression.  I know the answer to the question, what
24    the compromise numbers were and because she told me, but I
25    didn't want to invade the jury.  But he's going to bring that up

1    I would ask what was the range they were considering because I

2    happen to know the low end was $2.5 million.  The high end was

3    like 15 million.

4              THE COURT:  Fair point.  Why don't you ask the range

5    and then where she was and then let's get out of this.  Okay?

6              MR. HENDRIX:  I want to make sure I'm understanding.

7    I do what?

8              THE COURT:  Ask about the range.  You said the verdict

9    was a compromise.  What range?  What was the rough range all the

10   jurors were considering?  We get 1 to 10, and where were you on

11   that?  And then let's move on.

12             MR. HENDRIX:  Can I ask:  Did you feel it was too high

13   or too low?

14             THE COURT:  I think we are -- I think if you --

15   Counsel, I'm doing the best I can here, but this really makes me

16   uncomfortable to be getting into the particulars of the jury's

17   thinking.

18             MR. HENDRIX:  I understand.

19             THE COURT:  I think, if you put her on the number

20   line, don't you have that implicitly of whether she thinks it's

21   too high or too low?

22             MR. HENDRIX:  What was the range from high to low?

23             THE COURT:  Right.

24             MR. HENDRIX:  For some reason you all decided on 5.2.

25             THE COURT:  You said you compromised.  Were you above

1  or below that 5.2?

2          MR. HENDRIX:  I will ask her.

3          THE COURT:  Yes.  Okay.  Thank you.

4      (End of sidebar conference.)

5  BY MR. HENDRIX:

6  Q.   All right, Ms. May.  I think where we were is on these

7  deliberations, in the assessment of damages, you said it was a

8  compromise among the jurors?

9  A.   Yes.

10 Q.   What was the high; what was the low?

11 A.   The very beginning they were coming up with numbers like

12 17, 15, and then some were 2, 3.  That was the way it was going.

13 Q.   And it was a compromise then to arrived at 5.2?

14 A.   Right.  The majority was on the high end, and so we worked

15 through it and --

16 Q.   So where were you?

17 A.   I was closer to the low end.

18 Q.   To the low end.

19 A.   Um-hum.

20         MR. HENDRIX:  May I confer with Ms. Depper?

21         THE COURT:  Yes.

22         MR. HENDRIX:  That's all I have got, Ms. May.  Thank

23 you.

24         THE COURT:  Ms. Peters?

25              REDIRECT EXAMINATION

1    BY MS. PETERS:

2    Q.    Just one question, and I may not have heard the witness.

3    You said 15 to 17 and 2 to 3.  You meant million dollars?

4    A.    Yes.

5              THE COURT:  You didn't miss anything, Ms. Peters.

6              MS. PETERS:  Thank you.

7              THE COURT:  It was not spoken.

8         May Ms. May be excused, or do you want to follow up?

9              MR. HENDRIX:  I just forgot to ask one question when I

10   sat down.

11                      RECROSS-EXAMINATION

12   BY MR. HENDRIX:

13   Q.    Did you ever see Mike Morton or Michael Maggio at your

14   office with Gilbert Baker?

15   A.    No.  I don't recall ever seeing them.

16             THE COURT:  Ms. Peters, did that prompt anything from

17   your side?

18             MS. PETERS:  No, it did not, and may Ms. May be

19   excused from her subpoena?

20             THE COURT:  Yes.

21        (Witness excused.)

22             THE COURT:  Next witness please.

23             MR. HARRIS:  Linda Lee Flanagin.

24             THE COURT:  Ms.  Flanagin, give us just a second.  If

25   you'll come over here.  Good afternoon, Ms. Flanagin.

```
 1              THE WITNESS:  Good afternoon.

 2              THE COURT:  You should take your mask off to testify

 3    so the jury can see your face.  I need to give you the oath to

 4    tell the truth, and it's important -- we are having some

 5    challenges with our sound system.  So grab the bottom of this

 6    thing and be sure to pull it right on over and --

 7              THE WITNESS:  Okay.

 8              THE COURT:  Good.  Raise your hand please.

 9         LINDA LEE FLANAGIN, GOVERNMENT'S WITNESS, DULY SWORN

10                       DIRECT EXAMINATION

11    BY MR. HARRIS:

12    Q.   Would you state your name, please, ma'am?

13    A.   Linda Lee Flanagin.

14    Q.   Ma'am, I can barely hear you.

15    A.   Linda Lee Flanagin.

16    Q.   Okay.  And where are you from, Ms. Flanagin?

17    A.   Little Rock.

18    Q.   Okay.  But before Little Rock, where are you from?

19    A.   I grew up in Conway.

20    Q.   Okay.  And do you know Mr. Gilbert Baker?

21    A.   Yes, I do.

22    Q.   And do you see him here in court today?

23    A.   Yes, I do.

24    Q.   Okay.  Would you point him out?

25    A.   He's right over there (indicating).
```

1   Q.   Okay.  And how long have you known Mr. Baker?

2   A.   A long time.  Probably maybe 20 years.

3   Q.   Okay.  And when you met him, was he in the Arkansas Senate?

4   A.   I believe he was.

5   Q.   Okay.  And -- did you know at one point he was the

6   executive director of the Arkansas Republican party?

7   A.   Yes.

8   Q.   Now, when you met him, was there a period of time when you

9   moved away to Florida?

10  A.   Yes, there was.

11  Q.   And when was that?

12  A.   In 2001.

13  Q.   And then you moved back when?

14  A.   2006.

15  Q.   Okay.  And then at some point after that, did you become

16  reacquainted with Mr. Baker?

17  A.   Yes, I did.

18  Q.   And how was that?

19  A.   I think through my dad.

20  Q.   Okay.  Who's your dad?

21  A.   He was Jim Flanagin.

22  Q.   Okay.  And was he somebody from Conway?

23  A.   Yes.

24  Q.   Okay.  And then did you start working either for Senator

25  Baker or somebody in the Arkansas Senate?  Is that what

1   happened?

2   A.   I started working for the Arkansas State Senate.

3   Q.   Okay.  And how did you get that job?

4   A.   Through just -- I just applied, and I think with people

5   kind of steering them to go in different directions or, you

6   know, maybe a good word you kind of get to work for the senate.

7   Q.   And was Senator Baker there then?

8   A.   Yes, he was.

9   Q.   And did you see him in the senate?  I mean, was it

10  something you would see on a regular basis?

11  A.   Yes.

12  Q.   And what did you do for the Arkansas -- did you work for

13  one senator or many?

14  A.   No, I worked for all the senators.

15  Q.   Okay.

16  A.   And I would -- when they had laws, I would file them, and

17  then I worked as reception and just kind of did whatever was

18  needed to be done.

19  Q.   Okay.  Now, at some point you went to work for a company

20  called LRM; am I correct?

21  A.   That's correct.

22  Q.   And what is LRM?

23  A.   LRM was Gilbert Baker's company, consulting company.

24  Q.   Consulting?

25  A.   Political consulting company.

1   Q.   And when did LRM begin existence?

2   A.   In 2013.

3   Q.   Okay.  Did you know that he stopped being a state senator

4   in January of 2013?

5   A.   Okay.  Then it started in 2014.

6   Q.   What did?

7   A.   LRM.

8   Q.   Okay.  Did you know that he stopped being a state senator

9   in January of 2013?

10  A.   Well, I knew it was either '12 or '13.

11  Q.   Okay.  And in 2012, were you working for LRM?

12  A.   No.  It would have been in '13.

13  Q.   Okay.  Do you know when LRM was first organized?

14  A.   I think it was '13.

15  Q.   Okay.  If I told you it was December of 2012, does that

16  ring a bell?

17  A.   It really doesn't.  You know, right in there.

18  Q.   Okay.  Let me ask you this:  Do you know when he went to

19  work at UCA as assistant to the president?

20  A.   When he finished being a senator.

21  Q.   Okay.  And do you know if that was in January of 2013?

22  A.   Okay.  So he would have started in January of '13.

23  Q.   Okay.  I know this is eight years ago.

24  A.   Right.  I'm not very good with the time.

25  Q.   I gotcha.  Some people aren't good with math.  That's just

1    the way it is.

2         THE COURT:  I beg your pardon?

3         MR. HARRIS:  I was talking about Mr. Hendrix, Your

4    Honor.

5         THE COURT:  Oh, okay.  All right.

6         MR. HARRIS:  I was born at night, but I wasn't born

7    last night.

8    BY MR. HARRIS:

9    Q.   January 2013 he stopped being senator.

10   A.   Okay.

11   Q.   And LRM was either in function or about to be; is that

12   fair?

13   A.   Right.

14   Q.   Can you kind of put your head on that?

15   A.   Right.

16   Q.   That time frame?

17   A.   Probably January of '14, I guess, would be when LRM

18   started.

19   Q.   Okay.  January of '14?

20   A.   Right.

21   Q.   Okay.  If he stopped being a senator in January of '13, how

22   did he get --

23   A.   January of '13.

24   Q.   I'm sorry?

25   A.   Okay.  You have got --

1  Q.   Okay.  If you have told us before that it was -- if the

2  Secretary of State showed that LRM was created in December of

3  2012, would you disagree with me?

4  A.   No, I wouldn't.

5  Q.   Okay.  And that would be the end of his Senate term; is

6  that right?

7  A.   Okay.

8  Q.   When did you go to work for LRM?

9  A.   Right about that time.

10  Q.   What time is that?

11  A.   Well, probably January -- well, you said December '13 was

12  when he --

13  Q.   No, I said December '12 is when LRM was created.

14  A.   So January of '13.

15  Q.   Okay.  What were you doing in the year 2012 for employment?

16  A.   I worked for the Senate.

17  Q.   Okay.  Did you ever work for an entity called Arkansas

18  Faith and Freedom?

19  A.   Yes, I did.

20  Q.   And what was that?

21  A.   That was a consulting company that hired me to do some

22  campaigns for state senators.

23  Q.   Okay.  And was that in -- what year was that?

24  A.   I don't know.

25  Q.   Okay.  Was it before you went to work for LRM?

1   A.   Yes.

2   Q.   So you went to work for LRM about January of '13 I think

3   you said; is that right?

4   A.   Okay.

5   Q.   So it would have been in 2012 or 2011 that you worked for

6   Faith and Freedom?

7   A.   Yes.

8   Q.   And did you know Mr. Baker worked there?

9   A.   Yes, I did.

10  Q.   How did you know that?

11  A.   Well, I really -- I worked for the leadership in the state

12  senate on -- and did those campaigns, but I mostly worked in

13  Michael Lamoureux, doing that.

14  Q.   And did you know that Mr. Baker worked at Faith and Freedom

15  or was employed by that consulting company?

16  A.   I think he had been.

17  Q.   Okay.

18  A.   I think he had been.

19  Q.   And how much were you getting paid at Faith and Freedom?

20  A.   I don't know.  I don't remember.

21  Q.   I mean, was it $500 a month or $50,000 a month?

22  A.   It wasn't $50,000 a month.  I know that.  It was probably

23  for each campaign.  I probably got paid for each campaign.

24  Q.   So give me an --

25  A.   And there were six of them, and so maybe $500 for six of

1  them -- for each one of them.

2  Q.   So $3,000 total?

3  A.   Probably something like that.

4  Q.   Okay.  And was that paid monthly, or was that paid at the

5  end when you were working for Faith and Freedom?

6  A.   I don't recall.

7  Q.   And what did Mr. Baker do for Faith and Freedom?

8  A.   I'm not sure what he did.  I think he did consulting.

9  Q.   Okay.  Did you know he was getting paid by Faith and

10 Freedom too in 2012?

11 A.   I don't know that I knew that.

12 Q.   Okay.  Now, January of 2013 you are no longer working for

13 the senate; is that correct?  You go to work for LRM?

14 A.   I may have worked for the senate one more year.

15 Q.   Okay.  Did you go to work for LRM in 2013?

16 A.   Yes.

17 Q.   Okay.  What did you do for LRM?

18 A.   Well, we had several campaigns that we ran just over a

19 period of time.

20 Q.   Tell us who LRM is or what it is.  What does it mean?  What

21 does LRM mean?

22 A.   It stands for -- it's initials for some of Gilbert's

23 friends.

24 Q.   Who are they?

25 A.   They were state senators with him.

1   Q.   And what were the names, is what I'm asking?

2   A.   Lamoureux.  I'm not sure.  Maybe Eddy Joe Williams.

3   Q.   Okay.

4   A.   I'm not sure who else.

5   Q.   Is Eddy Joe Williams, does he have an L or R or M in his

6   name?

7   A.   I don't think he does.

8   Q.   Okay.  Lamoureux obviously has an L.  Anybody else you can

9   remember?

10  A.   Not right now.

11  Q.   Okay.  Was Eddy Joe Williams or Michael Lamoureux involved

12  in LRM?

13  A.   No.

14  Q.   Okay.  Who all was involved in LRM?

15  A.   Just myself and Gilbert and another man who did the

16  payroll.

17  Q.   And what was his name?  If I told you it was James

18  McAllister, would that ring a bell?

19  A.   That's correct.

20  Q.   Is that right?

21  A.   That's correct, yeah.

22  Q.   Okay.  And what did Mr. McAllister do?

23  A.   He did the payroll and anything related to that.

24  Q.   You mean he paid the bills or paid -- he paid you a

25  paycheck every couple of weeks?

1    A.    Right.   Right.

2    Q.    And how much did you get paid while you are working at LRM?

3    A.    Probably about $2,000 a month, something like that.

4    Q.    And what did you do for that $2,000 a month?

5    A.    Well, I helped run campaigns, consulted, did a little

6    lobbying.   There was an environmental company that we had as a

7    consult -- that we consulted with.   A wet/dry issue in Faulkner

8    County.

9    Q.    Okay.

10   A.    There were just several things going on at the time.

11   Q.    Okay.   I didn't mean to interrupt, ma'am.

12         In January of 2013 there wasn't an election going on at

13   that time, was there?   Elections --

14   A.    I don't think so.

15   Q.    -- are usually like in May or November of even years?

16   A.    Okay.

17   Q.    Is that right?

18   A.    I think that's right.

19   Q.    So in January of 2013, you're working -- is Mr. Baker doing

20   stuff at LRM?

21   A.    Yes, he is.

22   Q.    What was he doing?

23   A.    Well, he was working with the same companies and clients

24   that I was working with.

25   Q.    Did he also have a job at UCA?

1   A.   Yes, he did.

2   Q.   What was his job there?

3   A.   He was assistant to the president.

4   Q.   Okay.  Did that take most of his time or a little bit of

5   time?  How was his time divided up?

6   A.   I think that took most of his time at that point.

7   Q.   So were you the primary employee at LRM?

8   A.   Yes, I was.

9   Q.   You worked on, I think you said, a wet/dry issue?

10  A.   Right.

11  Q.   So was that something you were working on in the spring of

12  2013?

13  A.   Probably a little bit later.

14  Q.   Okay.  Like summer, fall?

15  A.   Um-hum.

16  Q.   What about you said something about -- did you say

17  something about energy?  I forgot.

18  A.   No.  Environment.

19  Q.   Environment.  Was that something you were working on in the

20  spring of 2013 with LRM started?

21  A.   I don't know that.  I don't recall when the dates are.

22  Q.   Okay.  What else do you recall --

23  A.   The clients were --

24  Q.   -- working --

25  A.   Working on some campaigns.

1   Q.   And what campaigns were you working on in the spring of

2   2013?

3   A.   None I can think of.  We were working in '14 for Supreme

4   Court Justice.

5   Q.   That's Rhonda Wood; am I correct?

6   A.   That's correct.

7   Q.   Yeah, but in the spring of '13 when you started LRM or when

8   he started LRM and he was at UCA, you were the main employee or

9   only employee?

10  A.   I was the only employee.

11  Q.   Okay.  And you were making 2,000 a month?

12  A.   Yes.

13  Q.   Give or take?

14  A.   There was a tobacco company.

15  Q.   Tobacco company?  What did you do for them?

16  A.   Required some vaping projects.  They were trying to get

17  some vaping accessibility, I think.  I'm not really sure what

18  the project was, but we worked with the tobacco company.

19  Q.   Was that a client you recruited?

20  A.   No.  I didn't recruit them.

21  Q.   The environmental one, is that one you recruited?

22  A.   No.

23  Q.   What about the wet/dry issue?

24  A.   No.

25  Q.   Okay.  Who recruited those?

1    A.    Gilbert.

2    Q.    So he would recruit clients, and you would do the work?  Is

3    that kind of how it worked out?

4    A.    Well, we would work together on it.

5    Q.    Okay.  Okay.  And do you know what Arkansans for Lawsuit

6    Reform is?

7    A.    Yes.

8    Q.    If I call it ALR, does that ring a bell?

9    A.    No, but Arkansans --

10   Q.    Arkansans For Lawsuit Reform.  Okay.  What is Arkansans For

11   Lawsuit Reform?

12   A.    It was a group of people that were looking for there to be

13   some exactly what the name says, lawsuit reform --

14   Q.    Okay.

15   A.    -- within the legal community.

16   Q.    Okay.  And do you know who started that organization?

17   A.    I think Gilbert did.

18   Q.    Okay.  And do you know why they paid him $10,000 a month in

19   2013?

20   A.    As a retainer and to have him consult on that.

21   Q.    Okay.  So while --

22   A.    To do some -- they were going to do some legal changes in

23   the senate.  To help with that.

24   Q.    And I interrupted you, and I'm sorry.

25   A.    That's okay.

1  Q.   So in 2013 he's working at UCA, he's -- Arkansans For

2  Lawsuit Reform was paying $10,000 a month for him to be a

3  consultant for them, and then you are running LRM, you are doing

4  the groundwork; is that fair?

5  A.   Yes.

6  Q.   DBH Management, do you know what that is?

7  A.   Yes.

8  Q.   What is that?

9  A.   That is Mr. Hawkins' business.

10 Q.   And who's Mr. Hawkins'.

11 A.   Mr. Hawkins' from Morrilton.

12 Q.   I beg your pardon?

13 A.   Mr. Hawkins from Morrilton.

14 Q.   If I told you his first name was Bruce, would that ring a

15 bell?

16 A.   Yes.

17 Q.   Okay.  And did you know Bruce Hawkins?

18 A.   Yes, I did.

19 Q.   And has he been a state representative?

20 A.   Yes.

21 Q.   Was he a lobbyist consultant?

22 A.   Yes.

23 Q.   What is the difference between a lobbyist and a consultant?

24 Do you know?

25 A.   No.  I think there's some type -- consultants don't really

1    do lobby work.

2    Q.   Was Mr. Baker a lobbyist or a consultant?

3    A.   He was a consultant.

4    Q.   But not a lobbyist?

5    A.   I think he lobbied for UCA possibly.  I don't really know.

6    I don't remember if he did lobby work for UCA or not.

7    Q.   Do you know why DBH Management paid Ms. Baker $10,000 a

8    month?

9    A.   They probably had a client that they were sharing or

10   working together with --

11   Q.   Okay.  And do you know who that client was?

12   A.   -- would be my guess.

13        No.

14   Q.   Okay.  Was Mr. Baker -- he must have been getting some

15   money from LRM, I take it?

16   A.   Yes.

17   Q.   A salary?

18        Okay.  Now, let's move into 2013.  We are on 2013.  Okay?

19   A.   Okay.

20   Q.   You are working at LRM.  He's working at UCA.  I'm just

21   trying to lay the groundwork for you to start thinking about

22   this.

23        Do you remember the lawsuit of the Estate of Martha Bull

24   versus Greenbrier Nursing Home in May of 2013 that went to

25   trial?  Do you remember that?

1   A.   The first time I knew about it was when it was in the
2   newspaper.
3   Q.   And when was that?
4   A.   So if it was in the newspaper in 2013, then I knew about
5   it.
6   Q.   Okay.  Did you know about it when a verdict was reached in
7   May of 2013?  And that was in the newspaper.  There's been
8   testimony.
9   A.   I don't think I did.
10  Q.   Okay.
11  A.   If I did, I heard it briefly, and I don't remember.  I
12  don't recall that.
13  Q.   It was a $5.2 million verdict.  Does that ring a bell?
14  A.   Not really.
15  Q.   Okay.  And do you remember Mike -- do you know who Mike
16  Maggio is?
17  A.   Yes, I do.
18  Q.   Who is Mike Maggio?
19  A.   He was a judge in Conway.
20  Q.   Okay.  And if I call him a trial judge, is that what you
21  think he was?  A district judge?  I mean a circuit judge?
22  A.   I think he was running for circuit judge.
23  Q.   Actually he was a circuit judge.
24  A.   Okay.  He was a circuit judge.
25  Q.   Do you remember him running for Court of Appeals?

1  A.   Yes, I do.

2  Q.   Okay.  And did you know -- did Mr. Baker know Judge Maggio?

3  A.   Yes.

4  Q.   And how do you know that?

5  A.   Because we met one night for dinner.  He met -- I met Judge

6  Maggio and Gilbert for dinner one night.

7  Q.   And where was that at?

8  A.   At Sonny Williams.

9  Q.   What is Sonny Williams?

10 A.   A steak house.

11 Q.   Where?

12 A.   In Little Rock.

13 Q.   Okay.  What was the purpose of meeting at Sonny Williams?

14 A.   I think it was to discuss his campaign.

15 Q.   Okay.  Did you know that Mr. Baker was helping Judge Maggio

16 with his Court of Appeals campaign?

17 A.   I think that I knew that.

18 Q.   Okay.  When you say you think you knew that, you are

19 working at LRM and he owns LRM and he's working there, too?

20 A.   Right.

21 Q.   You all are working together, right?

22 A.   Right.

23 Q.   And are y'all talking daily?

24 A.   Yes.  But I don't know if he had committed to work for

25 Maggio's campaign yet.

1   Q.   Okay.  Are y'all working -- are you all talking daily?

2   A.   Yes.

3   Q.   Are you all talking multiple times a day?

4   A.   It would depend on his work schedule.

5   Q.   I know.  Are you all talking --

6   A.   Probably.

7   Q.   Probably?

8   A.   Probably twice or three times a day.

9   Q.   Okay.  And you all are talking about what, for example?

10  A.   Just what's going on in the company.

11  Q.   Okay.

12  A.   Who the clients are and what they needed.

13  Q.   Okay.  And he's talking about UCA?

14  A.   Yes.

15  Q.   He's telling you what he's doing?

16  A.   Yes.

17  Q.   Does he tell you what he's doing for tort reform at ALR?

18  A.   Well, I went to a couple meetings on tort reform.

19  Q.   Okay.  Did he tell you what he's doing for DBH Management?

20  A.   I'm sure he did.  I don't recall what he was doing with DBH

21  Management.

22  Q.   Did he tell you what he had been doing for Faith and

23  Freedom?  Was he still working for Faith and Freedom in 2013?

24  A.   I'm not sure.

25  Q.   Okay.  You don't know if he's getting paid by them, too?

1   A.   No, I don't know.

2   Q.   Okay.  Now, there was a verdict in this lawsuit.  Do you

3   know what I'm talking about?

4   A.   Yes.

5   Q.   Okay.  Do you remember going to a lunch in May of 2013 at

6   Brave New Restaurant with Mr. Baker and Mr. Morton was there or

7   you saw Mr. Morton?

8   A.   No, I do not.

9   Q.   Did you ever have lunch with Mr. Morton at Brave New

10  Restaurant?

11  A.   Not that I remember.

12  Q.   Never?

13  A.   Not that I remember.

14  Q.   Okay.  Did you ever have lunch with Mr. Baker?

15  A.   Yes.

16  Q.   At Brave New Restaurant?

17  A.   Yes.

18  Q.   Okay.  I think I probably asked you about Morton, didn't I?

19  A.   Yes.

20  Q.   Let me start all over.  Did you have lunch with Mr. Baker

21  at Brave New Restaurant?

22  A.   Yes.

23  Q.   Many times or a couple or --

24  A.   Probably a couple of times.

25  Q.   Okay.  And when were those couple of times?

1   A.   I have no idea.  Just over that -- over that time period

2   where I was working for him.

3   Q.   Okay.  And when did you stop working for him?

4   A.   I'm not sure what year it was.

5   Q.   Okay.

6   A.   Maybe '14, '15.

7   Q.   Okay.  A year and a half, two years, right?

8   A.   Right.

9   Q.   Okay.  And so you had lunch with him a couple times?

10  A.   Yes.

11  Q.   You had dinner with him?

12  A.   Yes.

13  Q.   Okay.  And -- y'all became good friends, didn't you?

14  A.   Right.

15  Q.   I mean, you worked together.

16       Do you know who Rhonda Wood is?

17  A.   Yes, I do.

18  Q.   Who is Rhonda Wood?

19  A.   Rhonda is on the Supreme Court.

20  Q.   Okay.  She is now, right?

21  A.   Arkansas Supreme Court.

22  Q.   She is now?

23  A.   Yes.

24  Q.   Back in 2013, do you remember that she was a Court of

25  Appeals judge running for the Supreme Court?

1    A.    Correct.

2    Q.    Did I get that right?

3    A.    Well, yes, I think so.

4    Q.    Okay.  Did you know that, before she was on the Court of

5    Appeals, she was a circuit judge in Faulkner County at the same

6    time Judge Maggio was there?

7    A.    Yes, I think I knew that.

8    Q.    And how did you know that?

9    A.    Well, my family lives in Conway, and I can -- you know, I

10   stay in touch with people there.  So I just think Maggio was a

11   friend of my brother's at one time, and so I just knew -- I knew

12   both of them by name.  I didn't -- I don't think I knew both of

13   them.

14   Q.    Your brother is a dentist in Conway?

15   A.    Yes.

16   Q.    As was your father; am I correct?

17   A.    Right.

18   Q.    Well, did you know that Judge Maggio and Judge Wood were

19   friends at the time?

20   A.    Yes.

21   Q.    And how did you know that?

22   A.    Well, I don't think we have gotten into me working on

23   Rhonda's campaign.

24   Q.    We're getting there, but I'm just saying how did you know

25   that Judge Wood and Judge Maggio were friends?

1    A.    I just knew they were.  I don't know that anybody told me.

2    I just knew that they were friends.

3    Q.    Okay.  Okay.  Now -- I'm going to get to Michael Morton in

4    a second, but did you know that Gilbert Baker was helping Judge

5    Wood raise money for her Supreme Court race in 2013?

6    A.    Yes.  We both were.

7    Q.    Okay.  But how did you know he was?

8    A.    Well, I'm sure he told me he was.

9    Q.    Okay.  And what did he tell you he was going to do to help

10   Judge Wood?

11   A.    Well, he was going to get in touch with his contacts.

12   Q.    And do what?

13   A.    And raise some money for her.

14   Q.    Okay.  Did he tell you how much money he wanted to raise

15   for her for her judicial campaign?

16   A.    I believe so.

17   Q.    And what do you believe he told you?

18   A.    I believe it was over $100,000.

19   Q.    Okay.  So I take it that Mr. Baker had this ability or he

20   knew a bunch of people he could raise money to help candidates,

21   right?

22   A.    That's correct.

23   Q.    Did you know he was helping Judge Maggio raise money?

24   A.    Yes, I did.

25   Q.    And how did you know that?

1  A.   Well, when we went to dinner that night, we talked about

2  his campaign, and I knew Gilbert was helping him.

3  Q.   Okay.  And how was Gilbert helping him?

4  A.   Raise money.

5  Q.   And how much was Mr. Baker supposed to raise for Judge

6  Maggio?

7  A.   I don't remember.  I don't recall that.

8  Q.   Did he tell you?

9  A.   He may have.  I just don't recall it.

10  Q.   Okay.  Did Judge Maggio mention how much it was going to be

11  raised?

12  A.   Not that I can remember.

13  Q.   Okay.  Based upon your experience in political consulting

14  and stuff, did you have an idea of how much Judge Maggio needed

15  to raise?

16  A.   Well, if Judge Wood needed to raise 100,000, Judge Maggio

17  probably needed to raise at least 50, 60, 70, somewhere in

18  there.

19  Q.   Okay.  Now, do you know Michael Morton?

20  A.   Yes, I do.

21  Q.   How do you know Mr. Morton?

22  A.   From working at the legislature.

23  Q.   Did he work there?

24  A.   No.  He was just there a lot.

25  Q.   Okay.  And when do you remember first meeting him or seeing

1    him in the legislature, I should say?

2    A.    When I was working in the receptionist capacity at the

3    state capitol.

4    Q.    Okay.  So that had to be before January of '13; is that

5    right?

6    A.    Right.  So it was '10 and '11 maybe.

7    Q.    Okay.  So '10 or '11, give or take, you would see him

8    coming in?

9    A.    Right.

10   Q.    Okay.  Would you say hi to him or he say hi to you or how'd

11   that work?

12   A.    Yes.  I met him.  So, you know, we always spoke and there

13   was a big group of healthcare people that would work together,

14   and that's --

15   Q.    I'm sorry.  I interrupted you again.

16   A.    That's how I knew him.

17   Q.    Did you know that he owned -- that he was a businessman?

18   A.    Yes.

19   Q.    Did you know he owned nursing homes?

20   A.    Yes.

21   Q.    Did you know he owned a lot of them?

22   A.    Yes.

23   Q.    Did you know whether he was a contributor of like campaigns

24   and judges and stuff?

25   A.    Yes, he was.

1  Q.   And how did you know that?

2  A.   I don't really know.  He was just very active in the

3  community and political world and very active with the -- a lot

4  of people who owned nursing homes also were active with him so

5  it --

6  Q.   What was active?

7  A.   It wasn't just Mr. Morton.  It was several people that

8  owned nursing homes, that they all would work together.

9  Q.   Okay.  Now, in the summer of '13 -- let's go to the summer

10  of '13.  You are still working at LRM, right?

11  A.   Yes.

12  Q.   And Mr. Baker is still working at UCA?

13  A.   Okay.

14  Q.   Okay?  And did you know that he was trying to fundraise for

15  Judge Maggio?

16  A.   Yes, I did.

17  Q.   And you knew he was trying to fundraise for Judge Wood?

18  A.   Yes.

19  Q.   Okay.  Did you know he had a meeting with Michael Morton in

20  June 26 of 2013 at Ruby Tuesday at Russellville?

21  A.   I knew it at the time.

22  Q.   And how did you know it at the time?

23  A.   He told me he was going up there.

24  Q.   Okay.  Did he tell you after he had gone up there or

25  before?

1    A.    I don't recall.

2    Q.    What did he tell you about the meeting?

3    A.    I don't really recall.

4    Q.    I mean, what did he tell --

5    A.    It went well.  You know, that it went well.

6    Q.    Okay.  When you say it went well, that indicates the

7    meeting had already happened.  Does it not?

8    A.    Right, but I don't know -- I don't know if he told me

9    beforehand or after.  I don't recall that.

10   Q.    I realize that.

11   A.    That was years ago.

12   Q.    It was indeed.  I realize that.  But if you say he told me

13   it went well, it had to be after the meeting?

14   A.    Right.  Right.  If he said that -- that's right.  That has

15   to be after the meeting.

16   Q.    Okay.  And did he tell you what the meeting was about?

17   A.    I believe he was fundraising.

18   Q.    Okay.  And did he tell you for whom he was fundraising?

19   A.    I don't believe we got into that much detail.

20   Q.    How much detail did you get into?

21   A.    I didn't recall the meeting until you just said it

22   happened, that he went to Russellville.

23   Q.    Okay.

24   A.    And then that -- I was like that did -- you know, I

25   remember that meeting.

```
1    Q.   I mean you --
2    A.   But I couldn't have told you that until you had said it.
3    Q.   I gotcha.  But you remember him telling you about the
4    meeting, is what I'm asking?
5    A.   I believe so.  That in general it went well.
6    Q.   Okay.  And do you have a memory of what he talked to
7    Mr. Morton about?
8    A.   No, I don't know.
9    Q.   Do you know did he have lunches with Mr. Morton quite
10   frequently?
11   A.   I don't know.
12   Q.   Okay.
13   A.   I don't know.
14   Q.   Do you know if he had dinner with Mr. Morton quite
15   frequently?
16   A.   On occasion I think you could say with a group of people.
17   Q.   It wouldn't be one-on-one?
18   A.   I wouldn't be one to know that.  I mean, maybe one-on-one.
19   Maybe with a group of people.
20   Q.   Okay.  Had you ever been to a lunch with -- when Mr. Morton
21   was present?
22   A.   Not that I recall.  I have been to a dinner with Mr. Morton
23   present.
24   Q.   Okay.  You don't remember a lunch on May 16 when Mr. Morton
25   saw you and Mr. Baker at the Brave New Restaurant?
```

1    A.    I don't recall that.

2    Q.    Okay.  Now, the dinner with Mr. Morton, how many dinners

3    were you present with Mr. Morton?

4    A.    I think it's one.

5    Q.    And where was that?

6    A.    At Sonny Williams.

7    Q.    Okay.  And who all was present?  Well, let me -- before you

8    answer that, when was this; do you know?

9    A.    No, I don't.

10   Q.    Okay.  Do you remember who was present?

11   A.    A couple of other people that own nursing homes.  I can't

12   recall their names right now.

13   Q.    Okay.  You have testified about two Sonny Williams'

14   dinners.  One with Mr. Morton present?

15   A.    Right.

16   Q.    With Gilbert Baker?

17   A.    Right.  And some other people.

18   Q.    And some other people, and another one with Judge Maggio

19   and Gilbert Baker present?

20   A.    Right.

21   Q.    And y'all were the only three?

22   A.    Right.

23   Q.    Any other dinners at Sonny Williams you had with Mr. Baker?

24   A.    I don't believe so.

25   Q.    Just two times?

1    A.   I believe so.  I believe those are the only two times I can
2    recall.
3    Q.   Okay.  Now, do you remember taking some checks -- this is
4    going to be July of 2013.  Did you know -- did he ever talk to
5    you about this lawsuit that Mrs. Bull's estate sued against
6    Greenbrier Nursing Home?
7    A.   I don't recall.
8    Q.   He being Mr. Baker?
9    A.   I don't ever recall having a conversation about that.
10   Q.   You could have.  You just don't remember?
11   A.   I could have.  I just don't recall it.
12   Q.   I realize it was eight years ago, wasn't it?
13   A.   Right.
14   Q.   Okay.  But y'all talked daily?
15   A.   Right.
16   Q.   And do you remember him getting a FedEx package with a
17   bunch of checks at his house in July of 2013?
18   A.   I remember he told me that he had gotten some checks
19   FedExed at his house.
20   Q.   Okay.  And when did he tell you that?
21   A.   Probably the day after he got them.
22   Q.   Okay.  So he said something like I got some checks
23   yesterday?
24   A.   Right.
25   Q.   Something like that?

1        Okay.  And did he tell you who the checks came from?

2   A.   I don't recall.  I think -- I think they might have been

3   from Mr. Morton, but I don't recall him saying that.

4   Q.   Okay.  Why do you think they might have been from

5   Mr. Morton?

6   A.   Because that was after he had had his meeting with

7   Mr. Morton.

8   Q.   Okay.  How long had it been since he'd had his meeting with

9   Mr. Morton?  Do you have any idea?

10  A.   I don't have the time clock for that.

11  Q.   Did he tell you that he had faxed a document to Mr. Morton

12  putting specific numbers for specific people?  Do you have a

13  memory of that?

14  A.   No, I don't.

15  Q.   Okay.  When he told you, I got some checks yesterday, did

16  he tell you how many checks he got?

17  A.   No, he didn't.  I remember he asked me if I would take them

18  over to his attorney's office, and I took the checks over in the

19  FedEx package and didn't open it.

20  Q.   Who was his attorney?

21  A.   Chris -- you'll have to give me his last name.

22  Q.   No, you have to give it to me.

23  A.   No, you have to give it to me.  I can't remember.

24  Q.   Stewart.

25  A.   Chris Stewart.

1    Q.    Does that ring a bell?

2    A.    Yes.

3    Q.    Does it really ring a bell?

4    A.    Yes, Chris Stewart.

5    Q.    Chris Stewart.  And so did he tell you, hey, I just got a

6    $100,000 check for UCA yesterday?

7    A.    I don't remember that.

8    Q.    I mean, that's a big deal, isn't it?

9    A.    Right.  That would be a big deal.

10   Q.    I mean, I thought y'all were close.  Talked daily.  Two or

11   three times a day?

12   A.    Well, but I don't know that he told me what he had gotten

13   from Mr. Morton.

14   Q.    I know, but you don't remember him telling you he got

15   $100,000 yesterday from UCA from Mr. Morton?

16   A.    I don't recall that.

17   Q.    Okay.  Would you agree that's a big deal, though?

18   A.    Yes, it's a big deal.

19   Q.    Rhonda Wood, were you like wanting to work for Rhonda Wood

20   at that point?  Help her in her campaign?

21   A.    No, I think you can only start in November when a judge is

22   running for office, and I think her race was in May.  So I think

23   you can only start in November.

24   Q.    Okay.  Because it's a 180-day rule for when judges can

25   solicit or take money, isn't it?

1    A.    Yes.

2    Q.    180 days backing up from May goes to November 21st or 22nd.

3    Do that sound right?

4    A.    That sounds right.

5    Q.    So you hadn't started working for Judge Rhonda Wood at that

6    point when he took the checks over to Chris Stewart?

7    A.    No.

8    Q.    Did you know that in that same package he got 50 -- $48,000

9    for Rhonda Wood?

10   A.    No, I didn't know that, but Mr. Morton was a big

11   contributor.

12   Q.    No, I know.  Did Mr. Baker tell you that?  That's what I

13   was asking.

14   A.    I mean, he -- I think the meeting was a successful, but I

15   don't think we talked about specific checks.

16   Q.    Okay.  He didn't tell you that the checks he got in one day

17   from Mr. Morton totaled $228,000?

18   A.    No, he did not.

19   Q.    That's a lot of money, isn't it?

20   A.    It is, but Mr. Morton is very active in the political

21   scene.

22   Q.    I know, but I mean Mr. Baker got that much money in one

23   day.  He didn't say Linda Lee or -- what did he call you?

24   A.    Linda Lee.

25   Q.    Linda Lee, I got a quarter of a million dollars yesterday?

```
1    A.    No.
2    Q.    I mean, he's a big fundraiser, isn't he?
3    A.    Gilbert?
4    Q.    Yes.
5    A.    Yes, he's a successful fundraiser or was a successful
6    fundraiser.
7    Q.    In the summer of '13 he was fundraising for Mike Maggio,
8    for Rhonda Wood.  Who else?
9    A.    I don't know.
10   Q.    Anybody?
11   A.    He was fundraising for UCA.
12   Q.    Yeah, he sure was.  That was his job, wasn't it?
13   A.    Right.
14   Q.    Okay.  He got $100,000.  Who else was he fundraising for?
15   That was his paid job at UCA, right?  All this other stuff --
16   A.    Yes.
17   Q.    -- is either through LRM or it's free or something, isn't
18   it?
19   A.    Well, it's through LRM.
20   Q.    Okay.  So tell me who else through LRM he was fundraising
21   for besides Judge Maggio and Judge Wood?
22   A.    I don't know.
23   Q.    Did he have a bunch of clients?
24   A.    He had several.
25   Q.    Can you --
```

1    A.    But I can't think of who else he was fundraising for at

2    that particular time.

3    Q.    Is several more than two?

4    A.    Well, could be.

5    Q.    Is it in your mind?

6    A.    I can't come up with the name so I guess we'll have to

7    stick with two.

8    Q.    Okay.  So you think in the summer of 2013 there were only

9    two people he was fundraising for at that time?

10   A.    That I can recall.

11   Q.    Okay.  And if he was fundraising for Judge Maggio and Judge

12   Wood and this is July of 2013, that would be too early, wouldn't

13   it?  Am I right?

14   A.    Well, I think you have to -- I'm not sure.  I'm not sure --

15   you can't ask for support.  You can't ask for support --

16   Q.    Before November 22nd?

17   A.    Right.

18   Q.    Is July before November 22nd?

19   A.    Yes, it is.

20   Q.    So if he got money in July, he shouldn't have got it,

21   should he?

22            MR. HENDRIX:  Objection, Your Honor.

23            THE COURT:  Sustained.

24            MR. HARRIS:  Okay.

25   BY MR. HARRIS:

1    Q.   Is July before November 22nd?

2    A.   It is, but I think it's different when you are using

3    PACs --

4    Q.   Okay.

5    A.   -- than if you --

6         MR. HENDRIX:  Your Honor, again, I object.  If the

7    witness could finish.

8         THE COURT:  I'm sorry?

9         MR. HENDRIX:  If he would allow the witness to finish

10   the answer.

11        THE COURT:  All right.  Of course, the witness needs

12   to finish her answer.  I'm concerned about drifting into this

13   area that we discussed before whether to give a limiting

14   instruction, and I haven't heard from the defense on that.  So,

15   Mr. Harris, pick back up, please.

16        MR. HARRIS:  Thank you, sir.

17   BY MR. HARRIS:

18   Q.   You said you could pick up for PACs.  I think you said

19   something about PACs, didn't you?

20   A.   Yes.

21   Q.   What did you just say?

22   A.   I just said there's a different way you can contribute to

23   PACs instead of for the separate campaign.

24   Q.   Okay.  And do you know was Judge Wood getting money through

25   PACs; do you know?

1    A.    Yes.

2    Q.    In July of 2013?

3    A.    Well, I don't know the date that she got them.  But he had

4    PACs for Judge Wood.

5    Q.    Okay.  How do you know that?

6    A.    Because we had talked about it.

7    Q.    Who's we?

8    A.    Gilbert and I had talked about it.

9    Q.    When had Gilbert and you talked about it?

10   A.    Well, I was an administrator of a PAC; so we had talked

11   about it when he was setting them up.

12   Q.    Okay.

13   A.    And asked me if I would be the administrator of a PAC.

14   Q.    And what PAC were you the administrator of?

15   A.    I think it was Red PAC or Arkansas -- it was Arkansas Red

16   or Red PAC.

17   Q.    Okay.  Had you ever been the administrator of a PAC before?

18   A.    No.

19   Q.    Okay.  What is an administrator of a PAC -- a PAC is

20   political action committee, is it not?

21   A.    Right.

22   Q.    What does an administrator of a PAC do?

23   A.    I don't really -- there's not a lot of responsibility to

24   it.

25   Q.    Then I could probably do it, couldn't I?

1   A.   You could.

2   Q.   I would be good at it?

3   A.   You could.

4   Q.   And how much did you get paid as the administrator of the

5   PAC?

6   A.   I didn't get paid anything.

7   Q.   And what were you supposed to do as the administrator of

8   the PAC?

9   A.   I don't really know what the responsibilities were.  I

10  don't know.

11  Q.   I mean, what did Mr. Baker tell you?

12  A.   He got several people to be administrators of PACs that we

13  knew and that I was friends with, and when he did it, he set

14  them up with administrators, and I felt comfortable, you know,

15  being an administrator.  I don't think there were a lot of

16  duties assigned to it, though.

17  Q.   And did he do this through Chris Stewart?

18  A.   Yes.

19  Q.   And do you know when he did this?

20  A.   No, I don't.

21  Q.   If I told you it was before he got the checks, would that

22  ring a bell or after he got the checks?

23  A.   I don't know.

24  Q.   Okay.  Now, let's talk about you got these checks from Mr.

25  -- or you got a package from Mr. Baker, right?

```
1    A.   Right.

2    Q.   You took it to Chris Stewart?

3    A.   Right.

4    Q.   And you said it was in an envelope?  Is that what you said?

5    A.   Yes.

6    Q.   Was it a FedEx envelope?

7    A.   I believe it was.

8    Q.   And was it sealed or was it just open?

9    A.   It was opened, but --

10   Q.   Okay.  What was in it?

11   A.   I didn't look in it.  It was rolled up, and I didn't look

12   in it.  I just gave it to Chris Stewart.

13   Q.   And did you look at the outside of the package?

14   A.   I'm sure I did.

15   Q.   Who was it addressed to?

16   A.   Gilbert.

17   Q.   And could you see who was sending it?

18   A.   I don't recall.  I don't recall.

19   Q.   And he asked you to take it to Chris Stewart?

20   A.   Right.

21   Q.   And at the time where was Mr. Baker's office or where were

22   you all doing this at?

23   A.   In the building right down from the capitol.  I can't

24   remember the name of the building.  It's a gray building.

25   Q.   You mean just down the street?
```

1   A.   Yes.

2   Q.   Here in Little Rock?

3   A.   Yes.

4   Q.   Victory Building.  Does that ring a bell?

5   A.   Victory Building.

6   Q.   Okay.

7   A.   That's correct.

8   Q.   How did you all happen to be at the Victory building?

9   A.   Because that's were the offices were.

10  Q.   What offices?

11  A.   LRM's offices.

12  Q.   Is that where you went every day to work?

13  A.   Yes.

14  Q.   Did Mr. Baker go there every day to work?

15  A.   No.

16  Q.   Okay.  And when you took -- where was Chris Stewart's

17  office?  Was it in Little Rock?

18  A.   On Cantrell.

19  Q.   In Little Rock?

20  A.   Yes.

21  Q.   Okay.  And did you take them and hand them to Mr. Stewart?

22  A.   I think I gave them to his assistant.

23  Q.   And did you have an idea what was in that package?  I mean

24  did Mr. Baker tell you?

25  A.   I knew there were some checks from Michael Morton, but I

1    don't know how many or who they were to or I didn't look at --

2    in the envelope.

3    Q.   And what did Mr. Baker tell you -- why were you taking it

4    to Chris Stewart?

5    A.   Right.  Why -- he just asked me to take it over to Chris.

6    Q.   Did you ever take anything to Chris before?

7    A.   Yes.

8    Q.   Did you take anything after that?

9    A.   Probably.

10   Q.   Okay.  Now, at some point you got to -- you got more

11   involved in Judge Wood and her Supreme Court race; am I correct?

12   A.   Right.

13   Q.   She was a Court of Appeals judge, right?

14   A.   Yes.

15   Q.   Did you know her before you got more involved?

16   A.   I knew -- I think I had met her before.

17   Q.   And where had you met her?

18   A.   I don't know.  I know we met talking to Rhonda Wood about

19   her campaign in Conway at Mike's Place.

20   Q.   What's Mike's Place?

21   A.   It's a restaurant.

22   Q.   Okay.  Who all was present?

23   A.   Gilbert was there, I was there, Rhonda was there and

24   someone else.  I don't know who else was there, but somebody

25   else were there.  I think there were four people.

1    Q.    Do you know a guy named Clint Reed?

2    A.    Yes.

3    Q.    Who is Clint Reed?

4    A.    He's a political strategist.

5    Q.    Okay.  Do you know whether or not he was helping Judge Wood

6    on her campaign?

7    A.    I don't know.

8    Q.    Okay.  Did you know whether or not he was helping Judge

9    Maggio in his campaign?

10   A.    I don't recall that.

11   Q.    Okay.  Now, at some point you got more involved in Judge

12   Maggio's campaign -- I mean, Judge Wood's campaign; am I

13   correct?

14   A.    That's right.

15   Q.    And how did that come about?

16   A.    Well, when we met that day, we just talked about that I

17   really -- I had the time and the opportunity to help her with

18   her campaign, and that's what we decided to do.

19   Q.    So this is --

20   A.    I think -- I think Gilbert thought it would be a nice fit

21   for me to do that for Rhonda Wood.

22   Q.    Okay.  Did you know that he was already -- he was

23   fundraising or agreeing to fundraise for her?

24   A.    I probably knew that.

25   Q.    And they had known each other for a long time?

1    A.    Correct.

2    Q.    And so he introduced you as, hey, this is Linda Lee, she

3    works for me at LRM.  She has some time.  She can help you on

4    your campaign.  Is that how it went?

5    A.    Something like that.

6    Q.    And then you kind of did your little sales pitch I take it?

7    A.    Well, I just talked to her.  Just got to know her a little

8    better.

9    Q.    I didn't mean to say little sales pitch.  I wasn't

10   belittling, I mean, but you went into your talk where you could

11   talk her into hiring you; is that correct?

12   A.    Well, we just talked and kind of got to know each other

13   better and got a feel for her personality and mine and what she

14   wanted done and if I thought I could accomplish that.

15   Q.    When do you think this lunch happened?

16   A.    It wasn't a lunch.  It was after work one day.  It was

17   about 4:00 or 4:30.

18   Q.    Oh, I thought you said lunch at Mike's Place?

19   A.    We went and met at Mike's Place, but we didn't eat lunch.

20   Q.    I misunderstood.  And so when do you think this happened?

21   A.    In the summer of '13.

22   Q.    Okay.  So after you had taken those checks over to Chris

23   Stewart, I'm sorry, that FedEx package over to Chris Stewart?

24   A.    I didn't do it the same day.

25   Q.    No, I know.  I mean after that time period?

1   A.   It could have been.  I'm not sure.  It was -- I mean, I did

2   that sometime that summer.

3   Q.   Okay.  And so did she say -- did Judge Wood say I'll get

4   back to you or yes or no?

5   A.   Well, she had to leave the meeting.  She got a telephone

6   call and had to the leave the meeting so we didn't confirm

7   everything that day.

8   Q.   And when did you confirm it?

9   A.   Sometime after that.  Not too long after that.

10  Q.   Like a week or a day or month, two months?

11  A.   Within a couple weeks, I would say.

12  Q.   And so what were you supposed to do for Judge Wood?

13  A.   Fundraise for her, do an event for her, get grassroots

14  people to help with the campaign.

15  Q.   Okay.  And you can do this like on the side because you are

16  still working for LRM, I take it?

17  A.   Right.

18  Q.   Do you have any other job?

19  A.   No.

20  Q.   Okay.  So your sole job is LRM, $2,000 a month, and now, on

21  the side, you are going to do this for Judge Wood?  That's a

22  question.

23  A.   That's right.

24  Q.   Is that right?

25  A.   That's right.

1  Q.   Okay.  And how much is Judge Wood going to pay you for

2  this?

3  A.   I don't remember exactly.  I got paid -- it was -- I can't

4  recall.  I don't know.

5  Q.   And when y'all started, when y'all discussed at the

6  beginning, did she give you an idea of how much she could pay

7  you, is what I'm asking?

8  A.   Yes.

9  Q.   How much did she say she would pay you?

10  A.   I think there was going to be two payments, and you have

11  helped me remember this from -- I think there were two payments

12  of $20,000 a piece.

13  Q.   I helped you?

14  A.   Yes.

15  Q.   How did I help you?

16  A.   I saw the checks.

17  Q.   Okay.

18  A.   That you had.

19       MR. HARRIS:  May I approach, Your Honor?

20       THE COURT:  You may.

21  BY MR. HARRIS:

22  Q.   I'm going to show on Exhibit 7A and 7B.  I'm just going to

23  ask you this question:  Do you recognize these?

24  A.   Yes.  That's $10,000 a piece.

25  Q.   What are they?

1    A.    They are checks to my consulting company for $10,000, two

2    of them.

3    Q.    From whom?

4    A.    Rhonda Wood.

5    Q.    Okay.

6          MR. HARRIS:  Your Honor, I would offer Government's

7    Exhibit 7A and 7B.

8          MR. HENDRIX:  Your Honor, I would object and ask to

9    approach.

10         THE COURT:  Ladies and gentlemen of the jury, how

11   about an afternoon break?  Yes?  All right.  Usual rules of the

12   road.  At this time pads down here in your chair.  Don't talk

13   about the case.  Don't let anybody talk to you about it.  All

14   rise for the jury.

15         (Jury not present.)

16         THE COURT:  Ms. Flanagin, don't let anybody talk to

17   you about your case when we are on break, and you don't talk to

18   anyone about it.  And you can step down.

19         MR. HENDRIX:  Your Honor, it's a relevance objection,

20   and I don't -- because I don't understand the fact of

21   consequences that's trying to be proved.  I understand that this

22   evidence is she's getting paid by Rhonda Wood's campaign for

23   working on the fundraising.  I just don't know how that makes

24   any facts of consequences in this case more probably than not.

25         (Recess taken from 2:01 until 2:19 p.m.)

```
1          THE COURT:  Y'all can be seated.  Thank you.
2          MR. HARRIS:  May I proceed, Your Honor?
3          THE COURT:  You may.
4   BY MR. HARRIS:
5   Q.   Ms. Flanagin, if you bare with me just a few more
6   questions, I'm really close.
7   A.   Okay.
8   Q.   Okay.  Get some water?
9   A.   Yes.
10  Q.   Now, I think this is right, but I think you said you have
11  never been to the Brave New with Gilbert Baker when you saw
12  Michael Morton?
13  A.   That's correct.
14  Q.   I beg your pardon?
15  A.   Can you hear me?
16  Q.   I can't, no.
17       (Off the record discussion.)
18          THE COURT:  Try again, Mr. Harris.
19  BY MR. HARRIS:
20  Q.   Okay.  I believe you said you have never been to Brave New
21  Restaurant with Gilbert Baker when Michael Morton was there; is
22  that correct?
23  A.   That's correct.
24  Q.   And did you know that Mr. Baker and Judge Maggio were
25  friends?
```

1   A.   Yes.

2   Q.   Okay.  And how did you know that?

3   A.   I keep up with what's going on in Conway.  My family lives

4   there.

5   Q.   Was it common knowledge that Gilbert Baker and Michael

6   Maggio were friends?

7   A.   I don't know that it would be common knowledge, but -- I

8   don't know what to -- I mean, I don't know what you are asking.

9   Q.   I was just asking you how you know Gilbert Baker and

10  Michael Maggio were friends?

11  A.   I just keep up with what's going on in Conway.

12  Q.   And then I asked you:  Is it common knowledge in Conway?

13  A.   I don't know that it's common knowledge, but I knew it.

14  Q.   Okay.  Did Mr. Baker tell you that?

15  A.   I don't know if he did or didn't.

16  Q.   Okay.  But he did ask you to be a PAC officer, and somebody

17  actually looked it up for me; does the name Conservative

18  Persons --

19  A.   Conservative Persons.

20  Q.   Conservative Persons, I don't know if that's Inc. or In?

21  A.   Incorporated, I think.

22  Q.   Incorporated, all right.  CPI -- CPI PAC?

23  A.   Yes.

24  Q.   Does that ring a bell?

25  A.   Yes.

1   Q.   And what officer were you of CPI?

2   A.   I was the administrator, is my understanding.

3   Q.   Okay, and what other officers were there of CPI?

4   A.   Let's see.  I think the guy who did payroll.

5   Q.   Who's that?

6   A.   I can't think of his name right this second.

7   Q.   You mean the guy at LRM or the guy at --

8   A.   At LRM.

9   Q.   James McAllister?

10  A.   James McAllister was administrator.

11  Q.   So you think he was an officer on the CPI PAC?

12  A.   Not CPI.  He would have been on a different PAC.

13  Q.   No, but I'm asking with CPI; what other officers were there

14  besides you?

15  A.   I think I was the only one.

16  Q.   And how did -- and you became an officer because --

17  A.   Gilbert asked me to be one.

18  Q.   Okay.  You didn't get paid?

19  A.   I didn't get paid, no training.

20  Q.   No training.  Honorary title?

21  A.   Right.

22  Q.   Okay.  You never did anything?

23  A.   No.

24  Q.   Did he tell you you would ever have to do anything?

25  A.   I think it's -- I think it's just a -- he has to have a

1   different administrator on a PAC, and he just has to have

2   somebody that can -- I don't -- I don't know anything about

3   them.

4   Q.   What did he tell you you would have to do, is what I'm

5   asking?

6   A.   He said I wouldn't have to do anything.

7   Q.   Okay.  Did he think you were qualified to do that?

8   A.   Yes.

9   Q.   Okay.  And you wouldn't get paid?

10  A.   No.

11  Q.   Would you have to fundraise for CPI?

12  A.   No.

13  Q.   Why did he want you to be a PAC, do you know -- a PAC

14  officer; do you know?

15  A.   No, I don't.

16  Q.   Did you ask him?

17  A.   No.

18  Q.   And I think you said he did tell you he got some checks

19  from Morton, but he didn't tell you who they were for or how

20  much?

21  A.   Right.

22  Q.   He didn't tell you about the $100,000 from UCA?

23  A.   Not when I first -- I don't know if I even had the check

24  from -- for UCA in the pack -- I mean, in the UPS or FedEx

25  package.

1   Q.   But I'm saying you testified that he didn't tell you he got

2   $100,000 UCA check?

3   A.   Not to my knowledge.

4   Q.   Did he tell you he got $50,000 for ALR?

5   A.   No.

6   Q.   Did he tell you he got money for Judge Maggio?

7   A.   I don't know -- I don't know what the checks were.

8   Q.   Okay.  Y'all were close, though, weren't you?

9   A.   Yes.

10  Q.   You talked daily?

11  A.   Yes.

12  Q.   Took trips together, didn't you?

13  A.   A couple of trips.

14  Q.   Three?

15  A.   Okay.

16  Q.   No, I'm asking you.

17  A.   No, you said three.  I said a couple which means two.

18  Q.   That means a couple?

19  A.   Two.

20  Q.   New York?

21  A.   Yes.

22  Q.   New Orleans?

23  A.   Yes.

24  Q.   Los Angeles?

25  A.   Yes.

1  Q.    Any more that I have left out?

2  A.    I don't believe so.

3  Q.    Would that be three?

4  A.    That would be three.

5  Q.    Now -- in 2014, July 25th, 2014, do you remember coming to

6  the U.S. Attorney's Office and visiting with the U.S. Attorney

7  and the FBI?

8  A.    Yes.

9  Q.    You had an attorney?

10  A.    Yes.

11  Q.    Did you get immunity?

12  A.    Yes.

13  Q.    What's immunity to you?

14  A.    That means that as long as I tell the truth that I don't

15  have any responsibility to go to jail.

16  Q.    Yeah.  I mean, not responsibility, but as long as --

17  A.    I know, right.

18  Q.    Can't be prosecuted for anything you have done?

19  A.    Right.

20  Q.    And the day you were interviewed -- do you remember being

21  interviewed on the morning of July 25th, 2014?

22  A.    Yes.

23  Q.    Do you remember when you left, who called you?

24  A.    Gilbert did.

25  Q.    Yeah.  How did he know you were meeting with the FBI and

1   the U.S. Attorney's Office?

2   A.   I may have told him.

3   Q.   Okay.  And when he called after you left, what did he say?

4   A.   He wanted to know how it had gone.

5   Q.   What did you tell him?

6   A.   I told him I couldn't talk about it.

7   Q.   What did he say?

8   A.   I think he wanted me to talk about it.

9   Q.   Okay, and how was his reaction when you said, I'm not

10  telling you?

11  A.   He was frustrated.

12  Q.   Okay.  If you had said mad, would that be correct?

13  A.   He could have been mad.

14  Q.   Yeah.  What's the difference between mad and frustrated?

15  A.   Well, I don't know.  I mean, that's just different things

16  to different people.

17  Q.   Um-hum.  How did you take it when you told him, I'm not

18  going to tell you what I told the FBI?

19  A.   How did I take it?

20  Q.   How did you take it when he was asking you that and you

21  wouldn't tell him?  How did you take his -- what he was saying

22  to you?

23  A.   Well, I had been asked not to say anything about it so I

24  wanted him to be respectful of that.

25  Q.   And, was he?

1   A.   Probably not.

2   Q.   Okay.  In fact, you told him, didn't you?

3   A.   Did I testify that I told him?

4   Q.   Ma'am, I'm asking you a question.  Did you tell him?

5   A.   No.  I don't believe I told him.

6   Q.   Okay.  July 25th, 2014, you were interviewed by the FBI and

7   you got immunity, right?

8   A.   Right.

9   Q.   Okay.  You testified at the grand jury on this case in

10  January of 2019; didn't you?

11  A.   Yes.

12  Q.   Do you remember that?

13  A.   Yes.

14  Q.   Where we met that four-and-a-half years later, wasn't it?

15  A.   Right.

16  Q.   So during those four-and-a-half years you never told him

17  what you told the FBI?

18  A.   I don't recall ever telling him what I told the FBI.  I was

19  asked not to say anything.

20  Q.   I realize you don't recall.  I'm asking you did you tell

21  him over that four-and-a-half-year period that you -- what you

22  told the FBI?

23  A.   I just was honest and said what I was supposed to say, said

24  what I -- said what happened, what I knew to be true.

25  Q.   My question is --

1    A.    I don't believe I did.

2    Q.    My question is:  Did you tell him over that

3    four-and-a-half-year period?

4    A.    I don't believe I did.

5    Q.    Okay.  But after that July 25th, 2014, meeting, when you

6    continued to see him and work for him?  That's a question.

7    A.    Repeat that.

8    Q.    Yeah.  After that July 25th, 2014, meeting, did you ever

9    see him again?

10   A.    Yes, I saw him again.

11   Q.    Okay.  On more than one occasion?

12   A.    Yes.

13   Q.    And on those more than one occasions, you never told him

14   what you told the FBI?

15   A.    No, I didn't.

16   Q.    That's the gospel?

17   A.    To my recollection, yes.

18   Q.    Okay.  Do you realize there's a difference between, "Yes,

19   that's the gospel," and "to my recollection, that's the gospel";

20   do you realize that's a difference?

21   A.    Do you realize that's a difference?

22   Q.    I'm asking the questions, Ma'am.

23   A.    Yeah, well, I just asked one.

24          THE COURT:  Ma'am, Ms. Flanagin, you have to answer

25   the questions.

1          THE WITNESS:  Well, I asked him to repeat it.

2          THE COURT:  That's not what just happened in the

3     exchange, ma'am.

4          THE WITNESS:  I asked him to repeat it.

5     BY MR. HARRIS:

6     Q.   You testified to the grand jury on January of 2019, didn't

7     you?

8     A.   If that's the date you have.

9     Q.   You don't remember the date?

10    A.   No, I don't remember the date.

11    Q.   Do you remember testifying at the grand jury?

12    A.   Yes, I do.

13    Q.   Okay.  And you are telling the truth today?

14    A.   Yes, I am.

15    Q.   Okay.

16          MR. HARRIS:  That's all I have, Your Honor.

17          THE COURT:  Please keep your seat.  Yes, ma'am.

18    Mr. Hendrix?

19                        CROSS-EXAMINATION

20    BY MR. HENDRIX:

21    Q.   Thank you, Judge.  Ms. Flanagin, my name is Blake Hendrix.

22    I represent Gilbert Baker.  We've never met, correct?

23    A.   That's correct.

24    Q.   First time you and I have talked?

25    A.   (Nodding head.)

1  Q.   This will be a lot easier, I promise.  Okay?  Let's

2  talk about --

3  A.   I have something to say but go ahead.

4  Q.   I have to admit, I'm highly confused about a lot of things

5  right now about your testimony.  Let me see if I can't clear

6  some things up, if not for the jury's understanding, at least

7  mine.  Okay?  Let's talk about LRM but go back before LRM.

8       Gilbert Baker served in the Arkansas State Senate for 12

9  years; is that right?

10  A.   I think that's right.

11  Q.   So it was generally from 2000 to 2012 --

12          THE COURT:  Mr. Hendrix?

13          MR. HENDRIX:  Yes, sir.

14          THE COURT:  Sorry.  I need to interrupt.

15          MR. HENDRIX:  Yes, sir.

16          THE COURT:  I'm having trouble hearing both of you.

17          MR. HENDRIX:  Hello?

18          THE COURT:  Yes.  If you could just get the mike --

19  stay close to the mikes.  I think it will help me and the

20  members of the jury hear everything.  Thank you.

21          MR. HENDRIX:  Better?

22          THE COURT:  Yes.

23          MR. HENDRIX:  Good.

24          THE WITNESS:  Okay.

25  BY MR. HENDRIX:

1   Q.   Okay.  So Gilbert Baker served in the state senate from

2   2012 -- pardon me from 2000 to 2012.  That's your understanding,

3   right?

4   A.   Yes.

5   Q.   You got a little bit -- cross ways on some dates with

6   Mr. Harris.

7   A.   I did.

8   Q.   But technically that term would be January 1, 2001, to

9   December 31st, 2013; fair enough?

10  A.   Okay.

11  Q.   All right.  During that time -- so I think these are

12  three-year terms.  So Mr. Baker was elected four times in a row

13  to the state senate, correct?

14  A.   Okay.

15  Q.   I may have gotten that wrong.  Are they four-year terms?  I

16  don't know.  All right.

17  A.   I don't know.

18  Q.   He continued to get re-elected.  He left in 2012 because of

19  term-limits, correct?

20  A.   That's correct.

21  Q.   And so that we understand what term limits are, in Arkansas

22  you can only get elected so many times in a row and you can't

23  run again, right?

24  A.   That's right.

25  Q.   So he got term-limited out in 2012, right?

1  A.    Yes.

2  Q.    Okay.  In 12 years in the Arkansas State Senate, you get to

3  know a lot of people, I assume, right?

4  A.    That's correct.

5  Q.    You worked there at the Arkansas State Senate, correct?

6  A.    Yes.

7  Q.    And you are aware that one of the many things that

8  Mr. Baker did is, during his term -- his 12-year terms, he

9  served as Chairman of the state budget committee, right?

10  A.    Yes.

11  Q.    And the state budget committee runs and distributes all the

12  funding for all the state agencies in the state, correct?

13  A.    That's correct.

14  Q.    It's essentially running about a $6 billion business and

15  how you fund a $6 billion business like the State of Arkansas,

16  right?

17  A.    That's correct.

18  Q.    It takes very specialized knowledge, doesn't it?

19  A.    Yes, it does.

20  Q.    It takes a lot of work?

21  A.    Yes.

22  Q.    It takes a lot of understanding of the intricacies of how

23  state government works, correct?

24  A.    That's correct.

25  Q.    Also during that time he served, when he was elected as,

1    chairman of the state Republican party, correct?

2    A.    Yes.

3    Q.    And that takes a lot of knowledge about how the state

4    Republican party works, right?

5    A.    Yes.

6    Q.    And so, like many, many, many others, when he leaves the

7    Arkansas State Senate, he opens up a consulting firm, right?

8    A.    That's right.

9    Q.    That consulting firm is called LRM, right?

10   A.    Yes.

11   Q.    And people want to come to someone with that level of

12   specialized knowledge to consult with, correct?

13   A.    That's correct.

14   Q.    So, for instance, you have a legal problem.  You want to

15   consult with somebody who has specialized problems, you may go

16   to a lawyer, right?

17   A.    That's correct.

18   Q.    And consult with that lawyer, right?

19   A.    That's right.

20   Q.    And you pay me for that consultation, right?

21   A.    Yes.

22   Q.    That's what LRM is doing, correct?

23   A.    That's correct.

24   Q.    He has specialized knowledge.  He's giving it to clients,

25   and he's getting paid for it, correct?

1   A.   That's correct.

2   Q.   And he had several clients, right?

3   A.   Yes.

4   Q.   One was Arkansans for Lawsuit Reform, right?

5   A.   Correct.

6   Q.   He had all those connections in the state senate, yes?

7   A.   Yes.

8   Q.   ALR's ProTort Reform?

9   A.   Right.

10  Q.   There's a voice right there, an understanding of how the

11  state senate works, that a company, a trade association like

12  ALR, would want to tap into, correct?

13  A.   That's correct.

14  Q.   I think you mentioned a tobacco company -- the vape

15  industry, I think?

16  A.   Right.

17  Q.   They would want that specialized knowledge, correct?

18  A.   That's correct.

19  Q.   And would pay for it and pay handsomely for it?

20  A.   That's right.

21  Q.   We lawyers make a little bit of money, not that much, but

22  it's the same principle; am I right?

23  A.   That's correct.

24  Q.   Okay.

25       (Off the record discussion.)

1    BY MR. HENDRIX:

2    Q.    Okay.  Odd question I'm going to ask you.  At LRM, you

3    didn't have an LRM credit card, did you?

4    A.    No, I didn't.

5    Q.    Okay.  Let me clear up a thing that you were dealing with

6    at the very end there with Mr. Harris.

7          There came a time where you sat for a deposition in a civil

8    case that's been talked about here, where Gilbert and Michael

9    Morton ended up getting sued, right?

10   A.    That's correct.

11   Q.    And you sat for a deposition, correct?

12   A.    Yes.

13   Q.    And Gilbert Baker told you, before sitting in that

14   deposition, tell the truth?

15   A.    To tell the truth.

16            MR. HARRIS:  What was that?

17            THE WITNESS:  To tell the truth.

18            MR. HARRIS:  Objection.

19            THE COURT:  Sustained.  I'm not sure that's a proper

20   question.

21   BY MR. HENDRIX:

22   Q.    The next -- well, I don't want to do it in front of the

23   jury, I was going to talk about -- Okay.

24            THE COURT:  Let's go to sidebar.

25         (Sidebar conference reported as follows:)

1          THE COURT:  Start with you, Mr. Harris, on the basis

2     of the objection.

3          MR. HARRIS:  It's hearsay, Your Honor.  He's trying to

4     get in his client's statement through her.  That's hearsay.

5          MR. HENDRIX:  By the nature of the question, it was to

6     imply that Mr. Baker wanted to know and manipulate her grand

7     jury testimony.  The next follow-up question is:  Did Gilbert

8     Baker tell you to go to the grand jury and tell the truth?

9          THE COURT:  I think you can ask the follow-up

10    question, subject to hearing from Mr. Harris, but I don't know

11    about the windup.  Maybe not even the follow-up, if the hearsay

12    analysis is right.  Mr. Harris?

13         MR. HARRIS:  I guess my questions on direct was

14    implying he got her to lie to the grand jury.  I don't

15    understand that point.  But my point is he can't get up there

16    and say:  Did my client say this? yes. did my client say this?

17    and get his client's statement as a question when actually he

18    is -- that's getting in hearsay.

19         THE COURT:  I think that -- right.  It's the reverse

20    of the statement by a party opponent because you are trying to

21    get your own person.  So I'm -- the implication -- I didn't get

22    an implication of lying.  I got an implication of anger, that

23    she wouldn't say what she said.  But --

24         MR. HENDRIX:  Okay.

25         THE COURT:  But I don't know what the jury got, of

1    course.  I'm going to sustain the objection.  And let's move on.

2         (Sidebar conference ended.)

3    BY MR. HENDRIX:

4    Q.   Mike Morton, is your direct testimony you met a couple of

5    times?

6    A.   At least.

7    Q.   I heard you had dinner a couple times.  How -- well, do you

8    know Michael Morton?

9    A.   Pretty well.

10   Q.   Okay.  So how many times -- you -- I heard two, but are

11   there more times that you -- let me narrow this down.

12        Gilbert Baker and Michael Morton had, for instance, dinner?

13   A.   I don't know how many times Gilbert Baker and Michael

14   Morton had dinner.  I have been with them probably twice, but I

15   have seen him at the state Ocapitol --

16   Q.   Sure.

17   A.   -- a lot.

18   Q.   Not when Mr. Morton would be at the state capitol on behalf

19   of his business and talking to politicians and senators and

20   congressmen and whatever at the state capitol, right?

21   A.   Right.

22   Q.   On business?

23   A.   Yes.

24   Q.   So these occasions when you were with Mr. Morton, it was

25   business?

1  A.    Yes.

2  Q.    And with Gilbert, was it fundraising business?

3  A.    Yes.

4  Q.    Okay, LRM's offices are at the Victory Building?

5  A.    They were.

6  Q.    Did Michael Morton ever go there?

7  A.    Not to my knowledge.

8  Q.    Okay.  There's this discussion of a lunch meeting on

9  May 16th, 2013, at Brave New Restaurant.  So let's clear that

10 up.

11      Are you saying you definitively were not there or you don't

12 recall being there?

13 A.    I don't recall being there.

14 Q.    Could have been, right?

15 A.    It could have been.

16 Q.    And so that was May 16th, 2013.  The legislature was in

17 session, right?

18 A.    I don't recall.  I don't know if it was still in session in

19 May or not.

20 Q.    And it's been a long time for you, I understand, but let's

21 stay with when the legislature is in session.

22      For everybody in the political arena, there are lots of

23 lunches going on, right?

24 A.    Yes.

25 Q.    There are lots of dinners going on?

1   A.   Yes.

2   Q.   There are lots of meetings going on?

3   A.   Yes.

4   Q.   That's the workings of our government, right?  And

5   during --

6   A.   Very much so.

7   Q.   Beg your pardon?

8   A.   Very much so.

9   Q.   And during those, say, 90 days or whatever it is that the

10  state legislature meets, you have politicians from all over the

11  state converging on Little Rock, right?

12  A.   That's correct.

13  Q.   You are from Little Rock?

14  A.   I'm from --

15  Q.   You are from Conway, right?

16  A.   Right, I grew up in Conway, but I've been in Little Rock a

17  long time.

18  Q.   Well, I was going to ask if you ever -- if you're from

19  Little Rock and you spent any time in Little Rock, we all know

20  when we try to go out to a restaurant when the legislature is in

21  session because you can't get a seat anywhere just about, right?

22  A.   That's correct.

23  Q.   So there's a lot of activity going on?

24  A.   (Nodding head.)

25  Q.   And Gilbert, as a fundraiser, as a former politician, as a

1  consultant, is as equally busy as all of them, correct?

2  A.   Yes.

3  Q.   A discussion about a meeting between Gilbert and Michael

4  Morton in Russell at a Ruby Tuesday's, do you remember

5  discussing that with Mr. Harris?

6  A.   Yes.

7  Q.   And all you know about that is -- is that that was Gilbert

8  meeting with Michael Morton regarding Gilbert's fundraising

9  efforts, correct?

10  A.   Yes.

11  Q.   And it was after that then, that campaign contributions are

12  received from Michael Morton to political action committees,

13  Rhonda Wood campaign, contributions to ALR, correct?

14  A.   Yes.

15  Q.   And the donation to UCA, correct?

16  A.   That's correct.

17  Q.   You said that -- so it was a successful meeting?

18  A.   Yes.

19  Q.   It was a fundraising meeting?

20  A.   Yes.

21  Q.   And that's what Gilbert did?

22  A.   That's right.

23  Q.   Gilbert had lots of those lunches with lots of people,

24  correct?

25  A.   Yes.

1    Q.    In order to raise money?

2    A.    That's right.

3    Q.    Because he worked for raising money for lots of people,

4    right?

5    A.    Yes.

6    Q.    This PAC -- actually, you are listed as an officer for a

7    PAC called Conservative Persons N PAC; does that sound familiar

8    to you at all?

9    A.    I thought it Conservative Persons Incorporated, but it

10   could be.

11           MR. HENDRIX:  May I show this to her, Judge?

12           THE COURT:  You may.

13           MR. HENDRIX:  Just to refresh your memory.

14           THE WITNESS:  Okay.

15   BY MR. HENDRIX:

16   Q.    And, Ms. Flanagin, I'm not going to do it right now because

17   that document is actually going to come into evidence, I think,

18   in the -- as a government exhibit, but just to refresh your

19   memory, that shows you as a -- that's a PAC registration form,

20   correct?

21   A.    Yes, it is.

22   Q.    I think the date on it is January 15th, 2014; am I right?

23   See a file mark on the front page?

24   A.    Yes.  It's right.  That's correct.

25   Q.    Okay.

1   A.   January 15th.

2   Q.   And it lists two officers, correct?

3   A.   Yes, it does.

4   Q.   It lists Chris Stewart as an officer?

5   A.   Yes.

6   Q.   And it lists you as an officer?

7   A.   Right.

8   Q.   And Chris Stewart is an attorney in town, correct?

9   A.   Yes.

10  Q.   And he was actually the one that created that PAC, correct?

11  A.   Yes --

12  Q.   And he administered it, correct?

13  A.   Yes.

14  Q.   Okay.  So there was nothing for you to do.  Chris Stewart's

15  a lawyer that's name is on the PAC and officer of the PAC,

16  right?

17  A.   Right.  He was a registered agent and officer, and I was

18  just an officer.

19  Q.   Now, back between LRM and fundraising, you guys were busy,

20  and you and Gilbert were working a lot together, right?

21  A.   Yes, we were.

22  Q.   And it was busy, and when I mean busy, Gilbert had LRM

23  Consulting, right?

24  A.   Right.

25  Q.   He had fundraising for candidates going on, right?

1    A.    Right.

2    Q.    Had his job at UCA, right?

3    A.    That's correct.

4    Q.    And there was a lot of traveling involved, right?

5    A.    Yes.

6    Q.    Now, I understand yours was limited, but you are aware

7    Gilbert was on the road quite a bit, correct?

8    A.    That's correct.

9    Q.    Off to Washington, D.C., to do political things there, off

10   to Dallas to do political things.  I think UCA was mainly the

11   Dallas thing, but he was on an airplane a bunch, right?

12   A.    Yes.

13   Q.    Traveling, always busy?

14   A.    Yes.

15   Q.    Okay.  During all of that time, in the busyness and the

16   times you were together, he never mentioned anything to you

17   about this verdict, the $5.2 million verdict and this nursing

18   home case, right?

19   A.    No.

20   Q.    And having never discussed it, then the obvious answer to

21   the next question is, he never said anything about trying to

22   influence a judge in a legal case, right?

23   A.    No.

24   Q.    Never talked to you about influence, never talked to you

25   about a bribe?

1    A.    Never.

2    Q.    You didn't bribe anybody?

3    A.    No.

4    Q.    You got an immunity grant?

5    A.    Yes.

6    Q.    You didn't bribe anybody?

7    A.    That's correct.

8    Q.    Was that a lawyer thing?

9    A.    I'm -- I'm not a lawyer.  I don't know.

10   Q.    You had one?

11   A.    Yes.

12   Q.    And that lawyer worked out some deal for you to be able to

13   sit down with the government, right?

14   A.    That's right.

15            MR. HENDRIX:  That's all I have got.  Thank you.

16            THE COURT:  Thank you, Mr. Hendrix.  Mr. Harris,

17   redirect?

18            MR. HARRIS:  Yes, sir.

19                    REDIRECT EXAMINATION

20   BY MR. HARRIS:

21   Q.    Ms. Flanagin, when Mr. Hendrix started off, he asked you

22   about Gilbert Baker when he worked as a state senator; do you

23   remember those questions?

24   A.    Yes, I do.

25   Q.    Okay.  And I'm going to correct the record.  And,

1  Mr. Hendrix, if I get this wrong, by all means correct me, but

2  Mr. Hendrix said that Gilbert Baker was a state senator from

3  January 1 through 2001 -- I'm sorry -- January 1, 2001 through

4  December 30th, 2013.  Do you remember him asking that question?

5  A.    Yes.

6  Q.    Because you have said yes to it, right?

7  A.    Yes.

8  Q.    That's not right, is it?

9  A.    I don't know.  You tell me.

10  Q.    Okay.  Okay.  I will.  I will.  He -- he stopped being a

11  senator in January of 2013 when he went to work for UCA, is what

12  you testified to earlier?

13  A.    Okay.

14  Q.    Is that not right or am I right or am I wrong?

15  A.    I usually -- when we go over this timeline, I usually have

16  a pen that I can write down the timeline.  It's been one big

17  blob today; so you are telling me it was '13?

18  Q.    No, no.  I'm asking you.

19  A.    Well, I don't know the exact dates.  It's one big blob

20  today.  I don't know the exact dates.

21  Q.    What exactly do you know?  Do you have immunity?  Do you

22  know that?

23  A.    Yes, I do.

24        MR. HENDRIX:  I'm sorry.

25        MR. HARRIS:  Am I right about that date?

1          MR. HENDRIX:  Hold on, Mr. Harris.

2          MR. HARRIS:  Oh, I'm sorry.

3          MR. HENDRIX:  I object to the argumentive nature of

4    the questions, but I also got the year wrong.  He served for 12

5    years.

6          MR. HARRIS:  And ended in January of '13.

7          MR. HENDRIX:  Okay.

8          MR. HARRIS:  No, no.  2012.

9          THE COURT:  It shouldn't be a matter -- Counsel, it

10   shouldn't be a matter of great dispute when someone served in

11   public office.  I'm sure it will be made clear as the case goes

12   forward.

13      Mr. Harris, a bit salty on the last questions.  Sustained.

14   Please proceed.

15          MR. HARRIS:  Got you.  I think Ms. Peters will

16   probably clear up the dates.

17          THE COURT:  I'm sure she will.

18   BY MR. HARRIS:

19   Q.   Mr. Hendrix also said that LRM had several clients, and you

20   said yes.  Do you remember that?

21   A.   Yes.

22   Q.   And when I asked you that question, you talked about a

23   wet-dry issue?

24   A.   Yes.

25   Q.   You talked about environmental?

1    A.    Yes.

2    Q.    You talked about --

3    A.    A tobacco issue.

4    Q.    Tobacco issue?

5    A.    Yes.

6    Q.    And Judge Woods?

7    A.    Yes.

8    Q.    Was Judge Woods an LRM client?

9    A.    No, she was a client of mine.

10   Q.    Okay.  Okay.  Was Judge Maggio an LRM client?

11   A.    I'm not sure.

12   Q.    So we got three?

13   A.    No.  That was five, if we counted the judge.

14   Q.    What judge?

15   A.    Maggio.

16   Q.    Okay.  Maggio, tobacco, environmental, wet-dry?

17   A.    And Rhonda Wood.  No, there was one more.

18   Q.    And it was what?

19   A.    Lawsuit reform.

20   Q.    ALR?  Is ALR what you're talking about, Arkansans for

21   Lawsuit Reform, that was paying him $10,000 a month?  You have

22   to answer.

23   A.    Yes.

24   Q.    I mean, this lady is taking it down.  That's the only

25   reason I -- and when he says they have several clients, that's

1   what you were referring to, those five; am I correct?

2   A.   Okay.

3   Q.   I'm asking you.  Were there more than those five?

4   A.   There were probably more than five.

5   Q.   And like how many more?

6   A.   Maybe three more.

7   Q.   And can you name them?

8   A.   No.

9   Q.   And how did you come up with three?  Is that just a number

10  you have?

11  A.   Well, it's more than two.

12  Q.   It is indeed.  I think you said you only ate with

13  Mr. Morton twice.  Mr. Hendrix asked you a question.  You said,

14  "I only ate with Mr. Morton twice."  Is that your memory?

15  A.   That's my memory.

16  Q.   As you sit here today?

17  A.   Yes.

18  Q.   Okay.  And you said Gilbert saw him and talked to him a

19  lot?

20  A.   Yes.

21  Q.   Okay.  And so did Gilbert Baker see him a lot and have

22  lunch with him or dinner with him a lot?

23  A.   I can't speak for Gilbert.

24  Q.   Okay.  You said -- I think the question Mr. Hendrix asked

25  you was, Gilbert Baker had lots of lunches with lots of people

1  to raise money, and you said?

2  A.  Yes.

3  Q.  That's right.  That's what you said.  Who were those people

4  that he raised money for, the lots of people?

5  A.  He was raising money for UCA.

6  Q.  Okay.  That was his job.  Yes, okay.  Who is the lots of

7  people, is what I'm asking?

8  A.  He raised money for people that were running for office.

9  Q.  Yes, like who?

10  A.  Well, I can't name all of them.

11  Q.  The only reason I ask is because he said there were lots of

12  people, and you said yes, and so I'm just following up --

13  A.  I'm sorry.

14  Q.  Who are those lots?

15  A.  Well, I mean, I had six campaigns at one time, and I know

16  he was helping fundraise for some of those people, and I can't

17  name those people.  That was six one summer.

18  Q.  What summer was that?

19  A.  So -- 2012, I believe.

20  Q.  Okay.  So that was before LRM started, right?

21  A.  That's right.

22  Q.  That's when he was still a state senator, right?

23  A.  That's correct.

24  Q.  That was when he was getting 10,000 a month for Arkansas

25  Faith and Freedom, right?

1    A.    I don't know if he was or not.

2    Q.    You were working for Arkansas Faith and Freedom, weren't

3    you?

4    A.    Yes, I was.

5    Q.    That summer of 2012 is what you are talking about when he

6    helped you, right?

7    A.    Yes.

8    Q.    Not '13, not '14?

9    A.    No.

10   Q.    When did you stop working for LRM?  I don't -- when did you

11   stop working for LRM?

12   A.    I don't know.

13   Q.    Do you have an idea?

14   A.    '15 maybe.

15   Q.    Okay.  And then Mr. Baker -- I mean Mr. Hendrix said it was

16   a busy time for Gilbert Baker during this time; he was

17   fundraising for candidates and traveling.  Do you remember what

18   you said?  You said yes.

19   A.    Okay.

20   Q.    Remember that?

21   A.    Yes, I do.

22   Q.    Okay.  So what time was he -- are you talking about it was

23   busy for him fundraising for candidates and traveling?

24   A.    Well, when he was chairman of the budget committee, he was

25   super busy.

1    Q.    Okay.

2    A.    I don't know if you've known anybody who was chairman on

3    the budget committee, but that's an all-encompassing job.

4    Q.    Okay.  And so that was when he was state senator?

5    A.    That's correct.

6    Q.    Okay.  So that was before January of 2013, wasn't it?

7    A.    Yes.

8    Q.    Because he stopped being a state senator in January of '13?

9    A.    Okay.

10   Q.    So you're talking about back in '12 and '11 is when he was

11   busy traveling around raising money for candidates?

12   A.    No, I didn't say he was raising money for candidates then.

13   Q.    No, no.  Mr. Hendrix -- that was his question.  He was

14   fundraising for candidates, and you said, yes.  I'm asking you:

15   When was this time he was doing all this?

16   A.    When was the time he was doing all this?  Well, probably

17   from '10 to -- earlier than that.  He has the Republican party

18   and probably did fundraising then.  So whatever year that was.

19   It was before '10 --

20   Q.    Okay.

21   A.    Through until -- until this came up.

22   Q.    And when --

23   A.    Then he went out of business.

24   Q.    When did this come up?

25   A.    When I met you.

1    Q.   You met me in January of '19.

2    A.   Okay.

3    Q.   So you mean from before '10, 2010, through January of '19,

4    he was raising money and helping candidates and all that kind of

5    stuff, and you were with him?

6    A.   I didn't say I was with him.

7    Q.   No, I'm asking you.  Were you with him during that whole

8    time?

9    A.   No, he was raising money long before '10.

10   Q.   Let's just focus on '13.

11   A.   Okay.

12   Q.   2013, 2014.

13   A.   I'm sorry?

14   Q.   Was he raising money for a lot of candidates then?

15   A.   Yes, he was.

16   Q.   But you can't tell me any candidate he was raising money

17   for other than Judge Wood and Judge Maggio, can you?

18   A.   That's all I'm going to say right now.

19   Q.   Okay.  Can you tell me any other candidates he was raising

20   money for?

21   A.   No, I cannot.

22   Q.   Okay.

23        MR. HARRIS:  That's all I have, Your Honor.  Thank you

24   Ms. Flanagin.

25        MR. HENDRIX:  Nothing further, Judge.  Thank you.

```
1          THE COURT:  Counsel, may Ms. Flanagin be excused?
2          MS. PETERS:  For the United States, yes.
3          THE COURT:  Thank you, ma'am.
4          MS. PETERS:  The United States calls Ancil Lea.
5          THE COURT:  Mr. Lea, come on forward, please.
6      ANCIL LEA, GOVERNMENT'S WITNESS, DULY SWORN
7                    DIRECT EXAMINATION
8  BY MS. PETERS:
9  Q.   Would you please state and spell your name?
10 A.   Yes, ma'am.  Ancil Lea.  A-n-c-i-l, first name.  Last name
11 is Lea, L-e-a.
12 Q.   Mr. Lea, what do you do for a living?
13 A.   We sell -- I sell medical software, and we do consulting
14 for clinics and hospitals.
15 Q.   Have you ever served in political office?
16 A.   I have.
17 Q.   What kind of office?
18 A.   I was Justice of the Peace in Faulkner County.
19 Q.   Do you know Gilbert Baker?
20 A.   I do.
21 Q.   And how did you get to know Gilbert Baker?
22 A.   Well, his -- his wife and my girlfriend at the time decided
23 it would be a great idea for us to get together in this prayer
24 group they were having at First Baptist Church in the early part
25 of 1980, and so we became prayer partners.
```

1  Q.   And did you all continue to be friends over the years?

2  A.   We have, yes.

3  Q.   At some point did your friendship sort of die away?

4  A.   We kind of -- more or less we kind of came to a -- he was

5  going one way, I was going another way in the late, like, 2010,

6  2009.

7  Q.   Did you ever see him after that?

8  A.   Oh, sure.

9  Q.   And so what was your relationship after about 2009 or '10?

10 A.   It was just -- it was friendly.  We just weren't quite as

11 close.

12 Q.   Did you meet for coffee occasionally?

13 A.   Absolutely.

14 Q.   Okay.  About how often do you think you met for coffee?

15 A.   Oh, gosh, maybe once a quarter, maybe.  Something like

16 that.

17 Q.   Did Gilbert Baker ever talk to you about a political action

18 committee?

19 A.   He did.

20 Q.   And was this in the summer of 2013?

21 A.   Yes.

22 Q.   Okay.  And what did he say to you about a political action

23 committee and when did he -- what was the context?

24 A.   Well, we had had coffee, and we were just visiting and --

25 and we were about to wrap up, and -- and he would -- and he

1    said, kind of, oh, by the way, hey, I'm -- we are putting

2    together these political action committees; you know, we would

3    like to put your name on one.  And I -- go ahead.

4    Q.    Please.  You go ahead.

5    A.    No.  I said, I'm not opposed, you know.  Sounds like a good

6    idea to me.

7    Q.    Had you ever served as a PAC officer before?

8    A.    I have not.

9    Q.    Okay.  So did he specifically ask you to serve as an

10   officer on a certain PAC?

11   A.    He -- I don't remember that.  I remember he mentioned the

12   name of the PAC that -- which I don't remember.  But I don't

13   remember that.

14   Q.    In spring of 2014, did Gilbert Baker reach out to you about

15   the PAC?

16   A.    Oh, absolutely.

17   Q.    And what happened during that conversation?

18   A.    Well, he said, hey, look, don't talk to the media, and I

19   was like, what are you talking about?  He said, don't talk to

20   the media about the PACs.  I was like, what are you talking

21   about?  And so from there, I found out more about the PAC.

22   Q.    What did you find out?

23   A.    Well, I found out that apparently the PAC that had my name

24   on it had given money to -- to candidates.

25   Q.    And were you aware that that specific PAC had started

1    giving money?

2    A.   I was not.

3    Q.   Did you ever talk with anybody before this conversation in

4    2014 with Gilbert Baker -- and I'm really talking here about the

5    summer of 2013 -- let me start over.

6         In the summer of 2013, did you talk with anybody about the

7    PAC after the initial conversation you had with Gilbert Baker?

8    A.   I don't remember.  I don't think so, but I don't remember.

9    Q.   Okay.  Did anyone ever ask you, hey, you have a PAC, would

10   you like to give some money to these candidates?

11   A.   No.

12   Q.   Did you ever receive a letter from an attorney, Chris

13   Stewart, telling you that you were an officer in a PAC?

14   A.   To the best of my recollection, no.

15   Q.   And when you found out you were an officer on this

16   particular PAC, did you reach out for Chris Stewart?

17   A.   Oh, I sure did.

18   Q.   Why did you do that?

19   A.   I wanted to know how this -- how this all came about.

20   Q.   What do you mean by "all this"?

21   A.   How -- at -- my question to Chris was:  How could you form

22   this PAC without my signature?

23   Q.   And, Mr. Lea, I would like you to take a look in that

24   binder there, please.

25   A.   Yes.

1   Q.   Can you take a look at what's called Government Exhibit 42?

2   There would be a little yellow sticker, 42.

3   A.   42?

4   Q.   Yes, sir.

5   A.   Yes.

6   Q.   Do you recognize that as a PAC registration form that has

7   your name on it?

8   A.   I do.

9           MS. PETERS:  Your Honor, the United States offers

10  Government Exhibit 42.

11          MR. HENDRIX:  No objection.

12          THE COURT:  Received.

13      (Government's Exhibit No. 42 was received in evidence.)

14      (Off the record discussion.)

15  BY MS. PETERS:

16  Q.   So this committee -- this form shows it was filed with the

17  Secretary of State on July 31st of 2013.  Were you aware that

18  this was being filed on July 21st of 2013.  Sorry.  I misspoke.

19  31st?

20  A.   No.

21  Q.   It says Citizens for Information Technology PAC, CIT PAC.

22  Do you recognize that name?

23  A.   I do.

24  Q.   Did you know that was the PAC you were an officer on?

25  A.   That's the one that Gilbert had mentioned to me.

1  Q.    Okay.  If you scroll up to Section 4.  I'm sorry, Section

2  3, right there.  Could you enlarge this?  And that lists you as

3  Ancil Lea, officer; is that correct?

4  A.    That's correct.

5  Q.    Okay.  This address, 6 West Post Oak, is that your address?

6  A.    No.

7  Q.    Has that ever been your address?

8  A.    No.

9  Q.    You do live in Conway?

10 A.    I do.

11 Q.    Okay.  And this phone number here 501-327-1779; is that

12 your phone number?

13 A.    No.

14 Q.    Was that ever a landline phone number of yours?

15 A.    It was -- it was our old landline.

16 Q.    Do you know about when you directed it?

17 A.    I want to say about 2005.

18 Q.    Okay, and Mr. Baker would have had your cell phone number?

19 A.    Oh, for sure.

20 Q.    Because you met for coffees?

21 A.    You bet.

22 Q.    Did you learn about who got the money from the CIT PAC?

23 A.    I did.  I learned that from the FBI.  The FBI contacted me

24 and asked me to come in and talk to them.

25 Q.    So you learned that $1450 from that PAC went to Judge

1    Maggio?

2    A.    That's correct.

3    Q.    And $1,000 went to a woman named Stacy Hurst?

4    A.    Right.

5    Q.    And in 2013 and 2014, did you know Stacy Hurst?

6    A.    No, I sure don't.

7    Q.    And in the -- the money that went to Judge Maggio if

8    anybody had consulted you about where this PAC money was going,

9    would you have said let's give it to Judge Maggio?

10   A.    Never.

11   Q.    Why is that?

12   A.    I do not like Mike Maggio.

13   Q.    Did you all have a bad business dealing before he became a

14   judge?

15   A.    Very much, yes.  Back in the '90s, I have been in medical

16   software really my whole career, since college, and we were

17   doing some medical billing for a doctor locally, and his AR was

18   messed up and I saw an opportunity to make money, and so we were

19   helping him with his billing so we got about, God, probably

20   about three or four months into it, and money was starting to

21   roll in except he wasn't paying us, and so I was like, oh, my

22   gosh, you know, so I really sought counsel with Mike Maggio

23   because at the time he had a billing service.

24         MR. HENDRIX:  Your Honor, if I may, not that I care,

25   but it doesn't sound relevant to me.

1          MS. PETERS:  I can move on, Your Honor.  It's not a

2    problem.

3          THE COURT:  Thank you.

4          MS. PETERS:  We'll just move on.

5    BY MS. PETERS:

6    Q.    Do you know Michael Morton?

7    A.    I do not.

8    Q.    So you were unaware he had given any money to fund the PAC?

9    A.    That's correct.

10   Q.    By agreeing to be an-on a pack would you expect to

11   participate in the decisions about where the money would go?

12   A.    100 percent.

13   Q.

14          MS. PETERS:  Your Honor may I have just moment?

15          THE COURT:  Absolutely.

16          MS. PETERS:  That concludes direct examination.

17                    CROSS-EXAMINATION

18   BY MR. HENDRIX:

19   Q.    Mr. Lea?

20   A.    That's correct.

21   Q.    You have been in a PAC before?

22   A.    Yes.

23   Q.    This is a PAC to support conservative Americans, right?

24   A.    That's correct.

25   Q.    That's right.  And you didn't say no, right?

1    A.    That's correct.

2    Q.    That's right.  Let's talk about this address.  May I

3    approach?

4              THE COURT:  You may.

5    BY MR. HENDRIX:

6    Q.    It's the same thing.  I think you got a 64.  Is that the

7    PAC registration form?

8    A.    64?

9    Q.    42?  I'm so sorry.  Citizens For Information Technology

10   PAC?

11   A.    Right.

12   Q.    Had you looked at that already?

13   A.    Correct.

14   Q.    Lists two officers, correct?

15   A.    Correct.

16   Q.    Chris Stewart, correct?

17   A.    Right.

18   Q.    He's an attorney, and it lists you, correct?

19   A.    That's correct.

20             MR. HENDRIX:  All right.  May I approach again?

21             THE COURT:  You may.

22             MR. HENDRIX:  I retract that, Judge.

23   BY MR. HENDRIX:

24   Q.    Let me ask it this way:  Did Chris Stewart send you a

25   letter dated January 19, 2014, that said, Dear Mr. Lea, I hope

1  this letter finds you well.  As you may know, I am the

2  registered agent for Citizens for Information Technology

3  Political Action Committee.  Thank you for serving as an officer

4  with this PAC.  I'm happy to report fundraising has been

5  successful.  CIT PAC has raised a total of $3,000.  By

6  January 9th we have not donated to any candidates but will be

7  doing so this quarter.  If you would like to review the PAC

8  financial reports, please visit the following website.  Thank

9  you for your attention to this correspondence.  Please do not

10  hesitate to contact me.

11      Did you receive a letter from Chris Stewart stating that on

12  January 9, 2014?

13  A.    I don't recall.

14  Q.    So let's look at the address.  What's the address?

15  A.    6 West Post Oak.

16  Q.    Look at your PAC registration form.  What's the address?

17  A.    6 West Post Oak.

18  Q.    Your address happens to be 6 Oak Wood Circle, correct?

19  A.    That's correct.

20  Q.    Chris Stewart got the 6 right, correct?  He got the 6

21  right, didn't he, Mr. Lea?

22  A.    So?

23  Q.    6 is in your address, is it not?

24  A.    Yeah.

25  Q.    Oak is in your address, correct?  Yes?

1   A.   Sure.

2   Q.   All right.  Conway, same address -- the same city, right?

3   Yes?

4   A.   Sure.

5   Q.   ZIP code is the same, 72034, correct?

6           THE COURT:  Ms. Peters?

7           MS. PETERS:  I'm not objecting.  I can't see the

8   witness because -- I moved; so I could see.

9   BY MR. HENDRIX:

10  Q.   Correct ZIP code?

11  A.   That's not address.

12  Q.   Is that the correct ZIP code, Mr. Lea?

13  A.   Yes.

14  Q.   He got the 6 right?

15  A.   Yes.

16  Q.   He got the Oak right?

17  A.   Yes.

18  Q.   He got the city right, got the state right, got the ZIP

19  right.  And now we find out today that, in fact, he got the

20  telephone number right; that's your landline, right?

21  A.   It was.

22  Q.   All right.  So is it possible that he just got -- missed

23  one word in your address and you didn't get this?

24  A.   That's correct.

25  Q.   All right.  You know Steve Goode?

```
1    A.   I do.

2    Q.   Steve Goode is an officer on one of these PACs, isn't he?

3    A.   Yes, he is.

4    Q.   On Red Arkansas?

5    A.   As far as I know.

6    Q.   Yep.  All right.  So the press hit with this story about

7    these PACs in March of 2014.  You remember that very well, do

8    you not?

9    A.   I do.

10   Q.   Yeah.  And that's the first time you ever made any

11   complaints about this pack, correct?

12   A.   Correct.

13   Q.   It was after your name showed up in the newspaper, right?

14   Yes?

15   A.   Yes.

16   Q.   You remember going to Don Thomas and Steve Goode and

17   saying, hey Steve, Don and I want to do a joint press release

18   that we'll say we were totally unaware of these PACs and that

19   Gilbert Baker never asked us at all to be a PAC officer?  Do you

20   remember having that conversation with Steve Goode?

21   A.   No, I didn't.

22   Q.   You do not remember having a conversation with Steve Goode

23   saying, Steve, join me and Don for a press release saying we

24   don't have any knowledge of any PACs?

25   A.   No.  I don't.
```

1    Q.   You don't remember Steve Goode saying, no, that's a lie,

2    Ancil, that's a lie, Don, I won't join your press release?

3    A.   I don't recall it.

4    Q.   You don't recall?

5    A.   No, I don't.

6              MR. HENDRIX:  I'm done, Your Honor.

7              THE COURT:  Mr. Hendrix, thank you.

8         Ms. Peters?

9              MS. PETERS:  No redirect, Your Honor.

10        May Mr. Lea be excused?

11             THE COURT:  Thank you, Mr. Lea.

12        Mr. Hendrix, for the record, was that a yes?

13             MR. HENDRIX:  Yes.

14             THE COURT:  I took it as a yes whether it was or not.

15   You can leave, sir.

16        (Witness excused.)

17             THE COURT:  Ladies and gentlemen, you all doing okay?

18   I would like to go a little further down the road if we can.

19   Okay?  How about a seventh-inning stretch?  Anybody need to

20   stand up.  I'm going to stand up.  Y'all do it if you need to.

21        Ms. Peters, who's next?

22             MS. PETERS:  FBI Agent Jacob Stokes.

23             **JACOB STOKES, GOVERNMENT'S WITNESS, DULY SWORN**

24                          **DIRECT EXAMINATION**

25   BY MS. PETERS:

1  Q.    Would you please state your name?

2  A.    Jacob Stokes.

3  Q.    Where do you work?

4  A.    I'm a special agent for the FBI here in the Little Rock

5  field office.

6  Q.    Would you please tell the jury just a little bit about what

7  you do with the FBI.

8  A.    I'm a special agent.  I have been for six years.  I am

9  currently on a white collar squad in which we investigate public

10  corruption cases, complex financial crimes, and civil rights.

11  Q.    And prior to being a special agent, did you work in another

12  capacity with the FBI?

13  A.    I was a investigative specialist for four years, which is a

14  surveillance specialist in Sacramento, California, field office.

15  Q.    And on October 3rd, of 2014, did the FBI seize the cell

16  phones of Gilbert Baker and Michael Maggio?

17  A.    Yes, that's correct.

18  Q.    And Mr. Baker's phone was associated with 501-472-0304?

19  A.    That is correct.

20  Q.    Was Mr. Maggio's cell phone number associated with the --

21  Mr. Maggio's phone associated with the number 501-773-4953?

22  A.    Yes.  That's correct.

23  Q.    And were those phones submitted to your CART group to be

24  search pursuant to a search warrant?

25  A.    That is correct.

1    Q.    What is CART?

2    A.    They were a computer forensic analysis team.

3    Q.    Did the FBI also obtain toll records from AT&T for

4    Mr. Baker's phone number and Mr. Maggio's phone number?

5    A.    Yes.

6    Q.    And would you explain to the jurors what a toll record is?

7    A.    So a toll record is phone carriers have log-in information

8    from the phones of dates, times, phone calls, text messages, to

9    and from what phone number was called or what phone number

10   called the number we requested information from.

11   Q.    So date, time, length of call?

12   A.    Correct.  Duration of phone call, text messages, whether it

13   was a text message going out or coming in.

14   Q.    So toll data, like a phone bill?

15   A.    Correct.

16   Q.    And does AT&T preserve context in those toll records, say

17   the context of text messages?

18   A.    No, they do not.

19   Q.    And do you see a binder up there in front of you?

20   A.    Yes.

21   Q.    Okay.  Would you please take a look at Government Exhibit

22   61?

23   A.    Yes.

24   Q.    And is that a disk of Mr. Baker's telephone records for

25   that number ending 0304 from January of 2013 through April of

1  2014?

2  A.   Yes, that's correct.

3  Q.   And would you look at Government's Exhibit 62?

4  A.   Yes.

5  Q.   Is that a disk of all of the telephone records for

6  Mr. Baker's phone ending in 0304 and Mr. Maggio's phone ending

7  in 4953 in 2014?

8  A.   Yes.  From January 1, 2014, through December 31, 2014.

9  Q.   And finally could you please take a look at Government's

10  Exhibit 71?

11  A.   Yes.

12  Q.   Is that a disk of telephone records for Michael Maggio's

13  phone ending 4953 starting January of 2013 through July 31st of

14  2014?

15  A.   That's correct.

16       MS. PETERS:  Your Honor, the United States moves to

17  admit Government Exhibit 61, 62 and 71.

18       MR. HENDRIX:  No objection.

19       THE COURT:  Received all three of them.

20    (Government's Exhibit Nos. 61, 62 and 71 was received in

21  evidence.)

22  BY MS. PETERS:

23  Q.   Those have a ton of data on them, right?

24  A.   Yes.

25  Q.   Every call and text that Gilbert Baker or Michael Maggio

1   made or received?

2   A.   For that time period, yes.

3   Q.   So using those records, did you create some summary

4   exhibits?

5   A.   Yes, I did.

6   Q.   And let me first ask you to take a look at Government

7   Exhibit 67.

8   A.   Yes.

9   Q.   And what is Government Exhibit 67?

10  A.   This is a summary of Mr. Baker's cell phone records and his

11  calls and text messages with Judge Mike Maggio.

12  Q.   So it's just the calls and texts between Gilbert Baker and

13  Michael Maggio?

14  A.   Correct, from January '13 to July 2014.

15  Q.   Well, January 1st of 2013?

16  A.   Correct, to July 31st of 2014.

17          MS. PETERS:   Your Honor, the United States moves for

18  the admission of Government's Exhibit 67.

19          MR. HENDRIX:   No objection.

20          THE COURT:   Received.

21      (Government's Exhibit No. 67 was received in evidence.)

22          THE COURT:   Ladies and gentlemen, the rules of

23  evidence allow for the preparation of summaries where there's a

24  whole bunch of stuff to boil it down and give you essentials.

25  That's what the -- is being done here.

1       Ms. Peters.

2           MS. PETERS:  Thank you, Your Honor.

3   BY MS. PETERS:

4   Q.   And we are just going to take a quick look because I know

5   you have distilled it further.  But so this Government Exhibit

6   67, you can scroll all the way through the year and see every

7   time -- actually through this more-than-a-year-and-a-half-period

8   everyone time Mr. Baker and Mr. Maggio was in contact?

9   A.   Correct.  It's going to be multiple pages, yes.

10  Q.   So we are going to move on then because that will be

11  available to the jury as an exhibit.

12       So we are going to move on to Government Exhibit 68.  Would

13  you please tell me what Government Exhibit 68 is.

14  A.   Like the last, this was a summary of Mr. Baker's cell phone

15  records, his calls and his text messages with Michael Morton.

16  Q.   What's the time period for your summary?

17  A.   January 1, 2013, through July 31st, 2014.

18  Q.   And did Mr. Morton use three numbers in those records

19  contacting Gilbert Baker?

20  A.   That's correct.  He used 479-414-3949 which was his cell

21  phone, and then there was two other numbers, 479, 783-4672 and

22  479-783-6694, which are tied to his business.

23  Q.   And so Government's Exhibit 68 would have all of the calls

24  and texts between Gilbert Baker and Michael Morton from

25  January 1st of 2013 through July 31st of 2014?

1    A.   That's correct.

2         MS. PETERS:  Your Honor, the United States moves to

3    admit Government Exhibit 68.

4         MR. HENDRIX:  No objection.

5         THE COURT:  Received.

6    (Government's Exhibit No. 68 was received in evidence.)

7         MS. PETERS:  And same thing; the jury will have that

8    to look at.

9    BY MS. PETERS:

10       Let's' move on to Government Exhibit 69.  Were these the --

11   are these telephone records, same time period, January 1st of

12   2013 through July 31st of 2014 between Gilbert Baker and Chris

13   Stewart?

14   A.   That's correct.

15   Q.   We have heard here Chris Stewart was an attorney working on

16   the PACs?

17   A.   Correct.

18   Q.   What phone numbers was Chris Stewart using to be in contact

19   with Gilbert Baker during that time period?

20   A.   We had two different numbers.  One was for Chris Stewart's

21   business 501-353-1364, and then also his cell phone, which was

22   501-837-7155.

23        MS. PETERS:  And, Your Honor, the United States moves

24   to admit Government Exhibit 69.

25        MR. HENDRIX:  No objection.

1          THE COURT:  Received.

2          (Government's Exhibit No. 69 was received in evidence.)

3    BY MS. PETERS:

4    Q.   Again, this will reflect all of the calls the jury can look

5    at.

6          And let's talk about Government's Exhibit 70, if you would

7    take a look at it.

8    A.   Okay.

9    Q.   This is another summary?

10   A.   That's correct.

11   Q.   Who is it between?

12   A.   This is a summary of Mr. Baker's cell phone records, his

13   calls and his texts with Judge Rhonda Wood.

14   Q.   What number was Judge Wood using at that time?

15   A.   501-472-5791, and this encompasses that same time period.

16   Q.   January 1st of 2013 through July 31st of 2014?

17   A.   Yes.

18          MS. PETERS:  Your Honor, the United States moves to

19   admit Government's Exhibit 70.

20          MR. HENDRIX:  No objection.

21          THE COURT:  Received.

22          MS. PETERS:  And, again, that will be available to the

23   jury so we'll move on to Government Exhibit 72.

24   BY MS. PETERS:

25   Q.   What is Government's Exhibit 72?

1   A.   This is a summary of Michael Maggio's cell phone records,

2   his calls and his text messages with Judge Rhonda Wood.

3   Q.   So just between those two people?

4   A.   Correct.

5   Q.   And that is between January 1st of 2013 and July 31st of

6   2014?

7   A.   Yes.

8        MS. PETERS:  And, Your Honor, the United States moves

9   to admit Government Exhibit 72?

10       MR. HENDRIX:  No objection.

11       THE COURT:  Received.

12   (Government's Exhibit No. 72 was received in evidence.)

13   BY MS. PETERS:

14   Q.   Were you also asked to prepare some exhibits that relate to

15   specific dates in the Martha Bull litigation?

16   A.   Yes.

17   Q.   And I would like you, please, to take a look at Government

18   Exhibit 73.  Do you see that?

19   A.   I do.

20   Q.   Are those the telephone contacts between -- involving

21   Gilbert Baker, Michael Morton, and Judge Maggio on May 16 and 17

22   of 2013?

23   A.   That's correct.

24       MS. PETERS:  Your Honor, the United States moves to

25   admit Government Exhibit 73.

1      MR. HENDRIX:  No objection.

2      THE COURT:  73 is in.

3   (Government's Exhibit No. 73 was received in evidence.)

4   BY MS. PETERS:

5   Q.   So in Government Exhibit 73, you can see at 10:32 and 10:33

6   and 10:39 a.m. there are text messages?

7   A.   Yes, that's correct.

8   Q.   Who's texting each other at that time?

9   A.   This is Judge Maggio and Gilbert Baker.

10  Q.   And then at 1:25 p.m. the same day, the day the verdict was

11  returned, what happens?

12  A.   There was a phone call from Gilbert Baker to Judge Maggio

13  that lasted three minutes and 50 seconds.

14  Q.   And there's been testimony that the verdict came in --

15  started at 5:47, came around 5:50 p.m.?

16  A.   Yes.

17  Q.   And so what do you see there after the verdict?

18  A.   About a little over 30 minutes later, after that verdict

19  came in at 6:22 p.m., Judge Maggio sent a text message to

20  Gilbert Baker.

21  Q.   What happened next?

22  A.   And then at 6:33 p.m. Michael Morton called Gilbert Baker

23  for six minutes and 49 seconds, and right after that phone call

24  that Mr. Baker had with Mr. Morton, he sent a text message to

25  Judge Maggio at 6:40 to which Judge Maggio responded at 6:44

1    p.m.

2    Q.    And the very next day in the morning on May 17, would you

3    highlight these communications please?

4    A.    Absolutely.  The morning of May 17th at 8:55 a.m. Gilbert

5    Baker called Michael Morton on a call that lasted eight and

6    three seconds.  And shortly after that phone call, Michael

7    Morton called Mr. Baker for another phone call that was two

8    minutes and 22 seconds.  And then 11:09 it appears Mr. Morton

9    tried to reach Mr. Baker again twice.  And then 11:59 Mr. Baker

10   called Mr. Morton for a call lasting six minutes and 11 seconds.

11   Q.    Now, there's already been testimony that, on June 17th of

12   2013, there were some motions filed including a motion for

13   remittitur.

14   A.    Correct.

15   Q.    Are you familiar with that?

16   A.    Yes.

17   Q.    I would like you to take a look at Government Exhibit 74,

18   please.

19   A.    Yep.

20   Q.    Do you see that?

21   A.    I do.

22   Q.    And on that day, the motion for a new trial or remittitur

23   was filed at 10:05 a.m.?

24   A.    Correct.

25   Q.    June 17?

1  A.  Yes.

2  Q.  And are these all of the phone communications between

3  Michael Morton and Gilbert Baker and Gilbert Baker and Judge

4  Maggio on June 17?

5  A.  For that date, these are all their phone records, yes.

6        MS. PETERS:  And, Your Honor, the United States offers

7  Government Exhibit 74.

8        MR. HENDRIX:  No objection.

9        THE COURT:  Received.

10     (Government's Exhibit No. 74 was received in evidence.)

11  BY MS. PETERS:

12  Q.  So the remittitur motion was filed by the nursing home

13  attorneys at 10:05 a.m.

14     What happened at 10:29 a.m.?

15  A.  At 10:29 a.m. Michael Morton called Gilbert Baker, and the

16  phone call lasted five seconds.

17  Q.  And at 5:51 p.m.?

18  A.  Michael Morton called Gilbert Baker again on a call lasting

19  three seconds, and then at 6:02 p.m. Michael Morton called

20  Gilbert Baker on a call lasting 19 seconds.  Finally at 6:23

21  p.m. Gilbert Baker called Michael Morton back in a call lasting

22  four minutes and 39 seconds.

23  Q.  So Michael Morton is trying three times that day to reach

24  Gilbert Baker?

25  A.  Correct.

1   Q.   And then they finally connect at 6:23?

2   A.   That's correct.

3   Q.   And that night there were text messages between Gilbert

4   Baker and Judge Maggio?

5   A.   Yeah, from 9:26 p.m. to 9:49 p.m. there was a text

6   conversation that took place, starting with Gilbert Baker to

7   Mike Maggio at 9:26 p.m.

8   Q.   So Baker to Maggio, then three with Maggio to Baker.  Baker

9   to Maggio, Maggio to Baker.  Baker to Maggio, Maggio to Baker?

10  A.   Correct.

11  Q.   Have you also reviewed some of Gilbert Baker's credit card

12  records?

13  A.   Yes, I have.

14  Q.   And would you please take a look at Government Exhibit 13?

15  A.   Yes.

16  Q.   Is Government Exhibit 13 Gilbert Baker's American Express

17  statement?

18  A.   Yes, it is, for Gilbert Baker and LRM Consulting.

19  Q.   And that is actually two pages of the statement; is that

20  correct?

21  A.   That is correct.

22  Q.   On there were you able to find an entry showing Ruby

23  Tuesday's?

24  A.   On June 26, 2013, there was a charge to Ruby Tuesday in

25  Russellville, Arkansas, for $33.85.

1  Q.   And did you determine that Mr. Baker and Mr. Morton had a

2  meeting at that date at Ruby Tuesday?

3  A.   Yes.

4         MS. PETERS:  And, Your Honor, the United States moves

5  for the introduction of Government Exhibit 13.

6         MR. HENDRIX:  No objection.

7         THE COURT:  Received as 13.

8      (Government's Exhibit No. 13 was received in evidence.)

9  BY MS. PETERS:

10  Q.   Go to the next page.  And that's the entry we were talking

11  about for Ruby Tuesday's on June the 26th?

12  A.   That's correct.

13  Q.   Would you please look at Government Exhibit 75.  Starting

14  then with June 27th -- Government Exhibit 75, so Ruby Tuesday's

15  on June 26th and on -- were you asked to prepare a summary of

16  all contacts between Gilbert Baker and Michael Maggio and

17  Gilbert Baker and Michael Morton on June 27, 28, and 29 of 2013?

18  A.   That's correct.

19  Q.   What happened on June 27th of 2013 of significance?

20  A.   Judge Maggio announced his campaign for Court of Appeals.

21  Q.   So he formally announced?

22  A.   Correct.

23         MS. PETERS:  Your Honor, the United States moves to

24  admit Government Exhibit 75.

25         MR. HENDRIX:  No objection, Your Honor.

1          THE COURT:  75 is received.

2          (Government's Exhibit No. 75 was received in evidence.)

3     BY MS. PETERS:

4     Q.   On June 27th there, would you tell the jury what you see?

5     A.   Yeah.  There Judge Maggio texted Gilbert Baker twice --

6     once at 5:14 p.m. and then at 5:40 p.m. to which Mr. Baker

7     responded at 5:40 p.m. by text message.

8     Q.   On June 28th of 2013, the next day, what are the

9     communications?

10    A.   Michael Morton called Gilbert Baker at 11:08 a.m. a phone

11    call lasted 21 minutes, 14 seconds.  Mr. Baker attempted to call

12    again at 1:19 p.m. to Mr. Morton for 8 seconds.  Mr. Morton

13    called Mr. Baker after that at 1:22 p.m. for four seconds, and

14    finally at 1:23 p.m. Mr. Morton called Mr. Baker, a call for 1

15    minute, 52 seconds.

16    Q.   The very next day on June 29th?

17    A.   There was a -- text communications between Judge Maggio and

18    Gilbert Baker, starting with Judge Maggio at 8:06 a.m. to which

19    Mr. Baker responded at 8:15 a.m. and then two more messages from

20    Judge Maggio at 8:20.

21    Q.   Okay.  Would you please look at Government Exhibit 76.  And

22    there's been testimony that on July 8th already that on

23    July 8th, the remittitur hearing happened around 1:00 p.m.?

24    A.   Correct.

25    Q.   The checks were sent via FedEx?

1    A.    Correct.

2    Q.    On July 9th that FedEx was delivered?

3    A.    Yes.

4    Q.    Were you asked to make a chart of communications between

5    Mr. Baker and Chris Stewart, the attorney, Rhonda Wood, the

6    judge, Michael Morton?

7    A.    And Judge Maggio.

8    Q.    And Judge Maggio.  Thank you.

9    A.    Yes.

10   Q.    Is that what this is?

11   A.    That's correct.

12        MS. PETERS:  Your Honor, the United States moves to

13   admit Government Exhibit 76.

14        MR. HENDRIX:  No objection.

15        THE COURT:  Received.

16   (Government's Exhibit No. 76 was received in evidence.)

17   BY MS. PETERS:

18   Q.    So let's look first at July 8th, the day of the remittitur

19   hearing.  What's going on that morning?

20   A.    At 9:25 a.m. Gilbert Baker calls Chris Stewart in a call

21   lasting 1 minute 41 seconds.  Shortly after that phone call,

22   Mr. Baker attempted to call Judge Maggio which lasted four

23   seconds.  Then at 9:32 Mr. Baker sent a text message to Judge

24   Maggio.  Judge Maggio then called Gilbert Baker at 9:48 a.m. and

25   left a voicemail, and then they finally connected on 9:49 a.m.

1  when Gilbert Baker called Judge Maggio for 4 minutes and 15

2  seconds.

3  Q.  And then on July 9th of 2013, when FedEx was delivered to

4  Mr. Baker's home at 10:31 a.m.?

5  A.  At 3:30 p.m. Mr. Baker called Judge Maggio for six seconds,

6  and then at 3:31 he called again for a call lasting one minute

7  and 22 seconds.  Shortly after that phone call, a half hour

8  later, Gilbert Baker called Michael Morton for a call lasting

9  eight minutes and 27 seconds.

10  Q.  That was at 4:05 p.m.?

11  A.  4:05 p.m., yes.

12  Q.  What happened next?

13  A.  Gilbert Baker sent a text message to Chris Stewart at 5:16

14  p.m. and then at 5:24 p.m. Mr. Baker sent a text message to

15  Judge Wood to which Judge Wood responded at 5:27 p.m.

16  Q.  And there's been testimony that Linda Lee Flanagin met with

17  the FBI for a proffer and interview at 10:00 a.m. on July 25th

18  of 2014?

19  A.  Correct.

20  Q.  Were you asked to prepare a summary of the calls between

21  Linda Lee Flanagin, Gilbert Baker, Michael Morton -- I should

22  say Gilbert Baker with Linda Lee Flanagin with Michael Morton

23  and with Judge Maggio for July 25th and 26th of 2014?

24  A.  That's correct, yes.

25  Q.  Sorry I talked over you.  25th and 26th, 2014?

1    A.    Yes.

2    Q.    Okay.  And --

3          THE COURT:  Ms. Peters, I'm sorry.  I was confused on

4    who's talking to who.  Would you -- would you draw me some links

5    there?

6          MS. PETERS:  I will, Your Honor.

7    BY MS. PETERS:

8    Q.    Government Exhibit 77, this is created from the phone

9    records of Gilbert Baker?

10   A.    Correct.

11   Q.    And it reflects the toll records of Gilbert Baker with

12   Linda Lee Flanagin?

13   A.    Yes.

14   Q.    Judge Maggio?

15   A.    Yes.

16   Q.    And Michael Morton?

17   A.    Correct.

18         MS. PETERS:  And, Your Honor, the United States moves

19   to admitted Government Exhibit 77?

20         MR. HENDRIX:  No objection.

21         THE COURT:  Admitted.

22    (Government's Exhibit No. 77 was received in evidence.)

23   BY MS. PETERS:

24   Q.    So the afternoon of Linda Lee Flanagin's interview with the

25   FBI, would you please describe the communications?

1    A.    Beginning at 1:15 p.m., Ms. Flanagin called Gilbert Baker

2    on a call lasting two minutes and 37 seconds, after which Ms.

3    Flanagin texted Gilbert Baker at 1:41 p.m. and Mr. Baker texted

4    back at 1:45 p.m. to Ms. Flanagin.  Right after that text

5    message, Gilbert Baker sent a text message to Michael Morton at

6    1:46 p.m., and Mr. Morton responded at 2:20 p.m. by text

7    message, and lastly Gilbert Baker sent a text message to Linda

8    Lee Flanagin at 2:25 p.m.

9    Q.    And then the next day on July 26th at 2014, the next

10   morning?

11   A.    At 10:41 a.m. Gilbert Baker sent a text message to Judge

12   Maggio.

13   Q.    And prior to these text messages between Gilbert Baker

14   texting Michael Morton on July 25th and Michael Morton

15   responding by text on July 25th, when was the last time before

16   July 25th that they had been in communication?

17   A.    The previous time they had contact was on March 18th, 2014,

18   which was a call for seven minutes and 34 seconds at 4:33 p.m.

19   Q.    And with respect to Gilbert Baker and Judge Maggio, before

20   this text message on July 26th of 2014 at 10:41 a.m., when was

21   the last time the toll records show they had been in contact?

22   A.    Prior to July 26th their last phone contact was on

23   March 16th, 2014, which is a phone call from Gilbert Baker to

24   Mike Maggio at 2:30 p.m. that lasted 1 minute and 55 seconds.

25   Q.    Did the FBI determine that, on July 2nd of 2014, there was

1   a fax sent from Conway Copies to Michael Morton's business fax

2   number?

3   A.   That's correct.

4   Q.   Would you take a look at Government Exhibit 10?

5          THE COURT:  Ms. Peters?

6          MS. PETERS:  Yes, Your Honor.

7          THE COURT:  Let's find a good breaking point sooner

8   rather than later.

9          MS. PETERS:  I have an excellent breaking point.  I

10  have this one exhibit and one more, and then I'm finished.

11         THE COURT:  Thank you.

12  BY MS. PETERS:

13  Q.   Government Exhibit 10, do you see that?

14  A.   I do.

15  Q.   Is that a Conway Copies receipt?

16  A.   Yes, it is.

17  Q.   From 4:05 p.m. on July 2nd, 2014?

18  A.   Correct.

19  Q.   And that shows that a fax was sent from that shop?

20  A.   Yes.

21         MS. PETERS:  Yes, Your Honor, I offer Government

22  Exhibit 10.

23         THE COURT:  Received without objection.

24      (Reporter clarification.)

25         MS. PETERS:  Thank goodness Mr Harris corrected me.

1    This is actually July 2nd of 2013.

2    BY MS. PETERS:

3    Q.    Is that correct?

4    A.    That is correct.

5    Q.    Okay.  I apologize.  It's not often Mr. Harris is right and

6    I'm wrong.

7              THE COURT:  The record will so reflect.

8              MS. PETERS:  Thank you, Your Honor.

9         So that's Government Exhibit 10.  I think I moved for it to

10   be admitted.

11             THE COURT:  And, Mr. Hendrix, confirm for me.

12             MR. HENDRIX:  No objection, Your Honor.

13             THE COURT:  10 is received.

14        (Government's Exhibit No. 10 was received in evidence.)

15   BY MS. PETERS:

16   Q.    So this is a Conway Copies receipt from July 2nd of 2013.

17   A.    It is.  I lost my screen.

18             MS. PETERS:  I think we all did.

19             THE COURT:  Yes.  Ladies and gentlemen, do y'all have

20   anything?  No.  I think the computer knows what time it is, too.

21   Don't you?

22             MS. PETERS:  And I could finish this in the morning,

23   Your Honor, if that's more convenient.

24             THE COURT:  No, no.  You said you had two things.

25   We'll do those.  We have to get our machinery to go, though.

1          THE WITNESS:  Do you want me to show the jury?

2          THE COURT:  I was going to say we have a paper copy of

3     PX 10.  Let's take it out of the binder and do things the old-

4     fashioned way.

5          MS. PETERS:  Yes, Your Honor.

6     BY MS. PETERS:

7     Q.   And let's just move on to Government Exhibit No. 11 then.

8     If you would look at that.

9     A.   Yes.

10    Q.   Is that a page of AT&T records for Phone No. 479-783-2715?

11    A.   Yes, it is.

12    Q.   And that's one of Mr. Morton's nursing homes?

13    A.   Central Arkansas Nursing, yes.

14    Q.   And that shows receipt of a fax from Conway Copies on

15    July 2nd at 2013 -- July 2nd of 2013 at 4:09 p.m.?

16    A.   That's correct.  That a fax number from Conway Copies sent

17    a fax to this number from Central Arkansas Nursing.

18    Q.   And did you determine that this was the only fax that came

19    into Mr. Morton's business that was not from a nursing home or a

20    medical company?

21    A.   Correct.

22    Q.   So Conway Copies' fax number is 501-238-9944 is the only

23    one between June 26th Ruby Tuesday's and July 8th that --

24    A.   Of our search of the phone records, it's the only fax that

25    was sent that was not from a nursing home or some sort of

1    medical company.

2            MS. PETERS:  The United States offers Government

3    Exhibit 11.

4            MR. HENDRIX:  No objection.

5            THE COURT:  Received.

6        (Government's Exhibit No. 11 was received in evidence.)

7            MS. PETERS:  I would like to pass that to the jury

8    quickly if I may, Your Honor.

9            THE COURT:  Ms. Black says the Elmo is now working and

10   we can all see it at the same time.

11       This is Government's 11, Ms. Peters?

12           MS. PETERS:  It is, Your Honor.

13           THE COURT:  Okay.

14   BY MS. PETERS:

15   Q.   Is this the entry you were speaking about, Agent Stokes?

16   A.   If it's supposed to be on my screen, I don't see it.  But,

17   yes, it is.

18           THE COURT:  I was gesturing to a juror who got the

19   exhibit to give back to him.  Sorry, Agent Stokes.

20           THE WITNESS:  Yes, this is it.  It popped up.

21   BY MS. PETERS:

22   Q.   It reflects the fax that came in at 4:09?

23   A.   Correct.  And it shows that it is in UTC time, which is

24   minus five hours for central time.  It shows 2109 -- the records

25   show it's in UCT time, and it shows 2109, and so it's minus five

1    hours to put it into central time, which is 4:09.

2           THE COURT:  What is UTC time?

3           THE WITNESS:  Universal time, I think it stands for.

4    Going through phone records is confusing when sometimes phone

5    companies put it in that universal time.

6           THE COURT:  You knew this, Ms. Peters?

7           MS. PETERS:  I actually did, Your Honor.

8           THE WITNESS:  It forces us to do a little math.

9    BY MS. PETERS:

10   Q.    Math, yes.

11         So you have to adjust for daylight savings also?

12   A.    Yes.

13   Q.    So sometimes central time is minus five?

14   A.    And sometimes it's minus six, correct.

15         MS. PETERS:  And that includes the direct examination.

16         THE COURT:  Good.  Thank you, Ms. Peters.

17         Juror No. 4, could you give that exhibit back please.

18         Agent Stokes, if you'll stay seated, we are going to take

19   our break for the day, and, Agent, don't talk with anyone about

20   your testimony tonight, and we will have cross-examination and

21   any redirect in the morning.  Okay?

22         THE WITNESS:  Yes, sir.

23         THE COURT:  Good.

24         Ladies and gentlemen of the jury, we made good progress

25   today, and I watched you pay attention, and the lawyers and

1    parties have as well, and everybody appreciates it.

2         As you go home and about your way tonight, leave the case

3    here in the jury room.  That's something you'll hear me say

4    several times.  Leave it here.  Pads facedown, of course, on

5    your chairs, when you leave, and follow all the rules of the

6    road.  Stay away from the news and social media.  Don't talk to

7    anyone about the case.  Don't let anyone talk to you about the

8    case.  Don't post anything on social media, and we'll see you

9    bright-eyed and bushy-tailed in the morning.  We'll start at

10   8:30.  Please be here about 8:15 or so.

11        Any member of the jury have any question for the Court?

12   Any logistical problems?  Everybody getting here on the time?

13   Is this all working for folks traveling?  Good.  Y'all have a

14   good evening.  All rise for the jury.

15        (Jury not present.)

16             THE COURT:  Ms. Peters or Mr. Harris, any ground to

17   cover this afternoon for the United States?

18             MS. PETERS:  No, Your Honor.  Thank you.

19             THE COURT:  Mr. Hendrix, any questions?

20             MR. HENDRIX:  No, Your Honor.

21             THE COURT:  Very good.  Counsel, y'all have a good

22   evening.  If you would please be here in place about 8:15 in

23   case something comes up that we need to deal with.  See you

24   tomorrow.  We are in recess.

25             (Proceedings continued to July 27, 2021, at 8:15 a.m.)

1                    I N D E X

2

3       Testimony of Connie May

4            Direct by Ms. Peters          107

5            Cross by Mr. Hendrix          111

6            Redirect by Ms. Peters        122

7            Recross by Mr. Hendrix        122

8       Testimony of Linda Lee Flanagin

9            Direct by Mr. Harris          123

10           Cross by Mr. Hendrix          177

11           Redirect by Mr. Harris        192

12      Testimony of Ancil Lea

13           Direct by Ms. Peters          201

14           Cross by Mr. Hendrix          208

15      Testimony of Jacob Stokes

16           Direct by Ms. Peters          214

17

18

19

20

21

22

23

24

25

Kathleen E. Maloney, RMR, FCRR, U.S. Court Reporter
kathleen_maloney@ared.uscourts.gov - 501-604-5115

```
 1                        E X H I B I T S

 2          Government's Exhibits in Evidence:

 3               Government's 10              233

 4               Government's 11              235

 5               Government's 13              226

 6               Government's 42              205

 7               Government's 61, 62, 71      216

 8               Government's 67              217

 9               Government's 68              219

10               Government's 69              220

11               Government's 72              221

12               Government's 73              222

13               Government's 74              224

14               Government's 75              227

15               Government's 76              228

16               Government's 77              231

17

18                    REPORTER'S CERTIFICATE

19          I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

20

21                                  Date:  July 26, 2021

     /s/ Kathleen Maloney, RPR, FCRR
22          United States Court Reporter

23

24

25
```

Kathleen E. Maloney, RMR, FCRR, U.S. Court Reporter
kathleen_maloney@ared.uscourts.gov - 501-604-5115