```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
 2
                    Case No. 4:19-CR-00031-DPM-1
 3
    UNITED STATES OF AMERICA,      )
 4                                 )
         GOVERNMENT,               )
 5                                 )
         -v-                       )
 6                                 )
    GILBERT R. BAKER,              )
 7                                 )
         DEFENDANT.                )    Little Rock, Arkansas
 8                                 )    July 27, 2021, 8:21 a.m.
    _____)
 9

10              VOLUME 3A - PAGES 240 - 391

11          TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12        BEFORE THE HONORABLE D.P. MARSHALL, JR.

13              UNITED STATES DISTRICT JUDGE

14

15   Appearances:

16   FOR THE GOVERNMENT       Julie E. Peters, ESQ., AUSA, and
                              Patrick C. Harris, ESQ., AUSA
17                            U.S. Attorney's Office
                              Eastern District of Arkansas
18                            Post Office Box 1229
                              Little Rock, AR 72203
19
     FOR THE DEFENDANT        J. Blake Hendrix, ESQ., and
20                            Margaret D. Depper, ESQ.
                              Fuqua Campbell, P.A.
21                            Riviera Tower
                              3700 Cantrell Road, Suite 205
22                            Little Rock, AR 72202

23
         Proceedings reported by machine stenography; transcript
24   prepared utilizing computer-aided transcription.

25
```

```
 1                      MORNING SESSION
 2        (Call to the order of the Court.)
 3             THE COURT:  Good morning, everyone.  Good to see
 4   you.  Do we have any business we need to do before the jury
 5   comes in, Ms. Peters?
 6             MS. PETERS:  Not for the government.
 7             THE COURT:  Mr. Hendrix?
 8             MR. HENDRIX:  Just a little bit, Your Honor.
 9             THE COURT:  Okay.
10             MR. HENDRIX:  If you'll give me one second, sir.
11   And I apologize I don't have my jacket on.
12             THE COURT:  Apology accepted but not necessary.
13             MR. HENDRIX:  On the judicial window issue, Judge --
14   by the way, any new policy on, as we speak, about masks?
15             THE COURT:  Not unless you have something that you
16   want me to consider.  I'll say this, counsel, think about it.
17   I went through the entire five weeks of school case trial this
18   summer and October with everybody in masks all the time.  Now,
19   it was a bit of a challenge, and it was just me looking at the
20   witness, and so I felt, rightly or wrongly, that I could
21   discern what I needed to see notwithstanding a mask, but it's
22   an alternative to consider.
23             So we also have the face shields.  I'm not sure if
24   folks were reminded of that, but we've got these things, and
25   we have plenty of them that people could put on when they take
```

1    their mask off, as an alternative, and you can see them, and

2    the jury can see them, but it would be a little bit of

3    protection.

4            MR. HENDRIX:  Understood.

5            THE COURT:  So I look forward to counsel's thoughts

6    about that.

7            Ms. Black, will you remind me maybe at lunch or the

8    middle of the day we could revisit mask issues?  Yes?

9            THE COURTROOM DEPUTY:  Yes.

10           THE COURT:  Thank you.

11           Do we have any word from Officer Pike?  We got

12   everybody?  Thank you, Officer Vanness, for the relay.  Sorry

13   I derailed you, Mr. Hendrix.

14           MR. HENDRIX:  Not at all, Your Honor.

15           On the judicial window, Ms. Depper and I have

16   crafted up a draft of a limiting instruction that we've given

17   to the government?  Just wanted to tender it to you at this

18   point.  We don't have to make a decision.  I think this would

19   be -- we would ask for it when David Sachar testifies, so

20   we've got some time, but I wanted to go ahead and give it to

21   you, and I've given a copy to the government.

22           THE COURT:  Thank you.

23           Okay.  I look forward to hearing the government's

24   thoughts about that in due course.

25           MR. HENDRIX:  And the second issue is just to not

```
 1   create any surprise, Agent Stokes testified yesterday that he
 2   had reviewed the Gilbert Baker slash LRM credit cards, and
 3   part of that was an exhibit.  I was going to cross Agent
 4   Stokes on some additional entries on those credit card
 5   statements.  They were not included in our exhibit list.  If I
 6   lay a foundation, I understand the government won't object to
 7   the introduction of this as an additional defense exhibit, but
 8   I didn't want to surprise you either.  And I don't have to --
 9   I can just cross him on it.
10            THE COURT:  Yes.
11            MR. HENDRIX:  Whatever the Court's preference is.
12            THE COURT:  I don't have a preference.  I think
13   either way is fine, and I'll leave it to you on how important
14   it is, whether you want the jury to see the paper, too, or
15   have it for reference down the line.
16            MR. HENDRIX:  Perfect.  Thank you, Your Honor.
17            THE COURT:  Just cover the foundation, as I know you
18   will, and I appreciate the government's cooperation on this
19   with the camel's nose already under the edge of the tent
20   there.
21            MR. HENDRIX:  Yes, sir.
22            And that's all we've got.
23            THE COURT:  Okay.  Good.
24            Does anyone need to step down the hall before we
25   begin?  It's fine if you do.  Otherwise, we can get our 12, or
```

```
 1    14 as it is now.

 2              Officer Vanness, we'll take our jury, please.

 3              MR. HENDRIX:  Your Honor, one final thing, just for

 4    clarity's sake.  I'm not sure I understood.  When we lawyers

 5    are speaking, masks up or can we have them down?

 6              THE COURT:  Until further order, you can have them

 7    down.

 8              MR. HENDRIX:  Okay.

 9              THE COURT:  But I'm open to considering y'all having

10    them up and using your sawmill voice, but . . .

11              MR. HENDRIX:  Understood.

12              THE COURT:  Okay.  Agent Stokes, I understand you

13    have an obligation in front of Sister Baker later today.

14              THE WITNESS:  I do, yes.

15              THE COURT:  That will be fine.

16              Ms. Peters, do you request me to say something to

17    the jury about that or to leave it alone, on him coming and

18    going?

19              MS. PETERS:  I think if Your Honor doesn't mind, I

20    think it would be helpful for the jury to know why he's

21    stepping out and coming back at an untimely time.  He is

22    actually needed upstairs as soon as he's finished with his

23    testimony here.

24              THE COURT:  Any objection, Mr. Hendrix?

25              MR. HENDRIX:  No, Your Honor.
```

 1              THE COURT:  I agree with you, Ms. Peters, and I'll

 2    tell the jury.

 3              MS. PETERS:  Thank you.

 4              THE COURT:  You are welcome.

 5              Agent, I will call you back and remind you about the

 6    oath, that's a better way to do it, once we get our folks in.

 7              Do we have everyone?

 8              COURTROOM SECURITY OFFICER:  Yes, Your Honor.

 9              THE COURT:  I'm going to put you on the spot,

10    Officer Pike.  Any concerns or anything expressed by any of

11    the jurors about health issues or the virus?

12              A JUROR:  No, sir.

13              THE COURT:  Very good.  Everybody ready?

14              MR. HENDRIX:  Yes, sir.

15              THE COURT:  We'll take our jury.

16              COURTROOM SECURITY OFFICER:  Ladies and gentlemen,

17    your jury.

18         (The jury enters the courtroom.)

19              THE COURT:  Good morning, ladies and gentlemen.

20    Y'all can be seated.  Everybody doing okay?  Good.

21              Ladies and gentlemen, as y'all are discovering,

22    Ms. Black runs the courtroom and takes care of things.  She's

23    done a little rearranging here on the end to give folks a

24    little bit more room and spread people out, and keep letting

25    us know if there's anything that you would prefer or something

1    about the arrangement of the courtroom that's not working for

2    you, because you're the ones doing the important work in the

3    case.

4            Me and the lawyers, of course, are working hard,

5    too, that goes without saying, but y'all are the essential

6    ingredient in the trial.  We're making good progress on our

7    proof.  I'm very pleased with that, and we're going to press

8    on this morning.

9            Agent Stokes, will you return to the stand.

10           THE WITNESS:  Yes, Your Honor.

11           THE COURT:  Even though the night has passed, Agent

12   Stokes, you're still under oath.  Do you understand?

13           THE WITNESS:  Yes.

14           THE COURT:  Very good.

15           Ms. Peters, any further on direct?  I used to think

16   that the question, the perfect question that I wish I'd asked,

17   after I let the witness go, so did you want to ask any further

18   questions on direct?

19           MS. PETERS:  I'm sorry, I didn't hear what Your

20   Honor said.

21           THE COURT:  I was trying to tell a story.

22           MS. PETERS:  Oh.

23           THE COURT:  Do you wish to ask Agent Stokes anything

24   else before cross begins?

25           MS. PETERS:  No, Your Honor.  Thank you.

Stokes - Cross

```
1              THE COURT:  You're welcome.

2              Mr. Hendrix.

3              MR. HENDRIX:  Thank you, Your Honor.

4        Jacob Stokes, Government's witness, resumed the stand.

5                         Cross-Examination

6    BY MR. HENDRIX:

7    Q    Good morning, Agent.  How are you?

8    A    Good morning.  Good.  How are you?

9    Q    I'm good, thank you.

10              Yesterday you had testified -- pardon me -- that you

11   had reviewed Gilbert Baker's credit cards; is that right?

12   A    That's correct.

13   Q    And that credit card is actually a credit card in the

14   name of LRM Consulting; is that right?

15   A    Yes, and Gilbert Baker, yes.

16   Q    LRM Consulting and Gilbert Baker, one credit card?

17   A    Correct.

18   Q    And, in fact, you had introduced or through you the

19   government introduced one of the entries that had to do with

20   the meeting at Ruby Tuesdays?

21   A    Yes, sir.

22   Q    And you found that receipt, correct?

23   A    Yes.

24   Q    And you've gone through all of these credit card entries?

25   A    Yeah, I've looked through all of them, yeah.
```

Stokes - Cross

```
 1    Q    And I've handed you a stack of those; is that correct?
 2    A    Correct, yes.
 3    Q    Let's go through those kind of briefly, if you don't
 4    mind.  Is that all right?
 5    A    Yes.
 6    Q    And, Agent, if you will look at the bottom left of the
 7    pages is a Bates stamp number.  Do you see it, beginning would
 8    be 004791?
 9    A    Yes.
10    Q    That will help you and me get through these.
11              All right.  Go to Bates stamp 4799.
12    A    I'm there.
13    Q    And up at the top this shows the closing date of this
14    credit card statement on the LRM Consulting, Gilbert Baker,
15    it's an American Express card, right?
16    A    That's correct.
17    Q    The closing date is March 14th, 2013?
18    A    Yes.
19    Q    You with me?
20    A    Yep.
21    Q    Okay.  Let's go to Bates stamp 4801.
22    A    Yes.
23    Q    And if you will go down, I've tried to mark these for
24    convenience.  Do we see that on February 26, 2013, a credit
25    card charge to the Capitol Hotel in Little Rock?
```

Stokes - Cross

```
 1   A    That's correct, for 51.99.

 2   Q    Correct.  And the next one is March 14th, 2013, to Sonny

 3   Williams' Steakhouse?

 4   A    March 4th.

 5   Q    Pardon me.  You're absolutely right, March 4th, 2013.  Is

 6   that right?

 7   A    That's correct.

 8   Q    Now, March 2013 the legislature was in session; is that

 9   your understanding?

10   A    That's my understanding.

11   Q    Okay.  And I don't know if you're from Little Rock or

12   not, but Capitol Hotel, Brave New Restaurant, Sonny Williams',

13   the Packet House.  Are you familiar with those places as

14   places here in Little Rock where the legislators, when they're

15   in session, meet for lunch, meet for dinner, do the business

16   of the people at places like that?

17   A    I'm not from Little Rock, but I'm familiar with those

18   places, and, yes.

19   Q    Okay.  Great.  All right.  Move on to Bates stamp 4807.

20   A    I'm there.

21   Q    And this would be the credit card statement, again, for

22   Gilbert Baker, LRM Consulting, the closing date of April 12th,

23   2013.

24   A    Correct.

25   Q    4809.
```

Stokes - Cross

1  A     Yep.

2  Q     And we have an entry for March 25th, 2013.  Do you see

3  that?

4  A     Yes, looks like a Southwest Airlines.

5  Q     Yeah, it appears, and the passenger name is Gilbert

6  Baker, right?

7  A     Correct.

8  Q     And it appears that Mr. Baker purchased an airline ticket

9  for Southwest Air from Little Rock to Dallas, departing

10 April 13th; is that right?

11 A     Correct.

12 Q     Two more notations down, April 11th, another Packet House

13 charge; is that right?

14 A     Yes, looks like a restaurant charge on April 11th, 2013.

15 Q     Gotcha.  And so let's go to 4817.

16 A     Okay.

17 Q     Statement with a closing date of May 14th, 2013?

18 A     That's correct.

19 Q     And move over to Bates stamp 4820.

20 A     Okay.

21 Q     And on April 20th is another airline ticket purchase; is

22 that right?  It looks like from Dallas to San Antonio,

23 departure July 4th?

24 A     Yes, I see it, yes.

25 Q     At the top?

Stokes - Cross

1   A      Yep.

2   Q      Couple down, April 22nd, again, another charge to Brave

3   New Restaurant?

4   A      That's correct.

5   Q      Couple more down, April 23rd to the Capitol Hotel?

6   A      Yes.

7   Q      Okay.  Next, 4827 Bates stamp.

8   A      Statement closing date June 13th, 2013?

9   Q      You got it.

10          Bates stamp 4829.

11  A      Yep.

12  Q      Okay.  A charge on May 14th, 2013, to a restaurant in

13  Houston, Texas?

14  A      Yeah, Backstreet Cafe.

15  Q      Yeah, looks like two of them sort of back to back; is

16  that right?

17  A      Correct.

18  Q      May 15th, 2013, a charge to the La Quinta Inn in

19  Stafford, Texas?

20  A      That's correct.

21  Q      May 15th, a charge to Papa's Burgers in Houston?

22  A      Yes.

23  Q      And on May 20th, another airline purchase by Gilbert

24  Baker with a date of departure of 7/7/13; is that right?

25  A      That's correct.

Stokes - Cross

```
 1   Q     All right.  Let's take a little bit step back.
 2              The charges May 14th, 14th, May 15th and May 15th,
 3   that is during the trial of the Bull case, correct?
 4   A     Correct.
 5   Q     Right?  Because I think the Bull case, what, started
 6   May 8th; am I right?
 7   A     That sounds correct, and a verdict was on May 16th.
 8   Q     Correct.  So this shows that Mr. Baker, during the Bull
 9   trial, is actually in Houston, Texas, right?
10   A     On May 14th and 15th it appears so, yes.
11   Q     Gotcha.  And then switch over to the next page, and we
12   see the third entry down, May 25th, 2013, appears to be
13   another airline purchase on Spirit Airlines from Baltimore to
14   Dallas in the name of Gilbert Baker, date of departure
15   June 15th?
16   A     That's correct.
17   Q     Okay.  And June 17th is actually when posttrial motions
18   were filed, right?
19   A     Correct.
20   Q     May 26, 2013 we see another airline purchase ticket in
21   the name of Gilbert Baker, date of departure June 14th?
22   A     Yes.
23   Q     So those two actually, I think, entries probably got
24   turned around by American Express.  The first one should be
25   the day of the departure, June 14th, and then there's a date
```

Stokes - Cross

```
1    of departure -- that's from Little Rock to Dallas on

2    June 14th.  Then June 15th is Baltimore to Dallas.

3              Does that make sense?

4    A    Yes.

5    Q    I'm guessing, too.  It's a little bit confusing.

6    A    It looks like he's going from Little Rock to Dallas on

7    the 14th, and then on the 15th Baltimore back to Dallas.

8    Q    So somewhere --

9    A    I don't know how he got to Baltimore, but, yes.

10   Q    Yeah, and somewhere -- that's exactly right.

11             Go down to May 23rd, we see, again, another Capitol

12   Hotel, a couple of them, actually, right?  May 31st and

13   June 3rd?

14   A    Yes, Capitol Hotel.

15   Q    Let's keep moving on a little bit more.  Bates stamp 4837

16   should be the closing date of July 14th, 2013.

17   A    Yes.

18   Q    Bates stamp 4839 on that statement.  With me?

19   A    I'm with you.

20   Q    Looks like a purchase on June 14th, 2013, another airline

21   ticket, date of departure June 15th, Baltimore to Dallas, name

22   of Gilbert.  It's got to be a duplicate, right?

23   A    Yes, there's a Spirit Airlines date of departure

24   June 15th, yes.

25   Q    And then we see on June 14th a charge to the Marriott in
```

Stokes - Cross

1  Washington, D.C.?

2  A    Yes.

3  Q    Two of them back to back?

4  A    Correct.

5  Q    And then June 15th, a charge to a restaurant in

6  Baltimore?

7  A    Correct.

8  Q    June 16th, the purchase of a ticket on Southwest from

9  Little Rock to Dallas departing June 21st in the name of

10 Gilbert Baker?

11 A    Correct.

12 Q    June 16th, a purchase of an airline ticket Dallas to

13 Little Rock, date of departure June 22nd?

14 A    That's correct.

15 Q    And then continuing, June 16th, it shows that he's in

16 Washington, D.C., purchasing with the Marriott in D.C.

17 A    Yes.

18 Q    June 16th, another Marriott, in D.C., purchase, two of

19 them in a row.

20 A    Yeah, June 16th there appears to be three Marriott

21 purchases.

22 Q    That would tell us that the day before these posttrial

23 verdicts, he's actually in Washington, D.C., right?  I guess

24 that'd be technically correct.  I should say the credit

25 card --

Stokes - Cross

1    A    The credit card was charged --

2              THE COURT:  One at a time.  A little slower,

3    Mr. Hendrix, though I appreciate and I know the jury does,

4    too, your moving it along.

5    BY MR. HENDRIX:

6    Q    Jacob, the question was, to be technically correct, these

7    records reflect that the credit card in his name was being

8    used at, for instance, the Marriott, in Washington, D.C.,

9    right?

10   A    The credit card was charged on June 16th, 2013.

11   Q    Right.

12   A    Yes.

13   Q    Bates stamp 4841.  And, Agent, go down to one, two,

14   three, it'd be the fourth entry from the bottom.

15   A    June 9th, 2013, is that what you're looking -- or

16   July 9th, sorry.

17   Q    July 9th, 2013.  Looks like a Delta onboard purchase in

18   Atlanta.  Well, Delta's out of Atlanta.  But that would denote

19   that on June 9th, the credit card's being used on an airplane,

20   on a Delta airplane, correct?

21   A    It reflects a charge on July 9th with Delta Airlines,

22   yes.

23   Q    And, again, the hearing on the motion for remittitur was

24   July 8th, 2013, correct?

25   A    Correct.

Stokes - Cross

```
1   Q     This entry --
2   A     The hearing was on July 8th, yes.
3   Q     The hearing was, right.
4               This entry would at least imply that on July 9th,
5   Mr. Baker, or to be technically correct, the credit card was
6   being used on an airplane?
7   A     The credit card was used -- a charge was made with Delta
8   Airlines on July 9th, yes.
9   Q     Gotcha.  And two down, July 11th, 2013, is a credit card
10  charge to the Hilton Garden Inn in Atlanta, correct?
11  A     Correct.
12  Q     Next page, at the top, June 18th, 2013, purchase of an
13  airline ticket in the name of Susan Baker, departing 7/21,
14  Little Rock to Dallas, to San Francisco?
15  A     Correct.
16  Q     Two entries down, June 21st, looks like a corresponding
17  Southwest Airline purchase in the name of Gilbert Baker, date
18  of departure June 15.  It would appear to be Dallas coming
19  back to Little Rock, correct?
20  A     Correct, with a date of departure on July 15th, yes.
21  Q     And here's how the credit card's statement going to do
22  them backwards because of how they post.
23              The next entry is June 21st, and that shows Gilbert
24  Baker, airline ticket departing July 14th, Little Rock to
25  Houston to San Antonio?
```

Stokes - Cross

```
 1  A    Correct.
 2  Q    So when you invert that, July 15th he's returning to
 3  Little Rock, right?
 4  A    Yes.
 5  Q    Last entry on that page, June 25th, 2013.  It would
 6  appear the purchase of an airline ticket in the name of
 7  Gilbert Baker, date of departure September 6th, Little Rock to
 8  Dallas to San Francisco?
 9  A    Correct.
10  Q    And I've just got one more, Agent.  If you'll go to Bates
11  4849, closing date August 14th, 2013.
12  A    I'm there.
13  Q    Bates 4851.
14  A    Yes.
15  Q    Looks like we've got at the top August 1, restaurant
16  charge in Dallas.  Pardon me, two down, August 7th restaurant
17  charges in Chicago, one, two, three, four in a row; is that
18  right?
19  A    Correct.
20  Q    And it looks like other charges.  Apparently, at least
21  the credit card was being used in Chicago at that time?
22  A    Yes.
23  Q    And then Bates 4853.
24  A    Yes.
25  Q    July 21st, another airline charge in the name of Gilbert
```

Stokes - Redirect

1    Baker departing July 21st?

2    A    That's correct.

3    Q    Okay.  So in sum, the credit card shows a lot of activity

4    of places in Little Rock during the legislative session where

5    legislators and people involved in the people's business

6    oftentimes meet, fair enough?

7    A    Yes.

8    Q    And a lot of travel during the relevant times in this

9    case?

10   A    They were -- yeah, there were airline purchases for sure,

11   yes.

12        MR. HENDRIX:  Thank you, Agent.

13        THE COURT:  Thank you, Mr. Hendrix.

14        Ms. Peters.

15                      Redirect Examination

16   BY MS. PETERS:

17   Q    Agent Stokes, you said airline purchases, and that's

18   because you have no way to verify through these records

19   whether Gilbert Baker traveled; is that correct?

20   A    Correct.  I can only say that a purchase was made with

21   that credit card, yes.

22   Q    Okay.  And with respect to the date that things have

23   posted on the credit card statement, credit card companies

24   don't always post charges on the date they happen.

25   A    Correct.  It can take days to post, yes.

Stokes - Recross

1          MS. PETERS:  Okay.  Thank you.

2          THE COURT:  Thank you, Ms. Peters.

3          MR. HENDRIX:  Just a quick follow-up, if you don't

4    mind, Your Honor.

5                         Recross-Examination

6    BY MR. HENDRIX:

7    Q    You're familiar with TSA?

8    A    Yes.

9    Q    We cannot buy a ticket in somebody else's name these

10   days, right?

11   A    Correct.

12   Q    And those purchases are in the name of Gilbert Baker,

13   right?

14   A    It shows Gilbert Baker as a passenger, yes.

15   Q    And according to TSA regs, that means it's Gilbert Baker

16   on that airplane?

17   A    Correct.

18          MR. HENDRIX:  Thank you.

19          THE COURT:  Ms. Peters.

20          MS. PETERS:  I have no follow-up, Your Honor.

21          THE COURT:  Very good.

22          Ladies and gentlemen of the jury, that's it for now

23   from Agent Stokes.  He's required upstairs, though, to testify

24   before one of my colleagues in another trial.  So he's going

25   to disappear for a while and then return.  That's why he'll be

Whitlock - Direct

1    gone.

2           You're excused, Agent Stokes.

3           THE WITNESS:  Thank you, Your Honor.

4           THE COURT:  Ms. Peters or Mr. Harris?

5           MR. HARRIS:  Your Honor, Tim Whitlock.

6           THE COURT:  Tim Whitlock.

7           MR. HENDRIX:  Your Honor, I am so sorry.  Out of

8    order, I meant to move for the introduction of that exhibit as

9    defense 27.

10          THE COURT:  Ms. Peters, any objection to the rest of

11   those AMEX bills?

12          MS. PETERS:  No, Your Honor.

13          THE COURT:  Defense 27 is admitted.

14      (Defense Exhibit No. 27 entered into evidence.)

15          THE COURT:  Good morning.

16          THE WITNESS:  Good morning.

17          THE COURT:  How are you?

18          THE WITNESS:  Good.  Thank you, sir.

19          THE COURT:  Would you please raise your right hand.

20          Timothy Whitlock, Government witness, sworn.

21          THE COURT:  Very good.  Thank you.

22                       Direct Examination

23   BY MR. HARRIS:

24   Q    Would you state your name, please, sir.

25   A    Timothy Whitlock.

Whitlock - Direct

```
 1   Q     And who are you employed by?

 2   A     With the FBI.

 3   Q     What do you do with the FBI?

 4   A     I'm a computer forensic examiner.

 5   Q     And what does that mean in English?

 6   A     It's my job to assist investigators with the collection,

 7   the preservation and the examination of digital evidence.

 8   Q     Does that mean like phones and laptops and stuff like

 9   that?

10   A     Yes.

11   Q     And how long you been working with the FBI?

12   A     I've been working with the FBI since 1999.  About 22

13   years.

14   Q     In your capacity, did you receive a cellphone of Michael

15   Maggio?

16   A     Yes.

17   Q     And how did you receive it?

18   A     I received it from our -- just our evidence control.

19   Q     Okay.  Do you know how --

20   A     At the FBI.

21   Q     Do you know how the FBI got it?

22   A     I believe it was a search warrant.

23   Q     Okay.  And then when you got Judge Maggio's phone, what

24   did you do?

25   A     I made a copy of the phone, and then from the copy I
```

Whitlock - Direct

1  processed it with forensic software tools, and then I created

2  reports.

3  Q    Okay.  And was the phone number of this phone of

4  Mr. Maggio, was it 733-4953?

5  A    Yes.

6  Q    Did you also get Maggio's laptop, a personal and office

7  laptop?

8  A    Yes.

9  Q    And what'd you do with those?

10 A    Same thing, I made copies of the laptops, and then I

11 processed them with forensic software tools.

12 Q    Okay.  And Gilbert Baker's cellphone, did you get that

13 from the FBI, from an agent?

14 A    Yes.

15 Q    Same way?

16 A    Yes.

17 Q    And was that (501)472-0304?

18 A    Yes.

19 Q    And what did you do with Mr. Baker's cellphone?

20 A    Made a copy of it, then processed the copy and made

21 reports of that.

22 Q    And there was a third phone I think you made a copy of.

23 It was Bruce Hawkins; am I correct?

24 A    Yes.

25 Q    His cellphone?

Whitlock - Direct

```
1    A    Yes.

2    Q    And number 208-2300?

3    A    Yes.

4    Q    Now, when you make a copy of these phones, what do you do

5    with the actual phones after you make a copy?

6    A    I either return them to our evidence control room or I'll

7    return them to the investigator.

8    Q    Okay.  Now, Mr. Maggio's cellphone, it was an iPhone; am

9    I correct?

10   A    Yes.

11   Q    Mr. Hawkins' cellphone was an iPhone?

12   A    Yes.

13   Q    What about Mr. Baker's?

14   A    It was a Motorola phone.

15   Q    What's the difference between an iPhone and a Motorola

16   phone?

17   A    Motorola -- of course, they're made by different

18   companies.  The Motorola will run a, what we call an Android

19   operating system.  The iPhone will, of course, use the Apple

20   operating system on it.

21   Q    So let's talk about Mr. Maggio's phone.  Tell me, let's

22   go through the process, what do you do when you get it and you

23   make a copy of it?  How do you extract stuff?

24   A    I used -- on this one we used a program called

25   Cellebrite.  It's a company that makes forensic software, and
```

Whitlock - Direct

1  it basically makes a full copy.  In this case it made a full

2  copy of that phone.  And then with another -- the same company

3  makes another tool that actually you can process that copy.

4  And that's what I did.

5  Q    So when you make that copy, are you able to look at

6  what's on the phone?

7  A    Yes.

8  Q    Now, I know, with my limited knowledge of cellphones,

9  there are like text messages, correct?

10 A    Yes.

11 Q    There's e-mails?

12 A    Yes.

13 Q    There's call logs?

14 A    Yes.

15 Q    And I know between iPhones there's IMs, instant

16 messaging; is that correct?

17 A    Yes.

18 Q    Could an iPhone IM an Android?

19 A    It can text -- it can message.

20 Q    It can text, but not IM?

21 A    Correct, yes.

22 Q    And what's the difference between an instant message and

23 a text?

24 A    On an iPhone?

25 Q    Yes.

Whitlock - Direct

1   A     The difference is if you have iMessage enabled on an

2   iPhone, that means it can communicate by that iMessage with

3   another Apple device.

4   Q     Now, when you did this with Mr. Maggio's phone, if things

5   are deleted can you recover them?

6   A     Yes.

7   Q     Okay.  Can you recover deleted texts on iPhones?

8   A     Yes.

9   Q     Can you recover deleted IMs?

10  A     Yes.

11  Q     Can you recover deleted e-mails?

12  A     Yes.

13  Q     And how about -- what am I leaving out, call logs?

14  A     Yes.

15  Q     What about an Android?

16  A     Yes, same thing, recover all those items.

17  Q     Can you recover the actual messages, or can you recover

18  that there are deletions?

19  A     Yes, you can recover the actual message.

20  Q     Well, let me show you an exhibit -- there's a book -- is

21  there still a book up there?

22  A     Yes.

23  Q     Look at exhibit 8A and tell me if you recognize that.  Do

24  you recognize it?

25  A     Yes.

Whitlock - Direct

```
 1  Q     And what is it?

 2  A     It's a text message from S. Baker to the judge.  It's

 3  from Mike Maggio's iPhone.

 4  Q     And the 0304 S. Baker, is that Mr. Baker's phone?

 5  A     Yes.

 6  Q     And did you recover that?

 7  A     Yes.

 8  Q     And it's a true and accurate depiction of what you

 9  recovered?

10  A     Yes.

11          MR. HARRIS:  Your Honor, I'd offer Government

12  Exhibit 8A.

13          MS. DEPPER:  No objection, Your Honor.

14          THE COURT:  Received.

15      (Government Exhibit No. 8A entered into evidence.)

16  BY MR. HARRIS:

17  Q     I think it's going to come up on the monitor here.

18          Can you see that, Mr. Whitlock?

19  A     Yes.

20  Q     So it looks like the date was 5/16/13; is that correct?

21  A     Yes.

22  Q     May 16th, 2013?

23  A     Yes.

24  Q     And it's from the 0304 -- I'm saying the last four

25  digits, but the 0304 phone number of S. Baker; am I right?
```

Whitlock - Direct

1    A    Yes.

2    Q    And it's going to the 4953, the last four digits, of De

3    Judge?

4    A    Yes.

5    Q    Who is De Judge?

6    A    Mike Maggio.

7    Q    Did you put all this on, did he call himself that or did

8    you call him that?

9    A    I guess he called himself that.

10   Q    Okay.  So it's an incoming message from Mr. Baker, and

11   does it read:  "I have a LR lunch today with the nursing home

12   folks?"

13   A    Yes.

14   Q    "The topic will be judicial races.  You are at the top of

15   the list."

16   A    Yes.

17   Q    Did I read that correctly?

18   A    Yes, you did.

19   Q    It looks like if you keep on going, it says the time is

20   10:33:49 a.m.

21   A    Yes.

22   Q    So 10:30 in the morning?

23   A    Yes.

24   Q    And if you keep on going, it says deleted, yes.  What

25   does that mean?

Whitlock - Direct

1   A    That means it was a deleted message, and it was recovered

2   by my forensic software.

3   Q    Okay.  And I notice at the top of this it says instant

4   message.  So this is an instant message sent from Mr. Baker?

5   A    Yes.

6   Q    Now, when you look at 8B, do you recognize that?

7   A    Yes.

8   Q    And what is that?

9   A    It's a message from Mike Maggio's phone.

10  Q    That you recovered?

11  A    Yes.

12  Q    And is it a true and accurate depiction of the message?

13  A    Yes.

14  Q    That we printed up?

15  A    Yes.

16       MR. HARRIS:  Your Honor, I'd offer Government's

17  Exhibit 8B.

18       MS. DEPPER:  No objection, Your Honor.

19       THE COURT:  Received.

20       (Government's Exhibit No. 8B entered into evidence.)

21  BY MR. HARRIS:

22  Q    Now, Mr. Whitlock, I said -- we've printed this up, I

23  mean, to enlarge it for trial, haven't we?

24  A    Yes.

25  Q    I mean, this didn't come out of this page like this for

Whitlock - Direct

1 you, did it?  I mean, this only thing on one page, did it?

2 A No.

3 Q But let's read this.  This is another message, and what's

4 the date of this one?

5 A June the 29th of 2013.

6 Q At 8:15 in the morning?

7 A Yes.

8 Q And it's from S. Baker, phone number 0304?

9 A Yes.

10 Q To whom?

11 A The 4953 number, De Judge, Mike Maggio.

12 Q Okay.  And it's an incoming.  It says:  "Well, your first

13 50K is on the way.  When can we take the money."

14    Did I read that right?

15 A Yes.

16 Q And it was deleted also?

17 A Yes.

18 Q So Mr. Baker is sending a text to Mr. Maggio, and

19 Mr. Baker's telling him, your first 50K's on the way?

20 A Yes.

21 Q And the date was June 29th?

22 A Yes.

23 Q Look at 8C, if you will.  Do you have that?

24 A Yes.

25 Q And do you recognize that?

Whitlock - Direct

```
 1   A     Yes.

 2   Q     What is it?

 3   A     It's a message from Mike Maggio's phone.

 4   Q     To who?

 5   A     It's to S. Baker.

 6   Q     Okay.  And the copy we printed up, is that a true and

 7   accurate copy of the message from the phone?

 8   A     Yes.

 9         MR. HARRIS:  Your Honor, I'd offer exhibit 8C.

10         MS. DEPPER:  No objection, Your Honor.

11         THE COURT:  Received.

12         (Government Exhibit No. 8C entered into evidence.)

13   BY MR. HARRIS:

14   Q     Okay.  So this is from Maggio back to Mr. Baker; am I

15   correct?

16   A     Yes.

17   Q     And I noticed the date, 6/29/13, the same as the previous

18   exhibit, correct?

19   A     Yes.

20   Q     And now this is 8:20 a.m., correct?

21   A     Yes.

22   Q     And do you remember the exhibit 8B, the one we just saw,

23   from Mr. Baker, talking about your first 50K, was at 8:15.

24   Does that look right?

25   A     Yes.
```

Whitlock - Direct

1    Q    Okay.  So this one is an outgoing from Maggio's phone to

2    S. Baker, and it says:  "Thank you.  Unfortunately not 'til

3    late November.  I had a visit with Bunny Adcock.  I'll be on

4    the next bank board meeting.  Thank you.  This is going to be

5    a big task.  I off to Clinton to meet and greet."

6            Did I read that right?

7    A    Yes.

8    Q    And was that deleted?

9    A    Yes.

10   Q    Now, would you go to 8D.  Flip the page there.  Do you

11   recognize that?

12   A    Yes.

13   Q    And what is it?

14   A    It's a message from Mike Maggio's phone.

15   Q    Okay.  And did you recover that and print it up?  Is that

16   a true and accurate copy of the message?

17   A    Yes.

18           MR. HARRIS:  Your Honor, I'd offer Government's

19   Exhibit 8D.

20           MS. DEPPER:  No objection, Your Honor.

21           THE COURT:  Received.

22   (Government Exhibit No. 8D entered into evidence.)

23   BY MR. HARRIS:

24   Q    So this is a message, a chat.  Now it's a chat.  What's

25   the difference between a chat and an instant message?  Because

Whitlock - Direct

```
 1   I think the last ones were instant messages, weren't they?
 2   A    I mean, they're all text messages basically.
 3   Q    Okay.
 4   A    I'm not sure about the category, why it puts it that way.
 5   Q    Okay.  This is from Mr. Baker's phone to Mr. Maggio's
 6   phone; am I correct?
 7   A    Yes.
 8   Q    I mean, Mr. Baker's sending the message, right?
 9   A    Correct.
10   Q    And it's dated July 26th of 2014.  Am I correct?
11   A    Yes.
12   Q    At 10:41 in the morning?
13   A    Yes.
14   Q    And it -- the message from Mr. Baker says:  "Hey there.
15   Hope you're okay?  Been thinking about you.  Hang in.  You are
16   a good guy.  Your friend, GB."
17              Did I read that right?
18   A    Yes.
19   Q    And that was a year later, July 26 of 2014?
20   A    Yes.
21   Q    Now, those all came from Mr. Maggio's phone; am I
22   correct?
23   A    Yes.
24   Q    Now, you also looked at Mr. Baker's phone?
25   A    Yes.
```

Whitlock - Direct

1   Q      Am I correct?

2   A      Yes.

3   Q      And were you able to copy it and look at it and all that

4   kind of nick-knack stuff?

5   A      Yes.

6   Q      Nick-knack's not a technical term you use, is it?

7   A      No.

8   Q      Now, would you look at exhibit 12, and do you recognize

9   that?

10  A      Yes.

11  Q      And what is that?

12  A      That is a calendar entry from Mr. Baker's phone.

13  Q      Okay.  And is that a true and accurate copy of the

14  calendar entry from his phone, it's exhibit 12?

15  A      Yes.

16          MR. HARRIS:  Your Honor, I'd offer Government's

17  Exhibit 12 into evidence.

18          MS. DEPPER:  No objection.

19          THE COURT:  Received.

20      (Government Exhibit No. 12 entered into evidence.)

21  BY MR. HARRIS:

22  Q      So this was from the calendar phone of Mr. Baker, I think

23  you said; am I correct?

24  A      Yes.

25  Q      And it shows category, it says ArkansasFFC@gmail.com.

Whitlock - Direct

1  A    Yes.

2  Q    Okay.  And the subject is Russellville, MM.  Did I read

3  that right?

4  A    Yes.

5  Q    Start date is June 26, 2013, at 11:00 o'clock?

6  A    Yes.

7  Q    That's a.m., right?

8  A    Yes.

9  Q    And then below it, it says UTC minus five.

10  A    That's for daylight savings time.

11  Q    And Greenwich time and all that kind of stuff.

12  A    Correct, yes.

13  Q    And then the end date is the same date, 6/26, at noon.

14  Did I read that right?

15  A    Yes.

16  Q    Okay.  Now, if you will, go to -- now, on Mr. Baker's

17  phone, you did the same analysis you did on Mr. Maggio's

18  phone?

19  A    Yes.

20  Q    And on Mr. Hawkins' phone?

21  A    Yes.

22  Q    The difference was Mr. Baker's phone is an Android?

23  A    Yes.

24  Q    A Motorola?

25  A    Yes.

Whitlock - Direct

```
1    Q    And does that not save as much, or does it save less, or
2    does it get deleted?  How does it work?
3    A    It does -- I don't -- there's no difference as far as
4    what it saves.
5    Q    Okay.
6    A    Yes.
7    Q    Did you find on Mr. Maggio's phone there were some gaps
8    on his phone?
9    A    Yes.
10   Q    And tell me what a gap is.
11   A    It's just kind of where basically there's -- in the
12   time -- for instance, in the text message, there was a huge,
13   just, part missing from the large amount of messages that
14   there was.
15   Q    Okay.  What do you mean missing?
16   A    They just weren't there.  I was unable to recover them.
17   Q    Okay.  Can you recover deleted messages?
18   A    Yes.
19   Q    Okay.  Then how can there be messages you can't recover?
20   A    It just may be something -- it just gets overwritten by
21   newer data.
22   Q    And from Mr. Maggio's phone, could you tell what was the
23   time period of stuff that was unrecoverable?
24   A    On Mr. Maggio's phone or Mr. Baker's?
25   Q    Well, let's talk Mr. Baker's.
```

Whitlock - Direct

1    A    The timeframe?

2    Q    Uh-huh.

3    A    Yeah, the gap as we're calling it, is between I think May

4    of 2013 to January of 2014.

5    Q    So on Mr. Baker's phone you couldn't recover stuff from

6    his phone during that period of time if it's a text or an IM?

7    A    Correct.

8    Q    And how -- how could there not be something there to

9    recover is what I'm asking you.

10   A    I don't know.

11   Q    Okay.  But then after January of '14, do you start

12   recovering things?

13   A    Yes.

14   Q    Okay.  Before May 16th -- or May 6th, could you recover

15   some stuff?

16   A    Yes.

17   Q    Okay.  How would -- does someone have to physically go in

18   and make a point of deleting stuff between May 6th and January

19   of 2014?

20   A    Yes.

21   Q    Okay.  You can't accidentally do it?

22   A    Correct.

23   Q    Okay.  Now, in Mr. Baker's phone, the last recoverable

24   text was April 4th of 2014.  Are you aware of that?

25   A    Yes.

Whitlock - Direct

1   Q     And why was that the last thing you could recover?

2   A     To my knowledge, I believe he got a different phone,

3   maybe a new phone.

4   Q     Okay.  Now, look at exhibit 9 there, if you can.  Did you

5   find exhibit 9?

6   A     Yes.

7   Q     Okay.  And do you recognize that?

8   A     Yes.

9   Q     And what is that?

10  A     That's a message from Bruce Hawkins' phone.

11  Q     Okay.  And did you recover that?  Because I know you had

12  Mr. Hawkins' phone, too.

13  A     Yes.

14  Q     And is that a true and accurate depiction of the message

15  found on Mr. Hawkins' phone?

16  A     Yes.

17          MR. HARRIS:  Your Honor, at this time I'd offer

18  Government's Exhibit 9.

19          MS. DEPPER:  No objection, Your Honor.

20          THE COURT:  Received.

21      (Government Exhibit No. 9 entered into evidence.)

22  BY MR. HARRIS:

23  Q     So this is what you recovered from Mr. Hawkins' phone.

24  Did you recover other things, or is this related to Gilbert

25  Baker and Bruce Hawkins, or do you know?

Whitlock - Direct

1    A    There were other items recovered.

2    Q    But this is related to Mr. Baker?

3    A    Yes.

4    Q    Okay.  Because this is to Bruce Hawkins from Gilbert

5    Baker.  Did I read that right?

6    A    Yes.

7    Q    And the date is 12/20 of 2013?

8    A    Yes.

9    Q    So December 20th.  Looks like it's 8:46 in the morning?

10   A    Yes.

11   Q    And the message is:  "BH."  And this is from Mr. Baker,

12   right?

13   A    This is -- yes.

14   Q    Okay.  "BH.  Thanks for everything.  Remember Maggio for

15   judge."  Correct?

16   A    Correct.

17   Q    And then it says "deleted"?

18   A    Yes.

19   Q    So you were able to recover that?

20   A    Yes.

21   Q    Could you tell whether Mr. Maggio deleted things or tried

22   to delete things?

23   A    Mr. Maggio -- well, there were deleted items on there,

24   yes.

25   Q    I mean, but you could recover them?

Whitlock - Cross

1   A    Yes.

2   Q    And then were there deleted items on Mr. Baker's phone

3   that you could not recover?

4   A    Yes.

5   Q    Were there deleted items on Mr. Maggio's phone that you

6   could not recover?

7   A    Yes.

8           MR. HARRIS:  That's all I have, Your Honor.  Let me

9   just ask, may I have a moment, sir?

10          THE COURT:  You may.

11  BY MR. HARRIS:

12  Q    Mr. Whitlock, did you try to recover all the text on

13  Mr. Maggio's phone?

14  A    Yes.

15  Q    Were you able to recover all of them?

16  A    You can't always recover all of them.

17  Q    Okay.  What about on Mr. Baker's phone?

18  A    Yes, same thing.

19  Q    Can't recover them?

20  A    Yes.  Tried to.

21          MR. HARRIS:  Okay.  That's all I have, Your Honor.

22          THE COURT:  Good morning, Ms. Depper.

23          MS. DEPPER:  Good morning, Your Honor.

24                      Cross-Examination

25  BY MS. DEPPER:

Whitlock - Cross

```
 1   Q    Good morning, Agent Whitlock.

 2   A    Good morning.

 3   Q    How are you today?

 4   A    Good.  Thank you.

 5   Q    Good.  I just have a few questions for you.

 6            First I want to start with, if we could look at

 7   defense exhibit 19.

 8            MS. DEPPER:  Your Honor, may I approach?

 9            THE COURT:  You may.

10   BY MS. DEPPER:

11   Q    Agent Whitlock, do you recognize that document I just

12   handed you?

13   A    I do.

14   Q    And does that appear to be the first maybe two pages or a

15   summary of the extraction report that you did for Gilbert

16   Baker's phone?

17   A    Yes.

18   Q    Okay.  And that is a report that you created?

19   A    This looks -- appears to be a derivative report from the

20   big report that I created, yes.

21   Q    Okay.  And it says on that report on the front, it says

22   Examiner Name, Timothy D. Whitlock.  Is that you?

23   A    Yes.

24            MS. DEPPER:  Your Honor, I'd move for admission of

25   Defense Exhibit 19.
```

Whitlock - Cross

1              MR. HARRIS:  Your Honor, may I just inquire?  I

2     didn't understand.  He said he did create this?

3     BY MS. DEPPER:

4     Q    And I believe, if you'll clarify for that how this was

5     created.

6     A    Well, as the original report that was provided on

7     discovery was a larger report that I created, and from that

8     report, the defense can create, like, derivative reports or

9     other reports from it.

10    Q    And this is -- and this is through Cellebrite, a program

11    that you use, and you use Cellebrite to create your large

12    reports, and Cellebrite from your large reports, can create

13    these summary reports; is that correct?

14    A    Yes.

15    Q    Okay.  So this is created from information that you

16    provided on Cellebrite?

17    A    Yes.

18              MR. HARRIS:  No objection, Your Honor.

19              THE COURT:  Defendant's 19 is received.

20         (Defendant's Exhibit No. 19 entered into evidence.)

21              MS. DEPPER:  Thank you, Your Honor.

22    BY MS. DEPPER:

23    Q    And, Agent, if you will look at -- so this is an

24    extraction report, and it's for Gilbert Baker's phone,

25    correct, summary?

Whitlock - Cross

1   A     Yes.

2   Q     And if you'll look at the second page of that report, it

3   goes through the contents of what you found on Gilbert Baker's

4   phone, a summary; is that correct?

5   A     Yes.

6   Q     And we see, if we look at the contents, it talks about

7   call logs, it talks about chats, e-mails, instant messages and

8   texts.  Do you see all of that?

9   A     Yes.

10  Q     And if we look at that, Agent, on call logs, if I'm

11  reading it correctly, it said there were a total of 3804 call

12  logs and 3636 of those call logs were deleted; is that

13  correct?

14  A     Yes.

15  Q     So that would be the majority of the call logs on that

16  phone were deleted?

17  A     Yes.

18  Q     Okay.  And if we go further down, it talks about e-mails.

19  We see 193 total e-mails on the phone; is that right?

20  A     Yes.

21  Q     Okay.  And then we see 159 of those e-mails were deleted;

22  is that correct?

23  A     Yes.

24  Q     Okay.  Moving down to instant messages, we have 1598

25  instant messages; is that correct?

Whitlock - Cross

1   A     Yes.

2   Q     And it looks like all of those instant messages were

3   deleted from the phone?

4   A     Yes.

5   Q     Okay.  And further down on texts, we see 1378 total texts

6   on the phone; is that correct?

7   A     Yes.

8   Q     Okay.  And of that, we see 615 were deleted; is that

9   correct?

10  A     Yes.

11  Q     Okay.  And, Agent, are you aware that sometimes people

12  will periodically delete e-mails or texts or phone calls from

13  their phone?

14  A     Yes.

15  Q     Okay.  And is that a way to free up space on someone's

16  phone?

17  A     It can be, yes.

18  Q     Okay.  And from your report, there's no way to tell if

19  there were periodic deletions of e-mails or texts or phone

20  calls, is there?

21  A     No.

22  Q     Okay.  But there's also, you can tell from your report,

23  Agent, or your report fails to show us if there was any

24  evidence of intentional deletions of particular texts or

25  particular phone calls?

Whitlock - Cross

1    A     Yeah, there's nowhere to tell.

2    Q     Okay.  Is there any way to tell from your report, I think

3    the way I read it, there was no indication that there was one

4    particular person for which texts were deleted; is that

5    correct?

6    A     That's correct.

7    Q     Okay.  No evidence that there was one particular person

8    or two particular people for which phone calls were deleted;

9    is that correct?

10   A     Yes.

11   Q     Okay.  And so these deletions and what we're looking at

12   is kind of mass deletions.  Agent, can we assume that those

13   mass deletions would include deletions of personal phone calls

14   with family members, coworkers, that kind of thing?

15   A     It could have been, yes.

16   Q     Okay.  Again, not one particular person for texts or

17   calls that were being deleted; is that correct?

18   A     Yes.

19   Q     Okay.  And just to summarize all of that, there's no

20   indication that Mr. Baker was selectively deleting; is that

21   correct?

22   A     Yes, that's correct.

23   Q     I want to talk about the deletion of e-mails or texts or

24   phone calls, just data on a phone.  Okay?  And what Mr. Harris

25   had gone through with you is a time gap, a time gap, and I

Whitlock - Cross

1    think he said the time gap on Mr. Baker's phone was May 2013

2    to January 2014; is that accurate?

3    A    Yes.

4    Q    And you said that time gap and that time gap is a period

5    of time for which you can't recover anything from what's

6    deleted; is that correct?

7    A    Yes.

8    Q    Okay.  And that time gap, I think you said it stems from

9    the phone writing over data; is that correct?

10   A    Yes.

11   Q    Okay.  And I want to make sure my understanding is

12   correct, because I've dealt with computers in the past, and

13   cellphones and kind of how storage works.  And my

14   understanding is that when you delete something, let's say I

15   delete something on my phone, it can still be recovered as

16   long as the phone hasn't put more information over it; is that

17   correct?

18   A    Yes.

19   Q    Okay.  And that's something the phone or the computer

20   will do on its own; is that correct?

21   A    Yes.

22   Q    Okay.  So as a user, I'm not able to go in and find what

23   I've already deleted and tell the computer or the phone to

24   write back over it; is that correct?

25   A    Yes.

Whitlock - Cross

```
 1  Q    Okay.  And so that time gap, that time period of May 13th

 2  to January 2014, that was the result of the phone writing over

 3  whatever data had been deleted; is that correct?

 4  A    Yes.

 5  Q    Okay.  Not any effort at Gilbert Baker to write over

 6  that, make the phone write it over; is that correct?

 7  A    Not that I can tell, no.

 8  Q    Okay.  And, Agent, you said that you were able to recover

 9  many deleted texts, many deleted call logs from Mr. Maggio and

10  from Gilbert Baker; is that correct?

11  A    Yes.

12  Q    Okay.  And Mr. Harris went over with you some of the

13  texts that he found, some I think have been deleted, maybe

14  some have not, I'm not sure, whatever the evidence shows.  But

15  you were able to look at, actually see those text messages and

16  the records of some phone calls; is that correct?

17  A    Yes.

18  Q    Okay.  And, Agent, from those, from the messages that you

19  looked over as you were going through, all through

20  Mr. Maggio's phone, going through, all through Mr. Baker's

21  phone -- and let me get into that a little bit before I go

22  down this road.

23       When you were going through these phones, were

24  you -- except for the parts that had been written over, were

25  you basically getting a full image of each phone?
```

Whitlock - Redirect

```
 1   A    Yes.
 2   Q    Okay.  So you were able to see, as long as it wasn't
 3   written over, you were able to see anything that existed in
 4   that phone?
 5   A    Yes.
 6   Q    Okay.  Agent, did you see anywhere in that phone any kind
 7   of message between Mr. Maggio or Mr. Baker or Mr. Morton -- I
 8   think I know the answer to this, the answer is "no" -- did you
 9   see anything, any message that said you will get campaign
10   contributions for this?
11   A    No.
12           MS. DEPPER:  Okay.  Your Honor, may I have just a
13   moment?
14           THE COURT:  You may.
15           MS. DEPPER:  No further questions, Your Honor.
16           THE COURT:  Thank you, Ms. Depper.
17           MS. DEPPER:  Thank you.
18           Mr. Harris.
19           MR. HARRIS:  Yes, sir.  Just a couple follow-ups,
20   Your Honor.
21           THE COURT:  Certainly.
22                       Redirect Examination
23   BY MR. HARRIS:
24   Q    Mr. Whitlock, I notice that you can recover -- you can
25   see whether or not a message has been deleted; am I correct?
```

Whitlock - Redirect

1    A      Yes.

2    Q      From Mr. Maggio's phone?

3    A      Yes.

4    Q      And you can recover the content of that deleted message.

5    Did you do that?

6    A      Yes.

7    Q      Mr. Baker's phone, could you recover -- could you see

8    that some messages were deleted?

9    A      Yes.

10   Q      Because you talked about May 6th, 2013, through January

11   of 2014.  You couldn't even recover deleted messages?

12   A      Yes, that's correct.

13   Q      On Mr. Baker's phone, could you recover the content of

14   his deleted messages?

15   A      Not in that period, but other messages were recovered,

16   yes.

17   Q      And the text messages we were seeing here on the monitor,

18   exhibits 8 and 9, all that stuff --

19   A      Yes.

20   Q      -- that came from Mr. Maggio's phone?

21   A      The exhibits for 8, yes.

22   Q      Yeah.  And I know 9 was from Mr. Hawkins' phone, right?

23   A      Yes.

24   Q      Those were not from Mr. Baker's phone?

25   A      No.

Whitlock - Recross

```
 1   Q    And why couldn't you get those off Mr. Baker's phone?

 2   A    I'm sorry, what . . .

 3   Q    Why couldn't you get those off Mr. Baker's phone?

 4   A    The same messages that were Mr. Maggio's?  They weren't

 5   there.  They were -- unable to recover them.

 6   Q    Okay.  And why were you unable to recover them is what

 7   I'm asking.

 8   A    I don't know.  Just, they weren't there.

 9   Q    Did you try to recover the content of messages from

10   Mr. Baker's phone?

11   A    Yes.

12   Q    And during that period you couldn't recover any?

13   A    Not in that time period, no.

14   Q    Okay.  And are there programs that people can buy to wipe

15   phones, you know, to clean them up and delete them and all

16   that kind of stuff?

17   A    Yes.

18            MR. HARRIS:  Okay.  That's all I have, Your Honor.

19            THE COURT:  Thank you, Mr. Hendrix.

20            Ms. Depper?

21            MS. DEPPER:  Just a brief follow-up, Your Honor.

22                     Recross-Examination

23   BY MS. DEPPER:

24   Q    Agent Whitlock, Mr. Harris just talked to you about

25   people being able to buy programs to wipe phones.  Did you see
```

Sloan - Direct

```
 1   any evidence of that on Gilbert Baker's phone?

 2   A    No.

 3           MS. DEPPER:  Okay.  Thank you, Your Honor.

 4           THE COURT:  Thank you.

 5           May Agent Whitlock be excused, Mr. Harris?

 6           MR. HARRIS:  Yes, Your Honor.

 7           THE COURT:  Ms. Depper?

 8           MS. DEPPER:  Your Honor, he may be excused.

 9           THE COURT:  Very good.  Thank you, sir.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  Ms. Peters.

12           MS. PETERS:  The United States calls Graham Sloan.

13           THE COURT:  Graham Sloan.

14           Come forward, please, Mr. Sloan.  Good morning.

15           THE WITNESS:  Good morning.

16           THE COURT:  Come up here.

17            Graham Sloan, Government witness, sworn.

18           THE COURT:  Very good.  Please be seated, and as

19   needed, grab the base of that microphone and pull it close to

20   you so that we can all hear.

21           Ms. Peters.

22           MS. PETERS:  Thank you, Your Honor.

23                         Direct Examination

24   BY MS. PETERS:

25   Q    Would you please state your name?
```

Sloan - Direct

1    A      My name's Graham Sloan.

2    Q      Mr. Sloan, where do you work?

3    A      The Arkansas Ethics Commission.

4    Q      What is your position at the Ethics Commission?

5    A      I'm the director.

6    Q      How long have you been the director of the Arkansas

7    Ethics Commission?

8    A      Since February of 2000.

9    Q      So, over 20 years?

10   A      Yes, 20-plus years.

11   Q      Okay.  Before that were you chief counsel for the Ethics

12   Commission?

13   A      Yes, I went to the Commission in November of 1997 and

14   was -- my first position was chief counsel, and then I became

15   director three years later, two and a half years later.

16   Q      And you're an attorney, right?  You're a lawyer?

17   A      Correct, yes.

18   Q      Is the Arkansas Ethics Commission a state agency?

19   A      Yes, it is.

20   Q      How is the Ethics Commission organized?

21   A      Well, the Commission has a five-member board, and they're

22   appointed.  One's appointed by the governor, one's appointed

23   by the lieutenant governor, another one appointed by the

24   attorney general, and then the speaker of the house and the

25   president pro tem of the Senate round out the five appointing

Sloan - Direct

1   officials, and the members of the board serve a five-year

2   term, and then they're staggered so that somebody rotates off

3   every year.

4   Q    In terms of the actual staff who does the day-to-day work

5   of the Ethics Commission, how many people are there?

6   A    Currently there's 11, myself plus 10 others.

7   Q    What kinds of jobs do those 10 people do?

8   A    Well, more than half of us are lawyers, and the Ethics

9   Commission serves as the compliance and enforcement agency

10  with respect to a number of different laws.  And so staff

11  would be there to conduct investigations, but also answer

12  questions from persons that are subject to the Commission's

13  jurisdiction, to, you know, render advice.

14  Q    Let's talk for just a minute about investigations.  How

15  do investigations come to you?  How do cases come to you?

16  A    Any citizen who feels like there's been a violation of

17  one or more of the laws under the Commission's jurisdiction is

18  authorized to file a complaint.  Once a complaint gets filed,

19  it comes across my desk to make sure that it meets certain

20  minimum requirements.  It has to be in writing and under oath

21  against somebody we have jurisdiction over, and if it meets

22  those requirements, then it's assigned a case number and an

23  investigation is conducted.

24         And then once the investigation's been completed,

25  the results of that investigation are presented to the board,

Sloan - Direct

1    and they decide whether or not probable cause exists, and, if

2    so, then the subject of the investigation has the right to

3    request a hearing before the Commission.

4    Q    Is there a common thread as to what your commission is

5    regulating?

6    A    Well, I think yes and no.  The -- a lot of the laws we

7    enforce are public disclosure laws, and they track the flow of

8    money that's in and around the political process.  And so

9    there's a common thread in the disclosure laws, and then there

10   are also laws which regulate conduct that is set forth,

11   permissible activities and prohibited activities, and those

12   can just be across the board as far as, you know, there's

13   standards of conduct applicable to elected officials,

14   candidates.

15   Q    Well, let me ask you this:  Do you all investigate

16   violations relating to campaign finance?

17   A    Yes, definitely.

18   Q    And political action committees?

19   A    Yes.

20   Q    And you're not a policy agency, right, you just enforce

21   what's on the books?

22   A    For the most part, yes.  From time to time people will

23   ask us for a suggestion or what we think, and we're happy to,

24   you know, provide that opinion, but essentially we don't set

25   policy.  We just enforce the law on the books.

Sloan - Direct

1   Q    Now, I'd like to talk to you about the 2014 election

2   cycle, because I know since then there have been some changes

3   in the law in contribution amounts.  Let's just talk about the

4   2014 cycle.

5   A    Okay.

6   Q    In the 2014 cycle, what was the limit on what a person

7   could give a candidate per election?

8   A    It was $2000.

9   Q    At that time, what was -- a person is a human, but what

10  was the definition of a person for purposes of that $2000

11  limit?

12  A    Yes, it -- at that time, person was a broadly defined

13  term, and it would have included not only an individual, a

14  human being, but then also a business, a partnership, a

15  corporation, a trust.  It was broadly defined, and it included

16  groups of people acting in concert, which would encompass a

17  PAC.  So person was broadly defined.

18  Q    So a PAC, or a corporation or a person, each of them

19  could give no more than $2000 per election to a candidate?

20  A    Correct.

21  Q    Okay.  We're going to talk about PACs in just a minute.

22       For the 2014 cycle for legislative candidates, was

23  May 2014 their primary?

24  A    Yes, for a legislative candidate it would have been.

25  Q    And so their election is November of 2014?

Sloan - Direct

1    A      Correct.

2    Q      Can a candidate raise money even if they're unopposed?

3    A      Yes.

4    Q      When can legislative candidates, in 2014, when could

5    legislative candidates -- I should say, sorry, 2013 and 2014.

6    When could legislative candidates begin raising money?

7    A      At that time there was a provision in the law that said a

8    candidate could not start raising money more than two years

9    before the election at which their name was going to be on a

10   ballot.  So two years out.

11   Q      And the rules for judges are different?

12   A      Yes.  They play by a more strict set of rules, and those

13   rules aren't found in the laws under our jurisdiction.

14   They're in the Code of Judicial Conduct.

15          But as used there or in that area, it says they

16   can't start raising money more than 180 days out.

17   Q      How about the money that either a candidate or a PAC --

18   let's just start with candidates, money that they raise.  Does

19   a candidate have an obligation to report money that they've

20   raised?

21   A      Yes.  The campaign finance law, or laws, require a

22   candidate to file reports of their contributions,

23   expenditures.  And so, you know, and at the state and district

24   level you have to file in the nonelection years quarterly,

25   then when you move into the year of the election, it's

Sloan - Direct

```
 1   monthly.  Then in addition to that, there's preelection file
 2   reports, and so they can file 10, 12, 15 reports, just
 3   depending upon their situation.
 4   Q    So it's the candidate who's responsible to file the
 5   report?
 6   A    Yes.
 7   Q    And does the report include contributor names?
 8   A    Yes.
 9   Q    Now, would that just reflect the name of a corporation if
10   the corporation were the contributor?
11   A    Yes.
12   Q    Or the individual?
13   A    Correct.
14   Q    Or the name of the PAC?
15   A    Right.
16   Q    Does it reflect amounts?
17   A    Yes.
18   Q    And the dates the contributions are made?
19   A    Yes.  There's an itemization threshold of $50.  And so if
20   somebody contributed less than $50, the money would show up on
21   the report, but not the contributor's name.  And it's not a
22   one-time $50 test, it's just cumulatively.  So, you know, if
23   somebody gave you $20 three times, that third one would put
24   them over 50, and their name would go on the report as an
25   itemized contributor.
```

Sloan - Direct

1  Q    Let's talk about PACs.  Could you please tell the jurors

2  what is a PAC?

3  A    The definition of PAC, it's a group of -- or, I'm sorry,

4  it is a person who receives contributions from individuals in

5  order to make contributions to candidates or other PACs or

6  political parties.  So it's a group that receives

7  contributions and then, in turn, uses those, uses that money

8  to make contributions.

9  Q    And you said there a PAC is a person.  You didn't mean

10  that a PAC is a human, right?

11  A    No, PACs can be a group of people, or it can be -- they

12  have officers, and so, I mean, there would be individuals

13  involved with or associated with a PAC, but it, you know,

14  doesn't have to be a human being.  It's not a human being.

15  Q    Okay.  How much money per year can an individual human

16  give to a PAC?

17  A    $5000 in a calendar year.

18  Q    Is there any limit to how many PACs an individual can

19  contribute $5000 to?

20  A    No.

21  Q    So you could contribute $5000 to 10 different PACs?

22  A    Correct.

23  Q    Okay.  And how much money can a PAC give to an individual

24  candidate?

25  A    PACs are subject to the $2000 campaign contribution

Sloan - Direct

1   limits.  So, you know, a PAC would be limited to $2000 to a

2   candidate.

3   Q    Okay.  And can a PAC have unlimited contributors?

4   A    Yes.

5   Q    So you could get $5000 from a hundred people and put it

6   in a PAC?

7   A    Correct.

8   Q    Let's talk about conduit contributions for just a minute,

9   or strawman contributions.  What is a strawman contribution in

10  the campaign finance context?

11  A    Well, a strawman is a person who makes a contribution to

12  a candidate, a campaign contribution to a candidate, and they

13  do it in their own name, but they're using funds that were

14  coming from somebody else, somewhere else.

15  Q    So could you explain what the "in the name of the person"

16  rule is?

17  A    Yes.  I mean, if you -- let's just say the strawman is an

18  individual named John Smith.  And so somebody besides John

19  Smith would provide the money, you know, gave John Smith the

20  money, and John Smith would make a contribution to the

21  candidate in his own name, John Smith, and then, but the

22  source of the funds was actually somebody else, and by using a

23  strawman it conceals the source of the funds.

24  Q    What if -- we talked about the two-year limit.  What if

25  somebody gives a contribution too early?  What should the

Sloan - Direct

```
 1   candidate or their committee do?
 2   A    Well, it's -- they're prohibited from receiving it, so
 3   they would need to send back --
 4            MR. HENDRIX:  Your Honor, I'm so sorry.  I object to
 5   the relevance.  If I'm understanding --
 6            THE COURT:  Hold on.  Let's go to sidebar.
 7            Bear with us, ladies and gentlemen.
 8       (The following proceedings were held at sidebar:)
 9            THE COURT:  Mr. Hendrix.
10            MR. HENDRIX:  The objection is relevance.  If I'm
11   understanding what Mr. Sloan is testifying to right now are
12   non-judicial candidates, which is irrelevant to this case.  To
13   the extent that he's going to testify about judicial
14   candidates, that's not his bailiwick.
15            THE COURT:  Ms. Peters?
16            MS. PETERS:  They have testified that Mr. Baker is a
17   very experienced fundraiser, fundraising for any candidates,
18   legislative and otherwise, and I'm trying to get out the
19   parameters of what the rules are for fundraising for
20   candidates, and that would include returning early
21   contributions.
22            THE COURT:  The objection is sustained.  We've gone
23   far enough into this what I'll call contextual evidence about
24   the political fundraising world.
25            MS. PETERS:  Thank you, Your Honor.
```

Sloan - Direct

1        THE COURT:  You're welcome.

2        (Sidebar conference concluded.)

3        THE COURT:  If y'all weren't awake, ladies and

4    gentlemen, you are now, aren't you?  Yes.

5        Ms. Peters.

6        MS. PETERS:  Thank you, Your Honor.

7    BY MS. PETERS:

8    Q    Does the Ethics Commission do any trainings to ensure

9    that people working in the political process understand the

10   rules?

11   A    Yes.  We, for each election cycle, we conduct a number of

12   campaign finance training sessions.  We would prepare updated

13   materials, advertise those training sessions, and historically

14   we've gone around to all four corners of the state.  I think

15   during the pandemic we conducted training via Zoom, but, and

16   then, you know, other areas of our jurisdiction we conduct

17   training, as well.

18        So, yes, we, in addition to enforcing the laws, we

19   provide education and training on those same laws.

20   Q    And do you know Gilbert Baker?

21   A    Yes.

22   Q    When he was a state senator, did he assist the Arkansas

23   Ethics Commission?

24   A    Yes.  He had sponsored legislation in 2005, 2007, 2009

25   and 2011.  The 2005 and '7 bills that he sponsored were

Sloan - Cross

1    relatively short.  They were ideas that the Ethics Commission

2    proposed.  2009 was a bill that he came up with on his own.

3    And then 2011, the -- he sponsored a longer bill that was what

4    I would call the Ethics Commission's cleanup package, that as

5    the agency charged with enforcing laws, we see technical

6    mistakes or things that could be made more clear and correct.

7    And so usually that's a longer bill, and in 2011 he was the

8    primary sponsor of that legislation.

9    Q    Did Mr. Baker ever attend any of your trainings?

10   A    Yes, I remember specifically two occasions that he did.

11   Q    Did he speak with you afterward about different scenarios

12   that might arise under the ethics law?

13   A    Yes.

14            MR. HENDRIX:  Your Honor, I object to relevance

15   again.

16            MS. PETERS:  That's the end of my direct, Your

17   Honor.

18            THE COURT:  Okay.

19            MR. HENDRIX:  Then withdrawn.

20            THE COURT:  Very good.

21            MS. PETERS:  Thank you, Your Honor.

22            THE COURT:  Thank you, Ms. Peters.

23                      Cross-Examination

24   BY MR. HENDRIX:

25   Q    Mr. Sloan, a little education.  The Ethics Commission is

Sloan - Cross

1  not a law enforcement agency, correct?

2  A    We civilly or administratively enforce the statutes under

3  our jurisdiction.  We do have subpoena power, and -- but the

4  statutes all carry criminal misdemeanor penalties, and the

5  prosecuting attorney would have concurrent jurisdiction to

6  enforce them criminally.  So we're not a criminal law

7  enforcement agency, but I think we're civil or administrative

8  regulatory agency.

9  Q    Right.  You're a commission of the State, right?

10 A    Right.

11 Q    You're not a prosecuting attorney?

12 A    Correct.

13 Q    Got it.

14        The complaint was filed in front of you, and that

15 complaint was against Judge Maggio; is that right?

16 A    We had two complaints against Judge Maggio.

17 Q    There wasn't a complaint against Mr. Baker?

18 A    No.

19 Q    Got it.  Starting with campaign contributions, and I want

20 to make sure we understand it, I'm going to put it in my

21 context.  Things have changed since the 2000 and 2014 election

22 cycle as far as amounts of contributions, right?

23 A    Correct.

24 Q    People can contribute more now than they could contribute

25 in the 2013-2014 election cycle, correct?

Sloan - Cross

1    A      Correct.

2    Q      In my context.  So in the 2013-'14 elections cycle, I

3    could personally contribute to a candidate, legislative

4    candidate, judicial candidate, whatever, maximum of $2000,

5    correct?

6    A      Correct.

7    Q      Okay.  I could also contribute a maximum of up to $5000

8    into a PAC, correct?

9    A      Yes.

10   Q      Okay.  So by my math, which we need to check, that means

11   that there's 3000 -- if I contribute $5000 to a PAC, the PAC

12   can only contribute $2000 to a single candidate, right?

13   A      Correct.

14   Q      Okay.  So if I give $5000 to a PAC and I have a preferred

15   candidate, the PAC can only contribute $2000 to my preferred

16   candidate, leaving $3000 extra, right?

17   A      Yes, but I would have a problem or exception with the

18   term "preferred candidate," because if you gave the money to

19   the PAC with the express instructions or understanding that

20   they were going to give it to that candidate, then it's really

21   not a contribution from the PAC, it would be a contribution

22   from you or the person who provided the funds.

23   Q      And that's exactly where I'm going.  That actual question

24   be considered a straw donation.  But my point is is that when

25   I give money to a PAC, I lose control of my money, correct?

Sloan - Cross

```
1    A     You should.

2    Q     The PAC, the PAC administrator, makes the decision of

3    who -- what candidate the PAC is going to contribute to,

4    right?

5    A     If they were acting properly.

6    Q     Yeah.  I mean, that's the way this thing is designed,

7    right?  Yes?

8    A     Um, a PAC ought to make its own independent decision.

9    Q     Correct.  So I don't, if I'm contributing $5000 to a PAC,

10   I don't get to -- I'm giving the money at that point.  I don't

11   get to go to the PAC and about, this is who I want you to

12   contribute to?

13   A    I don't think there's anything to prohibit you from

14   trying to do that, but they oughta decline to do it.

15   Q    The PAC makes the decision?

16   A    Yes, ultimately.

17   Q    Yeah.  So if my personal contribution is limited to a

18   candidate for $2000, but let's say theoretically I give $3000

19   to a PAC, if I have a preferred candidate and I've not

20   discussed it with the PAC, the max that can go to that

21   candidate is $2000?

22   A    Correct.

23   Q    So I've given a thousand extra dollars that I know has to

24   go to some other candidate?

25   A    Or for pack overhead and administrative expenses.
```

Sloan - Redirect

1   Q     For whatever, right.

2             Straw contributions, straw donations.  Do y'all

3   investigate that fairly frequently?

4   A     That's not one of the more common complaints.

5   Q     Well, is it rare?

6   A     Um, I would say so, yes.

7   Q     Okay.  About how many a year do you think you

8   investigate?

9   A     Probably not even one.  You know, we get a lot of

10  campaign finance complaints, but straw donations aren't a

11  common ground.

12  Q     And a straw donation under the Arkansas statutes is a

13  state court misdemeanor, right?

14  A     Correct.

15  Q     It's not a federal felony, right?

16  A     No.

17            MR. HENDRIX:  That's all I've got, Mr. Sloan.

18  Thanks.

19            THE WITNESS:  Sure.

20                     Redirect Examination

21  BY MS. PETERS:

22  Q     Mr. Sloan, the whole point of a strawman contribution is

23  that nobody's supposed to know who really gave the money; is

24  that right?

25  A     Right.  If it's -- the true source of the funds is

Sloan - Recross

 1   concealed or hidden.

 2   Q    So if the only people who know who gave the money are the

 3   true source of the funds and the strawman, it's unlikely

 4   somebody's going to make a complaint to the Ethics Commission.

 5   Is it fair to say that?

 6   A    It would be -- yes, it would be hard to get that

 7   information.

 8          MS. PETERS:  Thank you.  That's all I have, Your

 9   Honor.

10          MR. HENDRIX:  May I have a moment?

11          THE COURT:  You may, if you'll follow Ms. Depper's

12   good example on recross.

13          MR. HENDRIX:  To remind me to do what?

14          THE COURT:  I said if you'll follow Ms. Depper's

15   good example on recross, how she can target.  I'm poking at

16   you, Mr. Hendrix, I'm sorry.

17          MR. HENDRIX:  Thank you, Judge.

18                      Recross-Examination

19   BY MR. HENDRIX:

20   Q    PACs, back on PACs.  They have to have a registered

21   agent, correct?

22   A    It's a resident agent's, the term.

23   Q    A resident agent?

24   A    Right.

25   Q    You don't even have to have a officer, right?

Sloan - Recross

1   A    PACs do have officers.  They're required to have a

2   resident agent, which is just somebody here within the state.

3   You know, if we needed to serve a complaint on a PAC, then,

4   you know, they're required to have a live person in Arkansas

5   to accept service of that.

6   Q    And that's all that's required to register the PAC is a

7   resident agent, correct?

8   A    No, I --

9   Q    Yeah, resident agent.

10  A    I think a PAC has to list its officers.  The reports are

11  signed by an officer.  The resident agent is not an officer.

12  That's just somebody to get ahold of locally.

13  Q    The resident agent can be the officer?

14  A    Yes.

15  Q    Okay.  So if you have a PAC, you can have one person

16  listed under here that's going to be resident agent and

17  officer, and that's all that's necessary?

18  A    Yeah, they'd be listed on there as an officer, and also

19  their name would be in the acceptance of designation of

20  resident agent part of the form.  So they'd be on there twice,

21  but it'd be -- one person could be in the same place twice.

22          MR. HENDRIX:  Understood.  Thanks.

23          THE COURT:  Ms. Peters?

24          MS. PETERS:  No questions, Your Honor.  May

25  Mr. Sloan be excused from his subpoena?

Morton - Direct

```
 1              MR. HENDRIX:  Yes, Your Honor.

 2              THE COURT:  Very good.  Thank you, Mr. Sloan.

 3              THE WITNESS:  Thank y'all.

 4              THE COURT:  Mr. Harris.

 5              MR. HARRIS:  Yes, sir.  Michael Morton.

 6              THE COURT:  Michael Morton.

 7              Good morning, sir.

 8              THE WITNESS:  Good morning.

 9              THE COURT:  I need to give you the oath.

10              Michael Morton, Government witness, sworn.

11              THE COURT:  Very good.  Be seated.

12              Mr. Harris, when you're ready.

13                        Direct Examination

14    BY MR. HARRIS:

15    Q    Would you state your name, please, sir.

16    A    Michael Morton.

17    Q    And Mr. Morton, where are you from?

18    A    Fort Smith, Arkansas.

19    Q    And what do you do?

20    A    I am owner and operator of several longterm care

21    facilities.

22    Q    Okay.  Is that also known as nursing homes?

23    A    Yes.

24    Q    Or is that an old term?

25    A    It's nursing homes.
```

Morton - Direct

```
 1              THE COURT:  Mr. Harris, let me interrupt.

 2              Are you more comfortable in your mask, Mr. Morton?

 3              THE WITNESS:  I'd like it off, if I could.

 4              THE COURT:  You can take it off for testifying.

 5              THE WITNESS:  Okay.  Thank you.

 6              THE COURT:  You're welcome.

 7   BY MR. HARRIS:

 8   Q    It's nursing homes?

 9   A    Yes, sir.

10   Q    And how many do you own?

11   A    Thirty-seven.

12   Q    And is that a company you own, and these companies own

13   these other nursing homes, is that how it works?

14   A    Each nursing home is incorporated separately.

15   Q    And where are these nursing homes?

16   A    Thirty-five or 34 are in Arkansas, and three are in

17   Oklahoma.

18   Q    And how long have you been doing this?

19   A    Since 1976.

20   Q    And how did you get started in the nursing home business?

21   A    I graduated from college in, like, '72, January of '72,

22   and started working for a company in Sallisaw, Oklahoma, that

23   had seven nursing homes, as an accountant and worked for them

24   for around four or five years, and I had a friend that wanted

25   to go into -- told me that if I found a nursing home that I
```

Morton - Direct

```
 1    thought would be one that we could buy, that he would loan me

 2    my half of the money.  And so we bought a nursing home in

 3    Booneville, Arkansas.

 4    Q    And then it just multiplied I take it?

 5    A    Yes, sir, over the years.

 6    Q    And did you eventually move to Fort Smith?

 7    A    Well, yes, sir.

 8    Q    I mean, that's where you live now.

 9    A    Yes, I moved there in 1993.

10    Q    And one of the nursing homes you owned in 2013, and

11    actually earlier than that, was Greenbrier Nursing Home; am I

12    correct?

13    A    Yes, sir.

14    Q    And was that in Greenbrier, Arkansas?

15    A    Yes, sir.

16    Q    That was a pretty easy name for it, wasn't it?

17    A    Yes, sir.

18    Q    Okay.  And do you remember when Greenbrier Nursing Home

19    got sued, and there was a trial in May of 2013?

20    A    Yes, sir.

21    Q    In Faulkner County?

22    A    Yes.

23    Q    And do you remember who the judge was?

24    A    Yes.

25    Q    Who was it?
```

Morton - Direct

```
 1   A     Judge Maggio.
 2   Q     And Greenbrier was one of your nursing homes; am I
 3   correct?
 4   A     Yes.
 5   Q     And do you recall the verdict on May 16th, 2013, returned
 6   against Greenbrier Nursing Home?
 7   A     Yes, sir.
 8   Q     How much was it?
 9   A     There was a judgment of $5.2 million.
10   Q     Had any of your nursing homes been sued before?
11   A     Yes.
12   Q     I mean, is that a common occurrence?
13   A     Yes.
14   Q     Had any of your nursing homes had trials before?
15   A     Yes, sir.
16   Q     Had any of your nursing homes had a judgment greater than
17   $5.2 million?
18   A     No, sir.
19   Q     Other than this 5.2, do you have any idea what was the
20   largest judgment you had against you?
21   A     No, sir.
22   Q     Okay.
23   A     Not in a jury trial.
24   Q     But 5.2 was the largest you'd ever had?
25   A     Yes, sir.
```

Morton - Direct

1    Q    Now, we know because we've seen some telephone records,

2    that on May 16th when the verdict came back you talked to

3    Mr. Gilbert Baker?

4    A    Yes, sir.

5    Q    Do you know Mr. Baker?

6    A    Yes, I do.

7    Q    And do you see him here in court?

8    A    Yes, I do, now.

9    Q    Okay.  The gentleman over here?

10   A    Yeah, it's hard to tell people from the masks.

11   Q    I know that.  That's why I took mine off so you know who

12   I am.

13   A    Yes, I do.

14   Q    Okay.  And how long have you known Mr. Baker?

15   A    Several years.

16   Q    And what's several years to you?

17   A    Probably 20 years.

18   Q    Okay.  So back in 2013, you'd known him for 15 years,

19   give or take?

20   A    I don't know exactly.

21   Q    I know, I'm not trying to --

22   A    I know him since he's been -- when he was a state senator

23   I met him.

24   Q    Okay.  Did you know that he was a state senator from

25   January 2001 to January of 2013?

Morton - Direct

```
 1  A    I didn't -- I don't know his exact dates, but he was a
 2  state senator for as long as he could be in term limits.
 3  Q    Okay.  And did you used to go down to state capitol
 4  during legislative session and talk to people?
 5  A    Yes, sir.
 6  Q    Do you still do that?
 7  A    Not as much.  I have other people that work for me that
 8  do that now.
 9  Q    You mean like lobbyists and consultants?
10  A    Yes, sir.
11  Q    When you first started out, did you have them but you
12  also went, or did you not have them?
13  A    We have -- on our association that I'm a member of, has
14  had lobbyists all along, but I considered myself an advocate
15  of the industry, not necessarily lobbyist.
16  Q    Okay.  And when you talk about your association, what
17  association are you talking about?
18  A    The Arkansas Healthcare Association.
19  Q    I didn't mean to interrupt you.
20  A    It's an association of all the -- there's around 220
21  nursing homes in Arkansas.
22  Q    How many?
23  A    220.
24  Q    Okay.
25  A    And there's about 200 or 190 of these homes are in this
```

Morton - Direct

1   association.

2   Q    So it's just like agree to get together collectively?

3   A    Yes, sir.

4   Q    And is anybody a bigger or own more nursing homes in

5   Arkansas than you?

6   A    I think there's a couple that own a few more than me.

7   Q    Okay.  Do you know a guy named Bryan Adams?

8   A    Yes, sir.

9   Q    And he and his brother own some, don't they?

10  A    Yes, sir.

11  Q    And are they a large owner of nursing homes?

12  A    Yes.

13  Q    So you met him back when he was a senator, and you would

14  go to the state capitol, and whatever you do, you do; is that

15  right?

16  A    Yes, sir.

17  Q    Have you ever been out to, like, lunch with him back

18  during that period of time when he was in the state senate?

19  A    Yes.

20  Q    Dinner?

21  A    Yes.

22  Q    I mean, that's a common occurrence, wasn't it?

23  A    Well, not necessarily, but I had been with him.

24  Q    Okay.  Well, let's go back to this lawsuit of Greenbrier

25  Nursing Home was sued by the Estate of Martha Bull.  Do you

Morton - Direct

```
 1   know what I'm talking about?
 2   A    Yes.
 3   Q    Going back to this lawsuit on May 16th, how did you find
 4   out about this $5.2 million judgment, do you remember?
 5   A    The -- after the verdict, one of my employees, I think
 6   the administrator, called me.
 7   Q    Okay.  Do you remember talking to Mr. Baker that night?
 8   A    Yes, I do.
 9   Q    And how come you called Mr. Baker?
10   A    I wanted to call him and explain to him this is exactly
11   what happens when you don't have tort reform, and that's
12   something that I had been advocating for, and that you could
13   get a runaway jury that could bankrupt a nursing home.
14   Q    Okay.  And when you say you called him up, did you call
15   him up?
16   A    Yes, I did.
17   Q    And when you called him up, you just kind of explained in
18   those terms, that tone that you just talked to me about?
19   A    Yes.
20   Q    Were you a little bit upset?
21   A    I was very upset.
22   Q    Were you mad?
23   A    Pretty mad.
24   Q    Real, real mad?
25   A    Well, I -- you know, I was upset.
```

Morton - Direct

1   Q    Okay.  And you cussed at him and just -- remember -- not

2   cussing at him, but cussing about the situation?  Ranting?

3   A    I was pretty well raging, yes.

4   Q    Okay.  And what did he tell you he could do about it?

5   A    He didn't tell me to do anything about it, he just

6   listened mainly.  I didn't give him a lot of time to talk.

7   But, you know, he had -- was unaware of the verdict, but I

8   informed him.

9   Q    Is it fair -- I didn't mean to interrupt, Mr. Morton.

10  A    I informed him of the verdict and then went on to scream

11  about it a while, because this is exactly what tort reform was

12  needed for.

13  Q    Okay.  Is it fair to say that when Mr. Morton calls and

14  screams at you, that people listen?

15  A    Well, some do, and some do not.

16  Q    And why is it you called him?

17  A    Because I had dealt with him on the issue of tort reform.

18  Q    Okay.  Do you know of an entity called Arkansans for

19  Lawsuit Reform?

20  A    Yes, sir.

21  Q    Do you know it as that big name, or do you know it as

22  ALR?

23  A    I called it Arkansans for Lawsuit Reform.

24  Q    Then we'll do that.

25       Do you know of an entity calls Arkansans for Lawsuit

Morton - Direct

```
 1  Reform?
 2  A    Yes, sir.
 3  Q    And what was that?
 4  A    It was an organization that I pursued to try to form an
 5  organization that would go about trying to get tort reform,
 6  similar to the state of Texas.
 7  Q    And who talked you into donating to Arkansans for Lawsuit
 8  Reform?
 9  A    I did.
10  Q    Okay.  Did -- who formed it?
11  A    I had Gilbert to -- I guess Gilbert, I don't know, I
12  think he had a lawyer form it.  I don't know who formed it,
13  but I'm the one who wanted it.
14  Q    In fact, do you remember in January of -- do you remember
15  maybe 2011 or 2012, you donated a hundred thousand dollars?
16  A    Yes, sir.
17  Q    To the Arkansans for Lawsuit Reform?
18  A    Yes, sir.
19  Q    And so is that why you called Mr. Baker, because he was
20  involved with Arkansans for Lawsuit Reform?
21  A    Yes, sir.
22  Q    And did you know what he was doing at the time for
23  employment?
24  A    I knew that he was -- at the time, he was working as
25  probably a lobbyist, I felt like.
```

Morton - Direct

1   Q     Okay.

2   A     And I think he was working for the college at that time.

3   Q     For UCA?

4   A     Yes, sir.

5   Q     Okay.  Did you know that he was getting $10,000 a month

6   from Arkansans for Lawsuit Reform?

7   A     I did not know how much that he was getting, no.

8   Q     Did he ever tell you how much he was getting out of

9   Arkansans for Lawsuit Reform?

10  A     Not me personally.

11  Q     Okay.  So when he had run for office, like the Senate,

12  when he was in the Senate, had you ever contributed to his

13  campaign?

14  A     Yes, sir.

15  Q     Did you know he ran for U.S. Senate in 2010?

16  A     Yes, sir.

17  Q     Did you contribute to his campaign?

18  A     I think I did.

19  Q     Okay.

20  A     I'm not positive.

21  Q     He ran against Senator Boozman, who was congressman at

22  the time.

23  A     Yes.

24  Q     Jim Holt.  It's possible you might have given to more

25  than one, is that fair?

Morton - Direct

```
 1   A     Yeah.  I'm -- what was the question?
 2   Q     It's possible you might have given to more than just
 3   Mr. Baker during that race?
 4   A     It could have been, yeah.  After Gilbert got out, I
 5   possibly could have.
 6   Q     Do you give to a lot of candidates, a lot of political
 7   candidates?
 8   A     I have over the years, yes.
 9   Q     And judicial candidates?
10   A     Yes, sir.
11   Q     Okay.  And when you give to them, how do you give to
12   them?  Because there's a limit is what I've just heard a while
13   ago.
14   A     Before, I don't know what year it was, the legislature
15   passed legislation that you couldn't give from corporations.
16   Now, you can only give privately.  And so it reduced a lot of
17   giving.  And then people started forming multiple PACs and
18   stuff to combat that.
19          But at the time when I was giving, it was from
20   myself and from different corporations I owned to different
21   candidates.  Now, that would include not just judges, but also
22   people running for representative, governor, lieutenant,
23   Attorney General, everything.
24   Q     And you give them in -- am I correct that you give money
25   in your name, Michael Morton?
```

Morton - Direct

```
 1   A     I have, yes.

 2   Q     And is it also true that you can give some of your money

 3   through your nursing homes?

 4   A     I could.  I can't now.

 5   Q     No, no, back in 2013.

 6   A     Yes, sir.  Yes.

 7   Q     So Greenbrier could give to a candidate?

 8   A     Yes.

 9   Q     I don't know the names of any other nursing home,

10   but . . .

11   A     Salem Place in Conway, if you're talking about Faulkner

12   County.  Yes.

13   Q     So you can put your money in those nursing homes, and

14   they can give to the candidate?

15   A     Yes.

16   Q     Now, during this trial at the Estate of Martha Bull

17   versus Greenbrier Nursing Home before Judge Maggio, did you

18   ever go to the trial?

19   A     No, sir.

20   Q     But you had attorneys representing the nursing home,

21   correct?

22   A     Yes.

23   Q     Lyn Pruitt?

24   A     Yes.

25   Q     Kirk Doughtery?  Were there others?
```

Morton - Direct

```
 1   A    There were several others, but -- Jeff Hatfield.

 2   Q    Jeff Hatfield.  You're right, yeah.

 3        And they kept you up to date on what was going on, I

 4   take it?

 5   A    Yes, sir.

 6   Q    Now, do you remember on the day of the verdict, earlier

 7   in the day being at a restaurant, Brave New Restaurant in

 8   Little Rock?

 9   A    Yes, sir.

10   Q    And Brave New is a restaurant here in Little Rock, isn't

11   it?

12   A    Yes, sir.

13   Q    Do you eat there frequently, or did you eat there?

14   A    No, our lobbyist that we had at the Arkansas Healthcare

15   Association, he liked to eat there.  So I would go with him

16   and other people there for lunch when we were in town for

17   different things.

18   Q    So on that day, the day of the verdict, do you remember

19   seeing Mr. Baker and Ms. -- I've already forgotten her name

20   now that I've asked the question -- Ms. Flanagin?

21   A    Yes.

22   Q    Okay.  And tell us about how you saw them.

23   A    Well, we were there -- I was there with some other people

24   from our industry.  We were having a fundraiser in a room that

25   was kinda behind the bar in a different room, and so when that
```

Morton - Direct

1    event was over, I left, me and another guy left, that works

2    with me.

3           Instead of going out the side, we just went out the

4    front, through the restaurant, and I was walking through it.

5    Gilbert was sitting there with her, and he hollered at me.  So

6    I went over to his table, and he asked me if I would consider

7    supporting Judge Maggio for appeals court.

8    Q    And did he ask you about support for anybody else at that

9    little meeting?

10   A    I don't think at that time that he did.

11   Q    Okay.

12   A    He -- no.

13   Q    Okay.  And he was eating -- and I said Ms. Flanagin.  Do

14   you know who Ms. Flanagin is if I say her name?

15   A    Yes, I just know her through her working for him and, you

16   know, being with him.

17   Q    Okay.  So it was just the two of them eating lunch there

18   at Brave New?

19   A    He had been back where we were at this fundraiser.

20   Q    I see.

21   A    I thought he had left, but he had gone out to a table.

22   Q    He was just eating with her?

23   A    Yes, sir.

24   Q    Did you know at the time that Mr. Maggio was --

25   Mr. Maggio was on the circuit court of Faulkner County at the

Morton - Direct

```
 1  time, that date.  Did you know he was going to run for court
 2  of appeals?
 3  A    Not until Gilbert Baker told me that.
 4  Q    At that Brave New Restaurant?
 5  A    Yes, sir.
 6  Q    Now, later on that afternoon, there's been some testimony
 7  the jury came back at, like 5:50 in the evening, you know, 10
 8  'til 6:00.  And you already testified you called Mr. Baker
 9  later.  Do you remember having a conversation with Mr. Baker
10  the next day and talking about one of the jurors to UCA?
11  A    I know we had a discussion.  I don't know if it's the
12  next day.  You're asking me about a time and it's very
13  difficult to --
14  Q    It's eight years ago.
15  A    I do remember talking to him about him having a person
16  that -- that worked at UCA that was on the jury.
17  Q    And what did Mr. Baker say?
18  A    That -- I can't remember if he had talked to her at that
19  point or not.
20  Q    Uh-huh.
21  A    But I was wanting to find out if the reason they had done
22  it was because they felt like it was a large insurance policy
23  that was backing everything up.
24  Q    Uh-huh.  And did he tell you whether or not that juror
25  told him anything?
```

Morton - Direct

```
 1   A     He -- not at that time.

 2   Q     I mean, later on in another conversation.

 3   A     Yes, he told me he felt like, I think that he felt like

 4   that she -- that they did think that.

 5   Q     They did think what?

 6   A     There was a large insurance policy backing up all this.

 7   Q     I gotcha.  Now, this is May 16th, what I was just talking

 8   to you about was May 16th of 2013 when the jury verdict came

 9   back.  I'm just saying that to kinda give you a little time

10   reference.

11   A     I believe you.

12   Q     No, you're following me.  I know that, I know that.

13         And then over the next couple of months, you know,

14   your lawyers do stuff.  I mean, you know what lawyers do.  And

15   on June 17th they filed some motions, a motion for judgment

16   notwithstanding the verdict, motion for remittitur, motion to

17   dismiss.  I know you're aware of that.  You may not be exactly

18   on June 17th, but I know you're aware; am I correct?

19   A     Yes.

20   Q     Because you were talking to your attorneys during all

21   this?

22   A     You have to realize that this trial that you're talking

23   about, you're kinda making it sound like it all happened in

24   one day.

25   Q     Yeah.
```

Morton - Direct

```
 1   A    This went on for five years prior to this.

 2   Q    Okay.  Meaning when she died.

 3   A    Yeah.  I mean, that's how, you know, we got to where we

 4   were going to have a lawsuit, and then the other side

 5   nonsuited the case, then they started again.  It just went on,

 6   and on, and on.

 7              So after the verdict, you know, my lawyers came to

 8   my office, and they informed me of options and all these

 9   motions that you're talking about that they were going to do,

10   and try, and all this.  But, you know, they said that these --

11   that they would very seldom -- you know, were ever granted.

12   Q    And you're right, I am trying to condense it, and I don't

13   mean to.

14              This matter had been going on for a number of years.

15   A    Oh, just forever.

16   Q    And then the trial was, what, eight days or something

17   like that, May 8th --

18   A    Couple of weeks.

19   Q    Yeah, okay.  Now, during the summer, were you talking to

20   Mr. Baker about all this during the summer?  Do you remember?

21   A    About?

22   Q    About the lawsuit, tort reform, the 5.2 million, all that

23   kind of stuff.

24   A    No, I didn't talk to him.  I talked to him about

25   different people that he wanted me to contribute for
```

Morton - Direct

```
 1  contributions he was raising money.

 2  Q    Okay.  We're going to get to that.

 3  A    Yeah.

 4  Q    Let's look at --

 5            MR. HARRIS:  Has exhibit 68 been admitted, Your

 6  Honor?

 7            THE COURT:  I'm sorry?

 8            MR. HARRIS:  Exhibit 68, has it been admitted?

 9            THE COURT:  Let me check my notes, and Ms. Black

10  will double-check us both.

11            Yes, it is admitted.

12            MR. HARRIS:  Can we put exhibit 68 up, please,

13  Nathan?

14  BY MR. HARRIS:

15  Q    Can you see this on your TV screen in front of you,

16  Mr. Morton?

17  A    Yes, sir.

18  Q    Okay.  Is that better?

19  A    Yes.

20  Q    Okay.  This is an exhibit's already been admitted.  It's

21  a summary of phone calls between Gilbert Baker's phone and

22  your phone through the period of a year and a half, January 13

23  through July 2014.  Do you see that at the top?

24  A    Yes.

25  Q    And next to your name there are like three different
```

Morton - Direct

```
 1   phone numbers.  Are those your phone numbers?
 2   A    The 4672 is my office, and the 3949 is my cell.
 3   Q    Okay.  Okay.
 4   A    6694 sounds familiar, but I'm not sure if that's -- it's
 5   a Fort Smith number, 783.
 6   Q    Well, let's start at the top.
 7   A    It could be -- my phone numbers have changed, or that
 8   last one, I'm not sure.  It could be.
 9   Q    Well, let's --
10   A    I -- if you say it is, it is.
11   Q    Okay.  Well, let's look at this.
12   A    Okay.
13   Q    On January 3rd, there are four attempts to call between
14   you and Mr. Baker.  You see that?
15   A    Yes.
16   Q    I touched it.
17           Then the next time is May 16th.
18   A    Uh-huh.  Yes.
19   Q    6:33 p.m.
20   A    Yes.
21   Q    And you called him and talked to him for six minutes and
22   49 seconds, do you see that?
23   A    Yes.
24   Q    Okay.  That's the date of the verdict, do you remember?
25   A    Yes, that's the evening.
```

Morton - Direct

1  Q    That's the evening, you're right.

2  A    Yes.

3  Q    Because it's 6:30 in the evening, right?

4  A    Yes, sir.

5  Q    Then you talked to him a number of times on the 17th.

6  See that?

7  A    Yes, sir.

8  Q    Okay.  You talked to him for eight minutes, two minutes,

9  six minutes.  I mean, there were a number of calls that day,

10 the next day.  And I take it they were about the verdict and

11 all that kinda stuff?

12 A    Yes, and the other things that were coming out about the

13 trial.

14 Q    Okay.  But it was primarily the trial is what I'm asking.

15 A    Yes, yes, sir.

16 Q    Then you talked to him I guess a week later, the 24th,

17 and then you --

18 A    It needs to scroll up.

19       MR. HARRIS:  Could you scroll it up?  Yeah.

20 BY MR. HARRIS:

21 Q    And then the next time is the May 24th, and then you

22 don't talk to him 'til June 17th.  You see that?

23 A    I don't see it.  It's still on 6/20.

24 Q    He's going to enlarge it I think for you.

25 A    You can make it smaller to put the log on there if you

Morton - Direct

```
 1  want to.
 2  Q    Well, I want to see it.
 3  A    Oh.
 4  Q    Okay.  You see the 6/17?
 5  A    Yes, sir.
 6  Q    Okay.  So there are like, what, four calls, five calls on
 7  6/17 --
 8  A    Yes.
 9  Q    -- between you and Mr. Baker.  And, there you go, how is
10  that?
11  A    That's good.  It's -- yeah.
12  Q    Now, let's go down so we go further in -- so you hadn't
13  called him since May 24th, and now it's June 17th, you call
14  him, right?
15  A    Yes.
16  Q    And do you have a memory on June 17th your lawyers filed
17  all those motions I was just talking about?
18  A    That they filed them on the 17th?
19  Q    Uh-huh.
20  A    I'm not sure what date they filed them.
21  Q    Okay.  Okay.  But they were keeping you up to date?
22  A    Yes, sir.
23  Q    Well, then we're talking on the 18th, the 19th and the
24  20th.  You see all that?
25  A    Yes, sir.
```

Morton - Direct

```
 1   Q    Okay.  So let's go down.  Let's go down to the 28th.

 2   A    Okay.

 3   Q    So you're talking on the 26th and the 28th.

 4   Twenty-eighth, do you remember a call -- I mean, do you

 5   remember a luncheon in Russellville at Ruby Tuesday with

 6   Mr. Baker?

 7   A    Yes, sir.

 8   Q    And how did that come up?

 9   A    He had discussed with me about wanting me to contribute

10   to different people.

11   Q    Uh-huh.

12   A    And so I told him that I'd talk with him about it, and he

13   wanted to meet there.

14   Q    Okay.

15   A    And I said, okay.

16   Q    And he -- you mean, so he'd been talking to you, like

17   these other phone calls on 6/17, 6/18, 6/19, 6/20, 6/26, those

18   were calls where he would talk to you about other

19   candidates -- contributions?

20   A    Yeah.  He would -- I kept telling him I needed a fax, he

21   needed to fax me.  He was wanting to put money in PACs, open

22   up some PACs, and I said, you need to send me a fax.

23        And so he decided he wanted me at Ruby Tuesday and

24   discuss the different candidates that he wanted me to consider

25   giving money to.
```

Morton - Direct

1   Q    And had you ever eaten at that Ruby Tuesday in

2   Russellville before?

3   A    Never.

4   Q    Is that kind of like halfway between y'all, Russellville,

5   Fort Smith and Conway?

6   A    I think the way I remember it, I was in Little Rock and I

7   was heading back to Fort Smith, and he was going to be in

8   Russellville -- I think.  I don't think I made a special trip

9   to Russellville to eat at Ruby Tuesday, but I think that's

10  where we met.  I was on my way back.

11  Q    And at Ruby Tuesday, what did -- I know you told him you

12  needed a fax, but what did he talk to you about he wanted you

13  to contribute?

14  A    He wanted me to contribute to the Maggio campaign, he

15  wanted me to contribute to Rhonda Wood campaign for Supreme

16  Court, he wanted some more money for Arkansans for Lawsuit

17  Reform, and then he wanted me to consider contributing, making

18  a donation to Foundation of UCA.  And then I'm not sure if he

19  mentioned Stacy Hurst at this meeting or not.

20  Q    Or later?

21  A    It could have been later.

22  Q    Okay.  Well, let's talk about Rhonda Wood.  She was on

23  the Court of Appeals, and had you contributed to her campaigns

24  when she ran for Court of Appeals or circuit judge?

25  A    Yes, sir, I contributed to her two or three -- two times

Morton - Direct

1   before, I know, at least.

2   Q    Okay.  And Mike Maggio was an elected judge in Faulkner

3   County at the time, running for Court of Appeals.  Are you

4   aware that, like, what, a day before this he had announced for

5   Court of Appeals?

6   A    I didn't know when he had announced, but . . .

7   Q    And had you contributed to his previous campaigns?

8   A    No, sir.

9   Q    ALR, you had contributed a hundred thousand dollars to

10  start it off?

11  A    Yes.

12  Q    If you know he was getting $10,000 a month, would you

13  have given him another 50?

14  A    If I had known that he was getting 10,000 a month?  You

15  know, it's -- I would have probably felt like that was a

16  little excessive for the amount of tort reform that was being

17  produced.

18  Q    Okay.

19  A    But you know how that goes.  You know, if there's a lot

20  of headway and production; there had not been.  And, you know,

21  I was getting hesitant about it.

22  Q    Uh-huh.  And then the UCA, did he tell you how much he

23  wanted you to give to UCA?

24  A    No, he did not.

25  Q    Okay.  Now --

Morton - Direct

1   A      He just told me he wanted me to consider it.

2   Q      Okay.  And had you ever given to UCA before?

3   A      No, sir.

4   Q      Okay.  Now, UCA, I know and probably you do, too, UCA

5   produces a lot of, like, medical people, like physical

6   therapists or therapists, don't they?

7   A      Well, at one time in the state of Arkansas, the business

8   that I'm in, the way that you can do better in that business

9   is to have therapy programs in your nursing home and longterm

10  care for hip fractures and different things for people that

11  qualify for Medicare, and we bring them into nursing homes and

12  give them short stays, like 10 to 15 days, and we give them

13  different therapies, physical therapy, occupational therapy

14  and speech therapy.

15          And for many years, UCA was the only school in the

16  state that produced those therapists.

17  Q      Okay.  And did he -- at this luncheon, did he tell you

18  how much he wanted for Ms. -- I'm sorry, for Judge Rhonda

19  Wood, how much he wanted you to give?

20  A      Yes.

21  Q      How much?

22  A      50,000.

23  Q      And did he tell you how much he wanted you to give for

24  Mike Maggio?

25  A      Yes.

Morton - Direct

1    Q    How much?

2    A    30,000.

3    Q    And did he tell you how much he wanted you to give for

4    AL -- for Arkansans for Lawsuit Reform?

5    A    Yes.

6    Q    How much?

7    A    50,000.

8    Q    And did he tell you how much he wanted you to give to

9    UCA?

10   A    No.

11   Q    Okay.  He just leave it up to you, or --

12   A    He just asked me if I would consider donating to their

13   foundation, if I'd consider it.

14   Q    So he didn't throw out a number.  He didn't try to --

15   A    No, no, no.

16   Q    Now, so this is a month actually after you just got a

17   $5.2 million judgment, wasn't it?

18   A    Yes, sir.

19   Q    You must have a lot of money.

20   A    I've been at this since 1976.

21   Q    Okay.

22   A    So, you know, I've . . .

23   Q    How did you feel about him asking for all that much money

24   at that luncheon after you just got a $5.2 million judgment?

25   A    Well, I had been intending on giving money to those

Morton - Direct

```
 1   people anyway.  I mean, I was going to give money to Rhonda
 2   Wood, and he didn't have to ask me.
 3   Q    You'd done that before.
 4   A    I had done that before.  I didn't see anything changing.
 5   Q    But you'd never given to Mike Maggio?
 6   A    No.
 7   Q    So did he, like, write all this out on a napkin and hand
 8   it to you there at lunch, or did you memorize it, or what
 9   happened?
10   A    No, I told him, I said, you've got to send me a fax.
11   Q    Okay.
12   A    Because, for one thing he was setting up these PACs.
13   Q    Okay.
14   A    And I wasn't going to be able to remember 10 PACs.  So I
15   told him to send me a fax.
16   Q    Okay.  And so, are you aware that on July 2nd a fax came
17   to your office?  And I know that's right around the July 4th
18   weekend.
19   A    Sometime about then I got the fax.
20   Q    Okay.  And you have two people who work for you, Pat
21   Cherry and Elizabeth Frederick?
22   A    Yes, sir.
23   Q    And they're like assistants or administrative assistants
24   or secretaries?  I don't know what the actual title is.
25   A    They're -- let's call them staff.  They're part of my
```

Morton - Direct

```
 1  staff, and one of them, Elizabeth Frederick, any corporate
 2  checks, the nursing home checks, she takes care of that.  And
 3  Pat Cherry takes care of my personal checks.
 4  Q    Okay.  And you call them staff, but, I mean, Ms. Cherry
 5  and Ms. Frederick have been there, like, 20, 30 years?
 6  A    Oh, yeah.  Pat's been there 25, and Elizabeth's been
 7  there, like, 32 or 33.
 8  Q    So they're trusted.  They've been around.
 9  A    Oh, yes.
10  Q    And so if they got a fax on~--- if they wrote the checks
11  on July 8th and sent a package on July 9th to Mr. Morton, you
12  wouldn't disagree with that -- I mean Mr. Baker, I'm sorry,
13  you wouldn't disagree with that, would you?
14  A    No.
15       MR. HARRIS:  Your Honor, at this time there is an
16  exhibit, and it is a stipulation, exhibit 79, and would the
17  Court entertain reading it at this time, or how would you like
18  to handle that, Judge?
19       THE COURT:  I'm happy to read it.  I'm not sure
20  where I put my copy.
21       The court reporter has come to the rescue.  And
22  since we've broken our pace here, Mr. Harris, I think after I
23  read the stipulation I'll give the jury a word or two, and
24  we'll take our morning break.
25       MR. HARRIS:  Thank you, sir.
```

Morton - Direct

1          THE COURT:  All right.  Ladies and gentlemen, a

2  stipulation is where the parties, both sides agree on facts

3  and so evidence doesn't have to be brought in to prove it to

4  you.  Don't need witnesses or documents or anything like that.

5  And the parties have a stipulation here about that FedEx.

6          So it is stipulated by and between the United States

7  and Gilbert Baker that if Susan Baker were called to testify,

8  she would testify that she's the wife of Gilbert Baker, and

9  that on July 9th, 2013, she received a FedEx package at

10  10:31 a.m. at their house, 17 Cooper Lane, Conway, Arkansas.

11  Gilbert Baker was not at home at that time.  The package was

12  addressed to Gilbert Baker and was sent from Pat Cherry at

13  Central Arkansas Nursing Center, 415 Rogers Avenue in Fort

14  Smith, Arkansas.  See Government Exhibit 15.

15          Someone at his house opened the package, and Susan

16  notified her husband that the package was at their house.

17          Okay?

18          MR. HARRIS:  Yes, sir.  Thank you.

19          THE COURT:  Very good.

20          Mr. Morton, during the break don't talk with anybody

21  about your testimony, okay?

22          THE WITNESS:  Okay.

23          THE COURT:  Very good.

24          Ladies and gentlemen of the jury, usual rules of the

25  road:  Pads facedown in your chair, don't talk among

Morton - Direct

1   yourselves about the case, keep your word to me about no

2   Facebook posts or anything like that, don't let anybody talk

3   to you about the case.

4            We will be out until 10:45.  So a little bit more

5   than 20 minutes.  Get a snack, stretch your legs, step down

6   the hall and get ready to come back and get after it.  We've

7   made good progress this morning.

8            All rise for the jury.

9       (The jury exits the courtroom.)

10           THE COURT:  Ladies and gentlemen, I appreciate

11  everybody's efforts to be more vigilant on virus matters.

12  Thank you for keeping your masks on over your mouth and your

13  nose.  Thank you for keeping your distance from each other

14  unless you live together or family members around each other

15  all the time anyway.

16           Mr. Harris, any ground to cover?

17           MR. HARRIS:  No, sir.

18           THE COURT:  Mr. Hendrix?

19           MR. HENDRIX:  No, Your Honor.

20           THE COURT:  We're in recess.

21      (A recess was taken from 10:23 a.m. to 10:45 a.m.)

22           THE COURT:  Thank you.  Our jury is on the way.

23  We'll take our jury, Officer Pike.

24           COURTROOM SECURITY OFFICER:  Ladies and gentlemen,

25  the jury.

Morton - Direct

1          THE COURT:  Y'all may be seated as you get to your

2    chairs.

3          Everyone may be seated.

4          Mr. Harris, you can resume.

5          MR. HARRIS:  Thank you, sir.

6    BY MR. HARRIS:

7    Q    Mr. Morton, I made a mistake.  I said Ruby Tuesday

8    luncheon was June 28th.  It's actually June 26th, and over the

9    break I looked at some credit card records that were

10   introduced earlier this morning.  So I stand corrected.  But

11   you still went there and y'all had lunch with Mr. Baker?

12   A    Yes, sir.

13   Q    Okay.  And that was -- and just to kind of refresh

14   everybody, that's when he talked to you about giving money,

15   30,000 for Judge Maggio, 50,000 for Judge Wood, 50 for ALR and

16   something for UCA?

17   A    Yes, yes, sir.

18   Q    And did he tell you why he wanted 50 for Judge Wood and

19   30 for Judge Maggio?

20   A    No.

21   Q    Okay.  And did he talk to you about PACs?

22   A    Yes.

23   Q    Were you supposed to make out money to PACs, or what do

24   you remember?

25   A    He wanted me to make the money to Maggio out in PACs.

Morton - Direct

```
 1   Q    Not to Judge Maggio's campaign?
 2   A    No, he wanted me to make it out to the PACs.
 3   Q    And then the PAC money would go to Judge Maggio; is that
 4   right?
 5   A    Yes, sir.
 6   Q    Or that was your understanding?
 7   A    Yes, sir.
 8   Q    Now, we talked about that you sent some checks on
 9   July 8th and they received them July 9th.  That's what the
10   stipulation that Judge Marshall read?
11   A    Yes.
12   Q    And tell me how these checks were written.  We're going
13   to look at them in a second, but tell me how these checks were
14   written.  They're from different nursing homes?
15   A    For Rhonda Wood they were from several different nursing
16   homes.
17   Q    And how much could you give from a nursing home, do you
18   know?
19   A    2000, that's the limit you could do.
20   Q    And could you give personally?
21   A    I think so.
22   Q    And for Judge Maggio through the PACs, how much were you
23   giving?
24   A    It's 3000 per PAC.
25   Q    Okay.  Now, I'm -- would you --
```

Morton - Direct

```
1                MR. HARRIS:  May I approach just to make this a
2    little easier, Your Honor?
3                THE COURT:  You may.
4    BY MR. HARRIS:
5    Q    I want you to look at exhibits 33A through 33X.  I think
6    there's a book there in front of you, isn't there?  Will you
7    open that up?
8    A    This big book?
9    Q    Yes, sir, this big book.  I think so.
10               Would you just look at that and tell me if you
11   recognize them?  Do you see those, Mr. Morton?
12   A    Yes, sir.
13   Q    Okay.  And do you recognize them?
14   A    Yes, sir.
15   Q    And what are they?
16   A    The 33A is a check from me personally to Rhonda Wood for
17   Supreme Court for 2000.
18   Q    Okay.
19   A    33B is a check to Rhonda Wood from one of my nursing
20   homes.
21   Q    Okay.  Is it safe to say that 33A through 33X are checks
22   either from you or one of your nursing homes that Ms. Cherry
23   or Ms. Frederick wrote at your request?
24   A    Yes, sir.
25   Q    Okay.  And let's also look at 39A through 39I.  And we'll
```

Morton - Direct

1   come back and talk about these in a second.

2   A    Okay.  39?

3   Q    Yes, sir, 39I -- I'm sorry, 39A through 39I.

4            Do you recognize those?

5   A    Yes, sir.

6   Q    And what are they?

7   A    They are $3000 checks to different PACs.

8   Q    Okay.  Are they checks from your nursing homes?

9   A    Yes, sir.

10  Q    And are they written because you instructed Ms. Cherry or

11  Ms. Frederick to do so?

12  A    Yes, sir.

13  Q    And then would you like at -- and we're going to come

14  back and talk to these, but while we're doing, I just . . .

15  would you look at 40A and 40B.  Do you recognize those?  And

16  41, I'm sorry.

17  A    Yes, sir.

18  Q    And what are they?

19  A    Those are $25,000 checks to Arkansans for Lawsuit Reform.

20  Q    And then what --

21  A    From me personally.

22  Q    And what is 41?

23  A    It's for the UCA Foundation for a hundred thousand from

24  me personally.

25  Q    And you recognize those checks?

Morton - Direct

```
1    A    Yes, sir.
2              MR. HARRIS:  Your Honor, at this time I would offer
3    exhibits 33A, B, C, D, E, F, G, H, and all the way through X.
4    You want me to say them all?
5              THE COURT:  No.
6              MR. HARRIS:  Okay.  Good.
7              THE COURT:  Those are all of the Wood-related
8    checks?
9              MR. HARRIS:  Yes, sir.
10             THE COURT:  Any objection?
11             MR. HENDRIX:  No, sir.
12             THE COURT:  The 33 and all of its number
13   iterations -- I'm not sure if that's the right use of that
14   word.  All the 33s are in.
15             MR. HARRIS:  Thank you, sir.
16             THE COURT:  A through X.
17        (Government Exhibits No. 33 A through X entered into
18   evidence.)
19             MR. HARRIS:  And I would also like to offer 39A
20   through 39I, which Mr. Morton just identified.  And they
21   are --
22             THE COURT:  Those are the PAC checks?
23             MR. HARRIS:  Yes, sir.
24             THE COURT:  According to my notes.
25             Mr. Hendrix?
```

Morton - Direct

1           MR. HENDRIX:  No objection.

2           THE COURT:  39A through I are admitted.

3       (Government Exhibits No. 39A through I entered into

4   evidence.)

5           MR. HARRIS:  I would also like to offer exhibits 40A

6   and 40B, which are the checks from Mr. Morton to Arkansans for

7   Lawsuit Reform.

8           MR. HENDRIX:  No objection.

9           THE COURT:  Received.

10          MR. HARRIS:  And 41, exhibit 41, is a check from

11  Mr. Morton to the UCA Foundation.  I would offer that.

12          THE COURT:  Received.  I assume no objection?

13          MR. HENDRIX:  That's correct.

14          THE COURT:  Good.  It's in.

15      (Government Exhibits No. 40A, 40B  and 41 entered into

16  evidence.)

17          MR. HARRIS:  I'm note rich over here, Judge.  I've

18  got all these little notes.

19  BY MR. HARRIS:

20  Q    Okay.  Now that we've introduced these, let's show them

21  to the jury.  Let's look at exhibit 33A, Mr. Morton.  And this

22  appears to be a check from you to Rhonda Wood for Supreme

23  Court; am I correct?

24  A    Yes, sir.

25  Q    Can you see it on your TV screen in front of you?

Morton - Direct

```
 1   A     Yes, sir.
 2   Q     For $2000, and it appears to have your signature.  I take
 3   it that's from your bank account?
 4   A     Yes, sir.
 5   Q     Can you read the date on it?
 6   A     It's -- I guess it says 11/22/13.
 7   Q     Okay.  But did you write this in November of 2013 and
 8   send it to him?
 9   A     No.
10   Q     You wrote it on June 8th -- I mean, July 8th, July 8th?
11   A     Yes, sir.
12   Q     Did you change this date on it?
13   A     No, sir.
14          MR. HARRIS:  Can we scroll down, Nathan?
15   BY MR. HARRIS:
16   Q     This is 33B, and it appears to be a check from Greenbrier
17   Care Center to Rhonda Wood for Supreme Court.  It's signed by
18   Elizabeth Frederick; did I get that correct?
19   A     Yes, sir.
20   Q     $2000, and it appears the date's been written over it.
21   Am I correct?
22   A     Yes, sir.
23   Q     Did you or Ms. Frederick do that?
24   A     No, sir.
25   Q     Is this another check that you sent on July 8th in the
```

Morton - Direct

1   FedEx package?

2   A    Yes, sir.

3   Q    Okay.  All these we're going to go through, is it fair to

4   say they were sent in the FedEx package?

5   A    Yes.

6   Q    On July 8th that the Judge read a stipulation about?

7   A    Yes, sir.

8        MR. HARRIS:  Okay.  Can we go down, or do we have to

9   go to another page?

10  BY MR. HARRIS:

11  Q    33C, Perry County Nursing Home, or Care Center, $2000 for

12  Rhonda Wood for Supreme Court.  Ms. Frederick wrote that.

13       33D, Salem Place Nursing Home, Rhonda Wood for

14  Supreme Court.  Ms. Frederick wrote.  These are your nursing

15  homes; am I correct?

16  A    Yes, sir.

17  Q    If I misstate something I want you to correct me,

18  Mr. Morton.

19       33E, Rhonda Wood for Supreme Court, $2000 signed by

20  Ms. Frederick, and it's from Nursing & Rehabilitation Center

21  at Good Shepherd.

22       Let's go to F.  Another $2000, Rhonda Wood, just

23  made out to her personally.  That was for her campaign, wasn't

24  it?

25  A    Sorry?

Morton - Direct

1   Q    It's just made out to Rhonda Wood, but I take it that was

2   for her campaign for Supreme Court?

3   A    Yes.

4   Q    Sherwood Nursing Home, $2000.  The date's been changed,

5   correct?

6   A    Yes, sir.

7   Q    33G, same thing, except it's from Quapaw Care &

8   Rehabilitation Center, $2000 for Rhonda Wood for Supreme

9   Court, and the date's been changed.

10        33H, $2000 to Rhonda Wood for Supreme Court,

11  Robinson Nursing & Rehabilitation Center.  Date's been

12  changed.

13        We go to I.  $2000 for Rhonda Wood for Supreme

14  Court, Legacy Heights Nursing & Rehab, signed by

15  Ms. Frederick.  Date's been changed, or it's been written

16  over, hasn't it?

17  A    Sir?

18  Q    The date's been written over?

19  A    Yes.

20  Q    Next one, Greystone Nursing & Rehabilitation Center,

21  $2000 for Rhonda Wood for Supreme Court.

22        And 33K is the same amount to Ms. Wood, Rhonda Wood

23  for Supreme Court, Dardanelle Nursing & Rehabilitation, and

24  the date's been written over.

25        Can we go to L?  Ms. Frederick must get tired.

Morton - Direct

1   A     Well, they were just instructed to do it, but she has

2   people that helps her, that it's all electronically done, and

3   they just run them.

4   Q     Oak Manor Nursing & Rehabilitation, $2000, Rhonda Wood

5   for Supreme Court, date's been changed.

6             33M, Briarwood Nursing & Rehabilitation Center, to

7   Rhonda Wood for Supreme Court, $2000.  The date's been

8   changed.

9             33N, Ashton Place Health & Rehabilitation, $2000,

10  Rhonda Wood for Supreme Court.  Date's been changed.

11            And we go to O, 33O, Rhonda Wood for Supreme Court,

12  from White Hall Nursing & Rehabilitation, $2000.  Date's been

13  changed.

14            P, 33P, same thing, $2000, Rhonda Wood for Supreme

15  Court.  What's that, Sheila Manor?

16  A     Stella.

17  Q     Stella Manor Care Center?

18  A     Yes, sir.

19  Q     And that's one of your nursing homes?

20  A     Yes, sir.

21  Q     $2000, the date's been changed.

22            33Q, Heather Manor Care Center $2000, Rhonda Wood

23  for Supreme Court, date's been changed.

24            Can we go to R?  Johnson County Health & Rehab,

25  $2000 to Rhonda Wood for Supreme Court, date's been changed,

Morton - Direct

```
 1    $2000.

 2           S, $2000, Rhonda Wood for Supreme Court.  They

 3    missed spelled R-h-o-n-a, Rhonda.  Jamestown Nursing &

 4    Rehabilitation Center.  Date's been changed.

 5           And T is for Atkins Care Center, $2000, Rhonda Wood

 6    for Supreme Court, the date's been changed.

 7           Can we go to S?  I guess we go to U, huh?

 8           MR. HARRIS:  So, no S?  Oh, we already did that?

 9    Okay.

10    BY MR. HARRIS:

11    Q    This is U, $2000, Rhonda Wood for Supreme Court, from

12    somebody.  Let me make it larger, the Russell Care Center,

13    date's been changed.

14           And the next one is from -- the V is from MSM

15    Properties, looks like your signature, Rhonda Wood for Supreme

16    Court, $2000, the date's been changed.

17           What is MSM Properties, Inc.?

18    A    It's a corporation that I own that has rental properties

19    and such in it.

20    Q    And you didn't change that date --

21    A    No, sir.

22    Q    -- to 11/22/13?  Do you know who did?

23    A    No.

24    Q    Now, let's look -- and all this money went to -- you

25    intended for all this money to go to Judge Rhonda Wood for
```

Morton - Direct

1   Supreme Court?

2   A     Yes, sir.

3   Q     And that's why you wrote it out like that?

4   A     Yes, sir.

5   Q     Now, let's go to 39A through I.

6            I'm sorry, let's do 33W and X, my bad.

7   A     Thirty what?

8   Q     33W and X.  Two more checks, Rhonda Wood for Supreme

9   Court, Country Club Gardens, $2000 for Rhonda Wood for Supreme

10  Court.

11           And X is the same amount to Rhonda Wood for Supreme

12  Court, Central Arkansas Nursing Centers, Inc.  Is that your

13  main one there in Fort Smith?

14  A     Yes, sir.

15  Q     Okay.  So all those you intended to go to Ms. Wood for

16  Supreme Court?

17  A     Yes, sir.

18  Q     Now, can we go to 39A?  39A, once again, Ms. Frederick's

19  signing these checks.  It's date 7/8 of '13 for $3000, and

20  it's from Central Arkansas Nursing Centers, Inc., DBH2 PAC?

21  How did you know to make it out to DBH2 PAC?

22  A     I received a fax, and there were 10 different PAC names

23  on this fax.

24  Q     Okay.

25  A     So I handed it to them and said make out a $3000 check to

Morton - Direct

 1  each PAC.

 2  Q     And this is the fax you got from Mr. Baker?

 3  A     Yes, sir.

 4  Q     And so this is the 30,000 for Mr. Maggio, Judge Maggio;

 5  is that right?

 6  A     Yes, sir.

 7  Q     So 39B, DBH PAC, not DBH2, but DBH PAC.

 8  A     Yes.

 9  Q     And if you flip through the book you can do that, too,

10  Mr. Morton.

11           Greenbrier Care Center, $3000.

12           Let's go to 39C.  39C is 3000 to GGG PAC from

13  Sherwood Nursing & Rehabilitation Center.

14           39D is $3000 to Judicial Reform PAC, and it's dated

15  July 8th of 2013, 7/8/2013, right?

16  A     Yes, sir.

17  Q     Let's look at 39E.  39E is $3000 Taxpayers for Change PAC

18  from Nursing & Rehabilitation Center at Good Shepherd.

19           39F, same date, July 8th of 2013, $3000 to Red

20  Arkansas PAC, and it's from Salem Place Nursing &

21  Rehabilitation Center.

22           39G, $3000 to CIT PAC, C-I-T, PAC, Briarwood Nursing

23  & Rehabilitation Center.

24           And 39H is from you, your personal account, I guess,

25  Michael Morton, to CPI PAC, $3000, dated July 8th of '13.  Is

Morton - Direct

```
 1  that right?
 2  A    Yes, sir.
 3  Q    How about 39I?  And this is from MSM Properties,
 4  July 8th, 2013, $3000 to TGI PAC, and you signed it.  Did I
 5  get that right?
 6  A    Yes, sir.
 7  Q    And this was the Maggio money?
 8  A    Yes, sir.
 9  Q    Okay.  Let's look at 40A and B.  40A is, same date,
10  July 8th of 2013, $25,000 on your personal account to
11  Arkansans for Lawsuit Reform.
12          And 40B is another $25,000 check to Arkansans for
13  Lawsuit Reform.  It's signed by you; am I correct?
14  A    Yes, sir.
15  Q    What, did you accidentally -- you actually sent them two
16  checks?  How come there are two $25,000 checks?
17  A    Gilbert had wanted 50,000, and I initially just wrote 25,
18  but before I sent the FedEx back I decided to go ahead and
19  write the other 25.  So instead of tearing up one check and
20  writing one for 50, I just wrote another one for 25.
21  Q    Why did you initially just --
22  A    I was just hesitant, you know.
23  Q    Why?
24  A    Oh, I just didn't feel like that lawsuit reform was
25  happening, and I was kinda getting, you know, dismayed with
```

Morton - Direct

1    it, so to speak, but, you know, I thought I would go ahead and

2    do it and see how it worked out.

3    Q    Let's look at 41.  This is the UCA Foundation, hundred

4    thousand dollars.

5    A    Yes, sir.

6    Q    Now, on his fax, did he have UCA Foundation $100,000?

7    A    Say that again?

8    Q    On the fax he sent you with all the PAC names, amounts?

9    A    Yes.

10   Q    Judge Wood's amount and ALR amount and UCA, did he have

11   an amount by UCA?

12   A    No, he did not.

13   Q    What did he have?

14   A    A question mark.

15   Q    So you had some time to think about it.  How did you come

16   up with this?

17   A    I have given to several educational deals, and I got to

18   thinking about his request, and I had never thought about UCA

19   a lot until he, you know, asked me.  Then I got to thinking

20   about what UCA had done for me, and as I was explaining while

21   ago, the different types of therapies they do, and if it

22   wasn't for that -- and I even went to the trouble of talking

23   to my therapy company and them finding out how many people

24   that they employed as therapists that worked in my nursing

25   homes had graduated from UCA.

Morton - Direct

1   Q     Uh-huh.

2   A     Over 50 percent of all of them had.  So I thought that,

3   you know, it helped out my nursing homes immensely, and so I

4   just felt like that they deserved a good contribution from me

5   for their foundation.

6   Q     Okay.  Why not 50,000, or why not 200,000?

7   A     I just thought a hundred thousand.  I think I had just

8   given a hundred thousand to a school that someone had asked me

9   to donate to that didn't have anything to do with healthcare

10  at all.

11  Q     Is that Kipp?

12  A     Yes, sir.

13  Q     Where's Kipp at?

14  A     In Helena, Arkansas.

15  Q     Is it like a lower level school?

16  A     Well, at the time that it started, it was just a class

17  of, I think, one class of fifth graders.

18          Now it's K, or pre-K, I think, or K through 12.

19  Q     When you give to political candidates, have you gone

20  through Mr. Baker before?

21  A     I had talked to Mr. Baker before about different

22  candidates, yes.

23  Q     When you give to political candidates, have you gone

24  through Mr. Baker before?

25  A     Yes, sir.

Morton - Direct

1   Q    To give him money to give to the candidates?

2   A    I don't think I've done that.  I'd write a check to the

3   candidate.

4   Q    Okay.  And when you give to -- I know all these nursing

5   homes, but when you, like, write a check to Judge Baker -- I

6   mean, I'm sorry, Judge Wood.

7   A    Yes.

8   Q    When you write it out to Judge Wood, it's from you and

9   from your nursing homes, right?

10  A    Yes, sir.

11  Q    And when they get them, do they know they're from you?

12  A    Yes, sir.

13  Q    And why do you want them to know that they're from you?

14  A    Why do I want to know?

15  Q    Why do you want them to know the money's coming from you?

16  A    Well, I think that a lot of times it's best that way, but

17  other people feel differently about that.

18  Q    No, I know, but why do you want the candidate or the

19  judge you're giving money to, why do you want them to know

20  it's coming from you?

21  A    I guess so they would know who was on their side, who was

22  for them.

23  Q    Yeah.  I mean, you're giving a lot of money to Judge

24  Rhonda Wood for Supreme Court, right?  $50,000.

25  A    Yes, sir.

Morton - Direct

1   Q    Or 48 I think it comes to.

2   A    Yeah, it's -- yeah, 48.  I don't know how it ended up

3   that way.

4   Q    You meant to give her 50?

5   A    Yeah.

6   Q    And you want her to know Michael Morton is contributing,

7   right?

8   A    Yes, sir.

9   Q    Okay.  How would Michael Maggio know that you're

10  contributing 30,000 to him?

11  A    The only way that he would know I guess would have been

12  who controlled the PACs.

13  Q    Okay.  But if the PACs give 30,000 to him, it looks like

14  it's coming from the PAC, not from Michael Morton.

15  A    Yes, sir.

16  Q    How would he know you were giving it to him is what I'm

17  asking you.

18  A    Someone would have to tell him.

19  Q    Okay.  Would that be you?

20  A    I've never talked to Mr. Maggio.

21  Q    Okay.  So these -- somebody else would have to say, oh,

22  this is Michael Morton's money?

23  A    Yes.

24  Q    Okay.  Who could have done that?

25  A    The person in control of the PACs.

Morton - Direct

1    Q    Or the person asking for the money?

2    A    Yes.

3    Q    Who asked for the money?

4    A    Mr. Baker.

5    Q    Okay.  Who was fundraising for Judge Maggio?

6    A    Mr. Baker.

7    Q    Okay.

8    A    With me.  I don't know who all else was -- there could

9    have been other people.

10   Q    Could have been, you're right.  But with you?

11   A    Yes, sir.

12   Q    And had you ever given to -- was this the start of PACs,

13   or had PACs been going around for some time in 2013?

14   A    PACs had been around forever, but the corporate giving

15   had -- there had been talk in the legislature that they were

16   going to do away with corporate giving, and it had been talked

17   about quite some time.  And I took it that Gilbert knew that

18   was going to happen or had anticipated it, and he was going to

19   set up PACs so he would be able to have a revenue stream of

20   more than just one PAC.

21        Because the limit for a PAC, these are $3000 checks.

22   They could have been $5000 checks, because the limit is 5.  So

23   you --

24   Q    Why didn't you give 5?

25   A    I just gave 3.

Morton - Direct

```
 1   Q     Why'd you give 3?

 2   A     I guess that's what I agreed to give was the 3.

 3   Q     I mean, is that what he asked for?

 4   A     I can't remember.  It's probably something we agreed on.

 5   He might have asked for that.

 6   Q     Uh-huh.

 7   A     I can't remember that exactly.

 8   Q     In the summer of 2013, there wasn't any laws or any

 9   problems with PACs at the time.  That was in the future,

10   right?

11   A     Yes, sir.

12   Q     Okay.  So in 2013, you could have -- you and all your

13   nursing homes could have written out checks to Judge Michael

14   Maggio campaign?

15   A     Yes, sir.

16   Q     Just like you did for Judge Rhonda Wood?

17   A     Yes, sir.

18   Q     But instead, for the Maggio money you wrote it out to CPI

19   PAC and Go Go Good Government PAC and whatever those names

20   were.

21   A     Right.

22   Q     I can't remember.  Right?

23   A     Yes, sir.

24   Q     And you did it because why?

25   A     Gilbert preferred for me to do it that way.
```

Morton - Direct

1  Q    He told you to do it?

2  A    Yes, he wanted me to do it that way.

3  Q    Okay.  And do you know -- and I know you do now, but do

4  you know -- did you know on July 8th, when you wrote all these

5  checks -- this is like 225, $228,000.  Do you know that?

6  A    Yes, sir.

7  Q    Something like that.  My math can be close.

8        When you wrote those checks, there was a hearing

9  going on in Judge Maggio's courtroom on the Greenbrier Nursing

10  Home's motion for new trial, judgment notwithstanding and

11  remittitur?

12  A    Yes, sir.

13  Q    Did you go to that hearing?

14  A    No, sir.

15  Q    Did you later find out what the result of that hearing

16  was, that he entered an order?

17  A    The judge?

18  Q    Yeah, like three days later?

19  A    Yes.

20  Q    And what was that order?

21  A    He reduced -- when he reduced the verdict to 5.2 million?

22  Q    He reduced it to?

23  A    1 million.

24  Q    1 million; is that right?

25  A    Yes.

Morton - Direct

1  Q    On the same day you wrote the checks for $225,000 and

2  sent them to Mr. Baker?

3  A    Yes.

4  Q    Did you ever refer to this as, this looks bad?

5  A    In hindsight it looks horrible, I know that.  And of the

6  things that I have told several colleagues, the lesson I have

7  learned in this is no matter who asks you to contribute to any

8  judge, don't do it if you have a case going on.

9  Q    Okay.  And after the -- all this money flowed, you said

10  to Mr. Baker, did you ever give any more money through him

11  again?

12  A    To who?

13  Q    Mr. Baker.

14  A    No.

15  Q    So this is the last -- you had given to him before; am I

16  correct?

17  A    Yes.

18  Q    And you'd given to Judge Wood before?

19  A    Yes.

20  Q    Never Judge Maggio?

21  A    Never.

22  Q    And so after this little July 8th money being sent to

23  him, you never sent any money to him again?

24  A    No.

25  Q    Why not?

Morton - Direct

```
1    A    Well, for one thing, my lawyer told me not to have any

2    contact at all with him.

3    Q    Because it looked bad?

4    A    He said it'd be conspiracy.

5    Q    Because it looked bad, right?

6    A    Well, yes.

7    Q    Do you know that --

8              MR. HARRIS:  Can we put up exhibit 68 again, please.

9    Go down to the bottom, if you can, Nathan.

10   BY MR. HARRIS:

11   Q    Okay.  Look there at the last three lines of that page,

12   and July 9th he called you because -- 0304 is Mr. Baker's

13   number, and he called you and talked for eight minutes and 27

14   seconds.  You see that third from the bottom where it says

15   7/9/13?

16   A    Yes, sir.

17   Q    Okay.  So you mailed it, you wrote -- you authorized, and

18   Ms. Cherry and Ms. Frederick wrote all these checks on July 8,

19   228,000, or whatever it is.

20   A    Yes, sir.

21   Q    And you FedExed them, and then on the ninth he -- or his

22   wife received them at his house.  You heard the stipulation.

23   A    Yes, sir, yes, sir.

24   Q    So July 9th at 4:00 o'clock he calls you.  Do you

25   remember what that call is about?
```

Morton - Direct

```
 1   A    As best I can recall, I think he called to tell me thanks
 2   for sending the checks, and the -- I think especially the UCA
 3   Foundation check.
 4   Q    Because he wasn't -- he didn't ask you for a specific
 5   amount.  He was just saying, do what you want, and you said, I
 6   want to do a hundred thousand.
 7   A    Yes.
 8   Q    And did you know he was the executive -- I don't -- he
 9   was an assistant to the president of UCA.
10   A    Yes, sir.
11   Q    He may have had a better title than that, but one of them
12   was trying to get people to give money.
13   A    I knew he was assistant whatever you said before.
14   Q    Yeah.
15   A    Yeah.
16   Q    Between the two of us, we have probably butchered his
17   title, but do you know what I'm talking about?
18   A    Yes, sir, I know what you're talking about.
19   Q    Okay.  So I'm sure he was happy for the hundred thousand
20   dollars to UCA.
21   A    Yes, sir.
22   Q    He was probably happy for the 50,000 to ALR.
23   A    Yes.
24   Q    Do you remember him thanking you for that, or . . .
25   A    No.
```

```
 1    Q    You just have a general memory of him thanking you?

 2    A    Yes.

 3    Q    And I'm sure he was happy for the 48,000 you had sent for

 4    the Rhonda Wood campaign?

 5    A    Yes, sir.

 6    Q    Did you know he was the fundraiser for her?

 7    A    Did I know that he -- I had not known that previously.

 8    Like I said, I was going to give to her.  It kinda surprised

 9    me that he's the one that asked me, but it didn't matter.

10    Q    Okay.

11    A    I think under the law, judges can't ask for money when

12    they're running for office.

13    Q    Uh-huh.

14    A    They have to have someone else to do that.

15    Q    Okay.  And I take it he thanked you for the 30,000 to the

16    PACs for Judge Maggio?

17    A    I suppose he did.

18    Q    I mean, that would seem to make sense, doesn't it?

19    A    It makes sense.

20    Q    Yeah.  And then, is he a talker?  Eight minutes and 27

21    seconds.  Is he a talker, or are you the talker?

22    A    I would not have any idea.  I, you know . . .

23    Q    Are you a big talker is what I'm asking.

24    A    Oh, I could be, yeah.

25    Q    Well, we're going to get a chance to check it out a
```

Morton - Direct

```
 1  little bit more.  Okay?
 2  A    Okay.  That's cool.
 3  Q    And then you didn't talk again until July 22nd.  You see
 4  that?
 5  A    Yes.
 6  Q    And then you didn't talk again until September 6th.
 7  A    Yes.
 8  Q    And do you have any idea why you kinda stopped talking to
 9  him after you sent the check -- or you went, what's that,
10  almost two months, why you only talked to him once in the next
11  two months?
12  A    No, I don't remember those conversations at all.
13  Q    You pretty much gave him your money.
14  A    Yes.
15  Q    And is that what people come to you for, try to get you
16  to give money?
17  A    A lot of people, yes.
18  Q    Okay.
19  A    For different political races.
20  Q    Yeah, but, I mean, you give money for political races,
21  judicial races, charities.
22  A    Yes.
23  Q    So people coming to you all the time trying to get money?
24  A    All the time.
25  Q    Yeah.  I know that Mr. Baker had come to you and got a
```

Morton - Direct

```
 1   hundred thousand for ALR back when it started.
 2   A    Yes, sir.
 3   Q    Okay.  Had he come to you before for money for Judge
 4   Maggio before this Ruby Tuesday's meeting?
 5   A    No.
 6   Q    Never?
 7   A    No.
 8   Q    Had he come to you before for Judge Wood?
 9   A    No.
10   Q    Okay.  Never?
11   A    No.
12   Q    Now, I know you had given to Judge Wood before, correct?
13   A    Yes, sir.
14   Q    That's where you personally handed it to her --
15   A    No, you can't do that.
16   Q    Right.  You go to some campaign party or donation?
17   A    I had been to fundraisers where the money was --
18   Q    Fundraisers.
19   A    Yeah.
20   Q    And you kinda leave it in a bowl, don't you?
21   A    Well, hand it to their assistant or someone similar to
22   Gilbert.
23   Q    And I'm not trying to -- I don't mean to imply that you
24   give it to the judge specifically, but you've gone to
25   receptions for Judge Wood and taken money and given to her
```

Morton - Direct

1  campaign?

2  A    Yes.

3  Q    She had run for the Court of Appeals twice?

4  A    Yes.

5  Q    Do you remember that?

6  A    Yes.

7  Q    And she had run for circuit judge of Faulkner County?

8  A    Yes.

9  Q    And that's the way you're supposed to do it, isn't it?

10  A    Yes, sir.

11  Q    Yeah, okay.  Why did you do it this PAC way for Judge

12  Maggio?

13  A    Because Gilbert talked to me about it, and that's the way

14  he wanted to do it.

15  Q    At the time did you have any -- the hairs on the back of

16  your neck standing up?

17  A    No.  The only problem I had with it and the only thing

18  that bothered me somewhat about it, because I -- you know, I

19  felt like that it was just another avenue of giving money, and

20  people have all sorts of avenues, but I do know that when you

21  put money in a PAC you don't know where it's going.

22  Q    True.

23  A    And sure enough, you know, I found out later that all the

24  money didn't go to Judge Maggio.

25  Q    But that was your intent, wasn't it?

Morton - Direct

```
1    A    Yes, it was.

2    Q    And that's what you told Gilbert Baker?

3    A    Yes.

4    Q    And that's what Gilbert Baker told you was this PAC

5    money's going for Mike Maggio?

6    A    Yes.

7    Q    Okay.  Now, let's look at exhibit 39A.

8              MR. HARRIS:  I believe I got this admitted a while

9    ago, too, Judge.  Can I approach and look real quick?

10             THE COURT:  You may.

11             And Officer Vanness, would you shut that door,

12   please.  I can hear the conversation in the vestibule.  I

13   think it's cracked maybe.  Never mind.  That's okay.

14             MR. HARRIS:  I think we've already looked at that,

15   Judge.  No, no, no, we haven't.  39A.  I believe that's

16   admitted.  And can we look at that?

17             THE COURT:  39A is in.

18             MR. HARRIS:  I'm sorry, I think we've already looked

19   at that.  I apologize.

20   BY MR. HARRIS:

21   Q    What did you know, Mr. Morton, what did you know about

22   LRM?  Did you know anything about that?  LRM, did you ever

23   hear of that before?

24   A    What is it?

25   Q    No, I'm asking you if you've ever heard of it before,
```

Morton - Direct

1    LRM.   It's a consulting firm that Mr. Baker had.

2    A     No.

3    Q     That he started in December of 2012.

4    A     No, sir.

5    Q     Okay.  Let us --

6            MR. HARRIS:  Judge, give me one second, if I may.

7            THE COURT:  Certainly.

8    BY MR. HARRIS:

9    Q    Let's look at exhibit 73.

10           MR. HARRIS:  They are already admitted, Your Honor.

11   Exhibit 73, if we could.

12   BY MR. HARRIS:

13   Q    And maybe I showed this to you a while ago, Mr. Morton.

14   This is a summary of phone calls and texts between you and

15   Mr. Baker and -- Mr. Baker and Mr. Maggio.  But look at

16   May 16th.  You see the one, Morton to Baker, six minutes and

17   49 seconds.  I think we talked about that before the break.

18   Remember?

19   A     Yes, sir.

20   Q     That was the day of the verdict?

21   A     Yes, sir.

22           MR. HARRIS:  And can you go down, scroll down?

23   BY MR. HARRIS:

24   Q     Then the next day, this is when y'all talked, and he may

25   or -- may have told you about the juror that worked in his

Morton - Direct

1    office?

2    A    Yes, sir.

3    Q    Let's go to 74.  This is June 17th of 2013, the day of

4    the motion for trial for new -- or remitter, new trial or

5    remitter that your attorneys filed.  10:29 you either

6    called -- or do you text?  Do you text?

7    A    Very little.

8    Q    Okay.

9    A    I don't think I ever . . .

10   Q    You called, five seconds.

11   A    Yeah.

12   Q    Then later that day, 5:51, you called him, and then

13   called him again, and then he called you back at 6:23, and

14   y'all talked for four minutes and 39 seconds.

15        Got any idea what that was about?

16   A    The only thing it could have been about was my lawyer

17   informed me that sometime after the trial -- what was the last

18   day of the trial?

19   Q    May 16th was the last day of the trial.  That was the

20   verdict.

21   A    Okay.  The next morning, the judge got a email from one

22   of the jurors said they'd messed up.  And so I'd been informed

23   of that, and I might have talked to Gilbert about that.  I

24   don't know.

25   Q    Okay.  And let's go to exhibit 75.  June 27th, Maggio

Morton - Direct

```
 1  announces the court of appeals.  And the day before this,
 2  June 26th, is Ruby Tuesday's luncheon.   Remember that?
 3  A    Uh-huh.
 4  Q    Okay.
 5  A    Yes, sir.
 6  Q    So the next day he announces for court of appeals.
 7         Then the next day, the 28th, you call Mr. Baker at
 8  11:08 in the morning, and then Baker called you back, he
 9  called you back, and then you called him back and talked for
10  almost two minutes at about 1:30 in the afternoon.  Do you
11  remember what that was about?
12  A    No.
13  Q    I know you talk to lots of people, I know that.
14  A    Yes.
15  Q    You've got lots of businesses.  Do you have any memory
16  what you were talking to Mr. Baker about during this time?
17  A    Well, it would either be probably one of two things, the
18  trial or the, what I just talked about, the --
19  Q    The money?
20  A    The money or the -- the mistake that a juror felt like
21  they had made.
22  Q    Uh-huh.
23  A    Or the fact that there was a person at UCA that felt like
24  that, you know, they gave such a large award because of the
25  idea of a large insurance company being involved.
```

Morton - Direct

1    Q    And did you, when you talked to Mr. Baker back in May

2    after the verdict came out, did you -- I think you said this

3    earlier, but I just need to make sure I ask it.  Did you talk

4    about this judgment, 5.2's going to bankrupt the nursing home

5    and put people out of business, employees out of jobs?

6    A    I informed him that night that I -- that night I called

7    him and let him know that.

8    Q    Okay.

9    A    That's the first phonecall, which I remember real well,

10   is when I told him, this is what happens when you have a

11   runaway jury that will do this, and there's not a big

12   insurance company backing it up, and it has bankrupted a

13   nursing home in Greenbrier, Arkansas.

14   Q    Before that time, May 16th call when you're angry and you

15   talked to him and you cussed and all that kind -- I mean,

16   things just kind -- did you ever talk to him like that before,

17   yelled at him over the phone or cussed at him?

18   A    I don't think so.  I can't remember.  No, no.

19   Q    Okay.

20   A    I try not to make a habit of that, but it was something

21   that was pretty disturbing to me, and, you know . . .

22   Q    5.2's a lot of money in my book.

23   A    Well, an additional 2 million that I owed on the nursing

24   home made it 7.2.

25   Q    June 20 -- let's go to -- give me one second, Mr. Morton.

Morton - Direct

1    Let's go to exhibit 76.  Go down to July 9th.  That's -- we

2    talked about that.  That's when he got the package, the FedEx

3    package with the $228,000 in checks, and he called you at

4    4:05.  See that?

5    A    Yes, sir.

6    Q    Eight and a half minutes?

7    A    Yes, sir.

8    Q    Okay.  Now, let's go to 77.  We're going to jump ahead a

9    whole year.  We're going to jump ahead a whole year.

10   A    Okay.

11   Q    Now, in the meantime -- and tell me if you remember this.

12   In the meantime, so we were talking about July of 2013 and

13   your lawsuit, and, in fact, it got changed to a million bucks,

14   didn't it?

15   A    Yes, sir.

16   Q    It got reduced to a million bucks?

17   A    Yes, sir.

18   Q    And did you pay that million bucks to the Estate of

19   Martha Bull?

20   A    Yes, I did.

21   Q    Okay.  And so we rock along, and, you know, in the

22   spring, in March of 2014 is when candidates file for judicial

23   office.  Do you know that, or am I telling you?

24   A    I don't know that exact date, but . . .

25   Q    In the spring, because you know there's an election in

Morton - Direct

```
1    May.

2    A     Yes, sir.

3    Q     May of 2014 there would have been an election.

4    A     Right, right.

5    Q     And are you aware that Judge Maggio did not file?

6    A     Yes, I was.  I was made aware of that.

7    Q     How were you made aware of that?

8    A     Gilbert told me.

9    Q     What did he tell you?

10   A     He told me that he had dropped out.

11   Q     Okay.  Did he tell you why?

12   A     Well, there had been things brought out in the media

13   about his Internet, stuff that he had put on the Internet, or

14   whatever, and had got him, I guess, in a situation that would

15   have made it impossible to run, in Maggio's mind, that he, you

16   know . . .

17   Q     So he didn't file?

18   A     He didn't file.

19   Q     For court of appeals.

20   A     Right.

21   Q     And did Mr. Baker tell you, hey, you know, you know that

22   30,000 you sent to the PACs, I gave it to Mike Maggio?  Did he

23   ever tell you that?

24   A     No.

25   Q     Okay.  Before we do this one, I want to look at
```

Morton - Direct

 1    exhibit 68.  I'm going to switch just real quickly,

 2    Mr. Morton.

 3    A    Okay.

 4    Q    Okay.  You see down at the bottom this is September 6th

 5    of 2013.  These are the calls between you and Mr. Baker.  You

 6    see that?

 7    A    Yes.

 8              MR. HARRIS:  Let's go to the second page, Nathan.

 9    BY MR. HARRIS:

10    Q    So you talk three times in October, and then you talk

11    once in January of '14.  Are you following me?  See the top

12    of --

13    A    Yes.

14    Q    I'm looking under Conn date times.  I guess that means

15    connection, I don't know.

16    A    1/15/14.

17    Q    Then you talk February 10th.  And then starting in March,

18    you talk a bunch.

19              MR. HARRIS:  Keep going down, Nathan.

20    BY MR. HARRIS:

21    Q    A bunch, don't you?

22    A    Uh-huh.

23    Q    Okay.  Stop.  3/18.

24              So from the first through the 18th y'all have a lot

25    of communications, and what do you think all that

Morton - Direct

```
 1    communications is about?
 2    A    Probably about different people that were running for
 3    office.
 4    Q    Okay.
 5    A    I would suspect.
 6    Q    Would they be about Mike Maggio?
 7    A    After he dropped out?
 8    Q    Or he's about to drop out, or he drops out.  I mean, were
 9    any of those conversations about Mike Maggio not filing and
10    dropping out?
11    A    Well, Gilbert's the one that informed me about it.  I
12    don't know the date, but he's the one that told me.  It could
13    have been any one of these calls.  It would have probably been
14    one of the longer calls, because some of them are zero.
15    Q    Oh, yeah, I know.
16    A    Some is four seconds.
17            MR. HARRIS:  Can we make it go up or down?  I want
18    to see 3/1.  Can I do that?  Which way do I need to go?
19    BY MR. HARRIS:
20    Q    Okay.  And you're right, there's lots of calls, but isn't
21    it reasonable that some of them were about Mike Maggio, the
22    problems he's had and why he's not filing?
23    A    It probably could have been, yes.
24    Q    Let's see.  On 3/4, there's an 11:17 call.  On 3/10
25    there's a 10:27 call.
```

Morton - Direct

1        MR. HARRIS:  Make it go up, Nathan, please.

2   BY MR. HARRIS:

3   Q    16:02, 3/13.  3/13, 3/14 were big days.  You talked a

4   bunch.  Sixteen minutes, 17 minutes, 10 minutes, 14 minutes.

5   A    Yes.

6   Q    Something's going on.

7        Eighteenth, next day you talked 12 minutes and then

8   you don't --

9        MR. HARRIS:  Keep on going so I can see the rest of

10  the screen.

11  BY MR. HARRIS:

12  Q    So after March 18th you don't talk again 'til July 25th,

13  2014.  You see that?

14  A    Yes.

15  Q    And why is it you didn't talk to him much after that?

16  A    I have no idea unless it was when the -- the charges or

17  the media was writing about it all the time, and then there

18  was -- I don't know when the investigation started, you know,

19  but at the time it did, I don't know if that's when it did or

20  not.

21  Q    Well --

22  A    But --

23  Q    Could I help you through this?

24  A    Yes.

25  Q    In March is when it came out about Judge Maggio and some

Morton - Direct

```
 1  things on the Internet, and so he didn't file.

 2  A     Okay.

 3  Q     Do you remember that?

 4  A     Yes.

 5  Q     Vaguely?

 6  A     Yes.

 7  Q     And then after that, there was some media reports about

 8  PAC monies, do you remember that coming out, going to Judge

 9  Maggio's campaign?

10  A     Yes.

11  Q     I'm trying to help you.  Trying to refresh you.

12  A     I understand.

13  Q     Do you remember?

14  A     Yes.

15  Q     That would have been in the March-April area.

16  A     Yes.

17  Q     And after that, is that why you stopped talking to

18  Mr. Baker, because all this came out about PAC monies going to

19  Mike Maggio coming from you?

20  A     Well, I talked to Gilbert after that, because we were

21  still --

22  Q     Well, you went from 3/18 to 7/25.

23              MR. HENDRIX:  Your Honor.

24              THE COURT:  Let the witness --

25              MR. HARRIS:  My apologies.  You're right.
```

Morton - Direct

```
 1   BY MR. HARRIS:

 2   Q    Mr. Morton, I apologize.

 3   A    I had discussions with Gilbert.  We were still talking

 4   about Arkansans for Lawsuit Reform, and we had -- and I don't

 5   know when the last meeting -- I think the last meeting or the

 6   last time that I discussed anything with Gilbert was when we

 7   met at Sonny Williams', and he had brought some people

 8   together with me and other people together with Johnny

 9   Goodson, to discuss lawsuit reform.  And I don't know what

10   that date was.  I think y'all have it, I'm not positive, but

11   that I think was the last time I talked to Gilbert.

12   Q    Okay.  And I apologize for interrupting you.

13   A    And that could have been -- some of those phone calls

14   could have been some about that, because I was still

15   interested in that, probably more than ever since, you know, I

16   had had a nursing home to have got in a situation like that.

17   Q    After March 18th of 2014, you didn't talk to him on the

18   phone again until July 25th, 2014.  You see that?

19   A    Yes.

20   Q    And then here's some texts on July 25th, in and out, in

21   and out.  He texted you, you texted him back.

22        I didn't think you texted him much.

23   A    I don't.  I didn't.  I don't know.

24   Q    What happened on July 25th that caused you to text him?

25   A    I have no idea.
```

Morton - Direct

1          MR. HARRIS:  Okay.  Let's put up exhibit 77, Nathan.

2    BY MR. HARRIS:

3    Q    This is pretty cool.  I put them side by side.  You see

4    on the right exhibit 77?

5    A    Yes, sir.

6    Q    At the top it says July 25, 2014, Linda Leigh Flanagin

7    proffer interview with the FBI at 10:00 a.m.

8          I think you said you did know who Linda Leigh

9    Flanagin is?

10   A    Yes, sir.

11   Q    And she was the lady you saw at Brave New on the day of

12   the jury verdict with Gilbert?

13   A    She was also at Sonny Williams' when we had the last

14   meeting.

15   Q    I think you testified she was also the lady with Gilbert

16   Baker at a table at Brave New Restaurant on the day of the

17   verdict when you walked out?

18   A    Yes, sir.

19   Q    Okay.  On exhibit 77, July 25th, 2014, Ms. Flanagin had

20   an interview with the FBI at 10:00 o'clock in the morning.

21   You see it says at the top?

22   A    Yes, sir.

23   Q    And at 1:15 she texted -- or she called Mr. Baker.  At

24   1:41 he texted her.  I mean, she texted him.  At 1:45 he

25   texted her back.  And then do you see who Mr. Baker then

Morton - Direct

```
 1  texted right after he texted Linda Leigh Flanagin at 1:46?
 2  A    Yes.
 3  Q    You.
 4  A    Yes.
 5  Q    And then you texted him back at 2:20.
 6  A    Yes.
 7  Q    And then five minutes later he texted you back.  You see
 8  that?
 9  A    At 2:20?
10  Q    2:25, I'm sorry.
11  A    2:25 Mr. Baker to Flanagin.
12  Q    2:20.  You're right.  I was trying to read too much at
13  one time here.
14  A    Okay.
15  Q    What do you think those texts were about?
16  A    I do not remember.
17  Q    Did he text you and say, hey, Linda Leigh's just been
18  interviewed by the FBI?
19  A    He possibly could have, but I don't remember him --
20  Q    Okay.
21  A    I don't remember for certain.
22  Q    Okay.  If he texted you and said, Linda Leigh, you know
23  who Linda Leigh was?
24  A    Yes.
25  Q    If Linda Leigh's been interviewed by the FBI, that's kind
```

Morton - Direct

```
 1   of a high alert text, isn't it?
 2   A    Oh, yes.
 3   Q    And so you think maybe that's what he said to you, but
 4   you're not sure?
 5   A    I'm not sure.  I couldn't definitely say yes.
 6   Q    Uh-huh.  What would be a high -- a higher alert text
 7   than, hey, Linda Leigh's been interviewed by the FBI?
 8   A    Well, I don't know of any, but all that became public
 9   knowledge pretty quick, so whether he texted me that or not, I
10   found it out.
11   Q    Well, on a scale of 1 to 10, that would be like a nine
12   text, wouldn't it?
13   A    Yeah, it'd be high.
14   Q    It'd be high.
15   A    Yes, sir.
16        MR. HARRIS:  Judge, can I have just one second?  I
17   think I'm about through, and I just need to check my notes.
18        THE COURT:  You may.
19        And while you're doing that, court security
20   officers, can I see y'all at the front, please?
21        Ladies and gentlemen, y'all can stretch if you need
22   to.
23        Mr. Harris.
24        MR. HARRIS:  Still have a little bit more, sir.
25        THE COURT:  That will be fine.  Colleagues are
```

Morton - Direct

1   useful and helpful, aren't they?

2            MR. HARRIS:  Sometimes.  Sometimes they point out

3   when you're wrong.

4            THE COURT:  That's useful in its own way.

5            MR. HARRIS:  Oh, you think so?

6            THE COURT:  I've had it happen to myself a time or

7   two, Mr. Harris.

8            MR. HARRIS:  Speaking from experience, then.

9            No, they are, I agree.

10  BY MR. HARRIS:

11  Q    Mr. Morton, the UCA check for a hundred thousand dollars,

12  at some point did you want it to be anonymous or not?  I don't

13  know the answer to that.

14  A    I might have told Gilbert I wanted it anonymous.  I don't

15  make a habit -- and, you know, when you talk -- when I talk

16  about anonymous, like I gave $25,000 not too long ago to the

17  Good Samaritan clinic in Fort Smith, and the girl come up to

18  my office, asked me for it and I gave it.  The day before I

19  had been reading the Fort Smith newspapers, and the First

20  National Bank had given the same amount, but they had a great

21  big picture of the bank president and a big check and all

22  that, and I don't want that.

23           I told her, I said, hey, I don't want -- she said,

24  oh, we didn't do that anyway, said the bank did that, you

25  know.  And I said, you know, well, I don't want to draw

Morton - Direct

1   attention to myself for --

2           And when I talk about anonymous, that's kinda what

3   I'm talking about.  You know, I've given money to different

4   places that, you know, you want it anonymous or not, they find

5   out, but I just don't want a lot of hoopla and attention.

6   Q    So there's a difference between giving it to somebody and

7   they know you gave it to them --

8   A    Yeah.

9   Q    -- and give it to somebody and they tell everybody else

10  and all those people come and ask you for money.

11  A    Well, they're going to do that.  They're going to find

12  out.  All these organizations all interact with each other.  I

13  know that.

14  Q    And people?

15  A    Yes, and people.

16  Q    And politicians.

17  A    And there's a list, believe me, and anybody in here

18  that's given money to politicians, you're on a list.  Okay?

19  And once you get on the list, you don't get off the list.  I

20  mean, it's just, you don't get off.

21          And so they talk to me frequently.

22  Q    So I guess it's best not to get on the list.

23  A    Well, but in my, my thoughts are if you're not a part of

24  the process and trying to be a part of the process, you know,

25  you're not going to -- if you're not at the dinner table,

Morton - Direct

1   you're going to be what they're eating.   Okay?

2   Q    Can I quote you?

3   A    You can.

4   Q    Okay.  I will.

5   A    Yeah.

6   Q    So if you give money anonymously, if you're not on the

7   list -- well, if you're on the list they know who gave money

8   to them, don't they?

9   A    Yes.

10  Q    And so they're appreciative of them (sic), and you can

11  call them up and say, hey, I'm Michael Morton, and they go,

12  Michael Morton's given me money, and I'm going to listen to

13  him.

14  A    They are probably -- and I don't know this to ever be the

15  truth, but it's the thing that's always said, but you do have

16  maybe a little more -- you want access, just to give your side

17  of the story, if nothing else, about any particular situation.

18  Q    And that's why you like to sign checks yourself and hand

19  them out to -- not to the people specifically, but at their

20  receptions or their fundraisers, so people know it's coming

21  from Michael Morton.

22  A    Well, I hardly ever, for quite some time now, I hardly

23  ever handshakes to people, but they are given, my name is

24  usually on it, and they know who it comes from.

25  Q    And if you give them -- if it's not your name, it's in

Morton - Direct

```
 1    the PAC and it gets to them, they don't know it's from you

 2    unless somebody tells them?

 3    A    You're exactly right.

 4    Q    So if you give it to Michael Maggio but it goes to the

 5    PAC, he doesn't know it's coming from you, does he?

 6    A    No.

 7    Q    And nobody else does either, do they?

 8    A    No.

 9    Q    It's hidden.

10    A    Yes.

11    Q    But it wasn't hidden to Rhonda Wood, was it?  Because

12    it's probably on her little filing thing that she has to file

13    with the Secretary of State.  You know what I'm talking about?

14    A    Yes, sir.

15    Q    And she files hers that shows Michael Morton and all of

16    these nursing homes gave to me 50 -- $48,000, right?

17    A    Yes.

18    Q    And everybody can figure out who the nursing homes are

19    owned by.

20    A    Yes.

21    Q    But Mike Maggio's filing with the Secretary of State when

22    he was running for court of appeals, it doesn't show any of

23    your nursing homes or your name, does it?  Because it's all

24    going through PACs.

25    A    Yes.
```

Morton - Direct

```
 1   Q    So your contributions to Judge Maggio were hidden by
 2   Gilbert Baker.
 3   A    If that's how you want to put it.  I just know that he
 4   wanted it in PACs.
 5   Q    I know.
 6   A    He didn't say, I want to hide.  He did not tell me that.
 7   Q    I know.  But now that you look back on it --
 8   A    You're surmising that, but I didn't hear that, he didn't
 9   tell me that.
10   Q    But now that you're looking back on it, you can see that
11   your contributions --
12   A    Well, that is your -- I can see your theory.
13   Q    Can you see what I'm saying?
14   A    Yes.
15   Q    Does it hold water?
16   A    It would hold water, but it would be one theory.
17   Q    Yeah.  Well, I mean, isn't it a fact you gave money from
18   (sic) Judge Maggio, and it went to a PAC?
19   A    Yes.
20   Q    And it -- in fact, those PACs then gave money to Judge
21   Maggio?
22   A    Yes.
23   Q    And isn't it a fact that you can't look at Judge Maggio's
24   public filings and see your name or your nursing home names on
25   them?
```

Morton - Direct

```
 1   A     I don't think so.  I'm not sure about that, but I would
 2   suspect you're correct.
 3             MR. HARRIS:  Okay.  I do -- I do want to do
 4   something.  There are some audio clips I would like to play at
 5   this time, Your Honor, and they've already been introduced,
 6   and they are -- if you'd give me a second, I just want to look
 7   at my little cheat sheet.
 8             Judge, would you mind, I really got one little thing
 9   left, maybe, 10, 15 minutes at the most, and I want to be more
10   organized.  I'm going to play some video clips that I believe
11   have already been introduced.  Would you mind if we broke for
12   lunch early and I do it when we come back and I'll finish it
13   up?
14             THE COURT:  Not at all.
15             MR. HARRIS:  Thank you, sir.
16             THE COURT:  I would rather you do it that way to
17   smooth it all out.
18             MR. HARRIS:  Thank you, sir.
19             THE COURT:  And your Brother Hendrix will know that
20   you're almost done, or your Sister Depper, and they can get
21   ready for their examination, so that will be fine.
22             Ladies and gentlemen of the jury, we're making good
23   progress.  The lawyers are doing well, and we're moving things
24   right along.  You're doing well, too, by your paying attention
25   and the notes that you're taking.
```

1          A couple of things.  Y'all may have noticed that I'm

2   kind of up and down, and you may have even seen my little

3   pillow here that I've got.  If you've got back trouble like I

4   do and you want to stand periodically or even lean up against

5   the wall, which I have to do periodically, that's fine.  Just

6   unobtrusively get up and do that.

7          On the lunch break, if you leave the courthouse --

8   well, even if you don't, keep your stickers on so that

9   everybody knows you're a juror.  Don't talk to anybody about

10  the case, and don't let anybody talk to you about the case.

11         I would ask you to please take your pads with you

12  this time during the lunch break, give them to Officer Pike,

13  and she'll hand them back out when you come back in.

14         And don't post anything on any social media, don't

15  look anything up about the case.  You're getting all you need

16  here through the lawyers and the evidence that's coming to

17  you.

18         I'll see everybody at 1:00 o'clock straight up.  All

19  rise for the jury.  Go wash your hands and keep your distance,

20  ladies and gentlemen, as you get there.

21      (The jury exits the courtroom.)

22         THE COURT:  Mr. Harris or Ms. Peters, any ground to

23  cover before we break?

24         MS. PETERS:  No, Your Honor.

25         THE COURT:  Mr. Hendrix?

```
 1              MR. HENDRIX:  No, sir.

 2              THE COURT:  Good.

 3              Mr. Morton, don't talk to anybody during the lunch

 4    break, not even your lawyer, about this.  Just pretend you're

 5    on the stand throughout lunch -- don't do that, you won't

 6    enjoy the lunch.  And when we come back, if you'd come on up

 7    here and get in the chair, ready to go.

 8              THE WITNESS:  Okay.

 9              THE COURT:  Okay.  We're in recess.

10       (A recess was taken from 11:52 a.m. to 1:00 p.m.)

11                          * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                            * * * * *

2                            I N D E X

3  Testimony of Jacob Stokes (Resumed)

4          Cross by Mr. Hendrix                247

5          Redirect by Ms. Peters             258

6          Recross by Mr. Hendrix             259

7  Testimony of Timothy Whitlock

8          Direct by Mr. Harris               260

9          Cross by Ms. Depper                279

10         Redirect by Mr. Harris             287

11         Recross by Ms. Depper              289

12 Testimony of Graham Sloan

13         Direct by Ms. Peters               290

14         Cross by Mr. Hendrix               301

15         Redirect by Ms. Peters             305

16         Recross by Mr. Hendrix             306

17 Testimony of Michael Morton

18         Direct by Mr. Harris               308

19                           * * * * *

20

21

22

23

24

25
```

Stephen W. Franklin, RMR, CRR, CPE
United States Court Reporter
stephen_franklin@ared.uscourts.gov (501)604-5145

1              * * * * *

2              E X H I B I T S

3   Governments Exhibits in Evidence:

4         Government's 8A                      266

5         Government's 8B                      268

6         Government's 8C                      270

7         Government's 8D                      271

8         Government's 12                      273

9         Government's 9                       277

10        Government's 19                      281

11        Government's 33A through 33X         343

12        Government's 39A through 39I         344

13        Government's 40A, 40B and 41         344

14  Defendant's Exhibits in Evidence:

15        Defendant's 27                       260

16              * * * * *

17            CERTIFICATE OF REPORTER

18      I, Stephen W. Franklin, Registered Merit Reporter, and

19  Certified Realtime Reporter, certify that the foregoing is a

20  correct transcript, to the best of my ability, from the record

21  of proceedings in the above-entitled matter.

22      Dated this 27th day of JULY, 2021.

23

24      /s/Stephen W. Franklin
        _____
25      Stephen W. Franklin, RMR, CRR