1               FOR THE UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF ARKANSAS
2
             Case No.  4:19-CR-00031-DPM-1
3

4   UNITED STATES OF AMERICA

5               GOVERNMENT,

6       vs.

7   GILBERT R. BAKER,
                           Little Rock, Arkansas
8              DEFENDANT.     July 27, 2021, 12:50 p.m.

9

10           **VOLUME 3B - PAGES 392 - 511**
         **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
      BEFORE THE HONORABLE D. PRICE MARSHALL, JR.,
11        UNITED STATES DISTRICT JUDGE and a jury

12
  APPEARANCES:
13
  On Behalf of the Government:
14
     MS. JULIE E. PETERS, ESQ., AUSA
15     MR. PATRICK C. HARRIS, ESQ, AUSA
     United States Attorney's Office
16      Eastern District of Arkansas
      425 West Capitol Avenue, Suite 500
17      Post Office Box 1229
      Little Rock, Arkansas  72203-1229
18

19   On Behalf of the Defendant:

20      MR. J. BLAKE HENDRIX, ESQ.,
     MS. MARGARET D. DEPPER, ESQ.
21      Fuqua Campbell, P.A.
      Riviera Tower
22      3700 Cantrell Road, Suite 205
      Little Rock, Arkansas  72202
23

24      Proceedings reported by machine stenography and displayed
  in realtime; transcript prepared utilizing computer-aided
25   transcription.

Kathleen E. Maloney, RMR, FCRR, U.S. Court Reporter
kathleen_maloney@ared.uscourts.gov - 501-604-5115

```
 1            (Proceedings continued July 27, 2021, 1:00 p.m.)
 2            THE COURT:  Thank you.  Mr. Harris, are you ready to
 3   go?
 4            MR. HARRIS:  Yes, sir.
 5            THE COURT:  Mr. Morton, are you ready?
 6            THE WITNESS:  Yes, sir.
 7            THE COURT:  Good.  We'll take our jury, Officer Pike.
 8       (Jury present.)
 9            THE COURT:  Everyone can be seated, pardon me, as you
10   find your place.  Mr. Harris, be patient let us all get settled
11   and then you can go.
12            MR. HARRIS:  May I proceed?
13                      DIRECT EXAMINATION (Cont'd)
14   BY MR. HARRIS:
15   Q.   Mr. Morton, before lunch we were talking about your phone
16   contact with Mr. Baker in March of 2014.  Do you remember that?
17   A.   Yes.
18   Q.   And that's when the information about the PAC came out in
19   the press; do you remember that?
20   A.   Yes.
21   Q.   And you were -- you must have made a number of quotes in
22   the paper about that.  Do you remember some of those?
23   A.   Yes.
24   Q.   Do you remember saying something like, "Looking back at it
25   now with all the uproar, obviously the appearance is absolutely
```

1  horrible"?

2  A.   Yes.

3  Q.   Do you remember saying something like, "I was sending it to

4  the people who were working for Maggio, so the people who were

5  creating the PAC"?

6  A.   Yes.

7  Q.   This was a good one.  "I'm going to pull my checks.  I need

8  to find out who I made the damn things to."  Do you remember

9  saying that?

10 A.   No.  But I -- was that in the press?

11 Q.   Yeah?

12 A.   No.

13 Q.   Okay.  But then after this, you got sued, again, or you got

14 sued, and there was a deposition?  Do you remember all that?

15 A.   Yes.

16 Q.   In fact, you were deposed, right?

17 A.   Yes, sir.

18 Q.   And Mr. Baker was deposed?

19 A.   Yes, sir.

20 Q.   We are going to watch some clips here.

21       MR. HARRIS:  The first one, Your Honor, is exhibit --

22 all of these have been entered, they've been admitted.  This is

23 from the video deposition of Mr. Baker, and we are going to

24 watch Exhibit 4B.

25       THE COURT:  Hold on.  Let me check my list before we

1    do.

2              MR. HARRIS:  Okay.

3              THE COURT:  4B.

4              MR. HARRIS:  Yes.

5         (Off the record discussion.)

6              THE COURT:  All the 4 series are in.

7              MR. HARRIS:  Yes.

8              THE COURT:  There was an agreement among counsel, but

9    that's collateral.

10             MR. HARRIS:  That's right.

11             THE COURT:  That's down the line.

12             MR. HARRIS:  Yes, sir.

13             THE COURT:  Go ahead.

14             MR. HARRIS:  4B.

15        (Video clip 4B played.)

16             MR. HENDRIX:  Your Honor, I'm so sorry.

17             THE COURT:  Can we stop?

18             MR. HENDRIX:  Can we approach?

19             THE COURT:  Sure.

20        (Sidebar conference as follows:)

21             MR. HENDRIX:  It's been a long couple of days, but I

22   thought only one video clip had been admitted and it was from

23   the ethics commission.

24             THE COURT:  That's not what my list showed.

25             MR. HARRIS:  4 was admitted.  We only played 4A where

1  he's sworn in, but all the rest were admitted through Brannon.

2          MR. HENDRIX:  Did not play them.

3          MR. HARRIS:  No.  We are going to do it now.

4          THE COURT:  Are all the 4s?  Am I right?  All of them

5  are in.  That's what my notes say.

6          MS. DEPPER:  We were checking our notes.  We had 4A

7  and 4M and I guess all of us at the table, we just missed that

8  the others had been admitted.  I apologize.

9          THE COURT:  No.  That's okay.  Better safe than sorry.

10  No need to apologize.  We all need to get it right the first

11  time in front of the jury.

12      (End of sidebar.)

13          MR. HARRIS:  May I?

14          THE COURT:  You may.  And would you give us a

15  refresher on the context?

16          MR. HARRIS:  Yes, this is 4B.  It's about -- it's a

17  clip of Mike -- I'm sorry -- Gilbert Baker's deposition in the

18  lawsuit in which you were a defendant.  He was too, and I

19  believe it's only about -- it's less than a minute long.  I

20  could be wrong.  It's math.

21      (Video clip 4B played.)

22  BY MR. HARRIS:

23  Q.   Did he ask you for money?

24  A.   Yes.

25  Q.   Okay.  Let's go to 4C, another deposition clip from

1    Mr. Baker.

2         (Video clip 4C played.)

3    BY MR. HARRIS:

4    Q.    Did he ask you for money?

5    A.    Yes.

6    Q.    For Rhonda Wood?

7    A.    Yes.

8    Q.    Pretty simple question; isn't it?

9    A.    Yes.

10   Q.    Okay.  4D, another clip of his deposition.

11        (Video clip 4D was played.)

12   BY MR. HARRIS:

13   Q.    He sent the fax, didn't he?

14   A.    Yes.

15   Q.    You wouldn't know how to send a check without a fax, would

16   you?

17   A.    I wouldn't know the names.

18   Q.    Yes.  4E.

19        (Video clip 4E played.)

20   BY MR. HARRIS:

21   Q.    4G.

22        (Video clip 4G played.)

23   BY MR. HARRIS:

24   Q.    That's not true, is it?

25   A.    No.

1   Q.    4H.

2         (Video clip 4H was played.)

3   BY MR. HARRIS:

4   Q.    Not true, is it?

5   A.    No.

6   Q.    Okay.  Last one, 4I.

7         (Video clip 4I played.)

8   BY MR. HARRIS:

9   Q.    Is that true?

10  A.    Yes.

11  Q.    He was under oath during of all of this; you knew that

12  right?

13  A.    Yes.

14  Q.    Because you did a deposition too?

15  A.    Yes.

16  Q.    Do you have any idea why he would lie about that other

17  stuff?

18  A.    No.

19              MR. HARRIS:  That's all I have, Your Honor.

20              THE COURT:  Thank you, Mr. Harris.

21                          CROSS-EXAMINATION

22  BY MR. HENDRIX:

23  Q.    Mr. Morton, my name is Blake Hendrix.  MS. Depper is

24  sitting over here next to me.  We represent Gilbert Baker.  You

25  and I have never spoken; is that right?

1   A.   Yes.

2   Q.   You are represented by an attorney, John Edward?

3   A.   Yes, sir.

4   Q.   You are aware I have talked to him?

5   A.   Yes.

6   Q.   But you and I have never talked, right?

7   A.   Correct.

8   Q.   I'm going to be very blunt, Mr. Morton.  Did you give

9   campaign contributions intended to Mike Maggio in exchange for

10  him reducing the jury verdict in the Bull versus Greenbrier

11  litigation?

12  A.   No.

13  Q.   Did you funnel money through PACs intending to conceal you

14  as the true source of any sort of bribe?

15  A.   No.

16  Q.   Mr. Morton, you are aware that in 2015 Mike Maggio, up on

17  the fourth floor in this courthouse in front of a different

18  judge, pleaded guilty to bribery, correct?

19  A.   Yes.

20  Q.   And you are aware he implicated you and Gilbert Baker in

21  that bribery scheme, right?

22  A.   Yes.

23  Q.   How do you feel about that?

24  A.   I feel like it's wrong.

25  Q.   Why?

1    A.   Because it never happened.

2    Q.   Tell us more.

3    A.   I have never discussed reducing a jury verdict with

4    anybody.  I have never talked to the judge.  I have never had a

5    phone conversation.  I have never been around him.  I have never

6    talked to Gilbert Baker about ever reducing a jury verdict or

7    bribing a judge.

8    Q.   You're under oath?

9    A.   I am.

10   Q.   Subject to penalty of perjury for lying?

11   A.   Yes, sir.

12   Q.   Are you telling us the truth under your oath, subject to

13   penalty of perjury?

14   A.   Yes.

15   Q.   Mr. Morton, let me take a little bit of a different tack

16   right now.  The government asked you in your direct examination

17   something about the PACs, and I think your response was, well, I

18   guess that my name was concealed because of these PACs.  Do you

19   remember that part of the direct examination?

20   A.   Yes.

21            MR. HENDRIX:  May I have just a second, Your Honor?

22            THE COURT:  Certainly.

23            MR. HENDRIX:  May I approach?

24            THE COURT:  You may.

25   BY MR. HENDRIX:

1    Q.   Do you see a document in front of you, the top of which

2    says, Political Action Committee PAC Registration Form?

3    A.   Yes.

4    Q.   Hang on just a second.

5         And is that -- do you see the tab?

6    A.   The what?

7    Q.   The tab.

8    A.   The tab?

9    Q.   Yeah.  Do you see the number on the white tab?  Okay.  Let

10   me try this.  Right there.

11        Okay.  Do you see that, where I'm talking about?

12   A.   Yes.

13   Q.   Registration form?  And at the top it says Section 1, PAC

14   name.  Do you recognize that?

15   A.   Yes.

16   Q.   And it says Conservative Person's N PAC?

17   A.   Yes.

18   Q.   Then in Section 3, it lists a couple of officers; Chris

19   Stewart and Linda Lee Flanagin?

20   A.   Yes.

21   Q.   I would like for you to flip over one, two, and I want us

22   to go to page 3.  And at the top it says, Political Action

23   Committee Quarterly Reporting Form.  Do you see that?

24   A.   Yes, sir.

25   Q.   It says, filed October 15th, 2013?

1    A.    Yes.

2    Q.    It's got the name of the PAC, Conservative Person's N PAC?

3    A.    Yes.

4    Q.    It's filed October 15, 2013, with the Arkansas Secretary of

5    State's Office, correct?

6    A.    Yes, sir.

7    Q.    That indicates to you it's a public record?

8    A.    Yes.

9    Q.    Correct?

10   A.    Yes.

11   Q.    Flip to the next page.  Number 11, "Itemized monetary

12   contributions received by committee over $500."  Who does it

13   list as the contributor?

14   A.    Michael Morton.

15   Q.    Michael Morton is listed on this PAC that's at issue in

16   this case, and your name is flat on it, correct?

17   A.    Yes.

18   Q.    And it's filed with the secretary of state's office,

19   correct?

20   A.    Yes, sir.

21   Q.    What address does it list for you?

22   A.    Address?

23   Q.    Yes, sir.

24   A.    415 Rogers Avenue, Fort Smith, Arkansas.

25   Q.    And what is that address, Mr. Morton?

1  A.   That's my office address.  Central Arkansas Nursing

2  Centers.

3  Q.   This is going to be difficult because it's a big bunch of

4  papers, but could you go back -- and I'm going to assist you, if

5  we can do this.  The white tab beginning 11A.

6  A.   I'll go backwards?

7  Q.   Yes, sir, to 11A.

8  A.   11A?  Okay.

9  Q.   Okay.  This is a political action committee registration

10 form, correct?

11 A.   Yes, sir.

12 Q.   It is filed with the secretary of state on public record on

13 July 31st, 2013?

14 A.   Yes, sir.

15 Q.   Okay.  And it lists the officers in Section 3, Chris

16 Stewart and Don Thomas?

17 A.   Yes.

18 Q.   Go over 1, 2, 3 pages over to Itemized Monetary

19 Contributions.

20 A.   Yes, sir.

21 Q.   And it lists -- who does it list as a contributor?

22 A.   MSM Properties.

23 Q.   What address does it list MSM Properties at?

24 A.   415 Rogers Avenue, Fort Smith --

25 Q.   What's --

1    A.    I'm sorry.

2    Q.    What's MSM Properties?

3    A.    That's a corporation I own.

4    Q.    And what's the address again?

5    A.    415 Rogers Avenue.

6    Q.    The same address that's associated with you personally on

7    the previous PAC, Conservative Persons N PAC, that we just

8    discussed?

9    A.    Yes, sir.

10    Q.    I can go through all of these, Mr. Morton.  Let's take

11    another stab at the proper -- go to the next one.  11D?

12    A.    I'm going to go straight to the third page.

13    Q.    You can.  I'll go ahead.  This is also a political action

14    committee registration form filed on public record with the

15    Arkansas Secretary of State on July 31st, 2015, correct?

16         This the -- 11B, the Political Action Committee

17    Registration Form, yes?  Sir, is that right?

18    A.    Yes, sir.

19    Q.    Filed again on public record with the Arkansas Secretary of

20    State's office?

21    A.    Yes, sir.

22    Q.    Filed July 31st, 2013?

23    A.    Yes, sir.

24    Q.    Lists two officers and, yes, if you'll go to the next page

25    under Item 11, what does it say?  Under Item 11 where it lists

1    the contributors to that PAC?

2    A.    Sherwood Nursing and Rehabilitation Center, Inc.

3    Q.    What's that?

4    A.    That's a nursing home I own in Sherwood, Arkansas.

5    Q.    What's the address?

6    A.    415 Rogers Avenue, Fort Smith, Arkansas.

7    Q.    The same address that was listed on the previous PAC?

8    A.    Yes, sir.

9    Q.    Which is the same address that was listed under the PAC

10   that had your name and your personal contribution, right?

11   A.    Yes, sir.

12   Q.    For brevity's sake, if there are eight PACs in there, are

13   they all going to say one of your nursing homes and the same

14   address of 415 Rogers Avenue in Fort Smith?

15   A.    They would have the same address, yes.

16   Q.    Right.  So when the government asked you in the direct

17   examination, did you think that you were concealing yourself by

18   using these PACs, the fact of the matter is those quarterly

19   registrations have your name on it, correct?

20   A.    Correct.

21   Q.    Your personal name, correct?

22   A.    Correct.

23   Q.    They have companies that you own, correct?

24   A.    Correct.

25   Q.    And it has all the same address, 415 Rogers Avenue,

1    Fort Smith, correct?

2    A.    Yes, sir.

3    Q.    And all of those reports are filed as a public record with

4    the Arkansas Secretary of State's Office, right?

5    A.    Yes, sir.

6    Q.    And you are aware that, not only can you go to the Arkansas

7    Secretary of State's Office and physically get copies of this

8    thing, they now, because they have such public interest, have an

9    online search tool you can go.  I can go to the secretary of

10   state's office and type in "Mike Morton," and all of this is

11   going to come up for me very easily; you're aware of that?

12   A.    I wasn't aware of that, but I knew that it would be

13   probably registered with the secretary of state at some time.

14   Q.    And it's a public record?

15   A.    All PACs are.

16   Q.    All PACs are registered?

17   A.    Yes.

18   Q.    And all filed on public record with the Arkansas Secretary

19   of State's Office, right?

20   A.    Yes.

21   Q.    So it's incorrect to imply to this jury that you are being

22   hidden, when you have contributed to PACs, right?

23   A.    Right.

24   Q.    You are in there, and it doesn't take a rocket scientist to

25   figure out that your name, Michael Morton, is on that public

1   record?

2   A.   It is public record.

3   Q.   You can't conceal anything, right?

4   A.   Exactly.

5   Q.   You have contributed to lots of campaigns over the years,

6   right?

7   A.   Yes, sir.

8   Q.   You have contributed to judicial candidates, right?

9   A.   Yes.

10  Q.   Mike Morton -- pardon me -- Maggio is not the only

11  candidate you have ever contributed money to, right?

12  A.   No.

13  Q.   You have contributed to state legislators, right?

14  A.   Yes.

15  Q.   You have contributed to the campaign contributions of

16  campaign committees of sitting United States Congressmen, right?

17  A.   Yes.

18  Q.   Of our present governor, right?

19  A.   Yes.

20  Q.   Of prior governors, right?

21  A.   Yes.

22  Q.   Of our present Attorney General, right?

23  A.   Yes.

24  Q.   Of our past Attorney Generals, right?

25  A.   Yes.

1  Q.   Would you listen to Gilbert Baker's advice sometimes on who
2  to send money to whose campaigns?
3  A.   Yes.
4  Q.   Would he give you advice on that?
5  A.   Yes.
6  Q.   Would he sometimes say, "Let's send money; how about
7  contribute to Asa Hutchinson?"
8  A.   I don't know if he ever said that or not, but those are the
9  conversations we might have.
10 Q.   You would get his advice?
11 A.   Yes.
12 Q.   On who you should give your campaign contributions to?
13 A.   Yes.
14 Q.   Okay.  Another thing that was brought up on direct
15 examination, the government was showing you these phone records
16 and text records and all of that, remember?
17 A.   Yes.
18 Q.   And got to about March 14th, 2014, and the government was
19 pointing out to you, there seems to be a lot of activity going
20 on, right?  Remember that?
21 A.   Yes.
22 Q.   He was asking what was going on?
23 A.   Yes.
24 Q.   And there were several communications going on starting
25 March 2014, right?

```
 1    A.    Yes.
 2    Q.    The fact of the matter is this became a bit of a media
 3    storm; did it not?
 4    A.    Yes, it did.
 5    Q.    It was being talked about by a lot of people?
 6    A.    Yes.
 7    Q.    People's name get in the newspaper, and they become
 8    concerned, right?
 9    A.    Yes.
10    Q.    Any time you are publicized, it's going to generate a lot
11    of conversation by people, right?
12    A.    Yes.
13    Q.    And when names get publicized in the newspaper, sometimes
14    people want to run from it.  I'm not suggesting you.  You did
15    not, but there are people that go, "I don't want any bad
16    publicity; how do I get out of it"; is that fair?
17    A.    Yes.
18    Q.    Okay.  Some of these people are you aware whose names are
19    attributed to these PACs started backtracking suddenly to the
20    media because their names were suddenly out there, right?
21    A.    I don't know about people backtracking, but I can assume
22    that would happen, sure.
23    Q.    And then word got out that because of the media storm that
24    suddenly the Fed was investigating, right?
25    A.    Yes.
```

1    Q.    And that created a whole other level of communications and

2    conversations that were going on among people, right?

3    A.    Yes.

4    Q.    Everybody is trying to figure out what's happening here,

5    correct?

6    A.    Correct.

7    Q.    And is that a plausible explanation for suddenly why

8    there's a lot of communications going on in these phone records

9    starting particularly in March 2014?

10   A.    Well, it could be, but I still -- I don't know the exact

11   conversations, what all I would have talked to him about that at

12   that time, but that's as good as any.  I -- you know.  I -- you

13   know, it's also an election year.  You know, I mean, there's all

14   kinds of reasons, but I just don't remember what -- but that's

15   as good an explanation as any.

16   Q.    I mean, I have looked over all these.  I suspect that the

17   problem in our case is the government is unable to produce to us

18   the contents of these communications, right?

19   A.    Yes.

20   Q.    We don't know what was being said, right?

21   A.    Correct.

22   Q.    Could be soliciting campaign contributions to Stacy Hurst,

23   to Anne Drial (phonetic), to whatever, right?

24   A.    Yes.

25   Q.    Could be about tort reform, right?

1    A.   Yes.

2    Q.   Could be about the verdict in the Bull case, right?

3    A.   Yes.

4    Q.   Could be about what's happening in the media; suddenly they

5    are poking around and telling stories in the media, right?

6    A.   Yes.

7    Q.   Okay.  It could be a wide variety of things, right?

8    A.   Yes.

9    Q.   In any communication you ever had with Gilbert Baker, did

10   you ever say, I want you to bride Mike Maggio to get a favorable

11   ruling in the Bull case?

12   A.   Never.

13   Q.   Did he ever say, I'll run your money through PACs to

14   conceal you as the donor?

15   A.   No.

16   Q.   Let's talk a little bit more about these PACs.  You

17   understand that, as a donor, a contributor to a PAC, you lose

18   control over your money when you contribute to that PAC, right?

19   A.   Yes.

20   Q.   Now, you supported Mike Maggio's campaign, right?

21   A.   Yes.

22   Q.   You wanted him to get elected to the Arkansas Court of

23   Appeals, right?

24   A.   Yes.

25   Q.   Yeah.  And it was because of his judicial philosophy, am I

1  right?

2  A.   It was because my lawyers told me he was a good judge

3  because he followed the law.

4  Q.   Followed --

5  A.   That's exactly why I supported him.

6  Q.   And I think you have said before because he followed the

7  law to a T?

8  A.   He had been a judge on this case for five years.  There had

9  been motions made from each side, and my lawyers told me that he

10  was -- he followed the law, that he -- we lost some motions, but

11  we won some.  It just wasn't one-sided like there is a lot of

12  times.

13  Q.   You thought, you personally and based on your attorney's

14  advice, that this was a good judge?

15  A.   Yes.

16  Q.   And that's why you contributed money to him?

17  A.   Exactly.

18  Q.   Now, there is a conservative judicial philosophy.  Judges

19  are no different from the rest of us.  We all have our views of

20  the way government should be run; is that fair to say?

21  A.   Yes.

22  Q.   Some of us are conservative; some of us are liberal,

23  correct?

24  A.   Yes.

25  Q.   Some of us believe in tort reform; some of us don't believe

1    in tort reform, correct?

2    A.    Yes.

3    Q.    Conservatives generally tend to support tort reform, right?

4    A.    Yes.

5    Q.    And on the judicial level, conservative-minded,

6    conservative philosophically-aligned judges are aligned with

7    tort reform, right?

8    A.    Yes.

9    Q.    The notion that sometimes -- I don't mean to speak out of

10   turn, but plaintiff's lawyers are people that sue people like

11   you, right?

12   A.    Yes.

13   Q.    These are the people that work on contingency fees, right?

14   A.    Yes.

15   Q.    I get -- I'm a plaintiff's lawyer.  I get a million dollars

16   from you.  Two-thirds goes to my client.  I'm making whatever

17   two-thirds of a million is?

18   A.    233,000.

19   Q.    Thank you.  I'm making a lot of money, correct?

20   A.    Yes.

21   Q.    Okay.  And sometimes the philosophy goes that those lawyers

22   can arouse the passions of a jury?

23   A.    Yes.

24   Q.    And talk them into awarding an excessive verdict?

25   A.    It's called inflaming the jury.

1    Q.    And your attorneys made that motion in this case saying

2    that's what these plaintiffs' lawyers did in the Bull case, is

3    they inflamed the jury, right?

4    A.    Yes, and it -- yes.

5    Q.    Okay.  More broadly, outside of the context of the Bull

6    litigation, outside of the context of judicial candidates, more

7    globally along the lines of campaign contributions to any one

8    that has to run for elected office, is it fair to say that you,

9    really anybody, we give our campaign contributions to elected

10   officials whether they are executive, legislative, or judicial

11   because we think they share our views and our values?  Yes?

12   A.    Yes.

13   Q.    And we want them to act favorably to our views and values,

14   correct?

15   A.    Yes.

16   Q.    That's why we give campaign contributions to legislators,

17   to judges, to presidents, and governors, right?

18   A.    Yes.

19   Q.    We want them to act in a way that is favorable to us?

20   A.    Yes.

21   Q.    And if every time I gave a campaign contribution to a

22   politician and they acted favorably to me, if that was a bribe,

23   can you imagine every politician is going to be hauled into this

24   court and accused of being bribed?

25   A.    Practically everybody in the state.

1    Q.    PACs are interesting.  You are aware that at that time, the

2    numbers have gone up since, but at that time you, as an

3    individual, any individual at that time, the most you could

4    contribute directly to a candidate for anything was $2,000,

5    right?

6    A.    Yes, sir.

7    Q.    But with the invention of PACs decades and decades and

8    decades ago, you can contribute more to a PAC, correct?

9    A.    Yes, sir.

10   Q.    And at that time it was $5,000, right?

11   A.    Yes.

12   Q.    Now, in this case, you didn't contribute the full $5,000

13   that you were allowed under the law to do to what ends up

14   actually being ten PACs that Mr. Baker asked you about, right?

15   A.    Yes.

16   Q.    You just contributed $3,000 per PAC, right?

17   A.    Yes.

18   Q.    These were not substantial contributions to you, were they?

19   The amounts?

20   A.    It's --

21   Q.    It's $30,000?

22   A.    Just another candidate.

23   Q.    Yeah.  And the amount is what I'm focusing on.  You said

24   earlier that you own 37 nursing homes?

25   A.    Yes, sir.

1    Q.    Okay.  Did you own 37 in 2013?

2    A.    Probably about that, or I could have had more because I

3    sold a couple in Missouri and a couple in Texas, but I might --

4    it's probably around the same.

5    Q.    Okay.

6    A.    Close to the same.

7    Q.    Here's a little confusing aspect, a bit of a mystery about

8    this case that I have never understood, but you sent ten $3,000

9    checks to be used to be funded -- to fund ten PACs, right?

10   A.    Yes.

11   Q.    But only eight are actually, I guess, discussed in this

12   case for some reason?

13   A.    Yes.

14   Q.    And only $3,000 per.  If you have all 37 -- only nine I

15   think of your cooperate entities contributed the $3,000 per; am

16   I right?

17   A.    Yes.

18   Q.    Your personal contribution came up to ten, correct?

19   A.    Yes.

20   Q.    3,000 each.  That's $30,000, right?

21   A.    Yes.

22   Q.    And, again, you expected and wanted that money or at least

23   some of it to go to Judge Maggio's campaign because you

24   supported his philosophy and how he had ruled and as your

25   lawyers had said, had followed the law, correct?

1    A.    He had followed the law.

2    Q.    Okay.  If you had 37 nursing homes, all 37 could have made

3    contributions, right?

4    A.    Yes.

5    Q.    Yeah.  And that's -- corporations can no longer contribute

6    directly, but corporations could and still can contribute to

7    PACs, right?

8    A.    Yes.

9    Q.    So here we go with the math.  If you have got 37 nursing

10   homes that could have contributed $5,000 each, you could have

11   had 37 -- plus you, 38, contribute $5,000 hoping that it would

12   all go to Mike Maggio, right?

13   A.    Yes, sir.

14   Q.    I have no idea what that math is, but it's a whole, whole

15   lot more than $30,000, isn't it?

16   A.    Yes.

17   Q.    So if you really wanted something for Mike Maggio, you

18   could have done a lot better than 30 grand, right?

19   A.    Yes.

20   Q.    And you didn't, right?

21   A.    Right.

22   Q.    So there was no bribe, right?

23   A.    There was no bribe.

24   Q.    You had mentioned that people are hitting you up all the

25   time, quite frankly, for contributions?

1    A.    Yes.

2    Q.    Right?

3    A.    Yes.

4    Q.    It's sort of a never-ending cycle, right?

5    A.    Yes.

6    Q.    And in the political world -- and I know you contribute --

7    you make charitable donations.  You make -- and we'll talk about

8    this in a little bit.  You make contributions to institutions of

9    higher learning like UCA and other ones, right?

10   A.    Yes, sir.

11   Q.    But in your world, as you said, you get on that list, and

12   once one campaign sees -- let me take one step back.  You

13   understand the political view, the political strategy, that once

14   the door opens to receive and accept campaign contributions, the

15   candidate wants to have a big number, wants a big war chest,

16   right?

17   A.    Yes.

18   Q.    Because that war chest then will fend off other opponents,

19   right?

20   A.    Yes.

21   Q.    Whether I'm a judicial candidate or whether I'm running for

22   governor or Attorney General, I have got to report my campaign

23   contributions, right?

24   A.    Yes.

25   Q.    I report those campaign contributions as a matter of public

1    record, correct?

2    A.    Yes.

3    Q.    So that if you were to contribute to my campaign for

4    whatever I could run for, everybody is going to know you

5    contributed to Blake, right?

6    A.    Yes.

7    Q.    Okay.  And what I would want is, in that first opportunity,

8    I want that big number, that big war chest, right?

9    A.    Yes.

10   Q.    Once that election cycle ends, the window opens back up

11   again for you, and they are coming right back to you for

12   contributions, right?

13   A.    It never ends.

14   Q.    It sounds like -- I don't live in that world, Mr. Morton,

15   but it sounds like this constant circle for you of constantly

16   being asked to raise funds to contribute to candidates; is that

17   fair?

18   A.    Correct.

19   Q.    Now, the issue has been -- has arose that -- well, why did

20   you make direct contributions to Justice Rhonda Wood's campaign

21   but donations to Maggio's campaign through PACs?  And let's talk

22   about that for a minute.

23        One of the things that I found interesting is, again, you

24   know an individual can only contribute $2,000 per candidate,

25   right?

1    A.    Yes.

2    Q.    The PAC can only contribute $2,000 per candidate, right?

3    A.    Yes.

4    Q.    Now, PAC can get in 5,000 bucks, but it can only send

5    $2,000 to an individual candidate, right?

6    A.    Yes.

7    Q.    Now, in your case you sent in $3,000, correct?

8    A.    Yes.

9    Q.    So now you had to know, at that point, not all that money

10   is going to go to Mike Maggio.  You got an excess of $1,000,

11   right?

12   A.    Yes.

13   Q.    Only $2,000 of your money could go to Maggio, but you gave

14   three, correct?

15   A.    Yes.

16   Q.    So you did know that -- first of all, you knew you didn't

17   have any control over how the PAC spent its money?

18   A.    I knew I was losing control, yes.

19   Q.    You hoped it would go to Maggio?

20   A.    Yes.

21   Q.    But you knew, because of your experience in PACs, that you

22   lost control of over it, right?

23   A.    Yes.

24   Q.    And then logically you would know, well, I'm giving 3,000

25   bucks so there's a thousand bucks that has to go to other

1    candidates, correct?

2    A.    Yes.

3    Q.    And so we know that some of it went to people like Stacy

4    Hurst, right?

5    A.    Yes.

6    Q.    And Bruce Holland.  There's a whole -- Asa Hutchinson?

7    A.    Asa Hutchinson, yes.

8    Q.    And that was also your money because you put it in those

9    PACs, right?

10   A.    Yes.

11   Q.    Technically it was the PAC's money?

12   A.    The PACs's money.

13   Q.    Because you gave that money to the PACs.

14         One, tort reform, as we covered, is an important issue for

15   you, I gather, but personally, philosophically and business-

16   wise, right?

17   A.    Yes.

18   Q.    And the legislature -- Arkansas legislature is

19   constantly -- I may have overstated that, but they consider

20   bills that affect your business commonly, correct?

21   A.    Yes.

22   Q.    They are bills that are passed -- the nursing home industry

23   is a heavily-regulated industry; is it not?

24   A.    Yes.  Right behind nuclear energy.

25   Q.    Seriously?

1   A.   Yes.

2   Q.   I did not know that.

3        So heavily regulated industry?

4   A.   Yes.

5   Q.   And it is important for you, other nursing homeowners,

6   obviously people that own nuclear energy sources, to be able to

7   share their views with legislators so that the legislators have

8   a full view of what bills they are considering?

9   A.   Yes.

10  Q.   Okay.  Sort of an awkward question; so let me try to break

11  it down.  But we know that legislation concerning nursing homes

12  is common, right?

13  A.   Yes.

14  Q.   You said this on direct examination.  Some people call it

15  access?

16  A.   Yes.

17  Q.   Your view is I need a seat at that table?

18  A.   Yes.

19  Q.   Right?

20       As an advocate for the nursing home industry, right?

21  A.   Yes.

22  Q.   As an advocate for the elderly residents that live in your

23  nursing homes, right?

24  A.   Yes.

25  Q.   And you want to advocate for them, right?

1    A.    Yes.

2    Q.    And you need that access to legislators, correct?

3    A.    Yes.

4    Q.    And that's why you contribute to campaigns, correct?

5    A.    Yes.

6    Q.    And that's why you have lobbyists, correct?

7    A.    Yes.

8    Q.    Let's go back to the Greenbrier Nursing Home case.  Now we

9    know the jury came back with a $5.2 million verdict, right?

10   A.    Yes.

11   Q.    And we're aware of this.  We've already talked about it at

12   the trial.  But the jury found only unanimously for the

13   plaintiffs on one claim, ordinary negligence, correct?

14   A.    It was pain and suffering.

15   Q.    Came back unanimously in the nursing home's favor on

16   wrongful death?

17   A.    Yes, we were innocent of wrongful death.

18   Q.    And were either split 9 to 3 or 9 to 4, depending on how

19   you do your math on the middle verdict, correct?

20   A.    I guess.  I'm not...

21   Q.    Fair.  Did that Greenbrier Nursing Home, that company, was

22   it worth $5.2 million?

23   A.    No.

24   Q.    Did it have assets worth $5.2 million?

25   A.    No.

1    Q.    So the logical conclusion would be that $5.2 million

2    verdict is going to bankrupt Greenbrier Nursing Home, right?

3    A.    The corporation that the plaintiff successfully sued and

4    got the judgment against was actually worthless because all my

5    corporations are set up with the bricks and mortar being a

6    landlord company and operating the other company.  The operating

7    company owns nothing but some computers.

8         Now, they did -- would have accounts receivable, which

9    would have amounted to around a half a million dollars.  So if

10   there was a bankruptcy filed, that's what they would have got.

11   Q.    Yeah.  And so --

12   A.    They would not have gotten the nursing home.

13   Q.    Right.

14   A.    Because the nursing home is in a separate corporation.

15   Q.    Well, and to follow up, because this is a topic I believe

16   you and Mr. Baker talked about, $5.2 million is going to

17   bankrupt Greenbrier, right?

18   A.    Yes.

19   Q.    It's going to go out of business, right?

20   A.    Yes.

21   Q.    And if it goes bankrupt, you, personally, are out no money,

22   right?  The company goes bankrupt.  Whatever assets it's got I

23   think you said a quarter million, half a million maybe in some

24   sort of assets?

25   A.    Yes, operating.

1   Q.   They would be sold off to try to satisfy $5.2 million?

2   A.   Yes.

3   Q.   You would not be responsible, personally, at all, correct?

4   A.   No.

5   Q.   That was a solution to a $5.2 million verdict, right?

6   A.   Yes.

7   Q.   You'd been okay.  Judge Maggio reduces that verdict to $1

8   million, right?

9   A.   Yes.

10   Q.   You end up essentially paying that out of your pocket; is

11   that right?

12   A.   Yes.

13   Q.   You loan Greenbrier a million dollars to satisfy that

14   judgment?

15   A.   Yes.

16   Q.   You are at -- because -- because Judge Maggio reduced this

17   verdict from $5.2 million to $1 million, you got the worst end

18   of that stick?

19   A.   You're exactly right.

20   Q.   He provided no benefit to you?

21   A.   Right.

22   Q.   That remittitur hurt you, correct?

23   A.   Correct.

24   Q.   It didn't make any sense to try to bribe him, right?  It's

25   illogical?  It ended up hurting you?

1    A.    Correct.

2    Q.    You never attended the trial, right?

3    A.    No.

4    Q.    How -- were you keeping up with the trial?

5    A.    Yes, I would have reports from my lawyers.

6    Q.    Gotcha.  But you got 37 nursing homes.  Maybe more back

7    then.  I don't mean to be cynical, but plaintiffs' lawyers like

8    to sue nursing homes, right?

9    A.    Yes.

10   Q.    And you're fending them off all the time; is that fair to

11   say?

12   A.    Say that again.

13   Q.    You're fending them off all the time?

14   A.    Oh, yes.

15   Q.    And so you're a busy man.  You have got 37, minimum,

16   nursing homes.  This is a problem with one of them, right?

17   A.    Yes.

18   Q.    Okay.  Now, let's talk about the phone contacts.  And let's

19   talk about after the verdict.  So the verdict came down in the

20   Bull litigation.  It would have been early evening of May 16,

21   2013; is that about right?

22   A.    Yes.

23   Q.    Okay.  The first person -- you found out about the verdict

24   from Stacy Usury (phonetic), the administrator of Greenbrier,

25   right?

1   A.   Yes.

2   Q.   That's the first time you knew about the $5.2 million

3   verdict was after the verdict and it was from your administrator

4   of nursing, Stacy Usury, correct?

5   A.   Yes.

6   Q.   It was not Gilbert Baker?

7   A.   No.

8   Q.   He didn't call you up and go, did you just hear what

9   happened?

10  A.   No.

11  Q.   The second person you talked to was I believe Wincy Hursh,

12  the director of operations?

13  A.   Yes.

14  Q.   Okay.  Let's go back to the conversation with Stacy Usury.

15  Was she -- first of all, when you got word, were you shocked?

16  A.   Yes.

17  Q.   Were you stunned?

18  A.   Was I what?

19  Q.   Stunned?

20  A.   Yes.

21  Q.   When Ms. Usury called, was your sense that she was shocked?

22  A.   Yes.

23  Q.   When you talked to Wincy Hursh, did she appear to be

24  shocked by the verdict?

25  A.   Yes.

1  Q.   At some point you ended up talking to Gilbert Baker that
2  night; is that right?
3  A.   Yes, sir.
4  Q.   You called him?
5  A.   Yes.
6  Q.   He did not call you?
7  A.   No.
8  Q.   Did he appear to be aware of the verdict at that point?
9  A.   He was not aware.
10  Q.   So you are the one that told Mr. Baker?
11  A.   Yes, I was.
12  Q.   And I get -- how do I say this?  It was an animated
13  conversation?
14  A.   Yes.
15  Q.   I believe the essence of it was, this is exactly why we
16  need tort reform, right?
17  A.   Yes, sir.
18  Q.   And this is why I, Mr. Morton, am putting the money into
19  Arkansas for Lawsuit Reform, correct?
20  A.   Yes.
21  Q.   As well as making contributions to candidates that I knew
22  would support tort reform legislation, correct?
23  A.   Yes.
24  Q.   And so cuss words were used?
25  A.   Yes.

1   Q.   You were venting?

2   A.   Yes.

3   Q.   You were venting about the verdict?

4   A.   Yes.

5   Q.   Venting about the failures of tort reform, right?

6   A.   Yes.

7   Q.   But you weren't dog cussing Gilbert Baker, right?

8   A.   No.  I was just --

9   Q.   Venting?

10  A.   I was just, I guess, venting about the fact that the tort

11  reform, in particular that, you know, I have always been

12  interested in not economic damages.

13  Q.   Uh-hum.

14  A.   You know, and that's -- you know, I personally believe in

15  recourse for people who have been wronged.  I do.  But the

16  noneconomic damages are things that have nothing to do with the

17  person itself.  It's, you know, things you can't even imagine.

18  But I just believe in a cap on those.

19       Now, you know, of course, people disagree and lawyers,

20  plaintiff attorneys especially, they do not want that.

21  Q.   And by noneconomic damages, what you are talking about are

22  those sort of vague concepts of pain and suffering?

23  A.   Yes.

24  Q.   How does one actually quantify and put a monetary figure on

25  pain?

1    A.    Yes.

2    Q.    And it's difficult in a sense?

3    A.    People want to say we are talking about life, but I'm not

4    talking about what is a life worth.  I'm talking about the

5    noneconomic damages.  The pain and suffering and the things like

6    that.

7    Q.    Right.  And the other side of that coin are compensatory

8    damages.  That's when -- and let's get to it.  I don't know the

9    Bull case very well, but I understood the fax ordered to go went

10   to the wrong place and the poor women didn't get to the hospital

11   and died?

12   A.    Well, we call the doctor.  She was in distress.  We call

13   the doctor, and the doctor -- he knew her condition.  And he

14   faxed over an order to the DON's office that, you know, said

15   send her to the emergency room.

16   Q.    And by explanation, DON is the director of nursing?

17   A.    Yes.  And then the DON was leaving, and so she had a fax

18   machine in her office.  I can't believe it was -- anyway, it

19   was -- you know, it was something that my nurses did wrong, and

20   I think that was deserving of something, the recourse, but never

21   in my wildest dreams did I think $5.2 million.

22   Q.    So was ordinary negligence involved in the case as the jury

23   found, right?

24   A.    Yeah.  I mean, it's -- we had an LPN with her constantly

25   when she was in distress and -- but you had to consider the

1    condition that she was in when she came into the nursing home.

2        Now, of course, they had doctors and other people on their

3    side saying that they could do a simple operation, and she'd be

4    up and playing with her grandchildren the next day, but, you

5    know, she had a stroke, she had had a heart attack.  She had all

6    kinds of things wrong with her.

7    Q.    And so you, being familiar with the case, your lawyers, the

8    people working there, a lot of people in the general public

9    found $5.2 million stunningly excessive?

10   A.    Yes.

11   Q.    Under those facts?

12   A.    Yes.

13   Q.    Okay.  Back on track on this conversation on May 16, 2013.

14   I think there was a phone call between you and Mr. Baker the

15   following day on May 17, 2013, correct?

16   A.    If you say so.

17   Q.    I think it's in the record.

18   A.    Yeah.

19   Q.    In either of those conversations, did you and Gilbert talk

20   about bribing Judge Maggio?

21   A.    Never.  We never had a conversation.

22   Q.    At that point, just after the verdict, May 16, May 17, did

23   you and Gilbert Baker have any discussion about post-verdict

24   motions your lawyers could file?

25   A.    I'm not sure if I ever talked to Gilbert about it, but my

1    attorneys came and talked to me about the options that I had.

2    Q.   I want to focus in on Gilbert.  Did you ever have an

3    explicit conversation with Gilbert Baker about these motions

4    that my attorneys have filed in the Bull case to overturn the

5    verdict?

6    A.   I don't -- I don't think so.  I'm not certain, but I don't

7    think so.

8    Q.   Gilbert Baker is not a lawyer?

9    A.   No.

10   Q.   Did you ever hear him use the word remittitur?

11   A.   No.  I never heard it myself until my own attorneys told

12   me.

13   Q.   Until this case and your attorneys --

14   A.   Yes.

15   Q.   Who filed the motion for remittitur?  You never even heard

16   of such thing?

17   A.   Right.

18   Q.   And to your knowledge Gilbert Baker's never heard of such a

19   thing?

20   A.   Right.

21   Q.   Let's talk about Arkansans for Lawsuit Reform real quick.

22   If I understood your direct testimony, you were sort of the

23   catalyst for beginning Arkansans for Lawsuit Reform; is that

24   right?

25   A.   Yes.  I had contact with the -- people in Texas.  It's

1    called Texans for lawsuit reform.  And they had been very

2    successful in having an organization there and making it a

3    viable organization, where they ended up being able to have some

4    tort reform.

5    Q.    Let's work through that a little bit because Texas has been

6    successful in its legislature for getting tort reform measures

7    passed; is that correct?

8    A.    Yes.  Yes.

9    Q.    Now, Arkansas legislature has passed forms of tort reform

10   in the past, correct?

11   A.    Yes.

12   Q.    I think in 2008, I think in 2013 there may have been?

13   A.    And then they start taking them back.

14   Q.    And then some of them would get passed, and the Arkansas

15   Supreme Court would strike them down?

16   A.    Yes.

17   Q.    So that's got to be frustrating?

18   A.    Yes.

19   Q.    Right.  So ALR, Arkansans for Lawsuit Reform, I'm assuming,

20   supported, in other words, making endeavors of first let's go to

21   the legislature like Texas has done and get our legislature to

22   pass tort reform bills to pay -- place caps on excessive

23   damages, yes?

24   A.    Yes.

25   Q.    Okay.  That gets struck down by the Arkansas Supreme Court.

1    Another effort that was taken by ALR was to go back to the

2    legislature and say, well, instead of directly passing this

3    bill, let's let the Arkansas legislature have control over court

4    rules and procedures, was another mechanism, right?

5    A.    Yes.

6    Q.    The Arkansas Supreme Court didn't like that and struck that

7    down, right?

8    A.    Yes.

9    Q.    That was another effort at tort reform, yes?

10   A.    Yes.

11   Q.    And another effort was, well, let's leave it up to the

12   citizens; let's leave it up to the voters, right?

13   A.    Yes.

14   Q.    Is that called an initiated act?

15   A.    Yes.

16   Q.    It was sort of what happened with medical marijuana in this

17   state, is the Arkansas legislature voted it down but were able

18   to send it as a constitutional amendment for all of us to vote

19   on?

20   A.    Yes.

21   Q.    And so that was another measure that ALR was involved in,

22   right?

23   A.    I don't know if ALR was involved in it, but the nursing

24   home industry certainly was.

25   Q.    So again ALR was providing --

1    A.    Yes.

2    Q.    ALR was proactive?

3    A.    Yes.

4    Q.    In pursuing tort reform measures, and I get it; you were

5    upset by this verdict because it's sort of tort reform Exhibit

6    A, right?

7    A.    Yes.

8    Q.    But efforts were being made, and Gilbert was involved in

9    Arkansans for Lawsuit Reform, right?

10   A.    Yes.

11   Q.    You were the original funder of it, right?

12   A.    Yes.

13   Q.    There's a company out of Conway called Reliance?

14   A.    Yes.

15   Q.    Run by a couple of brothers.  You mentioned them earlier.

16   They may own more nursing homes than you do, right?

17   A.    Yes.

18   Q.    They contributed to Arkansans for Lawsuit Reform, right?

19   A.    Yes.

20   Q.    I saw some checks from maybe outside companies like

21   Indianapolis, Indiana, and in-state too, Searcy.  There were

22   lots of people -- there were other people funding Arkansans for

23   Lawsuit Reform, other than you, right?

24   A.    Yes.

25   Q.    It was a concerted effort to try to get tort reform

1   measures passed, correct?

2   A.    Yes.

3   Q.    And Gilbert was involved in those measures, right?

4   A.    Yes.

5   Q.    I think you testified on direct examination that, after the

6   Bull verdict, you were even more committed then to the pursuit

7   of tort reform as a good public policy for our state?

8   A.    Yes.

9   Q.    Skipping around a little bit, this meeting at Brave New

10  Restaurant, was this during the legislature session?

11  A.    I don't think so because we were raising money for, I think

12  Eddy Joe Williams, but I'm not sure, and you can't raise money

13  during a session.

14  Q.    Got it.  So this would be May 16th.  The legislature begins

15  in session in January?

16  A.    Yes.  Something like that, yeah.

17  Q.    I think it goes 90 days?

18  A.    Yeah.

19  Q.    Am I right on that?

20  A.    Yes.

21  Q.    It goes 90 days, and then later it -- or the governor can

22  call a special session?

23  A.    Yes.  Yes.

24  Q.    Well, extraordinary sessions and those sorts of things.

25  Okay, got it.  So the Brave New Meeting was -- first of all, was

```
1    Brave New Restaurant a common place to have lunch -- lunch
2    meetings?
3    A.    It was in this situation because the guy that was our main
4    lobbyist, that's where he liked to go.
5    Q.    Okay, and who was that?
6    A.    Ernest Cunningham.
7    Q.    Okay, and Ernest Cunningham, he's a former state
8    legislator?
9    A.    Yes.  He was speaker of the house about 40 or 50 years ago.
10   Q.    Yeah, and then he became -- he became a lobbyist?
11   A.    Yes.  Yes.  He is not now.  He's retired, but he was
12   working -- he was our main lobbyist at this time.
13   Q.    And who you are talking about is the Arkansas Health Care
14   Association?
15   A.    Yes.
16   Q.    Correct?
17   A.    Yes.
18   Q.    AHCA?
19   A.    Yes.
20   Q.    And the AHCA, I think you talked about on direct
21   examination it's the association of -- I forget the numbers, but
22   if there are 220 nursing homes in Arkansas, 180 are --
23   A.    About 190, 180 - 190 are in the association.
24   Q.    Are a member of this collective organization?
25   A.    Yes.  Yes.
```

1   Q.   And it is sort of -- it's the politically active arm of the
2   health care association?
3   A.   Yes.
4   Q.   Of the health care industry, right?  It's who goes to the
5   legislature for that voice to be heard, right?
6   A.   Yes.
7   Q.   And so the Brave New meeting was at lunch on May 16th,
8   2013, correct?
9   A.   Yes.
10   Q.   Before the verdict in the case?
11   A.   I guess.  All these dates run together, but if you say so.
12   Q.   If I tell you that the verdict was at 5:50 p.m. that same
13   day?
14   A.   Yes.
15   Q.   You are in this meeting with -- who do you remember, Ernest
16   Cunningham, your lobbyist?
17   A.   There were several people there.  I don't know who all was
18   there.
19   Q.   Probably try here.  David Norsworthy?
20   A.   He was there.
21   Q.   Eddy Joe Williams?
22   A.   I think that it was for Eddy Joe.
23   Q.   Jim Cooper?
24   A.   Yes.
25   Q.   Gilbert Baker was there?

1    A.    Yes.

2    Q.    It was -- I want to make sure I understood this.  This

3    lunch meeting is happening in -- let's see here.  There's a back

4    room, back behind a door.

5    A.    Back here.  We were having the meeting back here, and

6    Gilbert had -- he just stepped in for a little bit, you know.

7    Q.    Okay.

8    A.    You know, and then he left, but when I left, me and

9    Norsworthy, we left together.  We walked out the front instead

10   of to the side, and Gilbert was sitting there then.

11   Q.    So you have got -- Brave New Restaurant has a lunch or

12   dinner area that's -- that's good for one meeting, a big -- a

13   group of people can reserve?

14   A.    Yes.

15   Q.    Okay.  And then you have got the restaurant out in front?

16   A.    Yes.

17   Q.    Okay.  So you guys were in the meeting area at lunch time

18   and was the topic tort reform?

19   A.    I'm sure it came up, but, you know, it was -- I think it

20   was a fundraiser for --

21   Q.    Eddy Joe?

22   A.    Eddy Joe Williams.  I can't remember exactly.

23   Q.    Okay.  It wasn't about the Bull litigation?

24   A.    No.

25   Q.    Those people don't --

1    A.    No.

2    Q.    They wouldn't know anything about it?

3    A.    No.

4    Q.    Okay.  And it's as you are leaving -- I guess Gilbert had

5    been a part of it.  Does he go out into the restaurant area and

6    is having lunch or something?

7    A.    Yes.

8    Q.    And with Linda Lee Flanagin?

9    A.    Yes.

10   Q.    Who works for him at LRM.  I don't think you know everyone

11   at LRM but --

12   A.    I understood she worked for him.

13   Q.    Okay.  Gotcha, and bump into them?

14   A.    Walked out, and then he saw me and hollered at me, and I

15   went over to him.

16   Q.    What does he say or she say?

17   A.    Well, he said that he wanted to know if I would consider

18   supporting Mike Maggio for appeals court judge.

19   Q.    You don't remember if he talked about anybody else or any

20   other candidate?

21   A.    Not at that time, no.

22   Q.    How long was this interaction?

23   A.    How long was what?

24   Q.    The interaction.  How long was that conversation?

25   A.    About less than five minutes, I imagine.

1 Q.    Okay.  And the conclusion of it was Gilbert, what --

2 A.    I told him that I would support -- that I knew -- I already

3 knew that I would support Maggio because my attorneys had told

4 me that he was a good judge.  So when he mentioned him for

5 appeals court, I immediately said yes, and then he might have

6 mentioned something about he'd call me and then talk to me about

7 some other stuff.  So later on he got in touch with me.

8 Q.    I may be the only person in the courtroom that missed what

9 I think is this important point.  It was your attorneys that

10 said you should give campaign contributions to Mike Maggio?

11 A.    They didn't tell me I should give him campaign

12 contributions.  They told me that he was a good judge because he

13 followed the law.

14 Q.    Because it was based on your attorney's advice, not

15 anything Gilbert said?

16 A.    Gilbert never said anything about Maggio, whether he -- he

17 might have said later he was good.  I don't know.  But the only

18 reason I agreed was because my own attorneys had told me he was

19 a good judge.

20 Q.    Understood.  Understood.  Did you -- you and Gilbert never

21 discussed the Bull trial while it was going on, right?

22 A.    No.

23 Q.    After the Brave New meeting, we ultimately get to the

24 meeting in Russellville at Ruby Tuesday; remember that?

25 A.    Yes.

1  Q.   That was June 26th, 2013, I think?  Does that sound close
2  enough?
3  A.   Yeah.  Yeah.
4  Q.   And this is the conversation about financial support for
5  Maggio, Wood, Arkansans for Lawsuit Reform, and UCA; is that
6  right?
7  A.   Yes, sir.
8  Q.   Okay.  Now, we saw these video clips.  So let's get to it.
9  The deposition -- that lawsuit that got filed is actually by the
10 same lawyers --
11 A.   Yes.
12 Q.   Same plaintiff's lawyers that sued Greenbrier Nursing end
13 up suing you and Gilbert Baker and Mike Maggio?
14 A.   Yes.
15 Q.   Okay.  It was in the course of that litigation that you are
16 deposed, right?
17 A.   Yes.
18 Q.   And then Gilbert Baker is deposed?
19 A.   Yes.
20 Q.   Right, and I have got -- that was in 2015, right?
21 A.   Yes.  I guess, if that's --
22 Q.   I think your deposition is dated in June 2015.  Gilbert's
23 in July of 2015.  Does that sound right?
24 A.   Dated when?
25 Q.   July 2015.  Give me one second.  I'll confirm yours.  Your

1   deposition -- your deposition was June 10th, 2015.

2   A.   2015?

3   Q.   Yes, sir.

4   A.   Okay.

5   Q.   Okay.  And Gilbert's was afterwards.  Did you attend

6   Gilbert's deposition?

7   A.   No.

8   Q.   Okay.  But you are aware that it was after you?

9   A.   Oh, yes, I was aware.

10  Q.   Now, at that point, that's right on two years after this

11  Ruby Tuesday meeting, correct?

12  A.   Yes.

13  Q.   Yeah, because the Ruby Tuesday meeting was in June 2013.

14  You were in Gilbert's deposition in June and July 2015, two

15  years later, right?

16  A.   Um-hum.  Yes.

17  Q.   Okay.  Memories fade after a couple of years, right?

18  A.   Huh?

19  Q.   Memories fade after a couple of years?

20  A.   Yeah.

21  Q.   Yeah?

22  A.   Yeah.

23  Q.   Okay.  The Ruby Tuesday meeting results in Gilbert sending

24  you a fax?

25  A.   Yes.

| | |
|---|---|
| 1 | Q.    Okay.  We don't have that fax, right? |
| 2 | A.    No. |
| 3 | Q.    Do you know why? |
| 4 | A.    Well, once I had the checks written, I just threw it away. |
| 5 | Q.    As a habit, I gather? |
| 6 | A.    Well, yeah.  It wasn't anything that I needed to keep. |
| 7 | Q.    Yes.  Right.  You weren't trying to hide anything? |
| 8 | A.    No, I mean, I just -- you know. |
| 9 | Q.    There's an interesting thing about you.  You like to deal |
| 10 | with fax machines, right? |
| 11 | A.    Yes. |
| 12 | Q.    Not so much of the e-mail guy, scan, PDF? |
| 13 | A.    No.  I don't like the e-mail.  It's all part of the |
| 14 | litigation process. |
| 15 | Q.    Yeah. |
| 16 | A.    If I did a lot of e-mail, I would have one of those |
| 17 | plaintiffs' lawyers you are talking about that would want all |
| 18 | the e-mails from every nursing home from every time since the |
| 19 | beginning of time -- |
| 20 | Q.    Yeah. |
| 21 | A.    -- because they have done that before, and, you know, it |
| 22 | just -- it costs you more to find them discovery than it is -- |
| 23 | Q.    Right.  There was nothing unusual about getting that fax, |
| 24 | writing those checks? |
| 25 | A.    Oh, no. |

1    Q.    Tossing the fax because you didn't need it?

2    A.    No, it's -- yeah.  That's -- it was another Tuesday.

3    Q.    Got it, and we don't have it so we don't know what was

4    written on it to confirm it now, what, seven years later, right?

5    A.    Yes.

6    Q.    Okay.  So on July 8th, 2013, is -- you have gotten this fax

7    in, and that's when you sit down, and you write ten $3,000

8    checks to ten different PACs?

9    A.    Yes.

10   Q.    Again, eight of them are at issue in this case.  Is a ninth

11   called DBH; do you know?

12   A.    I don't know.  My own attorneys talked to me, something

13   about the difference -- discrepancy in that.

14   Q.    That's what I'm trying to figure out.

15         I think another one might have been Egg Head that has to do

16   with economic growth.  Do you remember?

17   A.    I have no idea.

18   Q.    You know you wrote 10,000?

19   A.    I know we wrote that much, yes.

20   Q.    Got it.  And then you wrote 24 $2,000 checks for Rhonda

21   Wood's --

22   A.    Yes.

23   Q.    -- campaign for the Supreme Court?

24         And then your explanation that you gave us was the reason

25   you did two 25 -- two separate --

1    A.    Yes.

2    Q.    -- $25,000 checks to Arkansas's for Lawsuit Reform.  And

3    then and then the $100,000 contribution to UCA, correct?

4    A.    Yes, sir.

5    Q.    All right.  When you wrote those checks on July 8, 2013,

6    did you even know your lawyers were having a hearing in front of

7    Maggio that day?

8    A.    No.

9    Q.    You did not even know that there was that hearing in front

10   of him that day?

11   A.    No.

12   Q.    So, again, you own a lot of nursing homes.  This is a

13   problem with one of your nursing homes.  You are not up to speed

14   on every detail involved in all of those nursing homes?

15   A.    Exactly.

16   Q.    And you don't have any information that Gilbert Baker was

17   aware that there was a hearing on those motions in front of

18   Maggio on July 8th; is that correct?

19   A.    Correct.

20   Q.    And, notably, the government has already introduced them,

21   but I didn't see any calls.  I know you are not a texter, but

22   this would be encompassing any calls or texts between you and

23   Gilbert on July 8th, 2013.  You don't remember talking to him

24   that day either?

25   A.    No.

1    Q.   And the phone records confirm that.  Just briefly -- I'm

2    winding down.

3         I do want to talk about your contribution to UCA.  And if I

4    understood your direct testimony is, The number one reason I

5    contributed to UCA is they provide the physical therapist --

6    actually, literally one of the best therapy schools in the

7    country, right?

8    A.   Well, in Arkansas they were the only one for a long, long

9    time.

10   Q.   Yeah, and those are employee -- you employ -- 50 percent of

11   your employees --

12   A.   I use a company called Insight, and Insight is hired on,

13   but that's how I found out where that all comes from because I

14   wanted to know myself, and they told me.

15              MR. HENDRIX:  May I approach, Your Honor?

16              THE COURT:  You may.

17   BY MR. HENDRIX:

18   Q.   Do you want me to get any of that out of your way?

19   A.   Yeah.

20   Q.   I'm showing you Defendant's Exhibit 17; is that right?

21   A.   Yes, sir.

22   Q.   Does that appear to be an accurate record of all the

23   charitable donations that you have made to institutions of

24   higher learning?

25   A.   There could be some more, but this is quite a few of them,

1    yes.  It's --

2    Q.   You need to authenticate that document.

3    A.   Yes.

4         MR. HENDRIX:  Your Honor, I move to introduce

5    Defendant's 17.

6         MR. HARRIS:  I don't have any objection, but I thought

7    I heard him say, this isn't all or something like that.

8         THE COURT:  He said --

9         MR. HARRIS:  He was authenticating it.

10        MR. HENDRIX:  Sure, let me work at this one.

11   BY MR. HENDRIX:

12   Q.   We prepared that document, and then you have told us of

13   additional contributions?

14   A.   There could be.  I am not certain.  You know, if you ask me

15   if this is all of them, I don't know that to be a fact, but I

16   could go through these and tell you if they are the ones that I

17   have done, and from the very get-go, it looks like it is.

18   Q.   Sure.  And I don't want to have to waste our time on this,

19   but that document was prepared, what, with the assistance of

20   your attorneys?

21   A.   Yes.  Yes.

22   Q.   And your attorneys went back and took all the contributions

23   you have made --

24   A.   Yes.

25   Q.   -- to institutions of higher learning --

1    A.    Yes.

2    Q.    -- and compiled that for you?

3    A.    Yes, and some of these were not higher learning.  Some of

4    them are like the Kipp Delta School over in Helena.

5    Q.    That's the K --

6    A.    That's the K through 12.  Started with -- you know, when I

7    started giving money to them, it was just one group of fifth

8    graders.  Now it's a -- it's K through 12.

9              THE COURT:  Defendant's Exhibit 17 is admitted.

10              MR. HENDRIX:  Thank you, Judge.

11        (Government's Exhibit No. 17 was received in evidence.)

12    BY MR. HENDRIX:

13    Q.    So how much does it show that you have given educational

14    institutions?

15    A.    $1,963,719.

16    Q.    It might be more?

17    A.    Yes.

18    Q.    So a $100,000 contribution to UCA was hardly uncommon for

19    you?

20    A.    Well, it's not even on here because they sent me the money

21    back.

22    Q.    Yeah, that's my --

23    A.    So it would be over a million or two million.

24    Q.    Gotcha.  Phone calls and communications on May 16, May 17,

25    2013, I'm going to go directly to the same thing.  No

1  conversation of bribery trying to influence Judge Maggio between

2  you and Baker, yes?

3  A.   Correct.

4  Q.   June 17th conversations that are listed, no conversations

5  about bribing or trying to influence Judge Maggio?  Yes?

6  A.   Correct.

7  Q.   There were no communications on July 8th when the hearing

8  was held, correct?

9  A.   Correct.

10  Q.   All right.  So the order granting remittitur was filed July

11  10th, 2013, possibly the 11th.  I think it was actually signed

12  July 10th, two days after the hearing, formally filed of record

13  on July 11, 2013.  Does that sound about right to you?

14  A.   It sounds about right.

15  Q.   Did Gilbert Baker call you up after the order of remittitur

16  and go, look, look, Mr. Morton, what I did for you?

17  A.   No.

18  Q.   Look what I have achieved for you?

19  A.   No.

20  Q.   You weren't giving campaign contributions to Mike Maggio in

21  order to try to influence him to remit that jury verdict?

22  A.   No.

23        MR. HENDRIX:  May I consult?

24        THE COURT:  You may.

25        MR. HENDRIX:  Nothing further.  Thank you, Mr. Morton.

1        THE COURT:  Thank you, Mr. Hendrix.  Mr. Harris, hold
2    on.
3        Ladies and gentlemen, I don't know about you, but I could
4    use a break.  The usual rules of the road.  Don't talk to each
5    other about the case.  Don't let anybody talk to you about the
6    case.  You can put your pads face down in the chair.  We'll be
7    out 20 minutes; so we'll come back at 20 till 3:00, 2:40.  All
8    rise for the jury.
9        (Jury not present.)
10        THE COURT:  Counsel, I appreciate your work.  I'm
11    concerned about the volume at the podium on the two mics.
12    Mr. Morton, you can step down.  Don't talk to anybody during our
13    break.  Okay?
14        THE WITNESS:  Thank you.
15        THE COURT:  Yes, sir.  Well, you can talk to people.
16    Don't talk to anybody about the case.
17        Mr. Hendrix, part of it I think is your voice dropping, but
18    I think part of it is we are not close enough to the mics, and
19    part of it is a volume issue.  So I need all of us --
20    Mr. Harris, I mean this in the nicest possible way.  You, too.
21    I want you all to slow down, stay on those mics, and if you can
22    pull them closer to you, please do so.  And Ms. Black is going
23    to work on the volume.  But I'm struggling to hear.  I think our
24    court reporter and our jurors and witnesses are, too.  It
25    concerns me.  Let's fix it.  We'll be out our 20 minutes.  Thank

1   you.

2        (Recess taken from 2:20 p.m. until 2:41 p.m.)

3            THE COURT:  Are we ready to go, Mr. Hendrix?

4            MR. HENDRIX:  Yes, sir.

5            THE COURT:  Mr. Harris?

6            MR. HARRIS:  Yes, Your Honor.

7            THE COURT:  Did you think of anything you want to

8   cover?

9            MR. HENDRIX:  Not for this witness.  Possibly the next

10  witness.

11           THE COURT:  Officer Pike, we'll take our jury.

12           COURT SECURITY OFFICER:  Ladies and gentlemen, the

13  jury.

14       (Jury present.)

15           THE COURT:  Y'all can be seated.  Everyone can.

16       Mr. Harris.

17           MR. HARRIS:  May I proceed, Your Honor?

18           THE COURT:  You may.  I think everybody is settled in.

19  Yes.

20                       REDIRECT EXAMINATION

21  BY MR. HARRIS:

22  Q.   Mr. Morton, I was looking over this list, Defendant's

23  Exhibit 17, that list of your donations, very impressive.

24       I notice in the year 2013, which is when you gave the

25  $100,000 to UCA, that was the largest -- go to page 4.

1        That was the largest amount you gave in 2013; am I correct?

2   A.   Yes, sir.

3   Q.   And, in fact, that year -- I mean, this is a large amount

4   of money.  I'm not diminishing it.  In that year you gave out

5   $134,000.   100 of it was to UCA?

6   A.   Okay.  I agree.

7   Q.   Okay.  And then other than 100, I never see anything that

8   large.  You do give out a lot of money.  I'm not diminishing

9   that.  But that 100,000 to UCA was the largest you have ever

10  given out?

11  A.   No.

12  Q.   Was there something higher?  Did I miss it?

13  A.   Yeah.  I gave -- are you talking at one time?

14  Q.   Yes, sir.  No.  You gave 150 to Kipp in 2014.  I apologize.

15  A.   Well, I gave a million one to Arkansas Tech.

16  Q.   You gave a building in 2006?

17  A.   Yeah.

18  Q.   Yeah?

19  A.   In 2006.  Yes, it was a million one.

20  Q.   But I'm talking cash or check or however you paid it out.

21  I'm not trying to diminish it, your contributions.

22  A.   Yes.  Made very good use of that building, by the way.

23  Q.   Good deal.  Good deal.  You made a comment.  You said the

24  $30,000 to Maggio, he's just another candidate.

25        Is that kind of how you looked at him and all these other

1    people you contribute money to?

2    A.    Well, I mean, they are candidates.

3    Q.    At some point you said something about you knew you were

4    losing control.  Mr. Hendrix asked you a question.  I don't

5    remember what he was asking you about.  Do you?

6    A.    The PACs.  You lose control of the money.

7    Q.    That's right.  That's right.

8    A.    I knew I was losing control of where the money went when I

9    put it in a PAC.

10   Q.    Yeah.  And four of these PACs you thought were going to

11   Maggio, had you given to PACs before?

12   A.    Yes.

13   Q.    Okay.  And since have you given to PACs?

14   A.    Yes.

15   Q.    You said that nursing homes were heavily regulated.  Just

16   behind nuclear regulation?

17   A.    Yes.

18   Q.    I did not know that.  Why do you think that is?

19   A.    That was according to American Healthcare.  So that's where

20   I get my information, but why do I think that?

21   Q.    Um-hum.

22   A.    Because you are dealing with human lives, and the

23   government tends to be very heavily regulated when it comes to

24   that.

25   Q.    You are dealing with parents and grandparents?

1    A.    Yes.  You are dealing with the most vulnerable people.

2    Q.    The people who are involved in it -- apparently there's a

3    lot of money to be made from nursing homes?

4    A.    There's a lot of money to be made and lost.

5    Q.    And then Greenbrier, had you ever lost a lawsuit that

6    was -- that had gone to trial and had a judgment of greater than

7    5.2?

8    A.    I don't think so.

9    Q.    Okay.  So this is the largest one?

10   A.    Well, I've never had -- no.  I know that.

11   Q.    Okay.

12   A.    No.

13   Q.    And I think you said Greenbrier was set up not to pay out

14   judgments.  What were you talking about?

15   A.    Well, my attorneys, when I buy a nursing home, they set up

16   a corporation for the bricks and mortar and the land, and then

17   they set up a corporation for the operations.  And so the

18   operations is what's taking care of the resident.

19   Q.    So the operation gets sued?

20   A.    The operation gets sued.  They actually own nothing but the

21   receivables, and that's -- probably that size of a home is about

22   a half a million.

23   Q.    And then I believe your nursing home, do you just have

24   $100,000 insurance on each one?

25   A.    $250,000.

1    Q.    250?

2    A.    500,000 in aggregate.

3    Q.    You paid a million dollar judgment?

4    A.    Yes.

5    Q.    But it was reduced from 5.2?

6    A.    Yes.

7    Q.    You could have appealed it, couldn't you?

8    A.    I could have appealed the 5.2?

9    Q.    No, the million.

10   A.    Oh, yes.

11   Q.    You could've appealed it?

12   A.    Yeah, I could have appealed it.

13   Q.    Did -- when it was reduced, did Mr. Baker or Judge Maggio

14   know you were going to have to pay the $1 million?

15   A.    I have no idea what they knew.

16   Q.    Okay.  AL -- Arkansans for Lawsuit Reform?

17   A.    Yes.

18   Q.    You gave 175,000 to it by July of '13.  Are you aware of

19   that?

20   A.    I knew it was somewhere around that.

21   Q.    Yeah.  In fact, you were the largest --

22   A.    I know that I gave 100,000 in the very beginning.

23   Q.    You did.  In October of '11.

24   A.    Yes.

25   Q.    And then in January of '13 you gave 25,000?

1    A.    Okay.

2    Q.    July you gave another 50?

3    A.    Okay.

4    Q.    And you were the largest contributor to Arkansans for

5    Lawsuit Reform?

6    A.    Yes.

7    Q.    And Mr. Hendrix was talking to you about all the things

8    Gilbert Baker had done for lawsuit reform and you were saying

9    yes.  Do you remember those questions?

10   A.    Yes.

11   Q.    What all did Mr. Baker do?

12   A.    Well, see, I don't know the exact -- he was talking about

13   the different initiated acts and all the different things that

14   had happened in the legislature as they went through the process

15   of trying to have like -- I think he said in 2010 or '11, they

16   did pass some tort reform at one time and then slowly but

17   surely, there would be a lawsuit filed and the Supreme Court

18   would uphold it and get rid of that part of this -- of the

19   lawsuit -- the lawsuit reform that they had established.  So

20   pretty soon it was just nothing.  So we started trying to get

21   the legislature to pass legislation, and then under the Beebe

22   administration they passed Amendment 80.  They got -- where you

23   couldn't do that.  You had to have initiated act by the people.

24   And so that's where you get all these people coming in and

25   signing these petitions to get initiated act on the ballot.

1      Now, I don't know what all in that Arkansas Lawsuit Reform

2   Organization participated in, what all or part of that.

3   Q.   Okay.  I misunderstood.  I thought he was going through all

4   that saying Gilbert did this and Gilbert was involved and you

5   are saying yes, yes, yes, but you don't really know?

6   A.   Well, those things, yeah.  I don't really know what all --

7   I know all those things went on.  I don't know what all the

8   Arkansans for Lawsuit Reform participated in, but I do know the

9   sequence of all of that is, you know, the -- where we even --

10  the -- our association spent several hundred thousands of

11  dollars getting signatures and to get it on the ballot, and then

12  the Supreme Court did away with our ballot.

13  Q.   Is it fair to say the 175,000 you put into Arkansans for

14  Lawsuit Reform?

15  A.   Do what?

16  Q.   Is it fair to say that the 175,000 you put in to Arkansans

17  for Lawsuit Reform and the 10,000 Mr. Baker was taking out,

18  10,000 a month, is it fair to say you hope he was involved in

19  all that?

20  A.   Yes.

21  Q.   The UCA contribution, did you -- whose idea was it to make

22  it anonymous, or was it anonymous?

23  A.   I don't know that it was anonymous.  Evidently I just made

24  it, and the next thing I know, after the sequence of events took

25  place and all this hit the media and the FBI and everybody got

1    involved in investigation, they just sent the check back; so

2    someone knew it was from me because they sent me my money back.

3    Q.   True.

4    A.   You know.

5    Q.   And then you said that your attorney told you that Maggio

6    was a good judge, right?

7    A.   Yes.

8    Q.   Okay.  But you gave money to Gilbert Baker because he asked

9    you to; am I correct?

10   A.   To --

11   Q.   To Gilbert Baker for Judge Maggio because Baker asked you

12   to?

13   A.   Well, yes.  He asked me if I would support him, and I said

14   yes.

15   Q.   And he asked you for $30,000?

16   A.   Yes.  Yes.

17   Q.   And he asked you to put it in a PAC?

18   A.   Yes.

19   Q.   For Maggio?

20   A.   Yes.

21            MR. HARRIS:  That's all I have, Your Honor.  Thank

22   you.

23            THE COURT:  Thank you.

24            MR. HARRIS:  Thank you, Mr. Morton.

25            THE COURT:  Thank you, Mr. Harris.

1          Mr. Hendrix?

2               MR. HENDRIX:  Nothing further, Your Honor.  Thank you.

3               THE COURT:  Hold on just a second, Mr. Morton.

4          Mr. Harris, may Mr. Morton be released?

5               MR. HARRIS:  Yes, sir.

6               THE COURT:  Mr. Hendrix?

7               MR. HENDRIX:  Yes, sir.  Thank you.

8               THE COURT:  All right.  You are free to go,

9     Mr. Morton.  Thank you.

10          (Witness excused.)

11               MR. HARRIS:  Pat Cherry is the next witness, Your

12     Honor.

13               THE COURT:  Come on forward, ma'am.  Yes, ma'am.  Good

14     afternoon.

15               THE WITNESS:  Hi.

16               THE COURT:  After you get situated, I need to give you

17     the oath.

18               THE WITNESS:  Sit down?

19               THE COURT:  Well, we can do it before or after.

20          **PAT CHERRY, GOVERNMENT'S WITNESS, DULY SWORN**

21               THE COURT:  You may take off your mask when you

22     testify so the jury can see you.  Grab the bottom of that mic,

23     if you would, I mean, the base of it, and pull it close to you,

24     so that we can all hear.

25               THE WITNESS:  Is that good?

```
 1              THE COURT:  That is good.

 2              THE WITNESS:  Okay.

 3              THE COURT:  Mr. Harris, take it away.

 4                        DIRECT EXAMINATION

 5   BY MR. HARRIS:

 6   Q.    Would you state your name, please, ma'am?

 7   A.    Yes.  Pamela Patricia Cherry.

 8   Q.    You go by Pat?

 9   A.    I do.

10   Q.    So do I.

11   A.    I know.

12   Q.    You work for Mr. Morton?

13   A.    I do.

14   Q.    And there's a lady named Elizabeth Frederick that also

15   works for him, correct?

16   A.    She does.

17   Q.    And you worked there 25 years?

18   A.    Longer than that.  1994.

19   Q.    So that's more than 25?

20   A.    Yes.

21   Q.    Okay.  And I understand, as part of your duties with

22   Mr. Morton, you write checks that he tells you to write for his

23   personal?

24   A.    I do.

25   Q.    And Ms. Frederick writes for, I guess, the nursing home
```

1   checks?

2   A.   Yes.  She's over the payables.

3   Q.   Did I divide that accurately?

4   A.   You did.

5   Q.   You kind of hesitated.

6   A.   No.  Her checks are computerized.  Mine are manual.

7   Q.   There's a book in front of you.  It says exhibits or

8   something like that?  That big book.  Flip over to 14A.

9   A.   Okay.  I see it.

10   Q.   Do you recognize 14A?

11   A.   I recognize it from, you know, when you were at our office

12   and showed it to us.

13   Q.   Okay.  And look at 14B.

14   A.   Okay.

15   Q.   Do you recognize that?

16   A.   The same, yes.

17   Q.   That's something y'all created or y'all had?

18   A.   Correct.

19   Q.   And would you flip over one more to page 15?

20   A.   Yes.

21   Q.   Do you recognize that?

22   A.   From when you showed it to me at the office, yes.

23   Q.   And that shows some FedEx shipment information from y'all?

24   A.   Correct.

25           MR. HARRIS:  Your Honor, at this time I offer

1    Exhibit 14A, 14B and 15.

2             MS. DEPPER:  No objection, Your Honor.

3             THE COURT:  They will all be received.  Did you cover

4    15 with her?  I didn't hear.

5             MR. HARRIS:  I thought I did at the end, but I'll go

6    back.

7    BY MR. HARRIS:

8    Q.   Do you see 15, ma'am?

9    A.   I do.

10   Q.   And is that a FedEx services shipment information report?

11   A.   Yes, it is.

12   Q.   Does it have your name on it?

13   A.   It has my name on it, but it doesn't mean that I

14   necessarily filled it out.

15   Q.   I know, but I mean is it from the place where you work?

16   A.   It is.  From Central Arkansas Nursing Centers, yes.

17            MR. HARRIS:  So now I offer 15, Your Honor.

18            THE COURT:  They are all in.  Received.  Thank you.

19        (Government's Exhibit No. 14A, 14B, 15 was received in

20   evidence.)

21            MR. HARRIS:  Can we put up 14A, Nathan?

22   BY MR. HARRIS;

23   Q.   We are going to start with 14A, ma'am.

24   A.   Okay.

25   Q.   And what is this?

1    A.    This is a spreadsheet that one of us created.

2    Q.    Okay.

3    A.    That I was given the information to create, and it was

4    either Liz or I would have created this.

5    Q.    Okay.  And Liz is Ms. Frederick?

6    A.    She is.

7    Q.    Also employed by Mr. Morton?

8    A.    Correct.

9    Q.    Gotcha.

10   A.    Okay.  And like I say, she takes care of the facilities.  I

11   take care of Michael's personal accounts.

12   Q.    So either you or Ms. Frederick created this, and it shows

13   money y'all sent out?

14   A.    Yes.  Michael would have told us to write these checks out.

15   When he calls me in, he'll say take this down.  I grab a Post-It

16   Note.  I write it down.  We have to submit something to accounts

17   payable to pay to put in their files.  That's why that was in

18   their file.  Can't hand a Post-It Note, and so one of us would

19   have created this spreadsheet.

20   Q.    Okay.  Is there a spreadsheet of moneys y'all sent in '15,

21   is that FedEx shipment, but is it's checks that you or

22   Ms. Frederick would have written?

23   A.    We would have had these checks created.  The checks on the

24   Michael's personal account, I would have written it.

25   Q.    Okay.

1  A.   Were they sent FedEx?  I don't know how they were sent.

2  Q.   We'll get there.

3  A.   Okay.

4  Q.   25,000 for Arkansas lawsuit reform, 25,000 again for

5  Arkansas lawsuit reform, 100,000, UCA?

6  A.   Yes.

7  Q.   Do you see that, ma'am?

8  A.   Yes, ma'am, sir.

9  Q.   Sir.  That's okay.

10  A.   I'm sorry.

11  Q.   That's okay.  Go to 14B, if you will, please.

12  A.   Okay.

13  Q.   Once again, this is a document that either you or

14  Ms. Frederick would have created?

15  A.   Correct.

16  Q.   From the records at Mr. Morton's business?

17  A.   Yes.

18  Q.   Okay.  And at top it shows checks to Rhonda Wood for

19  Supreme Court?

20  A.   Yes.

21  Q.   And I notice MSM Properties has a check?

22  A.   Yes.

23  Q.   And Michael Morton has a check?

24  A.   Those are the two accounts that I write checks for.

25  Q.   Gotcha.  Okay.  And so this was the money that the checks

1    were written and y'all sent out; is that correct?

2    A.   Yes.

3    Q.   And Exhibit 15.  If you'll look at that, please, ma'am.

4    A.   Okay.

5    Q.   That has at the top -- do you see where it says ship date,

6    7-8-2013?

7    A.   Yes.

8    Q.   And then the shipper, it's your name.  You may not have

9    sent it.  I realize that.

10   A.   Right.

11   Q.   But it could have been Ms. Frederick?

12   A.   Yes, or the receptionist or anybody else.  All the girls

13   create a shipping label at that time.

14   Q.   Okay.  And the recipient, do you see where it says Gilbert

15   Baker?

16   A.   I do.

17   Q.   And 17 Cooper Lane in Conway, Arkansas?

18   A.   Yes.

19   Q.   Delivery -- next -- below it says delivery 7-9-2013 at

20   10:31?

21   A.   Okay.

22   Q.   Do you see that?

23   A.   I do.

24   Q.   Do y'all do a lot of FedEx shippings?

25   A.   A lot.

1   Q.   Have you ever sent a FedEx to Mr. Baker before?

2   A.   Not that I remember.  No, I don't.

3           MR. HARRIS:  That's all I have, Your Honor.  I did

4   offer them.  I was going to offer them.  That's all I have, Your

5   Honor.

6           THE COURT:  You did, and you had mentioned 15 before.

7   I just missed it.  So thanks for doing it again, Mr. Harris.

8   Any objection, Ms. Depper?

9           MS. DEPPER:  No objection, Your Honor.

10          THE COURT:  They are received again then.  And who

11  will examine Ms. Cherry?

12          MS. DEPPER:  Your Honor, we have no questions for

13  Ms. Cherry.

14          THE COURT:  Okay.  Then may she be released from the

15  defense side?

16          MS. DEPPER:  Yes, Your Honor.

17          THE COURT:  Mr. Harris?

18          MS. PETERS:  Your Honor, I call Rhonda Wood.

19          THE COURT:  May Ms. Cherry be released?

20          MR. HARRIS:  Oh, yes.  Ms. Cherry.

21          THE COURT:  All right.  Thank you, ma'am.

22      (Witness excused.)

23      **RHONDA WOOD, GOVERNMENT'S WITNESS, DULY SWORN**

24          THE COURT:  You may remove your mask.  And you can

25  move the mic as close to you as needed.

1                           DIRECT EXAMINATION

2    BY MR. HARRIS:

3    Q.    Would you state your name, please, ma'am?

4    A.    Rhonda Wood.

5    Q.    And, Justice Wood, you are a Justice on the Arkansas

6    Supreme Court?

7    A.    That's correct.

8    Q.    And how long have you been on the Arkansas Supreme Court?

9    A.    I'm sorry.  I couldn't hear you.

10   Q.    How long have you been on the Arkansas Supreme Court?

11   A.    Seven years.

12   Q.    Now, prior to that, you were on the Court of Appeals?

13   A.    That's correct.

14   Q.    And how long were you on the Court of Appeals?

15   A.    Two years.

16   Q.    And prior to that, you were a circuit judge in Faulkner

17   County; am I correct?

18   A.    That's correct.

19   Q.    And how long have you been a circuit judge?

20   A.    Six years.

21   Q.    And how did you first become a circuit judge in Faulkner

22   County?

23   A.    I was appointed by then-governor, Mike Huckabee.

24   Q.    And then after that you ran for reelection or ran for

25   election, I guess?

1  A.   I did.  I ran for election in 2007, 2008 in the circuit

2  bench and was elected.

3            THE COURT:  Let me interrupt.  I'm sorry, Justice

4  Wood.  We are having trouble hearing you.

5            THE WITNESS:  I apologize.  I could get closer.  Is

6  that better?

7            THE COURT:  That is better and a bit slower for our

8  court reporter.

9            THE WITNESS:  I should know better than for you to

10  tell me.  I apologize.

11            THE COURT:  That's okay.  Mr. Harris.

12  BY MR. HARRIS:

13  Q.   When you were appointed as a circuit judge of Faulkner

14  County, was Mike Maggio already a circuit judge?

15  A.   That's correct.

16  Q.   And how long had he been one?

17  A.   That I could not tell you.

18  Q.   I mean, a couple years or --

19  A.   Yes.  Several years before me.

20  Q.   Okay.  And y'all were judges in the Tenth Judicial

21  District; is that correct?

22  A.   Correct.

23  Q.   Were y'all in the same -- when y'all were circuit judges,

24  were y'all's offices next to each in the annex?  Is that what

25  they called it?

1   A.    That's correct.  Faulkner County had an old courthouse and

2   the judges outgrew the current buildings.  There were only room

3   for three judges in the main courthouse, and there was a judge

4   in sort of an annex building originally.  Judge Maggio was

5   there, and then when I took the bench, I was in that building as

6   well.  So there was three in the main courthouse and two in the

7   annex.

8   Q.    And is that because you all were the junior judges, or I

9   don't know if that's the proper term.  The newest judges?

10  A.    No, I think that was irrelevant.

11  Q.    That was what?

12  A.    I don't think that was the decision.

13  Q.    What was the decision y'all were put in the annex?

14  A.    I was put in the annex because that was where Judge

15  Collier, who's seat I took, who was actually a more senior

16  judge, that was where her office is; so you take the seat of the

17  officeholder before you.

18  Q.    Sure.  Sure.  And you know Gilbert Baker?

19  A.    I do.

20  Q.    And how long have you known Mr. Baker?

21  A.    Gosh, over 25 years.

22  Q.    Okay.  And I know, I believe, that in some of your

23  elections, he has -- I'm not talking about the 2014 election,

24  but prior to that, am I correct that he has helped you raise

25  funds for your campaigns?

1    A.    He was always helpful in all of my races, yes.

2    Q.    Okay.  And when he first started helping you, I think he

3    was a state senator.  Does that sound right?

4    A.    I don't know that that was correct.  No.  I believe -- I

5    apologize.  I don't know that -- when he actually became a state

6    senator.  But when I first knew him, he was not a state senator.

7    He was just, you know, a publicly active citizen in Faulkner

8    County.  I don't actually know if he was a state senator in my

9    first race or not.

10   Q.    Okay.  Let me --

11   A.    I wouldn't want to be inaccurate.

12   Q.    Let me just tell you what I think the evidence is.  That he

13   was elected as a state senator in beginning session of

14   January of 2001 and ended in January of 2013 because he was term

15   limited.  Does that sound reasonable?

16   A.    If that's correct then, yes, he would have been a state

17   senator when I was running.

18   Q.    Okay.  Did you know he had also been the executive director

19   of the Arkansas Republican Party?

20   A.    Yes, I did.

21   Q.    Okay.  Now, in -- at some point you were elected to the

22   Court of Appeals.  I don't think you said what year.  Pardon me

23   if you did.

24   A.    I took office in 2013.

25   Q.    Okay.  So in 2012, you were elected to the Arkansas Court

1    of Appeals?

2    A.    Correct.

3    Q.    And can you -- do you mind just kind of giving us an

4    overview of the difference between a trial court and Court of

5    Appeals and Supreme Court?

6    A.    The different kind of courts, you mean?

7    Q.    Yes.

8    A.    So trial court is, I guess, what you are experiencing here.

9    So it hears the various types of trials in state court.  That's

10   domestic relations, civil cases, and then criminal matters such

11   as this and jury trials.  The Court of Appeals is the

12   intermediate Appellate Court.  That's where most of the cases go

13   if someone is unhappy or unsatisfied or felt they were treated

14   unfairly at the trial court level.  Most of them go to the

15   intermediate Court of Appeals.  And then there is the state

16   Supreme Court that hears a limited jurisdiction appeals.  They

17   can hear some from the Court of Appeals, but otherwise they hear

18   execution cases where someone has been sentenced to death,

19   election matters, cases of first impressions, and challenges

20   that statutes are unconstitutional.

21   Q.    And when you were on the Faulkner County Circuit Court,

22   what kind of cases did you hear?

23   A.    So for me, my -- I had the bulk load of the juvenile cases.

24   That would be delinquency and child welfare, and then I heard 20

25   percent of civil cases and then a limited jurisdiction of

1   criminal matters.

2   Q.   And what do you remember Mike Maggio's caseload being?

3   A.   I believe primarily criminal, and then he had some civil,

4   may have had some domestic relations, as I recall.

5   Q.   Okay.  Is it such that if you were absent and something

6   needed to be done in your case, he could help on that case and

7   you could help on his?  I mean, do judges do that to each other?

8   A.   Yes.  In Arkansas, circuit judges -- in that jurisdiction,

9   there were five.  You sit on exchange for each other.  So if one

10  of you is sick or has a child even or just is caught up in a

11  jury trial, then the other one would hear the other matters, and

12  so if the two of us were in one building together, we would

13  frequently sit on exchange for each other.  Sometimes with the

14  other judges but not as often.

15  Q.   And I'm sorry.  I lost my train of thought.  I know the

16  Twentieth Judicial District -- what was it composed of?

17  A.   It was Faulkner County, Van Buren County and Searcy County.

18  Q.   Now, you were elected to the Court of Appeals, and then in

19  '12, I guess, you decided to run for the Supreme Court; is that

20  correct?

21  A.   No.  I'm sorry.  That's incorrect.

22  Q.   What is?

23  A.   So I was elected to the Court of Appeals in 2013, is when I

24  took office, and so I was -- then I was elected to the Supreme

25  Court in 2015.  So I was running in May of 2013 through 2014

1   election to the Supreme Court.

2   Q.   So the election would have been May of 2014?

3   A.   Correct.

4   Q.   So sometime in 2013 you have got to decide I'm going to run

5   for the Supreme Court?  You have got to start a year earlier or

6   so?

7   A.   That's right.

8   Q.   Thinking about it.  Talking to people?

9   A.   Yes.

10  Q.   And so sometime in 2013, you thought, I'm going to run for

11  the Supreme Court -- Arkansas Supreme Court?

12  A.   That's right.

13  Q.   And you know a man named Clint Reed?

14  A.   Yes.

15  Q.   Who is Mr. Reed?

16  A.   Mr. Reed is a political consultant.  At the time he worked

17  for Impact Management.

18  Q.   Had you used him in previous campaigns?

19  A.   Yes.  I used him in my Court of Appeals race in 2012, 2013.

20  I used Impact Management.  I hired the firm he worked for.

21  Q.   So in 2013, sometime in early 2013, you must have had some

22  contact with Clint Reed or solidified something to where he

23  would be your consultant?

24  A.   Yes.  Again, it's Impact Management.  That's who you

25  contract, yes, and he was one of their employees, correct.

1    Q.    But was he the one you primarily used?

2    A.    Primarily him and Terry Benham.

3    Q.    And then Mr. Baker, you must have had discussion with him

4    about him helping you raise money?

5    A.    Yes.

6    Q.    In 2013?

7    A.    Yes.

8    Q.    I mean, you talked to him in 2013 about I want to run for

9    the Supreme Court, and he said, I'll help?

10   A.    Correct.

11   Q.    Okay.  Now, in 2013, Mike Maggio decided to run for the

12   Court of Appeals?

13   A.    That's right.

14   Q.    And do you know how that happened?

15   A.    I think that he was assessing.  My understanding is he

16   always -- sort of had the desire to run for a higher court, and

17   he was very nervous about whether he would continue and be

18   reelected to the circuit bench, and he saw me being elected to

19   the Court of Appeals and running for the Supreme Court, and so

20   he was very interested, and he sought my, you know, advice and

21   counsel on it, and I advised him that I thought he would be more

22   successful running for the Court of Appeals than his own circuit

23   seat.

24   Q.    And when you run for the Court of Appeals, you run for a

25   section of the state.  You don't run for the entire state?

1   A.   Right.   Our particular district was 18 counties.

2   Q.   Including the three he was already representing?

3   A.   That's right.

4   Q.   Okay.   And so when you talked to Mike Maggio, Judge Maggio,

5   at the time, when you talked to him, did you introduce him to

6   Clint Reed or tell him he should talk to Clint or talk to

7   Gilbert or any of those people?

8   A.   So he already knew both of them.   So that was not, you

9   know, a matter of me introducing him to people that he was

10   already familiar with.

11  Q.   Did he end up having meetings with Mr. Reed and Mr. Baker?

12  A.   I assume so, yes.

13  Q.   Do you remember being at any of them?

14  A.   I do recall meeting with him and Mr. Baker, I believe,

15  once.   I don't recall, you know, ever meeting like the four of

16  us.

17  Q.   Okay.   You met with Mr. Reed and Judge Maggio?   Who is the

18  three you remember meeting?

19  A.   I think I remember going to lunch perhaps with Gilbert

20  Baker and Mike Maggio.   I apologize.   It's eight years ago.   But

21  I'm pretty sure that we did go to lunch once just to talk about

22  races and sort of how running works, running for the Court of

23  Appeals works, correct.

24  Q.   Was this during the time that he thought he might want to

25  run?

1   A.   Right.

2   Q.   Now, you know he did eventually announce to run for the

3   Court of Appeals?

4   A.   Yes.

5   Q.   In June 27 of 2013.  I know you don't --

6   A.   I'm trusting you on it.  I do not know the day he

7   announced.

8   Q.   There's been some evidence of June 27 --

9   A.   Okay.

10  Q.   -- he announced.

11       In May of 2013, Maggio, Mr. Maggio, Judge Maggio, he had a

12  trial in Faulkner County involving the Estate of Martha Bull

13  versus Greenbrier Nursing Home.  I know you know about it now

14  because there's been a lot of talk about it, right?

15  A.   Right.

16  Q.   At the time did you have any knowledge about it, or were

17  you talking to him about it, or were you hearing about it, or

18  did you know what was going on?  That's only four questions at

19  one time.

20  A.   I was going to say which one would you like me to answer.

21  You may have to repeat that for me, please.

22  Q.   Did you know the trial was going on in his court?

23  A.   Again, I apologize that, you know, you are asking about

24  something that happened in 2013.  I don't have any sort of

25  recollection of that standing out to me.  I think I was

1   generally aware that, you know, there was, you know, a jury

2   trial going on, but the specifics, no.

3   Q.   Okay.  You do know there was a judgment of $5.2 million on

4   May 16?  I know you don't know the date but May 16, 2013,

5   against the nursing home?

6   A.   Yes.  Yes.

7   Q.   And do you remember talking to Judge Maggio about that?

8   A.   I do not remember that, no.

9   Q.   Okay.  Do you remember telling him in a text that it's a

10  jury verdict and that's what happens?

11  A.   No, I do not.

12  Q.   You -- you and Judge Maggio y'all were friends, weren't

13  you?

14  A.   Yes.  I mean, colleagues, not personal friends outside of

15  work.

16  Q.   Maybe not at home?

17  A.   No.  We didn't socialize together.

18  Q.   At work y'all were friends?

19  A.   Certainly.

20  Q.   After working together all those years?

21  A.   Certainly.

22  Q.   Six years you had a lot of contact with him, calls and

23  text?

24  A.   Certainly.

25  Q.   Now, you know who Linda Lee Flanagin was?

1    A.    I do.

2    Q.    Who was she?

3    A.    She assisted Gilbert Baker and worked on my campaign.

4    Q.    What did she do?

5    A.    To my knowledge, what she did was she assisted setting up

6    and helping host my very first fundraiser.  That would have been

7    in November of '13.  She assisted taking me around to one of the

8    law firms that she knew one of the partners, and she also took

9    me to a firm, Crews & Associates, which is financial planning in

10   Little Rock.  She walked me around and introduced me to

11   different people.  I think she knew one of the employees there,

12   and other than that, I assume assisted Gilbert.

13   Q.    What did Mr. Baker do for you and your campaign?

14   A.    So Gilbert Baker, I provided him the list of who

15   contributed to my past campaigns, and so he was responsible for

16   contacting them to make sure they knew I was running for the

17   Supreme Court to see if they would continue supporting me again.

18   And then, when it was time to raise money, then he was

19   responsible for the direct contact as far as setting up and

20   helping us setting up hosting events and sort of having that

21   direct contact because judicial candidates cannot and are

22   discouraged from talking directly to contributors and raising

23   money directly.  So he had agreed to be that person.

24   Q.    I take it, listening to you, it sounds like it's a little

25   awkward to be a political candidate and be a judge at the same

1  time?

2  A.   Yes.  I sort of describe it as being in the political arena

3  in a straight jacket.  And so you are in a political

4  environment, but you have all these rules and restrictions, and

5  you have to be very careful, and it's because the public, and I

6  think rightfully so, do not want judges to be overpoliticized

7  and have too much in that arena, but yet the public in Arkansas

8  feel strongly about the right to elect judges.  So it's sort of,

9  you know, a different situation.

10  Q.   And you mentioned something about when you can start taking

11  money.   In fact, judicial races have a separate rule, don't

12  they?

13  A.   We do.  It's judges operate under a code of judicial

14  conduct, and that code requires that judges not raise money

15  until 180 days before the election, and we're elected in

16  May which is when other candidates' primary election is.  So

17  typically that falls a little around Thanksgiving usually that

18  we can raise money.

19  Q.   So it's the window from like if the election is May, May 21

20  or whatever it is, subtract 180 days; so it's around November 21

21  or 22?

22  A.   It's usually right around Thanksgiving.

23  Q.   Before that you can't raise it?  You knew it?

24  A.   Yes.

25  Q.   Mr. Baker knew it?

1    A.    Yes.

2    Q.    How did you know he knew it?

3    A.    Because I had that discussion with him.

4    Q.    Okay.  Can I show you something?  33A -- let me just tell

5    you there are some checks and they're Exhibits 33A through 33X,

6    and they have already been admitted in evidence.  There's 24 I

7    think.  I'm not going to show you all 24 just out of time, but

8    I'll show you a couple just to kind -- I know you have seen

9    them.  To kind of refresh your memory.  It's going to show up

10   here.  If I may do 33A.  This is 33A, and this is from Michael

11   Morton.  It's to the Rhonda Wood for Supreme Court, which is

12   your campaign?

13   A.    Right.

14   Q.    $2,000, and at the bottom it says 11-26-2013 when it was

15   deposited in your campaign account?

16   A.    Right.

17   Q.    But look at the date up here.  It's been changed.  Do you

18   see that?

19   A.    Right.

20   Q.    I know this isn't a surprise.  You have seen this.  Let's

21   go to 33B.  This is from the Greenbrier Care Center --

22   Greenbrier Care Center.  It's for $2,000.  Rhonda Wood for

23   Supreme Court, and -- did I say $2,000?  It's 2,000.  And same

24   thing on the date, but if you look at the bottom, it shows it

25   was deposited on 11-26-13.  On 11-26-13 that would have been

1    within the 100-day window deposited?

2    A.    That's correct.

3    Q.    Did you or anybody, your campaign manager, Mr. Reed,

4    anybody who's doing your bookkeeping or whatever -- I don't know

5    what I'm talking about.  Did they change that date?

6    A.    No.  They did not.

7    Q.    Okay.  Can we play 4J.  And this is going to be from a

8    deposition, and this has been admitted, Your Honor.  This is

9    from a deposition of Mr. Baker in 2015, I believe.

10          (Video clip 4J played.)

11    BY MR. HARRIS:

12    Q.    Have you ever seen this deposition?

13    A.    I have not.

14    Q.    Mr. Baker says he changed the date?

15    A.    I see that.

16    Q.    Now, I know before you seen this deposition, you have been

17    told that.  Have you ever been told that by Mr. Baker?

18    A.    No, I have not.

19    Q.    Have you ever -- after you found out that the date was

20    changed, because it was actually written on July 8 of 2013,

21    after you found out that it was changed, you never talked to

22    Mr. Baker about that?

23    A.    I did not.

24    Q.    What should Mr. Baker have done?

25          MR. HENDRIX:  Your Honor?

1        MR. HARRIS:  I'll rephrase.

2        MR. HENDRIX:  I object.

3        THE COURT:  Please.

4  BY MR. HARRIS:

5  Q.   What would you have done if Mr. Baker said, Justice Wood, I

6  got these checks on July 8 from Michael Morton for your

7  campaign?

8  A.   If he had told me that at the time?

9  Q.   Yes.

10  A.   I would have asked him to return them to them.

11  Q.   Why is that?

12  A.   Because it was before the window, the 180-day window.

13  Q.   It was the right thing to do?

14  A.   Yes.

15  Q.   And then in November, ask again?  Could he do that?

16  A.   Yes.

17  Q.   That would have solved the problem, wouldn't it?

18  A.   Right.

19  Q.   When did you first find out about the dates being changed

20  or see the checks, I guess?

21  A.   In the FBI's office.

22  Q.   Okay.  So when they showed them to you?

23  A.   Yes.

24  Q.   What was your initial reaction?

25  A.   I was shocked.

1    Q.    Okay.  Disappointed?

2    A.    Disappointed.

3    Q.    Okay.  When -- during the summer of 2013 -- actually when

4    these checks were sent from Michael Morton, in the summer of

5    2013, you didn't hear any cases that Mike Maggio sat on that got

6    appealed to the Court of Appeals, did you?

7    A.    No.  I had recused off his cases.

8    Q.    Why was that?

9    A.    It was because, as I explained earlier, by sitting on

10   exchange, that we frequently -- I would step in on his cases or

11   he might step in on mine.  There's a constitutional rule in

12   Arkansas that you cannot sit as an Appellate Court -- appellate

13   judge on any case that you sat as the trial court judge on, and

14   in our system, unfortunately, our computer system isn't as sort

15   of tech savvy as it should be, and so it only records the trial

16   judge of record.  So when a case came up on appeal, I wouldn't

17   have a way of knowing if I had sat in and heard a motion to

18   dismiss or arraignment or anything on his cases.  So to protect

19   those litigants and make sure I was meeting my constitutional

20   duty, it was better for me to have a blanket recusal and make

21   sure I didn't violate the Constitution.  So I was really careful

22   with that.  And that way also, if I was in communication with

23   him, there was just no issue that I was hearing anything

24   inappropriately.

25   Q.    Did you have other judges in the Twentieth Judicial

1   District that you recused on?

2   A.    I did not because, like I said, it was a different building

3   and environment sitting on exchange.

4   Q.    Because y'all were the same building and offices next to

5   each other?

6   A.    Right.

7   Q.    Chambers next to each other?

8   A.    Right.  That was, typically, when a judge came from a

9   circuit to Court of Appeals, they would recuse off the judges in

10  their circuit that they sat on exchange with.

11  Q.    And also I think it's fair to say you had quite a bit of

12  contact with Mr. Maggio.  He texted you and talked to you?

13  A.    Yes.  When he was running, he was asking me for advice and

14  different things.

15  Q.    Like in 2013, I'm talking?

16  A.    Yes.  Yes.

17  Q.    Michael Morton, do you know who that person is?

18  A.    I do.

19  Q.    How do you know Mr. Morton?

20  A.    I apologize.  Obviously, through this and this experience,

21  and I knew him, that I believe -- I don't recall.

22  Unfortunately, I have tried to remember.  It was in I think

23  maybe '09 that he hosted a fundraiser at a nursing home for me,

24  and I believe in '07 when I was on trial bench, we had an

25  unpleasant conversation actually where I hung up on him so those

1    are my two encounters with Michael Morton.

2    Q.    I guess one is good; one is bad?

3    A.    I actually was shocked that he ever gave money since my

4    first experience was me hanging up on the phone on him.

5    Q.    This was a case you had in which one of his nursing homes

6    was involved?

7    A.    Yes.  I believe he was trying to connect with my trial

8    court assistant, but I think he was upset --

9            MR. HENDRIX:  Your Honor, I object to the relevance of

10   this line.

11           THE COURT:  Sustained.

12           MR. HARRIS:  Okay.

13   BY MR. HARRIS:

14   Q.    After the '09, when I think you said he hosted a

15   fundraising for you, did you see him again?

16   A.    Never.

17   Q.    Okay.  Did you know he was giving money to your campaign?

18   A.    I knew, you know, in -- I guess during the time of the 180

19   days I knew, yes.

20   Q.    Because, I mean, you can read -- you can read -- you had

21   filing reports when you run for office, don't you?

22   A.    Yes.  That's the difficulty.  You are not supposed to know

23   who is giving, but at the same time the ethic commission

24   requires you and you are responsible for your financial reports

25   that you file every month saying here's your campaign

1   contributions, here's your expenditures.  So you have to

2   ethically approve those reports, and you are responsible for

3   them.  But at the same time you are supposed to try not to know

4   who's giving.  We -- since the rules have changed with the code

5   where now that restriction is lifted from judges.

6   Q.   Because it's kind of a conundrum?

7   A.   It was a real Catch-22.  You could reach your ethical goal

8   with the cannons versus the ethical rules.

9   Q.   The summary before the verdict on May 16 -- I know there

10  was a hearing, a remittitur hearing, on July 8, 2013.  I'll give

11  you that date.

12       During that period of time -- I know you had contact with

13  Judge Maggio, but do you remember talking to him about the case

14  and what was he going to do with the people filing motions?

15  A.   No.

16  Q.   It was a large verdict, wasn't it?

17  A.   Yes.

18  Q.   It's the largest one in Faulkner County, I guess?

19  A.   That I don't know.

20  Q.   Okay.  It's still a large verdict?

21  A.   Yes.  Certainly.

22  Q.   And during the summer of 2013, were you talking to

23  Mr. Baker?

24  A.   Yes.

25  Q.   Because he was kind of fundraising or going to fundraise?

1    A.    Hopefully wasn't, but I guess he was.

2    Q.    We know he was.  You were hoping he wasn't?

3    A.    Correct.

4    Q.    Did you have much contact with Ms. Flanagin during the

5    summer of '13?

6    A.    I don't believe so, no.

7    Q.    Okay.  Now, Judge Maggio entered an order that was filed on

8    July 11, 2013, remitting the 5.2 to $1 million.  I hate to tell

9    you this, but I had to look up "remittitur" when I started in

10   all this stuff.  Had you ever done a remittitur?

11   A.    I had not.

12   Q.    A remittitur is very rare?

13   A.    Yes.  They are unusual.

14   Q.    Before this, had you ever known any judge to do a

15   remittitur?

16   A.    No, I don't think that I had.

17   Q.    Okay.  Did Maggio talk to you about the remittitur and what

18   he should do in the hearing coming up and what's going on?

19   A.    No.  I don't believe so, no.

20   Q.    I mean, you were recused from his case; so he could have

21   talked to you?

22   A.    Yes, but as a general rule, I didn't discuss how he ruled

23   on cases with him.

24   Q.    Okay.  Now, I'm going to put Exhibit 76.  On July 9,

25   Mr. Baker received a FedEx from Michael Morton, and it had about

1  $228,000 of checks in the FedEx.  And you now know that 48,000
2  were for you.
3  A.  Correct.
4  Q.  Okay.  And he texted you.  And I'm going to show you here.
5  At 5:24 p.m. on July 9th he texted you at 5:27.  You texted him.
6  What was that about?
7  A.  I don't have any recollection, and I don't know.  I wish
8  that I could tell you, but I don't.  Unfortunately, no one asked
9  until five years or so later.  So I don't recall, you know, a
10  single text.
11  Q.  Okay.  And the reason I ask is because y'all hadn't had a
12  text since the 27th of June.  So it had been -- how many days
13  was that?  15 days, two weeks.  So you have no idea.  This is on
14  the day he got all that money for you.  Do you think the text
15  could have been, hey, I got some money?
16  A.  Certainly it was not that I got -- no, because then I would
17  have sent a text back saying return the money.
18  Q.  Okay.  Well, earlier in the day he had texted Mike Maggio,
19  called him.  See at 3:30?
20  A.  I do.
21  Q.  And he had called him at 3:31, and there was $30,000 in
22  there for Mike Maggio's campaign that was going through PACs,
23  and Mr. Baker called Michael Morton at 4:05 for 8 minutes and 27
24  seconds, and in that FedEx package was 48,000 for you, 30,000
25  through the PAC for Judge Maggio, 50,000 for an entity called

```
 1   Arkansans for Lawsuit Reform, which was Baker's little
 2   consulting thing, and then 100,000 to UCA.
 3        And so at 5:16 he texted Chris Stewart about the PACs, and
 4   then he texted you.
 5        Do you have any idea what any of those calls or texts were
 6   about?
 7   A.   I certainly do not.
 8   Q.   Okay.
 9   A.   I sort of resent any implication that I would have any part
10   of that.
11   Q.   I was just asking if you remember the text.
12   A.   And I don't.
13   Q.   Okay.  Did you ever know what LRM was?
14   A.   I do not.
15   Q.   Okay.  You didn't know it was a consulting firm that
16   Mr. Baker had?
17   A.   No.
18   Q.   Did you ever know what other candidates in the summer of
19   2013 he was raising money for?
20   A.   I knew he was raising money for Mike Maggio.  I knew he was
21   raising money for maybe Senator Cotton, Governor Hutchinson,
22   probably Tim Griffin.  I mean, it would be sort of a laundry
23   list of Arkansas candidates.
24   Q.   And do you know that because he told you?
25   A.   I knew that.  I knew that from them.
```

1   Q.   Okay.  And did you know what DBH was, DBH management?

2   A.   No.  I don't know that I have ever heard of that before.

3   Q.   Bruce Hawkins?

4   A.   No.

5   Q.   You don't know Mr. Hawkins?

6   A.   I know the name.  I don't know him.

7   Q.   Do you know Marvin Parks?

8   A.   I know him.

9   Q.   Okay.  Judge Maggio signed the order on July 10th, and it

10  was filed on July 11th?

11  A.   Okay.

12  Q.   So he had the hearing on the 8th.  10th, he files the

13  order.  11th, he signs it.  On July 10 do you remember going to

14  Fort Smith with Judge Maggio and Troy Brazzle?

15  A.   I remember going to Fort Smith.  I did not recall the exact

16  date we went.  But, yes, we went -- the three of us together

17  went to -- our local sheriff was being sworn in to the sheriff's

18  association.  I don't recall if he's president or vice president

19  or whatever and asked us to attend.

20  Q.   Okay.  And was Troy Brazzle running for something?

21  A.   I believe he was running for circuit judge.

22  Q.   Okay.  Was he running for Judge Maggio's position or was

23  there another vacancy?

24  A.   Boy, I don't recall.

25  Q.   Okay.  And so y'all go from Conway to Forth Smith?

1   A.   Correct.

2   Q.   And you went to some ceremony?

3   A.   Correct.

4   Q.   And met people and drove back?

5   A.   Correct.

6   Q.   And during that trip, did Judge Maggio talk about the

7   remittitur hearing?

8   A.   He did not.

9   Q.   Did he talk about the order he entered reducing it?

10   A.   He did not.

11   Q.   Had it already hit the paper that it had been reduced from

12   5.2 to $1 million?

13   A.   I don't believe so, no.

14   Q.   Did you not know it had been reduced to one million on that

15   trip?

16   A.   No.  I believe I didn't find out until I think the next

17   day.  I was in -- left for Mississippi, and I found out through

18   the press then.

19   Q.   Okay.

20   A.   Like a news story.

21   Q.   Did you -- you ended up not having an opponent; am I

22   correct?

23   A.   That's correct.

24   Q.   Unopposed?

25   A.   Correct.

1    Q.    And I think you raised or your campaign raised something

2    like 150,000, give or take?

3    A.    About 155,000.

4    Q.    You know better than I.

5    A.    Yes.

6    Q.    Okay.  And having that much money helps, doesn't it, an

7    opponent not getting in?

8    A.    Certainly.

9    Q.    And do you know how much Mike Maggio raised?

10   A.    I have no idea.

11   Q.    Okay.  Did he talk to you about whether he was raising

12   money or Gilbert was raising money for him?

13   A.    I believe so.  I think he was sort of an over-talker and

14   prolific texter, and I admit that I didn't pay that close of

15   attention to what he was saying.

16   Q.    He's gregarious; is that fair?

17   A.    That's probably being nice.

18   Q.    Okay.  And if you weren't nice, what would you call it?

19   A.    I don't know.  You know, everybody has someone in their

20   life that's a Mike Maggio that is sort of a, you know, talk,

21   talk, talker and you just sort of, you know, smile.

22   Q.    Okay.  I mean, he seems to be likeable, I guess?

23   A.    Yes.

24   Q.    Okay.  Did you end up paying Mr. Baker for all the help he

25   gave you?

1    A.    I did.

2    Q.    Do you have any idea how much you paid him?

3    A.    I paid him $20,000.

4    Q.    Okay.  And when he started out, was that what y'all worked

5    on?

6    A.    No.  He had helped with all my campaigns and had never -- I

7    had never paid him, and I was pretty adamant that this time I

8    wanted to pay him.  I felt like he had done just instrumental

9    work, and he had told me just to pay him what I thought was

10   fair, and we -- the agreement was that, if there was money left

11   over, then I would pay him what was fair.  If there was an

12   opponent and someone got in the race and we ended up spending

13   every dollar that we raised, then he wouldn't get anything.  So

14   it was sort of wait and see at the end.  So there was certainly

15   no guarantee that he could have gotten a dime.

16   Q.    So it sounded like he raised money for you?

17   A.    Um-hum.

18   Q.    And talked your name up, and I take it he did, and then

19   Ms. Flanagin sort of helped?

20   A.    She's his assistant.

21   Q.    Walking around the law firm and Crews & Associates and set

22   up that first fundraiser?

23   A.    Um-hum.

24   Q.    When this -- in March of 2014 -- let me look at Exhibit

25   70 --

1    MR. HARRIS:  Can I just take one second to check one
2  thing out?
3    THE COURT:  You may.
4  BY MR. HARRIS:
5  Q.    Can we look at Exhibit 70?  I'm just about through, ma'am.
6  A.    That's fine.
7  Q.    Okay.  Can we look at Exhibit 70?  These are a summary of
8  cell phone calls between you and Mr. Baker, and it's for the
9  year -- it's from January '13 through July '14.  Can we go down
10  to 5:16.  This is you and Mr. Baker.
11    So it looks like in May you had some calls and texts.
12  June you do the same thing.  There's the July 9th one.  And then
13  none until August.  And then some in September.  Keep going.
14  Some in October.  Keep going.  Quite a few in October.  I take
15  it November is when you can start getting serious.  And so you
16  are gearing up; is that a fair statement?
17  A.    I would think that would be fair, yes.
18  Q.    Okay.  Keep going.  Keep going.  Okay.  Stop.  11-22 -- I
19  think 11-22 is when you can start collecting money or acquiring
20  campaign funds.  It could be the 21st.  And so November,
21  December, and so this is you and Mr. Baker, and I take it y'all
22  are talking about what generally?
23  A.    Probably just the campaign.
24  Q.    I mean, you and Mr. Baker are also friends; are you not?
25  A.    Yeah.  I mean, so we knew each other, you know, just from

1   political life and Faulkner County life.

2   Q.    Socially?

3   A.    So it could have been anything.

4   Q.    Did y'all have social contact?

5   A.    In the sort of, if we were showing up at a political event

6   or something like that.  We didn't sort of as families

7   socialize, no.

8   Q.    During this period of time, are you out like going to

9   different -- I guess you had to go all over the state, didn't

10  you?

11  A.    Yes.  So, I mean, I was traveling -- when you run, it's not

12  like you -- even if you are unopposed, you are still asking the

13  citizens, and you are out there trying to hear their voices and

14  hear what they're interested in.  And so you travel the whole

15  state whether you have an opponent or not.  So I was in every

16  county and attending events.  So certainly he would have been

17  there as well and, you know, as a judicial candidate, if someone

18  says, you know how can I contribute to your campaign, then, you

19  know, I would say I will have someone contact you.  So that

20  person -- I would let him know to contact that person.

21  Q.    So I take it Impact Management or Clint Reed or

22  Ms. Flanagin or Mr. Baker would say, hey, there's something in

23  West Memphis next Thursday, there's something in Pine Bluff on

24  Friday, and they kind of give you a heads-up and you know where

25  to go or were you doing it yourself?

1   A.   A lot of it you did yourself.  It's not as sophisticated as

2   one would, you know, like to believe.

3   Q.   Okay.  I was trying.

4   A.   You are sort of digging on the Internet trying to find

5   events.

6   Q.   You're doing what on the Internet?

7   A.   You're digging on the Internet to find civic events.

8   Q.   I thought you said dating on the Internet.

9   A.   Oh, gosh, no.

10  Q.   But that's what you are doing.  You're going out and

11  meeting people and getting your name out and getting your face

12  out?

13  A.   Right.

14  Q.   If that was 70, let's go to 72.

15       This is the calls between Mr. Maggio and you.  Let's go

16  down to May 16.  Let's scroll down, ma'am, Justice.  Did he

17  have -- so the first call after 5-16 is 5-18.  You have some in

18  June.  Some in July.  6-27 down there, that's -- I will tell you

19  that's when Mike Maggio announced for Court of Appeals on 6-27.

20  A.   Okay.

21  Q.   Then the next call is 7-9.  Keep going down.  And then more

22  in July, August.  Now keep scrolling, if you will.  A lot in

23  August.  September, October.  Looks to be either a lot of short

24  calls or a lot of texts.  Stop.  11-21 there's a 25-minute call.

25  That would be the first day or the day before the first day.

1 And then so during this period of time, this August, September,

2 October, November, I take it Mike Maggio was also out

3 campaigning?

4 A. Yes, sir.

5 Q. He had a smaller district?

6 A. Yes.

7 Q. What did he have?  Conway, Clinton, and Marshall?

8 A. No, he had 18 counties.

9 Q. I'm sorry.  You are right.  He represented those three

10 counties in the Twentieth Judicial District?

11 A. Correct.

12 Q. So what 18 counties did he have generally?  I mean it's

13 like central?

14 A. The best way to describe is it is sort of going from

15 Faulkner County straight up to Boone County, which is Harrison,

16 and then it goes all the way over to Randolph County which is

17 Pocahontas, and then it sort of comes down through Jackson

18 County.

19 Q. Which is Newport?

20 A. Yeah.  Excludes White County to Cleveland County back down

21 to Faulkner, and then all those counties in the middle of that.

22 Q. So kind of north central?

23 A. Yes.

24 Q. And he was going out campaigning?

25 A. Right.

1   Q.   And were there times that y'all would campaign together?

2   A.   Yes.

3   Q.   Okay.  And were there times he would say, hey, I'm going to

4   Harrison tomorrow, do you want to go or what do you think -- was

5   it just casual conversation like that, is what I'm asking?

6   A.   Yes.  He joked and liked to joke that -- I think he more

7   used it as a running joke in some respects.  He like to sort of

8   fly on my coattails; so he would joke that I was -- he was my

9   driver at campaign events, although that technically was not

10  true but maybe one time, but it was like a good line that he

11  used that I asked him to stop using at campaign events.  But

12  certainly, yes, whenever we were in those districts, then it

13  would be every candidate in that district at an event.

14  Q.   And I take it it's the role of the candidate to show up in

15  the event?

16  A.   Yes.

17  Q.   So he liked to show up with you and say, hey, I'm her

18  friend?

19  A.   Yes.

20  Q.   Hopefully, that would gain him some advantage?

21  A.   Yes.

22  Q.   Okay.  Now, you know, that in the spring of 2014, he did

23  not run, he did not file.  And you know that some information

24  came out about some PACs?  Do you know that?

25  A.   So I think you asked multiple questions.  I think the first

1    part of your question was incorrect.

2    Q.   Okay.  Let me make it correct.  In 2014 he did not file?

3    A.   That's incorrect.

4    Q.   Okay.

5    A.   I believe he did file.

6    Q.   Okay.  And in 2014 some information came out about PACs; am

7    I correct?  PACs?

8    A.   I assume that's when it came out, but at some point, yes.

9    Q.   Okay.  And there was some brouhaha in the news media about

10   Michael Morton and things like that.  Do you remember that?

11   A.   Yes, I do.

12   Q.   Okay.  An you talked to Gilbert Baker about that?

13   A.   About the PACs and the --

14   Q.   Yeah.

15   A.   No.

16   Q.   Okay.  Did you tell Mr. Maggio what he should do about some

17   texts that were in his phone?

18   A.   In regards to the PAC?

19   Q.   Yes.

20   A.   No.

21   Q.   In regard to any text on his phone?

22   A.   Yes.  I'm kind of being careful because I think there was

23   maybe a judge's order about not to discuss some of the -- a

24   certain part.

25   Q.   I'm just asking you about texts.  Do you want me to ask a

1   specific question?

2   A.   No.  And so I mean about a certain --

3   Q.   He had texts on his phone to you and to Gilbert Baker?

4   A.   Yes.

5   Q.   And other people?

6   A.   I -- the reason that I believe he withdrew from the race --

7   Q.   No, no.  I'm not asking that.

8   A.   That's what I'm saying.

9   Q.   Okay.  Did you talk to him about whether he should delete

10  texts on his phone?

11  A.   Yes, in regards to why he withdrew from the race.

12  Q.   Not texts with you?

13  A.   Not texts regarding the PACs.

14  Q.   Not texts with you?

15  A.   Yes, with regards to the race, yes.

16  Q.   Texts with you?

17  A.   Yes.

18  Q.   Texts with Gilbert Baker?

19  A.   No.

20  Q.   Just you?

21  A.   Just me.

22  Q.   Anybody else?

23  A.   No.

24  Q.   Okay.

25          THE COURT:  Mr. Harris?

1          MR. HARRIS:  Sir?

2          THE COURT:  I'm confused.  Maybe it's the time of day.

3          MR. HARRIS:  Could be.

4          THE COURT:  Do you have more with this witness?

5          MR. HARRIS:  No, sir.  Let me unconfuse this little

6     issue, and then I'll sit down.

7          THE COURT:  Do that, and then unless you have no

8     questions or only two or three, I think we have gone about far

9     enough.  Okay.

10         MR. HARRIS:  Maybe we could break today, and I can

11    clear this up tomorrow, judge.

12         THE COURT:  It would certainly be possible.

13         MR. HARRIS:  I will be better organized.

14         THE COURT:  It's not you, Mr. Harris.  It's me.

15         MR. HARRIS:  Okay.

16         THE COURT:  And it's because we have been going since

17    8:15.

18         MR. HARRIS:  Yeah.

19         THE COURT:  So, ladies and gentlemen of the jury, I

20    appreciate your attention today as to the parties.  Thank you

21    for the taking of the notes.  They will help you down the line.

22    I need you to keep your promises to me.  Don't post anything on

23    social media about your service.  Don't talk to anybody about

24    the case, and don't let them talk to you.  Take your pads with

25    you here in a second and give them to Officer Pike, and she'll

1    secure them overnight.  Remember that you are not to share them
2    with each other and not to talk about the case until I put it in
3    your hands.
4         Please show up again tomorrow morning about 8:15, and we'll
5    have you in the box at 8:30 working.  Does any juror have a
6    question for me?  Anything on logistics?  Yes, ma'am.
7              JUROR NO. 10:  It's about one of the exhibits.  Can I
8    ask about that?
9              THE COURT:  No, ma'am.
10             JUROR NO. 10:  Okay.
11             THE COURT:  But I will say, trying to anticipate what
12   you were going to ask, that the exhibits belong to y'all and
13   they'll be in the jury room, and you'll have them and can root
14   around with them, and there will be a computer that you can use
15   to play any of the stuff that you want to, and so you'll have
16   all that.  Okay.  Leave the case here, ladies and gentlemen.
17   Leave it in the jury room.  All rise for the jury.
18        (Jury not present.)
19             THE COURT:  Counsel, let's take a true five minutes
20   and then come back and handle some loose ends.  Caffeine is
21   welcome if you can find some and you can even take your coats
22   off.
23        Justice Wood, don't talk with anyone overnight about the
24   case.  You'll be on you're oath overnight, and we'll see you
25   about 8:15 or 8:20.  Start at 8:30.

1          THE WITNESS:  Thank you, sir.

2          THE COURT:  Thank you.  You're excused for the

3     evening.  I'll be right back.

4        (Recess taken from 3:51 p.m. until 4:00 p.m.)

5          THE COURT:  All right.  Let's go back on the record.

6      Ms. Overton, you can stay inside the bar.  Ms. Overton.

7     Did I get the last name right?

8          MS. OVERTON:  Yes.

9          THE COURT:  I know we've got our jury instruction

10    issue to talk about.  Is there anything else to put on the

11    grocery list?  Mr. Hendrix?

12         MR. HENDRIX:  Judge, I just need to check the

13    admissibility of some of the government's exhibits.

14         THE COURT:  Okay.

15         MR. HENDRIX:  Are 5, 6, 7A and 7B admitted?

16         THE COURT:  Subject to Ms. Black, I don't see that 5

17    has been admitted.

18         MS. BLACK:  Government's, correct?

19         THE COURT:  Yes, he said the government's exhibit.

20    Government 5 I don't believe is in.  What was the next one?

21         MR. HENDRIX:  6.

22         THE COURT:  Government's 6 is not in.

23         MR. HENDRIX:  7A.

24         THE COURT:  Those were the Linda Lee, and they were

25    mentioned, and then we had the sidebar, and so I kind of

1   sustained and Mr. Harris didn't press to put them in.  I think

2   he may have shown them.  Then what's next?

3          MR. HENDRIX:  7B.  And that's where my -- I wanted to

4   make sure I was -- I remembered right because I remember the

5   relevance objection.

6          THE COURT:  7B I don't think is in either.

7      Anything else?

8          MR. HENDRIX:  No, Your Honor.

9          THE COURT:  Okay.

10          MR. HARRIS:  If you want me to offer them, I will.  I

11   thought I wasn't allowed to so that's why I moved on.

12          THE COURT:  And you did correctly.  You can proffer,

13   if you want, but -- anything else other than the limiting

14   instruction?

15          MR. HENDRIX:  No, Your Honor.

16          THE COURT:  All right.  Ms. Peters, what's on your

17   list?

18          MS. PETERS:  I believe there are limiting instructions

19   requested by the defense, Your Honor.

20          THE COURT:  Only the limiting instruction?

21          MS. PETERS:  Yes, that's what I am aware of.

22          THE COURT:  Okay.  Good.  Well, before we get to that,

23   I need to say well done, Counsel.  You all are moving the case

24   along, and I appreciate it, and I know that it's y'all who are

25   doing it.  And thank you for tolerating my grumpiness about the

1    sound.  I think we were in a little better shape on that, and

2    Ms. Black and I and the Court Reporter will work this evening

3    and try to tune that up a little bit, but I appreciate the focus

4    and the pace that you all are keeping, and I know the jury does

5    as well.

6         On this limiting instruction, Mr. -- let's start with what

7    the government has proposed, the amended -- amendment to what

8    you offered.  Give me a preliminary read from the defense on

9    that.

10        MS. DEPPER:  Your Honor, we don't have a problem

11   necessarily with the first block of highlighted language that

12   they have added.  I think our biggest problem is with the second

13   portion of highlighted language where they included the

14   paragraph is violations of the Arkansas code of judicial conduct

15   do not, and the government added "in and of themselves

16   constitute a crime."  And we do take issue with the "in and of

17   themselves."

18        THE COURT:  Okay.  So I'm going to take down my mask

19   briefly so that y'all, perhaps, can hear me a bit better.  I am

20   concerned with the amount of talk that we have had about state

21   law and this 180 days and what I'll call campaign -- campaign

22   irregularities and the violation of campaign laws.

23        I would propose to counsel that instead of this limiting

24   instruction that's directed at the 180-day rule, that, instead,

25   in the morning maybe after Justice Wood that I say to the jury,

1    in general terms, ladies and gentlemen of the jury, you have

2    heard a lot of things about this 180-day rule and campaign

3    finance rules and the reports that are filed, the PAC forms.

4        Mr. Baker is not on trial for any campaign finance

5    violation.  He has three charges pending against him, and you

6    are entitled to consider all of this -- all of these matters of

7    campaign finance and the Arkansas background as context, but he

8    is not charged with violating the campaign laws of Arkansas, and

9    you should consider whether he is guilty or you must consider

10   whether he's guilty or innocent of each of the crimes charged

11   which are, under federal law, conspiracy, bribery, and wire

12   fraud.

13       So I wonder if a more generic instruction along the lines

14   of what I just roughed out, without getting into the details of

15   the 180 days, would be helpful.  What do you think, Ms. Peters?

16           MS. PETERS:  Your Honor, at the outset, the United

17   States does not object to that.  We are not saying that he is on

18   trial for the campaign violations.  What we are saying -- or if

19   they are violations.  What we are saying is that the 180-day

20   rule applies to the candidate and it's up to the candidate to

21   ensure that the people working for them follow it.  The

22   relevance here is not that he is subject to a judicial rule.

23   The relevance is that the contributions were sought out of time

24   which he was aware was out of time, and the relevance of that is

25   that it shows that it is -- went to the bribe, not necessarily

1  to legitimate campaign contributions.  So we don't have an

2  objection to saying he's not on trial for campaign finance

3  violations.  I just wanted to explain why we have revisited it

4  is because it's relevant to concealment and it's basically

5  intent.

6         THE COURT:  I understand the government's position,

7  and I appreciate -- I appreciate your willingness to help the

8  Court in crafting a limiting instruction.

9      I am reluctant to venture too far into saying much more

10  beyond context, that this is context for you to consider the

11  crime charged because I don't want to get into the argument that

12  I know you have to make on why it is relevant, why it is

13  material, and how they should look at it.

14         MS. PETERS:  I apologize, Your Honor.  I was not

15  intending that that should become part of the instruction.  I

16  just wanted to explain to the Court why we have returned to that

17  with the proof.

18         THE COURT:  Got it.

19         MS. PETERS:  We are fine with the instruction that

20  says he is not on trial for campaign finance violations.  That's

21  fine.

22         THE COURT:  Thank you.  Ms. Depper, what do you think?

23         MS. DEPPER:  Your Honor, we are fine with that

24  instruction as well.

25         THE COURT:  Okay.  Good.  Well, with the help of our

1   faithful court reporters, I'll have the benefit of my rough

2   draft that I just spoke, and I'll try to make it a little better

3   and then read that to the jury.  When -- Mr. Depper or

4   Mr. Hendrix, when do you want it?

5           MR. HENDRIX:  After Wood.

6           MS. PETERS:  Yes.

7           MR. HENDRIX:  Perfect time in between because it will

8   be what you heard and what you may hear.

9           THE COURT:  Good.  That's when I'll do it then.  Good.

10  All right.  We've got that taken care of.  What else?

11  Ms. Peters?

12          MS. PETERS:  Nothing for the United States, Your

13  Honor.

14          THE COURT:  Okay.  Everybody feeling okay on your side

15  of the case, Ms. Peters?

16          MR. HARRIS:  I may be getting sick.  You know I'm

17  kidding.

18          THE COURT:  I do.  I know you're kidding, Mr. Harris.

19  Yes, I appreciate the color that you have brought to the trial,

20  and will continue to bring.

21          MR. HARRIS:  So does Ms. Peters.

22          THE COURT:  Anything, Ms. Depper or Mr. Hendrix, on

23  the defense side?

24          MS. DEPPER:  No, Your Honor.

25          THE COURT:  And how is everybody on y'all's side

1   feeling?  Everybody okay?

2            MS. DEPPER:  Yes.

3            THE COURT:  Thank you for helping me informally as you

4   are dealing with people, encouraging them to do right on the

5   masks.  I will say that I see that or at least I read in the

6   press that the CDC figured out what the Eastern District of

7   Arkansas was doing on things and has decided to do right as well

8   about masks in public settings.  Just kidding.  We are in

9   recess.

10       (Proceedings continued to July 27, 2021, at 8:15 a.m.)

```
 1                    I N D E X
 2       Michael Morton
 3           Direct Examination (Cont'd) by Mr. Harris    393
 4           Cross-Examination by Mr. Hendrix             398
 5           Redirect Examination by Mr. Harris           452
 6       Pat Cherry
 7           Direct Examination by Mr. Harris             461
 8       Rhonda Wood.
 9           Direct Examination by Mr. Harris             468
10                    E X H I B I T S
11       Defendant's Exhibit No. 17 received             449
12       Plaintiff's 14A, 14B, 15                        463
13                    REPORTER'S CERTIFICATE
14           I certify that the foregoing is a correct transcript from
         the record of proceedings in the above-entitled matter.
15
16                                          Date: 7-27-21
         /s/ Kathleen Maloney, RPR, FCRR
17             United States Court Reporter
18
19
20
21
22
23
24
25
```