```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF ARKANSAS
2
                       Case No. 4:19-CR-00031-DPM-1
3
     UNITED STATES OF AMERICA,      )
4                                   )
          GOVERNMENT,               )
5                                   )
          -v-                       )
6                                   )
     GILBERT R. BAKER,              )
7                                   )
          DEFENDANT.                )   Little Rock, Arkansas
8                                   )   July 28, 2021, 8:21 a.m.
     _____)
9

10                   VOLUME 4A - PAGES 512 - 623

11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12            BEFORE THE HONORABLE D.P. MARSHALL, JR.

13                 UNITED STATES DISTRICT JUDGE

14

15   Appearances:

16   FOR THE GOVERNMENT          Julie E. Peters, ESQ., AUSA, and
                                 Patrick C. Harris, ESQ., AUSA
17                               U.S. Attorney's Office
                                 Eastern District of Arkansas
18                               Post Office Box 1229
                                 Little Rock, AR 72203
19
     FOR THE DEFENDANT          J. Blake Hendrix, ESQ., and
20                               Margaret D. Depper, ESQ.
                                 Fuqua Campbell, P.A.
21                               Riviera Tower
                                 3700 Cantrell Road, Suite 205
22                               Little Rock, AR 72202

23
          Proceedings reported by machine stenography; transcript
24   prepared utilizing computer-aided transcription.

25
```

```
 1                        MORNING SESSION
 2        (Call to the order of the Court.)
 3             THE COURT:  Good morning, everyone.  Y'all can be
 4   seated or stand, as you choose.  Hope everybody's doing okay
 5   this morning.
 6             I have an e-mail that I believe counsel, yes, all
 7   counsel's copied on, sent to chambers last night, indicating
 8   that the defense wishes to add Ms. Fowler as a witness.
 9             Mr. Hendrix or Ms. Depper?
10             MS. DEPPER:  Yes, Your Honor.  Our intent is
11   potentially to add Ms. Fowler as a witness.  She would be
12   testifying basically to a review of the phone records similar
13   to Agent Stokes and summaries that she has come up with, Your
14   Honor.
15             THE COURT:  Hmm, has the United States had a chance
16   to consider this?
17             MS. PETERS:  We did not receive that e-mail.
18             THE COURT:  Let me see here.
19             Well, and that -- I misspoke.  You're right,
20   Ms. Peters; it -- I don't see you copied here.  So I'd ask the
21   lawyers to think about that, talk about it at the next break,
22   and bring it up with me after we know whether there's
23   consensus or disagreement on the issue.
24             MS. DEPPER:  Absolutely, Your Honor.
25             THE COURT:  Good.
```

```
 1              And anytime anyone communicates with the Court,
 2    everybody needs to be copied.  Okay?
 3              MS. DEPPER:  And we apologize, Your Honor.  I guess
 4    it was just late at night when we were working, and we
 5    apologize for that oversight.
 6              MS. FOWLER:  It's my mistake.
 7              THE COURT:  Understood.  It certainly happens.  We
 8    all stumble when we're tired, no question about that.
 9              What about the -- my, I hope, tuned-up limiting
10    instruction?  Ms. Peters, what says the United States?
11              MS. PETERS:  The United States thinks it's great.
12              THE COURT:  Thank you.
13              Ms. Depper?
14              MS. DEPPER:  And, Your Honor, the defense is fine
15    with that instruction, as well.
16              THE COURT:  Very good.  I will give it as planned
17    after Justice Wood, before Mr. Sachar.  If I forget, please
18    nudge me, because I make mistakes, too, of course.
19              A communication from a juror through the court
20    security officer to my CRD that I wanted y'all to know about.
21    I was told this morning.  One of our alternates has asked
22    who's in the courtroom.  Have I got that right, Sherri, on
23    the, how it was phrased?
24              THE COURTROOM DEPUTY:  Pretty much, yes.
25              THE COURT:  Okay.  I'm not sure if that's -- I've
```

1   forgotten who's inside the bar and, you know, who's who, or if

2   it has to do with folks in the gallery or what.

3           Suggestions on what, if anything, on how I respond

4   to that this morning?

5           MS. PETERS:  We do not have any suggestions, Your

6   Honor.

7           THE COURT:  Mr. Hendrix?

8           MR. HENDRIX:  All I can think, Your Honor, is to

9   advise them Sixth Amendment guarantees the defendant the right

10  to a public trial, these are members of the public, whomever

11  they may be.  It's the public.

12          THE COURT:  I like that, and I don't think anybody

13  is -- surely, they remember or know enough about who's at the

14  table.  I think it's probably directed toward who all's out

15  there in the audience, just curious.  I like the -- I'm going

16  to cling to the Sixth Amendment, Mr. Hendrix.  Thank you.

17  Good.

18          Any other ground that we need to cover this morning.

19          Ms. Peters?

20          MS. PETERS:  Your Honor, it's possible that in some

21  of the testimony today terms like "JNOV" or "directed verdict"

22  or "motion for new trial" will come up, and I -- I remember

23  the Court's instruction about let the Court define the legal

24  terms.

25          THE COURT:  Yes.

1          MS. PETERS:  Should I ask, or will the Court

2   interrupt me when it's time?

3          THE COURT:  Thank you for raising this, Ms. Peters,

4   because I am -- as I look down on our witnesses that we might

5   have coming, both for the United States and then the defense,

6   I'm concerned about law talk and what might be there.  I'm

7   inclined to say that we're just going to have to have a bit of

8   jazz here, and a little of it is okay if it -- but please keep

9   it to a minimum.  If you think it's going too far, look to me,

10  and if I think it's going to far I'll interrupt, but I would

11  just ask counsel to stay away as much as possible from having

12  witnesses tell the jury what the law is on X, Y or Z.

13          I would almost say that it's better to come from one

14  of y'all or me than it is from the witness, because I'm

15  supposed to take care of the law, and I've told them that what

16  y'all say is not evidence, and it just -- I'm opposed to the

17  legal expert testimony, and I don't want us to drift into

18  that.  So is that -- how does that strike you, Ms. Peters?

19          MS. PETERS:  That's fine, Your Honor.  Thank you.

20          THE COURT:  Okay.  Mr. Hendrix, will you help me

21  with the jazz?

22          MR. HENDRIX:  That sounds -- it's going to be

23  difficult, because I know Justice Wood has already gotten into

24  some that I'm going to need to address, and I know

25  Mr. Sachar's next, and that's going to . . . we can try to

1  keep it as vague and layperson talk as we can.  Things like,

2  Your Honor, the Code of Judicial Conduct regulates judges, not

3  us.

4          THE COURT:  Yeah, yeah.  And I would be comfortable

5  with, as you question, if you sense the witness going too far,

6  you saying something like, let's stay away from law talk to

7  the extent that we can.  The Judge has admonished us to do

8  that, and I may speak in those terms to our witness, as well.

9  One of the reasons why we're making so much testimony is that

10  counsel, all counsel, are making wise use of leading questions

11  to direct the witnesses and move things along, and I applaud

12  that, and I applaud the lack of objections to it when it's

13  clearly sign-marking and moving things along on matters at the

14  margin.  So, good.

15          So I don't know that I have seen a batting order for

16  today, and I'm curious to know.  I know we've got Justice

17  Wood, finish her.

18          Mr. Harris, you've got a bit more, don't you?

19          MR. HARRIS:  No, sir, I do not.

20          THE COURT:  Did you get done?

21          MR. HARRIS:  I'm through.

22          THE COURT:  Okay.  So we'll move to cross, and then

23  Mr. Sachar?

24          MS. PETERS:  Yes, Your Honor.  After Mr. Sachar will

25  be Michael Maggio.  After Mr. Maggio will be Chris Stewart,

1   and I think the one after that is Jill Barham, but I would be

2   shocked if we got to Jill Barham today.  Pleased, but shocked.

3              THE COURT:  Okay.  Good.  Thank you.  That is

4   helpful.  Good.

5              Ms. Peters, anything else on your list that we need

6   to cover?

7              MS. PETERS:  No, Your Honor, thank you.

8              THE COURT:  Ms. Depper or Mr. Hendrix?

9              MS. DEPPER:  No, Your Honor.  Thank you.

10             THE COURT:  Okay.  Do y'all need -- anyone need a

11  second to step down the hall, or are we ready to go?

12             Good.  Okay.  Ladies and gentlemen in the audience,

13  thanks for maintaining your distance, keeping your mask up

14  over your nose, and spread out.  Let's all stand for our jury.

15             COURTROOM SECURITY OFFICER:  Ladies and gentlemen,

16  your jury.

17        (The jury enters the courtroom.)

18             THE COURT:  Everybody can be seated.  Good morning.

19             Juror number 4, I came up with an extra pillow there

20  if you need one for your back.  I think you've got two in your

21  seat.  That was the point.  I pulled it over last night.

22             A JUROR:  It was kinda tough on me, so I put it

23  back.

24             THE COURT:  Okay.  If you need to stand up, it's

25  fine.

```
 1              A JUROR:  Thank you.

 2              THE COURT:  Just do it.

 3              Everybody doing okay, ladies and gentlemen?

 4              Good.  Good to see you all.

 5              Officer Pike has relayed to my staff that one or

 6    more of you are curious about who's in the courtroom, and, of

 7    course, we have our people inside the bar.

 8              Good morning, Justice Wood.

 9              THE WITNESS:  Good morning.

10              THE COURT:  How are you?

11              THE WITNESS:  Good.

12              THE COURT:  Come on up.

13              THE WITNESS:  I didn't want to interrupt you.

14              THE COURT:  So as I was saying, Officer Pike has

15    related to a member of my staff that one or more of you are

16    curious about who's in the courtroom, and we've got the folks

17    for each side.  I think you know our FBI agents and our

18    lawyers on this side, and then we have a paralegal for the

19    United States, Mr. Bowen, who's been running the machinery.

20    Not sure he was introduced to you before.  And then on the

21    defense side, of course, we've got our lawyers and Mr. Baker

22    and paralegal Fowler.

23              We've had lots of visitors in the audience outside

24    the bar, and they're members of the public.  The Constitution,

25    in particular the Sixth Amendment, requires that there be a
```

Wood - Cross

1   speedy and public trial in all criminal prosecutions.  We

2   don't do things in secret, important things like this.  It's

3   one of the things this -- the public nature of the proceeding

4   is one of the things that keeps us a free people, that anyone

5   can come in the doors of the courthouse and see my colleagues

6   and the lawyers and jurors doing the public's business.

7           So I'm glad that we have open doors and that members

8   of the public are here.

9           All right.  Justice Wood, welcome back.  Even though

10  the night has passed, you're still on your oath.

11          THE WITNESS:  Yes.

12          THE COURT:  And Mr. Harris, no further direct?

13          MR. HARRIS:  That's correct, Your Honor.

14          THE COURT:  All right.  Mr. Hendrix, you may cross.

15          MR. HENDRIX:  Thank you, Your Honor.

16     Rhonda Wood, Government's witness, resumed the stand.

17                    Cross-Examination

18  BY MR. HENDRIX:

19  Q    Justice Wood, good morning.

20  A    Good morning.

21  Q    How are you?

22  A    I'm good.

23  Q    Good.

24          Just a few topics really for us this morning.

25          In the 2013-'14 election cycle, as we established

Wood - Cross

1   yesterday, you were running for the Arkansas Supreme Court,

2   right?

3   A     That's correct.

4   Q     And that is a statewide race?

5   A     Right.

6   Q     You have to campaign all over the state because it,

7   again, is statewide, correct?

8   A     That's correct.

9   Q     Justice -- Judge Maggio then was running for the Arkansas

10  Court of Appeals, right?

11  A     Yes.

12  Q     That is not a statewide race; am I right?

13  A     Right.

14  Q     I think as you described it for the jury yesterday, he

15  ran for the court of appeals from a district that ran from

16  Faulkner County up, sort of encompassing north-central

17  Arkansas?

18  A     Right.

19  Q     And so that was his voter base?

20  A     Right.

21  Q     It's more expensive than to run a campaign for the

22  Arkansas Supreme Court than it is the court of appeals; is

23  that right?

24  A     Yes.

25  Q     And I think you testified that Clint Reed was your

Wood - Cross

1    campaign consultant for the Supreme Court in that election

2    cycle?

3    A    Yes.  Well, as an employee of Impact Management, yes.

4    Q    IMG was actually --

5    A    Right.

6    Q    The company, though, was your campaign consultant?

7    A    Right.  That was who my contract was with, correct.

8    Q    Gotcha.

9         And ultimately you sort of referred IMG, Impact

10   Management Group, to Judge Maggio, as well; is that right?

11   A    Yes, I would say so.

12   Q    And in the previous election cycle you had run for

13   Arkansas Court of Appeals?

14   A    Right.

15   Q    Earlier from 2013-'14 election cycle?

16   A    Correct.

17   Q    And Mr. Reed or IMG had handled that campaign for you, as

18   well?

19   A    Yes.

20   Q    And it was a successful campaign?

21   A    Right.

22   Q    And so there became an idea of how much money it costs to

23   run a successful campaign, one, for Arkansas Supreme Court for

24   you, two, for Arkansas Court of Appeals for Judge Maggio,

25   correct?

Wood - Cross

```
 1   A    Yes.
 2   Q    And generally, tell me if I've got these numbers right,
 3   but I think the advice from the campaign consultants was, run
 4   a successful Supreme Court campaign's gonna cost about
 5   $150,000?
 6   A    I -- I don't know that I can really agree with -- we
 7   really -- the Supreme Court race was sort of unknown.  There
 8   hadn't been an open seat for the Supreme Court in a number of
 9   years.  So that we were really sort of guessing.  I don't
10   think, you know, that that was an initial sort of starting
11   figure, knowing that if it was, you know, eventually go a lot
12   higher.  So, you know, I would say that I guess I'm not so
13   certain that that was really where we were.
14   Q    I think maybe best said, 150,000 was an initial goal?
15   A    Right.
16   Q    And so for Judge Maggio -- and I think that's pretty much
17   what you were able to raise in that election cycle.  I think
18   it was $154,900?
19   A    We did.  I mean, we -- there was a point we just stopped
20   trying to raise money, right.
21   Q    And so Judge Maggio would not need to raise that much
22   money, right?
23   A    No, not in the court of appeals race.
24   Q    And so using your prior run for the Arkansas Court of
25   Appeals, like Judge Maggio, there was that idea, I think you
```

Wood - Cross

1   probably raised about a hundred thousand dollars for your

2   successful court of appeals campaign, correct?

3   A     I believe that's correct, yes.

4   Q     And so the notion was roundabout figures, everybody, 150

5   for a successful Supreme Court campaign, a hundred thousand

6   for a successful court of appeals campaign; is that fair?

7   A     I think the second prong of that was -- that was fair.

8   Q     Thank you.

9   A     I don't know that I recall the 150 goal.

10  Q     Okay.  When you ran for court of appeals, basically the

11  idea was a hundred thousand dollars was what you needed for a

12  successful court of appeals campaign?

13  A     Correct.

14  Q     And so that was the idea for Judge Maggio, you're

15  probably going to need a hundred thousand dollars to run the

16  successful court of appeals campaign based on Justice Wood's

17  prior campaign for the court of appeals?

18  A     Right.

19  Q     Prior to -- let me go back.  You're presently an

20  associate justice with the Arkansas Supreme Court?

21  A     Right.

22  Q     Since 2000 -- I guess your first day in office would have

23  been January 1st, 2015?

24  A     Correct.

25  Q     Elected in May of 2014?

Wood - Cross

```
 1   A     Correct.

 2   Q     Before that, Arkansas Court of Appeals?

 3   A     Right.

 4   Q     And for how many terms?

 5   A     At the court of appeals?

 6   Q     Yes, ma'am.

 7   A     I was elected for one term, but I only served two years

 8   because of being elected to the Arkansas Supreme Court.

 9   Q     Understood.  Before that, then you were a trial judge,

10   which we call a circuit judge in Arkansas?

11   A     Right.

12   Q     And that was in Faulkner County.

13   A     Correct.

14             THE COURT:  If you'll slow down, Mr. Hendrix.

15   BY MR. HENDRIX:

16   Q     How long were you a trial judge, a circuit court judge?

17   A     Six years.

18   Q     And did I understand from your direct testimony that the

19   majority of that work that you were doing was as a juvenile

20   judge?

21   A     Juvenile and civil.

22   Q     And could you give us an idea of the split, how much

23   juvenile, how much civil?

24   A     So I think as far as the docket, it's difficult.  You

25   know, the juvenile took more time, but caseload, civil, the
```

Wood - Cross

1   numbers kinda run through a lot faster.  A lot of them don't

2   go to jury trial, for instance, and so it was probably, you

3   know, 60/40.  It's just juvenile encompassed probably

4   80 percent of my time actually on the bench.

5   Q    So the civil aspect, the civil cases were approximately

6   40 percent of your caseload --

7   A    Right.

8   Q    -- during those six years?

9        And did you have civil jury trials?

10  A    I did.

11  Q    Do you have an -- can you give us a ballpark of how many

12  civil jury trials you had?

13  A    Less than 15.

14  Q    Less than 15.  So the potential for a remittitur motion

15  was reduced because if you only had 15 civil jury

16  trials . . .

17  A    That's correct, yes.

18  Q    And you probably, with only 15 civil jury trials,

19  probably never had a motion for remittitur; is that correct?

20  A    I don't recall ever having one.

21  Q    All right.  Let's talk about the checks that the

22  government showed you yesterday.  And so to reestablish, we

23  know these facts now, Madam Justice, that Michael Morton wrote

24  checks to your campaign directly on July 8th, 2013, correct?

25  A    Right.

Wood - Cross

```
1   Q    You had a fundraiser, I think it was the day or the day
2   after the quote-unquote judicial window opened, which would
3   have been November 1st or November 22nd, 2013; is that right?
4   A    That's correct.
5   Q    Your dad I think was your campaign treasurer, right?
6   A    That's right.
7   Q    And so I think Mr. Baker or someone handed I guess your
8   dad the 24 $2,000 checks made out from Mike Morton and his
9   companies; is that right?
10  A    Right.  I think there was a collection there for everyone
11  that attended the event, sort of basket or something that they
12  put checks in if they wanted to contribute, and my
13  understanding is an envelope, those checks were placed in that
14  basket.
15  Q    And you probably didn't see the checks at that time.
16  A    Right.  He collected all the checks from that event.
17  Q    It was later during the course of this case, then, that
18  you saw the checks and saw that the date had been changed?
19  A    That's right.
20  Q    And I think it's just sort of scratched out and
21  November 21st written in.  Is that fair?
22  A    I believe that's what it looks like.
23  Q    Okay.  Briefly about the Code of Judicial Conduct, this
24  180-day judicial window, the Code of Judicial Conduct
25  regulates the conduct of judges and judicial candidates,
```

Wood - Cross

1    correct?

2    A    That's right.

3    Q    And imposes on the judge an obligation to inform the

4    judge's campaign committee, here are the rules, follow these

5    rules, right?

6    A    That's right.

7    Q    Now, the Code of Judicial Conduct does not -- and I'm not

8    a judge and probably won't be a judicial candidate, but it

9    doesn't regulate my conduct as a private citizen, correct?

10   A    Right.  It only applies to judges and judicial

11   candidates.

12   Q    So there wouldn't be any problem -- we have another

13   election cycle coming up.

14   A    Correct.

15   Q    And you've recently announced for your reelection; am I

16   correct?

17   A    That's correct.

18   Q    Good luck, and congratulations.

19            I'm not on your campaign committee, right?

20   A    No.

21   Q    There's no problem, in your estimation, if I go out

22   tonight and try to raise a hundred thousand dollars for you

23   without any of your participation, right?  I'm free to do that

24   as a private citizen in this country?

25            THE COURT:  Counsel, could we talk at the side?

Wood - Cross

```
1              Justice Wood, hold that thought.

2              THE WITNESS:  Thank you.

3         (The following proceedings were held at sidebar:)

4              THE COURT:  Mr. Hendrix --

5              MR. HENDRIX:  Too much?

6              THE COURT:  You've just asked the judge to give a

7    legal opinion.

8              MR. HENDRIX:  Too much.

9              THE COURT:  Yes.

10             MR. HENDRIX:  Okay.

11             THE COURT:  Yes.

12             MR. HENDRIX:  Okay.

13             THE COURT:  Counsel, do not solicit legal opinions

14   from the witnesses.  Okay?

15             MR. HENDRIX:  Okay.

16             THE COURT:  All right.

17             You move on.  Just pretend that question wasn't

18   answered and move on.

19             MR. HENDRIX:  I'll do the next topic.

20             THE COURT:  Thank you.

21        (Sidebar conference concluded.)

22             THE COURT:  Mr. Hendrix.

23             MR. HENDRIX:  Thank you, Judge.

24   BY MR. HENDRIX:

25   Q    The checks were dated July 8th, which would have been
```

Wood - Cross

1    outside the window.

2    A    Right.

3    Q    They were postdated to November 21st, within the window,

4    correct?

5    A    Right.

6    Q    Had they remained July 8th, 2013, that could have raised

7    questions?

8    A    Yes.

9    Q    It was sort of beneficial -- well, let me put it this

10   way.  The date that you received the checks was November 21st,

11   2013, or your campaign did?

12   A    Or I think maybe the 22nd.

13   Q    Or November 22nd.

14   A    Right.

15   Q    Correct?  And so the change date on the checks reflected

16   the date your campaign actually received the checks?

17   A    Yes.  And bear with me, I don't recall whether the change

18   date was the 21st or the 22nd, but we received them at the

19   appropriate time.

20   Q    Right.  And that date on the checks has changed from

21   July, reflected the truth, which was these are the dates your

22   campaign received the checks.

23   A    Right.

24        MR. HENDRIX:  Okay.  May I approach just for a

25   minute?  I just want to refresh the Justice's recollection.

Wood - Cross

```
 1              THE COURT:  Certainly.

 2              THE WITNESS:  Okay.  Okay.  Okay.

 3              MR. HARRIS:  May I ask what it is?

 4   BY MR. HENDRIX:

 5   Q    The campaign after -- I guess it's actually before --

 6   before and after the election, if I got my dates right, the

 7   campaign paid 101010 Consulting; is that right?

 8   A    That's correct.

 9   Q    Let's talk about Mike Maggio for a second.  I was curious

10   about this in your direct testimony yesterday.  You said that

11   you had sort of encouraged Maggio to run for the court of

12   appeals slot?

13   A    That's probably a little bit of a -- I guess in the sense

14   that when he asked, I thought he would be more successful

15   there than in his running for circuit seat.

16   Q    That was the comment I was interested in, Justice.

17   A    Right.

18   Q    You thought he'd have more success in the campaign for

19   the court of appeals than getting reelected for the position

20   that he held?

21   A    Yes.

22   Q    Why is that?

23   A    He had been through a divorce, and it was pretty well

24   known in that small community, and he had run every race very

25   contested in the local community and had very close elections,
```

Wood - Cross

```
 1   by sometimes winning by 40 points -- 40 votes; very close.
 2   But when you expand to a larger 18-county, and there was, you
 3   know, little chance of someone running against him, in that
 4   18-county race a divorce really has less of an impact than it
 5   does in a really small community, and it was less likely to
 6   have an opponent than in the little small circuit race.  So
 7   that was just sort of a political assessment, that I really
 8   believe that.  It sounds strange, I understand that, to the
 9   layperson.
10   Q    Well, no, I think it does make sense, because another
11   part of your direct examination was sort of talking about
12   Maggio as a person, and I think you described him as everybody
13   kinda has that friend in life, talk, talk, talk, you just
14   smile back.
15   A    Right.
16   Q    I think Mr. Harris had said, asked you gregarious, and
17   you went, that's kind of kind, right?  Is that fair enough?
18   A    That's -- yeah, that's what I said.
19   Q    Lots of talk out of Mike Maggio, right?  Lots of texting.
20   And money during the campaign seemed to be a constant concern,
21   is that fair to say?
22   A    I believe so.
23   Q    Having read hundreds and hundreds of texts, tell me if
24   this is a fair characterization:  A worrier?
25   A    Yes.
```

Wood - Cross

1  Q    I think he termed himself a Nervous Nellie?

2  A    Yes.

3  Q    That money was always an issue for the campaign,

4  sometimes he couldn't sleep at night?

5  A    I don't know that I would know whether he slept at night.

6  Q    Would that be a fair assessment of how -- what was going

7  on in his life at the time, how he was reacting at the time?

8  A    I think the fair assessment was as you described, that he

9  was just a worrier and very nervous in general, just

10  unsettled.

11  Q    One more just final topic from your direct testimony.  As

12  I understood you to say, that you were aware during this time

13  that Mr. Baker was helping your campaign, Mr. Baker was

14  helping Maggio's campaign, that Mr. Baker was also helping

15  Governor Hutchinson's campaign; is that correct?

16  A    That's correct.

17  Q    Senator Tom Cotton's campaign?

18  A    Yes.

19  Q    Which I guess was a Lieutenant General Tim Griffin at the

20  time?

21  A    Yes, I believe so.

22  Q    And I forgot, there was one other candidate that you're

23  aware of that Mr. Baker was helping.  I forgot who it was, but

24  it was Leslie Rutledge or . . .

25  A    I don't recall saying her or knowing that.

Wood - Redirect

```
 1   Q    I think your final comment was basically if it was a
 2   candidate, I'm not putting words on your -- fair warning, I'm
 3   putting words in your mouth, Justice, particularly a
 4   Republican candidate, Gilbert Baker was involved in helping
 5   raise funds?
 6   A    Most well known in constitutional law or the State
 7   offices in the state, he was helping them.
 8   Q    Understood.
 9           MR. HENDRIX:  May I consult?
10           THE COURT:  Of course.
11           MR. HENDRIX:  Justice Wood, thank you so much.
12           I'll pass, Your Honor.
13           THE COURT:  Thank you, Mr. Hendrix.
14           Mr. Harris?
15           MR. HARRIS:  Yes, sir.
16                    Redirect Examination
17   BY MR. HARRIS:
18   Q    Justice Wood, am I correct that -- am I correct that you
19   asked Gilbert Baker to help you fundraise in 2013 for the 2014
20   election?
21   A    I did; that's correct.
22   Q    And did you talk to Mike Maggio about that and then, and
23   he asked Baker, or how did that evolve, do you know?
24   A    Yes.  I mean, generally -- excuse me.  I'm sorry.  I have
25   asthma and my throat gets really dry.
```

Wood - Redirect

```
 1              Yes, so I did ask Gilbert Baker to fundraise, and
 2   I'm trying to remember, you asked two questions there at the
 3   end.
 4   Q    I do that a lot.
 5   A    I know you do.  I realize that.
 6              I believe that Mike Maggio knew that, and then he
 7   subsequently, I believe, asked Gilbert Baker to help, as well.
 8   Q    Okay.  And did you talk to Gilbert Baker about the fact
 9   that he was helping Mike Maggio?
10   A    Yes.  I mean, certainly, you know, he mentioned that, and
11   I knew that, and certainly.
12   Q    And then I think the first question Mr. Hendrix asked you
13   was you referred Mr. Maggio to Clint Reed or to Impact
14   Management?
15   A    Again, I don't recall referring him to them.  I think
16   they generally knew each other, and I think he just generally
17   wanted to use the people that I was using that I had been
18   successful with.
19   Q    Okay.  I wrote down that you said, "I referred Clint Reed
20   to Maggio."  I may have written it down wrong.  But he knew
21   you were using Clint Reed?
22   A    Certainly, yes.
23   Q    And you talked to him about Clint Reed?
24   A    Yes, because I had all the faith and confidence in him.
25   Q    And you talked about how good Clint was?
```

Wood - Redirect

1    A    Absolutely.

2    Q    Had a reputation?

3    A    Yes.

4    Q    And so Mr. Maggio, or Judge Maggio hired Clint Reed?

5    A    Again, I assume he probably hired Impact Management, the

6    group, yes.

7    Q    You're right.  But Clint Reed was the main man he was

8    working with, as he was with you; am I correct?

9    A    I believe so, yes.

10   Q    And then yesterday I think you talked about you remember

11   one meeting with Clint Reed and Mike Maggio or Gilbert Baker

12   or some variation on that?

13   A    Yes.  So certainly, yes.  Went to lunch with different

14   people.  I obviously went to lunch with my team, and

15   certainly, you know, there were times that, just because we

16   were all friends, went to lunch with Gilbert Baker and Mike

17   Maggio.  I don't remember all of us going to lunch, but, yes,

18   certainly, that's conceivable.

19   Q    I mean, you were a successful candidate.

20   A    Yes.

21   Q    Larger than Faulkner, larger than the 20th Judicial

22   District?

23   A    Yes.

24   Q    And Judge Maggio knew that and --

25   A    Certainly, yes.

Wood - Redirect

1   Q    And I think yesterday you said you thought Maggio needed

2   60 to 70, and today it's a hundred.  Somewhere in that

3   neighborhood is probably right.

4   A    I don't believe I said 60 to 70 yesterday.

5   Q    I may have written it down wrong.

6         You said -- Mr. Hendrix was talking about Judge

7   Maggio, you said that he talked to you about wanting to run

8   for the court of appeals and you encouraged him to run.

9   A    Again, I think that I've probably cleared that up, but I

10  said that, yes, I believe he would be more successful in a

11  court of appeals race than a circuit race.  So to that extent,

12  yes, I encouraged him.

13  Q    Okay.

14  A    That would be the best --

15  Q    I beg your pardon?

16  A    That that would be, you know, his best option if he

17  wanted to continue serving.

18  Q    Okay.  And is that because you didn't think he could win

19  a reelection as a circuit judge in the 20th Judicial District?

20  A    I thought it would be difficult.

21  Q    Okay.  He had always had opponents before, hadn't he?

22  A    Right.

23  Q    He had always won before?

24  A    Yes.  Close.

25  Q    Pardon me?

Wood - Redirect

```
 1   A     Very close.
 2   Q     A close win's still a W, isn't it?
 3   A     It is.
 4   Q     And you talked about with a larger audience, the fact
 5   that he had a divorce and the fact that -- well, I guess that
 6   was the reason that he might be more successful in a larger
 7   audience than a smaller audience, is that fair?
 8   A     Yes.
 9   Q     And you mentioned that Mr. Baker helped other people,
10   Governor Hutchinson, Senator Cotton, fundraise?
11   A     That's right.
12   Q     Was Senator Cotton running in 2014 for election?
13   A     I don't recall whether he was on the ballot at that time
14   specifically.
15   Q     What about Governor Hutchinson?
16   A     He was elect -- yes, he would have been, because he took
17   office in January '15 when I took office.
18   Q     Because I know they're all staggered.
19   A     Yes.
20   Q     It's hard to remember who was running when.
21   A     But, yes, he took office when I did.
22   Q     Okay.  And then Mr. Hendrix asked you if you were aware
23   that money was a concern for Mike Maggio in the run for court
24   of appeals?
25   A     Right.
```

Wood - Recross

```
1    Q    And you said, yes, I believe?

2    A    Yes, that's correct.

3    Q    And how did you know that?

4    A    Because I do recall him, you know, in his frequent, you

5    know, texts, that generally that was one of his, you know,

6    subject matters that he was always, you know, about raising

7    money and worried about it.

8    Q    Uh-huh.  And do you know whether he was talking to

9    Mr. Baker about that?

10   A    Do I know when?

11   Q    No, whether he was talking to Mr. Baker about that.

12   A    I would assume so, yes, because he had -- was using him

13   to raise money, so, yes.

14   Q    Did you ever talk to Mr. Baker about Judge Maggio's

15   campaign?

16   A    Yes.

17   Q    Okay.  And did Mr. Baker mention that he was raising

18   money for Judge Maggio, or not?

19   A    Yes.

20        MR. HARRIS:  Okay.  That's all I have.  Thank you,

21   ma'am.

22        Thank you, Your Honor.

23        THE COURT:  Thank you, Mr. Harris.

24        Mr. Hendrix?

25                      Recross-Examination
```

Wood - Recross

```
1    BY MR. HENDRIX:

2    Q    Justice, two final areas.  We're always careful to say

3    not just two more questions, two more areas.

4              Michael Morton's contributed to your campaigns.

5    Several of them, right?

6    A    Yes, that's correct.

7    Q    And you have had cases of Morton's pending in front of

8    you, correct?

9    A    Yes.

10   Q    And it was not appropriate to have to get off those

11   cases?

12   A    I did -- I had a standing order, I recused off his cases

13   from 2000' -- from the time I started at the court of appeals,

14   2015, I believe, all the way 'til 2017, maybe, 2017 that I had

15   a standing recusal order.  I waited until three years after he

16   had last contributed before I sat on any of his cases.

17             And then when this started, I recused again.  So I

18   think that maybe I entered one decision maybe in a workers'

19   comp case involving a nursing home, but other than that.

20             So during, of course, the period of campaign

21   contributions, I had a standing recusal order.

22   Q    Understood.  I am curious to know if you know this and

23   your reaction to it, but are you aware that during the course

24   of the multiple interviews that Maggio had with the United

25   States Government prosecution team, that he tried to implicate
```

Wood - Further Redirect

```
 1    you in this alleged bribery scheme?
 2    A    No, I did not know that.  It doesn't surprise me, knowing
 3    what I know now about him.
 4    Q    And that was my question.  That's going to come up in
 5    evidence.  What's your reaction to it?
 6    A    Knowing what I know about him now --
 7              MR. HARRIS:  Judge, I object.
 8              THE COURT:  Sustained.  You could call her back, I
 9    think, but let's wait and see what Maggio says about it.
10              MR. HENDRIX:  Understood, Your Honor.
11              Justice, thank you.
12              THE COURT:  Mr. Harris, anything else?
13              MR. HARRIS:  Can I ask one follow-up question to his
14    recross?
15              THE COURT:  You may.
16                    Further Redirect Examination
17    BY MR. HARRIS:
18    Q    Justice Wood, Mr. Hendrix asked you about a recusal in
19    the Morton case, in a case involving Morton.  I know that when
20    you were a trial judge in Faulkner County he called you up and
21    you hung up on him.  Did you recuse from that case?
22    A    I did.
23              MR. HARRIS:  That's all I have, Your Honor.
24              THE COURT:  Thank you.
25              So I was about to ask if Justice Wood could be
```

```
 1    excused, but given my prior ruling, she needs to probably

 2    remain under subpoena; is that right, Mr. Hendrix?

 3              MR. HENDRIX:  With my apologies, but, yes.

 4              THE COURT:  Okay.  Well, and mine, too.  I thought

 5    we could get everything done, but it would be best if there's

 6    testimony about that to come later.

 7              Justice Wood, thank you, and if you will not talk

 8    with anyone about your testimony, and we'll let you know as

 9    soon as we can about whether we need you to return.

10              THE WITNESS:  Judge, if it's appropriate, if I may?

11              THE COURT:  You want to talk to me about that?

12              THE WITNESS:  Yes.

13              THE COURT:  We'll have a break in a little bit.  May

14    I impose on you to wait until then, and then we'll visit?

15              THE WITNESS:  Okay.  Thank you.

16              THE COURT:  Okay.  You're welcome.

17              Ms. Peters or Mr. Hendrix, who's next?

18              MS. PETERS:  David Sachar.

19              THE COURT:  Okay.  Good morning, Mr. Sachar.

20              THE WITNESS:  Good morning, Your Honor.

21              THE COURT:  How are you?

22              THE WITNESS:  I'm fine.

23              THE COURT:  Good.  I need to give you the oath.

24         David J. Sachar, Government's witness, sworn.

25              THE COURT:  Good.  Please sit down.  You can keep
```

1    your mask off while you're testifying, and cozy up to the

2    microphone, please.

3              Ms. Peters.

4              MS. PETERS:  Thank you, Your Honor.

5              MR. HENDRIX:  Your Honor and Ms. Peters, I'm so

6    sorry for interrupting, but is now the appropriate time for

7    the instruction?

8              THE COURT:  Thank you for reminding me.

9              MS. PETERS:  Your Honor, should we excuse the

10   witness for the instruction, or . . .

11             THE COURT:  I think so, yes.  And maybe after I give

12   it we also take a short break and deal with our other witness

13   issue.

14             Mr. Sachar, I'm sorry.  If you'll step out.

15             Ladies and gentlemen of the jury, I know you

16   remember from the beginning of the case where I told you that

17   there might be limiting instructions that I give you along the

18   way.  Here's one of those limiting instructions:

19             You've heard, and I anticipate that you will hear, a

20   lot of testimony about this 180-day rule about contributions

21   to judge candidates, and PAC forms, and reporting

22   requirements, and other campaign finance rules.  Gilbert Baker

23   is on trial only for the federal crimes charged in the

24   indictment.  You'll remember those three:  Conspiracy, bribery

25   and honest services wire fraud.

1          He is not on trial for any campaign finance

2     violations under federal or state law, and you may not find

3     him guilty of any of the crimes charged solely because you

4     believe that he may have violated one or more campaign finance

5     rules.  Instead, you may consider these matters of campaign

6     finance and the Arkansas rules as background, context as you

7     decide whether he's guilty or innocent of each of the crimes

8     charged in the indictment.  It's up to you to determine what

9     weight, if any, to give this background evidence.

10          If you understand my limiting instruction about this

11     evidence dealing with campaign finance, please raise your

12     hand.  I see hands from all 12 of our jurors and the two

13     alternates.  Thank you.

14          Now, as you picked up, ladies and gentlemen, I have

15     an issue to deal with with Justice Wood remaining under

16     subpoena, and I need to deal with that so that she can move on

17     and we can, too.  I don't think it will take very long, and so

18     what I'd ask is that we just take a break in place.  Ms. Black

19     will turn on the white noise, you can stand up, visit about

20     the weather, ask about the Razorbacks or talk about a

21     grandchild or a child, but nothing else.  So bear with us.

22          Officer Simpson, would you ask Justice Wood to come

23     back in and join us at sidebar over here.

24          Counsel.

25     (The following proceedings were held at sidebar:)

```
 1              THE COURT:  Mr. Hendrix, first, thank you for
 2   reminding me on the instruction, the limiting instructions.
 3   Everybody okay with how that went?
 4              MS. DEPPER:  Yes, Your Honor.
 5              THE COURT:  Good.
 6              Justice Wood, what's up on the schedule?
 7              THE WITNESS:  I apologize.
 8              THE COURT:  Whisper, please.
 9              THE WITNESS:  And I will try, I notified the U.S.
10   Attorney's Office of this.  I have a major surgery scheduled
11   on August 9th.  I think they are quarantining me on the 5th
12   following a COVID test August 5th.  So I'm available for
13   re-call until August 5th, but I'd certainly like to get it
14   done before the term, and I actually scheduled the surgery on
15   this trial date.
16              THE COURT:  We won't interfere with your surgery,
17   and we'll get you in and out before the 5th.
18              MR. HENDRIX:  Justice, I don't think that's going to
19   be important.  Go about your business.  I'm not going to worry
20   you any longer.  Okay?
21              THE WITNESS:  Like I said, I'm free.  I didn't want
22   you to wait 'til then.
23              THE COURT:  Sure.
24              MR. HENDRIX:  You know where I stand today.  I'm
25   telling her she understood where I was going with that
```

Sachar - Direct

```
 1   examination; the reaction's fine.  I'm voting for the defense

 2   is not going to call Justice Wood back.

 3            You're released from your subpoena.

 4            THE WITNESS:  Okay.

 5            MR. HARRIS:  Good to me.

 6            THE COURT:  Okay.  Then I think you're released.

 7            THE WITNESS:  Okay.  Thank you.

 8            THE COURT:  And we all wish you the best in the

 9   surgery and getting through that.

10            THE WITNESS:  Okay.  Good luck.  Appreciate your

11   time.

12       (Sidebar conference concluded.)

13            THE COURT:  Thank you for your patience, ladies and

14   gentlemen.

15            We'll take Mr. Sachar, please.

16            Thanks for bearing with us, Mr. Sachar.

17            THE WITNESS:  No problem.  Thank you, Your Honor.

18            THE COURT:  Ms. Peters.

19            MS. PETERS:  Thank you, Your Honor.

20                      Direct Examination

21   BY MS. PETERS:

22   Q    Would you please state your name.

23   A    My name is David J. Sachar, and it's S-a-c-h-a-r for the

24   record.

25   Q    Mr. Sachar, where do you work?
```

Sachar - Direct

1  A    I'm the executive director of the Arkansas Judicial

2  Discipline and Disability Commission.

3  Q    How long have you been the executive director there?

4  A    I've been the executive director there since the

5  beginning of 2013.  Previously I was the deputy executive

6  director starting, like, I think August of '07.

7  Q    And you're an attorney?

8  A    Yes, ma'am.

9  Q    What is the Judicial Discipline and Disability

10  Commission?

11  A    The JDDC is a judicial conduct commission.  Every state

12  has one.  Basically the best way to describe it would be like

13  internal affairs for the judiciary.  We regulate judicial

14  conduct based on a code of conduct that they have, a code of

15  ethics called the Code of Judicial Conduct.

16  Q    So there are special rules of conduct applicable to

17  judges?

18  A    That's true.  We also have authority over candidates for

19  judicial office.

20           THE COURT:  State judges and state candidates,

21  right, Mr. Sachar?

22           THE WITNESS:  That's correct, Your Honor.  I'm sure

23  I'll get to the creation and how we're created by Arkansas

24  Constitution.  If I do get a complaint against a federal

25  judge, we dismiss it outright and I send it over here to the

Sachar - Direct

 1 judges.

 2 BY MS. PETERS:

 3 Q    What are the four canons under your -- under the code of

 4 conduct, your jurisdiction?

 5 A    Okay.  Basically, they break up the code into four

 6 different sections, and so they're called canons, and there's

 7 rules under each one of them.

 8          And canon 1 we call like the do-right rule, which is

 9 follow the law, always uphold the integrity of the judiciary,

10 don't let the judicial position be used for public gain.

11          Number 2 is going to be on-bench behavior.  Our

12 judges, were they rude?  Did they delay and not get their job

13 done?  Did they talk to one side and not the other, what we

14 call ex parte communication?  Should they have recused off of

15 a case?  Is it a case that they were too close to someone

16 involved?  All of those things would be under canon 2.

17          Canon 3 would be off-bench behavior.  And while

18 we're not the morality police, we do regulate the private

19 behavior of judges, particularly when it comes to stuff like

20 businesses that they're in.  Can they be on the board of a

21 civic organization?  What about testifying in front of the

22 legislature?  All these things that they might do in their

23 private life, including, of course, not violating the law in

24 their private life.

25          And then canon 4 is the political one.  All of these

Sachar - Direct

1 canons are based on a model that kind of comes from the

2 American Bar Association, and every state has very similar

3 codes.  Canon 4 probably differs the most state to state,

4 because not -- only half the states elect their appellate

5 officers.

6 Q And --

7 A So, go ahead.

8 Q Mr. Sachar, if I could just maybe narrow down your answer

9 a little bit about canon 4.

10 A Okay.

11 Q So it is regulating their political conduct?

12 A Correct.

13 Q And specifically what about their political conduct,

14 fundraising?

15 A Yes, fundraising would be part of it.  Also, can they

16 endorse people, things like that.

17 Q And the JDDC investigates and prosecutes complaints

18 against state court judges?

19 A Correct.

20 Q How about candidates?

21 A Candidates, as well.

22 Q Who can make these complaints?

23 A Anybody can.  We -- as a matter of fact, we were the

24 first state in the nation to do online complaint filing by

25 about 10 years, and so you could get online, we accept

Sachar - Direct

1    anonymous complaints.  I can file a complaint as executive

2    director should I see something in the paper or be told

3    something on my own.  And we do that fairly often.

4    Q    And very briefly, would you explain what happens when you

5    get a complaint?

6    A    Briefly, it goes through a screening process to make sure

7    that we have jurisdiction.  So if it's against a federal

8    judge, or if it just says, I don't like the result of the

9    trial, we don't have jurisdiction over issues that would

10   normally be appealed.  Then it goes to a panel.  A panel

11   investigates it and decides whether or not they want to go

12   forward.  And then if they do and they find probable cause, it

13   would go to a trial, open trial in front of nine members of

14   the JDDC.

15   Q    And the JDDC itself, what are your options if you find

16   that there is a violation?

17   A    The range of sanctions obviously could start with

18   dismissal, if it wasn't founded, from a, what we would call an

19   informal adjustment, which sounds chiropractic, but it really

20   means you didn't really break the rules, but we want to remind

21   you, all the way up to a admonishment, reprimand, censure, and

22   those can include, like, things the judge has to do, as well

23   as just the declaration, suspension without pay, and then

24   removal.

25             Both of those must be affirmed by the Arkansas

Sachar - Direct

1    Supreme Court, though.  We just recommend those to the Supreme

2    Court.

3    Q     So you have no criminal authority; is that correct?

4    A     No, our rules allow us to turn over information to

5    criminal authorities, even information that would normally be

6    confidential, but we don't have authority to investigate

7    crimes.

8    Q     Okay.  Can judges just call you for advice?

9    A     Yes, and they do quite often.

10   Q     About how often do judges call you for advice?

11   A     Many times a week.  It's -- while I've been here I've had

12   calls in the last day or so, and I would say during election

13   season it's maybe once a day.

14   Q     Do you also have a staff that can help answer questions?

15   A     I do.  My deputy director, she also has her cellphone out

16   there, and the judges that want information on can they do

17   certain things or should they do certain things call her

18   probably as often as me.

19   Q     Do you do any trainings on the judicial code of conduct?

20   A     Yes, I would say in a normal year we're doing at least,

21   you know, eight to 12, and we've done up to 24 in a year,

22   because it's a continuing legal education hour for people.

23   And we do new judges, new district court judges, new circuit

24   court judges every time they're elected to kind of give them

25   an update on what they should be aware of.

Sachar - Direct

1  Q     Now, we've talked here in this trial about how in

2  Arkansas we elect judges, and that's not the case in every

3  state; is that right?

4  A     Correct.

5  Q     Some judges, some states appoint their judges?

6  A     Again, about half, less than half elect their supreme or

7  appellate court judges.

8  Q     Elections in Arkansas are nonpartisan; is that right?

9  A     Correct, by constitutional amendment.

10  Q     So judges don't run as a Republican or a Democrat?

11  A     That's correct.

12  Q     Or other?

13  A     Or other.

14  Q     How does canon 4 -- what are the safeguards in canon 4 to

15  make sure that the judges can comply with the rules in their

16  elections?

17  A     Well, judicial elections are supposed to be different.

18  We expect a different behavior from our judges than we do from

19  partisan politicians.  We expect that they will be fair, they

20  won't be running on a platform of, here's promising I'm going

21  to make rulings in cases a certain way, but just that they'll

22  hear the law and make a decision.

23         Some of those safeguards are that we shorten the

24  election period.  You can't officially announce for judicial

25  office until 365 days before the election, and you can't raise

Sachar - Direct

1    money until 180 days before the election, and you can't retire

2    your debt -- you must retire your debt in a shorter period of

3    time, 45 days after the election.  That's one of the

4    safeguards.

5    Q    Are judges responsible -- now, let me just get straight

6    to this.  You, your commission regulates the conduct of

7    judges, yes?

8    A    Correct.

9    Q    And judicial candidates?

10   A    Correct.

11   Q    It does not regulate the conduct of just your average

12   citizen?

13   A    No.

14   Q    But are judges responsible for supervising the people

15   working for them and ensuring that they comply with what the

16   judge is supposed to comply with?

17   A    Yes.

18            THE COURT:  Ms. Peters, I'd like to talk with

19   counsel.

20            MS. PETERS:  Yes, Your Honor.

21            THE COURT:  Give us a minute, ladies and gentlemen.

22            Mr. Sachar, hold on.

23       (The following proceedings were held at sidebar:)

24            THE COURT:  I didn't let Mr. Hendrix ask the other

25   side of this question.  I don't see how I can let you ask this

Sachar - Direct

1   side of it, Ms. Peters.

2          MS. PETERS:  Your Honor, I think it's a different

3   question I'm asking, and if I could try to explain.

4          Mr. Hendrix has made several references in

5   questioning, questions and the opening, that Mr. Baker,

6   because he was not a -- I think a member of her committee or,

7   you know, not a judge, he could just go out and start

8   fundraising for her, and I just want to make clear that judges

9   are supposed to make sure that people who agree to work for

10  them don't violate the rules.  That's my question, if I could

11  ask it.

12         THE COURT:  Mr. Hendrix?

13         MR. HENDRIX:  So Mr. Sachar and I used to be on

14  JDDC, and David and I have had a discussion about his

15  testimony, and I -- this opens up an entire can of worms.

16         For instance, an issue we talked about, how do you

17  know when someone is a member of a campaign committee?  Well,

18  Blake, it has to do with the definition of agency.  We can

19  look in Black's Law dictionary and determine what agency

20  means.

21         What about not regulating private citizens' conduct?

22  Do I violate the code without the judge's knowledge if I go

23  today and solicit a bunch of money and raise it and hold on to

24  it and give it during the period?  And he's like, well, best

25  practice is you return it, but it's -- I don't have an

Sachar - Direct

1   opinion, Blake, it's not whether it violates the code whether

2   you can hang on to it or not, and we're going down a road that

3   is just as murky as it can be.

4           MS. PETERS:  My conversation with Mr. Sachar led to

5   slightly different statements.  In essence, what he said is a

6   candidate cannot evade the fundraising rules by saying, I'd

7   like you to fundraise for me, but you're in the part of my

8   committee, and I think that the defense is giving the

9   impression that it is okay for somebody to -- it would be fine

10  for a judge, a judge would not have an issue if a private

11  citizen went out and started a campaign and fundraising for

12  them, and that's just not the way it works and not the law.

13          If a judge found that out, they would need to tell

14  that person to stop, especially if that person were asked by

15  them to fundraise.

16          And then in terms of the other statement that

17  Mr. Hendrix made, I think it's -- I was planning to ask

18  Mr. Sachar if a judicial candidate receives a check that comes

19  in before the 180-day limit, what should they do with the

20  check, and the answer is, send it back.  And I think that

21  that's well within the factual basis that's been established

22  here and also the argument that counsel is making during

23  questions.

24          MR. HENDRIX:  I can have that same conversation, and

25  did have it with David, and he went, I don't have an

Sachar - Direct

1    opinion -- it's best practice, but I don't have an opinion.

2    We can go --

3              THE COURT:  I understand the issues here, counsel,

4    and I appreciate your argument.

5              This door is going to swing both ways.  Just as I

6    didn't let Mr. Hendrix ask Justice Wood for her legal opinion,

7    I'm not going to let you ask Mr. Sachar for his legal opinion

8    and get into this issue of what the judicial candidate's duty

9    is of diligence and oversight.  We're not going to do that.

10             We have Justice Wood's testimony about, well, I

11   would have turned the check back that Mr. Harris got.  You can

12   ask Mr. Sachar that question, what should a candidate do, but

13   as I have tried to emphasize, and I'm trying to now, my

14   direction to counsel is to stop asking witnesses for opinions

15   about the law, especially on issues of law that aren't at the

16   core of our case.

17             MS. PETERS:  May I ask for guidance, then, Your

18   Honor?  May I ask for some guidance, then?

19             THE COURT:  Sure.

20             MS. PETERS:  In my direct examination, one of the

21   things I bring up is ex parte communications, because that is

22   something that is regulated by the Commission and under the

23   judicial canons, and that's relevant to this case.  And I

24   don't want to run afoul of what the Court is saying.

25             At the same time, I would like for the jury to

Sachar - Direct

1   understand about the ex parte communications and when they're

2   okay and when they're not, and I believe his answer will be if

3   somebody asks you a procedural question, what time is the

4   hearing, that might be okay.  If somebody asks you a question

5   about the case, that is not.

6        MR. HENDRIX:  My response:  My friend David Sachar

7   and I have talked about this issue, as well, and David and I

8   can debate the meaning of the Code of Judicial Conduct all day

9   long, and we used to.  This ex parte communications issue is

10   completely irrelevant to this case.  It is an attempt by them

11   to say, Mr. Baker engaged in ex parte communications within

12   the Code of Judicial Conduct, and therefore he's a criminal.

13   I submit to you it's irrelevant.

14        MS. PETERS:  I do not agree.  I do not agree.

15        THE COURT:  My ruling, I appreciate, Ms. Peters, you

16   asking for guidance.  Stay away, please, from asking

17   Mr. Sachar for legal opinions.  That would include for him to

18   explain to the jury about ex parte contact.  So please do not

19   cover that.

20        MS. PETERS:  Is there another way, because the term

21   has come up in this case, is there another way I can ask it or

22   ask the Court to explain to them what an ex parte

23   communication is?  This is a conspiracy.  During the time

24   period of the conspiracy, the statements that went on between

25   the co-conspirators are relevant to the charge.  Mr. Baker was

Sachar - Direct

1    having ex parte communications with Judge Maggio.

2            I'm not saying Mr. Baker broke a judicial canon, but

3    Mr. Maggio did.  And it goes to the actions of the

4    coconspirator to conceal and -- I'm having trouble

5    articulating it, but it's relevant to the fact that they were

6    having inappropriate conversations about something during the

7    fundraising, trying to connect with the money.

8            THE COURT:  So I don't recall the phrase "ex parte

9    communications" coming up, but your memory is better than

10   mine, and I believe you that it has.

11           It seems to me that our problem here is we've got

12   fact X that Gilbert Baker is talking to Judge Maggio.  That

13   fact's admissible.  The jury needs to hear it.  It's heard a

14   lot of it.  It's going to hear more.

15           Then we've got over here law, state law Y.  That's

16   an ex parte contact that should not have happened under the

17   code of conduct.  And what concerns me is all of this state

18   law Y that we've -- that is coming into the case, and I'm

19   trying to limit the amount of the state law Y so that just

20   like our campaign finance issue and my limiting instruction,

21   we don't have a verdict that is affected by these other legal

22   violations.

23           MS. PETERS:  I understand, Your Honor, but --

24           THE COURT:  So you can talk about the fact X.

25           MS. PETERS:  I am concerned that it leaves the jury

1   with the impression that it is okay for a private citizen to

2   come up and advocate on behalf of one of the litigants, and

3   that's all I'm trying to clear up, that it is not okay, and

4   that the fact that Judge Maggio was doing that is part of the

5   proof of the conspiracy.  And I don't -- they're in essence

6   saying that's okay.  We all know it's not okay, and it

7   reflects on Judge Maggio's behavior as a coconspirator.  So

8   I -- is there -- could we do a limiting instruction, or . . .

9          THE COURT:  I'm happy to consider an instruction if

10  you want to craft one.  I disagree with your view of the proof

11  so far and what the defense is trying to say.  I haven't heard

12  from anyone on the defense side that a judge communicating

13  with someone about a pending case, a non -- is okay.  And so

14  I'm happy to consider an instruction, a sort of mirror image

15  of what I've already done on the campaign finance about ex

16  parte communication.

17         Y'all talk about it, make some proposal, I'll think

18  about it.  But my ruling stands on fact -- facts X and law Y,

19  and I don't know how else to make the record any plainer.

20         MR. HENDRIX:  And if I may make my record clear, I

21  just wanted to reiterate, we have objected to all the

22  testimony regarding the judicial window as irrelevant and

23  prejudicial.  We now enter our objection to issues regarding

24  quote-unquote ex parte communications as irrelevant and

25  prejudicial.

Sachar - Direct

1      THE COURT:  I think we can find a way to steer

2  through this, but Ms. Peters, I just respectfully agree.  I

3  can't believe that there's anyone in this courtroom who thinks

4  that it's okay for -- to be -- for a judge to be talked to

5  about a pending case.  I don't -- I just don't believe it.

6      So do you want to take a break and if I were in your

7  shoes I would need to tinker with my examination a little bit.

8      MS. PETERS:  I do, Your Honor, both for Mr. Sachar

9  and Mr. Maggio.  So if it could be a break a little bit on the

10  longer side, that would be very helpful.

11      THE COURT:  We'll take -- certainly -- 20 minutes,

12  is that long enough?

13      MS. PETERS:  Yes, Your Honor.

14      THE COURT:  Or would you prefer 30?

15      MS. PETERS:  Well, 30 would be much better, Your

16  Honor.  I hate to keep the jury waiting, but I can make up the

17  time by eliminating questions.

18      THE COURT:  Try for 20, and I'll tell them that it

19  may stretch to 30.

20      MS. PETERS:  Thank you, Your Honor.

21      THE COURT:  You're welcome.  Okay.

22    (Sidebar conference concluded.)

23      THE COURT:  Ladies and gentlemen of the jury, the

24  lawyers are doing their best to help me on some issues about

25  the law of evidence, but I need some more time.  And so we're

1  going to take an early morning break.  It will be at least 20

2  minutes, and it may be 30 as I sort through some legal issues.

3          During that break, the usual rules of the road

4  apply:  Don't talk with each other about the case, and don't

5  let anybody talk to you about the case.  Don't do any Internet

6  research or post anything on social media if you step outside

7  the courthouse, which you may do to get some fresh air or to

8  call someone about a family matter or whatever you need to do.

9          Pads facedown in your chair.  Keep your juror

10  stickers on if you wander about.  And remember that I've

11  suspended the rules of good manners.  So if you see anybody

12  around the courthouse, we don't exist if they're in the case.

13          All rise for the jury.

14      (The jury exits the courtroom.)

15          Ms. Peters, you know what you need to do on the

16  break.

17          MS. PETERS:  I do, Your Honor.

18          THE COURT:  Mr. Hendrix, I have homework for you,

19  too.  Yes.  And Ms. Depper can help you, though.

20          Start on that limiting instruction, on what it is

21  that the Court ought to say maybe about the canons and maybe

22  about a general or ex parte contact.  Defense starts on it,

23  provide it to the government, and we'll see where we go.

24          MR. HENDRIX:  Yes, sir.

25          THE COURT:  Did you have a further question,

Sachar - Direct

1  Ms. Peters?

2          MS. PETERS:  I do, Your Honor.  It's about something

3  that we talked about over there.  I just want to make sure I

4  have something clear.  Should we excuse the witness first or

5  do another bench conference?

6          THE COURT:  Yes.

7          Mr. Sachar, you're earning jewels for your patience

8  crown.

9          THE WITNESS:  It's not a problem at all.

10          MS. PETERS:  Should this be a bench conference

11  again?

12          THE COURT:  Certainly.  We can come back up.

13          Ladies and gentlemen we're in recess.  Y'all are

14  free to leave.

15      (The following proceedings were held at sidebar:)

16          THE COURT:  Ms. Peters.

17          MS. PETERS:  I'm so sorry.  The truth is I'm just

18  nervous, and I forgot what question the Court said I could ask

19  about you can't circumvent the rule by using somebody that's

20  not on your committee, and I just don't want to do the wrong

21  thing.

22          THE COURT:  Thank you.  That was the question that I

23  excluded.

24          MS. PETERS:  Okay.

25          THE COURT:  The one that you can ask, I think, is

Sachar - Direct

```
 1   the Justice Wood-answered question, what does a candidate do
 2   if they get money out of time.
 3               MS. PETERS:  That's fine.  Thank you.  I'm so glad I
 4   asked.  Thank you.
 5               THE COURT:  Okay.
 6               MS. PETERS:  Thanks so much.
 7               THE COURT:  All right.  Thank you, counsel.
 8         (Sidebar conference concluded.)
 9         (A recess was taken from 9:32 a.m. to 9:59 a.m.)
10               THE COURT:  Mr. Sachar, ready to go?
11               THE WITNESS:  Yes, sir.
12               THE COURT:  Counsel?
13               MS. PETERS:  Yes, Your Honor.
14               MR. HENDRIX:  Your Honor, an objection.
15               THE COURT:  Should we be over at the side?
16               MR. HENDRIX:  I'm fine.
17               THE COURT:  Okay.
18               MR. HENDRIX:  Regarding the issue of ex parte
19   communications, our position at this point, Your Honor, is
20   there is no evidence in the record that there were
21   communications between Mr. Baker and Mr. Maggio during the
22   trial that were about the trial.  Therefore, foundation has
23   not been laid in order for Mr. Sachar to start testifying
24   about ex parte communications.
25               THE COURT:  Counsel, let's go to sidebar.
```

Sachar - Direct

1          Mr. Sachar, you can sit down.

2          THE WITNESS:  Thank you, Your Honor.

3      (The following proceedings were held at sidebar:)

4          THE COURT:  Mr. Hendrix, thank you for raising the

5  issue before we got going again.

6          Ms. Peters, my hunch is what you're going to say is,

7  yeah, not during the trial, but it's after, when the posttrial

8  motions --

9          MS. PETERS:  That is correct.

10         THE COURT:  -- that there are the communications.

11         Mr. Hendrix?

12         MR. HENDRIX:  The record shows that there were

13  communications between the two, but no evidence it was about

14  the trial.

15         THE COURT:  Well, that is certainly -- that is

16  certainly true.  I think each side can argue what it is that

17  was being said in there.  I'm -- and let me just go ahead and

18  get this out.  Ms. Peters, you're probably already there.  My

19  thought on the ex parte issue during the break is that we need

20  to handle it much like we're doing the 180 days and the

21  campaign finance with generic and touch lightly and maybe a

22  limiting instruction, as opposed to litigating what's an ex

23  parte communication, which is a very murky issue as y'all

24  know.

25         So that's where I think we ought to head, and I

Sachar - Direct

1    anticipated that that's where you were going.

2              MS. PETERS:  That's correct, Your Honor.  But I also

3    understood that I was not to ask this witness about ex parte

4    communications.  So the objection --

5              MR. HENDRIX:  Premature?

6              MS. PETERS:  Well, isn't that -- am I correct, Your

7    Honor?  I'm not supposed to ask Mr. Sachar about ex parte

8    communications.

9              THE COURT:  It would be probably best if you didn't,

10   but I'm trying to steer the parties toward a place where I

11   think both sides will get what they need to argue what

12   needs -- what they want to argue in the case without getting

13   the jury tangled up on our, what's the law of ex parte

14   communications.

15             MR. HENDRIX:  More direction from Your Honor.  Back

16   on the 180-day judicial window.

17             THE COURT:  Uh-huh.

18             MR. HENDRIX:  A non -- I can foresee -- I want to

19   avoid a debate obviously about the law, but I think the issue

20   will be, was Gilbert Baker part of the campaign committee,

21   right?  Which is subject to dispute in this case.  I could

22   see -- my impulse would be to want to talk to Mr. Sachar about

23   that, what is a campaign committee, how does one become

24   attached to it, when is one a member, when is one not a

25   member.

Sachar - Direct

1        THE COURT:  You got to take the bitter with the

2   sweet, Mr. Hendrix, and I've provided the limiting

3   instruction.

4        MR. HENDRIX:  Okay.

5        THE COURT:  I've told the jury that that's -- to

6   beware of being distracted by the state law issues, and we

7   don't need to litigate the state law issues.  I don't have my

8   pad with me, but I know you saw my X and Y, the law and fact.

9        MR. HENDRIX:  Right.

10       THE COURT:  So my request is that you steer clear of

11  that.

12       What about Ms. Peters being able to ask a similar

13  question on ex parte context like we did on the 180 days?  For

14  example, what should a judge do if he's contacted by someone

15  about the merits of the case outside the courtroom or outside

16  of a judicial proceeding?  He should push that off.  And then

17  we move on, and y'all can argue then in due course from each

18  side as to how the evidence spins out about that.  But we

19  don't go down the garden path about when is it that Mr. -- you

20  know, I mean this in the nicest possible way, when is it that

21  Mr. Harris is going too far in the conversation that he and I

22  might have?  You know, is it okay for us to talk about

23  scheduling?  Well, probably.  When does it drift into the

24  merits?  I mean, that's just . . .

25       MR. HENDRIX:  Yeah, I know.

Sachar - Direct

1          THE COURT:  So are you okay on the . . .

2          MR. HENDRIX:  I'm going to try my absolute best to

3   make sure that I understand the Court's ruling, and I

4   encourage everybody to poke me in the eye if I'm going too

5   far.

6          THE COURT:  Okay.  And what about on the generic

7   pitch by Ms. Peters?  Okay on that?

8          MR. HENDRIX:  I can live with it.

9          THE COURT:  Thank you.

10          MS. PETERS:  So I may ask what should a judge do if

11   someone talks to them about the merits of the case outside of

12   the courtroom?

13          THE COURT:  Yes.

14          MS. PETERS:  Outside of the Court process.

15          THE COURT:  Yeah, or the Court proceeding.

16          MS. PETERS:  Outside of the proceedings.

17          THE COURT:  Yeah, the courtroom, or the Court papers

18   that are filed.

19          MS. PETERS:  Okay.  That's what I want to ask.

20          THE COURT:  Good, good.

21          Because I get it.  I know what y'all want to argue,

22   and we need a little, but thank you, counsel, thank you for

23   trying.

24          MR. HENDRIX:  One final issue.  Totally remiss, has

25   nothing to do with this topic.  I keep forgetting to ask the

Sachar - Direct

1    Court first thing in the morning and at breaks, have you read

2    anything about the case, heard anything about the case,

3    because it has been in the paper.  My fault, and I'm asking

4    you to ask that intermittently throughout the trial.

5              THE COURT:  To ask the jurors?

6              MR. HENDRIX:  Yeah, have you guys read anything

7    about the case, heard anything about the case.  I think

8    we've --

9              THE COURT:  I'll have to think about that,

10   Mr. Hendrix.  I don't usually cross-examine the jurors, I just

11   tell them not to do it.

12             MR. HENDRIX:  Uh-huh.

13             THE COURT:  But I don't usually ask them if they

14   have.  So I'll think about it.  But, yeah, we've got press, as

15   y'all know.  We've got press.

16             Y'all are expecting this.  I had not been thinking

17   about it, but we'll need to take another short break, too,

18   before Mr. Maggio, because I think even though I'm informed

19   he's in garb, I don't think we need to walk him across the

20   courtroom.  I think we need to get him on the stand.

21             MR. HARRIS:  He may still be up in the lockup.

22             MS. PETERS:  I think they brought him down.

23             THE COURT:  I think that's why Jay's here, the

24   marshal is here.  He's actually here, but I just don't want

25   to -- the point will be made with him in the clothes, but we

Sachar - Direct

```
 1   don't need to embarrass him or inject that spectacle into the

 2   trial.

 3              MR. HENDRIX:  Sure.

 4              MS. DEPPER:  Yes, sir.

 5              THE COURT:  Okay?

 6              MS. PETERS:  Yes, Your Honor.

 7              THE COURT:  Good.  Thank you.

 8        (Sidebar conference concluded.)

 9              THE COURT:  Officer Pike, we'll take our jury.

10              COURTROOM SECURITY OFFICER:  Ladies and gentlemen,

11   your jury.

12        (The jury enters the courtroom.)

13              THE COURT:  Y'all can be seated as you choose.

14   Thank you for your patience with us, ladies and gentlemen.

15              Ms. Peters, you may resume questioning when our jury

16   gets settled.

17              That's a good-looking mask you have there,

18   Mr. Sachar.  Where did you get the Arkansas state flag, if I

19   may ask?

20              THE WITNESS:  Well, I'm sure it was Amazon, but my

21   wife ordered it for Christmas for me last year.

22              THE COURT:  Very good.

23              Ms. Peters.

24              MS. PETERS:  Thank you, Your Honor.

25   BY MS. PETERS:
```

Sachar - Direct

1   Q    Mr. Sachar, what should a judge do if someone tries to

2   talk to them about a case outside of the court proceedings?

3   A    Well, there's a rule on that, Rule 2.9.  They should

4   report it.  Most situations, Ms. Peters.  It depends.  There

5   are certain parts where judges are allowed to speak, so . . .

6   Q    Let me ask this.

7   A    Please.

8   Q    What should -- I'm going to try and narrow it down.

9   A    Thank you.

10  Q    What should a judge do if someone talks to them about the

11  substance of the case, the merits of a pending motion,

12  something like that?  What should a judge do if somebody

13  approaches them and talks to them about the substance of the

14  case?

15          THE COURT:  Or tries to, right?

16          MS. PETERS:  Or tries to.  Yes, thank you, Your

17  Honor.

18  BY MS. PETERS:

19  Q    Outside of the court proceedings, in the hallway, in

20  chambers, wherever.

21  A    Well, just like the jury's been instructed, they should

22  try to not engage, first.  If someone were to speak to them,

23  then they should report it to both sides and allow counsel to

24  take it from there.

25  Q    Thank you.

Sachar - Direct

1              Now, the election for judges in Arkansas is always

2    in May; is that right?

3    A    It is, unless the legislature moves the date to March.

4    They've done that a time or two.  But by statute, it's

5    generally in May.

6    Q    If a runoff is needed, if there are three candidates and

7    nobody gets a majority, that takes place on the November

8    ballot?

9    A    Correct.

10   Q    And in May of 2014 was the election we're speaking of,

11   when could candidates begin fundraising?

12   A    Well, the election date was May 20th of 2014, so 180 days

13   before that they could solicit and accept contributions

14   November 21 of 2013.

15   Q    And, finally, what should a judicial candidate do if they

16   receive money, checks, before that 180-day period?

17   A    The best practice for that would be for them to --

18   obviously they could receive a check from someone who doesn't

19   know the time limit, or whatever.  They would take that check,

20   return it, you can even write a thank you note, I'm sorry we

21   can't accept it at this time.

22              You could tell them the date, and that they would

23   have to contact the judge's treasurer or the candidate's

24   treasurer, because candidates for judicial office are not

25   allowed to personally solicit and accept funds.

Sachar - Cross

```
 1              MS. PETERS:  Thank you, Mr. Sachar.

 2              THE WITNESS:  Thank you, Ms. Peters.

 3              MS. PETERS:  Your Honor, that completes my direct

 4    examination.

 5              THE COURT:  Thank you, Ms. Peters.

 6                          Cross-Examination

 7    BY MR. HENDRIX:

 8    Q    Mr. Sachar, a couple of issues.  In your direct

 9    examination you talked about how we elect our judges in this

10    state, correct?

11    A    Correct.

12    Q    But the Code of Judicial Conduct attempts to make it as

13    nonpartisan politics as possible, right?

14    A    That's true, along with Amendment 80.  But, yes, I agree.

15    Q    Virtually impossible to do, though, isn't it?

16    A    The practicality of the matter is it has -- it has not

17    worked, in my opinion.  Candidates are still going to try to

18    find a way to gain groups of people to vote for them, and one

19    of the best ways to do that is try to identify with a party.

20    Q    To try to identify with one of the partisan parties?

21    A    That is correct.

22    Q    A recent example, a sitting --

23              MS. PETERS:  Objection, Your Honor.

24              THE COURT:  Relevance?

25              MS. PETERS:  Yes, Your Honor.
```

Sachar - Cross

```
 1            THE COURT:  Sustained, I think, Mr. Hendrix.
 2   BY MR. HENDRIX:
 3   Q    The Code of Judicial Conduct does not prohibit a judicial
 4   candidate from trying to identify with a politician affiliated
 5   with one of the two major parties in the state, correct?
 6   A    I can't agree with that just because there are some
 7   limitations in there.  They cannot accept, seek or use an
 8   endorsement from a partisan political official.  So if I were
 9   the green candidate for -- or the President of the United
10   States is the green candidate and you were running for office,
11   I can endorse you because I've got a First Amendment right to
12   do so.
13            You can't put it on your material, you can't
14   advertise with it, you can't -- also, you couldn't ask me for
15   that endorsement.
16   Q    I'm going to try this.
17   A    That's fine.
18   Q    And if I don't get there, I don't get there.  Are you
19   aware of an example fairly recently --
20            MS. PETERS:  Objection, Your Honor, relevance again.
21            THE COURT:  I think I need to hear the question
22   before I can rule correctly.
23            Ladies and gentlemen, I'm sorry.  There comes a
24   point in every trial where there's usually some evidentiary
25   tangles, and we're at that point in this one.  So please bear
```

Sachar - Cross

```
 1   with us.  I'll be right back.

 2              Counsel.

 3         (The following proceedings were held at sidebar:)

 4              THE COURT:  Mr. Hendrix, tell me what you want to

 5   ask so I can rule.

 6              MR. HENDRIX:  I was going to ask him, I won't say it

 7   exactly like this, but the topic is Barbara Webb just during

 8   her campaign recently for Supreme Court ran an ad with the

 9   governor of the state of Arkansas, a known Republican in her

10   ad affiliated with that.

11              The point is it's impossible to regulate judicial

12   candidates and make them purely nonpartisan.

13              THE COURT:  Objection on relevance or the 403

14   sustained.  We don't need to get into Justice Webb in that

15   you've got your point about -- I mean, Mr. Sachar said

16   nonpartisan elections don't work, so, good.

17              MR. HENDRIX:  I understand.  Thank you, Judge.

18              MS. PETERS:  Thank you.

19         (Sidebar conference concluded.)

20   BY MR. HENDRIX:

21   Q    Something again that I believe has been clearly

22   established.  The Code of Judicial Conduct regulates judges

23   and judicial candidates, correct?

24   A    That is correct.

25   Q    It does not regulate anybody else?
```

Sachar - Cross

1   A    We do not have authority to sanction or investigate

2   anybody other than judicial candidates or judges.

3   Q    And so when it comes to fundraising, the 180-day judicial

4   window, the Code of Judicial Conduct attempts to regulate the

5   conduct of that judge and the judge's campaign committee and

6   when the committee or the judge can solicit and receive

7   campaign contributions, correct?

8   A    The judge and those people at the judge's, yeah,

9   committee or the people working for the judge on the campaign;

10  that's correct.

11  Q    It doesn't regulate the conduct of anybody else?

12  A    No, just the people involved in the campaign on behalf of

13  the judge.  Again, the judge is the only one that could get

14  written up, so to speak.

15  Q    Right.

16  A    But it keeps us from having, you know, the issue of, I

17  direct you to do something.

18  Q    Right.

19          THE COURT:  Far enough, Mr. Hendrix.

20          MR. HENDRIX:  Understood.  Next topic.

21  BY MR. HENDRIX:

22  Q    You had said on direct examination in the example of if a

23  judicial candidate -- if someone solicits, obtains campaign

24  contributions for a judicial candidate outside of the window,

25  that the best practices are to return the money, correct?

Sachar - Cross

```
1    A     Correct.  Acceptance is to keep -- is to take with the
2    intent to keep.  So -- and there are other rules on that, but
3    it's the best practice to return it in such a way, but you --
4    a candidate could not accept money outside of the 180
5    regardless.
6    Q     And, again, the narrow -- and focus in on that.  Again,
7    your testimony was it would be the best practice in that
8    scenario to return the money to the donor?
9    A     It's -- it would be the best practice to return it
10   promptly.  You can send them a note, things like that, are
11   what we would advise them to do.  Is that fair?
12   Q     And that's where I'm getting at, Mr. Sachar, is when you
13   use the term "best practices," first question is, that is not
14   an explicit part of the Code of Judicial Conduct, correct?
15   A     Correct.  That's our advice on the best way to remedy
16   that situation.
17   Q     The Code of Judicial Conduct doesn't say, if that occurs,
18   return the money to the donor, correct?
19   A     The Code of Judicial Conduct says you can't accept it.
20   Q     Right.
21   A     And that would have been acceptance.  So I'm trying to
22   help people remedy that.
23   Q     Understood.  So best practice is an opinion, correct?
24   A     Sure.
25   Q     It's not a black letter rule, correct?
```

Sachar - Cross

```
1    A    No.

2    Q    And so if someone not affiliated with the judge, not

3    affiliated with the campaign raises funds for that campaign

4    outside of the window, without any involvement of the

5    candidate, you don't have an opinion whether it's okay for --

6              THE COURT:  Mr. Hendrix.

7              MR. HENDRIX:  Too much?

8              THE COURT:  I've excluded -- yes, that is too much.

9    Mr. Sachar can't tell the jury what the law is on this issue.

10             MR. HENDRIX:  I am treading on delicate grounds, so

11   I'm going to be done, Mr. Sachar.

12             THE WITNESS:  That's fine, Mr. Hendrix.  I'm not

13   trying to be difficult.  I'm trying to do my best.

14             MR. HENDRIX:  No, no, no.  I worked with you for six

15   years.

16             THE WITNESS:  We know each other quite well, and so,

17   certainly, thank you very much, counsel.

18             MR. HENDRIX:  Thank you.  I appreciate it.  Good to

19   talk to you.

20             THE COURT:  Thank you, Mr. Hendrix.

21             To clarify that point, it may have been brought out,

22   but I don't believe so.  Mr. Sachar, you talked about the

23   Commission and the panels.  Who -- what kinds of people are on

24   the Commission and the panels?

25             THE WITNESS:  The Commission is nine people, three
```

1    judges appointed by the Supreme Court, three lawyers appointed

2    by various agencies, the Attorney General, Lieutenant Governor

3    and Speaker of the House, and three citizen members,

4    nonlawyers or non-judges.  I like to call them normal people,

5    who are appointed by the governor.  And each panel is one of

6    each, and it's from the mirrored alternates.

7            There's 18 total.  The alternates make up three

8    panels, they investigate.  If they find enough to go forward,

9    it goes to the full nine, like a trial.  So that would be --

10   they would be the jury.  That way you don't have the same

11   Commission members investigating, as hearing the case.

12           THE COURT:  Thank you for clarifying.

13           Counsel, did my questions prompt any further

14   questions from y'all, or is there something else you wish to

15   cover?  Ms. Peters?

16           MS. PETERS:  No, Your Honor.  Thank you.

17           THE COURT:  Mr. Hendrix?

18           MR. HENDRIX:  No, thank you, Judge.

19           THE COURT:  And I assume Mr. Sachar can be released

20   to go about his business?

21           MS. PETERS:  Yes, for the government, Your Honor.

22           MR. HENDRIX:  Yes, Your Honor.

23           THE COURT:  Very good.  Thank you, Mr. Sachar.

24           THE WITNESS:  Thank you, Your Honor.

25           THE COURT:  Ladies and gentlemen, we need to take a

1    short break to get ready for our next witness.  It won't be

2    long, but we need to make some arrangements.  I believe you

3    can take a break just sort of out in the hallway here.

4    There's restrooms right outside the courtroom that you could

5    use if you need.

6            So Officer Pike, keep the jury staged, and we'll be

7    out for a true five minutes.

8            All rise for the jury.

9        (The jury exits the courtroom.)

10            THE COURT:  Counsel, y'all did well in staying

11    within the guardrails that the Court has imposed, and the

12    Court appreciates it.

13            Marshal, can we have our next witness?  Everybody

14    can be seated or stand at ease.  We'll be in a quasi recess

15    here.

16        (A recess was taken from 10:22 a.m. to 10:26 a.m.)

17            THE COURT:  All right.  All rise for the jury.

18            We'll take our jury, please, Officer Pike.

19            COURTROOM SECURITY OFFICER:  Ladies and gentlemen,

20    the jury.

21            THE COURT:  Everybody can be seated as they find

22    their place.

23            You can be seated.

24            THE WITNESS:  Thank you, Judge.

25            THE COURT:  You are welcome.  Please raise your

```
 1   hand, Mr. Maggio.
 2               THE WITNESS:  Yes, sir.
 3             Michael Maggio, Government's witness, sworn.
 4               THE COURT:  Very good.
 5               THE WITNESS:  Thank you, sir.
 6               THE COURT:  You can take your mask off to testify so
 7   that the jurors can see your face.
 8               THE WITNESS:  I'm not vaccinated, though.
 9               THE COURT:  Ah.  We have face shields there.
10               THE WITNESS:  Is it okay if I just leave it on,
11   Judge?
12               THE COURT:  Actually, do we have the see-through
13   masks here?
14               THE COURTROOM DEPUTY:  I do not.  I will check on
15   it.  The shields are what I have.
16               THE COURT:  Okay.  Counsel, let me visit with you
17   over here.
18               Thank you for telling me, and we'll figure out what
19   to do.
20               THE WITNESS:  Yes, sir.
21         (The following proceedings were held at sidebar:)
22               THE COURT:  This is a key witness.  I'm concerned
23   about him being masked.  Ms. Peters, what do you think?
24               MS. PETERS:  I understand the Court's concern.  At
25   the same time, his attorney reached out to me because he needs
```

1   a vaccine and he hasn't gotten it yet, and his attorney

2   represented that he has some health conditions that put him at

3   risk.  But beyond that, this is a representation of the

4   attorney, and I -- I understand the defendant's right to

5   cross-examine.  So I just leave it to the discretion of the

6   Court, but I think that's why he's resistant to taking it off.

7               THE COURT:  Got it.

8               Mr. Hendrix, do you or Ms. Depper wish to speak?

9               MR. HENDRIX:  His credibility is central to the

10   case.  I think it's important that they see him and see his

11   full face.  I think that there is a plausible argument on the

12   right of confrontation.  I've not dealt with it in masks.  I

13   know the law familiarly enough to know that you can't put a

14   shield in front of the witness, there's the child witness

15   case, they can't testify remotely.

16               THE COURT:  Yes.

17               MR. HENDRIX:  It raises that concern.

18               THE COURT:  At my direction, the Court ordered some

19   see-through masks that just have a -- kind of a foam border

20   around them.  I don't think we have one in the courtroom.  I

21   know I have at least one in chambers, and I think I'll get one

22   of those, and we'll go that route.

23               MR. HENDRIX:  Okay.

24               THE COURT:  Because we know he's not vaccinated, and

25   we know that our circumstances are challenging, but I think to

1    the extent possible the jury does need to see him, and

2    Mr. Baker's entitled to see him as he testifies.

3            Mr. Harris?

4            MR. HARRIS:  Yes, sir.  No other witness has

5    mentioned they're unvaccinated.  I know that Marvin Parks is

6    going to testify, and I know he's unvaccinated, because when I

7    met with him he refused to answer that.  So I assume he is.

8    Should the same rules apply to him?

9            THE COURT:  Yeah, I think any witness that informs

10   us that they're not vaccinated in our current circumstances,

11   I'd say that we do the clear mask.

12           MR. HARRIS:  Okay.

13           THE COURT:  So I'll see what I can do on rounding

14   one of those up sooner rather than later.  We'll probably take

15   another break in place just to get that.

16           MS. PETERS:  Your Honor, the juror that's on the

17   end, I don't know the number, but he, I think the Court will

18   recognize him because he wears his mask below his nose.

19           THE COURT:  Yes.

20           MS. PETERS:  Is there any way possible to ask him to

21   pull his mask up at least during this testimony?  It's really

22   not protecting him if his nose is exposed.

23           THE COURT:  Understood.  I asked the court security

24   officer to visit with him yesterday to try to do an informal

25   nudge.  It does not appear to have succeeded, and so I don't

1    like to embarrass jurors, but I think now is the time, this is

2    a good opportunity to revisit that issue.

3              MS. PETERS:  Thank you, Your Honor.

4              THE COURT:  Okay.

5              MR. HARRIS:  But you're going to revisit to the

6    whole jury, not just specifically number 4?

7              THE COURT:  That's right.

8              MR. HARRIS:  Thank you, sir.

9              THE COURT:  Yes, okay.  Thanks.

10         (Sidebar conference concluded.)

11             THE COURT:  Ladies and gentlemen, y'all are earning

12   jewels for your patience crown today.

13             Mr. Maggio, as you've heard, I think, has told us

14   that he's not vaccinated, and this concerns me, as I know it

15   concerns him.

16             THE WITNESS:  Yeah.

17             THE COURT:  And so here's what we're going to do.

18   We, the Court, has some clear facemasks that have a kind of a

19   foam thing around it.  We gotta rustle them up.  I thought

20   they were here but it's not, it's just the face shields.  So

21   give us just a second to find one of those.

22             The Constitution protects -- as I said earlier, the

23   trial is supposed to be public, and Mr. Baker has the right to

24   be confronted with the witnesses against him, and so he's

25   entitled to see the witnesses testify, including their facial

1   expressions.

2            And I think it's important, too, as y'all know from

3   watching the witnesses, demeanor is important.  Be careful

4   with it, as I told you, but pay attention.  So we're going to

5   get a clear mask so that Mr. Maggio can have a mask, because

6   he'll testify.

7            Now, with that said, I'm going to take 30 seconds to

8   emphasize how we all need to be very careful in the virus

9   circumstances, which means having our masks over our nose and

10  our mouth, keeping distant from each other as you're coming

11  and going.  So every juror needs to have his mask or her mask

12  over his nose, as well as his mouth.

13           Yes, sir.

14           A JUROR:  It fogs up my glasses, and I can't see.

15  That's the only problem I have with it.  And I've been

16  vaccinated, but I can't see when it fogs up.

17           THE COURT:  I need you to deal with the fog, juror

18  number 4.  I'm sorry, but do your best and keep it up there.

19  Thank you.

20           MS. PETERS:  Your Honor, if I may?

21           THE COURT:  Yes.

22           MS. PETERS:  The parties jointly have a spray that

23  prevents --

24           THE COURT:  Oh, to go on the glasses?

25           MS. PETERS:  Prevents glasses from fogging.  Can we

Maggio - Direct

1   jointly provide it to the jury?

2            THE COURT:  Juror number 4, would you want to try

3   the magic spray?  I have this issue, as well, and the spray,

4   one of my law clerks gave me the spray, and it seemed to work

5   pretty good.  But I think you just gotta -- some of it you

6   just got to lift it.

7            Okay.  Break in place, ladies and gentlemen of the

8   jury.  Don't talk about the case, don't let anybody talk to

9   you about it, but I'm not going to move you in and out for

10  what I hope will be a very short break here.

11           I'm going to step out to try to do what I can, too,

12  to round us up our mask so we can go forward.

13           Any of the jurors got any questions for me?  Okay.

14           Break in place.

15      (A recess was taken from 10:35 a.m. to 10:39 a.m.)

16           THE COURT:  Ms. Peters.

17           MS. PETERS:  That's fine for the United States, Your

18  Honor.

19           THE COURT:  Mr. Hendrix?

20           MR. HENDRIX:  Yes, sir.

21           THE COURT:  Very good.  All right.  We are back in

22  session.  I've given Mr. Maggio the oath, and Ms. Peters, you

23  may examine.

24           MS. PETERS:  Thank you, Your Honor.

25                        Direct Examination

Maggio - Direct

```
1   BY MS. PETERS:

2   Q    Would you please state your name.

3   A    Mike Maggio.

4   Q    I'm going to ask you to pull the microphone close,

5   please?

6   A    Mike Maggio.

7   Q    You are an inmate in the Bureau of Prisons; is that

8   right?

9   A    Currently, yes.

10            THE COURT:  Use your sawmill voice.

11            THE WITNESS:  Yes, sir.

12            THE COURT:  Just get right on the mic so we can be

13  sure and hear it.

14            Ms. Peters.

15            MS. PETERS:  Let's just start over.

16  BY MS. PETERS:

17  Q    Please state your name.

18  A    Mike Maggio.

19  Q    You are an inmate in the Bureau of Prisons?

20  A    Currently, yes.

21  Q    And you're in prison because you pled guilty to bribery?

22  A    Yes.

23  Q    And when did you go to prison?

24  A    July of 2017, I believe.

25  Q    Now, you were a judge?
```

Maggio - Direct

```
 1   A    Yes, I was.

 2   Q    How did you first become a judge?

 3   A    I was appointed by the governor.

 4   Q    Which governor?

 5   A    Huckabee.

 6   Q    And when were you appointed to be a judge?

 7   A    01/01/01.  January the 1st, 2001.

 8   Q    How long did that appointment last for?

 9   A    Until this.

10   Q    Well, was the appointment continuous, or did you then

11   have to run for election?

12   A    I'm sorry.  It was a two-year appointment.  I'm sorry.

13   Q    So did you then run for election?

14   A    I did.

15   Q    And were you elected to a six-year term?

16   A    Thankfully, the voters said yes.

17   Q    And how about in 2008, did you again run for a six-year

18   term?

19   A    I did.

20   Q    Both times you had an opponent?

21   A    Oh, yes.

22   Q    And both times you were obviously successful?

23   A    Oh, yes.

24   Q    And have you found that having a large war chest early

25   staves off opponents?
```

Maggio - Direct

```
 1   A    That's the common perception, yes.

 2   Q    Has that been your experience?

 3   A    Well, I never really had a big one before, but that was

 4   the goal, yes.

 5   Q    Would you tell the jury where you served as a judge.

 6   A    Faulkner, Van Buren and Searcy Counties.

 7   Q    Which makes up the 20th Judicial District?

 8   A    Yes.

 9   Q    You were a circuit court judge?

10   A    Yes, ma'am.

11   Q    So the trial court?

12   A    Yes, ma'am.

13   Q    What kinds of cases, what types of cases did you hear,

14   categories, during your time as a judge?

15   A    Ultimately I heard every kind you could hear, that being

16   civil.  I don't know how in-depth --

17   Q    How about family law?

18   A    Family law, civil, criminal, probate, and even some

19   juveniles.

20   Q    Did you preside over bench trials?

21   A    Yes.

22   Q    Did you preside over jury trials?

23   A    Yes, ma'am.

24   Q    And how many jury trials do you think you had a year?

25   A    In all three counties, a year, probably, oh, anywhere
```

Maggio - Direct

1   from five to eight or nine a year.

2   Q     And that was over the course of 13 years of being a

3   judge?

4   A     Yes, ma'am.

5   Q     Okay.

6   A     So . . .

7   Q     I'm not going to attempt the math, but 13 times five or

8   13 times eight?

9   A     Somewhere in that range.

10   Q     Okay.  At some point you decided you were going to try

11   and move up to the Arkansas Court of Appeals; is that right?

12   A     Yes, ma'am.

13   Q     And was that in 2013 that you decided you'd run?

14   A     Yes, ma'am.  Yes, ma'am.

15   Q     You had officially announced that you were going to run

16   on June 27th of 2013?

17   A     Yes, ma'am, I'll go by your dates.  I'm trusting you.

18   It's been a long time ago, so, yes, ma'am.

19   Q     Okay.

20   A     I don't think you're trying to trick me on a date.

21   Q     That's right, I'm not.  And I can represent that's true.

22   A     Yes, ma'am.

23   Q     Did anyone encourage you to run for the court of appeals?

24   A     Yes, ma'am.

25   Q     Would you please tell the jury who encouraged you to run?

Maggio - Direct

1    A     Primarily Judge Wood, Judge Rhonda Wood.

2    Q     Did anyone else encourage you to run?

3    A     I got some other pushes from Cody Hiland, and, oh, some

4    other people, just . . .

5    Q     How about Mr. Baker, did he encourage you to run?

6    A     I don't know if he -- he encouraged me so much as he

7    offered to help, you know, if I decided to run he offered to

8    help.  But I would say he was probably part of the mix, yes,

9    ma'am.

10   Q     How do you know Rhonda Wood?

11   A     I've known Judge Wood for, both as a friend, a lawyer and

12   a judge, 20 years, I guess, maybe more.  I couldn't tell you

13   the specific timeframe, but that's about right.

14   Q     And at one point you all shared office space?

15   A     Yes.

16   Q     And did you help each other with campaigns?

17   A     Yes, ma'am, we did.

18   Q     And with respect to this court of appeals campaign, did

19   Rhonda Wood help you with this campaign?

20   A     Yes, ma'am.

21   Q     And how did she help you?

22   A     Well, Judge Wood's previous two -- I want to say terms,

23   but two election cycles, how about that, had run for court of

24   appeals and the Supreme Court, and I'd helped her in those

25   races quite a bit.  My help is the old-fashioned shoe leather,

Maggio - Direct

1    go out and meet people.  So when it came time to do that --

2    Q    Let me stop you for just a second and see if I can't

3    clarify my questions.

4              In 2013, you decided to run for the court of appeals

5    for the 2014 election.

6    A    Yes, ma'am.

7    Q    That also was the election Judge Wood decided to run for

8    the Supreme Court?

9    A    Yes, ma'am.

10   Q    So at the time you were running for the court of

11   appeals --

12   A    Yes, ma'am.

13   Q    -- she was already on the court of appeals?

14   A    She was on the court of appeals at that time, yes, ma'am.

15   Q    Did you talk with her about her experience running for

16   the court of appeals?

17   A    Oh, yes, ma'am.  Part of the encouragement she gave me

18   was she had what she called the playbook, or that's what she

19   kept calling it, was a playbook, because she had run for the

20   court of appeals twice prior, and so she had -- she called it

21   playbook, and for lack of a better term, it's just a

22   direction, like a roadmap of where to go.

23             It was a large district.  It was, I don't know, 19

24   or 20 counties.  At one time I knew them all, but -- so she

25   had already been down that route.  She had been to those

Maggio - Direct

```
 1    places.  She met people.  She knew places to go.  She knew who
 2    to talk to in Kiwanis or Rotary.  She knew, since on an Easter
 3    egg hunt she knew where to go find the eggs.  So she was
 4    willing to help me by giving me that playbook.
 5            Part of that playbook was also people who would --
 6    who had helped her campaign, whether it be donations, whether
 7    it be putting signs out, whatever it was.
 8    Q    Let me jump in there.  And were two of the -- two of the
 9    people who helped with your campaign Gilbert Baker and Clint
10    Reed?
11    A    Yes, they were.
12    Q    Okay.  Let's start with Clint Reed.
13    A    Yes.
14    Q    What did he do for you?
15    A    Clint --
16    Q    What was he supposed to do for you?
17    A    Yeah, Clint was going to be my, for lack of a better
18    term, my campaign manager.  He was in charge of -- going to be
19    in charge of media, also things you do in election, data
20    gathering.
21    Q    Strategy?
22    A    Mail out pamphlets, those type of things, voter contacts.
23    And that was also part of the playbook.  He had already done
24    that.  He had just done it for Rhonda, so he knew what was
25    successful in those counties.  So that was part of it.
```

Maggio - Direct

1   Q     Did Gilbert Baker offer to help you fundraise for your

2   campaign?

3   A     He did.

4   Q     And how long have you known Gilbert Baker?

5   A     Probably longer than I've known Judge Wood, so 20-plus

6   years.  I mean, I don't want to -- I don't want to say 25, but

7   over 20 years.

8   Q     Were you friends?

9   A     We were friends.

10  Q     And can you tell me a little bit about the history of

11  your friendship, briefly, leading up to that 2013 election?

12  A     Gilbert Baker and I were friends on different levels as

13  far as political.  We were both conservatives.  He had run for

14  office, I'd helped him run for office.  We had some kids that

15  were friends, knew each other from around town.  So we were

16  social, political friends.  He helped me in my first race, not

17  fundraise, but he helped me my first race, gave me some ideas

18  and some of his expertise.  We just were --

19          At that time, Conway was a -- I'm talking the '90s,

20  Conway was honestly much smaller than it is today.  So

21  everybody kinda knew everybody, and we ran in the same

22  circles, I guess you'd call it.

23  Q     And in this election, the one that would have been in May

24  of 2014, right?

25  A     Yes, ma'am.

Maggio - Direct

1   Q     So in 2013, did Mr. Baker offer to fundraise for you?

2   A     He did.

3   Q     And how much did he offer to fundraise?

4   A     Well, according to Clint Reed, to run a successful court

5   of appeals campaign, he felt like a hundred thousand dollars

6   was necessary to at least get started with, that he felt that

7   he could do a good job and do it with that -- that's what he

8   had just done for Rhonda, Judge Wood.

9          So in the division of labor, Mr. Baker said he would

10  raise $50,000, and I had to raise 50,000.  And actually I

11  think Clint said to do that.  I don't -- it's been a long time

12  ago.  But long and short of it, Gilbert said he would raise

13  50,000, and I had to raise 50,000.

14  Q     From where was he going to raise the 50,000?  Did y'all

15  talk about that?

16  A     We didn't necessarily specifically talk about where he

17  was going to get it, we talked more about where he was not

18  supposed to get it, and that was to be stay away from nursing

19  homes and specifically Mr. Morton.

20         Other than that, his -- the normal pots for money,

21  so to speak, were, especially as a conservative judge, were

22  Chamber of Commerce, the businesspeople, those type.  I mean,

23  he knew where he was going to get the money.

24  Q     Okay.  And so nursing homes would be a good source of

25  money for a conservative candidate?

Maggio - Direct

```
 1   A     And they had been in the past, yes.  That's the track
 2   records, yes.
 3   Q     And when you started out, you were not planning on
 4   relying on nursing homes?
 5   A     That was our goal, correct.
 6   Q     Now, in 2012, as a circuit judge you were assigned to
 7   preside over the Estate of Martha Bull versus Greenbrier Care
 8   Center?
 9   A     For the second time, yes, ma'am.
10   Q     And who is the owner of Greenbrier Nursing Home?
11   A     Mr. Morton.
12   Q     Have you ever met Michael Morton?
13   A     No, ma'am.  I wouldn't know him if he were sitting right
14   here.
15   Q     And have you had any form of communication with him?
16   A     Zero.  I wouldn't -- no.
17   Q     No phone, no text?
18   A     No, ma'am.  I have no idea.
19   Q     The Martha Bull trial went to the jury, or went to a jury
20   trial in May of 2013?
21   A     Yes, ma'am.
22   Q     And do you remember how much money the jury awarded when
23   they returned their verdict?
24   A     A little more than $5 million.
25   Q     $5.2 million sound right?
```

Maggio - Direct

1   A     Sounds right; yes, ma'am.

2   Q     On July 8th, did you preside over a hearing about that

3   $5.2 million judgment?

4   A     Yes, ma'am.

5   Q     What was the purpose of the hearing on July 8th?  There

6   were three motions pending, right?

7   A     Yes, ma'am.  There was --

8   Q     And I don't want to talk about the law, but just what

9   kind of motions?

10  A     I remember judgment notwithstanding the verdict, and then

11  the remittitur.  I don't remember, was there a third motion?

12  Q     Was there a motion for a new trial?

13  A     There may have been.  And if there was --

14  Q     It's been a long time?

15  A     -- I'm going to take your word.  I just don't -- I

16  remember the JNOV and the remittitur.

17  Q     And the JNOV would have flipped the judgment to the

18  defendant?

19  A     Well, set aside the judgment, yes.  In essence, yes,

20  ma'am, it sets aside the judgment of the jury.  It's like a

21  dismissal or directed verdict in a criminal matter.

22  Q     And it -- a remittitur would reduce it?

23  A     A remittitur actually has three components to it.  There

24  are three components to a remittitur, or three options in a

25  remittitur.

Maggio - Direct

```
 1              MS. PETERS:  Your Honor, how would you like me to
 2    proceed here?
 3              THE COURT:  Mr. Maggio, I'm trying to do my best for
 4    me to be the one that tells the jury about the law.  So I know
 5    that you were a lawyer and a judge, but if you could, hold
 6    back a little bit on the law talk, and Ms. Peters will ask you
 7    questions that we need to get out.  You made the point that
 8    remittitur is complicated, and I'll tell the jury down the
 9    line whatever particulars they need to know about that.  Okay?
10              THE WITNESS:  Yes, sir.
11              THE COURT:  Good.
12              THE WITNESS:  Yes, sir.
13              THE COURT:  Ms. Peters.
14              MS. PETERS:  Thank you, Your Honor.
15    BY MS. PETERS:
16    Q    As relevant here, a remittitur can be a reduction of the
17    verdict?
18    A    Yes, ma'am, that's one of the options.  Yes, ma'am.  Yes,
19    ma'am.
20    Q    On July 10th of 2013, did you sign an order remitting the
21    verdict from 5.2 million to 1 million?
22    A    Yes, ma'am.  Yes, ma'am.  Yes, ma'am, it was from 5.2 to
23    1 million.  Yes, ma'am.
24    Q    Okay.  Is it a big deal to remit a verdict?
25    A    At the state level, yes, ma'am.  It's not -- it's not
```

Maggio - Direct

```
1   usual, I'll say that.  Yes, ma'am.

2   Q    Had you ever remitted a verdict before?

3   A    No, ma'am.

4   Q    Did you think there was a legal basis to remit this

5   verdict?

6   A    I did.

7   Q    And if the verdict was excessive, though, the defendant

8   could have appealed the judgment; is that right?

9   A    That's one of the options, yes, ma'am.

10  Q    So remittitur is not the only option to cure an over

11  large judgment?

12  A    No, ma'am.

13  Q    Likewise, if you had granted a new trial, either side

14  could have appealed that?

15  A    That's the other option, yes, ma'am.

16  Q    And if you had flipped the judgment in favor of the

17  nursing home, Martha Bull's family could have appealed that?

18  A    Correct.

19  Q    You said you thought there was a legal basis --

20  A    Yes, ma'am.

21  Q    -- to remit the verdict?

22  A    Yes, ma'am.

23  Q    Is that the only reason you did it?

24  A    No, ma'am.  I did plead guilty, and I took a bribe for

25  reducing.  Yes, ma'am.
```

Maggio - Direct

```
 1   Q    So are you saying that you reduced the verdict?

 2   A    I did, yes, ma'am.

 3   Q    And the reason you reduced it was?

 4   A    For the potential campaign donations, yes, ma'am.

 5   Q    Okay.  Between the day of the verdict, which was

 6   May 16th, and the day of your remittitur order, which is

 7   July 10th -- so almost two months there, right?

 8   A    Okay.  Yes, ma'am.

 9   Q    May 16th to July 10.

10   A    Yes, ma'am.

11   Q    Did you and Gilbert Baker ever talk about the Martha Bull

12   case?

13   A    I think he sent me a text message or two about it.  Well,

14   not about the case.  I mean, maybe rephrase.

15   Q    Okay.

16   A    I mean, we had --

17   Q    Let me try.

18   A    Yes, ma'am.

19   Q    Let me try again.  My question isn't great.

20   A    Okay.

21   Q    The verdict came back, it was $5.2 million.  That was a

22   really big deal.  Can we agree on that?

23   A    Yes, ma'am.

24   Q    Okay.  And at some point you decided to reduce that

25   verdict?
```

Maggio - Direct

```
 1   A    Yes, ma'am.

 2   Q    In between those times, did Mr. Baker talk to you on

 3   behalf of Mr. Morton?

 4   A    Well, he talked to me -- we did have a couple

 5   conversations -- communications about, I guess, the case.

 6   Q    Okay.  Would you tell us what he told you about the

 7   Martha Bull case?

 8   A    One communication was he sent me an e-mail, text message,

 9   e-mail about win, lose or draw, you'll still have Mr. Morton's

10   support I think is what it said.  And another instance, it was

11   a communication of, Mr. Morton's paying attention to the case,

12   or watching the case.  He understands it's a tough decision,

13   and he appreciates making a tough decision.

14   Q    So Mr. Morton is watching the case?

15   A    Yes, ma'am.

16   Q    Knows it's a tough decision, would appreciate the tough

17   decision?

18   A    And appreciates the tough decision, yes.  Appreciates a

19   tough decision, yes, ma'am.

20   Q    So you thought Mr. Baker was telling you what Mr. Morton

21   wanted?

22             MR. HENDRIX:  Objection to leading, Your Honor.

23             THE COURT:  Sustained.  Mr. Maggio can testify what

24   he thought about that, Ms. Peters.  If you'll rephrase.

25             MS. PETERS:  Yes, Your Honor.
```

Maggio - Direct

1   BY MS. PETERS:

2   Q    What did you think Mr. Baker was telling you there?

3           MR. HENDRIX:  Objection to speculation, Your Honor.

4           THE COURT:  No, overruled on that basis.

5           THE WITNESS:  Well, I think it was implied that

6   Mr. Morton would be -- would be happy, or more happy, I guess,

7   for a reduced verdict, or granting of the remittitur, or any

8   of the motions, I guess, because he didn't say anything

9   specific about remittitur, just any of the tough decisions.

10  So . . .

11  BY MS. PETERS:

12  Q    Anything that would benefit the nursing home?

13  A    Yes, ma'am.  That's reasonable to expect.

14  Q    When Mr. Baker talked to you on behalf of Mr. Morton, did

15  you tell the attorneys for Martha Bull's family about that

16  communication?

17  A    No, ma'am.

18  Q    I'm going to show you some exhibits now that have already

19  been admitted.

20  A    Yes, ma'am.

21          MS. PETERS:  So can we have government exhibit 73

22  highlighted?

23  BY MS. PETERS:

24  Q    Okay.  Mr. Maggio.

25  A    Yes, ma'am.

Maggio - Direct

```
 1  Q    Let me move this microphone.
 2            You see there that's May 16th, the day the verdict
 3  came back?
 4  A    Yes, ma'am.
 5  Q    And you all have some communication in the morning?
 6  A    Yes, ma'am.
 7  Q    And then a call midafternoon?
 8  A    Yes, ma'am.
 9  Q    And the verdict came back about 5:50.  I think the Court
10  resumed at about 5:47, and we see some contacts there around
11  6:22 and after?
12  A    Yes, ma'am.
13  Q    Okay.  And, now, you know that the FBI seized your phone,
14  right?
15  A    I gave it to them, yes, ma'am.
16  Q    Okay.  And they've searched your phone?
17  A    Yes, ma'am.
18  Q    But they were only able to recover some things, not all
19  things?
20  A    Yes, ma'am.
21            MS. PETERS:  And Mr. Bowen, could you please put up
22  Government Exhibit 8A with this Exhibit 73?  There we go.
23  Could you please zoom in on 8A?
24            THE WITNESS:  Thank you.
25            MS. PETERS:  Okay.  There we go.
```

Maggio - Direct

1    BY MS. PETERS:

2    Q    You see there this Government Exhibit 8A, which is the

3    text message that was received by you at 10:33 a.m. on

4    May 16th?

5    A    Yes, ma'am.

6    Q    So that is the -- or 10:33 a.m., that's right there on

7    the chart, too, right?

8    A    Yes, ma'am.

9    Q    Okay.  And that was from S. Baker, we've established as

10   Mr. Baker, and you were Da Judge, and this was deleted from

11   your phone.

12   A    Yes, ma'am.

13   Q    You did delete text messages from your phone?

14   A    I did; yes, ma'am.

15   Q    And would you please read the text message to the jury?

16   A    "I have a LR lunch today with nursing home folks.  The

17   topic will be judicial races.  You are top of the list."

18   Q    So this is Mr. Baker talking to you in May, May 16th of

19   2013?

20   A    Yes, ma'am.

21   Q    In the morning.

22        And what did you understand that text message to be

23   about?

24   A    Just what he's saying, that he's got a meeting with

25   nursing home folks.  They're going to talk about a bunch of

Maggio - Direct

1    judicial races, of which I'm top of the list.

2    Q    And what was he going to do for you in your judicial

3    race?

4    A    He was going to raise money.

5    Q    Let's go back to just Government Exhibit 73.  You can

6    take away 8A.

7              All right.  So you see there at 1:25 p.m. Mr. Baker

8    calls you?

9    A    Yes, ma'am.

10   Q    Do you remember what that call was about?

11   A    I have no recollection at all.

12   Q    Okay.  Could it have been about the lunch?

13   A    It could have been.  I just have no -- I mean, that's

14   been eight years ago, over eight years ago.

15   Q    We understand.

16             Okay.  How about knowing that the verdict came back

17   at around 5:50 p.m., you see there there's a text message from

18   you to Mr. Baker at 6:22.

19   A    Yes, ma'am.

20   Q    And then you see Mr. Baker is contacting you at 6:40, and

21   you reply at 6:44.

22   A    Yes, ma'am.

23   Q    Do you know what those text messages were about?

24   A    No, ma'am, I don't have any recollection.

25   Q    Do you have any educated guess what they were about?

Maggio - Direct

1    A    It would be just a guess strictly.  I mean, I . . .

2    Q    Did you talk with him about the verdict?

3         MR. HENDRIX:  Your Honor, again, object to leading

4    the witness.

5         THE COURT:  Overruled.

6         You can answer.  Please do answer the question, sir,

7    of did you talk with him about the verdict that night.

8         THE WITNESS:  I'm sure at some point we did talk

9    about a verdict.  I'm sure, I just -- I'm sure.

10   BY MS. PETERS:

11   Q    You don't remember the specific content of the text

12   messages?

13   A    No, I don't.

14   Q    We have to take turns talking so the court reporter can

15   take down what we're saying.

16   A    Yes, ma'am.

17   Q    So let me just clarify that.

18        You remember communicating about the verdict or the

19   size of the verdict?

20   A    I'm sure we did.  I'm sure, but I -- I can't tell you

21   what words or what -- or how.  I'm sure.

22   Q    Okay.

23   A    I . . .

24        MS. PETERS:  Could we change to Government

25   Exhibit 74 highlighted?

Maggio - Direct

1   BY MS. PETERS:

2   Q    And I can represent to you it's already been admitted,

3   that on June 17th the nursing home filed that -- the motions

4   that you wound up hearing on July the 8th.

5   A    Yes, ma'am.

6   Q    At 10:05.

7         And that night there's a series of text messages

8   with Mr. Baker reaching out to you and then going back and

9   forth.  I know it's eight years.  Do you have any recollection

10  what those texts were about?

11  A    No, ma'am, I don't.  I really don't.

12  Q    Government Exhibit 75, please.  And we're just going to

13  look at June 27th.  That's the day you announced for the court

14  of appeals.  I know you don't remember the words, but do you

15  know what those text messages were about?

16  A    An educated guess would be, it would be a guess, about

17  the announcement.

18  Q    Okay.  Well, let me ask you this.  During this time

19  period right around your getting ready to gear up to announce

20  your campaign and fundraising, and the case is going on

21  between the verdict and the remittitur, did you and Mr. Baker

22  talk about anything other than the case and the campaign?

23  A    Uh, we may have, I just -- but I . . .

24  Q    What would you have talked about that wasn't about the

25  case or the campaign?

Maggio - Direct

1   A    Well, we may have talked about Rhonda's campaign.  We may

2   have talked about something, Cody Hiland, or Troy Braswell, I

3   don't know, but . . .

4   Q    Campaign matters?

5   A    Yes.  Campaign matters, yes.

6   Q    Yes.

7   A    Maybe not specific to me.  I understand, now.  Would have

8   been about campaign matters, yes, ma'am.

9            MS. PETERS:  And if we could zoom this back out,

10  please.

11  BY MS. PETERS:

12  Q    You see there on June 29th, that's two days after you

13  announced?

14  A    Yes, ma'am.

15  Q    Okay.  And that's the remittitur motion is still pending?

16  A    Yes.

17  Q    All the motions are pending.

18  A    Yes.

19           MS. PETERS:  And could we compare this with

20  Government Exhibit 8B?

21  BY MS. PETERS:

22  Q    Okay.  You see there this is a text message on~--

23           MS. PETERS:  Can you move that up a little bit so we

24  can see the date?  There we go.

25  BY MS. PETERS:

Maggio - Direct

1    Q       -- on June the 29th, at 8:15 a.m., right?

2    A    Yes, ma'am.

3    Q    Okay.  So you can see that there in the toll list on

4    June 29th?

5    A    Yes, ma'am.

6    Q    And could you read -- that's a text message from

7    Mr. Baker to you.  Could you read that, please?

8    A    Yes, ma'am.  "Well, your first 50K is on the way.  When

9    can we take the money?"

10   Q    50K stands for?

11   A    50,000.

12   Q    Dollars?

13   A    Yes, ma'am.  Yes, ma'am.

14   Q    And "when can we take the money" refers to the rules

15   about when judges could start soliciting?

16   A    That's what I took that to mean, yes, ma'am.

17   Q    Did Mr. Baker know that rule?

18   A    I sure hoped he did.  I thought he did.  He had raised

19   money for lots of judges, and he was familiar with them, what

20   I figured.

21   Q    And then if we could take a look now at Government

22   Exhibit 8C.  And this looks like your reply at 8:20, and would

23   you read the first two lines up there?

24   A    "Thank you," exclamation, exclamation.  "Unfortunately,

25   not 'til late November."

Maggio - Direct

1    Q    Where did you understand that Gilbert's 50K was coming

2    from?

3    A    Well, as I said earlier, various different sources, but I

4    assumed that some of it was probably coming from the nursing

5    home folks.

6    Q    Did you believe that some of the 50,000 was going to be

7    coming from Michael Morton?

8    A    I don't know if necessarily at that time I did, but at

9    some point I did, yes, ma'am, I did feel like it was a

10   potential that he might send some money.

11   Q    Now, why would --

12        MS. PETERS:  If we could go back to 8B, please.

13   BY MS. PETERS:

14   Q    Why would Mr. Gilbert be asking you when you could take

15   the money if he already knows, do you know?

16   A    I don't know.  You'd have to ask him that question.  I

17   don't know.

18        MS. PETERS:  Let's take a look at Government

19   Exhibit 76 highlighted, please, and if we could zoom in on the

20   tolls for July 9th.

21   BY MS. PETERS:

22   Q    Again, I know it's been just over eight years.  Do you

23   have any recollection what these calls were about on July 9th?

24   A    No, ma'am, have no idea.

25   Q    Mr. Maggio, did Mr. Baker ever come out and tell you,

Maggio - Direct

1    word for word, that he wanted you to reduce the judgment by

2    $4.2 million in exchange for campaign contributions from

3    Mr. Morton?  Did he ever say those words?

4    A    Not those exact words, no, ma'am.

5    Q    How, then, did you know what he was asking you to do and

6    what he was offering?

7    A    I think it was just a combination of linking up a couple

8    of communications that I understood that he was offering -- it

9    would be easier to get money from nursing home folks, some of

10   which might come from Mr. Morton, you know, for a tough

11   decision is what he said, for a tough decision.  And I took

12   that to mean granting the remittitur.

13   Q    Or taking some favorable action?

14   A    Yes, ma'am.

15   Q    For the nursing home?

16   A    Yes, ma'am.

17   Q    Now, we talked about your guilty plea, or that you pled

18   guilty.

19   A    Yes, ma'am.

20   Q    And why did you plead guilty?

21   A    Um, based upon advice of counsel, I pled guilty because I

22   reduced -- or I granted --

23   Q    Let me ask it this way:  Did you take a bribe?

24   A    Yes, ma'am, that's what I pled guilty to.  Yes, ma'am.

25   Q    Well, that's what you pled guilty to.

Maggio - Direct

1   A    Yes, ma'am.

2   Q    And did you plead guilty to it because you took a bribe,

3   because factually it's true?

4   A    Yes, ma'am.

5   Q    Without going into the law, at some point you had some

6   legal issues about your plea; is that right?

7   A    Yes, ma'am.

8   Q    And whether you thought it met some elements?

9   A    Correct.

10  Q    Okay.  But that was resolved that it did?

11  A    Correct.

12  Q    And when you first pled guilty, or when you pled guilty,

13  the one time you pled guilty, in January of 2015, at that time

14  did you plan to cooperate in the government's investigations?

15  A    Yes, ma'am.

16  Q    And what was the government asking you to do?

17  A    Tell what I knew or ask -- answer the questions as asked.

18  Yes, ma'am.

19  Q    Between 2014 and today, about how many times do you think

20  you've met with the FBI to talk about this case?

21  A    I don't know, eight, nine.  You know the -- I mean, I

22  don't know exactly how many.

23  Q    Eight or nine, that sounds -- that's your answer.

24  A    I don't know.

25  Q    And since your plea, have you gone back and forth on

Maggio - Direct

```
 1   whether or not you wanted to cooperate in the investigation?
 2   A    Yes, ma'am.
 3   Q    Why?
 4   A    Some of it is based upon advice of counsel at the time,
 5   that there were issues with the plea, and there were issues
 6   with the case.  So some of it was where I was at the time.
 7   Q    What do you mean by, where I was at the time?
 8   A    I guess where the case was.  I shouldn't say where I was;
 9   where the status of the case was at the time.
10   Q    So at some point you tried to take back your guilty plea?
11   A    Much like General Flynn, yes, I tried to withdraw my
12   plea, yes.
13   Q    What did you factually understand a quid pro quo to be?
14   A    Well, my definition of a --
15   Q    Let me just ask you factually, because I'm trying not to
16   veer into the law.  But I know you had a very vivid image of
17   what you thought a quid pro quo should look like.
18   A    Yes.
19   Q    And so, can you describe that image?
20   A    Was a direct formal communication, I have this for that.
21   Q    Okay.  And when you do this, what's this?
22   A    This would be a bag of money or a suitcase of money or
23   whatever you want to call it, money, but I need you to do
24   this, and then you be specific, detailed, this is what I need
25   you to do.  And that was my understanding, I guess, of a
```

Maggio - Direct

1   bribe.

2   Q    That it would require somebody to show up with a bag of

3   money and lay it out for you word for word?

4   A    Yes, ma'am.

5   Q    And in the past, there have been times when you said

6   there was no quid pro quo with Mr. Baker.  Why did you say

7   this?

8   A    Because there was never any money brought to me, there

9   was never any to the campaign that I was aware of.  There was

10  no -- in my definition, that never happened.

11  Q    Well, was there a quid pro quo?  You know what the legal

12  definition is now, and I'm not going to relate it.

13           MR. HENDRIX:  Your Honor.

14           THE COURT:  I'm going to sustain the objection that

15  started to be made.  The witness, I don't think, can say

16  whether there was a quid pro quo.

17  BY MS. PETERS:

18  Q    Let me ask it this way:  Did you take favorable action in

19  the nursing home suit about the judgment in exchange for

20  campaign contributions offered to you by Mr. Baker?

21  A    The potential campaign -- yes, ma'am.  Yes, ma'am, that

22  was why I did that.  Yes, ma'am.

23  Q    And you said before, you thought you had a legal basis?

24  A    Oh, yes, ma'am.

25  Q    But what ultimately made the decision for you was wanting

Maggio - Direct

1  that money?

2  A     It was a part, but not the part of the decision.

3  Q     A part, but not the only part is what you're saying?

4  A     Correct.

5  Q     Has anybody forced you to come in here and testify today?

6  A     No, ma'am.

7  Q     And did anybody at the government's table there,

8  including me, me, Pat, Jake, Ward, has anybody there ever told

9  you that we were going to prosecute your wife if you didn't

10  plead guilty?

11  A     That was communicated to me through counsel, prior

12  counsel.  So, I don't know.  All I can say is I can't say

13  y'all did; no, ma'am.

14  Q     Okay.  Well, did any of us ever speak to you and say to

15  you directly, this is what we're going to do?

16  A     No, ma'am.

17          MS. PETERS:  Your Honor, could I request a sidebar

18  for just a minute?

19          THE COURT:  Of course, you may.

20          Ladies and gentlemen, bear with us.  If anyone needs

21  to stand up and stretch, take a seventh inning stretch, either

22  the jury, or the public or our witness, y'all may do so.

23      (The following proceedings were held at sidebar:)

24          THE COURT:  Mr. Hendrix, I'm sorry, I didn't mean to

25  cut you off on your objection, I just thought I knew what you

Maggio - Direct

1    were going to say.

2          MR. HENDRIX:  Thank you so much, Your Honor.

3          THE COURT:  Ms. Peters.

4          MS. PETERS:  Your Honor, I have a bit of a struggle

5    here, because, you know, counsel in opening statement said

6    you're going to hear that he pled guilty because the

7    government threatened him, and if he didn't plead guilty they

8    were going to prosecute his wife.  I know for a fact that we

9    didn't do that, and he has said that his counsel might have

10   told him that, or did tell him that, I don't know.

11         But my answer would be to that, I would like to ask

12   him, do you think your wife did anything criminal, because I

13   think the answer will be "no," and then would be, so why would

14   somebody want to prosecute her?

15         However, I'm trying to be careful here.  I don't

16   want to imply that only guilty people get prosecuted.  So

17   could I get some --

18         THE COURT:  Hmm, okay.  That request for advisory

19   opinion noted.

20         MS. PETERS:  Yes.

21         THE COURT:  And Mr. Hendrix, what's your . . .

22         MR. HENDRIX:  I'm interested in your response,

23   Judge.

24         THE COURT:  I might suggest to the government that

25   it develop the facts here.  Was your wife involved with you in

Maggio - Direct

1    the campaign?  Yes.  She supported you?  Yes.  Did she have

2    anything to do with Gilbert Baker and money from the nursing

3    home?  No.

4              MS. PETERS:  I think that will get me . . .

5              THE COURT:  Did she -- did you talk with her about

6    reducing the verdict?  And maybe you'll get an objection on

7    marital privilege, but I think you can put out the facts

8    without getting into your guilty crime thing.

9              MS. PETERS:  Thank you.  I can do it that way.

10   Thanks for the advice.

11             THE COURT:  You're welcome.

12             There you go.  How'd I do, Mr. Hendrix?

13             MR. HENDRIX:  Perfect.  Thank you, Judge.

14   Objection, overruled.

15        (Sidebar conference concluded.)

16             THE COURT:  Ms. Peters.

17   BY MS. PETERS:

18   Q    Mr. Maggio, your wife helped you in your campaign; is

19   that right?

20   A    She did; yes, ma'am.

21   Q    Briefly, what did she do on behalf of your campaign?

22   A    Well, she was definitely the better looking of us two.

23   Q    I'm sorry, the better . . .

24   A    She was better looking of the two of us, so she was a big

25   help in that aspect.  I mean, everybody loves her, so . . .

Maggio - Direct

1    But specific to the campaign, she, she deposited money when

2    the funds came, she would deposit them into the bank, gather

3    them up and make a spreadsheet and then gave it to the -- our

4    campaign treasurer at the time.

5    Q    And did you ever talk to her about the bribe?

6    A    No.

7    Q    Did you ever talk to her about the things, what Gilbert

8    Baker told you --

9    A    No.

10   Q    -- about the Bull case?

11   A    No.

12   Q    When was the first time you told her that you took a

13   bribe, face to face?

14   A    Last week, maybe.  I don't . . .

15   Q    Recently?

16   A    Yes.

17   Q    So you'd never --

18   A    Last 10 days, maybe.  How about that?

19   Q    But she was not involved in any of this --

20   A    No.

21   Q    -- activity?

22   A    No, ma'am.

23   Q    She didn't know it was going on?

24   A    She's not a big fan of politics, and even less now.

25   Q    Has anybody told you what to say today?

Maggio - Direct

1   A    The truth, that's all, the admonition.

2   Q    And has the government made you any promises?

3   A    Um, as far as -- promises for?

4   Q    Well, the government filed a motion, right?

5   A    Yes, ma'am.

6   Q    Under Rule 35.

7   A    Yes, ma'am.

8   Q    And let your sentencing judge know that you were

9   attempting to cooperate with the government, right?

10  A    Yes, ma'am.

11  Q    And so does that agreement say if you testify truthfully,

12  the government will recommend a reduced sentence?

13  A    Yes, it does.

14  Q    Who makes the final decision about your sentence?

15  A    The sentencing judge.

16  Q    What happens if you do not tell the truth?

17  A    Probably no reduction.

18  Q    Could you --

19  A    Could maybe get charged with something else.

20  Q    Like perjury?

21  A    You know more about your federal court than I do, but

22  that's probably one of the options.

23  Q    So what has the government asked of you?

24  A    To answer the questions truthfully.

25  Q    Now, when everything happened -- because we know that

Maggio - Direct

```
 1   everything exploded in March of 2014, right?

 2   A    Oh, it did, yes, ma'am.

 3   Q    All went down the tubes.

 4   A    Yes, ma'am.

 5   Q    And you decided not to run for judge?  You did not run

 6   for judge?

 7   A    Yes.  I was not allowed to run for judge, that's for

 8   sure, yes.

 9   Q    Okay.  When it all came out in March of 2014, did you

10   continue talking with Mr. Baker?

11   A    I don't believe so.  I don't have any recollection of any

12   contact with him.

13          MS. PETERS:  And Mr. Bowen, could we have Government

14   Exhibit 77?

15   BY MS. PETERS:

16   Q    Now, this has been admitted, and I'll just represent to

17   you the phone records show that the last time you talked to

18   Mr. Baker in March was March 16th of 2014, and then you all

19   have no contact until he sends you a text message on July 26.

20   Do you see that there?

21   A    Yes, ma'am.

22          MS. PETERS:  And Mr. Bowen, could we have Government

23   Exhibit 8D?

24   BY MS. PETERS:

25   Q    What is Mr. Baker saying there?  Could you read the text?
```

Maggio - Direct

```
1    A    "Hey there.  Hope you are okay?  Been thinking about you.
2    Hang in.  You are a good guy.  Your friend, GB."
3    Q    Do you have any idea what prompted him to send that
4    message?
5    A    None at all.
6    Q    And back in March of 2014, did anyone ask you to delete
7    your text messages?
8    A    Yes.
9    Q    Who asked you to delete your text messages?
10   A    Judge Wood.
11   Q    And did she ask you to delete messages with her?
12   A    Yes.
13   Q    What about messages with Gilbert Baker?
14   A    Yes.
15   Q    Did you delete your text messages?
16   A    Yes, ma'am.
17             MS. PETERS:  And, Your Honor, may I have just a
18   moment?
19             THE COURT:  You may.
20             MS. PETERS:  Your Honor, that concludes direct
21   examination.
22             THE COURT:  Thank you, Ms. Peters.
23             Ladies and gentlemen of the jury, it's a good time
24   for us to take a lunch break.  The usual rules of the road
25   apply:  Don't talk among yourselves about the case, don't let
```

Maggio - Direct

1   anybody talk to you about the case.  If you -- I started to

2   say if you leave the courthouse, but even if you don't, keep

3   your juror tag on.  Remember that I've suspended the rules of

4   good manners.

5           Keep your promises to me of not posting anything on

6   any social media website about your service, not looking up

7   anything on the Internet about the case, and staying away from

8   places where there might be media coverage about the case.

9           Any logistical issue that any juror wants to raise

10  with me?

11          Juror number 4, thank you.  Your glasses are looking

12  clearer, and I appreciate -- it's been a morning of what my

13  mother would call fits and starts, and thank y'all for putting

14  up with it.

15          We'll take a full hour for lunch, and we'll be back

16  here and at work at 12:30.

17          All rise for the jury.

18          Take your pads, please, and give them to Officer

19  Pike.  Sorry.

20      (The jury exits the courtroom.)

21          THE COURT:  Counsel, any ground to cover?

22          MS. PETERS:  Not for the government, Your Honor.

23          MR. HENDRIX:  No, thank you, Judge.

24          THE COURT:  Very good.

25          Doing okay?

1            THE WITNESS:  What's for lunch?

2            THE COURT:  Good.

3            Marshals.

4       (A recess was taken from 11:30 a.m. to 12:30 p.m.)

5                          *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Stephen W. Franklin, RMR, CRR, CPE
United States Court Reporter
stephen_franklin@ared.uscourts.gov (501)604-5145

```
1                           *  *  *  *  *

2                          I N D E X

3    Testimony of Rhonda Wood (Resumed)

4            Cross by Mr. Hendrix              520

5            Redirect by Mr. Harris           534

6            Recross by Mr. Hendrix           539

7            Further Redirect by Mr. Harris   541

8    Testimony of David J. Sachar

9            Direct by Ms. Peters             546

10           Cross by Mr. Hendrix             572

11   Testimony of Michael Maggio

12           Direct by Ms. Peters             585

13                          *  *  *  *  *

14                       E X H I B I T S

15   (None.)

16                          *  *  *  *  *

17                  CERTIFICATE OF REPORTER

18       I, Stephen W. Franklin, Registered Merit Reporter, and

19   Certified Realtime Reporter, certify that the foregoing is a

20   correct transcript, to the best of my ability, from the record

21   of proceedings in the above-entitled matter.

22       Dated this 28th day of JULY, 2021.

23

24       /s/Stephen W. Franklin
         _____
25       Stephen W. Franklin, RMR, CRR
```

Stephen W. Franklin, RMR, CRR, CPE
United States Court Reporter
stephen_franklin@ared.uscourts.gov (501)604-5145