1             IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF ARKANSAS

2
            Case No.   4:19-CR-00031-DPM-1

3

4   UNITED STATES OF AMERICA

5                 GOVERNMENT,

6       vs.

7   GILBERT R. BAKER,
                       Little Rock, Arkansas

8             DEFENDANT.     July 28, 2021, 12:30 p.m.

9

10           **VOLUME 4B - PAGES 623 - 733**
          **TRANSCRIPT OF JURY TRIAL PROCEEDINGS**
        BEFORE THE HONORABLE D. PRICE MARSHALL, JR.,

11          UNITED STATES DISTRICT JUDGE and a jury

12
  APPEARANCES:

13
  On Behalf of the Government:

14
     MS. JULIE E. PETERS, ESQ., AUSA

15     MR. PATRICK C. HARRIS, ESQ, AUSA
     United States Attorney's Office

16      Eastern District of Arkansas
      425 West Capitol Avenue, Suite 500

17      Post Office Box 1229
      Little Rock, Arkansas  72203-1229

18

19  On Behalf of the Defendant:

20     MR. J. BLAKE HENDRIX, ESQ.,
     MS. MARGARET D. DEPPER, ESQ.

21      Fuqua Campbell, P.A.
      Riviera Tower

22      3700 Cantrell Road, Suite 205
      Little Rock, Arkansas  72202

23

24     Proceedings reported by machine stenography and displayed
  in realtime; transcript prepared utilizing computer-aided

25  transcription.

Case 4:19-cr-00031-DPM   Document 124   Filed 08/13/21   Page 2 of 111

624

```
 1          (Proceedings continued on July 28, 2021, at 12:30 p.m.)
 2               THE COURT:  Thank you, Ms. Black.  Good afternoon,
 3    everyone.  Everybody ready to go?
 4               MR. HENDRIX:  Yes, sir.
 5               MS. PETERS:  Yes, Your Honor.
 6               THE COURT:  Good.  Apologies.  I'm a few minutes late.
 7         Officer Pike, do we have our 12 plus two?
 8               COURT SECURITY OFFICER:  Yes, Your Honor.
 9               THE COURT:  We'll take them.
10         (Jury present.)
11               THE COURT:  Everyone may be seated.
12         Mr. Hendrix?
13               MR. HENDRIX:  Thank you, Your Honor.
14         MICHAEL MAGGIO, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN
15                         CROSS EXAMINATION
16    BY MR. HENDRIX:
17    Q.   Good afternoon, Mr. Maggio.
18    A.   Good afternoon, Mr. Hendrix.
19    Q.   How are you?
20    A.   Well, under the conditions, about as good as I can be, I
21    guess.
22    Q.   I beg your pardon?
23    A.   About as good as I can be, I guess.
24    Q.   I completely understand.  We've got a lot of work to do
25    this afternoon.  I suspect it's going to go longer than your
```

Kathleen E. Maloney, RMR, FCRR, U.S. Court Reporter
kathleen_maloney@ared.uscourts.gov - 501-604-5115

1  direct examination.  Okay?  Sit back, relax, pull the microphone
2  up, and we'll get down to business.  Okay?
3  A.   Sounds good.
4  Q.   What I would like to start with, Mr. Maggio, is to be able
5  to establish a clear timeline of events in your case with the
6  jury.  Okay?  Be patient as we work through this.
7  A.   Yes, sir.
8  Q.   October 20th, 2014, October 20th, 2014, that was the date
9  of your first interview with the prosecution team.  Do you
10  recollect that?
11  A.   I don't.  I know I had one, but --
12  Q.   Sure.  I'm going to help you because I know this has been
13  about seven years ago.
14  A.   I figured you would.
15  Q.   I want to be able to help you remember these things.  You
16  are aware of a thing called the FBI 302?  It's the document --
17  so I'm going to give you this date.  October 20, 2014, you sat
18  down and had a meeting at the U.S. Attorney's Office with Julie
19  Peters and your two lawyers at the time, Lauren Hamilton and
20  Marjorie Rogers; is that right?
21  A.   Yes, sir.
22  Q.   Do you remember that?
23  A.   Yes, sir.
24  Q.   You signed a proffer agreement at that time?
25  A.   Yes, sir.

1  Q.    And what happened was, is after that interview, the agents

2  then typed up their notes of that interview?

3  A.    Okay.  I understand.

4  Q.    And I have now access to the notes that I have made of

5  that.  So my notes reflect in accordance with the FBI 302

6  generated from that interview that you were first interviewed

7  October 20, 2014.  Any need to disagree with that?

8  A.    No, sir.

9  Q.    Okay.  Second-most important date or next date, October 27,

10 2014, was your second time for sitting down with the prosecution

11 team.

12 A.    No reason to dispute that.

13 Q.    It was a week later.  December 11, 2014, was your third

14 interview.

15 A.    No reason to dispute that.

16 Q.    Okay.  January 9, 2015, was the date you pleaded guilty?

17 A.    I won't forget that date.

18 Q.    So from -- let's work our way through that as a little

19 sidetrack from our timeline.  You pleaded guilty to what's

20 called a felony information, correct?

21 A.    Yes, sir.

22 Q.    You waived your right to be indicted by a grand jury?

23 A.    Yes, sir.

24 Q.    You reached a plea agreement with the government?

25 A.    Yes, sir.

1    Q.    And you pleaded to one offense, correct?

2    A.    Correct.

3    Q.    Federal program bribery, correct?

4    A.    Yes, sir.

5    Q.    That, a conviction on federal program bribery, carries a

6    maximum term of ten years.  You're aware of that?

7    A.    Well, I know that.

8    Q.    And so what happened is you and your attorneys, I gather

9    Ms. Hamilton and Ms. Rogers, negotiated this plea agreement with

10   the government that you would agree to plead to one count of

11   federal program bribery, yes?

12   A.    Yes, sir.

13   Q.    Other offenses that were negotiated away in that were a

14   conspiracy count, right?

15   A.    I don't know if I was ever aware of any other count -- any

16   other charges.  This is what I was told was negotiated.

17   Q.    Okay.  You are aware that Mr. Baker's charged with

18   conspiracy?

19   A.    Not until --

20             MS. PETERS:  Objection, Your Honor.

21             MR. HENDRIX:  I'm asking if he's aware.

22             THE COURT:  Overruled.  You can ask.

23   BY MR. HENDRIX:

24   Q.    Aware, unaware, that the government alleges his role in

25   this offense with you, he's also charged with conspiracy, but

1    you were not, correct?

2    A.    Apparently not, yes.

3    Q.    Okay.  Another offense is honest services wire fraud.  You

4    did not plead guilty to that, correct?

5    A.    Correct.

6    Q.    That was negotiated away by your attorneys, we assume, in

7    this pleading negotiations?

8    A.    Correct.

9    Q.    Okay.  Are you aware that honest services wire fraud

10   carries a maximum of 20 years?

11   A.    I was not aware of that.

12             THE COURT:  Stay away from the potential penalties,

13   Mr. Hendrix, please.

14             MR. HENDRIX:  Understood.

15   BY MR. HENDRIX:

16   Q.    So you plead guilty to one count of federal program

17   bribery, and you agree to cooperate with the government, right?

18   A.    Yes, sir.

19   Q.    And by cooperation we mean that, in exchange for your

20   assistance to the United States government in the prosecution of

21   others, that it may result in the government asking for your

22   sentence to get reduced, right?

23   A.    Yes, sir.

24   Q.    Because you were facing ten years at the time, right?

25   A.    Yes, sir.

1   Q.   A way to get that sentence down is to cooperate with the

2   government, right?

3   A.   Yes, sir.

4   Q.   Because your hope is that they will stand up in front of

5   your sentencing judge, Judge Miller, and go:  He helped us; give

6   him a lesser sentence, right?

7   A.   That's my understanding of the plea, yes.

8   Q.   So in your guilty plea, essentially to paraphrase -- and I

9   have read the whole plea colloquy, but what you essentially said

10  is:  I got bribed.  Michael Morton and Gilbert Baker did it,

11  right?

12  A.   I mean, I haven't seen my plea colloquy since then, but if

13  that's what I said, that's what I said.  Yes, sir.

14  Q.   Okay.  Good.  All right.  That brings us -- that's

15  January 9, 2015.  Next date in your case that I have is April 9,

16  2015.  You were interviewed again by the prosecution team.

17  A.   No reason to dispute that.

18  Q.   Then January 19, 2016, interviewed again?

19  A.   No reason to dispute that.

20  Q.   Do you recollect the January 19, 2016 -- did you know you

21  were being audio/video recorded?

22  A.   No.

23  Q.   You are aware that in the first four interviews you were

24  not being recorded?

25  A.   That was my understanding every time I met with them, was

1   to never be audio/video recorded.

2   Q.   Right.  The January 19, 2016, interview was actually

3   recorded.  Are you aware of that?

4   A.   I became aware of it much later, yes.

5   Q.   You did become aware of it?

6   A.   Yes.

7   Q.   And it was a lengthy interview?

8   A.   Yeah.  I don't know what you would define as lengthy but

9   more than a couple hours.

10  Q.   Did it seem longer than your first four interviews?

11  A.   Oh, yeah.

12  Q.   Okay.  Next relevant date, February 12, 2016.  February 12,

13  2016, is the date that you moved to withdraw your guilty plea?

14  A.   No reason to dispute that.  Yes, sir.

15  Q.   Okay.  And then on February 26 -- so six days later --

16  pardon me -- February 26, 2016, Judge Miller held a hearing in

17  his courtroom on your motion to withdraw your guilty plea.  Do

18  you remember that?

19  A.   Yes, sir.

20  Q.   March 10, 2016, March 10, 2016, Judge Miller denied your

21  motion to withdraw your guilty plea.  Do you remember that?

22  A.   Oh, yeah.

23  Q.   And then I know you will remember this specifically.

24  March 24, so two weeks later, March 24, 2016, is when you were

25  sentenced?

1    A.    In 2016?

2    Q.    Yes, sir.  March 24, 2016, was your sentencing hearing?

3    A.    Yes, sir.

4    Q.    Okay.  And Judge Miller sentenced you to ten years,

5    correct?

6    A.    Yes.

7    Q.    All right.  I sidetracked here.  At that point you -- and I

8    think you had new lawyers at that time -- appealed Judge

9    Miller's order denying the oral motion to withdraw your guilty

10   plea.  It was an appeal to the Eighth Circuit Court of Appeals

11   in St. Louis.  Do you remember that?

12   A.    Yes, sir.

13   Q.    Unsuccessful appeal, correct?

14   A.    Yes.

15   Q.    July 3, 2017, the Eighth Circuit Court of Appeals affirmed

16   Judge Miller's denial of your motion to withdraw your guilty

17   plea, correct?

18   A.    Yes, sir.

19   Q.    Sound right?  Next date is October 29, 2018.  You are in

20   the Bureau of Prisons in 2018, correct?

21   A.    Yes, sir.

22   Q.    October 29, 2018, you filed what we call a petition for a

23   writ of habeas corpus; is that right?

24   A.    Yes, sir.

25   Q.    You didn't have an attorney at that point?

1   A.    No, sir.

2   Q.    And when you file a petition for writ of habeas corpus, you

3   have to verify it, correct?

4   A.    Yes, sir.

5   Q.    And you signed your petition for a writ of habeas corpus

6   saying, I'm under oath and I certify the following facts to be

7   true and correct to the best of my knowledge and belief, right?

8   A.    Yes, sir.

9   Q.    And so, in your motion to withdraw your guilty plea, coming

10  up through your petition for writ of habeas corpus, essentially

11  you were saying the following:  I am innocent; I was forced into

12  pleading guilty; let me out of the pen.  Fair enough?

13  A.    Yes, sir.

14  Q.    Okay.  Next date.  December 6, 2018, December 6, 2018, you

15  essentially changed your mind and you executed a post-sentencing

16  cooperation with the United States Attorney's Office.  Do you

17  remember that?

18  A.    Yes, sir.

19  Q.    You signed it?

20  A.    Yes, sir.

21  Q.    Ms. Peters signed it on behalf of Cody Hiland, the

22  then-United States Attorney, right?

23  A.    Yes, sir.

24  Q.    Let me show this to you.  I'm referring to proposed Defense

25  Exhibit 7B.

1          MR. HENDRIX:  May I approach, Your Honor?

2          THE COURT:  You may.

3    BY MR. HENDRIX:

4    Q.   Proposed Defense Exhibit 7B is your post-sentencing

5    cooperation agreement; is that correct?

6    A.   Yes, sir.

7    Q.   And if you'll look on page 3, you signed it?

8    A.   Yes, sir.

9    Q.   Julie Peters signed it on behalf of Cody Hiland, the United

10   States Attorney?

11   A.   Yes, sir.

12   Q.   And your then-attorney, James Henley, signed it, correct?

13   A.   Correct.

14   Q.   Okay.

15         MR. HENDRIX:  Your Honor, at this point I would move

16   to introduce Defendant's Exhibit 7B.

17         MS. PETERS:  No objection, Your Honor.

18         THE COURT:  Received.

19       (Defendant's Exhibit No. 7B was received in evidence.)

20   BY MR. HENDRIX:

21   Q.   On that same date, December 6, 2018, after you executed the

22   post-sentencing cooperation agreement, you give another

23   statement to the prosecution team, right?

24   A.   Yes, sir.

25   Q.   Okay.  Next date, December 17th, 2018.

1  A.   Yes, sir.

2  Q.   So that would be the very next -- pardon me.  It's nine

3  days later.  You and your attorney meet with Agent Ward Seale.

4  Do you remember this?  This is the interview that you had

5  December 6, 2018, if it refreshes your recollection.  And you

6  told the -- you told Agent Ward Seale, I'll withdraw my habeas

7  corpus petition?

8  A.   Yes, sir.

9  Q.   And you ended up dismissing your habeas corpus petition,

10 right?

11 A.   That sounds right.

12 Q.   Okay.  Next date January 7, 2019, you meet again with the

13 government and give another statement.  Does that sound right?

14 A.   That sounds about right, yes, sir.

15 Q.   Okay.  And the purpose of this January 7, 2019, meeting

16 with the government is for actually the government to type up a

17 draft of your proposed grand jury testimony.  Do you remember

18 that?

19 A.   I don't remember that.

20 Q.   Let me show it to you and see if it jogs your memory.

21       THE COURT:  Mr. Hendrix, I think if we can use the

22 Elmo and not publish to the jury -- that is, just goes to the

23 lawyers and witness.  I don't know if you want to keep it back

24 and forth.  It's your call, to do it the old-fashioned way or to

25 use the Elmo.

1          MR. HENDRIX:  So it will only go to Mr. Maggio?

2          THE COURT:  To the lawyers, Mr. Maggio, and me.  Not

3     the jury until I admit the document.

4          MR. HENDRIX:  And I am not going to move to admit

5     this.  This is to refresh Mr. Maggio's memory.

6     BY MR. HENDRIX:

7     Q.   All right.  You see at the top Maggio Draft Grand Jury

8     Statement?

9     A.   Yes.

10    Q.   And it begins, My name is Mike Maggio?

11    A.   Yes, sir.

12    Q.   It's typed up, correct?

13    A.   Yes, sir.

14    Q.   Who typed it?

15    A.   I didn't.  I don't know who did.

16    Q.   Somebody with the government presented you with a typed-out

17    statement, a draft of your proposed grand jury testimony, right?

18    A.   I think that's -- no reason to dispute that, yes.

19    Q.   Yeah.  January 10, 2019, next important date, three days

20    later.  You meet again with the prosecution team.

21    A.   Yes, sir.

22    Q.   Good.  You make another statement at that point?

23    A.   Yes, sir.

24    Q.   And the purpose -- I want to refresh your memory real

25    quick.

1    The draft that was typed up for you about your testimony,

2  at the end it says, statement not completed.

3  A.    Yes, sir.

4  Q.    So on January 7, you were presented a typed-up document by

5  the government for what you were supposed to say in the grand

6  jury, but in that meeting, you didn't finish up the typewritten

7  statement, right?

8  A.    Appears that way.  Yes, sir.

9  Q.    Okay.  January 10, you meet -- January 10, 2019, you meet

10  again with the prosecution team, and it's to go back over the

11  draft of your proposed grand jury testimony.  Do you remember

12  that?

13  A.    Yes, sir.

14  Q.    Okay.  And then later that day you actually appear before

15  the grand jury here, January 10, 2019.  Do you remember that?

16  A.    I do.

17  Q.    And you testified in front of the grand jury?

18  A.    I did.

19  Q.    Seeking to get Gilbert Baker indicted on the charges which

20  he's accused of now?

21  A.    I don't know about that.

22         MS. PETERS:  Objection.

23         THE COURT:  Ms. Peters is standing up to object.  I

24  think it's an objection.

25         MS. PETERS:  It is, Your Honor.

1          THE COURT:  Let's meet at sidebar.

2          MS. PETERS:  Thank you.

3       (Sidebar conference reported as follows:)

4          THE COURT:  Ms. Peters.

5          MS. PETERS:  The objection is misleading the jury.  If

6   Mr. Hendrix would look at his notes, I would be happy to show

7   him mine, 302.  The statement was prepared on the 10th, not on

8   the 7th, and, I mean, just for the record, it was typed up with

9   Mr. Maggio sitting there.  302.

10         MR. HENDRIX:  That's fine, but --

11         MS. PETERS:  It's --

12         MR. HENDRIX:  Yeah.  That's fine.

13         MS. PETERS:  On the 10th.  That's all.  And I object

14  to misleading the jury that it was two separate --

15         MR. HENDRIX:  No worries.  Easily fixable by me.

16         THE COURT:  Thank you.

17      (End of sidebar conference.)

18  BY MR. HENDRIX:

19  Q.    January 10, 2019, so plow the ground of you were presented

20  with a typed document, a draft of your grand jury testimony

21  typed up by someone with the prosecution team; yes?

22  A.    Yes.

23  Q.    Later that day, then you testified, January 10, 2019, in

24  front of the grand jury, correct?

25  A.    Yes.

1    Q.    And it returns an indictment against Gilbert Baker.  Are

2    you aware of that?

3    A.    I am now.

4    Q.    By me?

5    A.    Well --

6    Q.    Gotcha.

7    A.    I became aware later.  How about that?

8    Q.    Okay.  Now, next day, January 14, 2019, that's the date

9    that the government files a motion under what we call Rule 35,

10   Federal Rules of Criminal Procedure, saying essentially,

11   Mr. Maggio, if you testify for the government in this case, as

12   you are doing right now, we may ask your sentencing court to now

13   reduce your sentence.  Do you remember that?

14   A.    Yes, sir.

15   Q.    And so on January 14, 2019, in anticipation of today, you

16   were hoping that now you will get back in front of Judge Miller

17   and Judge Miller will reduce your ten-year sentence in exchange

18   for this testimony that you are giving today, correct?

19   A.    That is certainly what I hoped, yes.

20             MR. HENDRIX:  Can I do this on the Elmo?

21             THE COURT:  Ms. Black, not to the jury or the public.

22             MR. HENDRIX:  Good.

23   BY MR. HENDRIX:

24   Q.    And is this the document that I'm talking about up at the

25   top, January 14, 2009, Government's Motion Pursuant to Federal

1   Rule of Criminal Procedure 35?  Do you recognize it?

2   A.   Yes, sir.

3           MR. HENDRIX:  Your Honor, I would move to introduce

4   Defendant's Exhibit 7A.

5           THE COURT:  Ms. Peters?

6           MS. PETERS:  Your Honor, I just -- I want to look at

7   something on the copy.  I think it's going to be fine.  No

8   objection.

9           THE COURT:  These motions are typically under seal.

10  Is the request for this exhibit to be under seal, or since we

11  all know about it, it's not an issue, or what?  Ms. Peters?

12          MS. PETERS:  Your Honor, at this point, because the

13  witness is testifying publically, I don't think there's any

14  reason to keep it under seal.

15          THE COURT:  Thank you.

16      7A is received then.

17      (Defendant's Exhibit No. 7A was received in evidence.)

18          MR. HENDRIX:  Judge, mechanically, I have got two

19  exhibits -- I know they'll go back to the jury.  I don't want to

20  keep this in my hand when the jury retires and be in my

21  backpack.  What should I do with it?

22          THE COURT:  Is it the original, or does Ms. Black have

23  the original?

24          MR. HENDRIX:  You have the original?

25          MS. BLACK:  I think.

1          THE COURT:  We have it.

2          MR. HENDRIX:  Thank you, Judge.

3          THE COURT:  Certainly.

4     BY MR. HENDRIX:

5     Q.    Next, finally, March 13, 2019, March 13, 2019, you were

6     serving your time, at this point in time, at the Big Sandy

7     Federal Constitutional Institute in Kentucky, correct?

8     A.    Yes, sir.

9     Q.    And you got paid a visit by a man named John Everett,

10    correct?

11    A.    If you say that.  I remember getting a visit.  I don't

12    remember the date.  But if that's --

13    Q.    He's an attorney for Michael Morton, correct?

14    A.    But I have no reason to dispute that's the date.  I did get

15    a visit from him.  Yes, sir.

16    Q.    Right.  And that's the last important date, and you

17    remember that interview, correct?

18    A.    I don't know -- I mean, I remember some of it.  It's been

19    two and a half years ago.

20    Q.    Sure.  Well, let me see if this jogs your memory.  You told

21    Mr. Everett --

22          MS. PETERS:  Objection, Your Honor.  This is hearsay

23    in the question.

24          MR. HENDRIX:  I'm trying to refresh his recollection,

25    which, my understanding of the Federal Rules of Evidence,

1  anything can be used to get a -- refresh a witness's
2  recollection.
3         THE COURT:  I'm not sure that it's proper to do it in
4  the form of a question in front of the jury.
5  BY MR. HENDRIX:
6  Q.   Did you tell Mr. Everett --
7         MS. PETERS:  Your Honor, I have the same objection.
8         THE COURT:  Counsel, I'll see you at the side here.
9      (Sidebar conference reported as follows:)
10        THE COURT:  Ms. Peters?
11        MS. PETERS:  Your Honor, may I just point out that
12 there's so many levels of hearsay.  It's what Mr. Everett told
13 Mr. Hendrix that Mr. Maggio said to him, and I don't think this
14 is the proper way to go about refreshing recollection, and I
15 think it's an effort to introduce hearsay through a question
16 and, if he denies it, it's still there in the record for the
17 jury to have heard.
18        THE COURT:  Rule 612 is about a writing used to
19 refresh, and I think we are on dangerous ground here by the way
20 you are phrasing the question, Mr. Hendrix.
21        MR. HENDRIX:  Beg your pardon?
22        THE COURT:  By the way you are doing it, stating the
23 question, sort of putting the hearsay information out there in
24 the question.
25        MR. HENDRIX:  Here's my view of this legal issue.  The

1    witness has said he does not remember this interview.  His

2    memory needs to be refreshed.

3            THE COURT:  No.  I'm sorry.

4            MR. HENDRIX:  No, no.

5            THE COURT:  I thought he said he didn't -- he

6    remembered John Everett coming to talk to him but he didn't

7    remember everything about the interview.  That's different than,

8    I don't remember the interview.

9            MR. HENDRIX:  So the obvious question to refresh his

10   memory is:  Do you remember telling him that?

11        And here's where the ultimate legal analysis will go:  I

12   don't remember any of that.

13        Then we look to the reported past recollection recorded

14   exception under Rule 803, or is it 804?  If a witness has no

15   memory of something but it's recorded, then that past -- the

16   record of that past recollection comes in as an exception to the

17   hearsay rule.

18           MS. PETERS:  Is it recorded?

19           MR. HENDRIX:  Um-hum.

20           MS. PETERS:  What's recorded?

21           MR. HENDRIX:  His notes, Everett's notes.

22           THE COURT:  Really?

23           MS. PETERS:  Everett's notes are still hearsay.

24           MR. HENDRIX:  I'm just telling you my understanding of

25   the rules of evidence.

```
 1            THE COURT:  I have got to chew through this, counsel.
 2   I'm sorry.  I don't think I can do it adequately on the fly.  So
 3   we'll take a short break, and I need to reread the hearsay
 4   exception on recorded recollection.  We'll be able to argue in
 5   the courtroom, and if I need further argument.  So...
 6            (End of sidebar conference.)
 7            THE COURT:  Ladies and gentlemen of the jury, we have
 8   hit another evidentiary issue, and I need to study on it and
 9   think about it, reread the rule, and maybe get some more
10   argument from the lawyers.
11        So I need you to bear with us.  I'm going to send you out
12   back to the jury room because it may take us 10 or 15 minutes.
13   Not us.  It may take me 10 or 15 minutes to sort this.  I'm
14   sorry.  Usual rules of the road while you are out.  Pads
15   facedown in your chair.  Don't talk among yourselves about the
16   case in addition to all the other rules.
17        All rise for the jury please.
18            (Jury not present.)
19            THE COURT:  Everybody can be seated, and, Mr. Maggio,
20   if you want to, you can step down the hall or you can stay.
21            THE WITNESS:  Maybe I'll learn something.
22            THE COURT:  Mr. Hendrix?
23            MR. HENDRIX:  Yes, sir.
24            THE COURT:  Can you give me a rule citation?
25            MR. HENDRIX:  On refreshing recollection I think is
```

1    612, refreshing recollection with a writing.

2              THE COURT:  Yes.

3              MR. HENDRIX:  And then --

4              THE COURT:  It's 803.5.  Got it.  My law clerk has

5    helped me.

6         Are all the elements of 803.5 satisfied?  That is, did

7    Mr. Maggio make the record?  I don't think so because you said

8    that they are John Everett's notes.  Did he adopt the record?

9              MR. HENDRIX:  Mr. Maggio?

10             THE COURT:  Right.

11             MR. HENDRIX:  That would be a follow-up question.  I

12   don't think we are there to past recollection recorded yet.  We

13   are just on the present recollection refreshed part, and

14   possibly incorrectly phrased, but I think the simple matter for

15   Mr. Maggio is:  Do you remember sitting down with Mr. Everett,

16   talking to him, him asking questions, what did he say -- pardon

17   me -- what did you say?  Do you remember that?  And if

18   Mr. Maggio says, "I don't remember," I want to get into the

19   specific part of do you remember telling him that you were not

20   bribed and Gilbert Baker didn't bribe you?

21             THE COURT:  Ms. Peters, what's the United States' view

22   on this?

23             MS. PETERS:  I'm -- which rule did you cite on present

24   recollection refreshed?

25             THE COURT:  It's Rule 612 on a writing used to refresh

1   a witness's memory, and then the hearsay exception, which was

2   your objection, was hearsay, 803.5.  I don't --

3           MS. PETERS:  We have never seen this writing, ever, so

4   I would say first, the United States doesn't have a copy of it.

5   So I don't even know the quality of what it is, but I think that

6   it's hearsay and I think that the questions are an effort to get

7   into the substance.

8           THE COURT:  I don't know about the not having a copy.

9   I'm not sure one has to be -- it seems to me it's in the nature

10  of impeachment, but I'm still stuck on the point you made

11  earlier, and what you just said, Mr. Hendrix said, that you are

12  bringing in the hearsay in front of the jury in the question,

13  saying that I might have an exception that it's going -- that

14  will apply, but you have not satisfied the exception yet, and

15  so -- and then it's in.  No?

16          MR. HENDRIX:  My intention is simply to refresh

17  Mr. Maggio's memory of this interview and what he said in it.

18  If he disclaims any recollection of it, then we get to past

19  recollection recorded.  I don't think we are there.  Let me use

20  this as another example.  This happens in every criminal trial,

21  and I suspect it will be with Mr. Maggio as well.  We'll get

22  into the 302's.  And the question will be, for instance, do you

23  remember saying, Gilbert Baker is innocent.  I don't remember

24  that.  Well, let me show you my notes of your 302.  Does that

25  refresh your recollection now?  Oh, it does.  I did say Gilbert

1    Baker was innocent.  Right?  That's as typical of refreshing

2    recollection as it gets.  That's all I'm attempting to do here.

3            MS. PETERS:  Your Honor?

4            THE COURT:  Ms. Peters.

5            MS. PETERS:  In that instance using the 302, the 302

6    is not Mr. Maggio's statement.  It is notes that the agent made

7    and I'm trying to use notes that an agent made to refresh

8    Mr. Maggio on what he said at the time.  I think that there's a

9    level of hearsay in there.  It's -- and I think that this is an

10   effort to start asking questions that contain hearsay so that

11   the jury can hear the answers.

12       Mr. Maggio is on record in many places, so there are sworn

13   statements that defense counsel can work with.

14           MR. HENDRIX:  Refreshing recollection, Your Honor, I

15   can show the witness literally anything.  Does this refresh your

16   recollection about what you said on January 20?  It can be

17   anything in the world; admissible, inadmissible.  It's not

18   coming into evidence.  It's simply used to refresh the witness's

19   memory.

20           THE COURT:  The rule speaks in terms of a writing used

21   to refresh the recollection, not anything in the world,

22   Mr. Hendrix.

23           MR. HENDRIX:  Understood, Judge.  And I have a

24   writing.  Here's my proposal:  The following examination:  Do

25   you remember being interviewed by John Everett on March 13th,

1    2019?  Yes or no?  If no, then we are done.

2         THE COURT:  He's already answered that he remembers

3    Mr. Everett coming and talking to him, and he said he didn't

4    remember everything about it.  That's where we stopped.

5         MR. HENDRIX:  Right.  Did you tell Mr. Everett that

6    Mr. Baker was innocent?  Yes.  Problem solved.  No?  All right.

7    Now let's move to our next evidentiary issue.  Let me try to

8    refresh your memory of what you actually said.  Did you not, in

9    fact, say this specific thing?  And then, again you get to the

10   third level, and he goes, I absolutely don't remember anything.

11   Then we get into, does the document become admissible.  But we

12   are not there yet.

13        THE COURT:  So I'm slow, Mr. Hendrix.  Walk me through

14   it here.

15        MR. HENDRIX:  Sure.

16        THE COURT:  Aren't you using the -- so Mr. Maggio is

17   not a party.  This out-of-court statement -- you are offering it

18   for the truth, aren't you, that Mr. Baker is innocent in this?

19        MR. HENDRIX:  Most fundamental proposition, the

20   question is:  Did you tell John Everett that Gilbert Baker was

21   innocent?  And if he goes, yeah, that's exactly what I told him;

22   here's my testimony today.  He did -- I told Mr. Everett he was

23   innocent, done with this whole scenario.

24        THE COURT:  And if he says no, then you can show him

25   the statement.

1          MR. HENDRIX:  Right.

2          THE COURT:  But it's not admissible.

3          MR. HENDRIX:  Correct.

4          THE COURT:  The statement itself is not admissible?

5          MR. HENDRIX:  Never intended for it to be.

6          THE COURT:  Okay.

7          MR. HENDRIX:  It only would become admissible under

8   the theoretical -- the witness -- I don't mean to give an

9   evidence lecture, but only if a witness on the witness stand

10  goes, what?  I don't remember anything.  I have got amnesia.

11  Then your prior statement could probably come in as substantive

12  evidence.  I don't expect Judge Maggio to say that.

13      Did you tell him he was innocent or no?  I don't remember.

14  Okay.  Well, let me refresh your recollection.

15          THE COURT:  Ms. Peters?

16          MS. PETERS:  Your Honor, a few things.  I still think

17  it is an unfair effort to get in some hearsay.  I'm looking at

18  the rules, and it seems like, under 612, if he plans to use a

19  writing to refresh his writing, we ought to have a copy of that

20  writing, and we don't.

21          MR. HENDRIX:  If we have to get to that point.  He's

22  on the witness stand.  What he says is not hearsay.  Hey, did

23  you tell John Everett, Gilbert Baker is innocent?  Yes.  Story

24  over.  It's not hearsay.  He's testifying to it.

25          THE COURT:  If he -- if we go the other fork in the

1    road, though, I think your sister Peters is right, and she's
2    entitled to the statement.
3           MR. HENDRIX:  I couldn't agree more, and I think the
4    rule says, if you are using something, a document to refresh
5    somebody's memory, let the other side see it.  We are simply --
6    we're taking baby steps here, or I'm trying to take baby steps
7    here.  Somehow we have gotten way down the road.
8           THE COURT:  Okay.
9           MR. HENDRIX:  The simple question is:  Did you tell
10   Mr. Everett Baker was innocent?
11          THE COURT:  All right.
12          MS. PETERS:  That's -- I don't believe that that's the
13   question that was originally asked, but --
14          THE COURT:  But that's the question that's going to be
15   asked now.  I think I sustained, or at least I intended to, your
16   objection to the earlier question.  But we are going to proceed
17   on this revised path, and we are going to go more slowly, and
18   we'll see what happens.
19          MR. HENDRIX:  And a heads-up for everybody, seven
20   years ago, I'm sure Mr. Maggio's memory is going to be -- need
21   to be refreshed, and if -- I will ask the question.  On such and
22   such a day did you say, blah, blah?  And he goes, I don't
23   remember.  Let me show you my 302 notes.  See if that helps you
24   remember.  So to avoid this impasse.
25          THE COURT:  Yeah.  And Ms. Peters has the 302s.

1            MR. HENDRIX:  They are theirs.

2            THE COURT:  They are.

3            MS. PETERS:  They are, but what Mr. Hendrix is talking

4     about using is his own notes of the 302s.  If that's the writing

5     he's going to use to refresh, then I think we ought to have a

6     look at what he's writing.

7            MR. HENDRIX:  Then I think you need to produce for me

8     the 302s.

9            MS. PETERS:  The 302s are not this defendant's

10    statement.  We want to ensure the accuracy of what's being asked

11    about and have fair evidence, just the way he came to our office

12    and was able to review all of the 302s.

13           THE COURT:  If we get to the point, Mr. Hendrix, of

14    your notes on what the 302s say, I know that you will have

15    identified which interview it is and which 302.

16           MR. HENDRIX:  Um-hum.

17           THE COURT:  And which of our agents was doing it,

18    pause, and show Ms. Peters the two sentences in your notes

19    before you use it to refresh, please.

20           MR. HENDRIX:  Understood.  And first I apologize for

21    my frustration over this issue, but it goes back.  I may very

22    well be going to them, give me your 302 now.  You let me look at

23    it.  You let me make notes on it.  Now it's time for me to have

24    your actual document.

25           THE COURT:  And I think that door ought to swing both

1    ways.  The United States should have the 302s ready to go.  You

2    should have your notes ready to go, and Counsel should

3    collaborate as needed and be sure that we are getting the

4    witness correctly refreshed.

5                 MR. HENDRIX:  Correct.

6                 THE COURT:  Fair?

7                 MR. HENDRIX:  More than.

8                 THE COURT:  Ms. Peters?

9                 MS. PETERS:  We can work with that outcome, Your

10   Honor.  I'm just concerned about the amount of hearsay that

11   comes in through questions.

12                MR. HENDRIX:  I heard that's a fundamental

13   misunderstanding of the rules of evidence.  But I'm frustrated.

14                MS. PETERS:  I was speaking more globally, Your Honor.

15                THE COURT:  Understood.  Let's -- I need to step down

16   the hall.  So we'll take five minutes, and then we'll resume

17   with Mr. Maggio.

18        (Recess taken from 1:13 p.m. until 1:20 p.m.)

19                THE COURT:  Mr. Hendrix, ready to go?

20                MR. HENDRIX:  Yes, sir.

21                THE COURT:  Ms. Peters?

22                MS. PETERS:  Yes, Your Honor.

23                THE COURT:  Okay.  Mr. Maggio?

24                THE WITNESS:  Oh, of course.  Yes, sir.

25                THE COURT:  Officer Simpson, if you'll get our group.

```
 1              THE WITNESS:  It's your show.
 2              THE COURT:  I'm sorry?
 3              THE WITNESS:  It's your show.
 4              THE COURT:  I try to be kind to everybody.
 5              THE WITNESS:  I know.  You always have.  You always
 6      have.
 7          (Jury present.)
 8              THE COURT:  Everyone can be seated.  Continuing
 9      thanks, ladies and gentlemen, for your patience with me.
10          Mr. Hendrix, you can resume your questioning when you
11      choose.
12              MR. HENDRIX:  Thank you, Your Honor.
13      BY MR. HENDRIX:
14      Q.   Mr. Maggio?
15      A.   Yes, sir.
16      Q.   Where we left off was March 13th, 2019, on our timeline.
17      Do you remember?
18      A.   I do, yes, sir.
19      Q.   A man named John Everett visited you in the Bureau of
20      Prisons, correct?
21      A.   Yes, sir.
22      Q.   And you remember that conversation?
23      A.   I remember the meeting, but I don't remember all the
24      conversation, obviously.
25      Q.   Sure.  Do you remember telling him that you did not know
```

1    Mr. Morton?

2    A.    Correct.  I'm sure of it.

3    Q.    You remember telling him that you did not take any bribe?

4    A.    I may have told him that, yes.  I may have told him that.

5    Q.    Do you remember telling him you would have granted the

6    remittitur whether or not somebody gave you any contributions?

7    Do you remember him telling that?

8    A.    Yes.

9    Q.    And do you remember telling Mr. Everett that you did not

10   believe Gilbert Baker tried to bribe you or do anything

11   inappropriate?

12   A.    I don't remember if I remember that or not.  I may have, if

13   he says that.

14   Q.    No dispute?

15   A.    I guess, yeah, as far as I know.

16   Q.    Do you want to see?

17   A.    I don't know if it will help me, but if you want to show it

18   to me, sure.

19   Q.    Do you remember or not?

20   A.    At this time, no, I don't.

21   Q.    Okay.  It raises another interesting legal issue.  I think

22   we'll move on instead of bogging this process down.

23          THE COURT:  Okay.

24   BY MR. HENDRIX:

25   Q.    You don't deny having said those things to Mr. Everett,

1  correct?

2  A.   Correct.  That's his recollection, and I don't have a

3  reason to dispute it.  I just don't --

4  Q.   Remember it?

5  A.   Can't say for certain.

6  Q.   Not saying it didn't happen?

7  A.   Correct.

8  Q.   Not saying you didn't say it?

9  A.   Correct.

10  Q.   All right.  That finishes up the timeline.  We have been

11  going at it a while; so let's try to synopsize what we have been

12  over.

13  A.   Yes, sir.

14  Q.   From the information that's been provided to me, you met

15  with the prosecution team at least nine times from October 2014

16  to January 2019.  Sound right?

17  A.   Sounds right.

18  Q.   Then you have your grand jury testimony, which would be a

19  tenth statement?  All right?

20  A.   Yes.

21  Q.   Okay.  And then I'll just call it the Everett interview is

22  the 11th?  Fair enough?

23  A.   Yes.  That's fair enough.

24  Q.   Okay.  So now let me ask you:  The last statement about

25  this case that I'm aware of that you gave was March 13th, 2019.

1   Have you been interviewed since March 3rd, 2019?

2   A.    I believe so, yes.

3   Q.    Really?  In preparation for your testimony today?

4   A.    I think that's probably right.  I can't remember if it was

5   any other time.

6   Q.    Let me ask you this.

7   A.    That's probably right.

8   Q.    After Mr. Everett's meeting with you at Big Sandy, have you

9   been interviewed by the government again?

10   A.    I don't recall.  I really don't recall.  I'm trying to

11   think of my timeline in the BOP.  I have been bounced around

12   quite a bit.  I'm trying to remember.  In my time at the BOP I

13   have bounced around.  So I try to keep up with things by where I

14   was.  I don't -- in March '19 -- I don't recall being called

15   back to Little Rock.  Somebody may have visited me, but I don't

16   think it was about this case specifically.  I don't think.

17   Q.    Okay.  And that's fine.  Using March 13th, 2019, that --

18   when Mr. Everett met with you, using that as our guide, do you

19   recollect any time between then and you now sitting in that

20   witness chair that you have been interviewed by the government?

21   A.    Yes.

22   Q.    You do recollect?

23   A.    I do, yes.

24   Q.    Do you know when it was?

25   A.    Probably -- I got moved April -- I'm sorry.  I'll talk up.

1    I got moved in April from Big Sandy.  So maybe -- maybe in

2    June once or twice and in July a couple times maybe.  Two times

3    maybe?  I don't know, three, four times.

4    Q.   By federal agents?

5    A.   Yes.

6            MR. HENDRIX:  So, Your Honor, I would move for

7    discovery in the production of statements that we have not been

8    given.

9            THE COURT:  Let's take this up over here.

10        (Sidebar conference reported as follows:)

11           THE COURT:  Ms. Peters?

12           MS. PETERS:  Your Honor, I believe we met with

13   Mr. Maggio either last week or the week before one time, not

14   three or four times, and there are no notes because he did not

15   say anything inconsistent with what he previously said.

16           THE COURT:  Is there any *Brady* or *Giglio* material --

17           MS. PETERS:  No, No, Your Honor.

18           THE COURT:  -- in anything that you know of existing

19   after the March date with Mr. Everett?

20           MS. PETERS:  Your Honor, I told Mr. Hendrix and

21   Ms. Depper in an e-mail, letting them know that when he was

22   being interviewed by us, it went into the lunch hour, so we

23   provided him McDonald's and that we had arranged that he could

24   speak with his wife because he hadn't been able to see her due

25   to COVID restrictions up in the marshal's lockup.  That's the

1   only *Giglio* that I know of between that time and today.

2           THE COURT:  All right.

3           MR. HENDRIX:  Sorry.  I had been so notified.  I do

4   not care that the government bought him lunch.

5       What I'm interested in are agents' notes, interview

6   statements since March of 2019.  With all due respect, whether

7   the government believes they are consistent or not, it's our

8   determination and the Court's determination whether the

9   statements are consistent or inconsistent.  I would move for

10  their production.

11          THE COURT:  Do they exist?

12          MS. PETERS:  They do not exist, Your Honor.

13          THE COURT:  That's what I heard her say, Mr. Hendrix,

14  that there are no notes.

15          MR. HENDRIX:  Right.

16          MR. HARRIS:  Last Monday we got him ready for trial.

17  We sat down with the witness beforehand.  Ms. Peters?

18          MS. PETERS:  That's what it was.  I don't know what

19  all these meetings he's talking about.

20          MR. HENDRIX:  I don't either.

21          THE COURT:  It was news to all of us.

22          MR. HARRIS:  That's why we are over here.

23          THE COURT:  You are free, Mr. Hendrix, I think to ask

24  a question or two more about these meetings and what was talked

25  about, if you want to, but I don't know that our United States

1    attorneys know anything about it.

2            MR. HENDRIX:  Right.

3            THE COURT:  And have any information about it.

4            MR. HENDRIX:  I'm going to ask him, you think you got

5    interviewed four more times?  Whatever.  I'm going to sum up

6    actually.

7            THE COURT:  That's fine.

8        (End of sidebar conference.)

9            THE COURT:  Mr. Hendrix.

10           MR. HENDRIX:  I told you there was going to be a lot

11   of work between you and me, right?

12           MS. PETERS:  I apologize tremendously, but could we

13   speak briefly again?

14           THE COURT:  Yes.

15           MS. PETERS:  Thank you.

16           THE COURT:  Okay.  Ladies and gentlemen of the jury,

17   does anybody need to step down the hall?  Are you all doing

18   okay?  Good.  Yes, ma'am.  Juror No. 7.

19           JUROR NO. 10:  I was giving you a thumbs-up.

20           THE COURT:  My wife says I really need to go to the

21   eye doctor.  I think you are showing me that.

22       If anyone needs to take a seventh-inning stretch, you all

23   are okay to do that.

24       (Sidebar conference reported as follows:)

25           MS. PETERS:  I'm so sorry.  When I got back to the

1    table, the agent told me that we had met with him two times.  I

2    did not remember that independently.  I think he might be right,

3    but it's two times close together in advance of trial.  I didn't

4    want to make a misrepresentation.  I wanted to correct that.

5              THE COURT:  I appreciate you correcting the record,

6    and I know your brother Hendrix knows with all those witnesses

7    that you are meeting with them and getting them ready and he

8    just wants to be sure that he has copies of all the paper that

9    he could look at, and I think we are still at the same place.

10             MR. HENDRIX:  Yes, we are.

11             MS. PETERS:  Sorry for the interruption.

12             THE COURT:  Okay.

13         (End of sidebar conference.)

14             THE COURT:  Mr. Hendrix.

15   BY MR. HENDRIX:

16   Q.    Mr. Maggio?

17   A.    Yes.

18   Q.    To your recollection, since March 13th, 2019, you have been

19   interviewed possibly two times by a government agent?

20   A.    Two to four times is what I remember.

21   Q.    Okay.  Problem solved.  Let's move on.

22         So what I was doing, I was at that point of, now let's wrap

23   up this timeline and sort of give the jury a synopsis.  So let

24   me go back over it again.

25             October 2014, January 2019 -- from October 2014 to

1    January 19th, 2016, the substance of those statements that you

2    made to the government was:  I'm guilty of bribery and I was

3    bribed by Gilbert Baker and Michael Morton; fair enough?

4    A.    Yes, sir.

5    Q.    Then from February 12th, 2016, to December 6th, 2018,

6    however long that is, then you are saying, I'm innocent and I

7    was not bribed by either Michael Morton or Gilbert Baker, right?

8    A.    Yes, sir.

9    Q.    And some of those statements were under oath, right?

10   A.    Yes, sir.

11   Q.    Your habeas corpus petition was signed under oath, and in

12   your habeas corpus petition you verified, under oath, I was not

13   bribed, Gilbert Baker did not bribe me, Michael Morton did not

14   bribe me?

15   A.    Yes, sir.

16   Q.    Okay.  Then from 2006 to 2000 -- pardon me -- February --

17   sorry, Your Honor.  Little bit flustered.

18        December 6th, 2018, to right now, to this present moment in

19   time, you are back saying, I got bribed, Gilbert Baker and

20   Michael Morton bribed me.

21   A.    Yes, sir.

22   Q.    You have been flip-flopping a lot in the case, right?

23   A.    Sounds like it, doesn't it?

24   Q.    Yes, sir, it does.

25        Okay.  New topic.  Let's narrow and focus in a little bit

1   more on some of the things that you've said in the past.  Okay?

2   We've talked about this long interview that ended up being

3   recorded on January 19th, 2016.  Do you remember that?

4   A.    I don't remember that.  I remember what you are talking

5   about.  I don't remember.

6   Q.    Well, do you remember telling the agent -- I think it was a

7   federal agent named Lance Smythe, S-m-y-t-h-e?  Could be Smith?

8   A.    I have no idea who he is.

9   Q.    Okay.  You remember --

10  A.    My recollection is --

11  Q.    Sure.  You remember this interview on January 19th, 2016,

12  right?

13  A.    I remember the day, yes.

14  Q.    Well, you already said it was a lengthy interview?

15  A.    I remember that, yes.

16  Q.    And do you remember telling -- do you remember the agent

17  confronting you and saying that you have lied in your first four

18  statements to the government?

19  A.    I don't remember that, but that's his recollection, yes.

20  Q.    That's okay.  I actually I have a transcript of it.  I'm

21  going to see if it refreshes your recollection.  I'm going to

22  refer to page 68 of this.  Do you recollect the agent saying --

23          MS. PETERS:  Your Honor, objection.  Isn't he supposed

24  to show this to the witness?

25          MR. HENDRIX:  I'm happy to.  I don't think I have to.

1    But I would be happy.

2              THE COURT:  I believe it would be better on

3    refreshment to present it to the witness.

4              MR. HENDRIX:  I'm sorry.  I'm paranoid about the

5    virus.  It's my advanced age.

6              THE COURT:  Okay.  And remember that we have got the

7    Elmo.  Yes?

8              MR. HENDRIX:  Thank you.  Yeah, let's do that.

9    BY MR. HENDRIX:

10   Q.   Okay.  Let me show you this highlighted --  can you see

11   that, Mr. Maggio?

12   A.   Yes.

13   Q.   Okay.  Why don't you read it to yourself.

14   A.   Okay.

15             MS. PETERS:  Objection, Your Honor, what he's

16   refreshing it with is not his statement.

17   BY MR. HENDRIX:

18   Q.   Do you remember the agent confronting you and saying you

19   lied --

20             THE COURT:  I'm sorry, Mr. Hendrix.

21        You are right, Ms. Peters.  It is not his statement, but I

22   think Mr. Hendrix can ask about this exchange.

23        Go ahead, Mr. Hendrix.

24             MR. HENDRIX:  Thank you.

25   BY MR. HENDRIX:

1   Q.   Do you remember the agent saying, you lied to us in your

2   first four statements?

3   A.   After refreshing, yes.

4   Q.   Next, do you remember at that point, when confronted with

5   lying, that you essentially blamed it on your lawyers?

6   A.   I don't remember that.  I'm sure you'll refresh my memory.

7   Q.   I will.  This is a little awkward for me, but do you see

8   it?  Why don't you take a look at that?

9   A.   Okay.

10  Q.   Okay.  So when the agent -- do you remember the agent

11  saying, how is that different than being honest with Agent Land

12  and Agent Seal from the get-go, or the second time or the third

13  time or the fourth time, and you recollect you responding and

14  "The only thing I can think -- the only thing I can tell you

15  there, like I said, my attorneys are like, 'narrow this thing

16  down.'"  Do you remember saying that now?

17  A.   I do.

18  Q.   Do you remember in this interview you were confronted with

19  lying.  Is it fair to say you felt then your cooperation

20  agreement with the government is in jeopardy?

21  A.   Oh, without a doubt.

22  Q.   And you thought I actually am going to have to go to jail

23  for ten years, right?

24  A.   That's what they told me.

25  Q.   Because they are not believing you?

1   A.   They actually said at some point you'll get 12 more.

2   Q.   12 more years?

3   A.   Yeah.

4   Q.   So you became desperate at that point; is that fair to say?

5   A.   I don't know about desperate, but it definitely made me

6   think.

7   Q.   Made you think I'm not doing enough to get a reduced

8   sentence?

9   A.   Not 12 more.  We'll go for 12.

10  Q.   That's the way I --

11  A.   Not 12 more.  Now I've thought about it.  12.  Yes.

12  Q.   Your memory is that suddenly your maximum is 10 to 12?

13  A.   Correct.

14  Q.   Based on you lying to the agents?

15  A.   Based on his belief I was lying.

16  Q.   Okay.  Now, in that state of being confronted with lying to

17  federal agents, with the risk of you losing a reduced sentence,

18  do you recollect that, for the first time ever -- this will be

19  your fifth statement -- that you claimed that Rhonda Wood was

20  deeply involved in the scheme to bribe you?

21  A.   You would have to show me that.  I don't remember that.

22  Q.   Sure.  I'm on page 32 at the bottom.  I think it will bleed

23  over into the next page or two.

24  A.   Okay.  Yes, sir.

25  Q.   The next page.  Can you see that okay?

1    A.    Me?  You are asking me?

2    Q.    Yes.

3    A.    Yes, sir.  I can see it.

4    Q.    Okay.

5    A.    I'm sorry.

6    Q.    Okay.

7    A.    Okay.  Yes, sir.

8    Q.    You want to go more?

9    A.    That's fine.  No, sir.

10   Q.    Okay.  Now, has that refreshed your memory, in this state

11   of desperation, suddenly now you are starting to reach out and

12   trying to incriminate people who are close to you, Rhonda Wood,

13   right?

14   A.    I don't know if I was trying to incriminate her.  I just --

15   I remember the statement now, yes.

16   Q.    You said she was involved in a bribery scheme, right?

17   A.    That's not what I said there, I don't think.

18   Q.    Let's take a look at it.  You indicated she had an

19   exaggerated interest in the order, the filing?

20   A.    Correct.

21   Q.    The order of remittitur, and that information was readily

22   available to Baker?

23   A.    Okay.

24   Q.    Sat in the room.  You never heard the conversation where

25   Rhonda said, do I think that it happened, yes?  And again you

1    want me to testify to a hard fact.  And you go, well, no.

2        You incriminated Rhonda Wood, right?

3    A.   And her -- her concern about the order, yes.

4    Q.   Yeah, which is the center point of this case, that the

5    remittitur was quid pro quo of the quid pro quo, right?

6    A.   Yes, sir.

7    Q.   Is it fair to say, Mr. Maggio, that you were desperate at

8    this point, that you started revealing information that you

9    never said before?

10   A.   I was probably motivated, yes, sir.

11   Q.   Motivated to tell the government what it wanted to hear?

12   A.   I don't know if I would classify it that way.  But I was

13   motivated to reveal more than they asked for, more than I had

14   shared.

15   Q.   All right.  Let's move on to another part of this.

16       In this moment, having been confronted with lying to FBI

17   agents, your cooperation and reduced sentence on the line, do

18   you recollect, for the very first time, on your fifth statement

19   now, a couple years into this thing, for the very first time you

20   claimed that Baker told you that Morton was watching the case

21   and would be appreciative of making a favorable ruling?

22   A.   I don't remember that, but you'll have to show me.

23   Q.   Sure.  Got it?

24   A.   Yes, sir.

25   Q.   Okay.  Go to the next page.  Can you see it?  Got it?

1    A.    Okay.  Go down a little more.  Okay.

2    Q.    Now do you remember on this fifth statement for the first

3    time saying the only new thing I could think is I now remember

4    Baker tell me that Morton was watching the case and would

5    appreciate a favorable ruling on his behalf?

6    A.    Yes.

7    Q.    And the agent says, why didn't you tell us that before,

8    right?

9    A.    Yes, sir.

10   Q.    And then you say whatever you said, and then you say -- and

11   that conversation happened in March or April of 2013.  Do you

12   remember that?

13   A.    If that's what I said.  Yes, sir.

14   Q.    Okay.  All right.  So it seems to me that that's a center

15   point of this -- a center point of this case, is Michael Morton

16   is watching this case; he would appreciate a favorable ruling;

17   that's a quid pro quo.  Are you with me?

18   A.    Yes, sir.

19   Q.    All right.  Now you are saying for the first time, after a

20   year and half, that that conversation happened in March or

21   April of 2013, right?

22   A.    Yes, sir.

23   Q.    The case had not gone to trial in March or April of 2013,

24   right?

25   A.    Correct.

1   Q.   The case wasn't tried until May of 2013, right?

2   A.   Correct.

3   Q.   So there was no favorable ruling in March or April, right?

4   A.   Correct.

5   Q.   The remittitur happened on March 16, 2013?

6   A.   No.

7   Q.   Or pardon me.  I'm sorry.  You are absolutely right.  The

8   jury verdict was March 16, 2013?

9   A.   May.

10  Q.   What do I keep saying?

11  A.   March.

12  Q.   Keep correcting me.  Okay?

13       May 16, 2013, is the verdict?

14  A.   Correct.

15  Q.   So at that time there was nothing wrong -- there was

16  nothing to do for Mr. Morton that you are referring to, any

17  beneficial ruling, right?

18  A.   I'm not following the question.

19  Q.   Yeah.  It's a little bit difficult to work through.

20       So you are saying that, here's some evidence of a bribery;

21  I'm coming up with it the first time.

22  A.   Okay.

23  Q.   You are saying Baker told me that Michael Morton was

24  watching this trial -- actually with reference to he is watching

25  what's going on with this case and would appreciate a favorable

1   ruling, right?

2   A.    Okay.  Yes, sir.

3   Q.    Okay.  The case hadn't gone to trial yet?

4   A.    Correct.

5   Q.    The big center point of the case is the alleged bribe was

6   you remitting the $5.2 million verdict, correct?

7   A.    Correct.

8   Q.    That didn't happen until July 2013, right?

9   A.    Correct.

10   Q.    So this information is either dead mistakenly wrong or you

11   have made it up in your desperation to get back in the

12   government's favor, fair?

13   A.    That's your interpretation.  The jury will have to figure

14   that out.

15   Q.    Do you deny it?

16   A.    No, I don't deny I said that.

17   Q.    Yeah, I mean that's what you said, right?

18   A.    Right.

19   Q.    Okay.  Do you remember, in this moment, losing your

20   cooperation agreement, saying to the agent, I want to be a part

21   of the team.  Do you remember telling the agent that?

22   A.    I don't, but I'm sure you'll refresh my memory.  Okay.

23   Yes, sir.  I read it.

24   Q.    Okay.  You see the part I'm talking about?

25   A.    Right.

1   Q.   All right.  You said, I want to walk out of here.

2   A.   Yes, sir.

3   Q.   Being a part of the team, right?

4   A.   Correct.

5   Q.   You say to the agent, I want to -- very much so?

6   A.   Correct.

7   Q.   Then you say again, I very much so want to be?

8   A.   Correct.

9   Q.   You want to be on the government's team, right?

10  A.   Correct.

11  Q.   You want to say what they want to hear to get your down --

12  we call it a downward departure.  It's a sentencing reduction,

13  right?

14  A.   Yes, sir.

15  Q.   Do you remember telling the agent, listen, Agent Smyth, I

16  don't have a smoking gun for you.  Do you remember saying that?

17  A.   I hate that negative.  Keep refreshing my memory.

18  Q.   I can do it all day.

19  A.   But I don't.  I don't remember saying that.

20  Q.   Let's go through it.

21       Okay.  Got the highlight?

22  A.   Yes, sir.  Okay.

23  Q.   All right.  So do you remember saying --

24  A.   I do.

25  Q.   -- I think part of the issue I have is I don't necessarily

```
 1   have a smoking gun for you.  I don't have on X date at this time
 2   at this place this is exactly what was said.  He said, yeah.
 3        I don't have that?
 4   A.   Correct.
 5   Q.   He asked you, did you have it before you deleted the Rhonda
 6   Wood text, and you say no, never had it?
 7   A.   Correct.
 8   Q.   I never had the smoking gun?
 9   A.   Correct.
10   Q.   Do you remember then telling the agent -- I refer to page
11   73 -- I wish I had the smoking gun for you.  I don't.  I don't
12   have one.  Do you remember telling him that?
13   A.   No, I don't.
14   Q.   Okay.
15   A.   I really apologize.  Your memory may be better than mine.
16   Q.   No worries.  Take a look.
17   A.   Okay.  Yes, sir.
18   Q.   All right.  So now you remember telling the agent, I wish I
19   had the smoking gun for you.  I don't.  I don't have one.  And
20   then you go through the duffle bag scenario, and then you say
21   you know, I have a lot of innuendo?
22   A.   Yes, sir.  I remember saying that.
23   Q.   And just to make sure, one more record, page 76.
24            MR. HARRIS:  What page?
25            MR. HENDRIX:  76.
```

1        THE WITNESS:  Okay.

2    BY MR. HENDRIX:

3    Q.   Okay.  This is where -- do you remember now telling the

4    agent for what I have got is the third time, I don't have a

5    smoking gun.  When we had that conversation with the other

6    agents that -- that I know what I know, but I don't know what

7    you want me to know?

8    A.   I did say that.

9    Q.   One of the most extraordinary -- well, never mind.

10        You told the agent -- you really told the agent, I know

11   what I know, but I don't know what you want me to know?

12   A.   That's what I said, yes.

13   Q.   And I'm not being flippant, Mr. Maggio.  This is a very

14   serious time in your life.

15   A.   I know you well, Mr. Hendrix.  I know you aren't.

16   Q.   We know each other well?

17   A.   Yes.

18   Q.   And it was a terrible time in your life?

19   A.   That I can vouch.  Yes.  I don't wish it on nobody.

20   Q.   And you want out of the pen now?

21   A.   I think anybody incarcerated wants out.  I think that's a

22   fair statement.

23   Q.   All right.  New topic.  Gosh, I hope we don't have to go

24   through this whole thing.  Do you remember testifying in front

25   of the ethics commission?

1    A.    I do, but be ready to refresh my memory.

2    Q.    Okay.

3    A.    I don't know what you are going to ask.  I may remember

4    some.  I may not remember.

5    Q.    All right.  So your ethics commission testimony was under

6    oath, right?

7    A.    Yes, sir.

8    Q.    One second.  Do you remember telling the commissioner that

9    this interview was under oath, saying -- she was asking, do you

10   feel you have an understanding of Gilbert Baker, any kind of

11   understanding, that he would take steps so that you wouldn't

12   find out about the raising money for you, and your response was

13   no?  Do you remember that?

14   A.    Yes.

15   Q.    All right.  Do you remember telling -- now, October 20,

16   2014, that first interview you had with the agents, do you

17   remember saying there never was an outright quid pro quo but,

18   looking back on it now...  And I'm doing a, dot, dot, dot.  I

19   think your direct testimony was, it didn't occur to me then, but

20   it occurred to me later that I may have been influenced?

21   A.    I have no reason to dispute I said that.

22   Q.    Yeah.  So let's work our way through that process.  Tell me

23   if I'm getting this right.

24         What you are saying is and what you testified to the ethics

25   commission, what you have said several times, is there wasn't a

1  quid pro quo; looking back at things now, I see I was being

2  manipulated?

3  A.    I think that's probably fair.

4  Q.    Okay.  I take that to mean that at the moment there was an

5  alleged bribe, there was no agreement at that time; there was no

6  meeting of the minds at the time some alleged bribe occurred?

7  Fair enough?

8  A.    That's probably what I was saying at that time, yeah.

9  Q.    Sort of like a couple years later you woke up and went, I

10 think I got bribed; is that fair?

11 A.    I mean, that's what I said, yes.

12 Q.    Which means to me and is important in this case because one

13 of the big parts of this proof is going to have to be an

14 agreement, which is essentially a meeting of the minds, an

15 agreement to bribe and to be bribed, right?  And a bribe is an

16 agreement, right?  It's a contract.  And you are saying, when

17 these events were occurring, when I ordered the remittitur, it

18 never occurred to me; there was no agreement going on.  It never

19 occurred to me I was being bribed, right?

20 A.    In my definition of a bribe, yes, that is correct.

21 Q.    Sometime later, like I said, the light bulb went off, I

22 think I got bribed, right?

23 A.    Yes, sir.

24 Q.    Meaning there was no meeting of the minds to form an

25 agreement to bribe or be bribed, fair?

1   A.   I mean, I think that's what you are -- yeah, that's what

2   you are saying, yeah.  It's ultimately for the factfinder to

3   decide.

4   Q.   Well, I could continue on with this.  January 19, 2016, the

5   recorded interview, do you remember saying that you did not

6   realize this at the time but now you do?

7   A.   I mean, if you'll refresh my -- if I said that, if you have

8   it, which I'm sure you do.

9   Q.   I'm actually going to refer -- you talked about the draft

10  of your grand jury testimony.  Somebody with the government

11  typed up a statement, I gather, for you to read to the grand

12  jury.  Do you remember us talking about that?

13  A.   Yes, I do.

14  Q.   I'll find it here in a minute, and I'll rely on Ms. Fowler

15  to help me out.  But I read the next page.

16       Do you remember saying, or at least the government trying

17  to get you to say in that draft written, that at the time the

18  discussions with Baker and remittitur decision, it did not enter

19  your mind that you were taking a bribe?

20  A.   Is that what's written?

21  Q.   I'll get it.  It is in my timeline.

22            THE COURT:  She has it, Mr. Hendrix, electronically.

23            MR. HENDRIX:  Patience please, if you don't mind.  Can

24  we play it just for Mr. Maggio?  I think we have the technology

25  for our computer to show it to just Mr. Maggio.  Is that good,

1    Ms. Fowler?

2            MS. FOWLER:  Is that possible, Your Honor?

3            THE COURT:  Can you do it, Ms. Fowler?

4        Oh, to just carry the laptop.  To plug it into the system.

5        I don't know, Ms. Fowler.  You are asking the wrong person

6    on what the technology can do.

7            MR. HENDRIX:  I can't find it; so I'm going to move

8    on.

9    BY MR. HENDRIX:

10   Q.    So let me ask you again:  At the time of the remittitur,

11   you didn't think you were being bribed, correct?

12   A.    At the time of the remittitur?

13   Q.    Um-hum.

14   A.    Based upon my definition of what a bribe was, no, I didn't

15   think I was being bribed.

16   Q.    Okay.  All right.  Next topic.  Next topic.  Let's talk

17   about the reasons you pled guilty.  Okay?

18   A.    Okay.

19   Q.    All right.  So back on our timeline, you did -- when you

20   were on the trial bench in Faulkner County, you did criminal

21   work?

22   A.    I did some.

23   Q.    Your first interview with the government was October 20,

24   2014, correct?

25   A.    I did criminal trials in 2010 or '11 or something like

1    that.  Then we changed the docket around so I did all civil

2    cases.

3    Q.    So in our case and your case here in federal court, your

4    first interview was October 20, 2014, right?

5    A.    Yes, sir.

6    Q.    You pled guilty January 9, 2015, correct?

7    A.    Fairly quickly.

8    Q.    Three months?

9    A.    With holidays in between.

10   Q.    I understand.  I understand.  So, yeah, three months --

11   within three months of being advised that you were under federal

12   investigation, you pled guilty, right?

13   A.    Correct.

14   Q.    That had to be a lot of pressure on you in three months,

15   right?

16   A.    Yes, sir.

17   Q.    Yeah.  The normal course of business.  Now, granted, this

18   trial has been delayed by COVID some, but Mr. Baker was

19   indicted, for instance, in 2019.  It's now 2021.  The criminal

20   process generally doesn't work as fast as three months, right?

21   A.    Correct.

22   Q.    Having said that, part of the reasoning why this got fast

23   tracked for you was you felt pressure from your attorneys to

24   plead guilty?

25              THE WITNESS:  I don't know if that gets into

1    attorney-client privilege or not, Judge.  Can I answer that?  I

2    don't know.

3               THE COURT:  Do you have a lawyer here, Mr. Maggio?

4               THE WITNESS:  No, sir.

5               THE COURT:  The privilege belongs to you.  So you

6    decide whether you want to say or you can claim a privilege.

7    BY MR. HENDRIX:

8    Q.    If I can interject to maybe help out.  When you filed your

9    motion to withdraw your guilty plea to say you were not guilty,

10   right?

11   A.    Yes, sir.

12   Q.    As part of that in which you alleged your original two

13   attorneys --

14   A.    Yes, sir.

15   Q.    -- Ms. Hamilton and Ms. Rogers were ineffective in the

16   representation, correct?

17   A.    I'll go with that.  Yes, sir.

18   Q.    As part of that, you ended up filing a motion or the

19   government filed a motion for you to waive the attorney-client

20   privilege, right?

21   A.    Correct.

22   Q.    Because you were saying my attorney screwed up.  In

23   fairness, you have got to waive your attorney-client privilege?

24   A.    That's how it works.

25   Q.    So the privilege was waived how many years ago; fair

1   enough?

2          MS. PETERS:  Objection, Your Honor.  That's actually

3   not correct, and I don't want to testify.

4          THE COURT:  Then don't.

5      Counsel, come over to the side.

6      (Sidebar conference reported as follows:)

7          THE COURT:  I know it's very challenging, a difficult

8   witness, Mr. Hendrix, and difficult circumstances, but where are

9   we on this waiver?  Did I misstate the law?  Doesn't he get to

10  decide today -- whatever may have happened before, doesn't he

11  get to decide today?

12         MR. HENDRIX:  I don't know.  I'm interested in Julie's

13  thoughts.

14         MS. PETERS:  You got it wrong actually because here's

15  what's happened:  He filed with that the ineffective motion to

16  withdraw.  Judge Miller -- we asked to -- for it to be waived so

17  we could talk to Lauren and Marjorie.  Judge Miller entered an

18  order.  That's what happened in that.  He immediately filed a

19  motion -- amended motion to withdraw saying he was withdrawing

20  his claim about ineffective assistance of counsel because he

21  wanted the privilege to be retained.  So he stood on the

22  privilege.  So that's the status.  It wasn't --

23         THE COURT:  So it hasn't been waived, or it's not

24  clearly waived by what happened before?  So --

25         MR. HENDRIX:  Fair enough.

```
 1          THE COURT:  Okay.  It's about 2:00.  I know y'all are
 2    getting tired.  I'm getting tired.  We've had a lot of wrangling
 3    today.  I think we need to take a break, let the jury get a
 4    snack, some fresh air.  I don't know if we got any smokers.
 5    Ms. Peters is -- but some nicotine is needed if we do.
 6       Ms. Peters?
 7          MS. PETERS:  Mr. Maggio is actually represented by an
 8    attorney in North Carolina; so I just -- he doesn't have one
 9    here, but if he did need to consult with one.  I don't want to
10    delay the proceedings, but I want the Court to know he does have
11    an attorney.
12          THE COURT:  How important is this, Mr. Hendrix?
13          MR. HENDRIX:  Let me work through it over the break.
14    My sense is it's like probably going to be -- I think where I am
15    going is:  This thing got fast tracked; you felt pressure from
16    your attorneys.  They represented to you that your wife is going
17    to get indicted.  I know -- I understand where we are going.
18    And I'm not going to say you guys did it.  But I understand
19    those attorneys said your wife is going to get indicted.
20          THE COURT:  I think you can ask him, and we'll see
21    where it takes us.
22          MR. HENDRIX:  And then hopefully -- God, I don't even
23    know how far I'm into this thing.  I think I'm only into four of
24    ten piles.
25          MR. HARRIS:  You could quit.
```

1          MR. HENDRIX:  I'm about to.

2          MR. HARRIS:  After the last statement, you might.

3          THE COURT:  It was time.  We have made such good

4   progress, Counsel, in the last couple of days.  It was time for

5   the case to bog down, and it has.  So we've accomplished our

6   mission.  We are going to take a break.

7          (End of sidebar conference.)

8          THE COURT:  Ladies and gentlemen of the jury, it's

9   time for a real afternoon break; so we are going to take 20

10  minutes, and follow the usual rules of the road.  I encourage

11  you to have a snack.  Maybe step outside, get some fresh air,

12  shake it off, and come back in.  And then we'll do the last hour

13  or a little bit.  It's a challenging point in the trial, and as

14  I was kidding with the lawyers earlier, you get bogged down in

15  almost every trial.  You never know exactly when it's going to

16  happen, but it usually does where you get difficult evidentiary

17  issues or some similar tangle, and that's where we are today.

18  It's just where we are.  But we are getting through it.  And we

19  are going to do better when we come back, and we are going to do

20  better tomorrow.

21          So follow the usual rules of the road.  Pads facedown in

22  your chairs on this break.  Don't talk about the case.  Don't

23  let anybody talk to you about it.  All rise for the jury.

24          (Jury not present.)

25          THE COURT:  I'll see you all at 2:30, Counsel.

1           (Recess taken from 2:08 p.m. until 2:29 p.m.)

2                THE COURT:  Mr. Hendrix, ready to go?

3                MR. HENDRIX:  Yes, sir.

4                THE COURT:  Very good.  I don't see our court security

5      officer.

6           Officer Simpson, what do you know?

7                COURT SECURITY OFFICER:  They are lining up right now,

8      Judge.

9                THE COURT:  Okay.  Officer Pike, I was going to ask

10     you if we had our jury, and I forgot about the exchange in the

11     hall, and I see the note.  Everybody can be seated.  You, too,

12     Mr. Maggio.

13          Counsel, the court security officer told me, as I was

14     heading towards the last break, that one of the jurors wanted to

15     send me a note, and I told the CSO, tell the jury that I don't

16     want to talk to him about the merits of the case, but if they

17     had a logistical question, then, yes, they could send me a note.

18     And is that what we've got?

19               COURT SECURITY OFFICER:  Yes, Your Honor.

20               THE COURT:  Okay.  Come on up.

21          So let me read it to you.  I understand because of COVID

22     and the juror has not been vaccinated -- I think the juror is

23     referring to the witness -- but I would really like to see his

24     face, especially when testifying, but maybe for a brief time

25     prior to leaving.  I also believe he has a beard and mustache

1    which makes seeing his face more difficult due to distance.

2        So I'm going to make this Court's Exhibit No. 2, and unless

3    there's some objection from counsel, I don't intend to alter our

4    protocol, but I will ask -- I will acknowledge that I got the

5    note, and I'll ask Mr. Maggio to take down his mask and sort of

6    look at the jury before he leaves.

7        Mr. Hendrix?

8            MR. HENDRIX:  That's fine, Your Honor.

9            THE COURT:  Ms. Peters?

10           MS. PETERS:  That's fine, Your Honor.  Thank you.

11           THE COURT:  Very good.

12       All right.  We'll take our jury.

13           COURT SECURITY OFFICER:  May I also have a word with

14   you?

15           THE COURT:  This is one of those days, isn't it?

16           COURT SECURITY OFFICER:  Yes.

17           THE COURT:  Sure, Officer Pike.

18       (Discussion off the record between CSO and Judge Marshall.)

19           THE COURT:  Counsel, here's one to think about.  Okay?

20   The court security officer just relayed to me that several of

21   the jurors are asking, or want to ask me, about definitions of

22   various words.  We can punt, and I can say to the jury that I'm

23   going to give you the instructions that you need at the end.  Or

24   at the end of the day, I could ask them to list the words that

25   they want defined so that we would know what's on their mind.

1    Think about that, please, and we'll -- I'll make a decision with

2    y'all's help, here in due course.

3         We'll take our jury.

4         (Jury present.)

5              THE COURT:  Everyone may be seated.

6         Ladies and gentlemen of the jury, I have received a note

7    from a juror about seeing Mr. Maggio's face and that the juror

8    would like to see his face, and I'm not going to alter the

9    protocol.  I'm going to keep him in the mask because of our

10   virus circumstances.  But I will ask him to remove his mask, so

11   that y'all can see his face when he is done with his testimony.

12        Mr. Hendrix, you may question.

13             MR. HENDRIX:  Thank you, judge.

14   BY MR. HENDRIX:

15   Q.   Mr. Maggio, when we started this thing, I told you you and

16   I have a lot of work to do and it's become a slog.  I apologize,

17   but my client, you understand, is charged with very serious

18   federal crimes, and I'm going to do my job.  You understand

19   that, right?

20   A.   Yeah, I understand fully that.

21   Q.   Let me clear up a little mess --

22   A.   Yes, sir.

23   Q.   -- that I made.

24        We talked about you having said, at the time of your

25   discussions with Baker and the remittitur decision, it did not

1   enter your mind you were taking a bribe; remember that?

2   A.   It was my prior testimony or statement or whatever it was.

3   Q.   Yeah, I thought it was in your draft of that grand jury

4   testimony on January 10th, 2019.  You remember on January 10th,

5   2019?  I think three things happened.  There was the discussion

6   of the typed statement being made up for you to testify to in

7   front of the grand jury, right?

8   A.   Okay.  Yes, sir.

9   Q.   And then you had your grand jury testimony?

10  A.   Yes, sir.

11  Q.   But in between you gave another interview that got reduced

12  to an FBI 302.

13  A.   Okay.

14  Q.   Okay?  Fair enough?

15  A.   Fair enough.

16  Q.   Don't dispute it?

17  A.   No, sir.

18  Q.   It's in that interview on January 10th, 2019, you recollect

19  saying, at the time of the discussion with Baker and this

20  remittitur decision, it did not enter your mind that you were

21  taking a bribe?

22  A.   I don't dispute that's the recollection, for whatever agent

23  wrote that, yeah.

24  Q.   Good enough.  I wanted to clear that up.

25       All right.  Next topic.  I think we were talking about the

1    reasons that you pleaded guilty to federal program bribery, and

2    I think where we left off is you have said before -- well, let

3    me ask it more directly.

4         Did you feel like your trial attorneys pressured you into

5    pleading guilty?

6    A.    Yeah.  I think the easiest way for me to say is that by

7    analogy -- I don't want to get into that.  Yes.

8    Q.    Okay.  And it became an issue in your motion to withdraw,

9    right?

10   A.    Ms. Hamilton's representation of me, if anybody is familiar

11   with the comic Sam Kinison?  Sam Kinison, the comic, that's the

12   best -- that's the way to describe it.

13   Q.    I don't know if -- I don't know what that means.

14   A.    Well, you have to go home and look it up.

15   Q.    No need to get into it.  I got it.  But you have taken the

16   position at some point during this that you were, in fact,

17   innocent but one of the reasons you pled guilty is because your

18   attorneys were giving you bad advice, putting pressure on you?

19   A.    I did state that, yes.

20   Q.    Again, three months from initial interview to guilty plea,

21   right?

22   A.    Yes.

23   Q.    In the process that we know in the criminal process, very

24   short period of time, right?

25   A.    Extremely short, probably highly unusual, especially

1   federal, I would think.  I don't know.

2   Q.   I agree.  And do you remember part of your reasoning also

3   was that your attorneys had told you that your wife could be

4   indicted also?

5   A.   Oh, yeah.  They told my wife and me.

6   Q.   That both of you?

7   A.   Told her she would be.

8   Q.   And was it for money laundering?

9   A.   I don't know.

10  Q.   Okay.

11  A.   They just said she was looking at, I think, up to 20 years.

12  Q.   And so another part of the reason that you pled guilty so

13  fast was the threat of your wife being indicted, right?

14  A.   I'm not going to dispute that.  I don't think any man wants

15  his wife to -- no.  No.  I don't dispute that.

16  Q.   Sure.  I completely understand.

17       Now, there was a hearing on February 26th, 2016, in front

18  of Judge Miller, your judge in the case, and do you remember

19  telling -- let me set the stage for you here.  I think you and

20  Judge Miller may have had a private moment in this hearing where

21  you went back into his chambers so you could speak freely with

22  him.  Do you remember that?

23  A.   We did have an in-camera hearing, but I think it was in the

24  courtroom.

25  Q.   It was?

1    A.    They cleared the courtroom, and me, my wife, Judge Miller,

2    myself, my wife.  I don't know if anybody else was there.  I

3    don't -- for some reason I think he -- because it became a

4    question about attorney-client, and I remember Ms. Peters

5    offering, said, well, let's go ahead and -- I mean, if I can

6    remember right, I mean, she was very gracious and said, let's

7    step out, and so...

8    Q.    Right.  And so the prosecution team steps out?

9    A.    Yes.

10   Q.    And you have got a few people, but it's your moment to have

11   essentially a private moment with Judge Miller?

12   A.    Yes.

13   Q.    And do you remember telling Judge Miller that during this,

14   these three months leading up to your plea, that you were,

15   quote, "All messed up, very upset, and all kinds of emotional

16   problems because of this"?

17   A.    Oh, I'm sure I told him that.  I don't dispute it.

18   Q.    I keep interrupting.  I'm so sorry.  You don't dispute

19   that?

20   A.    (Shaking head.)

21   Q.    And do you remember saying that you had been posting on

22   social media that you needed counseling at this time?

23   A.    I don't remember that.

24   Q.    You do not?

25   A.    No, sir.  I don't remember that.  I posted a lot of things

1    on social media.  But I don't remember posting that.

2            MR. HENDRIX:  Can I do this one back to the Elmo?  All

3    right.  I'm showing you -- you got it?

4    BY MR. HENDRIX:

5    Q.   Are you with me?

6    A.   Oh, yes, sir.  I didn't know who you were talking to.  My

7    bad.

8    Q.   No, that's all right.  I'm referring to page 16 of this

9    transcript, line 6 through 11.

10   A.   Okay.

11   Q.   Got it?

12   A.   Yes, sir.

13   Q.   And so do you remember at that hearing then saying at that

14   time "Before pleading guilty, I received a message that the U.S.

15   Attorney asked me to quit posting on social media, that my

16   mental status was not the best.  That I did need counseling, but

17   to wait until after sentencing."

18   A.   I don't dispute saying that.

19   Q.   And it says, and you have since -- I have since been to

20   counseling?

21   A.   Yes.

22   Q.   Okay.  So that's the way life was for you leading up to the

23   decision to plead guilty and implicate Gilbert Baker and Michael

24   Morton, correct?

25   A.   That's fair.  Yes.

1  Q.    Yeah.  You were under pressure, emotional problems,
2  instability at the time?
3  A.    Yes.
4  Q.    Okay.  Okay.  Let's go back now.  Let's go back to your
5  campaign.  So you decided to run for the Court of Appeals,
6  what -- you were talking about it, what, through spring of 2013?
7  Am I right on that?
8  A.    Yeah, the process started back in fall of 2012, I think,
9  talking about it.
10 Q.    All right.
11 A.    All the way through spring and then ultimately culminating
12 in announcement in late June of 2013, '13, I believe it was.
13 Q.    I think June 27th of 2013 is when you actually formally
14 announced your candidacy?
15 A.    Fair enough.
16 Q.    And you know as part of running a judicial or any campaign
17 that, when you raise funds, you report those funds on what is
18 called a Campaign Contribution & Expenditure Report?
19 A.    Yes, sir.  The campaign committee has to do it, yes, sir.
20 Q.    We call it CN&Es or CC&Es, right?
21 A.    Yes, sir.
22 Q.    And you had a goal of raising $100,000, correct?
23 A.    Correct.
24 Q.    And we already established that, I guess, the political
25 view of this is the first quarterly report that has to be filed

1    you want to post a big number, big money number on there, right?

2    A.   That's the conventional wisdom, but as I have stated before

3    many times, not necessarily under oath, but if that were the

4    case, we would have had president Jeb Bush, not President Trump.

5    He had 94 million and Trump wasn't even in the race yet.  You

6    would think Bush would have won, but, yes, the conventional

7    wisdom is to have more support on the front end, more dollars, I

8    guess.

9    Q.   A war chest?

10   A.   Yes.

11   Q.   Right.

12   A.   If you will.

13   Q.   And every politician and judicial candidate wants to be

14   able to post that big war chest number to fend off any possible

15   competitors?

16   A.   It certainly helps.  It certainly helps.

17   Q.   It's a campaign goal, big number, first quarterly report,

18   right?

19   A.   That's been the traditional way, yes.

20   Q.   And the first quarterly report during this election would

21   have been January 15th, 2014, correct?

22   A.   Okay.  Yes, sir.

23   Q.   You got some money from PACs as a political contribution,

24   right?

25   A.   I didn't know it at the time, yes, sir.

1  Q.    You ultimately found out, right?
2  A.    As a judge, we're not allowed to know where the money comes
3  from.  At that time there was a law that judicial candidates
4  could not know who gave them money, who donated money, sources
5  of money.  Couldn't -- we weren't even allowed to review our C &
6  Es at the time.
7  Q.    You have first reviewed your first quarter CC&E, correct?
8  A.    I'm sure I have.
9  Q.    And then let me refresh your memory.  You testified in
10 front of the ethics commission, right?
11 A.    Yes, sir.
12 Q.    Right, and you had a lawyer.  It was Lauren Hamilton at
13 that point, right?
14 A.    Yes, sir.
15 Q.    And the ethics commission asked you to produce your CC&E
16 reports, correct?
17 A.    I'm sure I did.
18 Q.    And you did?  You gave them to the ethics commission,
19 didn't you?
20 A.    I'm sure.
21 Q.    Let's make sure we're talking about the same thing here.
22 So this -- what I am showing you is a Campaign Contribution &
23 Expenditure Report?
24 A.    Sure.
25 Q.    Filed January 15th, 2014, right?

1   A.   Correct.

2   Q.   Now, not all the money that went into your campaign in that

3   first quarter -- and I think you only did two quarterly reports.

4   Not all that money came from these PACs that are the subject --

5   that are at issue in this case, right?

6   A.   I would have to say yes.  I don't know for sure, but yes.

7   Q.   Let me show you a breakdown that I have made --

8   A.   Okay.

9   Q.   -- of your contributions?

10      And I don't want to waste our time going through all these,

11  but the first quarterly CC&E report?

12  A.   Clearly they are not from the PACs.

13  Q.   This, what I'm showing you, I'm going to represent to you,

14  none of it is from the PACs.  We have Mozella Dees Flucht; it's

15  a citizen who contributed $2000?

16  A.   Flucht.  Her name is Flucht.

17  Q.   Sorry.  I'm not going there.  Alcoa Pines Health and Rehab,

18  $2,000.

19  A.   Yes, sir.

20  Q.   That was the maximum contribution?

21  A.   Yes, sir.

22  Q.   Chapel Woods Health and Rehab, 2000?

23  A.   Yes, sir.

24  Q.   Hometown Nursing Center?

25  A.   Yes, sir.

1   Q.   2,000?

2   A.   Yes, sir.

3   Q.   It looks like your dad contributed, right?

4   A.   My dad?

5   Q.   I don't know.  I just saw Joe Maggio.  I assume that was --

6   A.   No.  That was my son, one of my sons.

7   Q.   Oh, I'm sorry.  Sure.  It goes down.  You have some

8   doctors.  M & M Environmental Oil Field Services contributed

9   $2,000?

10  A.   Yes, sir.

11  Q.   And so forth?

12  A.   Yes, sir.

13  Q.   I'm going to show you my handwritten notes of my

14  mathematical calculation.

15  A.   Okay.  Yes, sir.

16  Q.   Go back to your first quarterly report.  You posted the

17  number of -- do you remember -- $51,450 --

18  A.   Correct.

19  Q.   -- was the amount of contributions that you received?

20  A.   Correct.

21  Q.   So you got halfway to your $100,000 goal anyway?

22  A.   Not bad.

23  Q.   Yeah.  It was actually good.  The non-PAC money --

24  A.   Okay.

25  Q.   By my estimation, comes up to $28,00 in non-PAC

1    contributions to your campaign for that first quarter.  Does

2    that sound right?

3    A.    I guess.  I don't remember seeing any PACs on it.  But,

4    yeah, I'll take that.

5    Q.    Okay.  Is it now -- is it sort of in your memory that that

6    first quarterly report that you guys filed, looks to me about

7    half of the money was from entities that have nothing to do with

8    Michael Morton?

9    A.    Oh, that may be true because I didn't see any PACs on

10   there.

11   Q.    Okay.  And the point that I'm trying to make is Michael

12   Morton was not the only -- the PACs that are associated with

13   Michael Morton, that Michael Morton helped fund, were not the

14   only contributions that you received, right?

15   A.    Oh, correct.  Yes, sir.

16   Q.    Let's talk briefly about tort reform and your views as a

17   judge and as a jurist.  Is it fair to say that -- and I think

18   you did on direct examination.  You have a conservative judicial

19   philosophy, right?

20   A.    Without a doubt.

21   Q.    And conservative judicial philosophy breeds the notion that

22   sometimes plaintiffs' lawyers can inflame a jury?

23   A.    There can be a run-away jury or something like that

24   sometimes, yes.

25   Q.    And grant excessive verdicts, right?

1    A.    And it's happened in Arkansas, yes.

2    Q.    Right, and excessive verdicts run small businesses out,

3    right?

4    A.    It could.  Depends on their finances.  Are you asking

5    hypothetically?

6    Q.    But it could, yes?

7    A.    Yes.

8    Q.    So the notion of tort reform is, well, we should have some

9    ability to limit these debilitating excessive awards, right?

10   A.    That was the mindset or the -- yes.

11   Q.    Awards that, quote, unquote, shock the conscience of the

12   court, right?

13   A.    Yeah.

14   Q.    And remitting is a tough call, right?

15   A.    That's what a remittitur does.

16   Q.    And in the conservative philosophy, and really all judges

17   it's you are getting hired to make some tough calls here, right?

18   A.    I don't know about other judges, but that's what I felt,

19   like I was hired to make decisions.  That's the whole job of a

20   judge.  No offense, Judge, but it's to make decisions.

21   Q.    Yeah.

22   A.    Not kick the can down the road or not continue things

23   forever but to make a decision.

24   Q.    Right.  And it's sort of common language that we use in the

25   business, is it fair to say; hey, judges, you guys have to make

1   tough calls, right?

2   A.   Yes.  As a private attorney, I hated judges -- I shouldn't

3   say hate.  I was not fond of certain judges that seemed to defer

4   every decision.

5   Q.   Right.  Quote, unquote, tough calls; quote, unquote, tough

6   decisions are common phrases in our business, right?

7   A.   Yes, sir.  That's fair to say.

8   Q.   I'll take it out of the civil arena.

9        Sentencing another human being, as a judge, is a tough

10  decision, right?

11  A.   Yes, without a doubt.  To take somebody's liberty away,

12  yes.  Oh, yes.  That was probably the second toughest thing I

13  ever did as a judge, the first being deciding child custody.

14  Q.   These are tough decisions.  That's frankly what you guys

15  get paid to do, right?

16  A.   I like to think that's what we got paid to do.  At least,

17  that's the way I took my job.

18  Q.   Right.  Okay.  Let's get back to a little bit of ground

19  that we have plowed, but I don't want to get too -- maybe a

20  little deeper.  I think we covered this.  The January 19, 2016,

21  interview was the first time that you told the government that

22  Baker told you that Morton was watching the case and he would

23  appreciate a favorable ruling, right?

24  A.   I think we have said that, yes, sir.

25  Q.   Okay.  I want to take you to the December 6th, 2018

1   interview.

2       Do you recall in that interview saying that you do not

3   recall what decision Baker was talking about that Morton would

4   be appreciative of?

5   A.   I'm sure I said -- if that's what I said, I'm sure.  I'm

6   not going to dispute that if you have a record of that.  I don't

7   remember it.

8   Q.   Okay.  You are not going to dispute it?

9   A.   No, sir.

10  Q.   Then in March of 2019 when Mr. Everett interviewed you, do

11  you remember telling Mr. Everett that you had no memory of Baker

12  ever saying that Morton was watching the case or that Morton was

13  interested in the case?

14  A.   I don't remember saying that to Mr. Everett.  If I did, I

15  don't know.  I just don't remember it.

16  Q.   Back to where I think we are going to consistently go.  You

17  are not going to dispute it?

18  A.   If that's his recollection, yes.  I'm not going to dispute

19  his recollection.

20  Q.   All right.  Let me -- let's turn to Government's

21  Exhibit 8A.  Do you have that anywhere handy?

22      Okay.  This was for -- it's been introduced.

23      Okay.  This was introduced as Government's Exhibit 8A.  It

24  is a text message -- there it is.  It says S. Baker, but we are

25  going to assume that's Gilbert Baker because his wife's name is

1    Susan, right?  And it's to you, "da judge," correct?

2    A.    That's my wife putting that on there, yes.

3    Q.    Gotcha.  And it says -- this is Gilbert saying, "I have a

4    Little Rock lunch with the nursing home folks.  The topic will

5    be judicial races.  You are top of the list."

6    A.    Correct.

7    Q.    It's dated May 16th, 2013?

8    A.    Correct.

9    Q.    At 10:33 a.m., right?

10   A.    Yes, sir.  Yes, sir.

11   Q.    All right.  The verdict came in that evening, right?

12   A.    Okay.  Yes, sir.

13   Q.    Right.  It came in, I think, at 5:50 p.m.; is that right?

14   A.    I seem to recall that, yes.

15   Q.    At this point when Gilbert sent you this text, there was no

16   verdict, correct?

17   A.    Correct.

18   Q.    There was no decision at that point?

19   A.    Correct.

20   Q.    For which you could have been influenced by anybody?

21   A.    At that moment, that's correct.

22   Q.    Now, we know for sure this can't be part of some bribe,

23   alleged bribe, correct; this is campaign talk?

24   A.    That's what it appeared, yes.

25   Q.    The verdict came down, as we said, early that evening, and

1    is it fair to say, Mr. Maggio, that that verdict put everything

2    aside, everything aside about this case, that verdict stunned

3    you?

4    A.    I think it stunned everybody in the courtroom.

5    Q.    Stunned you as a human being?

6    A.    Yes.

7    Q.    Stunned you as a judge?

8    A.    Yes.

9    Q.    And in your estimation, stunned everybody in that

10   courtroom?

11   A.    Yes.

12   Q.    Your staff was stunned?

13   A.    My staff was tremendously stunned.

14   Q.    Lisa Sick was your law clerk, correct?

15   A.    Yes, she was.

16   Q.    Your law clerk was stunned?

17   A.    Yes.

18   Q.    Susan McGee was your trial court assistant; yes?

19   A.    I love her, yes.

20   Q.    Ms. McGee worked for you for a long time, right?

21   A.    Yes.

22   Q.    Lovely woman?

23   A.    Wonderful.

24   Q.    Absolutely stunned by this verdict, right?

25   A.    Yes.   The Court reporter, bailiff, everybody who was in the

1    courtroom I think probably the plaintiff's attorneys were

2    stunned a little too.

3    Q.    Personally stunned you?

4    A.    Yes.

5    Q.    As a judge, as a jurist, it shocked your conscience?

6    A.    I think that's what I put in the order, yes.

7    Q.    Shocked the conscience of the Court, and you abide by that

8    to this day, right?

9    A.    Yeah, I still think it.

10   Q.    It was a stunning verdict?

11   A.    It was an excessive verdict, yes.  Based upon the facts of

12   the case and the law, I thought it was tremendously excessive.

13   Q.    And thus the remittitur?

14   A.    That was part of the reason, yes.

15   Q.    Got it.

16         Let's go to Government's Exhibit 8B.  Let's talk about

17   this.  Came in; "Gilbert, well, your first 50K is on the way.

18   When can we take the money?"  Do you remember that?

19   A.    I do.

20   Q.    Okay.  That was on June 29th of 2013, correct?

21   A.    Yes.

22   Q.    That was two days after you announced for the Court of

23   Appeals, right?

24   A.    Correct.

25   Q.    Now, you didn't receive -- well, you now know that

1    Mr. Baker didn't receive these campaign checks for the PACs
2    until July 9th, 2013, right?
3    A.   Yeah.  I didn't know that until March of 2014.
4    Q.   Gotcha.  And what it's saying is your first 50,000 grand,
5    your first $50,000 of campaign contributions are on their way,
6    correct?
7    A.   Correct.
8    Q.   That was early in your campaign, right?
9    A.   Yes.
10   Q.   And earlier Mr. Baker said he would raise you $50,000,
11   right?
12   A.   Correct.
13   Q.   Your goal was $100,000?
14   A.   Correct.
15   Q.   Gilbert said, I will try to raise you $50,000?
16   A.   He did.
17   Q.   You were responsible for the other 50,000?
18   A.   I was.
19   Q.   So when he says, "Your first $50,000 is on the way," that
20   doesn't make sense, does it, because there wouldn't be a second
21   $50,000, right?
22   A.   Not from Gilbert, no.  That would be -- that's the way to
23   read that, yes.
24   Q.   Yeah.  So I'm just trying to work my way through this
25   because it's -- this is apparently part of the government's case

1   of some evidence of a bribe.  Let's work our way, best we can

2   figure that part out.

3       It's fair to say that you were fairly constantly talking

4   with Clint Reed and Gilbert Baker about raising money; is that

5   fair?

6   A.   Clint, Gilbert, Rhonda, Cody, Troy.  Everybody was talking

7   about it.

8   Q.   Troy?

9   A.   Braswell.

10  Q.   Braswell.

11      We have reviewed a lot of text messages that have been

12  recovered.  I think at one point you had called yourself a

13  nervous Nelly?

14  A.   I'm sure I did.

15  Q.   Sometimes you were having trouble sleeping, concerned about

16  the amount of money your campaign was able to raise; is that

17  right?

18  A.   Anybody who's ever run a campaign gets nervous.

19  Q.   Right.  So working our way through this process, your first

20  $50,000 on the way, the first thing that occurs to me, number

21  one, the PAC contributions were $30,000, right?

22  A.   Correct.

23  Q.   Not $50,000?

24  A.   Correct.

25  Q.   So it makes no sense what Baker was saying when he said

1    your first $50,000 is on the way, right?

2    A.    That's certainly one way to interpret it.

3    Q.    Here's another way that you have interpreted this:  I

4    actually think that e-mail was meant for Rhonda Wood, right?

5    A.    Yes.  It was not unusual for -- it happened on more than

6    one occasion that text messages were sent to me that were meant

7    for Rhonda or were sent to Rhonda, meant for me or -- I mean,

8    just -- Rhonda and I traditionally and personally and

9    professionally, we were -- I helped her campaign so much, the

10   joke was she introduced me as her driver because I drove her

11   probably 20,000 miles along the state campaign.  And so we were

12   together a lot.  So people would get my number.  Hey, can you

13   send -- tell Rhonda this or that, you know.  So, yeah, I guess

14   it's one way you could interpret it.

15   Q.    Yeah.  I'm searching for the meaning of this thing because

16   it really doesn't make sense, right?  We know that Gilbert was

17   responsible for $50,000 so your first $50,000, there's not going

18   to be a second $50,000?

19   A.    Not from Gilbert, no.

20   Q.    Right.

21         Another scenario is you were, in fairness to say, sort of

22   burning Clint Reed and Gilbert Baker up with texts and phone

23   calls about what's the status of the fundraising, how much are

24   you bringing in, Gilbert Baker bringing in?

25   A.    The plans for it were, yeah.

1  Q.   Um-hum.

2  A.   Sure.

3  Q.   This could be a way of Gilbert saying, goodness, let me get

4  this guy off my back.  50K is coming in, right?

5  A.   You would have to ask Gilbert about that.  I don't know

6  what his potential was.

7  Q.   The other thing that I find interesting about it is that

8  money was not being raised -- you don't know this.

9       Money didn't come in until July.  This is the discussion

10  back in June, fair?  Do you know about that?

11  A.   I know that now.  I had no idea at the time that money had

12  been -- I can tell you with all of us running for different

13  positions, that money was an issue, and support and, you know,

14  some people already had theirs lined up.  Well, I got mine.  I

15  got this, you know.  So everybody starts talking and back to

16  your point about you want to appear to be solid or strong.

17  Q.   Right.

18  A.   You don't word getting out, oh, my gosh, nobody's willing

19  to support him, and so anyway...

20  Q.   Sure.  Like I said, the third option is, with the confusion

21  of texts, this could have been meant for Rhonda Wood instead of

22  you, right?

23  A.   That is certainly one way to take it.

24  Q.   This is no evidence of a bribery scheme, right?

25  A.   In and of itself right there?

1    Q.    Yeah.

2    A.    I think you would be hard-pressed to say that alone, that

3    one text message.

4    Q.    It has nothing to do with this case, right?

5    A.    As you read that text message, no, it doesn't.

6    Q.    And can we put up then the second part?  I guess it's

7    Mr. Maggio's response.

8            MR. HARRIS:  Which is it?

9            MR. HENDRIX:  Your government -- do you have an 8C or

10   something?

11           MR. HARRIS:  8C.

12           MR. HENDRIX:  There it is.

13   BY MR. HENDRIX:

14   Q.    It's already been introduced.

15         Then you respond, thank you.

16   A.    Thank you.

17   Q.    Unfortunately not until late November?

18   A.    Yes, sir.

19   Q.    And then irrelevant stuff.

20         So what Gilbert is saying -- Gilbert is asking you when can

21   we -- when can you take money, because this is in June, right?

22   A.    Yes.

23   Q.    Your first $50,000 is on the way.  When can you take it?

24   A.    And I respond, "Not till November."

25   Q.    You go, hey, the judicial window is not open?

1   A.   Correct.

2   Q.   So is it fair to assume that at least this indicates that

3   Gilbert Baker really didn't know when the judicial window was

4   open or mistakenly calculated it somehow, right?

5   A.   That's certainly one way to --

6   Q.   I mean he's asking you when can you take the money?

7   A.   Yes.  Yes.  Yes.

8   Q.   Government's Exhibit 8D I would like your comments on.

9   This is the government's exhibit from -- on July 26, 2014.

10  Gilbert texts you, "Hey, there.  Hope you are okay.  Been

11  thinking about you.  Hang in.  You are a good guy.  Your friend

12  GB," correct?

13  A.   Yes, sir.

14  Q.   Okay.  Let's work our way through this process.

15       March 2014 the press exploded on you, did it not?

16  A.   Lucky me, yes.

17  Q.   Sir?

18  A.   Lucky.

19  Q.   I understand.  I understand.  Yeah, and it was bad.  They

20  were reporting about possible irregularity in PACs, campaign

21  contributions?

22  A.   Yes.

23  Q.   And then there was a completely other topic that you had

24  going on in your personal life that's nothing to do --

25  A.   Correct.

1   Q.    -- with PACs, campaigns, has nothing to do with what we are
2   here talking about?
3   A.    Correct.
4   Q.    But you had another personal issue going on in your life?
5   A.    Correct.
6   Q.    And it was big in the news also?
7   A.    Yes.
8   Q.    And embarrassing?
9   A.    Yes.
10  Q.    Okay.  You don't make your first statement to the FBI until
11  October 20, 2014.  We established that, right?
12  A.    Yes, sir.
13  Q.    All right.  So your best recollection of this text, is it
14  fair to say, this is Gilbert trying to reassure you during a
15  personal crisis when you are in the media all the time in an
16  embarrassing way, is this a kind gesture from somebody?
17  A.    Yeah.  That's how I took it.  I had no other reason to.
18  Q.    Does it have anything to do with this case?
19  A.    As I recall, no.  But I don't even know if I responded to
20  him.  I have no idea.  I don't think I responded to him.  I
21  could be wrong.  I just don't remember until seeing it here.
22  Q.    Yeah, yeah.  But -- it makes no sense in the context of
23  this case, right?  This is a guy trying to be kind to you when
24  you were suffering a personal crisis that has nothing to do with
25  PACs, campaign donations, your election -- well, it has nothing

1   to do with the issues that we are here for this jury to decide

2   here today, right?

3   A.   I think that's fair.  That's a fair interpretation.

4   Q.   Got it.  Your remittitur decision reducing that jury

5   verdict, you researched the law on remittiturs?

6   A.   I did.

7   Q.   Lisa Sick your law clerk, researched the law on

8   remittiturs, right?

9   A.   Yes, she did.

10  Q.   In fact, you reached out to other judges to get their

11  advice?

12  A.   I did.

13  Q.   And you talked to Judge Tim Fox?

14  A.   Oh, I am sure I did, yes.

15  Q.   Who's a Pulaski County Circuit Court judge?

16  A.   Yes, sir.

17  Q.   Did you talk to Rhonda Wood and get her advice?

18  A.   I am sure I did.

19  Q.   I saw a note that you had also maybe sought the advice of

20  another judge, Dave Clark?

21  A.   I probably did.

22  Q.   Okay.

23  A.   I respected his opinion.

24  Q.   And so you were trying to do the legally correct thing

25  here, right?

1    A.    I certainly wanted to research as much as I could, given

2    the fact it was an unusual potential decision and remittiturs

3    are complex.  I bet if you polled 100 lawyers, 98 of them

4    wouldn't know anything about it.  So, yeah, it was unusual.  You

5    know, it's not a final order, so --

6    Q.    Yeah.

7    A.    -- there's all kind of things that go on with remittiturs.

8    Q.    Is it fair to say that there were several, possibly many,

9    legal reasons supporting your order of remittitur?

10   A.    Oh, I thought so.  Yes, sir.  And had there not been, I

11   would not have granted it.

12   Q.    I'm not going to beat this dead horse because the jury has

13   already heard it.  But the only unanimous verdict in favor of

14   the plaintiffs was on ordinary negligence, right?

15   A.    Correct.

16   Q.    There was a unanimous verdict in favor of the defense on

17   wrongful death, right?

18   A.    Yes.

19   Q.    They had split verdicts on other things?

20   A.    Correct.

21   Q.    Okay.  So that obviously told you something?

22   A.    Without a doubt.

23   Q.    Yeah, and I think that you quote the plaintiff's lawyers --

24   what was your reasoning?  Essentially you concluded, I'm giving

25   the plaintiff's lawyers what they asked?

1    A.    That's exactly what I thought.

2    Q.    Work us through that please.

3    A.    Well, the jury was complicated -- jury trial was a

4    complicated trial, much like this one, guys, much like this one.

5    Lots of sidebars, lots of objections, lots of rulings.  It was

6    the second time I had the case and gotten all the way to jury

7    trial one other time prior.

8              THE COURT:  They know about the nonsuit.

9              THE WITNESS:  Okay.

10             THE COURT:  And it started off.

11             THE WITNESS:  I apologize, Judge.

12             THE COURT:  That's okay.

13             THE WITNESS:  So it gets to the end, and we had

14   already made the -- they had -- a motion had been made, and I

15   made an order to bifurcate the case in Arkansas with civil cases

16   to avoid the issue of punitive damages and negligence coming

17   together.  You try not to have a jury inflamed or prejudiced by

18   a horrible picture or by somebody's actions to get to punitive,

19   which, Judge, I may be all over your --

20             THE COURT:  I think you have gone far enough.

21             THE WITNESS:  I apologize.  So we bifurcate it to try

22   to be fair to all sides.  If there's a decision finding

23   culpability, finding the defendant guilty of intentional

24   negligence, then you go to the next stage where you had just a

25   hearing on punitive damages.  So in my view we got to the end.

1    The plaintiff's lawyer asked for, I want to say, $6 million,

2    maybe more, for the death, for her death, as I recall, asking

3    for her death, wrongful death, and then a million dollars for

4    negligence and violation of a couple of state statutes or

5    regulations or something.  I can't remember.

6        So the long and short of it is back comes the jury verdict,

7    and as we've already established, everybody in the place was

8    kind of shocked or stunned.  It did appear to me and my law

9    clerk maybe punitive damages had snuck in.  So we did some

10   research, and my decision was the plaintiffs asked for a million

11   dollars for negligence and $6 million for wrongful death.  They

12   did not get a wrongful death.  The nursing home was not held

13   liable for wrongful death.  No matter what they did, they were

14   not guilty of killing her wrongfully.  So in my mind I worked it

15   out.  They kind of come to pass.  And once that's done, the

16   plaintiffs have three choices.  They can either accept the

17   million dollars or the remitted amount.  They can get an

18   automatic new trial with a new jury venire and a new judge or an

19   automated expedited appeal to the Supreme Court to review my

20   remittitur order.

21       So I thought, based upon the facts of the law at the time,

22   I thought that was the thing to do.

23   BY MR. HENDRIX:

24   Q.   Right.  And so, as you just said, at that time, at the

25   moment that you granted the remittitur, first there was sound

1   legal reasoning behind it, right?

2   A.    Yes.

3   Q.    You guys had done your research.  You found *Advocat V Sauer*

4   which is a Supreme Court granted remittitur, right?

5   A.    Yes.

6   Q.    There were sound practical reasons; in light of the jury

7   verdict, I am giving the plaintiffs what their lawyers asked

8   for, right?

9   A.    Yes.

10  Q.    There were some problems with jurors.  You got contacted by

11  a juror afterwards concerned about the verdict?

12  A.    One or two jurors.

13  Q.    So all of those factors came in to remitting this jury

14  verdict, right?

15  A.    Those were all part of the decision.

16  Q.    And those were the reasons at the moment you granted the

17  remittitur, correct?

18  A.    Those are some of the reasons, yes.  Not the only reasons.

19  Q.    I'm so sorry?

20  A.    Not the only reason but some of the reasons.

21  Q.    Well, it only later occurred to you that maybe I got

22  manipulated into this thing?

23  A.    That's some of the statements I made before, yes.

24  Q.    I think you just said to the jury 35 seconds ago was, at

25  the time I made it, it was based on all these things.  Later I

1    came to a conclusion that maybe I got manipulated into this,

2    right?

3    A.    That's what I stated.

4    Q.    So, again, at that moment in time that you granted the

5    remittitur, there clearly was no agreement, no meeting of the

6    mind for you to be bribed when you granted that remittitur,

7    right?

8    A.    Based upon my definition of a bribe at that time, yeah,

9    there was no -- I didn't feel there was any direct, specific

10   detailed agreement, yes.

11   Q.    Understood.  Let's talk about the PACs.

12   A.    Okay.

13   Q.    Apparently a decision was made that Michael Morton would

14   contribute to several different PACs, and you -- your campaign

15   ultimately got that -- the money from the PACs, right?

16   A.    I guess there was.  I was not privy to that decision.

17   Q.    I think you had said earlier to the jury, look, the Bull

18   case was a bit off topic, the Chinese wall reference that you

19   were talking about?

20   A.    Yes.

21   Q.    Right?

22   A.    Yes.

23   Q.    I wanted to stay away from -- you didn't want direct

24   contributions from nursing homes, from Michael Morton because

25   you had that case pending in front of you?

1   A.   That's what we agreed.  That's what everybody agreed to,
2   yes.
3   Q.   So the way to affect that was for the money to go into PACs
4   and the PAC money to be distributed into your campaign?
5   A.   I was unaware of that.  But I guess that's how you do it,
6   yes.
7   Q.   In hindsight now, that's the way you do it?
8   A.   Yes.
9   Q.   In the world of judges and lawyers we have the phrase "the
10  appearance of impropriety," correct?
11  A.   Yes.
12  Q.   We do it with juries?
13  A.   Yes.
14  Q.   Every juror is told, hey, when you are walking down the
15  hallway, when a lawyer turns away from you, don't be offended.
16  It's, even if you guys are just passing the time, it may appear
17  to someone else that there may be something improper going on?
18  A.   I think that's the exact wording.
19  Q.   Even when it's proper?
20  A.   Right.
21  Q.   You want to avoid the appearance of impropriety?
22  A.   I think that's the instruction.
23  Q.   The way to avoid the appearance of impropriety, if you have
24  a nursing home case in front of you, was for the money to go
25  into the PACs, right?

1   A.   Yes.   Again, I didn't know about it.   But, yes, that would

2   be one way to avoid any appearance of any impropriety for any

3   judge, yes.

4   Q.   Let's go back in time to your motion to withdraw your

5   guilty plea.

6   A.   Yes, sir.

7   Q.   You had an attorney that filed that motion to withdraw your

8   guilty plea?

9   A.   Yes, sir.

10   Q.   And it was filed February 12, 2016, right?

11   A.   Yes, sir.

12   Q.   And you consulted with your attorney about the contents of

13   the motion?

14   A.   Yes, sir.

15   Q.   And he relied on what you told him when he wrote what he

16   wrote in the motion to withdraw your guilty plea, right?

17   A.   I would think so.

18   Q.   And you remember your lawyer asserting, Maggio also asserts

19   that he would not solicit or accept anything of value in order

20   to be influenced to remit the judgment in a civil case and only

21   admitted that he did because he was pressured by his previous

22   counsel and threatened by the U.S. Attorney with an indictment

23   and prosecution of his wife.

24   A.   I'm sure I did -- I'm sure that's in there, yes.   Yes, sir.

25   I'm sure.

1    Q.    I think, ultimately, where we are going, Mr. Maggio, is

2    what version is true?  All right?

3    A.    Yes, sir.

4    Q.    I'm curious to know when you think you got bribed.  Let me

5    work through that with you.

6          We've already gone through the May 16, 2013, text from

7    Baker saying, I'm meeting with the nursing home folks, right?

8    A.    Yes, sir.

9    Q.    Well, that was before the jury verdict; so that's not part

10   of the bribe, right?

11   A.    That's -- that's one way to look at it, yes, sir.

12   Q.    The evidence has shown us that there's a meeting at a Ruby

13   Tuesday in Russellville with Michael Morton and Gilbert Baker

14   where several causes and candidates was discussed; you had no

15   knowledge of that, right?

16   A.    No, sir.

17   Q.    So that didn't factor into any sort of bribe?

18   A.    No, sir.

19   Q.    You've already gone through the first 50K text is not part

20   of this case, is no evidence of a bribe, right?

21   A.    That is one way to look at it, yes, sir.

22   Q.    Baker -- you didn't know when Baker received the checks on

23   July 9.  That was something you didn't know.  So that couldn't

24   go into any sort of agreement to be bribed, right?

25   A.    That's correct.  Without a doubt.  Correct.

1  Q.   And, obviously, we have all heard by now the phrase quid

2  pro quo, right?

3  A.   I'm sure they have.

4  Q.   Simply this in exchange for that, right?

5  A.   This for that.  That's exactly what it says.

6  Q.   In this case the assertion is the quid is a specific thing

7  which is the promise of campaign contributions, right?

8  A.   Yes, sir.

9  Q.   For the specific act which is reducing the verdict in the

10 Bull case, right?

11 A.   Correct.

12 Q.   And do you remember testifying under oath in front of the

13 grand jury on page 51, quote, that never happened?

14 A.   I don't remember that, but I'm sure you'll refresh my

15 memory, and if I said that in front of the grand jury, I'm sure

16 I did.

17          MR. HENDRIX:  Ms. Depper or Ms. Fowler, can you help

18 me find the grand jury transcript?  There you go.  Go down to

19 page 51 please.

20      All right.  Let's see if we can find it.

21 BY MR. HENDRIX:

22 Q.   My concept of a bribe -- do you remember saying to the

23 grand jury, would be as we, as I told you before, a backpack

24 full of money.  I need you to make this decision right now.

25 Explicit amount for explicit action.  That was my definition, my

1    internal definition of a bribe.

2    A.    Correct.  I did say that, yes.

3    Q.    And then -- and you say, and so that never happened?

4    A.    Correct.  I did say that, yes.

5    Q.    It didn't happen like that?  Answer --

6    A.    Correct.

7    Q.    -- it never happened?

8    A.    Correct.

9    Q.    Right?

10   A.    Yes, sir.

11         MS. PETERS:  Your Honor, could I ask Mr. Hendrix to

12   complete the rest of that section?

13         MR. HENDRIX:  Sure.

14   BY MR. HENDRIX:

15   Q.    And it never happened like that?

16         And then Ms. Peters asked you, but you got asked to make a

17   favorable decision or tough decision, right?  Yes?  And you say

18   okay.  And the consequence will be money or campaign

19   contributions, right?  That was the inference for sure.  Yes,

20   ma'am.  Do you remember saying that?

21   A.    I do.  Yes.

22   Q.    At best, most favorable to the government, it was an

23   inference, right?

24   A.    Yes, sir.  That's what I said.

25   Q.    As you said in the January 19, 2016, interview, I don't

1    have a smoking gun for you people.  All I got is innuendo?

2    A.   Yes, sir.  That's what I said.

3    Q.   At some point I think you told the government, in order to

4    shore up your cooperation so you get a sentencing cut -- you

5    told the government you believe you would lose the support of

6    Baker and Morton if you did not reduce that jury award.

7    A.   I don't recall if I said that.

8    Q.   Let's work our way through it.

9    A.   Right.

10   Q.   You never met Morton?

11   A.   Never.

12   Q.   You never talked to Morton?

13   A.   Never.

14   Q.   He never said you are going to lose my support if you don't

15   grant this remittitur, right?

16   A.   Not to me, that's for sure.

17   Q.   Gilbert Baker never told you that, right?

18   A.   Correct.

19   Q.   Your discussions with Mr. Baker about the case, you have

20   been all over the place?

21   A.   It's been tough to remember many times, yes.

22   Q.   Yeah.  Do you remember in your April 9, 2015, interview you

23   said that any conversations I had related to the Bull case with

24   Baker did not include specifics?  We never discussed motions.

25   We never discussed dockets.  We never discussed ruling -- pardon

1    me -- hearings or rulings.

2    A.    I am sure I said that, yes.

3    Q.    So you never talked to Gilbert Baker about the ruling on

4    the order of remittitur?

5    A.    That's correct.  That is correct.

6    Q.    And you told the grand jury that, when Baker asked about

7    the Bull case, it was just procedural, status?

8    A.    Yes, sir.

9    Q.    October 27, 2014, interview, you told the government -- or

10   did you tell the government, I should say, when you were trying

11   to decide what to do about the Bull remittitur, Baker sent a

12   text to you that said, win, lose or draw, you get Morton's

13   support.  Do you remember that?

14   A.    I do remember that.

15   Q.    In your grand jury testimony under oath, right?

16   A.    Yes.

17   Q.    On page 34 and continued on to page 35, you said that you

18   took, quote, win, lose or draw, to mean that whatever decision

19   you made, you would still have the support of Morton, right?

20   A.    I did, yes.

21   Q.    You said that to the grand jury under oath, correct?

22   A.    I did say that, yes, sir.

23   Q.    Is that your testimony under oath today as well?

24   A.    Oh, yes.  Yes.

25   Q.    We all know what win, lose or draw means don't we?

1    A.    I think it's open to different interpretations, yes.

2    Q.    Is it really?  Could it actually be subject to

3    interpretation?  Its common meaning is, no matter the outcome,

4    that's what win, lose or draw means?

5    A.    And when you add the modifier, Mr. Morton will support

6    you --

7    Q.    Right.

8    A.    -- has a different connotation.

9    Q.    Right.  Win, lose or draw, it's being communicated to you.

10   Win, lose or draw, you are going to get campaign contributions

11   from Mr. Morton, right?

12   A.    Correct.

13   Q.    Are we dealing with some strained interpretation?

14        Are we -- is this trial about that phrase, except you take

15   out lose or draw?  Is it the position that win, lose or draw

16   means win, you get Michael Morton's support, if you lose or

17   draw?

18   A.    No.  It says win, lose or draw.  It says it.  But it's

19   talking about Mr. Morton's support so...

20   Q.    It couldn't have been communicated more clearly, win, lose

21   or draw, whatever the outcome, whatever decision you make, you

22   get Morton's support, right?

23   A.    That's what was communicated to me, yes, that's right.

24   Q.    I'm actually going to wind this down mercifully and on

25   time, I think.  Technical issue for us.  Circuit Court judges,

```
1   who pays you?  Who wrote your check when you were a judge?
2   A.   State of Arkansas.
3   Q.   And your checks are signed by Andrea Lea, correct?
4   A.   I don't know.
5   Q.   Who is it today?
6   A.   I don't know.  I have no idea.
7   Q.   The state auditor.  Your income as a circuit judge came out
8   of general revenues of the State of Arkansas?
9   A.   As I understand it as a constitutional officer, you get
10  paid even if the State is bankrupt.  Constitutional officers get
11  paid no matter what.
12  Q.   Yeah.  So --
13  A.   From state money.
14  Q.   Your employer is the State of Arkansas?
15  A.   Without a doubt.
16  Q.   Your employer is not Faulkner County?
17  A.   Well, the voters are Faulkner County.
18  Q.   They are not paying you.  State of Arkansas is paying you.
19  A.   Well, they are paying their taxes, and they voted me in.
20  So they are my kind of my employers.
21  Q.   The Twentieth Judicial District, the judicial branch?
22  A.   I get what you are saying, yes, sir.
23  Q.   Yeah, you are paid by the State.
24  A.   I was not ever paid by Faulkner County or Marion County.
25  It was the Twentieth Judicial District that paid me via the
```

1    State of Arkansas.  They threw out the money to the different

2    judicial districts; to the judges, I guess.

3    Q.    So you have been involved in state politics for a long

4    time, yeah?

5    A.    For a good minute, yes, sir.

6    Q.    Okay.  You know how county governments work?

7    A.    Yes, sir.

8    Q.    Just like the state government, just like the federal

9    government, there's an executive branch in the county

10   government?

11   A.    Yes, sir.

12   Q.    There's a legislative branch to the county government?

13   A.    Yes, sir.

14   Q.    There's a judicial branch to the county government?

15           MS. PETERS:  Objection, your honor.

16           THE COURT:  There's an objection.

17           MS. PETERS:  It's just to relevance as to this

18   witness.

19           MR. HENDRIX:  It goes to the jurisdictional element in

20   this case, Your Honor, on federal funding.

21           THE COURT:  I'll allow a question or two more about

22   it.  Let's move on.

23   BY MR. HENDRIX:

24   Q.    Wrapping up, the executive of the county government is the

25   county judge?

1   A.   Yes.

2   Q.   That's not a judge, like, with the black robe --

3   A.   No, sir.

4   Q.   -- making executive decisions.  The quorum court is the

5   legislative branch, correct?

6   A.   Correct.

7   Q.   And then you have the judicial branch of the county

8   government, right?

9   A.   Correct.

10  Q.   And that's you guys with black robes making the tough

11  calls?

12  A.   Correct.

13  Q.   Okay.  Are you aware of any federal money that the judicial

14  branch of the Twentieth Judicial District ever received?

15  A.   Totally unaware.  Never.

16  Q.   Okay.  A moment?

17          MR. HENDRIX:  Your Honor, Mr. Maggio, thanks for

18  everyone's patience.

19          THE COURT:  You are welcome.  Counsel, may I see you

20  at sidebar for a minute?  Let's cover some things.  Bear with

21  us, ladies and gentlemen.

22      (Sidebar conference reported as follows:)

23          THE COURT:  Ms. Peters, I'm thinking that you have

24  more than five or ten minutes of redirect?

25          MS. PETERS:  That's correct, Your Honor.

1        THE COURT:  Okay.  I think we have gone far enough

2   today and with all of the up the hill and down the hill, so I'll

3   let the jury go for the day.

4      Do y'all have a thought about the definitions issue?  And,

5   Ms. Peters, you first, because Mr. Hendrix is wore out.

6        MS. PETERS:  Your Honor, I would be interested to see

7   the list and see if it's anything that should be defined now.  I

8   mean, there's always the option to tell them we'll address this

9   in jury instructions.  But if it's something, for example, ex

10  parte that we could clear up.

11       THE COURT:  Remittitur.

12       MS. PETERS:  That too.

13       THE COURT:  What do you think, Mr. Hendrix?

14       MR. HENDRIX:  Sorry.  That's your inclination, too,

15  isn't it.

16       MS. DEPPER:  Yes.  Yes.  I think it would be nice to

17  have a list, Your Honor.

18       MR. HARRIS:  Mine too.

19       THE COURT:  Not that it matters apparently,

20  Mr. Harris.

21       MR. HARRIS:  I didn't know what remittitur was.

22       MR. HENDRIX:  I almost cited you.

23       THE COURT:  Okay.  I have this concern, not about the

24  definitions.  I think it would help us all.  I don't -- I want

25  the jury to stop talking to the court security officer about the

1    merits of the case.  If they are hot, cold, need an extra

2    pillow, hungry, yeah, but I don't -- this concerns me.  Not for

3    anything that's happened so far, but I want to get the camel's

4    nose out from under the hedge of the tent.  So I'm going to tell

5    them about that, that we'll take the definitions and that they

6    are only to speak with the court security officer about

7    logistical issues, not anything touching the merits of the case.

8         If they have any issue about the merits of the case, they

9    need to write a note and hand it to the court security officer

10   to give to me.  And then, of course, I will share it with y'all,

11   and we'll decide what to do.  But I'm concerned about the

12   conduit there.

13              MR. HENDRIX:  Understood.

14              THE COURT:  Okay?

15              MR. HARRIS:  Um-hum.

16              THE COURT:  All right.  Good.

17        (End of sidebar conference.)

18              THE COURT:  Ladies and gentlemen, thanks for your

19   continued patience with us.  As you might expect, there's more

20   ground to cover with Mr. Maggio, and so we are going to go ahead

21   and take our break for the day here, and he'll come back and be

22   examined further in the morning.

23        The court security officer has relayed to me that some --

24   one or more members of the jury has questions about terms that

25   have been used and the meaning of certain terms, legal terms, I

1    assume.

2         If you have questions along that line, you can write me a

3    note and ask me what the definition is of -- of these terms.

4         I would encourage you to do this individually because you

5    are not supposed to be deliberating or talking about the case

6    with each other as we go along.  So you need to do it -- I don't

7    mean to encourage you.  I'm telling you do it individually.

8    Don't tell anybody what you are doing, and if you want to

9    communicate with the Court about anything concerning the merits

10   of the case such as definitions, you write a note, Dear Judge

11   Marshall, and you close it up and you hand it to the court

12   security officer and give it to me.  But don't talk amongst

13   yourselves about, well, should we ask for this definition or

14   that because, inevitably, you'll start talking about the case,

15   and you shouldn't do that yet.  We are not done.  We haven't

16   given it to you.

17        The other thing is I don't want to put Officer Pike in a

18   bind of having to relay to me what it is that y'all might say to

19   her.  So don't say anything to her about the merits of the case.

20   You need more snacks tell her; somebody needs another pillow,

21   tell her; you need a pad, extra pad, tell her; you need a break

22   or an aspirin, tell her.  But on the case issues, either keep it

23   to yourself -- well, in any event, keep it -- don't talk with

24   each other about it, and if you have something that you have

25   just got to ask on the merits, then it needs to be in a note to

1  me.  Everybody with me?

2       Remember, too, that at the end of the case, I will do my

3  best to give you comprehensive instructions about the -- it has

4  lots of things in there.  Some of the things from the

5  preliminary instructions will carry over because they are

6  important, and there will be new things.

7       So enough on that unless one of you has a question about

8  that procedure that you want to ask me.  If so, you can raise

9  your hand.  All right.

10      Now, general rules of the road for this evening:  Remember

11  to leave the case here.  Pads given to Officer Pike, so she can

12  lock them up for the evening.  Don't talk with anybody about the

13  case, and don't let anybody talk with you about the case.  Keep

14  your promises to me about not looking up anything on the

15  Internet about the case and not posting anything on any social

16  media.  If at all possible, stay away from news, whether it's on

17  the Internet or looking at the -- at a physical newspaper or on

18  your iPad if you are an Arkansas Democrat Gazette subscriber and

19  they won't send you the newspaper anymore in Jonesboro.  Not

20  that I'm bitter about that.  But stay away from stuff on your

21  iPad, and the radio, and the TV in terms of news because you

22  never know when something might pop up about the case.

23      We appreciate you bearing with us.  I know it's been a hard

24  day, and the lawyers and I are going to do better tomorrow, and

25  we are going to be smoother.  We are going to get back in the

1    flow like we were Monday and Tuesday of clicking -- clicking

2    things on.

3        It's been bumpy, ladies and gentlemen, because the lawyers

4    are working hard to get the case to you in the right shape, and

5    they are working hard to help me guide the evidence to get to

6    you in the right shape.  It's not because -- we are not -- we

7    are not tangled up because they are fussing or because anyone

8    has any intention to confuse or bumfuzzle y'all.  They are just

9    doing their job to help me get the case to you in a correct,

10   right fashion.  So ya'll can decide and make the important

11   decisions that you are facing about the -- what the United

12   States charges here.

13       Okay.  Usual drill on the time tomorrow.  Please be here

14   about 8:15 or so, and we'll go to work at 8:30.  All rise for

15   the jury.

16       (Jury not present and excused for the evening.)

17           THE COURT:  You can sit down, Mr. Maggio.  Marshals,

18   thank you.  See you in the morning.

19           THE WITNESS:  I'll see you tomorrow.  Be careful going

20   home, sir.

21           THE COURT:  Well, thank you.  Ms. Peters, any ground

22   to cover for the United States?

23           MS. PETERS:  No, Your Honor.  Thank you.

24           THE COURT:  Okay.  Mr. Hendrix, any ground to cover

25   for the defense?

1          MR. HENDRIX:  No.

2          THE COURT:  All right.  Open your minds to me, please,

3   to the extent that you can, about where we are on finishing up

4   with this witness and the next witnesses.

5      Ms. Peters, what's your thinking on Mr. Maggio, how much

6   more time with him?

7          MS. PETERS:  I would say, Your Honor, 30 minutes

8   perhaps.

9          THE COURT:  Okay.  And I know Mr. Hendrix.  There will

10  be something that he will want to follow up, and you may need to

11  follow up, follow up, so that's fine.  Who will be after

12  Mr. Maggio?

13         MS. PETERS:  The next person up will be Chris Stewart.

14         THE COURT:  Okay.

15         MS. PETERS:  After that it will be Jill Barham.

16         THE COURT:  Okay.

17         MS. PETERS:  Then it will be Cheryl Oliger.  Then Don

18  Thomas.  I suspect that will take us through the day, but if it

19  doesn't, it will be Marvin Parks next and Bruce Hawkins.

20         THE COURT:  Okay.  Very good.  Are you taking notes,

21  Mr. Hendrix, you and Ms. Depper?

22         MS. DEPPER:  Yes, sir.

23         THE COURT:  Good.  I'm thinking that the United States

24  is thinking about resting relatively soon.  Mr. Harris?  I got

25  an amen from him.  You didn't hear it, Ms. Peters.  But I did.

1    So not tomorrow but the next day, maybe?

2             MR. HARRIS:  I think maybe on Friday, Ms. Peters,

3    don't you?

4             MS. PETERS:  No.  I think Tuesday, Your Honor, would

5    be my best estimate.  But I don't want to be held to it because

6    a lot of this is depends on what Mr. Hendrix does on cross, and

7    he's definitely a prolific and talented crosser.

8             THE COURT:  He is a prolific and talented crosser, and

9    he also knows Irving Younger's dictum well, that's the less, the

10   better.  But I appreciate the road map, and we'll do the best we

11   can.  And ya'll know the Court has --- all know that the Court

12   has time alotted to whatever is necessary for us to get through

13   it.

14       Okay.  I'll see ya'll in the morning, and we'll see what's

15   on the jury's mind.  So 8:15, and we'll see if we have a note

16   with questions.  We are in recess.

17           (Proceedings continued to July 29, 2021, at 8:15 a.m.)

18

19

20

21

22

23

24

25

1                          I N D E X

2

3        Michael Maggio

4             Cross by Mr. Hendrix                        624

5

6

7        Defendant's Exhibit 7B received into evidence    633

8        Defendant's Exhibit 7A received into evidence    639

9

10

11

12

13                    REPORTER'S CERTIFICATE

14       I certify that the foregoing is a correct transcript from
     the record of proceedings in the above-entitled matter.

15

16                                    Date:  7-28-21

     /s/ Kathleen Maloney, RPR, FCRR
17        United States Court Reporter

18

19

20

21

22

23

24

25