1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
2
                   Case No. 4:19-CR-00031-DPM-1
3
UNITED STATES OF AMERICA,        )
4                                )
        GOVERNMENT,              )
5                                )
        -v-                      )
6                                )
GILBERT R. BAKER,                )
7                                )
        DEFENDANT.               )    Little Rock, Arkansas
8                                )    July 29, 2021, 8:20 a.m.
_____  )
9

10                  VOLUME 5A - PAGES 734 - 869

11              TRANSCRIPT OF JURY TRIAL PROCEEDINGS

12            BEFORE THE HONORABLE D.P. MARSHALL, JR.

13                 UNITED STATES DISTRICT JUDGE

14

15   Appearances:

16   FOR THE GOVERNMENT          Julie E. Peters, ESQ., AUSA, and
                                 John Ray White, ESQ., AUSA
17                               U.S. Attorney's Office
                                 Eastern District of Arkansas
18                               Post Office Box 1229
                                 Little Rock, AR 72203
19
     FOR THE DEFENDANT           J. Blake Hendrix, ESQ., and
20                               Margaret D. Depper, ESQ.
                                 Fuqua Campbell, P.A.
21                               Riviera Tower
                                 3700 Cantrell Road, Suite 205
22                               Little Rock, AR 72202

23
          Proceedings reported by machine stenography; transcript
24   prepared utilizing computer-aided transcription.

25

```
 1                        MORNING SESSION
 2         (Call to the order of the Court.)
 3              THE COURT:  Good morning.  Everyone.  Y'all can be
 4    seated or stand as you choose.
 5              Let me begin with a thank you.  I appreciate,
 6    Ms. Peters, you letting me know last night about Mr. Harris
 7    falling ill.  Have you heard from him this morning?
 8              MS. PETERS:  I've spoken -- or I've texted with
 9    Mrs. Harris.  And so he's holding in there, and he'll be going
10    for his test at 9:30 this morning, and they expect to have
11    results within 45 minutes to an hour.
12              THE COURT:  Very good.  And are they going to share
13    those results with you?
14              MS. PETERS:  Yes, immediately, Your Honor.
15              THE COURT:  And would you make sure that it's okay
16    with the Harrises if you share those results with me and the
17    public, essentially, given our coverage here and everybody in
18    the courtroom?
19              MS. PETERS:  Yes, Your Honor.
20              THE COURT:  Good.  Thank you.
21              I, with the benefit of the evening to think about
22    things, I have some tentative thoughts, but counsel I know
23    have had a chance to think about it, too, and I want to hear
24    what's on your mind.
25              Ms. Peters, do you want to add anything to your plan
```

 1  that you, helpfully proposed last night, on how we might go

 2  forward?

 3              MS. PETERS:  No, Your Honor.

 4              THE COURT:  Okay.  I will just say before I go to

 5  you, Mr. Hendrix, welcome, Mr. White.

 6              MR. WHITE:  Thank you, Your Honor.

 7              THE COURT:  Glad to have you here.

 8              MR. WHITE:  Glad to be here.

 9              THE COURT:  You know, it is an honorable position to

10  be the B string and to come in from the bench as needed.

11              MR. WHITE:  Especially to follow on Mr. Harris'

12  heels.  So, thank you.

13              THE COURT:  There you go.

14          I will take this opportunity to say that assuming

15  that we go forward, or try to go forward, we need to increase

16  our vigilance on various things.  And so, for example, and I

17  mean this in the nicest possible way, y'all are too close

18  together at the government lawyers' table.  And so, and

19  likewise at the defense table.  And so we're all going to need

20  to be spreading out.

21          Now, maybe Agent Stokes, you can sit somewhere else.

22  And for my part, I'm going to do better on that, as well, and

23  we're not going to have anymore bench conferences.  Instead,

24  we're going to have hall conferences where we can all, right

25  behind the bench, where we can all spread out in the hall and

1   not be quite as close to one another as we have been.

2           But with that detour into logistics, Mr. Hendrix,

3   good morning.

4           MR. HENDRIX:  Good morning, Your Honor.

5           THE COURT:  What thoughts from you and your folks on

6   how we should proceed?

7           MR. HENDRIX:  I think we're in general agreement

8   with Ms. Peters' plan that our collective head right at this

9   moment is I think we would like to know Pat's rapid test

10  before we move forward, and if it's positive we'll have to

11  deal with it then.  If it's negative, then I think full steam

12  ahead.  But I am concerned about moving forward 'til we know a

13  bit more about Pat's condition.

14          THE COURT:  Agreed, agreed.  Thank you.

15          The -- well, our minds are all running in the same

16  channel.  That is, we're on this road, and we're coming up to

17  a fork in the road, and that the choice we make at the fork is

18  going to depend on what we learn about Mr. Harris.  So I --

19  with, I think, a dose of skepticism, because as I relayed

20  during the voir dire, and I think each of us has probably

21  heard something like this in the last year when we've

22  encountered these tests for ourselves or a family member, the

23  rapid tests are not infallible.  There's a pretty high error

24  rate.

25          And so it's a data point, but beyond that data

1    point, the PCR test that is much more reliable is the thing to

2    do.

3              So we will see what we -- what we hear about

4    Mr. Harris' illness and whether it, as we hope, is just a cold

5    or a good old-fashioned virus, or whether it's something --

6    whether it's the virus.

7              I like and believe that Ms. Peters' plan of

8    recessing tomorrow to allow the United States to nimbly deal

9    with Mr. Harris being out of commission for a few days, for

10   one reason or another; I think that's a good plan.  And in

11   addition, it gives all of us a chance to be tested and to see

12   if we're going to get sick, to see if symptoms appear, and

13   more data points for me to make a final decision on Monday on

14   whether we press on and get finished as we need to.

15             So that is what we will do, and I will tell the jury

16   that today.

17             The other thing that I am exploring with the Clerk

18   of Court is the Court's ability to either provide or

19   facilitate some rapid testing for our jurors.  These citizens

20   have given their time and their attention and come in, and it

21   may be that in doing that service, the Court's the one that's

22   exposed them to the virus.  Not intentionally, of course, but

23   inadvertently.

24             And so the Clerk of Court is, at my direction,

25   checking to see if we could provide rapid tests on-site at the

1    end of the day today to any juror or other participant in the

2    trial that wanted one, and could we pay for it.  And if we

3    can't do it here, can we get a block of tickets, as it were,

4    so that they all know that they could go down the street to X

5    Pharmacy and walk in and say, I'm from the federal trial, and

6    get tested.  And then, again, the second question, the money

7    question, can we pay for it there for these folks.

8            So I'm hopeful that I will have answers to those

9    questions by the middle of the day today, and I'll let the --

10   y'all and the jury know.  More data points for us, for the

11   lawyers, as counsel help me decide about the forward part of

12   the case.

13           Now, since we're talking about planning and timing

14   and when we're going to do things, now is a good time for me

15   to advise counsel about an obligation that I have next Friday

16   morning, which would be the 6th.

17           Ms. Black, have I got my date right?

18           THE COURTROOM DEPUTY:  Yes.

19           THE COURT:  Our hearing?

20           So I have pending before me a request for a

21   preliminary injunction, and I need to hear argument from the

22   lawyers on what to do about that.  And so my plan is that we

23   will have a late start on Friday the 6th, essentially starting

24   at what would have been after our morning break.  So I'll see

25   y'all at 10:15 on Friday morning, the 6th.  I wrangled up the

1   lawyers in the injunction case to come in about this time on

2   Friday morning so I could hear argument and either make a

3   decision or decide what I'm going to do and start writing it,

4   and I appreciate counsel's flexibility with me on that in

5   allowing me to tend to that matter.  So as we're planning out

6   what we do next week, keep that in mind, as well.

7           I think I need to tell the jury about Mr. White and

8   to say a word or two about Mr. Harris.  I'm reluctant to -- on

9   how much -- or I would appreciate counsel's thoughts on

10  whether I go whole hog or just a little bit to them until we

11  have the data point of the testing.

12          Ms. Peters?

13          MS. PETERS:  Your Honor, we think that it would be

14  appropriate to let them know that he became ill last night and

15  had a fever and is getting a test this morning.

16          THE COURT:  Whole hog.

17          MS. PETERS:  Yes, Your Honor.

18          THE COURT:  Mr. Hendrix?

19          MR. HENDRIX:  It's Pat's medical information.  It's

20  up to him.  It's HIPAA stuff, right?

21          THE COURT:  Well, perhaps.  That's a vexed question,

22  but I think I have a -- I think, at least as I read what has

23  been said to me and communicated to me, that Mr. Harris is

24  comfortable in the circumstances with the Court communicating

25  whatever is necessary to the jurors and to the public.  I was

1  asking more on the what I'll call the hair on fire point,

2  Mr. Hendrix.  So . . .

3          MR. HENDRIX:  Whatever the Court's comfortable with.

4          THE COURT:  Okay.

5          MR. HENDRIX:  I'm absolutely fine with it.

6          THE COURT:  Good.  I'm going to go with something

7  along the lines that Ms. Peters just suggested, if not the

8  whole hog, enough -- close enough.  Our jurors aren't -- they

9  weren't, as Mr. Harris said, they weren't born last night.

10 They know what our circumstances are in the world, and I just

11 need to get it out there.

12         So last thing, this is a law point.  My law clerk

13 has handed out a case that we found last night that I conclude

14 is very helpful on this, what I'll call the other-statements

15 issue.  It is an opinion from the Sixth Circuit in a case

16 called *Rush*, 399 F.3d 705.

17         I know counsel have other things on~-- at the front

18 of their mind, but please read this on the break, and as we're

19 dealing with Mr. Maggio's other statements, or indeed other

20 similar things that may arise, like the 302 issues in the

21 trial, this I believe is the roadmap on how we do it

22 correctly.  And in a sense, counsel, each of you had ahold of

23 part of the truth yesterday.  I'm not sure that we did it

24 exactly right in front of the jury, but we will going forward.

25         One, Mr. Hendrix, you were right that a writing can

1    be used to refresh a witness' recollection.  On a logistical

2    point, too, no more coming up and bringing things to the

3    witnesses.  We're going to use the ELMO, right?

4           MR. HENDRIX:  Yes, sir.

5           THE COURT:  But I think you have to go, or any

6    lawyer has to go as far as possible to exhaust the witness'

7    memory about the particulars, and then when the witness can't

8    remember, you show the statement, the prior statement, and see

9    if that triggers the witness' memory, and then the witness can

10   testify, memory triggered.

11          But you can't read or speak all of the statement

12   either in your question or otherwise to the jury, because

13   unless the witness remembers, unless the witness' memory is

14   refreshed and it's triggered and the witness is testifying,

15   you've moved too quickly across a line, I think, to

16   impeachment when you are saying all of the things in the

17   statement or bringing it out that way or having the witness

18   read it.  The memory isn't refreshed.

19          MR. HENDRIX:  Right.

20          THE COURT:  You know.  And if you go across that

21   line, then we're in the area that Ms. Peters was trying to

22   educate me about yesterday, and object, and that is, if it's

23   impeachment, it's not substantive evidence.  And I should be

24   saying to the jury, ladies and gentlemen, this is not

25   substantive evidence; consider this only in deciding whether

1    the witness is telling the truth today, not for the truth of

2    what was said earlier.  And that's the distinction that I

3    think we, may have been lost from time to time yesterday and

4    the one that I want us to follow as we go forward today.

5          And I will give that.  You're entitled to impeach,

6    Mr. Hendrix, no question about that.  But I want the jury to

7    be clear that this material, if it doesn't refresh the

8    witness' recollection, this material is being received for the

9    jury to consider in evaluating the credibility of the witness'

10   testimony today, it's not being received as the truth simply

11   because it's something the witness said earlier.

12         So I thank counsel for raising those issues.  I

13   should have been quicker on the draw yesterday, but I believe

14   that I've sorted it, and whether I've gotten it correctly or

15   not, that's the drill we're going to follow today, tomorrow

16   and the next few days.

17         Anything else, Ms. Peters?

18         MS. PETERS:  No, Your Honor.

19         THE COURT:  Mr. Hendrix?

20         MR. HENDRIX:  I think -- so to make sure that I

21   understand -- not this issue that you were just talking about,

22   Your Honor, but the process for today.  So are we on hold now

23   until we hear about Pat's test?

24         THE COURT:  No.

25         MR. HENDRIX:  We're going forward?

1          THE COURT:  We're going forward after I visit with

2     the jury and say here's where we are.

3          MR. HENDRIX:  Second issue.  Jill Barham will be up.

4     We have contextual 106 clips, but I know the government has an

5     objection to them.  Where we left it was, fine, we'll call

6     Jill back in our case in chief.  I didn't know whether there

7     would be time for us to take up that issue, but it doesn't

8     sound like there will be.

9          THE COURT:  No.

10         MR. HENDRIX:  No worries.

11         THE COURT:  And I have not had a chance to read

12    those clips yet, because I was relying on the, y'all will call

13    her back.

14         MR. HENDRIX:  Okay.

15         THE COURT:  So I thought that issue was in a couple

16    of days.

17         MR. HENDRIX:  Yes, Your Honor.

18         THE COURT:  All right.  We'll take our jurors,

19    Officer Pike.  All rise for the jury.

20         COURTROOM SECURITY OFFICER:  Ladies and gentlemen,

21    your jury.

22       (The jury enters the courtroom.)

23         THE COURT:  Good morning, ladies and gentlemen.

24    Y'all doing okay?  Good.  Have a seat.

25         How are the snacks and water and such holding out?

```
 1    You've got plenty back there?

 2              A JUROR:  I think so.

 3              THE COURT:  Good.  Okay.  We want to take care of

 4    you.

 5              As y'all have learned, ladies and gentlemen, by now,

 6    trial is one unexpected thing after another, and so I've got

 7    another one for you.  Here's the thing today:

 8              Y'all will remember Mr. Harris that's usually

 9    sitting there at the government's table.  He's not there

10    because he got home last night and he wasn't feeling good.  He

11    has a fever, and so he's going to the doctor today, and he's

12    going to get a test to see if he's got the kind of garden

13    variety plain old virus, like we hope he does, or if it's

14    COVID.

15              We should know that here in a few hours, and he has

16    authorized me to share that with everyone in our

17    circumstances.

18              If he's just sick, sick, then we'll wish him well,

19    and he'll get back with us whenever he can and nothing will

20    change, except that John Ray White -- stand up, Mr. White --

21    will be here instead of Mr. Harris.  Mr. White is a colleague

22    of Mr. Harris and Ms. Peters, has long been at the United

23    States Attorney's Office, and like the good egg that he is, he

24    swung into gear last night when it became clear that

25    Mr. Harris was under the weather.  So Mr. White will be here
```

1   until Mr. Harris gets better.

2          If, on the other hand, Mr. Harris gets a positive

3   result on the rapid test, then we need to take some steps, and

4   I'm investigating right now what the Court can do to help

5   folks get tested here at the Court.  I don't know what I'm

6   going to be able to accomplish on that, but I'll do the best I

7   can.  And I think at a minimum, the Court will be able to help

8   y'all get appointments to get tested and see where you are on

9   things.

10         In any event, whether Mr. Harris is sick, or sick,

11  Ms. Peters and Mr. White are going to need some time to

12  regroup and do -- get ready to do work that Mr. Harris was

13  going to do in the coming days.  And so the good news is y'all

14  will have Friday off.  We're going to recess for tomorrow, and

15  we will not be in session.  The lawyers will be working, of

16  course, but as you've seen, the lawyers on each side are

17  acting as a team, and the way you do that's divide and

18  conquer.  People have different responsibilities.

19         Mr. White has got to get up to speed on substituting

20  for Mr. Harris, and Ms. Peters has got to take a larger role

21  than she's already taking, and that means some work time

22  outside of trial time.

23         So that's the general plan, and that's what I know

24  today, or right now at this moment.

25         Do any of y'all, ladies and gentlemen, have

 1    questions for me about that logistics?

 2            Yes, juror number 4.

 3            A JUROR:  Do we go back to like our regular work

 4    like we were?  Do you want us to stay . . .

 5            THE COURT:  No, you can do whatever you want on

 6    Friday.

 7            A JUROR:  Okay.

 8            THE COURT:  I'll have a rather lengthy instruction

 9    at the end of the day, woodshedding you hard about leaving the

10    case here and not doing any research and not letting anybody

11    talk to you about it, but with court in recess for Friday,

12    you'll be able to do -- go back to work or go fishing or go

13    see your grandkids or whatever your normal life would be.  You

14    just can't talk about the case.

15            Good question.

16            Others?

17            All right.  Good.

18            Well, Marshal, we'll take Mr. Maggio, and he will be

19    our first witness.  We'll finish up with him today and then

20    move on to others.  And we have many -- we've got a full plate

21    of things to do, as usual.  So thank y'all for bearing with

22    us, ladies and gentlemen.  And as I said, as soon as I know

23    some things and can figure things out, I will let y'all know.

24            Good morning, Mr. Maggio.

25            THE WITNESS:  Good morning, Judge.  How are you,

Maggio - Redirect

```
 1   sir?
 2           THE COURT:  I'm fine.  I hope you are, too.
 3           THE WITNESS:  Well, yes, sir.
 4           THE COURT:  All things considered.
 5           THE WITNESS:  Yes, sir.  Thank you, sir.
 6           THE COURT:  Here's the drill.  I know you remember
 7   taking the oath yesterday.  Well, I'm a believer in that once
 8   you've taken the oath, you've taken the oath.  I remind you of
 9   your obligation to tell the truth and the whole truth.
10           THE WITNESS:  Yes, sir.
11           THE COURT:  Good.
12           Ms. Peters.
13           MS. PETERS:  Thank you, Your Honor.
14      Michael Maggio, Government's witness, resumed the stand.
15                      Redirect Examination
16   BY MS. PETERS:
17   Q    Mr. Maggio, yesterday Mr. Hendrix asked you about a grand
18   jury statement that he claimed was typed up and presented to
19   you.  Do you remember that?
20   A    Yes, ma'am.
21   Q    But when you testified before the grand jury you didn't
22   read a statement?
23   A    No, ma'am.
24   Q    You answered questions?
25   A    Yes, ma'am.
```

Maggio - Redirect

```
 1  Q     You said on a number of occasions yesterday that you
 2  didn't have a smoking gun, or you were asked about a smoking
 3  gun.
 4  A     Correct.
 5  Q     What would a smoking gun look like to you in this case?
 6  A     Goes back to my definition of a, what I consider a bribe.
 7  A smoking gun would be the -- an express or specific agreement
 8  to do a specific act for a certain amount of money.
 9  Q     So to you, a smoking gun would be if you were able to
10  say, Mr. Baker asked me to remit the verdict for this bag of
11  cash, correct?
12  A     On a certain time, day, place we came to an agreement for
13  this amount, you know, hey, I need you to reduce it to a
14  million dollars specifically for this amount of dollars, and I
15  agreed specifically, okay, I'll do that.  And so that was what
16  I consider a smoking gun.
17         You know, in most bribe cases you have a videotape
18  or you have a series of -- you have something like that.
19  Didn't have that here.  So that's another smoking gun.
20  Q     Can you agree that not all cases do have smoking guns?
21         MR. HENDRIX:  Objection, Your Honor.
22         THE COURT:  I think sustained.  I think we've gone
23  far enough.
24         MS. PETERS:  Thank you.
25  BY MS. PETERS:
```

Maggio - Redirect

```
1   Q    Mr. Maggio, how many years were you an attorney before
2   you became a judge?
3   A    Ten.
4   Q    Ten years?
5   A    (Nods head.)
6   Q    And then how many years did you serve on the circuit
7   court before you were removed?
8   A    Almost 14.
9   Q    So 24 years of legal practice?
10  A    Yes, ma'am.
11  Q    Yesterday, Mr. Baker was asking you -- Mr. Baker --
12  Mr. Hendrix was asking you about the statement, win, lose or
13  draw, you have Morton's support, and I think he was trying to
14  get you to agree that "win, lose or draw" meant whatever the
15  outcome.  I heard you say something to him like, adding the
16  phrase, you have Morton's support to win, lose or draw, gave
17  it a different connotation or a different context to you.
18           Did you want to elaborate on that?
19  A    (No verbal response.)
20  Q    Why does it give it a different context?  I mean, win,
21  lose or draw could mean no matter what, you have somebody's
22  support.  That's what I think Mr. Hendrix was trying to point
23  out.
24  A    I just think it drew the attention that Mr. Morton was
25  watching the case, and it just added another layer to that
```

Maggio - Redirect

1   statement, that Mr. Morton was involved, I guess, or watching,

2   or whatever you want to say.

3   Q     Mr. Maggio, how do you feel about the fact that you took

4   a bribe?

5   A     Well, I don't think anybody feels good about it.

6   Q     Well, how do you feel about it?

7          MR. HENDRIX:  Your Honor, I'm not sure that's

8   relevant.

9          THE COURT:  Overruled.

10         MR. HENDRIX:  Okay.

11         THE WITNESS:  I don't feel good about it.

12  BY MS. PETERS:

13  Q     And you'd said before that I think it took you, I think,

14  five years, seven years to tell your wife the truth?

15  A     Yes.

16  Q     Why is that?

17  A     Well, nobody wants to admit shortcomings, you know, or

18  cause pain to anybody.  Nobody wants to do that.

19  Q     Now, toward the end of your cross-examination yesterday,

20  Mr. Hendrix asked you about all of your legal reasons for

21  signing the remittitur.  Do you remember that?

22  A     Yes, ma'am.

23  Q     And he wanted you to agree that those were all of the

24  decisions, and I guess my question is, I heard your response

25  to be those were some of the reasons, not the only reasons.

Maggio Recross

1    A    That was a part of the decision, yes.

2    Q    And so was one of your reasons for remitting that verdict

3    that Mr. Baker offered you campaign contributions and told you

4    Mr. Morton would appreciate you making a tough decision?

5    A    That is exactly what I pled to, yes.

6    Q    Is that exactly true?

7    A    Yes.

8         MS. PETERS:  May I have just a moment, Your Honor?

9         THE COURT:  You may.

10        MS. PETERS:  Your Honor, no other questions.

11        THE COURT:  Thank you, Ms. Peters.

12        Mr. Hendrix.

13                    Recross-Examination

14   BY MR. HENDRIX:

15   Q    Just a few, mercifully.

16        I do want to ask about that draft statement, right?

17   The draft of the grand jury testimony?

18   A    Yes, sir.

19   Q    Kind of clear that up.

20        Somebody with the prosecution team presented you a

21   draft of your proposed grand jury testimony?

22   A    I think that's right, yeah.

23   Q    That was typed up?

24   A    Yes, sir.

25   Q    Got it.  I don't think it was completed; is that right?

Maggio Recross

1  Do you remember that?

2  A    No, I don't know if it was completed or not.  I don't

3  know.

4  Q    No worries.  Regardless, then you testified in front of

5  the grand jury, right?

6  A    Yes, sir.

7  Q    You did not read that draft that was given to you,

8  correct?

9  A    No, sir, did not read it.

10  Q    Is the reason because the draft that was given to you by

11  the government was not accurate?

12  A    I don't even -- I don't recall.  I mean, I don't -- I

13  don't think I had the option, I mean, just, I mean, showed it

14  to me, and me and my lawyer went over it and said, this is

15  what you need to say.  So . . .

16  Q    This is what you need to say?

17  A    Yeah.

18  Q    In the writing that the government presented to you?

19  A    Yes.

20  Q    I promise I will not beat this dead horse.

21        For the record, to be clear, your testimony under

22  oath here is previously in front of the grand jury under oath

23  is Gilbert Baker said, quote, win, lose or draw, you have

24  Morton's support?

25  A    Correct.

```
 1               MR. HENDRIX:  No further questions.

 2               THE COURT:  Thank you, Mr. Hendrix.

 3          Ms. Peters?

 4               MS. PETERS:  Nothing, Your Honor.

 5               THE COURT:  Okay.  Mr. Maggio, thank you for your

 6    testimony.

 7               THE WITNESS:  Thank you, sir.  Thank you, Judge.

 8               THE COURT:  The jurors wanted to see you without

 9    your mask.  And so could I ask you to take your mask down for

10    a minute and let especially those who are far away?

11               THE WITNESS:  Do I need to walk down in front of

12    them?  What do you need me to do, Judge?

13               THE COURT:  No, just take your mask down and maybe

14    stand up so that all can see you.

15               THE WITNESS:  Sure.  Yes, sir.

16               THE COURT:  Good.  Very good.  Thank you,

17    Mr. Maggio.

18               THE WITNESS:  Everybody had enough of me?

19          Thank y'all.  Thank you, Judge.

20               THE COURT:  You're welcome.

21          Marshals, thank you.

22               THE MARSHAL:  Your Honor, is he okay to go back?

23               THE COURT:  He can be released, can't he,

24    Ms. Peters?

25               MS. PETERS:  Yes, Your Honor.
```

```
 1              THE COURT:  Mr. Hendrix?

 2              MR. HENDRIX:  Yes, Your Honor.

 3              THE COURT:  Yes.  Thank you.

 4         All right.  Ms. Peters, who's next?

 5              MS. PETERS:  Your Honor, the United States calls

 6   Chris Stewart.

 7              THE COURT:  Alternate number 1, are you okay?

 8              A JUROR:  I had a question before he stepped up

 9   there.  I was wondering if you all were going to clean the

10   area since he wasn't vaccinated.

11              THE COURT:  I believe Ms. Black was going to do

12   that.  Thank you for reminding us.

13         Why don't you step down, Mr. Stewart, while we clean

14   the area.  We all need to do everything we can to be safe as

15   we can.

16         And for the jury's information, the entire

17   courtroom, but especially the witness box did get extra

18   special cleaned last night.

19              Mr. Stewart.

20              THE WITNESS:  Thank you, Your Honor.

21              THE COURT:  Good morning.

22              THE WITNESS:  Good morning.

23              THE COURT:  You okay?

24              THE WITNESS:  I'm doing well.  Thank you.  How are

25   you?
```

 1              THE COURT:  I'm fine, thanks.

 2              THE WITNESS:  Good to see you again.

 3              THE COURT:  Likewise.

 4         Chris Stewart, Government's witness, sworn.

 5              THE COURT:  You may be seated.

 6              THE WITNESS:  Thank you.

 7              THE COURT:  If you are vaccinated --

 8              THE WITNESS:  I am.

 9              THE COURT:  And thank you for saying, though you

10    didn't have to.  You can take your mask down while you testify

11    so the jury can see you.

12              THE WITNESS:  I'd like to.

13              THE COURT:  Good.

14              THE WITNESS:  Thank you.

15              THE COURT:  We've got some plastic masks that you

16    can put on with see-through if you want to, but . . .

17              THE WITNESS:  No worries.  If the jurors are okay,

18    I'm okay.

19              THE COURT:  I think we are.

20         Ms. Peters, it's your call.

21         MS. PETERS:  I'm going to try it with the mask on,

22    and then if that doesn't work, if you'll let me know, I'll

23    take it off.

24              THE COURT:  Good.  I will.  If I'm having trouble

25    hearing you or understanding you, I'll let you know.

Stewart - Direct

1           MS. PETERS:  Thank you, Your Honor.

2           THE COURT:  Just use your sawmill voice.  Okay?

3           MS. PETERS:  Yes, Your Honor.

4           THE COURT:  Okay.

5                      Direct Examination

6    BY MS. PETERS:

7    Q    Would you please state your name?

8    A    Chris Stewart.

9    Q    And Mr. Stewart, where do you work?

10   A    Stewart Law Firm.

11   Q    How long have you been a lawyer?

12   A    Eighteen years this year.

13   Q    What kind of practice are you in now?

14   A    Primarily two areas, business law, and then I do a little

15   bit of political law when necessary.

16   Q    And so are you a solo practitioner?

17   A    I am.

18   Q    And we're going to talk about some documents during this

19   case, so let me just get out on the front.  What is your --

20   what's your cellphone number?

21   A    It's (501)837-7155.

22   Q    And what's the e-mail address your law firm uses?

23   A    It's arklaw@comcast.net, arklaw@comcast.net.

24   Q    Do you know Gilbert Baker?

25   A    I do.

Stewart - Direct

1   Q      How did you first meet Mr. Baker?

2   A      I first met Mr. Baker 1997.  Quite a long time ago.

3   Q      And what was the context of where you met him?

4   A      I was in college.  It might have been between transition

5   period between college and law school.  I believe there was

6   some type of legislative forum, and I was a intern for an

7   organization at that time, and I met Mr. Baker, but it was

8   just a brief moment.

9   Q      And at some point, Mr. Baker became the chair of the

10  Republican Party?

11  A      He did, yes, ma'am.

12  Q      And were you legal counsel for the Republican party of

13  Arkansas?

14  A      I was, but not at that time.  I was legal counsel after

15  his departure as chairman.

16  Q      What years were you legal counsel?

17  A      I was legal counsel from 2007 to I believe 2011, sometime

18  in there.

19  Q      So if the State party had an issue, they would bring it

20  to you as their lawyer?

21  A      Yes, ma'am.  And it was a pro bono position, but, yes,

22  ma'am, I would advise them on the variety of things.

23  Q      Pro bono, meaning you volunteered your time?

24  A      Correct.

25  Q      And did Mr. Baker hire you to do legal work for him?

Stewart - Direct

```
 1   A    Yes, he did.  I believe it was in -- yes, he did.

 2   Q    Let me start with, I think we've heard a lot about

 3   Arkansas Faith and Freedom Coalition?

 4   A    Yes, Aircraft Faith and Freedom Coalition; yes, ma'am.

 5   Q    Did you form that for Mr. Baker?

 6   A    I did.

 7   Q    What kind of group was it?

 8   A    Arkansas Faith and Freedom Coalition was a 501(c)(4).

 9   Q    What does that mean, a nonprofit?

10   A    501(c)(4) is a nonprofit, and it has a distinction from a

11   501(c)(3), as it's able to do political advocacy or take

12   certain positions on issues, and it, therefore, can advocate

13   on one side of an issue or not.

14   Q    Was Mr. Baker the director of that organization?

15   A    He was.  He was the chairman for the Arkansas Faith and

16   Freedom Coalition.

17   Q    How about Arkansans for Lawsuit Reform?  Did you set that

18   up for Mr. Baker?

19   A    I did.

20   Q    And we're both talking a lot, so I just want to be real

21   careful that I finish my question and you get to finish your

22   answer before either one of us speaks.

23   A    Absolutely.  I think I run into that myself as a lawyer

24   sometimes, so I'll do my best.

25   Q    Okay.  So you set that up for Mr. Baker?
```

Stewart - Direct

```
 1   A     Yes, ma'am.

 2   Q     And what was the purpose of ALR supposed to be?

 3   A     Arkansans for Lawsuit Reform, it was a 501(c)(6).  It was

 4   going to be a trade association, and the purpose of it was to

 5   advocate for tort reform in the state of Arkansas.

 6   Q     Do you know if Mr. Baker had an official role in ALR?

 7   A     When you -- can you clarify official, official role?

 8   Q     Well, was he a president, or treasurer or any named

 9   officer?

10   A     No, ma'am.

11   Q     Did he make the decisions on who would be paid what out

12   of ALR?

13   A     Yes, ma'am, he did.

14   Q     And he paid you to set up that corporation?

15   A     He did.

16   Q     Let's talk about LRM Consulting.

17   A     Okay.

18   Q     Did you set that up for Mr. Baker?

19   A     I did.

20   Q     Was that in 2011?

21   A     Yes, ma'am.

22   Q     And what kind of organization was LRM?

23   A     Mr. Baker came to me sometime before he developed -- was

24   exiting the state Senate and want to set up a personal company

25   to continue to work, to have some business.  And so I think it
```

Stewart - Direct

1   was going to be a lobbying and consulting-type firm.  And so

2   he hired me at that time on an individual basis to set that

3   up.

4   Q    And eventually you were on a retainer with Mr. Baker; is

5   that right?

6   A    I was on a retainer, yes, ma'am, with LRM Consulting.

7   Q    And how much were you paid per month?

8   A    It was $1500 per month.

9   Q    And was that so you'd just -- you were on-call to provide

10  advice or help?

11  A    Correct; yes, ma'am.

12  Q    Did that include work for ALR and Faith and Freedom, as

13  well?

14  A    Yes, ma'am, it did.  For all entities.

15  Q    As a political person you keep up with the goings on of

16  the general assembly?

17  A    Somewhat, but at that time not as much, because I was not

18  a lobbyist at that time.  My practice, I was really focused on

19  my legal practice.

20  Q    Sure.  Well, are you aware that in April of 2013, the

21  Arkansas legislature decided to refer to the voters the

22  question of whether corporations could give contributions to

23  political candidates?

24  A    Yes, ma'am, I was aware with that, for -- with that

25  issue.

Stewart - Direct

```
1    Q     And they referred that to be on the ballot for November
2    of '14?
3    A     They did, and that was one of the reasons that Arkansans
4    for Lawsuit Reform also was set up is because -- and because
5    of some of the other work that I was doing.  I was -- because
6    corporations, you know, on the ballot, it was going to be
7    whether or not, like you said, corporations could or no longer
8    give to political candidates in the state of Arkansas.
9    Q     Okay.  So that was April of 2013, but the voters wouldn't
10   actually make a decision until November of 2014?
11   A     Correct.
12   Q     And so if they voted yes in November 2014, it takes
13   effect in January of 2015?
14   A     Yes, ma'am.
15   Q     In the summer of 2013, did Mr. Baker approach you to set
16   up some PACs?
17   A     Yes, he did.
18   Q     And how did this initially start?  Did y'all have a
19   breakfast?
20   A     We did, yes, to discuss it.
21   Q     Well, would you tell the jurors just a little bit about
22   what happened at that breakfast?
23   A     Sure.  So political action committee, essentially,
24   Mr. Baker had requested or we regularly would have breakfast,
25   wanted to have a conversation about setting up political
```

Stewart - Direct

1   action committees.  And so at that breakfast there was a

2   discussion on, it was really general legal discussions about

3   what is a political action committee, how are they set up, how

4   are they controlled, what are the contribution limits that

5   people can donate to a political action committee, and then

6   also what can those political action committees do, who can

7   give, how much they can give, and then also, you know, what

8   are the contribution limits for people receiving, or

9   candidates, receiving money from political action committees.

10          And that was an area of law that I was very familiar

11  with, so it was a very routine discussion that I could have

12  with him about that.

13  Q    So you all had many breakfasts.

14  A    Yes, ma'am.

15  Q    Is that right?

16          And this particular breakfast in the summer of 2013

17  he asked you about the PACs?

18  A    Correct.

19  Q    And was your understanding that an individual can

20  contribute to more than one PAC?

21  A    Absolutely, yes.

22  Q    Is there -- was there a limit on how many PACs could

23  contribution to a specific candidate?

24  A    No, there was not.

25  Q    And on a PAC, what was your expectation of how a PAC

Stewart - Direct

1    would be set up in terms of officers and decisions made?

2    A    So ideally, you know, our PAC discussion revolved around

3    the fact that this ballot initiative was coming up, and, you

4    know, when the ballot initiative would pass, then corporations

5    would no longer be able to give to individual candidates.

6          So the discussion was, well, how, then, will

7    corporations and entities be able to influence politics or

8    candidates?  How are they going to be able to give to a

9    politician or a candidate.  And the legal way to do that is to

10   set up a political action committee, because corporations can

11   give to a political action committee.

12         And ideally the way I see political action

13   committees operate and how I see that they should be set up is

14   that you have a committee of people.  It's called a committee.

15   You would have an agent who would be responsible for setting

16   up the PAC, registering the PAC, doing all the necessary

17   paperwork for the PAC, but then you would have a committee of

18   people that then would help make the decisions on where that

19   money would be donated and to what candidates.

20   Q    After your breakfast, did Mr. Baker e-mail you and ask

21   you to actually set up some PACs?

22   A    Yes, ma'am.

23         MS. PETERS:  And, Your Honor, I'm going to need to

24   be able to use the screen to show the witness exhibits but not

25   the jurors here.  Is that . . .

Stewart - Direct

1      THE COURT:  That will be fine.  Ms. Black will make

2  it so.

3      MS. PETERS:  Okay.  Mr. Bowen, could I have 16?

4      THE COURT:  Ladies and gentlemen of the jury, as

5  y'all have seen, the law of evidence requires Ms. Peters,

6  Mr. Hendrix, to lay a foundation for a document before I can

7  admit it into evidence, and y'all can't see it until I admit

8  it.  So that's why we do the show-the-witness-first step in

9  all of this.

10  BY MS. PETERS:

11  Q    I'm just going to ask Mr. Bowen to scroll through it so

12  you can take a look at this exchange real quick.

13  A    Yep.

14  Q    Do you recognize that e-mail?

15  A    I do.

16  Q    Is that an e-mail conversation you and Mr. Baker had on

17  June 10th of 2013?

18  A    Yes, ma'am.

19      MS. PETERS:  The United States offers government

20  exhibit 16.

21      MS. DEPPER:  No objection, Your Honor.

22      THE COURT:  Government's 16 is received.

23      (Government Exhibit No. 16 entered into evidence.)

24      MR. HARRIS:  Mr. Bowen, could you scroll down to the

25  bottom section?

Stewart - Direct

1  BY MS. PETERS:

2  Q    And here you are asking Mr. Baker a question --

3         MS. PETERS:  May I publish to the jury, Your Honor?

4         THE COURT:  Yes.

5  BY MS. PETERS:

6  Q    Would you read for the jury what's said here, what you're

7  saying here?

8  A    I said:  "Gilbert, do you need me to come to the meeting

9  in D.C. this weekend?  If it is critical that I attend I will

10 gladly make it.  However, if not, I need to stay in Arkansas.

11 I am fine with going if you need me to, please know that.

12 Just let me know.  Thanks."

13        MR. HARRIS:  And can you scroll up to the next

14 section?

15 BY MS. PETERS:

16 Q    This was Mr. Baker's response on June 10th at 9:57 a.m.?

17 A    Yes, ma'am.

18 Q    And what was that response?

19 A    Mr. Baker typed:  "No, I would not worry about DC.  I do

20 need the scoop on forming ARK state PACs, just a template so

21 we could form as many as 10.  Thanks, GB."

22        MS. PETERS:  And then could you scroll up, please?

23 BY MS. PETERS:

24 Q    This was your response to him, is this?

25 A    Yes, ma'am.

Stewart - Direct

1   Q    Would you please read that?

2   A    Yes.  "Good deal.  A PAC must register after receiving

3   contributions of $500, and with an affidavit from the

4   organizer.  Each PAC can only receive up to $5000 per person.

5   Thus, a bank account must be set up to receive the money.

6   Most banks are going to require some sort of corporate

7   documents.  So for each PAC, there will need to be separate

8   entities.  I can set these up.  There is a quarterly and

9   monthly reporting requirements per PAC.  I can help with this.

10  The three of us should have an extended conversation about

11  this effort.  Forms are attached."

12  Q    Your reference to forms are attached -- not forms are

13  attached, "the three of us," who is the three of us to the

14  best of your recollection?

15  A    The best of my recollection, most likely would have been

16  Marvin Parks.

17  Q    And Mr. Baker?

18  A    And Mr. Baker, correct.

19  Q    So you agreed to set up the PACs?

20  A    Yes, ma'am.

21  Q    And what was going to be your role in the PACs?

22  A    My role would be the agent of record, and to be the

23  registered agent for the PAC, for each PAC, which is what the

24  law requires.

25  Q    How much were you going to charge for that?

Stewart - Direct

```
 1    A     For each PAC that I would set up, it would be $500.

 2    Q     From this e-mail to the time that you've set up the

 3    PACs -- let me see if I have a better way to ask this.

 4              How urgent was it for Mr. Baker that you set up

 5    these PACs?

 6    A     Fairly -- I would say it was urgent.

 7    Q     Do you have any idea why it was so urgent, given that the

 8    law couldn't change until January of 2015?

 9    A     No, ma'am.

10    Q     And within a few days of your initial discussions, did

11    Mr. Baker provide you some PAC names?

12    A     Yes, ma'am.

13              MS. PETERS:  Could I show the witness, just the

14    witness, Government Exhibit 17?

15              THE COURT:  Yes, please.  Ms. Black.

16              THE COURTROOM DEPUTY:  Yes.

17    BY MS. PETERS:

18    Q     And is this an e-mail exchange between you and Mr. Baker

19    on July 2nd?

20    A     It is.

21              MS. PETERS:  Mr. Bowen, could you scroll down?

22              And, Your Honor, the United States offers Government

23    Exhibit 17.

24              MS. DEPPER:  No objection, Your Honor.

25              THE COURT:  Received.
```

Stewart - Direct

1          (Government's Exhibit No. 17 entered into evidence.)

2              MS. PETERS:  May I publish it to the jury?

3              THE COURT:  You may.

4    BY MS. PETERS:

5    Q    Okay.  At the bottom here you're saying you hadn't

6    received your check for the retainer, the $1500?

7    A    Correct.

8    Q    And you want to read the rest of it?

9    A    Yes, ma'am.

10            "Additionally, I mailed you an invoice last week for

11   setting up the PACs.  I will send you a statement shortly and

12   an invoice for this month."

13   Q    And Mr. Baker responded on July 2, July 2nd, at 3:08 p.m.

14   A    Yes, ma'am.

15   Q    And he said?

16   A    "Chris, LLF, put the retainer check in the mail slot.

17   Please get me three or four PAC names.  Thanks."

18   Q    Who's LLF?

19   A    Linda Leigh Flanagin.

20            MR. HARRIS:  Could you scroll up, please?

21   BY MS. PETERS:

22   Q    And you responded to him on July the 2nd, at 3:36 p.m.?

23   A    I did.

24   Q    What was your response?

25   A    "Yep, thanks.  She delivered a $1500 check for June's

Stewart - Direct

```
 1   retainer.  I am working on it right now.  Checking the names
 2   against the PAC list.  Stand by."
 3   Q    What did that mean, checking the names against the PAC
 4   list?
 5   A    So the Arkansas Ethics Commission and I believe also the
 6   Secretary of State keep a list of all the PACs registered in
 7   the state of Arkansas, as required by law, and I was checking
 8   against that list to make sure there was not going to be a
 9   duplication, you know, in the names.
10            MS. PETERS:  And, Your Honor, I'd like to show a
11   summary now that comes from Government Exhibits 61 and 69,
12   which were admitted on Monday the 26th.  And that would be
13   Government Exhibit 31.  Could I show that to the witness?
14            THE COURT:  You may certainly show it to the witness
15   only.
16            Ms. Depper, I assume you have the proposed 31?
17            MS. DEPPER:  Yes, Your Honor.
18            THE COURT:  Okay.
19   BY MS. PETERS:
20   Q    This is actually a phone record page that comes from some
21   phone records previously admitted, Mr. Baker's.  And could you
22   look at the highlighted entry there?
23            MS. PETERS:  And Mr. Bowen, could you zoom in?
24   BY MS. PETERS:
25   Q    Do you see the originating number there?
```

Stewart - Direct

```
 1  A     Yes.

 2  Q     That ends 0304?

 3  A     Yes, ma'am.

 4  Q     Do you recognize that as Mr. Baker's number?

 5  A     I do.

 6  Q     And the next number there, what's that?

 7  A     That number is 1(501)837-7155.  That's my cellphone

 8  number.

 9  Q     And this shows that you had a call with Mr. Baker on July

10  the 2nd of 2013?

11  A     Yes, ma'am.

12         MS. PETERS:  And, Your Honor, the United States

13  offers Government Exhibit 31.

14         MS. DEPPER:  No objection, Your Honor.

15         THE COURT:  Received.

16      (Government's Exhibit No. 31 entered into evidence.)

17         THE COURT:  You may publish.

18         MS. PETERS:  We're going to try and zoom in a

19  little.

20  BY MS. PETERS:

21  Q    So that entry right there, that's July 2nd, 3:37 p.m.,

22  and the duration is five minutes and 19 seconds.

23  A     Yes, ma'am.

24  Q    So you had just had an e-mail exchange with Mr. Baker,

25  and is this him calling you in response to that last e-mail
```

Stewart - Direct

1   that we saw?

2   A    Yes, ma'am.

3          MS. PETERS:  And I'd like to show the witness

4   Government Exhibit 17, please.  Sorry, 18.

5   BY MS. PETERS:

6   Q    Are these some text messages that you exchanged with

7   Mr. Baker between July 9th and July 23rd?

8   A    Yes, ma'am.

9   Q    And these are text messages you provided to the FBI?

10  A    I did.

11  Q    We did not -- the FBI did not search your phone; is that

12  right?

13  A    No, ma'am.

14  Q    Okay.

15  A    I voluntarily gave them to you and the FBI.

16         MS. PETERS:  And, Your Honor, the United States

17  moves for the admission of Government Exhibit 18.

18         MS. DEPPER:  No objection.

19         THE COURT:  Received.  Eighteen is in.

20      (Government's Exhibit No. 18 entered into evidence.)

21         MS. PETERS:  May I publish, Your Honor?

22         THE COURT:  You may.

23  BY MS. PETERS:

24  Q    So let's start with the first there.  G-i-l, I'm assuming

25  that stands for Gilbert?

Stewart - Direct

```
 1   A     Yes, ma'am.

 2   Q     So these are your messages with Mr. Gilbert?

 3   A     They are.

 4   Q     That first message he sends to you on July 9th at

 5   5:16 p.m.  Do you see that there?

 6   A     Yes, ma'am.

 7   Q     What does that text message say?

 8   A     "Call me.  I've got these PAC checks."

 9   Q     And your response?

10   A     "Okay.  I will first thing in the morning.  He says:

11   Okay."

12   Q     So he's letting you know the checks you all have been

13   waiting to set up the PACs with are -- you have them?

14   A     Yes, ma'am.

15   Q     He has them?

16   A     Correct.

17         MS. PETERS:  Okay.  Could you scroll down, please.

18   Is there -- it doesn't scroll?

19   BY MS. PETERS:

20   Q     Then here, on July 19th, at 8:02 a.m. you say:  "Got the

21   packet, thanks.  And follow-up I think 9:20," and what did you

22   say there?

23   A     "P.O. box will be 960 total for all PACs.  If you could

24   advance those fees, that would be great.  I can have these set

25   up as soon as I have the check.  I have P.O. box forms and
```

Stewart - Direct

1    have appointment with the bank.  We are ready to roll."

2    Q    So you're letting him know you received those PAC checks?

3    A    Correct.

4    Q    And July 22nd and 23rd, is that around when you set up

5    the P.O. boxes?

6    A    Yes, ma'am.

7    Q    And why did you set up different post office boxes?

8    A    Best practices.  Each PAC should have its own P.O. box

9    and address.

10   Q    I think we duplicated that page.

11              And here, Mr. Baker is letting you know what?

12   A    He says:  "I am out of town.  Just texted Linda Leigh to

13   bring you a 1K check for boxes."

14   Q    1K meaning?

15   A    $1000.

16   Q    And so that was to pay the fees on the boxes?

17   A    Correct.

18   Q    The post office boxes?

19   A    Yes, ma'am.

20              MS. PETERS:  Okay.  Could you scroll down?

21   BY MS. PETERS:

22   Q    And you set up those post office boxes, and then did you

23   set up bank accounts for each of the PACs?

24   A    Yes, ma'am, I did.

25   Q    Where'd you set those up?

Stewart - Direct

```
 1    A     At that time it was Delta Bank and Trust.

 2    Q     Why did you choose Delta Bank and Trust?

 3    A     Smaller hometown bank, and my experience working in the

 4    political world, sometimes banks don't necessarily know what

 5    to do with political entities or how to categorize them, and I

 6    knew that Delta Bank and Trust had an option for political

 7    organizations.  So I knew it would be easier for me just

 8    time-wise and organization-wise.

 9             MS. PETERS:  And Mr. Bowen, could you please show

10    Mr. Stewart Government Exhibit 19.  And could you scroll to

11    the second page, too.

12    BY MS. PETERS:

13    Q     Do you see government exhibit 19 there?

14    A     I do.

15    Q     What do you recognize that to be?

16    A     That is a handwritten document on a legal pad given to me

17    by Mr. Baker with the names of eight new PACs, and including

18    the names of two others that were already existing.

19    Q     Did this come to you along with the checks?

20    A     Can't recall.  It may have, it might not have.  I can't

21    recall.

22             MS. PETERS:  And, Your Honor, the government moves

23    to admit Government Exhibit 19.

24             MS. DEPPER:  No objection.

25             THE COURT:  Received, and you may publish.
```

Stewart - Direct

1         (Government's Exhibit No. 19 entered into evidence.)

2              MR. HARRIS:  Can we zoom that in?

3    BY MS. PETERS:

4    Q    Do you remember how you received this list?

5              THE COURT:  He said "no" twice.

6              MS. PETERS:  Oh, I'm sorry, Your Honor.

7              THE COURT:  Yes, ma'am.

8              MS. PETERS:  May I look at my exhibits for just a

9    moment, Your Honor?

10             THE COURT:  Absolutely.

11             MS. PETERS:  And, Your Honor, we had a scanning

12   error, so if I could show Mr. Stewart something on the ELMO?

13             THE COURT:  Of course.  It takes a while, ladies and

14   gentlemen, to switch back and forth to the ELMO and the

15   computer, so that's what's going on.

16   BY MS. PETERS:

17   Q    Mr. Stewart, looking at this, does this refresh your

18   memory at all about how you got that list?

19   A    Yes, ma'am.  Yes.

20   Q    And this right here is the actual original handwritten

21   list?

22   A    That's right.

23             MS. PETERS:  Could we switch back to the . . .

24             THE COURT:  You may.

25             MS. PETERS:  And, Your Honor, I'm asking for the

Stewart - Direct

```
 1   admission of -- I think I moved for the admission of
 2   Government's Exhibit 19, or if I didn't, I intended to, but
 3   this is actually -- this envelope is a part of 19.
 4            THE COURT:  Got it.
 5            MS. PETERS:  And we'll get that scanned.
 6            THE COURT:  Very good.
 7            Ms. Depper, any objection on 19?
 8            MS. DEPPER:  No objection, Your Honor.
 9            THE COURT:  It will be admitted, if I haven't
10   already.  And my notes are unclear, Ms. Peters.  So thanks for
11   doing it again, maybe.
12   BY MS. PETERS:
13   Q    You see this envelope?
14   A    I do.
15   Q    If it's all right, I'm just going to hold it up for the
16   jury.  Standard envelope.
17   A    Yes, ma'am.
18   Q    And on the front it says?
19   A    My name, Chris Stewart.
20   Q    Do you recognize the handwriting on that?
21   A    Yes, I do.
22   Q    And this list, Government Exhibit 19, was that what was
23   inside this envelope?
24   A    Yes, ma'am.
25   Q    And that refreshed your memory of how you got this?
```

Stewart - Direct

```
 1   A     Yes, ma'am, thank you.

 2   Q     Would you tell the jury, please, how you got this list?

 3   A     So this list was given to me from Mr. Baker, and it was

 4   inside the original manila envelope that was shown to you by

 5   Ms. Peters.

 6   Q     Looking at the list now, do you recognize the handwriting

 7   on the list?

 8   A     I do.

 9   Q     And the bulk of that handwriting, we see a couple

10   cross-outs, but the bulk of the handwriting, whose handwriting

11   is that?

12   A     Mr. Baker's.

13   Q     Do you have any idea who the more bubbly handwriting is?

14   A     I believe it was my secretary, I can see it closely.  It

15   was probably my secretary, Sarah Drye, yes.

16   Q     And is this a list of the PAC names that you were going

17   to form?

18   A     Correct.

19   Q     Who came up with this list?

20   A     Mr. Baker did.

21   Q     And who came up with the names?

22   A     Next to the PACs, Mr. Baker.

23   Q     Who was responsible for getting PAC officers?

24   A     Mr. Baker was.

25   Q     And let's just look at each one.  There's Conservative
```

Stewart - Direct

1   Persons In, CPI PAC, and the name listed there is?

2   A    Linda Leigh Flanagin.

3   Q    Okay.  And then Thomas Group In, Don Thomas.  Do you know

4   Don Thomas?

5   A    I do not.

6   Q    Conservative Information Tech, Ancil Lea.

7        And before the events that happened here, did you

8   know Mr.~Lea?

9   A    No, ma'am.

10  Q    Number 4, Good Government Guys, and it looks like

11  originally it said James McAlister, and then there's a note,

12  Chris, your secretary, but then it's scratched through and

13  says, Steve Goode.

14  A    Yes, ma'am.

15  Q    Number 5, DBH2.  Do you know what DBH2 stands for?

16  A    Yes, DBH2 stood for Bruce Hawkins 2, and the reason it

17  said 2 was because there was already a PAC that existed that

18  was DBH.

19  Q    Okay.  And that says Cammie Bogges.

20       Number 6 says, Red Arkansas, and that's where Steve

21  Goode's name was?

22  A    Yes, ma'am.

23  Q    And then crossed out.  And that's your secretary's name?

24  A    Correct.

25  Q    Number 7 is Judicial Reform.  And that's Cheryl Loechter?

Stewart - Direct

1   A      Correct.

2   Q      And that's L-o-e-c-h-t-e-r?

3   A      Yes, ma'am.

4   Q      This is -- okay, and number 8, Taxpayers for Change, Don

5   Thomas.

6   A      Yes, ma'am.

7   Q      Did you know Cheryl Loechter?

8   A      I did not.

9   Q      And in addition to these eight new PACs you were setting

10  up, what was Mr. Baker indicating here?

11  A      He was indicating that there were two additional PACs

12  that already -- it says already exist, and it's CEG, John

13  Nabholz, and DBH, Bruce.

14          MS. PETERS:  May I show the witness Government

15  Exhibit 20?

16          THE COURT:  You may.

17          MR. HARRIS:  I'm told if he puts up the exhibit it's

18  going to go to the gallery, and it's not been admitted yet.

19          THE COURT:  Are we limited, or everybody?  Ms. Black

20  says it will just be the witness and the lawyers.

21          MS. PETERS:  Okay.

22          THE COURT:  Ladies and gentlemen, if you see it out

23  there, or jurors, if you see it, close your eyes.

24          A JUROR:  It popped up.

25          THE COURT:  Okay.  Close your eyes.  Thank you.

Stewart - Direct

1              Mr. Bowen, you've obviously helped us discover a

2    Gremlin that's gotten in the system this morning.  It was

3    working fine earlier, but not now.

4              Are these exhibits in the binder up here?  Could we

5    do the identification that way?

6              MS. PETERS:  We could.

7              Your Honor, may I confer with opposing counsel for

8    just a second?

9              THE COURT:  Sure.  At a distance with your masks on.

10             MS. PETERS:  I apologize for the delay, Your Honor.

11             THE COURT:  That's okay.  I'd like to do a test run,

12   Ms. Peters, with something innocent, something that's already

13   been admitted.  So let's do a limited -- limited on~-- well,

14   that's just a cover page, so that will be fine.

15             Mr. Stewart, can you see that?

16             THE WITNESS:  Yes, Your Honor.

17             THE COURT:  Juror number 4?

18             A JUROR:  No.

19             THE COURT:  Alternate number 3?

20             A JUROR:  No.

21             THE COURT:  Good.  Okay.  So I think we're back

22   working on the technology.

23             MS. PETERS:  We're back in business?  Okay.  Could I

24   show the witness Government Exhibit 20?  I think that's where

25   I left off.

Stewart - Direct

```
 1              THE COURT:  Absolutely.

 2              Counsel, let's take our chairs and get back to work.

 3   Counsel?

 4              Ms. Peters.

 5              MS. PETERS:  Thank you, Your Honor.

 6              THE COURT:  Yep.

 7   BY MS. PETERS:

 8   Q    And this is an e-mail that you sent to Mr. Baker on July

 9   the 24th at 1:49 p.m., and it says:  "Information for PAC

10   officers."

11   A    Yes, ma'am.

12   Q    It looks like you sent it with high priority?

13   A    I did.

14   Q    And what are you asking for here?

15   A    I say:  Address, phone number and --

16              MS. PETERS:  Did I move to admit it?

17              THE COURT:  No.

18              MS. PETERS:  Okay.  The United States offers

19   Government Exhibit 20.

20              MS. DEPPER:  No objection, Your Honor.

21              THE COURT:  Government 20's received.

22         (Government's Exhibit No. 20 entered into evidence.)

23              THE COURT:  You may publish.

24              THE WITNESS:  I do that all the time.

25   BY MS. PETERS:
```

Stewart - Direct

1    Q    Could you, now that it's published --

2    A    Correct.

3    Q    -- please read the jury what it says.

4    A    It says:  "Address, phone number and employer of the

5    following people:  Linda Leigh Flanagin, Don Thomas, Ancil

6    Lea, Camie Bogges, Steve Goode, Cheryl Loechter."

7    Q    And then you say "Thanks"?

8    A    I say, "thanks, Chris Stewart."

9    Q    And that's your signature block?

10   A    Yes, ma'am.

11   Q    Why were you asking for this information?

12   A    Because in order to register the PACs with the Secretary

13   of State's office, I wanted to get the information of the

14   officers.  Because I explained to Mr. Baker I'll be the agent,

15   but I'm not going to be the only person on this PAC.  You

16   know, we need to have a committee that will decide where this

17   money goes, who makes decisions on what candidates are going

18   to receive these funds, and I explained to him that that was

19   the best practice for political action committees.

20        Well, on that form, you have to say, of the PAC

21   officer, you're required to give the name, you're required to

22   give the address, you're required to give the employer

23   information of the PAC officers.

24        So I could -- and he was pushing me, as we've seen

25   in exhibits, to get these PACs filed.  Well, I can't file them

Stewart - Direct

```
 1   and get them running without the information of the PAC
 2   officers.  So that's why it was high importance.
 3            MS. PETERS:  Okay.  I'd like to show the witness
 4   Government Exhibit 21, please.
 5            THE COURT:  Okay.
 6   BY MS. PETERS:
 7   Q    Do you recognize that?
 8   A    Yes, ma'am.
 9   Q    Is that e-mail his response to you on July 25th at 2:03
10   p.m.?
11   A    Yes, ma'am.
12            MS. PETERS:  Your Honor, the United States moves for
13   the admission of Government Exhibit 21.
14            MS. DEPPER:  No objection, Your Honor.
15            THE COURT:  Received.
16       (Government's Exhibit No. 21 entered into evidence.)
17            MS. PETERS:  May I publish, Your Honor?
18            THE COURT:  You may.
19   BY MS. PETERS:
20   Q    So this is his e-mail response to your request for these
21   people's information; is that right?
22   A    Yes, ma'am.
23            MR. HARRIS:  Can you scroll down just for a second,
24   Mr. Bowen?
25   BY MS. PETERS:
```

Stewart - Direct

```
 1   Q    This was the original e-mail you sent him?

 2   A    Correct.

 3        MR. HARRIS:  Okay.  And then scroll up.

 4   BY MS. PETERS:

 5   Q    This was his response?

 6   A    Yes, ma'am.

 7   Q    Would you please read off the information that he gave

 8   you?

 9        THE COURT:  Ms. Peters, can I interrupt?

10        MS. PETERS:  Yes, Your Honor.

11        THE COURT:  The witness does not need to read the

12   exhibit.

13        MS. PETERS:  Okay.

14        THE COURT:  Okay.  Jury can read.

15        MS. PETERS:  Okay.

16        THE COURT:  Yes.

17        MS. PETERS:  I'd like to just go over a couple of

18   the addresses, if I may?

19        THE COURT:  Absolutely, yes, but not every line of

20   every exhibit.

21        MS. PETERS:  Thank you, Your Honor.

22        Yes.

23   BY MS. PETERS:

24   Q    For Don Thomas, the address he gave you was 12 Stern

25   Wheel?
```

Stewart - Direct

1   A    Correct.

2   Q    And that's the phone number there, that the jurors see?

3   A    Yes, ma'am.

4   Q    And this is information that he provided to you?

5   A    Yes, ma'am.

6   Q    And he represented to you this is the correct contact

7   information for Don Thomas to put on the PAC form?

8   A    Correct.

9   Q    Same question for Cheryl Loechter, which he spelled

10  L-o-e-t-c-h-e-r?

11  A    Correct.

12  Q    This is the information he represented was her correct

13  address and phone number?

14  A    Yes, ma'am.

15  Q    Likewise, for Ancil Lea, 6 West Post Oak, in Conway?

16  A    Yes, ma'am.

17  Q    He told you Ancil Lea's address was 6 West Post Oak?

18  A    Yes, ma'am.

19  Q    And that's the phone number he provided you?

20  A    Yes, ma'am.

21  Q    For Steve Goode, that's the address and the phone number

22  he provided you?

23  A    Yes, ma'am.

24  Q    And then he says:  "Cammie and Linda Leigh to come?"

25  A    Correct.

Stewart - Direct

1        MS. PETERS:  And I'd like to show the witness

2   Government Exhibit 22.

3   BY MS. PETERS:

4   Q    Are these the -- are these e-mails exchanged between you

5   and Mr. Baker on July 30th?

6   A    Text message.

7   Q    Sorry, text messages, July 30th of 2013?

8   A    Yes, ma'am.

9        MS. PETERS:  And, Your Honor, the United States

10  moves for the admission of Government's Exhibit 22.

11       MS. DEPPER:  No objections, Your Honor.

12       THE COURT:  Received.

13       (Government's Exhibit No. 22 entered into evidence.)

14       MS. PETERS:  May I publish, Your Honor?

15       THE COURT:  You may.

16  BY MS. PETERS:

17  Q    So in this message he is asking you to change Linda

18  Leigh's address?

19  A    Correct.

20  Q    And then it looks like you're asking him on July 30th,

21  please bring employment information of PAC officers today?

22  A    Yes, ma'am.

23  Q    Why were you asking for that information?

24  A    I still needed that information to fill out the PAC

25  registration forms.  I had to have their employment

Stewart - Direct

1   information.

2   Q    And the next day you told him the PACs were all

3   registered and the bank accounts were open?

4   A    Yes, ma'am.

5   Q    And his response:  "Very good, thanks"?

6   A    Correct.

7   Q    We're going to look at a series of exhibits now that are

8   PAC registration forms.

9            MS. PETERS:  I'd like to show the witness Government

10  Exhibit 42, please.

11  BY MS. PETERS:

12  Q    Is this the original PAC registration form that you filed

13  with the Secretary of State for Citizens for Information

14  Technology or CIT PAC?

15  A    Yes, ma'am.

16           MS. PETERS:  The United States moves for the

17  admission of Government Exhibit 42.

18           THE COURTROOM DEPUTY:  It's already admitted.

19           THE COURT:  Ms. Black says it's already in,

20  Ms. Peters.  Let me check my -- yes, I've got 42 in, as well,

21  but that's the only one of the forties that I see admitted.

22           MS. PETERS:  That's right, Your Honor, because that

23  was Mr. Ancil Lea.  We asked Mr.~Lea about it.

24           THE COURT:  That's right.

25           MS. PETERS:  Okay.  Great, I'd like to publish

Stewart - Direct

1    Government Exhibit 42.

2              THE COURT:  Certainly.  That's your Post Oak Point?

3              MS. PETERS:  It is, Your Honor.

4    BY MS. PETERS:

5    Q    You can see the stamp of the Secretary of State?

6    A    Yes, ma'am.

7    Q    This is the form you filed with the Secretary of State to

8    get the PAC going?

9    A    It is.

10   Q    And Citizens for Information Technology, CIT, Section 2,

11   is that the post office box that you set up for the PAC to

12   receive mail?

13   A    Correct.

14   Q    Section three, you're listed there under PAC Officer.

15   That's you.

16   A    I am.

17             MS. PETERS:  Could we zoom in on the next section,

18   please?

19   BY MS. PETERS:

20   Q    That section right there where you provide officer

21   information for Ancil Lea, 6 West Post Oak, and that phone

22   number, 327-1779, where did you get that information?

23   A    Mr. Baker.

24   Q    Was that from the e-mail that he provided you?

25   A    Yes, ma'am.

Stewart - Direct

1   Q      That we've already seen?

2   A      Correct.

3            MS. PETERS:  Next, I'd like to show the witness

4   Government Exhibit 43.

5   BY MS. PETERS:

6   Q      Do you recognize this?

7   A      I do.

8   Q      Is this the registration form for CPI PAC, or

9   Conservative Persons In?

10  A      Yes, ma'am.

11           MS. PETERS:  The United States moves for admission

12  of Government Exhibit 43.

13           MS. DEPPER:  No objection, Your Honor.

14           THE COURT:  Received.

15       (Government's Exhibit No. 43 entered into evidence.)

16  BY MS. PETERS:

17  Q      Do you see there on this form, same file mark?

18  A      I do.

19  Q      Conservative Persons In PAC?

20  A      Yes, ma'am.

21  Q      CPI PAC, again, the post office box that you set up?

22  A      Yes, ma'am.

23  Q      Let's scroll down.  That's Linda Leigh Flanagin's

24  information?

25  A      Correct.

Stewart - Direct

1    Q    And that was provided to you by Mr. Baker?

2    A    It was.

3    Q    And her employer is listed as well.  RM Consulting?

4    A    Yes, ma'am.

5              MS. PETERS:  I'd like to show the witness Government

6    Exhibit 45.

7              THE COURT:  Forty-five, Ms. Peters?

8              MS. PETERS:  Yes, Your Honor.

9    BY MS. PETERS:

10   Q    Do you recognize this to be the PAC registration form for

11   the Go Good Government, GGG PAC?

12   A    Yes, ma'am.

13             MS. PETERS:  The United States moves for the

14   introduction of Government Exhibit 45.

15             MS. DEPPER:  No objection, Your Honor.

16             THE COURT:  Received.

17        (Government's Exhibit No. 45 entered into evidence.)

18   BY MS. PETERS:

19   Q    Same form as we've already seen?

20   A    Yes.

21             MR. HARRIS:  And if Mr. Bowen could scroll down.

22   BY MS. PETERS:

23   Q    It says there the officer is Sarah Drye.

24   A    Yes, ma'am.

25   Q    Sarah Drye was your legal assistant or your secretary?

Stewart - Direct

1    A     Correct.

2    Q     And did you talk with her about whether she wanted to

3    serve as a PAC officer?

4    A     Yes.

5    Q     And she gave you her permission?

6    A     Correct.

7    Q     And I assume you know what her address was?

8    A     Yes, ma'am.

9          MS. PETERS:  The United States would like to show

10   the witness Government Exhibit 46.

11   BY MS. PETERS:

12   Q     Do you recognize this as the PAC registration form for

13   Judicial Reform PAC?

14   A     Yes, ma'am.

15         MS. PETERS:  The United States moves for the

16   admission of Government Exhibit 46.

17         MS. DEPPER:  No objection.

18         THE COURT:  Received.

19      (Government's Exhibit No. 46 entered into evidence.)

20   BY MS. PETERS:

21   Q     Again, this was filed on July the 31st of 2013 along with

22   the others?

23   A     Yes, ma'am.

24         MR. HARRIS:  And Mr. Bowen, could you scroll down to

25   the PAC officers section?  And could you highlight the Cheryl

Stewart - Direct

```
 1  Loechter?

 2  BY MS. PETERS:

 3  Q    So this information right here, putting Cheryl Loechter

 4  as a PAC officer, you did this why?

 5  A    Mr. Baker gave me her information to be a PAC officer.

 6          MS. PETERS:  And could I show the witness Government

 7  Exhibit 47?

 8  BY MS. PETERS:

 9  Q    Do you recognize that as the PAC registration form for

10  Taxpayers for Change PAC?

11  A    I do.

12          MS. PETERS:  The United States moves for the

13  admission of Government Exhibit 47.

14          MS. DEPPER:  No objection.

15          THE COURT:  Received.

16      (Government's Exhibit No. 47 entered into evidence.)

17  BY MS. PETERS:

18  Q    Again, this is the form you filed?

19  A    It is.

20  Q    Same file mark date?

21  A    Correct.

22          MS. PETERS:  And if Mr. Bowen could scroll down.

23  BY MS. PETERS:

24  Q    You're listed there as the resident agent officer?

25  A    Yes, ma'am.
```

Stewart - Direct

1   Q   Okay.  And the second officer listed is Don Thomas?

2   A   Yes, ma'am.

3   Q   This information that you used, 12 Stern Wheel, and

4   retired, and that phone number, where did you get that

5   information from?

6   A   Mr. Baker.

7         MS. PETERS:  Could I show the witness Government

8   Exhibit 48?

9   BY MS. PETERS:

10   Q   Do you recognize this as the PAC registration form for

11   the Thomas Group In PAC?

12   A   I do.

13   Q   Again, same file mark?

14   A   Correct.

15         MS. PETERS:  Your Honor, the United States moves for

16   the admission of Government Exhibit 48.

17         MS. DEPPER:  No objection.

18         THE COURT:  Received.

19   (Government's Exhibit No. 48 entered into evidence.)

20   BY MS. PETERS:

21   Q   And, again, scrolling down to the officers section, same

22   information is on Taxpayers for Change, Don Thomas, 12 Stern

23   Wheel, with that phone number?

24   A   Yes, ma'am.

25   Q   And you got that information from the e-mail from

Stewart - Direct

 1   Mr. Baker?

 2   A    Yes, ma'am.

 3            MS. PETERS:  And Government Exhibit 49, could I show

 4   that to the witness, please?

 5   BY MS. PETERS:

 6   Q    Do you recognize this as the registration form for

 7   Government Exhibit 49?

 8   A    I do.

 9            MS. PETERS:  Could I move for the admission of

10   Government Exhibit 49?

11            MS. DEPPER:  No objection.

12            THE COURT:  Forty-nine is in.

13       (Government's Exhibit No. 49 entered into evidence.)

14   BY MS. PETERS:

15   Q    So this is for the Red Arkansas PAC, and scrolling down

16   shows Steve Goode as an officer, with an address in Vilonia

17   and a telephone number of 796-3984?

18   A    Correct.

19   Q    And where did you get that information?

20   A    Mr. Baker.

21            MS. PETERS:  Now, could I show the witness

22   Government Exhibit 44, please?

23   BY MS. PETERS:

24   Q    Do you recognize this as the registration form for the

25   DBH2 PAC?

Stewart - Direct

```
 1   A    Yes, ma'am.
 2           MS. PETERS:  The United States moves for the
 3   admission of Government Exhibit 44.
 4           MS. DEPPER:  No objection.
 5           THE COURT:  Received, and you may publish.
 6   (Government's Exhibit No. 44 entered into evidence.)
 7   BY MS. PETERS:
 8   Q    On this registration form it's marked August 6th of 2013.
 9   Why is that one dated a week after the others?
10   A    There had been some discussion with Mr. Baker as whether
11   or not I would be the registered agent for this PAC.
12           MR. HARRIS:  And could you scroll down, please.
13   BY MS. PETERS:
14   Q    You're listed as the only officer?
15   A    Yes, ma'am.
16   Q    So was the discussion -- who is -- we've talked -- DBH is
17   Bruce Hawkins.
18   A    Yes, ma'am.
19   Q    So this was his PAC, or named after him.
20   A    It was named after him.
21   Q    And so you were waiting to find out if --
22   A    I was waiting to find out, one, if this PAC was going to
23   be set up and used, DBH2.  Secondly, was I going to be the
24   registered agent for this PAC, and also who the officers were
25   going to be.  I was waiting to see if there was somebody else
```

Stewart - Direct

```
 1  that was going to be named as an officer.

 2  Q    Were you waiting to hear about this from Mr. Hawkins?

 3  A    No, ma'am.

 4  Q    From Mr. Baker?

 5  A    Correct, from Mr. Baker.

 6  Q    Mr. Hawkins was also a client of yours; is that right?

 7  A    He was.

 8  Q    And did you expect that Mr. Baker was consulting with

 9  Mr. Hawkins?

10  A    Absolutely.

11  Q    Did Mr. Baker tell you that Mr. Hawkins wanted you to

12  manage that PAC?

13  A    Yes.

14  Q    Now, the funds that were going out of these PACs, because

15  we know that the PACs received money --

16  A    They did.

17  Q    -- who made the decisions about where the money was going

18  to go?

19  A    Mr. Baker.

20  Q    And how did you find out where the money was supposed to

21  go?

22  A    Mr. Baker would either call me, e-mail me or text me.

23  Q    So were you the one making any decisions about where the

24  money would go?

25  A    No, ma'am.
```

Stewart - Direct

1    Q    And --

2              THE COURT:  Ms. Peters?

3              MS. PETERS:  Yes.

4              THE COURT:  May I interrupt?

5              MS. PETERS:  Yes, Your Honor.

6              THE COURT:  I take it we're going to go into the

7    checks next, the money coming in and money going out?

8    Whatever we're going to do next, I think we need a morning

9    break.

10             MS. PETERS:  Thank you, Your Honor.

11             THE COURT:  Okay.  Ladies and gentlemen of the jury,

12   don't talk to anybody about the case and don't let anybody

13   talk to you.  Pads facedown.  We'll be out until 10:15, 10:15.

14             All rise for the jury.

15         (The jury exits the courtroom.)

16             THE COURT:  Mr. Stewart, you can step down.  Don't

17   talk to anybody about your testimony during the break.  Okay?

18             THE WITNESS:  Absolutely.

19             THE COURT:  Very good.  Thank you.

20             Counsel, let's talk a minute.

21             THE WITNESS:  Your Honor, is this water for me?

22             THE COURT:  Let me check with Sherri.  Yes.

23             THE WITNESS:  May I take one?

24             THE COURT:  You may, of course.

25             THE WITNESS:  Thanks.

Stewart - Direct

1           THE COURT:  And put the other one down there, too,

2   so it will be easier, within reach, if you need it.

3           THE WITNESS:  Okay.

4           THE COURT:  Ms. Peters, I know you've got a lot on

5   you, Ms. Peters, this morning and in general, but we need to

6   pick up the pace.  And I'm sorry to grump at you, but I'm not

7   going to allow every exhibit to be read to the jury like that,

8   and your meticulousness is one of your gifts as a lawyer, but

9   our jurors are -- they know what's going on.  They've heard

10  about these PACs.  They know, and they don't need as much

11  detail as is being presented.

12          And also remember the Court's ruling, that the PACs

13  are at the margin, and I'm concerned about how much time we're

14  spending on this, both in general, as well as on my general --

15  my concern about what we're focusing the jury on.

16          So I need laser bombing on this from you, please,

17  like the Post Oak thing, and where is the information coming

18  from.

19          MS. PETERS:  Thank you, Your Honor.

20          THE COURT:  You are welcome.

21          Counsel, any issues for me?  Mr. Hendrix?

22          MR. HENDRIX:  Yes, Your Honor.  And you were -- I

23  was tracking you, actually.  While we believe the evidence

24  irrelevant and inadmissible, we do -- we will be asking for a

25  limiting instruction that has been -- Your Honor's given

Stewart - Direct

1   before, at whatever juncture you think is appropriate, if

2   you're willing to give the limiting instruction, at the time

3   that you think is appropriate.

4           THE COURT:  I will think about that.  I think about

5   whether to maybe give a limiting instruction light on what

6   they're supposed to use this for.  But, again, Mr. Baker's not

7   on trial for any funny business with PACs.

8           MS. PETERS:  Well --

9           THE COURT:  I know the -- I understand the

10  government's position that it's part of the conspiracy, part

11  of how things were concealed and done.

12          MS. PETERS:  May I briefly state?  The PACs were

13  used, and the testimony here is going to be about how

14  Mr. Baker funneled the money from Mr. Morton through the PACs

15  to Judge Maggio, and Mr. Stewart will testify that he asked

16  about sending it to other people and was told it was earmarked

17  for Judge Maggio.

18          And I do believe that's relevant as to whether or

19  not there was a bribe and a bribe paid.  That's why I'm

20  spending time here.  It's not to say that Mr. Baker wrong --

21  shouldn't have set up PACs.  It's that these PACs were not set

22  up for the legitimate purpose of supporting many candidates,

23  they were set up primarily for the purpose of funneling bribe

24  money to Mr. Maggio.

25          THE COURT:  And many PACs were important because of

Stewart - Direct

```
 1    the limit on how much each PAC could give to a candidate?  So

 2    part of my concern is the cumulative nature of this.

 3              MS. PETERS:  I think Mr. Morton's testimony was that

 4    he was willing to give $30,000 to Judge Maggio.

 5              THE COURT:  Yeah.

 6              MS. PETERS:  And Mr. Baker told him or gave him PAC

 7    names and said the money for Judge Maggio needs to go into

 8    these 10 PACs, $3000 each.  That is why I am spending time on

 9    each PAC.

10              THE COURT:  I think I get it, but we need more

11    forest and fewer trees.

12              MS. PETERS:  I understand, Your Honor.

13              THE COURT:  Thank you.  And I'll think about the

14    limiting instruction light.

15              MR. HENDRIX:  Thank you, Your Honor.

16              THE COURT:  Mr. Hendrix.

17              MR. HENDRIX:  Thank you, Judge.

18              THE COURT:  10:15, counsel.

19         (A recess was taken from 9:58 a.m. to 10:20 a.m.)

20              THE COURT:  Ms. Black tells me that counsel are

21    working on some stipulations to exhibits to move things along?

22              MS. PETERS:  We're trying, Your Honor.  I don't know

23    that we're officially there yet.

24              THE COURT:  Okay.

25              MR. HENDRIX:  I think I can represent this.
```

Stewart - Direct

1    Whatever we can do to help move along, we're now into the area

2    that we call the fake PAC officers.  We have an overarching

3    objection, as you know, to the -- that none of this is

4    relevant, and it's simply prejudicial.  However Your Honor

5    feels about that in the ruling on that, you'll make it.  If it

6    comes in, what can we do to help to get it in as fast as we

7    can.

8                THE COURT:  I've made the rulings, Mr. Hendrix.

9                MR. HENDRIX:  Yes.

10               THE COURT:  Do you want me to repeat it and

11   emphasize it?

12               MR. HENDRIX:  No, I think the record's clear.

13               THE COURT:  Yeah, it is.

14               I agree with the United States that it has some

15   relevance, but it's at the margin, and I'm concerned about the

16   time that we're spending on it and the potential for

17   confusion.  That's what prompted my limiting instruction that

18   I crafted with y'all's help yesterday or the day before.

19               So in the moving it along spirit, with that ruling

20   made, is the defense willing to stipulate to the admission of

21   these checks, the check exhibits, or no?

22               MR. HENDRIX:  Yeah, the -- the checks are what?

23               MS. PETERS:  Could I state which exhibits we're

24   about to offer, maybe?

25               THE COURT:  Sure.

Stewart - Direct

1          MS. PETERS:  Okay.  My plan is to offer -- I'm going

2    to chronological order, Your Honor, in terms of my examination

3    of this witness, and that's why -- it will make more sense

4    when he talks.  But I'm going to go to 34A, 35A, which are --

5    relate to the straw contributions; Government Exhibit 24,

6    which is text messages with Mr. Baker; Government Exhibit 25,

7    more text messages with Mr. Baker.

8          MR. HENDRIX:  May I interrupt?  And I think this

9    will help.  Let's go through them real fast, and we'll go,

10   let's let it in.

11         So 34 are the straw contribution checks of -- 34A,

12   34B, 34C, subject to our previous objection, we'll stipulate

13   to the admissibility.

14         THE COURT:  34A, B and C are admitted.

15      (Government's Exhibit Nos. 34A, 34B and 34C entered into

16   evidence.)

17         MS. PETERS:  35A, B and C.

18         MR. HENDRIX:  Thirty-five are the invoices, same

19   thing.

20         THE COURT:  Admitted, 35A, 35B, 35C.

21      (Government's Exhibit Nos. 35A, 34B, and 34C entered into

22   evidence.)

23         MS. PETERS:  Government Exhibit 24, text messages.

24         MR. HENDRIX:  Twenty-four, let me get to them.

25   Sure.  These are between Mr. Stewart and Mr. Baker, right?

Stewart - Direct

1   Yeah.

2           MS. PETERS:  And, again, Government Exhibit 25, same

3   things between Mr. Stewart and Mr. Baker.

4           THE COURT:  Is government 23 already in, Ms. Black?

5   I don't have it marked.

6           MS. PETERS:  I'm skipping Government Exhibit 23.

7   I'm trying to move along.

8           THE COURT:  Good.  I didn't miss anything.

9           Twenty-four and 25 are in.

10      (Government's Exhibit Nos. 24 and 25 entered into

11   evidence.)

12          MS. PETERS:  Government Exhibits 36A, B and C, which

13   are checks Mr. Stewart wrote to Maggio for judge.

14          MR. HENDRIX:  Sure.

15          THE COURT:  36A, 36B, 36C are in.

16      (Government's Exhibit Nos. 36A, 36B and 36C entered into

17   evidence.)

18          MS. PETERS:  Then checks written from the PACs to

19   Judge Maggio's campaign, government exhibits 50 through 53 are

20   checks in December.

21          MR. HENDRIX:  I'm sorry, did you say 50 through 53?

22   Sure.

23          MS. PETERS:  Yes, 50 through 53.  So 50, 51, 52, 53,

24   they're checks that are written on December 5th and

25   December 31st of 2013, from -- for PACs to Judge Maggio's

1  campaign.

2          THE COURT:  Those are admitted without objection,

3  Government's 50, 51, 52 and 53.

4      (Government's Exhibit Nos. 50-53entered into evidence.)

5          MS. PETERS:  Government's exhibit 26 and 27, those

6  are, again, text messages.  And 28 also.

7          MR. HENDRIX:  And, Julie, I'm sorry, 26, 27 and 28?

8          MS. PETERS:  Twenty-six, 27 and 28 are text messages

9  between Mr. Baker and Mr. Stewart.

10          MR. HENDRIX:  Good.

11          THE COURT:  Twenty-six -- Government's 26 is

12  admitted, Government's 27 is admitted, Government's 28 is

13  admitted.

14      (Government's Exhibit Nos. 26-28 entered into evidence.)

15          THE COURT:  What about the two e-mails, 29 and 30?

16          MS. PETERS:  That was going to be my next offer.

17          MR. HENDRIX:  Sure.

18          THE COURT:  Government's 29, Government's 30 are in.

19      (Government's Exhibit Nos. 29 and 30 entered into

20  evidence.)

21          MS. PETERS:  That is it for this witness, Your

22  Honor.

23          I'm also going to change up my order in that I'm

24  going to flip the next two witnesses and do Ms. Oliger first

25  and Ms. Barham second, and I believe anything I'll use with

Stewart - Direct

```
 1   Ms. Oliger is already admitted.  With Ms. Barham, the exhibits
 2   that's going to be offered is Government Exhibit 32 containing
 3   clips 32A through 32K.  These are the clips that are of
 4   Mr. Baker's testimony before the Ethics Commission.
 5              And so that's all I want to admit with Ms. Barham.
 6              MR. HENDRIX:  Subject to our overarching objection
 7   on the video clips from the Ethics Commission as irrelevant
 8   and prejudicial and bad character evidence, they come in, we
 9   stipulate to them.  They can come in.  We are going to ask
10   Ms. Barham to stay under subpoena so that -- and then we will
11   debate whether we can have contextual clips.
12              THE COURT:  So the parties' agreement on these
13   ethics excerpts holds as to the plan on how to handle them?
14              MR. HENDRIX:  Yes, sir.
15              THE COURT:  Good.
16              MR. HENDRIX:  Again, just so my record is clear,
17   subject, again, to my overarching objection.
18              THE COURT:  It is subject to your overarching
19   objection, which the Court has overruled, believing that the
20   limiting instruction, and perhaps more, as we go along are
21   sufficient in the circumstances.
22              MR. HENDRIX:  Yes, sir.
23              THE COURT:  So 32, 32A, B, C, D, E, F, G, H, I, J,
24   K -- and I may have gone too far.  I may have included one
25   that I wasn't supposed to, or two, but check me.
```

Stewart - Direct

1              Are all of the 32s, A through K, in subject to the

2    reserved objection and the plan to fuss about several of them,

3    or are there some that are held back?

4              MS. PETERS:  I think the fuss was in the reverse.

5    We had three clips that we fussed about from their offer

6    that's going to come up in the defense case.

7              THE COURT:  That's right.

8              Okay.  So A through K, 32, are in.

9         (Government's Exhibit Nos. 32A-32K entered into

10   evidence.)

11             THE COURT:  Good.

12             MS. PETERS:  The next witness would be Don Thomas.

13   That was Mr. Harris' witness, so I'll be preparing for him at

14   lunchtime.  And so I don't believe there will be new exhibits

15   through him, but I can confirm that at lunchtime and let

16   counsel know, and I think that will carry us through the day.

17   I really hope it does.

18             THE COURT:  Very good.

19             MR. HENDRIX:  With Mr. Thomas, we intend to try to

20   introduce defense exhibit.  They are the Arkansas Committee

21   for Economic Growth PAC records that show Mr. Thomas as an

22   officer of this PAC, defense exhibit 18.

23             MS. PETERS:  Okay.

24             THE COURT:  I think, counsel, I think we've made

25   great progress, so why don't we get our jury in and get back

Stewart - Direct

```
 1   to work, and with them.  And thank you, I very much appreciate
 2   the cooperation and the anticipation, and I'm going to tell
 3   the jury that we're going to move quicker because, counsel,
 4   this is why they had to wait a little bit, counsel were
 5   stipulating, where they could, to exhibits.
 6          Do we have any word about Mr. Harris?
 7          MS. PETERS:  May I check my phone, Your Honor?
 8          THE COURT:  You may.
 9          MS. PETERS:  The test has been taken.  Results have
10   not yet been received.  Mr. Harris has confirmed that he's
11   fine with the Court sharing the test results when we do get
12   them.
13          THE COURT:  Excellent.  That's good.  That's
14   progress.
15          I have one, two, three notes received from jurors
16   just handed to me from Officer -- I'm sorry, Officer Pike.
17   I've got lots of officers on my mind here.  I have -- Officer
18   Pike caught me in the hall after the -- on the way to the last
19   break and raised a question from a juror about, I forget what,
20   and I repeated my speech of, I don't want to get questions
21   through you from the jurors.  Have them write it down.  And so
22   thus, the notes.
23          Officer Pike, do you remember what it was that you
24   raised in the hall with me after the last break or at the
25   beginning of the last break?
```

Stewart - Direct

1         COURTROOM SECURITY OFFICER:  Yes, sir.  One of the

2   jurors stated that she knew one of the --

3         THE COURT:  Yes, that's it.  She knew somebody that

4   had been revealed on all the PAC forms.  And so, again, I

5   emphasized to Officer Pike and asked her to tell the jurors

6   not to talk to her, Officer Pike, about things, but rather to

7   put -- to write them on notes, to get it to me so that I could

8   share with counsel.

9         I want to go through, I thought about putting it

10  off, but being reminded on what the question was about, I

11  think we need to deal with them.

12        Officer Pike, will you take the jury back to the

13  jury room, and Officer Simpson will let you know when to get

14  them lined up again.  Okay?

15        COURTROOM SECURITY OFFICER:  Yes, sir.

16        THE COURT:  Tell them that we've been working on

17  exhibits and to speed things along, and now we need to deal

18  with their notes.  Okay?

19        COURTROOM SECURITY OFFICER:  Yes, sir.

20        THE COURT:  Thank you.

21        Y'all can be seated or not as you choose, counsel.

22  Mr. Stewart, you can sit down or go back or whatever.

23        THE WITNESS:  Thanks.

24        THE COURT:  All right.  This is from juror number 3,

25  front row here at that end:  "I recognize Don Thomas' home

Stewart - Direct

```
 1   address.  My mother used to take care of his wife's mother and
 2   sister in their home years ago.  She also watched her husband,
 3   Don in quotation marks, for a short time a couple months ago.
 4   She does not work for them now.  I do not feel this will
 5   affect my decision in any way, just wanted to let the
 6   situation be known."
 7            Ms. Peters?
 8            MS. PETERS:  Is the question whether I'm okay with
 9   juror number 3?
10            THE COURT:  Yes.
11            MS. PETERS:  The answer is "yes".
12            THE COURT:  Mr. Hendrix?
13            MR. HENDRIX:  Good for us.
14            THE COURT:  Good.  This will be Court's exhibit
15   number 3, and I'll tell juror number 3 when we come back in,
16   it's fine, thank you, you can sit.
17            Next from juror number 5:  "Judge Marshall, when you
18   stated that we can do whatever we want to do, does that mean
19   we're still getting paid for Friday?"
20            No, I'll tell juror number 5 that they don't get
21   paid.
22            THE WITNESS:  It's an important question.
23            THE COURT:  Yeah.  That will be Court's exhibit 4.
24            The next Court's exhibit, 5, this is from juror
25   number 9:  "Out of an abundance of caution, I just wanted to
```

1  mention that someone I'm pretty sure I know, a lawyer, stepped

2  into the gallery this morning.  We don't know each other well,

3  and I haven't seen him in years.  At one time we were in a

4  Sunday school class together, juror number 9.  P.S., the

5  lawyer's name is Jeff Wankum."

6          MR. HENDRIX:  You know what?

7          AUDIENCE MEMBER:  Yeah, he was here briefly.

8          MR. HENDRIX:  Was it Wankum or Gilham?

9          THE COURT:  It was Luc Gillam.  I saw Luc Gillam

10  come in, but I didn't see Mr. Wankum, but he may well have

11  wandered in.  We've had a lot of visitors.

12          AUDIENCE MEMBER:  One of the two Wankums was sitting

13  behind me.  He's got a brother, right?

14          MR. HENDRIX:  I always, frankly, get Luc and Jeff

15  mixed up because they look alike to me.

16          THE COURT:  Our record will reflect that that's the

17  retired Brannon Sloan speaking from the gallery who testified

18  earlier in the trial and has been attending, like any citizen

19  is free to do.

20          That's helpful.  I'm going to tell juror number 9,

21  unless, Ms. Peters, you have an objection, that that's fine,

22  don't worry about it.

23          MS. PETERS:  I'm fine with that.  I was just going

24  to say I don't believe he represents any witness or has any

25  involvement.  He just is an interested spectator.

Stewart - Direct

1           THE COURT:  My hunch is that any lawyer who is near

2    the courthouse is kinda stopping by to see what all's going on

3    in various courtrooms at the moment, including ours.

4           Well, all this is a relief to me, at least; and

5    what's my court exhibit on this, Sherri?

6           THE COURTROOM DEPUTY:  Five.

7           THE COURT:  Five.  Okay.  That was quicker than I

8    thought.  Does anybody need to step down the hall before we

9    resume with Mr. Stewart?

10          MR. HENDRIX:  Two minutes?

11          THE COURT:  Of course.  That's why I asked.

12          Ms. Peters?

13          MS. PETERS:  I'm fine, Your Honor.

14          THE COURT:  Okay.

15          MR. HENDRIX:  Be right back.

16          THE COURT:  Yes, we'll take a break in place for

17   whatever anyone needs to do.

18          We ready, Blake?

19          MR. HENDRIX:  Yes, sir.

20          THE COURT:  Julie?

21          MS. PETERS:  Yes, Your Honor.

22          THE COURT:  All rise for our jury.

23          COURTROOM SECURITY OFFICER:  One was in the

24   washroom.

25          THE COURT:  I see.  Well, we can stretch our legs

Stewart - Direct

1    and get ready for them.

2              Officer Pike, do we have our 14?

3              COURTROOM SECURITY OFFICER:  Yes, sir.

4              THE COURT:  Very good.  Bring them in.

5        (The jury enters the courtroom.)

6              THE COURT:  Y'all can be seated.

7              Ladies and gentlemen, thanks for your patience with

8    us.  The break that went longer than expected, the good news

9    is the lawyers have been rolling on, admitting or agreeing to

10   what exhibits can come in.  So I've had stipulations from them

11   on about 20 or 25 items, and that will make things go quicker.

12   I appreciate their work on that.

13             I thank you, too, for these notes on case-related

14   matters.  As I said a day or two ago, this is how we need to

15   communicate about such things.  Don't ask Officer Pike.  Write

16   a note to me if it's anything of substance about the case.

17   Officer Pike is your shepherd, and she takes care of the

18   snacks and the food and the getting you here and there and

19   whether you're hot or you're cold or things like that, but

20   substance matters need to come to me.

21             Juror number 3, you asked about the connection with

22   Don Thomas, whose name just came up on some of those forms.

23   Don't worry about that.  Thank you for telling us.  It's fine,

24   you can continue to sit.  Okay?

25             A JUROR:  Yes, sir.

Stewart - Direct

1          THE COURT:  Good.  But thanks for telling us.

2          Juror number 5, on the payment for Friday, no, no

3  juror payment on Friday.  Maybe we could find something for

4  you to do around here if you come up, but I can't pay you for

5  being a juror when we won't be sitting that day.  I'm sure

6  others have wondered about that, too.

7          Juror number 9, thank you for mentioning the lawyer

8  that you knew who came into the gallery and left.  We've got

9  lots of visitors that are coming and going.  Thank you for

10  telling us.  You can continue to sit in the case.  I don't

11  think that the lawyer -- I don't believe that this lawyer has

12  any connection with the case other than curiosity.

13          Juror number 9.  No?  One, two, three -- y'all are

14  trying to confuse me -- four, five, six, seven, eight -- it's

15  juror number 8?  Okay.  All right.  Thank you, juror number 8.

16          All right.  Everybody doing okay in general?  Good.

17  We're still waiting to hear back on Mr. Harris.  He's still at

18  the doctor.  I hope to have some clarity on that by the end of

19  the lunch hour, and I'll get back to you.  Okay?  Good.

20          Ms. Peters -- Mr. Stewart, you know, as a member of

21  the Bar, you're still on your oath notwithstanding the break.

22          THE WITNESS:  Yes, Your Honor.

23          THE COURT:  Ms. Peters.

24          MS. PETERS:  Thank you, Your Honor.

25  BY MS. PETERS:

Stewart - Direct

1   Q    I think when we left off you said that Mr. Baker would

2   inform you by text or e-mail what amounts to write from the

3   PACs and what to where?

4   A    Yes.

5   Q    When you wrote those checks, what did you do with them?

6   A    I would leave them at my front desk to be picked up.

7   Q    Do you know who was picking them up?

8   A    Most of the time -- well, it was one of two people.  It

9   was Mr. Baker or Linda Leigh Flanagin.

10  Q    I'd like to talk to you now about something involving

11  Arkansans for Lawsuit Reform.

12  A    Okay.

13  Q    And in November of 2013, did you have a conversation at

14  the ALR or at Mr. Parks' office with Mr. Parks and Mr. Baker

15  about a bonus?

16  A    Yes, ma'am.

17  Q    Or what was later represented to be a bonus?

18  A    Yes, ma'am.

19  Q    What specifically was said to you and by whom at that

20  conversation?

21  A    Mr. Baker and Mr. Parks and I were standing in Mr. Parks'

22  office, and we were having general discussion, and Mr. Baker

23  said, you know, Chris, if we were to pay you a bonus from

24  Arkansans for Lawsuit Reform, would you be willing to write

25  checks to Maggio for Judge, and he said, would you write a

Stewart - Direct

```
 1   check from -- for yourself and write a check in your wife's
 2   name and write a check from Stewart Law Firm?
 3   Q    So he wanted you to give $6000?
 4   A    Correct.
 5   Q    Because that's the max each person can give?
 6   A    Yes, ma'am.
 7   Q    And how much was the bonus supposed to be?
 8   A    Well, at the time, I was not told how much the bonus was
 9   going to be.  He just said it'll -- when you receive the check
10   you'll know, and when you get it, just be sure and invoice us
11   for that.
12   Q    What amount did you -- were you ultimately provided?
13   A    I received a check for $8000.
14   Q    What did Mr. Baker ask you to do with the money?
15   A    He asked me to donate to Maggio for Judge.
16   Q    Before you made these three, or you, your wife and your
17   business made these three $2000 contributions, what was the
18   largest contribution you had ever made to a candidate?
19   A    I had given $1000 to Mitt Romney.
20   Q    When he ran for president?
21   A    Yes, and I believe I had given $500 to Mike Huckabee when
22   he ran for president.
23             MS. PETERS:  Could we look at Government Exhibit 34A
24   and 35A?  Actually start with 34A.
25             THE COURT:  Ms. Peters, are you moving to another
```

Stewart - Direct

1    subject, or is that more?

2              MS. PETERS:  It's more of the same subject, Your

3    Honor.

4              THE COURT:  You let me know when you get done so I

5    can speak to the jury briefly on this subject about the

6    strawman.

7              MS. PETERS:  Oh, okay.  Yes, Your Honor.

8    BY MS. PETERS:

9    Q    Are these the three checks -- excuse me, not three

10   checks, just the top check there, they're all admitted, but

11   looking at the top check, Arkansans for Lawsuit Reform to

12   Stewart Law Firm for $8000.

13   A    Yes.

14   Q    Is this the check you received as a result of your

15   conversation with Mr. Baker?

16   A    Yes, Your Honor -- or, yes, ma'am.

17   Q    I wish, but . . .

18   A    I know.

19             THE COURT:  You deserve that, Ms. Peters.  We'll

20   promote you.

21   BY MS. PETERS:

22   Q    November 22nd of 2013 it's dated?

23   A    Correct.

24   Q    And Government Exhibit 35A, please.

25             Is this the invoice you sent in return?

Stewart - Direct

1    A    Yes, it is.

2    Q    And which came first, the check or the invoice?

3    A    The check.

4    Q    And on there it says legal fees.  Was it really for legal

5    fees?

6    A    No, it was not.

7         MS. PETERS:  Can we look at Government Exhibit 24?

8    BY MS. PETERS:

9    Q    Here, Mr. Baker, on November 21st of 2013, is texting

10   you:  "Thanks.  Remember, three 2K checks to Maggio for

11   Judge."  What did that mean?

12   A    He was reminding me to get my donations written for Judge

13   Maggio.

14   Q    And that November 21st text, that's the same date that

15   was on the ALR check to you?

16   A    Yes, ma'am.

17        MS. PETERS:  If you could scroll down to

18   November 25th.

19   BY MS. PETERS:

20   Q    Here, Mr. Baker says:  "When can I get the 6K of PAC

21   checks and the three 2K checks from you for Maggio?"

22        So 6000 in PAC checks and your three $2000 checks

23   for Maggio?

24   A    Correct.

25   Q    So that was four days later he's asking you again for

Stewart - Direct

```
 1   your three checks?
 2   A    Correct.
 3            MS. PETERS:  Could you scroll down to December 5th.
 4   BY MS. PETERS:
 5   Q    And here he's -- at the bottom here he's saying mail the
 6   checks to him at his home at 17 Cooper?
 7   A    Yes, he is.
 8            MS. PETERS:  Government Exhibit 25, Your Honor.  I'm
 9   sorry.  We're going to scroll down and get to that one.
10   BY MS. PETERS:
11   Q    So this is December 5th, and he's saying:  "I'll be in LR
12   later, Little Rock later.  I need to get your check to you."
13            Would that be your retainer check?
14   A    Yes, ma'am.
15   Q    "And pick up the 12K judge checks."
16            "When" and "where"?
17   A    Correct.
18   Q    What did you understand him to be asking?
19   A    He was asking -- he was asking, again, for the three
20   donation checks from me and for the contribution checks from
21   the political action committees.
22   Q    And your response to him was, well, first, the baby came
23   early is what you said before.  And then after, you said:  "I
24   have had to order checks for my personal bank account.  Should
25   be in soon.  We just don't write checks."
```

Stewart - Direct

1    Explain what was going on here.

2  A    Well, my wife and I were expecting our third child, and

3  we were in the hospital for several days and just couldn't

4  deal with other things that were going on, but he continued to

5  text me.  And then he says, you know, he's going to come back

6  into town, wants to pick up the checks.  And then I'm saying,

7  well, we don't write personal checks because we pay all of our

8  bills online, I'm going to have to go out of my way and order

9  personal checks so I can write these checks to Maggio.

10        MS. PETERS:  Can we look at Government Exhibit 36A,

11  B and C.

12  BY MS. PETERS:

13  Q    Are these the three checks that you wrote to Judge

14  Maggio's campaign?

15  A    Yes, they are.

16  Q    The first one is from your law firm?

17  A    Correct.

18  Q    $2000?

19  A    Yes, ma'am.

20  Q    And that's the maximum amount a corporation or a person

21  or a PAC could give?

22  A    At that -- at that time, yes, ma'am.

23  Q    The next one is Chris Stewart?

24  A    Yes, ma'am.

25  Q    And the next one -- sorry, that was 36B.

Stewart - Direct

1    36C, you circled the name Julie.

2  A    Correct.

3  Q    Is that your wife, Julie Stewart?

4  A    Correct.

5  Q    Who actually signed that check?

6  A    I did.

7  Q    What did you do with those checks?

8  A    Gave those to Mr. Baker.

9         MS. PETERS:  Your Honor, that's the end of what I'm

10  going to talk about for the strawman contributions.

11         THE COURT:  Thank you, Ms. Peters.

12         Ladies and gentlemen, a reminder of something I said

13  yesterday in the limiting instruction.  Remember that

14  Mr. Baker is not on trial for any alleged violation of

15  Arkansas campaign laws, and that's not the issue for y'all to

16  decide.  Y'all have to decide instead whether he's guilty or

17  innocent of bribery, honest services wire fraud and

18  conspiracy.

19         Again, this is context evidence for you to evaluate

20  the parties' arguments and the other proof about the

21  allegations of bribery.  That's the core issue in the case.

22  But you may not convict Mr. Gilbert of the crimes with which

23  he is charged because of, simply or solely because of any

24  violation of state campaign law or how this money was handled,

25  the strawman issue that Ms. Peters just mentioned.

Stewart - Direct

1           So, again, as I told you at the very beginning,

2  there are times when you can receive evidence for one purpose

3  but not for other purposes, or where evidence requires special

4  handling to avoid confusion or unfair prejudice.  That's what

5  we've got here on all this state finance campaign proof.

6  Everybody with me?  I see nodding heads up and down the line.

7           I'm sorry, juror number 4.  Well, go ahead.  What's

8  your question?

9           A JUROR:  So are you saying stuff she just presented

10  we should not look at?  Is that what you -- that's what I'm

11  trying to figure out.

12           THE COURT:  I'm not saying that, so thank you for

13  stopping me, and let me try again.

14           You can look at it.  I've admitted into evidence

15  this proof that the government is offering about how the money

16  flowed, how the campaign contributions were done, but -- and

17  you can consider that evidence as context, understanding and

18  for deciding whether Mr. Baker is guilty of the federal crimes

19  charged:  Bribery, conspiracy and honest services wire fraud.

20           But you may not convict Mr. Baker of one of those

21  federal crimes simply because he may not have turned square

22  corners, done things exactly right, under the state campaign

23  laws.  Because those federal crimes, as I'll tell you at the

24  end of the case, have many elements to them.

25           This, all of this proof that I've allowed the

Stewart - Direct

1    government to offer about the state campaign finances and how

2    things were done, the government's going to argue to you how

3    you should -- how that fits in and why that's important, why

4    it, in their view, makes it more likely than not that one of

5    the federal crimes was committed.

6            On the other hand, Mr. Baker's counsel will argue to

7    you, no, there are explanations for all of this, here's what

8    happened, here's what didn't happen.  But the evidence about

9    the state campaign alleged violations is context only.  You

10   with me?  You with me now, juror number 4?  Okay.  I got a

11   thumbs up.

12           Everybody else with -- raise your hand, please, if

13   you understand that.  I see 14 hands from our 12 and two

14   alternates.  Thank you.

15           Ms. Peters, thank you for pausing and telling me

16   where we were.

17           MS. PETERS:  Thank you, Your Honor.

18   BY MS. PETERS:

19   Q    I'd like to talk to you now about some of the PAC checks

20   that you wrote to Judge Maggio's campaign.  Again, you were

21   the person signing the PAC checks; is that right?

22   A    Correct.

23           MS. PETERS:  And could we look at Government

24   Exhibit 50?

25   BY MS. PETERS:

Stewart - Direct

1   Q     This is The Thomas Group In PAC.  Did you write this

2   check on December 5th for $2000 to Maggio for Judge?

3   A     I did.

4             MS. PETERS:  Can we look at 51, please?  Government

5   Exhibit 51.

6   BY MS. PETERS:

7   Q     DBH2 PAC, $2000, Maggio for Judge, December 5th, 2013.

8   You wrote both of those?

9   A     Correct.

10  Q     Who directed you to write those checks?

11  A     Mr. Baker.

12  Q     Government Exhibit 52, Judicial Reform PAC, $500 to

13  Maggio for Judge on December 31st.  Did you write that check?

14  A     I did.

15  Q     And Government Exhibit 53, also on December 31st, $500

16  from CPI PAC.  And I notice here it says Conservation Persons

17  In, whereas previously it said Conservative Persons In.  Do

18  you know why?

19  A     Looks like there was just a misprint on the check, but

20  the name of the PAC is Conservative Persons In.

21  Q     Both of those on December 31st, you wrote both those

22  checks?

23  A     Yes, ma'am.

24  Q     And who directed you to write them?

25  A     Mr. Baker.

Stewart - Direct

1   Q    The PACs had received the money in July?

2   A    Yes, ma'am.

3   Q    And at some point did you start having a conversation

4   with Mr. Baker about getting money out to more candidates?

5   A    Yes, I did.  You know, there -- to me, as an agent of the

6   PAC and an officer of each of these PACs, I was concerned

7   about where all this money was going, and I had a conversation

8   with him on the telephone, and I said, we need to get together

9   and write checks from these PACs to candidates.

10          That's what these PACs are for is to find candidates

11   that support these issues, and we distribute the money, as I

12   understood it from our breakfast and for the reason we

13   started -- he directed me to start so many PACs.  And I was

14   pressuring him or pushing him on the issue to write checks,

15   and I said, we need to write -- we need to get this money

16   given to other candidates, and he snapped back on the phone,

17   and he goes, well, this money is earmarked for Maggio.

18   Q    What did you think about that?

19   A    When he said that I was shocked.  I was very concerned,

20   because at that time I had not heard that.  He had not

21   mentioned that to me.  He had not said that all of this money

22   was going to be for Maggio, and that was the first time that I

23   had heard that, and it was contrary to my belief and

24   understanding as to what these PACs were meant to do.

25   Q    And you all did ultimately send money to some other

Stewart - Direct

1  candidates in addition to Judge Maggio?

2  A    Correct.  Very few.

3        MS. PETERS:  Could we look at Government Exhibit 26?

4  BY MS. PETERS:

5  Q    This is a text message from Mr. Baker December 20th:

6  "Need Judge Maggio checks."  December 26th:  "Need to connect

7  on Maggio checks today.  I'll be in Little Rock today."  And

8  then you told him you had mailed them?

9  A    Correct.  This was the day after Christmas.

10 Q    Government Exhibit 27.  This is Mr. Baker telling you on

11 Christmas -- no, New Year's Eve:  "Urgent.  I need you to find

12 a thousand more from your PACs in any denomination, five, 250,

13 250, whatever.  Maggio for Judge, dated today, thanks."

14 A    Yes, ma'am, New Year's Eve.

15 Q    And on December exhibit 28, January 4th he says:  "I

16 haven't received the Maggio check."  And you reply:  "In my

17 desk, dated the 31st."

18 A    Correct.

19 Q    And was the 31st the end of the quarter?

20 A    It was the end of the quarter, and it's the end of the

21 year.

22 Q    In January of 2014, did you send letters to the PAC

23 officers to update them on the PACs?

24 A    I did.

25 Q    And what addresses did you use to send those letters?

Stewart - Direct

```
 1   A    I used the addresses that Mr. Baker provided to me for
 2   each of the PAC officers.
 3   Q    Did any of those letters come back to you?
 4   A    Yes.
 5   Q    Which ones that you remember?
 6   A    The one that I remember that came back was Mr. Ancil
 7   Lea's letter came back.
 8   Q    Meaning undeliverable?
 9   A    Yes, came back as undelivered.
10        MS. PETERS:   Government Exhibit 29, please.
11   BY MS. PETERS:
12   Q    This is an e-mail, info requested.   It looks like
13   Mr. Baker is asking you how much is left in each of the PACs?
14   A    Yes.   He had called me and asked to give him a breakdown,
15   a balance of how much money was remaining in each of the PAC
16   bank accounts.
17   Q    So you started with $3000 per pack?
18   A    Yes, ma'am.
19   Q    You took out $500 from each PAC for your fees?
20   A    Correct.
21   Q    And you would have left $2500?
22   A    Yes, ma'am.
23   Q    To give out to candidates?
24   A    Correct.
25   Q    And these are the balances as of January 7th?
```

Stewart - Direct

1    A    Yes, ma'am.

2         MS. PETERS:  Government Exhibit 30, please.  Could

3    you please get to the middle part here?

4    BY MS. PETERS:

5    Q    Okay.  This is a little tricky, but Government Exhibit 20

6    -- Government Exhibit 30.  This is an e-mail from Mr. Baker to

7    you?

8    A    Yes.

9    Q    And that's on January 23rd?

10   A    Correct.

11   Q    He's telling you where to send the PAC money?

12   A    He is.  He's directing me on where -- how much money to

13   write to certain candidates out of each political action

14   committee.

15   Q    Okay.  And I see there there's some for Hurst?

16   A    Yes, ma'am.

17   Q    Maggio, Holland, Hurst, Maggio, Holland.  Anyway, we're

18   going to look at each one with the checks themselves.

19        THE COURT:  My tree admonition is waived on this

20   one, Ms. Peters.

21        MS. PETERS:  Thank you, Your Honor.

22        THE COURT:  It's a jumble, and if you want to take

23   the witness through it in some detail, please do so.

24        MS. PETERS:  Thank you, Your Honor, very much.

25        Could we compare this with Government Exhibit 54?  I

 1   don't know if we can still see it.

 2   BY MS. PETERS:

 3   Q    Okay.  Government Exhibit 54 is a checks you wrote to

 4   Citizens for Information Technology on January 28th; is that

 5   right?

 6   A    Correct.

 7   Q    And that was $1450?

 8            THE WITNESS:  Your Honor, the exhibit's just left my

 9   screen, for some reason.

10            THE COURT:  Did you happen to bump the screen?

11            THE WITNESS:  No, sir.

12            THE COURT:  Just one?

13            A JUROR:  It left our screen, too.

14            THE COURT:  It left y'all's screen because Ms. Black

15   says 54's not in evidence yet.

16            THE COURTROOM DEPUTY:  I may have missed it.

17            THE COURT:  Let me check my list.  She's saving us

18   from ourselves here.

19            THE COURTROOM DEPUTY:  I've got through 53.

20            MS. PETERS:  I'm sorry, Your Honor.  May I confer

21   with defense counsel for a moment?

22            THE COURT:  You may.  I think we stopped at 53 when

23   I pulled the plug and said, let's get the jury back to work

24   when y'all were in your stipulation cooperation there during

25   the break.  So y'all confer.

Stewart - Direct

1            MS. PETERS:  Defense counsel is stipulating to the

2    admission, subject to their objection, of exhibits 54, 55, 56,

3    57, 58, 59 and 60.  May they be received?

4            THE COURT:  Mr. Hendrix, yes?

5            MR. HENDRIX:  Yes, sir.

6            THE COURT:  Received, subject to the Court's prior

7    evidentiary rulings, of course, and objections, 54 through 60

8    are received.

9        (Government's Exhibit Nos. 54 through 60 entered into

10    evidence.)

11            THE COURT:  Thank you, Ms. Black, for catching that.

12    Now, you can publish 54, as well.

13            MS. PETERS:  Thank you, Your Honor.

14            THE COURT:  And I have to say this is really small

15    stuff.  I don't know about y'all's eyes, ladies and gentlemen,

16    but I'm struggling here.  So if you can blow it up, that would

17    help.

18            MS. PETERS:  We're going to zoom in on it.

19            THE COURT:  Good.

20    BY MS. PETERS:

21    Q    Okay.  So we are at Citizens for Information Technology

22    PAC, CIT PAC.  On January 24th you wrote a check for $1450

23    from that PAC, and to Judge Maggio's campaign.  And here in

24    the e-mail from Mr. Baker, that's Government Exhibit 30 on

25    January 23rd, he's asking you to send 1.5K, so $1500, to CIT

Stewart - Direct

1  PAC.

2  A    Yes, ma'am.

3  Q    From CIT PAC to Mr. Maggio?

4  A    Correct.

5  Q    Why did you only send $1450?

6  A    That was the remaining balance in that PAC account.  So I

7  could not send 1500, so I sent 1450 at my client's direction.

8  Q    And looking next at Government Exhibit 58, next to

9  Government Exhibit 30.  This is the Judicial Reform PAC.  This

10  is a check you wrote on January 28th of 2014 for a thousand

11  dollars to Maggio for Judge?

12  A    Yes, ma'am.

13  Q    And that is $1000, again.  And did you do that because

14  Mr. Baker sent you this message telling you to use a thousand

15  dollars to Maggio for Judicial Reform?

16  A    Yes, ma'am.

17          MS. PETERS:  Could we look at Government Exhibit 55

18  next to Government Exhibit 30.

19  BY MS. PETERS:

20  Q    Here, Conservation Persons In PAC, but we know it's CPI

21  or Conservative Persons In PAC.  Again, on January 28, 2014,

22  Maggio for Judge, $1000.  And right there --

23          MS. PETERS:  Can we un-highlight what we had before,

24  Judicial Reform, un-highlight and just do CPI?

25  BY MS. PETERS:

Stewart - Direct

1   Q    Okay.  There we go.  I said it's a little bit confusing,

2   but I have it drawn out on my paper with brackets, which

3   helps.

4           So CPI, 1K, Maggio.

5   A    Yes.

6   Q    So did you send this thousand-dollar check to (sic) the

7   CPI PAC because Mr. Baker told you to?

8   A    Yes, I wrote it out of the CPI PAC to Maggio at the

9   direction of my client, Mr. Baker.

10          MS. PETERS:  Could we look at Government Exhibit 56

11  next to 30?

12  BY MS. PETERS:

13  Q    This is a check from the DBH2 PAC you wrote for a

14  thousand dollars January 28th, 2014, to Maggio for Judge.

15  Again, did you do this because of the e-mail that Mr. Baker

16  sent you on January 23rd?

17  A    Yes, ma'am.

18          MS. PETERS:  Government Exhibit 57, please, next to

19  30.

20  BY MS. PETERS:

21  Q    This is a $250 check you wrote from the Go Good

22  Government PAC January 28th to Maggio for Judge.  Did you do

23  that because Mr. Baker told you to send $250 to Go Good --

24  from Go Good Government?

25  A    Yes, ma'am.

Stewart - Direct

```
 1          MS. PETERS:  Now, can we -- yeah.
 2          Looking at Government Exhibit 30 here, could you
 3   highlight red AR and 1Maggio?
 4   BY MS. PETERS:
 5   Q    Now, here, Mr. Baker is telling you to send a thousand
 6   dollars to Maggio from the Red Arkansas PAC?
 7   A    He is.
 8   Q    That's how you understood that?
 9   A    Correct.
10   Q    And you didn't write a check from Red Arkansas?
11   A    No, ma'am.
12   Q    Why would you not have written a check?
13   A    Money was not available from that PAC.
14   Q    So you had spent it, you think?
15   A    Correct.
16   Q    Or the PAC had spent it?
17   A    Correct.
18          MS. PETERS:  Okay.  Let's look at Government
19   Exhibit 59, next to 30.
20   BY MS. PETERS:
21   Q    Government Exhibit 59 is Taxpayers for Change PAC to
22   Maggio for Judge, $1000, written January 28th, 2014.  Again, I
23   know this is getting to be an obvious question, but you did
24   this because Mr. Baker instructed you to in his e-mail of
25   January 23rd?
```

Stewart - Direct

```
 1   A     Correct.  Yes, ma'am.

 2              MS. PETERS:  And Government Exhibit 60 next to 30.

 3   BY MS. PETERS:

 4   Q     The Thomas Group In PAC, $250 to Judge Maggio.  That's on

 5   Government Exhibit 60, again, January 24th.  And did you write

 6   that check because that's what Mr. Baker told you to do in

 7   Government Exhibit 30, the e-mail of January 23rd?

 8   A     Yes, ma'am.

 9   Q     So did you direct where any of the PAC money was going?

10   A     No, ma'am.

11   Q     Did you have any fundraising responsibilities with the

12   PACs?

13   A     I did not.

14   Q     At some point there became a public controversy about the

15   PACs; is that right?

16   A     Yes, ma'am.

17   Q     Around March of 2014?

18   A     Correct.

19   Q     At that point, were you contacted by some of the PAC

20   officers?

21   A     I was.

22   Q     And as a result of what they told you -- well, what did

23   they tell you?

24   A     Well, first, I received a fax from Cheryl Loechter out of

25   the blue that just --
```

Stewart - Direct

1    MS. DEPPER:  Objection, Your Honor.

2    THE COURT:  Sustained, hearsay.

3    MS. PETERS:  I'm trying to get to --

4  BY MS. PETERS:

5  Q    What did you do after you got these communications?

6  A    So I received communication from PAC officers, who I

7  thought were PAC officers, and I had to remove them from being

8  officers of the PACs because they had no knowledge of the

9  PACs, and nor were they aware that they were ever listed as

10 officers on these PACs.

11 Q    So what did you do?

12 A    Well, I had to file amendments with the Secretary of

13 State's office to get them removed as officers on these PACs,

14 and I had to call my client and have a conversation with him

15 as to what was going on and why did these people not know that

16 they were officers on these PACs that I filed as an agent with

17 my signature on it that was correct information.

18 Q    Do you have any recollection of what happened during that

19 conversation or what Mr. Baker said?  I can see you feel

20 emotional about it.

21 A    Well, not specifically as to what he -- what he said,

22 because I know as a result of that information, of me learning

23 that these PAC officers didn't know that there was a PAC or

24 that their names are listed as registered PAC officers, I knew

25 that there was a major issue.  Something was going on, and all

Stewart - Direct

1    the facts were not clear to me.

2              And it was in one of those conversations that I

3    fired Mr. Baker as my client because he had not been honest

4    and not truthful about who were these PAC officers, and I was

5    dealing with the fallout of that.

6    Q    During the time that you set up these PACs for Mr. Baker,

7    were you hurting for business?

8    A    No, ma'am.

9    Q    Your law firm was prospering?

10   A    Yes, ma'am.

11   Q    In April of 2014, you approached the FBI; is that right?

12   A    I did.

13   Q    And why did you approach the FBI?

14   A    Well, because of the controversy that was surrounding the

15   political action committees and the fact that I was, one,

16   being contacted by PAC officers out of the blue, that they

17   were not members of these PACs; two, there were statements in

18   the newspapers as to individuals were being --

19   Q    Let me stop you, because I don't want to get into

20   hearsay.

21   A    Gotcha.

22   Q    I guess what I'm getting at is, were you concerned about

23   what you had gotten involved in?

24   A    Yes, absolutely.

25   Q    And so you brought your e-mails and text messages and

Stewart - Direct

1   that envelope and that list from Mr. Baker --

2   A    Correct.

3   Q    -- you gave that all to the FBI?

4   A    Yes, because, also because I heard about the -- what

5   really prompted me at some point is when I found out about the

6   lawsuit in Conway that was related to Maggio, that was related

7   to Mr. -- that Mr. Baker had known about, and that Mr. Morton

8   was involved, and that I had set up these PACs, it -- I was

9   shocked.

10        I was -- and at that point, I said, okay, I need to

11   go and talk to the FBI.  I need to go in and set this record

12   straight.  I need to let them know what has happened in this,

13   because I was concerned.

14   Q   And when you approached the FBI, you did that through a

15   lawyer?

16   A    I did, absolutely.

17   Q   And you accepted a grant of immunity?

18   A    I did.

19   Q   Did you provide the FBI everything it asked for?

20   A    I provided everything you asked for, and I did it

21   voluntarily, and I was actually offered immunity prior to me

22   ever making a statement to you or handing you any information.

23        MS. PETERS:  Your Honor, may I have a moment?

24        THE COURT:  You may.

25        MS. PETERS:  Your Honor, that concludes direct

Stewart - Direct

```
 1   examination.  Before we do cross, can I show something to
 2   counsel and give it to the courtroom deputy?
 3           THE COURT:  Absolutely.
 4           MR. HENDRIX:  A relief.
 5           THE COURT:  Indeed.  Thank you, Ms. Peters.
 6           Ms. Depper, let me talk to the jury about this.
 7           MS. DEPPER:  Absolutely, Your Honor.
 8           THE COURT:  I've got good news, ladies and
 9   gentlemen.  Mr. Harris is just sick.  Yeah, yeah.  So at the
10   lunch hour we will stand down on the arrangements that the
11   Court was making for everybody to have tests here and all of
12   that at the end of the day, and we will breathe a sigh of
13   relief.
14           I will say that the quick tests are not perfect.
15   Remember, they're imperfect.  And so I encourage everyone to
16   be vigilant and keep wearing your masks and wash your hands,
17   and if you get to feeling sick, go get tested and let us know
18   so that we can do what we can to help take care of you.
19           Thank you, Ms. Peters, for the note.  I think I'm
20   going to keep this.
21           MR. HENDRIX:  Does that mean he's coming back?
22           THE COURT:  Yeah, now that's the question that
23   Mr. White wants to know, when does he get loose and Mr. Harris
24   come back, get in harness.
25           All right.  Ms. Depper.
```

Stewart - Direct

1          MS. DEPPER:  Your Honor, if I may, I think there's

2    some exhibits that I'm going to introduce that maybe the

3    government might stipulate to that move us along.  It involves

4    PAC records similar to the government's and some other letters

5    they believe Mr. Stewart is aware of.

6          THE COURT:  Good.  Do you think, counsel, you can

7    handle that with counsel at the moment?

8          MS. DEPPER:  I can.

9          THE COURT:  Let's do that.

10         Ladies and gentlemen, be patient with us.  The

11   lawyers are cooperating to move things along.

12         Ms. Depper, what do you plan to use?

13         MS. DEPPER:  I plan to use, Your Honor, 11A through

14   I believe 11H.

15         THE COURT:  Defense 11A.  Any objection?

16         MS. PETERS:  No objection to 11A through 11H.

17         THE COURT:  11A, 11B, 11C, 11D, 11E, 11F, 11G and

18   11H are admitted into evidence.

19      (Defense Exhibit Nos. 11A through 11H entered into

20   evidence.)

21         MS. DEPPER:  Thank you, Your Honor.

22         And then also I will be moving for admission of

23   defense exhibits 14 and 15.

24         MS. PETERS:  No objection, Your Honor.

25         THE COURT:  Defense exhibits 14 and 15,

Stewart - Cross

```
 1   correspondence involving Mr. Stewart, are admitted.

 2         (Defense Exhibit Nos. 14-15 entered into evidence.)

 3              MS. DEPPER:  Thank you, Your Honor.

 4              THE COURT:  Thank you, Ms. Depper.  Good work, and

 5   you may examine --

 6              Mr. Stewart, you doing okay?

 7              THE WITNESS:  Doing well, thank you.

 8              THE COURT:  Got water?

 9              THE WITNESS:  Got it.

10              THE COURT:  Good.

11                        Cross-Examination

12   BY MS. DEPPER:

13   Q    Good morning, Mr. Stewart.  How are you?

14   A    I'm well, thanks.  How are you?

15   Q    Good.  My name is Annie Depper, and we have not met

16   before, have we?

17   A    We have never met.

18   Q    Okay.  I want to go over a few issues with you that are

19   brought up in your direct testimony.

20   A    Okay.

21   Q    And then we'll go through some PAC records which may get

22   a little clunky, but I'll try to move it along.  Okay?

23   A    Okay.

24   Q    First, I want to talk to you about a statement that you

25   made during your direct testimony.  I believe you stated that
```

Stewart - Cross

```
 1   Mr. Baker came up with all the PAC names; is that correct?
 2   A    If that's what I said, then I would not object to that,
 3   no.
 4   Q    Okay.  You've also been interviewed in the past, right?
 5   You've given interviews to the FBI; is that correct?
 6   A    Correct.
 7   Q    You've also been deposed in a civil lawsuit; is that
 8   correct?
 9   A    Yes.
10   Q    Okay.  And you have also given a statement to the Ethics
11   Commission; is that correct?
12   A    Yes.
13   Q    And do you remember in May of 2014 is when you were
14   interviewed at the Ethics Commission?
15   A    It -- I -- yes.
16   Q    Okay.  And when you were interviewed by the Ethics
17   Commission, you were sworn in; is that correct?
18   A    Yes.
19   Q    Okay.  And do you remember that that was conducted by a
20   woman named Jill Barham?
21   A    Yes.
22   Q    Okay.  If you'll bear with me, I'm going to pull up some
23   information from that testimony.
24              THE COURT:  And Ms. Depper, if I may interrupt?
25              MS. DEPPER:  Yes, Your Honor.
```

Stewart - Cross

1          THE COURT:  Are we in the impeachment neighborhood

2   or the refreshment neighborhood?

3          MS. DEPPER:  I believe, Your Honor, we're going to

4   be in the impeachment neighborhood.

5          THE COURT:  Okay.  So, ladies and gentlemen, on

6   these other statements, you can consider them to determine

7   whether Mr. Stewart is testifying truthfully today.  Remember

8   my instruction to you about weighing the witness' credibility?

9   That's why you're going to see and hear information about

10  statements made at another time, but you may not consider

11  those statements at another time as substantive evidence about

12  what actually happened.

13          Instead, they are a lens, and only a lens, for you

14  to look through in deciding with what -- deciding whether what

15  Mr. Stewart has said today is true or not.  I realize that's a

16  fine distinction, but do your best to observe it.

17          Ms. Depper.

18          MS. DEPPER:  Yes, Your Honor.

19  BY MS. DEPPER:

20  Q    And so, Mr. Stewart, we had talked about this Ethics

21  Commission testimony.  You were sworn at the time, again,

22  correct?

23  A    Absolutely.

24  Q    Okay.  And at that Ethics Commission testimony, let's

25  look at page Bates number 3408.  And Mr. Stewart, in that

Stewart - Cross

1    testimony, Ms. Barham asked you:  "How did you know what to

2    name the PACs?"

3            You stated:  "Um, there, what -- that was -- my

4    client gave me some information on, on, on, on some of the, on

5    the names.  And then also I came up with some of the names.

6            "Ms. Barham:  Okay.  So he suggested some and then

7    you suggested some?"

8            And you stated:  "Yes, yes."

9            Do you see that?

10   A    I do.

11   Q    Okay.  If we can move to page 3413.  And about halfway

12   down that page Ms. Barham asks you:  "Okay.  Um, so, uh, the

13   PACs' officers came from Mr. Baker?  So y'all worked together

14   to come up with the names?"

15           And you said:  "Correct."

16   A    Yes.

17   Q    I want to move forward with some of your direct

18   testimony, and you stated to Ms. Peters, and I think, correct

19   me if I'm wrong, that sometime around July, Mr. Baker told you

20   that the money in the PACs was earmarked for Mr. Maggio; is

21   that correct?  Did I understand that correctly?

22   A    Not in July.

23   Q    Okay.  When did he tell you that?

24   A    It was the end of the year, and I believe she said

25   December, and I agreed with that.

Stewart - Cross

```
1    Q     Okay.

2    A     It was a telephone conversation.

3    Q     Okay.  Let me look at one thing real quick.

4          And, again, let's go to your Ethics Commission

5    testimony, again, sworn during this testimony.  And let's go

6    to 3469.  Do you see that, Mr. Stewart?  Is that in front of

7    you?

8    A     Yes.

9    Q     Okay.  And we're going to be at the top of there, and

10   Ms. Barham says to you:  "Were you -- you weren't told, we're

11   starting these PACs to make contributions to a couple of

12   people in particular?"

13         You said:  "No."

14         She said:  "Or, or to Judge Maggio or --"

15         And you said:  "No, ma'am.  And actually the first,

16   um, I mean the first checks that were written from these PACs,

17   I mean, went to, you know, David Sanders, Andrea Lea, Asa

18   Hutchinson" -- and you go on and on about some other officers.

19         Do you see that?

20   A     I do.

21   Q     Some other candidates.

22         MS. PETERS:  Your Honor, I think that if she's

23   asking the witness, even if it's impeachment, she's not read

24   him his whole statement, that same sentence, rule of

25   completeness.
```

1              MS. DEPPER:  And, Your Honor, I can read the rest.

2              THE COURT:  Please do.

3              I think Ms. Peters could clean it up later, but

4     better to get it all out now.

5              MS. DEPPER:  Absolutely, Your Honor.

6     BY MS. DEPPER:

7     Q    So further on in that statement you talk about the other

8     campaigns that you contributed to, and you said:

9              "Uh, so that was who they were going to first, and

10    then it was around December when I first heard Maggio's name,

11    and then we started writing a whole bunch of checks to Judge

12    Maggio."

13             Do you see that?

14    A    Yes.

15    Q    Okay.  You did not tell Ms. Barham at that time that you

16    were told the PACs were earmarked for Mr. Maggio; is that

17    correct?

18    A    Not in that statement, no, ma'am.

19    Q    Okay.  Mr. Stewart, what was your understanding about the

20    purpose of setting up those PACs?  And let me backtrack a

21    little bit.

22             You told Ms. Peters that at the time there was some

23    thought that corporations would be prohibited from

24    contributing to campaigns directly; is that right?

25    A    That's correct.

Stewart - Cross

1   Q    Had you advised any other clients on the potential of

2   setting up PACs as a way to remedy that?

3   A    I would -- without violating any privilege --

4   Q    Absolutely.

5   A    -- to other clients, I won't mention any names, but that

6   being the nature of my practice, I had several consultations

7   with other clients as to what tools may be used under the law

8   to make -- so a corporation could then have an influence on

9   politics, and how would they be able to donate.  And so, yes,

10  there were other conversations with potential clients, and

11  clients, on setting up other political action committees.

12  Q    And when you first set up these PACs, was one of the

13  understandings that it was to contribute to conservative

14  candidates?

15  A    Absolutely.  And for one PAC particularly, as it being

16  called Conservative Persons In, yes.

17  Q    Okay.  And what was your understanding at the time of

18  whether these PACs had to have officers?

19  A    My understanding was that they needed to, and I advised

20  my client that.

21  Q    Okay.  Do you remember when you gave a deposition in the

22  civil lawsuit -- and let me pull up that deposition.  Make

23  sure that's right.  We're going to go to page 29 of the

24  deposition.

25          MS. DEPPER:  And, Your Honor, this is going to be

Stewart - Cross

```
 1  for recollection, refreshing his recollection only.
 2          THE COURT:  All right.  Then don't publish to the
 3  jury.
 4          MS. DEPPER:  I will not.
 5          THE COURT:  I was talking to Ms. Black.  I know you
 6  can't.  You have super powers, but not that one.  She's in
 7  charge of the whole . . .
 8          Mr. Stewart, if you'll read through the document,
 9  see if it refreshes your recollection about this matter.
10  BY MS. DEPPER:
11  Q    And it will be the bottom of page 29, Mr. Stewart, if you
12  want to look at that.
13  A    Okay.
14  Q    And you can look at the last question that's asked and
15  then your answer.
16  A    Okay.
17          I've read it.
18          THE COURT:  Now remove the document.
19  BY MS. DEPPER:
20  Q    And Mr. Stewart, now reviewing that, at the time you
21  created these PACs, did you believe that officers were
22  required?
23  A    No.
24  Q    Okay.
25  A    It is a best practice.
```

Stewart - Cross

```
 1  Q    But not required?

 2  A    Correct.  And I think I said that on my direct, as well,

 3  that it was a best practice that a PAC have officers.

 4  Q    Understood.

 5            I wanted to look at, if we can, Government

 6  Exhibit 30.  If we could put that up, and it has already been

 7  admitted.

 8            Mr. Stewart, Government Exhibit 30, about midway

 9  down, when Mr. Baker is sending you this list of individuals,

10  candidates, amounts to be sent to them, at the bottom of that

11  where he's listing the candidates and amounts, he puts, okay,

12  question mark, question mark, question mark, question mark.

13  Do you see that?

14  A    I do.

15  Q    Okay.

16  A    I do.

17  Q    And would you agree with me that the question "okay" is

18  looking to confer with you on whether you should contribute to

19  these candidates?

20  A    No, ma'am, I would not agree with that.

21  Q    Okay.  You believe that okay, question mark, question

22  mark, question mark, is actually directing you to make those

23  contributions; is that right?

24  A    No, ma'am, I would not agree with that statement either.

25  Q    Okay.  Then what do you think that means, "okay"?
```

Stewart - Cross

1    A      In this, the context of this e-mail is, he is saying,

2    here's the PAC, here's the amount, here's who the check's

3    going to be written to, and then, okay, as saying, okay,

4    question mark, that we have the money and we can do that to

5    all of these candidates.

6    Q      But he doesn't say, okay, question mark, do we have the

7    money, he just says, okay, question mark; is that right?

8    A      Correct.

9    Q      Okay.  And you actually did make the decisions, because

10   sometimes you didn't follow his recommendation in this e-mail;

11   is that right?

12   A      Correct.

13   Q      There were times when you didn't give the amount that he

14   stated in this e-mail; is that correct?

15   A      Correct.

16   Q      And ultimately you're the person who makes the decision,

17   because you're the person who signs the check and sends it; is

18   that correct?

19   A      That's incorrect.

20   Q      How is that incorrect?

21   A      Because where I would make a decision is if there wasn't

22   enough money in the account, for instance, where he wanted

23   $1500 to go to Maggio from the CIT PAC, it didn't have that

24   much money in it, so I wrote the check for $1450.

25   Q      But you'd agree with me that Mr. Baker couldn't sign a

Stewart - Cross

```
 1   check for the PAC and send it out; is that correct?
 2   A    Obviously not, because he wasn't the signature agent at
 3   the bank.
 4   Q    Right.  That was you?
 5   A    Absolutely.
 6   Q    If we can look at Government Exhibit 19.  And in 19,
 7   Mr. Stewart, this is the handwritten list that you had
 8   testified to earlier, and I just have some questions for you.
 9   A    Okay.
10   Q    At the bottom we see the PACs that already existed.  Do
11   you see that?
12   A    Yes, ma'am.
13   Q    Okay.  We see CEG PAC.  Were you familiar with that PAC?
14   A    No, ma'am.
15   Q    You had not set up that PAC?
16   A    No, ma'am.
17   Q    Okay.  Do you know who John Nabholz is?
18   A    No, ma'am.
19   Q    DBH PAC, this was a PAC that you had set up prior; is
20   that correct?
21   A    No, ma'am, I don't believe so.
22   Q    But that was another Bruce Hawkins PAC; is that correct?
23   A    Correct.
24   Q    And the DBH2 PAC was ultimately a Bruce Hawkins PAC, as
25   well?
```

Stewart - Cross

```
 1   A     It was not a Bruce Hawkins PAC.  That was a PAC -- the

 2   DBH2 was a PAC that was directed to be set up by Mr. Baker.

 3   Q     Okay.  But ultimately Mr. Hawkins' attorney took over

 4   that PAC; is that right?

 5   A     That is correct.

 6   Q     Okay.  I'm going to go over with you a bit of PAC

 7   records, and this can get a little clunky.

 8   A     Okay.

 9   Q     But I'll try my best.

10   A     Sure thing.

11   Q     We're going to start with exhibit -- defense exhibit 11A.

12   And Mr. Stewart, defense exhibit 11A is the PAC records that

13   you filed associated with The Thomas Group In PAC.  Do you see

14   that opening page that lists the documents in it from the

15   Secretary of State?

16   A     I do.

17   Q     Let's go through a little of this, and I'll try to keep

18   it quick.

19         Let's first go to page 3504.  And 3504 is the

20   October 15th of 2013 quarterly reporting form.  Do you see

21   that?

22   A     I do.

23   Q     Okay.  Can you explain for the jury what a quarterly

24   reporting form is?

25   A     Yes.  Under Arkansas law, political action committees
```

Stewart - Cross

1    have to file quarterly reports that would say, here's how much

2    money we have in the bank account; if we've spent any money

3    out of those PACs, if you have, who have those checks been

4    written to, and to do the best that you can to keep up with

5    any other type of expenditures.

6            That's, you know, fees related to the PACs, legal

7    fees.  It could be check charge fees.  You know, any

8    expenditures.  And the best practices is and the rules for the

9    Ethics Commission is disclosure.  You're trying to disclose

10   and give the Ethics Commission and people of Arkansas what the

11   PAC is doing, and you do those quarterly.

12   Q    And ultimately what you're showing is money going out and

13   money coming in.  Is that --

14   A    Correct.

15   Q    -- is that a good summary?

16   A    Yes.

17   Q    So here on 3504, we're looking at the quarterly report

18   for The Thomas Group PAC for October 15th of 2013, and we see

19   your signature there; is that correct?

20   A    That's correct.

21   Q    If we go to the next page, which is 3505, we see a

22   contribution into that pack, and that's MSM Properties, do you

23   see that?

24   A    I do.

25   Q    And MSM Properties is owned by Michael Morton; is that

Stewart - Cross

```
 1  correct?

 2  A    I have no direct knowledge of that.

 3  Q    Okay.  Let's go to 3555.  And 3555 is another quarterly

 4  report for The Thomas Group In PAC.  Do you see that?

 5  A    I do.

 6  Q    The date of that is April 7th of 2014.  Do you see that?

 7  A    Yes.

 8  Q    And that is your signature on that page; is that correct?

 9  A    It is.

10  Q    Okay.  Let's go to page 3559.  And 3559, this is listing

11  contributions that the PAC has made; is that correct?

12  A    Correct.

13  Q    Okay.  And do we see on there that that PAC made a

14  contribution to Maggio for Judge; is that correct?

15  A    Yes.

16  Q    For 250?

17  A    Correct.

18  Q    Okay.  And then we also see a contribution made to

19  Re-elect Senator Holland, and that looks like a state senate

20  race, and that was $200; is that correct?

21  A    Correct.

22  Q    So this PAC contributed to more than just Michael Maggio;

23  is that correct?

24  A    Yes, that's what this record would show, yes.

25  Q    Okay.  Let's go to 11B.  And 11B, Mr. Stewart, are the
```

Stewart - Cross

1  PAC records for the Go Good Government PAC.  Do you see that?

2  A    I do.

3  Q    Okay.  Let's go through some of these.  Let's start with

4  3566.  Or, I'm sorry, let's go to 3579.  And 3579, what does

5  this show, Mr. Stewart?

6  A    This is the quarterly reporting form for January 15th of

7  Go Good Government PAC.

8  Q    Okay.  And that is your signature on that; is that

9  correct?

10  A    It is.

11  Q    Okay.  If we can go to 3583.  And Mr. Stewart, that shows

12  that that PAC made a contribution to Maggio for Judge; is that

13  correct?

14  A    Correct.

15  Q    Okay.  Let's go to 3618.  And at 3618 is another

16  quarterly reporting form filed on April 7th of 2014; is that

17  correct?

18  A    Yes.

19  Q    Okay.  And let's go to 3622, please.  And on page 3622,

20  these are contributions that that PAC had made; is that

21  correct?

22  A    Yes.

23  Q    Okay.  And in that we see that we have the Maggio for

24  Judge contribution, and then we see a contribution for -- to

25  Hurst for state rep for $200.  Do you see that?

Stewart - Cross

```
1   A     I do.

2   Q     Okay.  And to your knowledge, that was for a state rep

3   race; is that correct?

4   A     Yes, ma'am.

5   Q     For the name Stacy Hurst; is that correct?

6   A     That's correct.

7   Q     Okay.  Let's move forward to 11C.  And Mr. Stewart, these

8   are the PAC records for the DBH2 PAC.  Do you see that?

9   A     I do.

10  Q     Okay.  If we can go to page 3630.  And is this a

11  quarterly reporting form for the DBH2 PAC filed October 15th

12  of 2013?

13  A     It is.

14  Q     Okay.  And that is your signature; is that correct?

15  A     It is.

16  Q     Okay.  Let's go to 3631.  In this we see some

17  contributors into that PAC; is that correct?

18  A     Yes, ma'am.

19  Q     Okay.  First contributor is Central Arkansas Nursing

20  Centers, correct?

21  A     Yes.

22  Q     And then we have a contributor which is the Conway County

23  Legal Beverage Association; is that correct?

24  A     It is.

25  Q     To your knowledge, is the Conway County Legal Beverage
```

Stewart - Cross

```
 1   Association linked to Michael Morton in any way?

 2   A     I have no idea.

 3   Q     Okay.  If we can go to 3635.

 4         And this is for the DBH2 PAC, this is again showing

 5   contributions that that PAC has made; is that correct?

 6   A     Yes, ma'am.

 7   Q     We see contributions to Asa for Governor; is that right?

 8   A     Yes.

 9   Q     And Asa for Governor received $2000 from this PAC,

10   correct?

11   A     Correct.

12   Q     I see David Sanders for State Senate?

13   A     Yes, ma'am.

14   Q     David Sanders received $500; is that right?

15   A     Yes, ma'am.

16   Q     Andrea Lea for Auditor received $250.  Is that correct?

17   A     Yes, ma'am.

18   Q     Bryan King for State Senate received $250; is that

19   correct?

20   A     It is correct.

21   Q     And, again, David Sanders for State Senate received a

22   thousand dollars.  Do you see that?

23   A     Yes, ma'am.

24   Q     And your testimony has been that Gilbert Baker told you

25   to make those contributions; is that right?
```

Stewart - Cross

```
 1  A    Correct.
 2  Q    And you'd agree with me that those contributions are not
 3  just contributions to Judge Maggio; is that correct?
 4  A    Absolutely.
 5  Q    Okay.  Let's go to 11D.
 6            Mr. Stewart, 11D for the PAC records for Citizens
 7  for Information Technology.  Do you see that?
 8  A    I do.
 9  Q    Let's go to a quarterly report on 3780:  This quarterly
10  report was filed April 7th of 2014.  Do you see that?
11  A    I do.
12  Q    And that is your signature?
13  A    Yes, ma'am.
14  Q    Okay.  Let's go to 3783.  And on 3783, we see individuals
15  that this PAC has contributed to; is that right?
16  A    Correct.
17  Q    Okay.  And we see Hurst for State Rep, right?
18  A    Yes, ma'am.
19  Q    A thousand dollars.
20  A    Yes, ma'am.
21  Q    Okay.  And that's Stacy Hurst, correct?
22  A    It is.
23  Q    Okay.  We also see a donation that was made to Judge
24  Maggio; is that correct?
25  A    That is correct.
```

Stewart - Cross

```
 1   Q    Okay.  So you'd agree with me that Judge Maggio isn't the

 2   only one that's getting contributions from this PAC?

 3   A    I agree.

 4   Q    Okay.  Gilbert Baker had directed you to make the

 5   donation to Stacy Hurst; is that correct?

 6   A    That is correct.

 7   Q    Okay.  Let's go to 11E.  And this is the Citizens for

 8   Judicial Reform PAC.  Do you see that, Mr. Stewart?

 9   A    I do.

10   Q    Okay.  Let's go to 3848.  3848 is a quarterly reporting

11   form for the Citizens for Judicial Reform PAC filed April 7th

12   of 2014.  Do you see that?

13   A    I do.

14   Q    That's your signature on that page?

15   A    Yes, ma'am.

16   Q    Let's go to 3852.  And on 3852 we see contributions that

17   have been made by the PAC to candidates, correct?

18   A    Yes.

19   Q    And we see a donation or contribution made to Maggio; is

20   that correct?

21   A    Yes, ma'am.

22   Q    We also see a contribution made to Senator Holland; is

23   that correct?

24   A    Yes, ma'am.

25   Q    So, again, Maggio is not the only one receiving
```

Stewart - Cross

1    contributions from this PAC?

2    A    No, ma'am.

3    Q    Okay.  Gilbert Baker directed you to make the payment to

4    Senator Holland; is that correct?

5    A    Correct.

6    Q    11F, Taxpayers for Change PAC Records.  Does that appear

7    to be the Taxpayers for Change Tax Records on 11F?

8    A    Yes.

9    Q    Let's go to 3859, please.  Mr. Stewart, 3859, another

10   quarterly reporting form, this one for Taxpayers for Change

11   filed October 15th of 2013.  Do you see that?

12   A    I do.

13   Q    And that is your name there?

14   A    It is.

15   Q    Okay.  Let's go to 3865.  3865, these are the

16   contributions made by the PAC.  Do you see that?

17   A    I do.

18   Q    We have a contribution made to Andrea Lea for auditor for

19   500 bucks.  Do you see that?

20   A    I do.

21   Q    And that's not Judge Maggio, right?

22   A    No, ma'am.

23   Q    Okay.  And Mr. Baker directed you to make that payment?

24   A    Correct.

25   Q    Okay.

Stewart - Cross

```
 1              THE COURT:  Ms. Depper.

 2              MS. DEPPER:  Yes, Your Honor.

 3              THE COURT:  I think the jury gets the point.

 4              MS. DEPPER:  Okay.  Because, Judge, I can go through

 5   all of them.  You know I will.

 6              THE COURT:  I know you would gladly do it, but let's

 7   move on to something else.

 8              MS. DEPPER:  Okay, Your Honor.

 9   BY MS. DEPPER:

10   Q    I'll sum it up with if we went through the rest of these,

11   you would see other contributions to other candidates; is that

12   correct?

13   A    I would most likely agree with that, yes.

14   Q    Okay.  I want to get to, in these PAC reports, there were

15   times when you filed amendments; is that correct?

16   A    Correct.

17   Q    And there were times when you filed amendments prior to

18   the issue of any officers contacting you and having problems

19   with being an officer, you filed amendments prior to that; is

20   that correct?

21   A    If you say -- I wouldn't say probably, because oftentimes

22   you have to make amendments to PAC reports.

23   Q    Okay.

24   A    I mean, it's just . . .

25   Q    What are some of the reasons you make amendments to PAC
```

Stewart - Cross

1   reports?

2   A    For instance, if you get a bank statement back and it has

3   charges for checks that maybe, you know, you didn't report the

4   first time, so you have to disclose that.  You have to say,

5   oh, here's, you know, we were charged $19 for a box of checks,

6   you know.  Or if there was a contribution that came back, you

7   would have to make an amendment, and you would do that.

8            If a PAC officer wanted to come off and no longer --

9   you know, didn't know they were a PAC officer, then you have

10  to file an amendment, you gotta take him off.

11  Q    I want to go through a couple of your amendments with

12  you.

13  A    Sure.

14  Q    Let's look at The Thomas Group PAC records, 11A, and

15  let's look at page 3504 of 11A.  And this is on an

16  October 15th, 2013, quarterly report; is that correct?

17  A    Yes.

18  Q    Okay.  And then you ultimately file an amendment to that

19  report, and we're going to have to compare as easily as I can

20  with this.

21  A    Okay.

22  Q    That amendment is found on 3528 and we can tell it was an

23  amendment because it looks like it was filed on March 31st of

24  2014, but it notes, one, that it's an amendment, and, two,

25  that it's the October 15th quarterly, right?

Stewart - Cross

1    A    Okay.

2    Q    Is that how that works?

3    A    Yes.

4    Q    So it would be that this quarterly report filed on

5    March 31st is actually an amendment to the October 15th

6    report, right?

7    A    Correct.

8    Q    Okay.  And I just want to compare those reports, because

9    I think I know why you made the amendment, but I want to check

10   with you.

11   A    Okay.

12   Q    Okay.  So if we look at 3505.  Okay.  And on this --

13   remember this, 3505 is part of the first report, the October

14   report, not the amendment.  And on that, you note that the

15   date you received the check from MSM Properties is July 8th of

16   2013.  Do you see that?

17   A    I do.

18   Q    Now, let's compare that same page with the page that's in

19   the amendment, and that's on 3529.  And if we look at this

20   page, we see that the date has been changed of that check from

21   7/9 to 7/19/13; is that correct?

22   A    Correct.

23   Q    And my understanding, Mr. Stewart, that this was changed

24   because when you put the date, it's actually the date that the

25   PAC received it; is that right?

Stewart - Cross

```
1    A    Correct.

2    Q    So the new date that you put on here is the correct date,

3    the date the PAC received it?

4    A    Correct.

5    Q    Okay.

6    A    The date that it is -- so there's a distinction in the

7    law.  I mean, you have to make -- it's for a candidate or for

8    a PAC, for anybody that's receiving contribution funds, you

9    have to write -- you report it as the date you received it,

10   not the date that somebody writes on the check.

11   Q    Right.  And so a small error?

12   A    Correct.

13   Q    But an error that needed to be fixed?

14   A    Yes.  And the law is, and under the ethics rules, it's

15   all about disclosure.  So if it's sometime further down the

16   road, you say, oh, I need to make sure that I correct that.

17   You just correct it, you file an amendment.

18   Q    And like the other PAC records that we were going through

19   here, I can go through and go through the various amendments

20   and the changes that were made, but can you agree with me that

21   there were some small technical errors here and there that you

22   needed to fix with an amendment?

23   A    Yes, and that's normal in campaign contribution work if

24   you're a candidate or a PAC, because there's so much money

25   that moves in and out, and at the end of the day whenever the
```

Stewart - Cross

1    campaign closes or the PAC closes, you want to do a full

2    reconciliation.  And so that's very common.

3    Q    And I want to talk to you about one other change, just

4    because I find it interesting.  Let's look at the Red Arkansas

5    PAC records, which is 11H.  And let's go to 3985.

6              Mr. Stewart, 3985, so this is the PAC registration

7    form for 2013.  Do you see that?

8    A    Yes.

9    Q    Okay.  You're listed as a resident agent, if we go

10   further down on that page.  Steve Goode is listed as an

11   officer.  Do you see that?

12   A    I do.

13   Q    Okay.  And then we see his phone number there as

14   (870)796-3984.  It's small print, but do you see that?

15   A    I do.

16   Q    Okay.  Let's move on to the page 3999.  And this,

17   Mr. Stewart, I believe, if we can scroll up a little bit, is

18   the PAC registration form from 2014.  Do you see that, the

19   following year?

20   A    I do.

21   Q    Okay.  And on that, if we look down, it lists Steve

22   Goode's phone number.  Instead of 870, it's now 501.  Do you

23   see that?

24   A    I do.

25   Q    Error, but an error in contact; is that correct?

Stewart - Cross

1  A     Probably.  It's the first -- actually, it's the first

2  time I've ever seen that.

3  Q     Okay.  Moving on past these PAC records to exhibit 14.

4            THE COURT:  Ms. Depper, a question.

5            MS. DEPPER:  Yes, Your Honor.

6            THE COURT:  How much more do you anticipate with

7  this witness?

8            MS. DEPPER:  Probably, Your Honor, 10 to 15 minutes.

9            THE COURT:  Hmm.  Why don't we -- I confess that I'm

10 ready for lunch, ladies and gentlemen, and I suspect maybe one

11 or two of you are, as well.  So we will take our lunch break.

12           The usual rules of the road:  Give your pads to

13 Officer Pike to take care of during the lunch break.  Don't

14 let anybody talk to you with the case, and don't talk to

15 anybody about the case.  Keep your word to me on all the

16 things you're not supposed to be doing.

17           All rise for the jury.

18     (The jury exits the courtroom.)

19           THE COURTROOM SECURITY OFFICER:  Judge, what time

20 would you like to return?

21           THE COURT:  Have them in the hall, please, at

22 1:00 o'clock.

23           COURTROOM SECURITY OFFICER:  Yes, sir.

24           THE COURT:  Thank you.

25           You can step down, Mr. Stewart.  Sorry to hold you

Stewart - Cross

```
 1  over.
 2           THE WITNESS:  That's okay.
 3           THE COURT:  Don't talk with anybody about your
 4  testimony during the lunch break.
 5           THE WITNESS:  You got it.
 6           THE COURT:  Thank you.
 7           THE WITNESS:  Thank you, Judge.
 8           THE COURT:  Ms. Depper, you were making good
 9  progress, and I am hungry, but --
10           MS. DEPPER:  I understand, Your Honor.
11           THE COURT:  No, no.  I've got a better view of the
12  jury than you do, and some folks were fading.
13           MS. DEPPER:  I hear you.
14           THE COURT:  So better to take a break and get full
15  attention.
16           MS. DEPPER:  Happy to, Your Honor.
17           THE COURT:  Ms. Peters, any ground to cover?
18           MS. PETERS:  No, Your Honor.
19           THE COURT:  Okay.  Ms. Depper or Mr. Hendrix, any
20  ground to cover?
21           MR. HENDRIX:  No, sir.
22           THE COURT:  Very good.  I think I'm going to dance
23  down to chambers, given our news about Pat Harris.  I thank
24  y'all again for counseling with me and working with me on what
25  we should do.  I think we just must use it as a reminder of
```

 1   how increased vigilance has got to be the order of the day as

 2   we get the rest of this trial done.

 3          Ms. Black's going to get on to the -- back in the

 4   cleaning swing for our witness box, whether we've got somebody

 5   vaccinated or not.  We're going to use the ELMO instead of

 6   approaching.  And we're going to stay away from each other in

 7   here to the extent that we can and do the hall conferences

 8   instead of the bench conferences.

 9          And in addition to substituting in here, Mr. White

10   is going to take Mr. Harris some chicken soup so that when we

11   resume on Monday, he'll be here.  Right?

12          MR. WHITE:  I was thinking that same thing, Judge.

13          THE COURT:  I thought so.

14          We're in recess.

15      (A recess was taken from 11:58 a.m. to 1:00 p.m.)

16                     *  *  *  *  *

17

18

19

20

21

22

23

24

25

```
1                            * * * * *

2                          I N D E X

3    Testimony of Michael Maggio (Resumed)

4            Redirect by Ms. Peters              748

5            Recross by Mr. Hendrix              752

6    Testimony of Chris Stewart

7            Direct by Ms. Peters               757

8            Cross by Ms. Depper                840

9                            * * * * *

10                         I N D E X

11   Government's Exhibits in Evidence:

12           Government's 16                     765

13           Government's 17                     769

14           Government's 31                     771

15           Government's 18                     772

16           Government's 19                     776

17           Government's 20                     782

18           Government's 21                     784

19           Government's 22                     787

20           Government's 43                     790

21           Government's 45                     791

22           Government's 46                     792

23           Government's 47                     793

24           Government's 48                     794

25           Government's 49                     795
```

```
 1                          * * * * *
 2                  E X H I B I T S (Cont.'d)
 3           Government's 44                      796
 4           Government's 34A through 34c         803
 5           Government's 35A through 35C         803
 6           Government's 24 and 25              804
 7           Government's 36A through 36C         804
 8           Government's 50 through 53          805
 9           Government's 26 through 28          805
10           Government's 29 through 30          805
11           Government's 32A through 32K         807
12           Government's 54 through 60          830
13   Defendant's Exhibits in Evidence:
14           Defendant's 11A through 11H          839
15           Defendant's 14 and 15              840
16                          * * * * *
17                  CERTIFICATE OF REPORTER
18        I, Stephen W. Franklin, Registered Merit Reporter, and
19   Certified Realtime Reporter, certify that the foregoing is a
20   correct transcript, to the best of my ability, from the record
21   of proceedings in the above-entitled matter.
22        Dated this 29th day of JULY, 2021.
23
24        /s/Stephen W. Franklin
         _____
25        Stephen W. Franklin, RMR, CRR
```